**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

UNITED STATES OF AMERICA

v.

CHRISTOPHER KYLE JOHNSTON,
TRENT BROCKMEIER, and
CHRISTOPHER CASSERI

Crim. No. 20-800 (RBK)

*Document Electronically Filed*

# OMNIBUS BRIEF IN SUPPORT OF DEFENDANT JOHNSTON'S PRETRIAL MOTIONS

**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07030
(973)596-4500

*Attorneys for Defendant*
*Christopher Kyle Johnston*

# TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES ........ iii

PRELIMINARY STATEMENT ........ 1

ARGUMENT ........ 3

I. The Indictment Fails To Sufficiently Allege Venue in New Jersey in Violation of the Constitution and Federal Rule of Criminal Procedure 18, and Accordingly Should Be Dismissed. ........ 3

A. Legal Standard ........ 4

B. The Conspiracy Counts, Charged in Counts 1 And 2, Should Be Dismissed Because The Alleged Agreements Were Not Formed In New Jersey And None Of The Alleged Overt Acts In Furtherance Of The Conspiracies Occurred In New Jersey. ........ 7

C. The Money Laundering Counts Should Be Dismissed Because The Financial Transaction And Underlying Unlawful Activity, If Any, Did Not Occur In New Jersey. ........ 16

II. Count 1 of the Indictment Must be Dismissed Because the Statutes, As Applied, Are Void for Vagueness. ........ 20

A. Legal Standard ........ 20

B. The Vague Term "Medically Unnecessary" Renders the Statutes Void for Vagueness, As Applied ........ 22

C. The Remaining Allegations In Count 1 Are Insufficient To Allege An Offense and Provide Notice to Defendants That Their Actions Were Criminal. ........ 27

D. Dismissal Is The Appropriate Remedy. ........ 29

III. Count 2 of the Indictment Should be Dismissed for Failure to Charge an Offense ........ 31

A. In light of the Supreme Court's recent decision in *Dubin v. United States*, the "use" of the "means of identification of another person" must be at the crux of an identity theft offense. ........ 31

B. The Indictment Fails to Satisfy the *Dubin* Test. ........ 37

Table of Contents (continued)

Page


IV. In the Alternative, the Government Must Elect a Conspiracy to Charge on Multiplicity Grounds ....38

V. Counts 4, 5, 6, 9, 10, 13, 14, 17, 19, 21, and 23 Should Be Dismissed for Failure to State an Offense ....45

VI. If the Indictment Survives The Motion to Dismiss, The Court Should Order the Government to Provide a Bill of Particulars ....49

A. The Court Should Order the Government to Provide a Bill of Particulars to Remedy the Fundamental Pleading Defects Permeating Throughout The Indictment. ....53

1. The Government Should Identify The Unnamed "Others" With Whom Mr. Johnston Is Alleged To Have Agreed And Conspired. ....54

2. The Government Should Identify Where, Including The "Elsewhere" Alleged In The Indictment, The Alleged Crimes Occurred. ....57

B. The Court Should Order the Government to Provide a Bill of Particulars to Provide Necessary Details Required In Light of the Allegations Set Forth in in Count 1 of the Indictment. ....59

1. The Government Does Not Specify How Mr. Johnston Participated In The Alleged Conspiracy to Commit Health Care Fraud and Wire Fraud. ....59

VII. Prejudicial Information Concerning The Amount Of Money That Mr. Johnston Purportedly Received From Central Rexall As Part Of The Alleged Conspiracy To Commit Health Care And Wire Fraud Should Be Stricken From The Indictment As Surplusage. ....67

CONCLUSION .... 71

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Albernaz v. United States*,
450 U.S. 333 (1981)....................40

*Arriaga v. Mukasey*,
521 F.3d 219 (2d Cir. 2008)....................21

*Blockburger v. United States*,
284 U.S. 299 (1932)....................39, 40, 42

*Bond v. United States*,
564 U.S. 211 (2011)....................35

*Bond v. United States*,
572 U.S. 844 (2014)....................35

*Braverman v. United States*,
317 U.S. 49 (1942)....................41

*Castillo v. United States*,
530 U.S. 120 (2000)....................36

*Ciminelli v. United States*,
598 U.S. 306 (2023)....................36, 37

*Connally v. General Constr. Co.*,
269 U.S. 385 (1926)....................20

*Draper v. Airco, Inc.*,
580 F.2d 91 (3d Cir. 1978)....................70

*Dubin v. United States*,
599 U.S. 110 (2023).................... *passim*

*Finch v. Hercules Inc.*,
CIV. A. 92-251 MMS, 1995 WL 785100 (D. Del. Dec. 22, 1995) ....................71

*Grier v. Goetz*,
402 F. Supp. 2d 876 (M.D. Tenn. 2005), *order clarified*, 421 F. Supp. 2d 1080
(M.D. Tenn. 2006) ....................26

*Heffner v. Murphy*,
745 F.3d 56 (3d Cir. 2014)....................21

*Johnson v. United States*,
576 U.S. 591 (2015)....................................................................................................20, 26

*Jones v. United States*,
529 U.S. 848 (2000)..........................................................................................................35

*Kelly v. United States*,
590 U.S. —, 140 S. Ct. 1565 (2020)...............................................................................36, 37

*Kolender v. Lawson*,
461 U.S. 352 (1983).............................................................................................21, 24, 27

*Nebraska Press Ass'n v. Stuart*,
427 U.S. 539 (1976)..............................................................................................................4

*Parker v. Levy*,
417 U.S. 733 (1974)....................................................................................................21, 28

*Salinas v. United States*,
522 U.S. 52 (1997)............................................................................................................49

*Sessions v. Dimaya*,
138 S. Ct. 1204 (2018)................................................................................................24, 27

*Shaw v. Delta Air Lines, Inc.*,
463 U.S. 85 (1983)............................................................................................................33

*Sheeran v. Blyth Shipholding S.A.*,
No. 14-5482, 2015 WL 9048979 (D.N.J. Dec. 16, 2015)..................................................61

*Sizemore v. Fletcher*,
921 F.2d 667 (6th Cir. 1990) ............................................................................................70

*Staples v. United States*,
511 U.S. 600 (1994)..........................................................................................................36

*Stirone v. United States*,
361 U.S. 212 (1960)....................................................................................................30, 31

*Travis v. United States*,
364 U.S. 631 (1961)..............................................................................................................5

*United States v. Addonizio*,
451 F.2d 49 (3d Cir. 1971).............................................................................50, 51, 58

*United States v. Agnello*,
367 F. Supp. 444 (E.D.N.Y. 1973) ...................................................................51, 56, 60

*United States v. Alsugair*,
256 F. Supp. 2d 306 (D.N.J. 2003) .......... 30, 68

*United States v. Anderson*,
328 U.S. 699 (1946) .......... 6

*United States v. Arledge*,
553 F.3d 881 (5th Cir. 2008) .......... 70

*United States v. Atwell*,
No. 13-cr-0560, 2015 WL 2092687 (D.N.J. May 5, 2015) .......... 50

*United States v. Auernheimer*,
748 F.3d 525 (3d Cir. 2014) .......... *passim*

*United States v. Barnes*,
158 F.3d 662 (2d Cir. 1998) .......... 63

*United States v. Bass*,
404 U.S. 336 (1971) .......... 35

*United States v. Bin Laden*,
92 F. Supp. 2d 225 (S.D.N.Y. 2000), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93 (2d Cir. 2008) .......... 55

*United States v. Birks*,
656 F. Supp. 2d 454 (D.N.J. 2009) .......... 13, 16

*United States v. Bortnovsky*,
820 F.2d 572 (2d Cir. 1987) .......... 51, 67

*United States v. Bowens*,
224 F.3d 302 (4th Cir. 2000) .......... 6

*United States v. Brassington*,
09-CR-45 DMC, 2010 WL 3982036 (D.N.J. Oct. 8, 2010) .......... 12

*United States v. Brennan*,
452 F. Supp. 3d 225 (E.D. Pa. 2020) .......... 6, 15

*United States v. Brooks*,
438 F.3d 1231 (10th Cir. 2006) .......... 68

*United States v. Bryant*,
556 F. Supp. 2d 378 (D.N.J. 2008) .......... 71

*United States v. Bullock*,
451 F.2d 884 (5th Cir. 1971) .......... 68

*United States v. Butler*,
211 F.3d 826 (4th Cir.2000) ....................48, 49

*United States v. Cabrales*,
524 U.S. 1 (1998).................... *passim*

*United States v. Carter*,
576 F.2d 1061 (3d Cir. 1978)....................39

*United States v. Caruso*,
948 F. Supp. 382 (D.N.J. 1996) ....................39

*United States v. Castro*,
776 F.2d 1118 (3d Cir. 1985)....................30

*United States v. Cerna*,
No. CR 08-0730, 2009 WL 2998929 (N.D. Cal. Sept. 16, 2009)....................50, 61, 65, 66

*United States v. Cole*,
717 F. Supp. 309 (E.D. Pa. 1989) ....................52, 67

*United States v. Concord Mgmt. & Consulting LLC*,
385 F. Supp. 3d 69 (D.D.C. 2019) ....................54, 60

*United States v. Cores*,
356 U.S. 405 (1958)....................4

*United States v. Cree*,
No. 12-26(4), 2012 WL 6194395 (D. Minn. Dec. 12, 2012)....................54

*United States v. Daraio*,
445 F.3d 253 (3d Cir. 2006)....................30, 31

*United States v. Davidoff*,
845 F.2d 1151 (2d Cir. 1998)....................51

*United States v. Davis*,
588 U.S. —, 139 S. Ct. 2319 (2019)....................20, 24

*United States v. DeGroote*,
122 F.R.D. 131 (W.D.N.Y. 1988)....................56

*United States v. DePaoli*,
41 F. App’x 543 (3d Cir. 2002) ....................50

*United States v. Fallon*,
61 F.4th 95 (3d Cir. 2023) ....................19, 47, 49

*United States v. Fischbach & Moore, Inc.*,
576 F. Supp. 1384 (W.D. Pa. 1983)....................62, 63

*United States v. Foster*,
740 F.2d 1202 (8th Cir. 2014)....................33

*United States v. Fumo*,
Cr. No. 06-319, 2008 WL 1731911 (E.D. Pa. Apr. 10, 2008....................41

*United States v. Gatto*,
746 F. Supp. 432 (D.N.J. 1990), *rev'd on other grounds*, 690 F.2d 60 (3d Cir. 1982)....................54, 58, 62

*United States v. Goldberg*,
830 F.2d 459 (3d Cir. 1987)....................10

*United States v. Greenidge*,
495 F.3d 85 (3d Cir. 2007)....................45

*United States v. Handakas*,
286 F.3d 92 (2d Cir. 2002), *overruled on other grounds*....................20, 24

*United States v. Hawit*,
No. 15-CR-252 (PKC), 2017 WL 663542 (E.D.N.Y. Feb. 17, 2017)....................66

*United States v. Hearod*,
499 F.2d 1003 (5th Cir. 1974)....................39

*United States v. Hedgepeth*,
434 F.3d 609 (3d Cir. 2006)....................30, 68

*United States v. Hickey*,
16 F. Supp. 2d 223 (E.D.N.Y. 1998)....................58

*United States v. Hird*,
913 F.3d 332 (3d Cir. 2019)....................12, 22

*United States v. Hodge*,
870 F.3d 184 (3d Cir. 2017)....................39

*United States v. Huet*,
665 F.3d 588 (3d Cir. 2012)....................46

*United States v. Hughes*,
766 F. 2d 875 (5th Cir. 1985)....................68

*United States v. Iannelli*,
339 F. Supp. 171 (W.D. Pa. 1972)....................56

*United States v. Irving*,
316 F. Supp. 3d 879 (E.D. Pa. 2018) ....................41

*United States v. Jackson*,
No. 3:16-CR-31, 2016 WL 6495589 (N.D. W.Va. Nov. 2, 2016)....................62

*United States v. Jackson-Randolph*,
282 F.3d 369 (6th Cir. 2002) ....................70

*United States v. Johnson*,
130 F.3d 1420 (10th Cir.1997) ....................44

*United States v. Johnson*,
323 U.S. 273 (1944)....................4

*United States v. Jones*,
471 F.3d 478 (3d Cir. 2006)....................37

*United States v. Jordan*,
No. 3:06-CR-102, 2007 WL 1849985 (E.D. Tenn. June 25, 2007)....................58

*United States v. Kelly*,
892 F.2d 255 (3d Cir. 1989)....................30

*United States v. Kemp*,
500 F.3d 257 (3d Cir. 2007)....................30

*United States v. Kennedy*,
682 F.3d 244 (3d Cir. 2012)....................39, 42

*United States v. Kensington Hosp.*,
760 F. Supp. 1120 (E.D. Pa. 1991) ....................61

*United States v. Korbe*,
No. 2:09-CR-0005, 2010 WL 2404384 (W.D. Pa. June 10, 2010)....................52, 65

*United States v. Kurlander*,
Crim No. 11-315 (WHW), 2012 WL 2263290 (D.N.J. June 14, 2012) ....................40

*United States v. L. Cohen Grocery Co.*,
255 U.S. 81 (1921)....................26

*United States v. Lampley*,
573 F.2d 783 (3d Cir. 1978)....................45

*United States v. Lattanzio*,
CR 15-446 (KM), 2018 WL 1837856 (D.N.J. Apr. 16, 2018) ....................70

*United States v. Lavin*,
504 F. Supp. 1356 (N.D. Ill. 1981) .....71

*United States v. Liotard*,
817 F.2d 1074 (3d Cir. 1978).....40, 41, 43, 44

*United States v. Loney*,
219 F.3d 281 (3d Cir. 2000).....34

*United States v. Long*,
697 F. Supp. 651 (S.D.N.Y. 1988) .....59

*United States v. Long*,
No. 1:08-CR-043, 2008 WL 11336760 (N.D. Ga. Oct. 3, 2008) .....55

*United States v. Lovett*,
964 F.2d 1029 (10th Cir. 1992) .....48

*United States v. Loy*,
237 F.3d 251 (3d Cir. 2001).....20

*United States v. Mango*,
No. 96-CR-327, 1997 WL 222367 (N.D.N.Y. May 1, 1997).....62

*United States v. Marcavage*,
609 F.3d 264 (3d Cir. 2010).....22

*United States v. Mariani*,
90 F. Supp. 2d 574 (M.D. Pa. 2000).....55, 59

*United States v. McCoy*,
492 F. Supp. 540 (M.D. Fl. 1980).....64

*United States v. McGhee*,
No. 3:06-CR-19, 2007 WL 1296009 (E.D. Tenn. May 1, 2007).....58

*United States v. Menendez*,
137 F. Supp. 3d 688 (D.N.J. 2015), *aff'd*, 831 F.3d 155 (3d Cir. 2016).....7

*United States v. Miller*,
471 U.S. 130 (1985).....30

*United States v. Mitan*,
CRIM. A. 08-760-1, 2009 WL 1651288 (E.D. Pa. June 11, 2009) .....69

*United States v. Mitchell*,
652 F.3d 387 (3d Cir. 2011).....21

*United States v. Morales-Lopez*,
No. 2:20-cr-27-JNP, 2022 WL 2355920 (D. Utah June 30, 2022)....................................22, 24

*United States v. Moyer*,
674 F.3d 192 (3d Cir. 2012)....................................................................50, 57, 58, 60

*United States v. Nachamie*,
91 F. Supp. 2d 565 (S.D.N.Y. 2000)..............................................................55, 62, 64

*United States v. Nasir*,
17 F.4th 459 (3d Cir. 2021) ..........................................................................................36

*United States v. Nat'l Dairy Prods. Corp.*,
372 U.S. 29 (1963)..........................................................................................................21

*United States v. Nestor*,
No. 3:09-CR-00397, 2010 WL 2696776 (M.D. Pa. July 6, 2010)..........................................55

*United States v. Newton*,
2002 WL 122911 (S.D.N.Y. Jan. 30, 2002) ......................................................................55

*United States v. Pendleton*,
658 F.3d 299 (3d Cir. 2011)..........................................................................................5, 15

*United States v. Perez*,
280 F.3d 318 (3d Cir. 2002)............................................................................... *passim*

*United States v. Peterson*,
357 F. Supp. 2d 748 (S.D.N.Y.2005)..............................................................................13

*United States v. Piervinanzi*,
23 F.3d 670 (2d Cir. 1994)..............................................................................................48

*United States v. Pinto-Thomaz*,
352 F. Supp. 3d 287 (S.D.N.Y. 2018)...............................................................................54

*United States v. Polizzi*,
257 F.R.D. 33 (E.D.N.Y. 2009) ......................................................................................39

*United States v. Pollen*,
978 F.2d 78 (3d Cir. 1992)..............................................................................................39

*United States v. Porat*,
76 F.4th 213 (3d Cir. 2023) ......................................................................36, 37, 38

*United States v. Portanova*,
961 F.3d 252 (3d Cir. 2020)..........................................................................................22

*United States v. Ramirez*,
54 F. Supp. 2d 25 (D.D.C. 1999) ........................................................................56, 61

*United States v. Redding*,
540 F. Supp. 2d 1184 (D. Kan. 2008) ..................................................................55

*United States v. Ringer*,
300 F.3d 788 (7th Cir. 2002) ...............................................................................12

*United States v. Robinson*,
974 F.2d 575 (5th Cir. 1992) ...............................................................................69

*United States v. Rodriguez-Moreno*,
526 U.S. 275 (1999).........................................................................................5, 6

*United States v. Rogers*,
617 F. Supp. 1024 (D. Colo. 1985)....................................................................65, 66

*United States v. Root*,
585 F.3d 145 (3d Cir. 2009)...............................................................................4, 7

*United States v. Roque*,
No. 12-cr-540, 2013 WL 2474686 (D.N.J. June 6, 2013) ....................................51

*United States v. Rosa*,
891 F.2d 1063 (3d Cir. 1989)..........................................................................50, 53

*United States v. Rush*,
807 F. Supp. 1263 (E.D. La. 1992) .....................................................................71

*United States v. Rutigliano*,
790 F.3d 389 (2d Cir. 2015).................................................................................10

*United States v. Safeway Stores, Maryland*,
51 F. Supp. 448 (D. Kan. 1943), *rev'd on other grounds*, *Frankfort Distilleries v. United States*, 144 F.2d 824 (10th Cir. 1944), *rev'd on other grounds*, 324 U.S. 293 (1945).........................................................................................................13

*United States v. Salerno*,
481 U.S. 739 (1987).............................................................................................21

*United States v. Sanders*,
952 F.3d 263 (5th Cir. 2020) ...............................................................................69

*United States v. Sattar*,
272 F. Supp. 2d 348 (S.D.N.Y. 2003)............................................21, 22, 23, 24

*United States v. Schweitzer*,
No. 03-00451-1, 2004 WL 1535793 (E.D. Pa. Feb. 26, 2004)....................................................68

*United States v. Schwening*,
No. 8:05CR282, 2006 WL 1559668 (D. Neb. June 5, 2006) ....................................................71

*United States v. Small*,
793 F.3d 350 (3d Cir. 2015)....................................................................................................22

*United States v. Smith*,
65 F.R.D. 464 (N.D. Ga. 1974)....................................................................................52, 63, 66

*United States v. Smith*,
82 F.3d 1261 (3d Cir. 1996)......................................................................................40, 41, 44

*United States v. Socony-Vacuum Oil Co.*,
310 U.S. 150 (1940)................................................................................................................70

*United States v. Sotelo*,
707 F. App'x 77 (3d Cir. 2017) ..........................................................................................45, 46

*United States v. Spurgeon*,
117 F.3d 641 (2d Cir. 1997)....................................................................................................34

*United States v. Stahl*,
616 F.2d 30 (2d Cir. 1980)......................................................................................................70

*United States v. Stanfa*,
685 F.2d 85 (3d Cir. 1982)..................................................................................................42, 43

*United States v. Steele*,
83 F. Supp. 2d 340 (N.D.N.Y. 2000).......................................................................................55

*United States v. Stevens*,
533 F.3d 218 (3d Cir. 2008)................................................................................................20, 27

*United States v. Taylor*,
707 F. Supp. 696 (S.D.N.Y. 1989) ..........................................................................................61

*United States v. Throneburg*,
921 F.2d 654 (6th Cir.1990) ....................................................................................................44

*United States v. Torres*,
2:20-CR-00418, 2023 WL 6389095 (D.N.J. Oct. 2, 2023) ......................................................68

*United States v. Travillion*,
759 F.3d 281 (3d Cir. 2014).............................................................................40, 41, 44, 45

*United States v. Trie*,
21 F. Supp. 2d 7 (D.D.C. 1998) ........................................ 55, 64

*United States v. Urban*,
404 F.3d 754 (3d Cir. 2005) ........................................ 49, 50, 53

*United States v. Vaid*,
No. 16 CR. 763 (LGS), 2017 WL 3891695 (S.D.N.Y. Sept. 5, 2017) ........................................ 64

*United States v. Valencia*,
600 F.3d 389 (5th Cir. 2010) ........................................ 69

*United States v. Vasquez-Ruiz*,
136 F. Supp. 2d 941 (N.D. Ill. 2001) ........................................ 62

*United States v. Vastola*,
670 F. Supp. 1244 (D.N.J. 1987) ........................................ *passim*

*United States v. Vitillo*,
490 F.3d 314 (3d Cir. 2007) ........................................ 12

*United States v. Whited*,
311 F.3d 259 (3d Cir. 2002) ........................................ 50

*United States v. Williams*,
553 U.S. 285 (2008) ........................................ 20

*United States v. Williams*,
705 F. App'x 869 (11th Cir. 2017) ........................................ 70

*United States v. Wiltberger*,
18 U.S. 76 (1820) ........................................ 36

*United States v. Woodard*,
CR 13-25-5, 2017 WL 11463711 (E.D. Pa. Dec. 15, 2017) ........................................ 7

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
455 U.S. 489 (1982) ........................................ 21

*Whitfield v. United States*,
543 U.S. 209 (2005) ........................................ 8, 16

*Zyla Life Scis., LLC v. Wells Pharma of Houston, LLC*,
4:22-cv-4400, 2023 WL 6301651 (S.D. Tex. Sept. 27, 2023) ........................................ 29

**Statutes**

18 U.S.C. § 666 ........................................ 69

18 U.S.C. § 667.....69

18 U.S.C. § 1028(a)(7)..... *passim*

18 U.S.C. § 1028A(a)(1).....32, 33

18 U.S.C. § 1343.....10, 13, 23

18 U.S.C. § 1347.....10, 13, 23

18 U.S.C. § 1349.....9, 22

18 U.S.C. § 1956.....45, 46

18 U.S.C. § 1956(i)(1).....16, 18

18 U.S.C. § 1956(a).....47

18 U.S.C. § 1956(c)(7)(F).....46

18 U.S.C. § 1956(h).....45

18 U.S.C. § 1957(a).....45, 46

18 U.S.C. § 1957(f)(2).....46

18 U.S.C. § 1957(f)(3).....46, 47

18 U.S.C. § 2315.....69

18 U.S.C. § 2339B.....23

18 U.S.C. § 3237.....7, 8, 10

**Other Authorities**

B. Sonny Bal, Lawrence H. Brenner, *The Law and Social Values: Medical Necessity and Criminal Prosecution*, 474(4) Clin. Orthop. Relat. Res. 887 (2016).....26

*Department of Health and Human Services, Medical Necessity in Private Health Plans,* https://hsrc.himmelfarb.gwu.edu/cgi/viewcontent.cgi?article=1170&context=sphhs_policy_facpubs.....25

Jim Maguire, *Specialty Pharmacy Work Flow Operations: Technical Considerations Overview*, 3 Specialty Pharmacy Times (Oct. 10, 2012).....28

Julie Furr Youngman, Courtney D. Hauck, *Medical Necessity: A Higher Hurdle for Marginalized Taxpayers?*, 51 Loy. L.A.L. Rev. 1 (2018) ....................25

Medicare, *Glossary*, https://www.medicare.gov/glossary/m ....................25

Morris A. Landau, *The Difficulties in Defining Medical Necessity*, Hous. L. Ctr. (2000) ....................26

National Academy for State Health Policy, "State Definitions of Medical Necessity under the Medicaid EPSDT Benefit," https://www.nashp.org/medical-necessity/ (published April 23, 2021) ....................25

Webster's Third New International Dictionary (1986) ....................48


**Rules**


Fed. R. Crim. P. 7(d) .................... *passim*

Fed. R. Crim. P. 7(f) ....................49, 50, 51

Fed. R. Crim. P. 12(b)(3)(A)(i) ....................7

Fed. R. Crim. P. 18 ....................3, 5, 9, 15

Fed. R. Evid. 801(d)(2)(E) ....................54, 57


**Constitutional Provisions**


U.S. Const. amend. V .................... *passim*

U.S. Const. amend. VI ....................5, 9

U.S. Const. art. III, § 2, cl. 3 ....................5, 9

**PRELIMINARY STATEMENT**

Defendant Christopher Kyle Johnston, a native and current resident of Louisiana, stands before this Court accused as part of a vast conspiracy of wrongful conduct in New Jersey by patients, doctors, and salespersons, who have been properly punished by this Court, but with whom he has had absolutely no contact. Critically, Mr. Johnston is not alleged to have set foot in this District, let alone undertaken criminal conduct here. Nor is he alleged to have directed or even known about wrongful conduct undertaken by other actors in New Jersey, all of whom are far removed from the Louisiana pharmacy in which he invested as a business venture. If he is to be held to account for any alleged criminal acts he undertook, they would have occurred in Louisiana and that is where this case should be brought, consistent with Article III of the Constitution of the United States.

The violation of his fundamental right to be charged where the crime occurred aside, the conduct here alleged against Mr. Johnston and his co-defendants also does not stand up to legal scrutiny—both constitutional and otherwise—for other reasons. First, although the most basic aspect of due process requires that a criminal law provide Americans with fair notice of the conduct it proscribes, Count 1 does not meet that standard, as applied to Mr. Johnston's alleged conduct. Thus, the Government's allegations that Mr. Johnston conspired to commit health care fraud and wire fraud require the Court to conclude that a reasonable person—not necessarily a medical professional—would understand that an insurance claim for reimbursement for a prescription drug would be deemed false or fraudulent because it was not "medically necessary," the meaning of which is subject to widespread disagreement among courts and medical professionals, even when signed by a doctor. That same Count seeks to punish Mr. Johnston—indeed, to subject him to years of incarceration, based upon allegations that persons connected to him were engaged in common industry practices such as checking to see if a medication is covered by insurance,

providing to doctors pre-printed prescription pads which they could use to prescribe (or not prescribe) certain products, or because the prescriptions ultimately presented, though signed by medical professionals, were for compound pharmaceutical products (themselves not subject to FDA approval) that were not supported by medical research. In sum, and as is set forth in detail below, the Indictment in this case seeks to criminalize that which is either vague (*i.e.*, "medically unnecessary"), or entirely lawful and consistent with industry practice.

Nor do the other Counts of the Indictment, alleged against Mr. Johnston, survive appropriate legal scrutiny. The Supreme Court's recent decision in *United States v. Dubin* narrowed the appropriate use of identity theft statutes to criminal conduct which has as the "crux of what makes the conduct criminal" the use of personal information. Count 2 not only lacks such allegations, but demonstrates precisely the opposite—that the identity theft alleged here, which purportedly occurred in connection with so-called "test adjudications" of reimbursement claims, was not at the crux of the "medical necessity" fraud alleged, even fully crediting the allegations of the Indictment. Furthermore, to the extent that Count 1 and 2 both survive, the Government's decision to charge the same conspiracy twice, in each of those Counts, violates principles of multiplicity based upon the Double Jeopardy Clause of the Fifth Amendment to the Constitution, and requires that at least one be dismissed.

The remaining counts against Mr. Johnston—all alleging money laundering conspiracy and substantive money laundering—though numerous, are also defective. Each of the substantive counts fails to allege that Mr. Johnston had any knowledge that property involved in certain monetary transactions was derived from unlawful activity (even assuming that is properly alleged), an essential element under the statute. Even more fundamentally, these counts fails to allege the charged crime of money laundering, because the allegation in the Indictment addressed

transactions that, though the Government says they were the subject of money laundering, occurred prior to the funds at issue becoming criminal proceeds, under recent, governing Third Circuit precedent

Finally, in order for this matter to proceed in a manner that is fundamentally fair to Mr. Johnston, certain details which are left ambiguous in or are absent from the Indictment—from the names of unindicated co-conspirators, to the location of the offenses, to the actions in which Mr. Johnston is himself alleged to have been involved—should be provided by the Government, pursuant to well-established law requiring a bill of particulars. Nor, instead of providing proper notice, should the Government be allowed to include blatantly prejudicial, but totally irrelevant information in the Indictment, as it did here in setting forth the amount of money that Mr. Johnston made in this venture; its effort to improperly besmirch Mr. Johnston should be rejected and that extraneous allegation stricken.

The allegations against defendant Johnston are without merit. And when that is the case, it is often true that an Indictment is plagued with deep-seated flaws, including constitutional infirmities, statutory shortcomings and procedural problems, all of which threaten to prevent a defendant—here Mr. Johnston—from obtaining a just verdict, after a fair process. Here, the potential result is the conviction of an innocent man. To assure that this worst possible outcome of a criminal trial does not occur, Mr. Johnston's pretrial motions should be granted.

## ARGUMENT

### I. The Indictment Fails To Sufficiently Allege Venue in New Jersey in Violation of the Constitution and Federal Rule of Criminal Procedure 18, and Accordingly Should Be Dismissed.

Mr. Johnston moves to dismiss Counts 1, 2, 4, 5, 6, 9, 10, 13, 14, 17, 19, 21, and 23 of the Indictment because venue is improper in the District of New Jersey. Each of the 13 counts filed against Mr. Johnston arise from alleged acts that occurred exclusively outside the District of New

Jersey. Because proper venue is a constitutional requirement, and—with respect to the counts against Mr. Johnston—the Indictment fails to allege any connection to New Jersey apart from vague and insufficient references to "the District of New Jersey," the counts against Mr. Johnston should be dismissed.

### A. Legal Standard

The question of venue in a criminal case is one of constitutional dimension. *See United States v. Root*, 585 F.3d 145, 155 (3d Cir. 2009) ("Proper venue in criminal trials is more than just a procedural requirement; it is a constitutionally guaranteed safeguard."). As such, the Supreme Court has "repeatedly underscored the importance of safeguarding the constitutional guarantee of proper venue in criminal trials," *United States v. Perez*, 280 F.3d 318, 328 (3d Cir. 2002); indeed, it is an aspect of being tried "by a jury of one's peers" that is "unquestionably one of the most precious and sacred safeguards enshrined in the Bill of Rights," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 572 (1976) (Brennan, J. concurring). In *United States v. Johnson*, 323 U.S. 273, 275 (1944), the Supreme Court recognized that a cautious interpretive approach to venue is "more consonant with the considerations of historic experience and policy which underlie [the venue] safeguards in the Constitution." The Court explained:

> These are matters that touch closely the fair administration of criminal justice and public confidence in it, on which it ultimately rests. These are important factors in any consideration of the effective enforcement of the criminal law. . . . Questions of venue in criminal cases, therefore, are not merely matters of formal legal procedure. They raise deep issues of public policy in the light of which legislation must be construed.

*Id.* at 276; *see also United States v. Cores*, 356 U.S. 405, 407 (1958) ("The provision for trial in the vicinity of the crime is a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place. Provided its language permits, the Act in question should

be given that construction which will respect such considerations.”); *Travis v. United States*, 364 U.S. 631, 634 (1961) (cautioning that “venue provisions in Acts of Congress should not be so freely construed as to give the Government the choice of ‘a tribunal favorable’ to it” (citation omitted)). Indeed, “[p]roper venue in criminal proceedings was a matter of concern to the Nation’s founders. Their complaints against the King of Great Britain, listed in the Declaration of Independence, included his transportation of colonists ’beyond Seas to be tried.’” *United States v. Cabrales*, 524 U.S. 1, 6 & n.1 (1998). In fact, “[i]t was of such concern that the Constitution of the United States ‘twice safeguards the defendant’s venue right.’” *United States v. Auernheimer*, 748 F.3d 525, 532 (3d Cir. 2014) (quoting *Cabrales*, 524 U.S. at 6).

Thus, Article III of the United States Constitution provides that “[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed.” U.S. Const. art. III, § 2, cl. 3. In addition, the Sixth Amendment requires that, “[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed.” These commands are codified in Federal Rule of Criminal Procedure 18, which provides that a “prosecution shall be had in a district in which the offense was committed.” *United States v. Rodriguez-Moreno*, 526 U.S. 275, 278 (1999).

“Under Rule 18 of the Federal Rules of Criminal Procedure, Congress has the power to lay out the elements of a crime to permit prosecution in one or any of the districts in which the crucial elements are performed.” *Perez*, 280 F.3d at 328–29; *see also United States v. Pendleton*, 658 F.3d 299, 303 (3d Cir. 2011) (“Congress may fix jurisdiction in any district where a ‘crucial element’ of the crime is performed.”). Thus, in determining whether constitutional venue requirements are satisfied, the Court first must look to whether there is a statutory directive with respect to venue. When Congress has not explicitly designated the location in which it considers

a crime to have occurred, the *locus delicti* of the offense charged in an indictment—that is, the place where the offense arose—"must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *Cabrales*, 524 U.S. at 6-7 (quoting *United States v. Anderson*, 328 U.S. 699, 703 (1946)).

"To perform this inquiry, [the court] 'must [1] initially identify the conduct constituting the offense…and then [2] discern the location of the omission of the criminal acts.'" *Auernheimer*, 748 F.3d at 532 (quoting *Rodriguez-Moreno*, 526 U.S. at 279). Courts engaging in this analysis "must be careful to separate 'essential conduct elements' from 'circumstance element[s].'" *Id.* at 533. This is because venue is proper only where the acts constituting the offense—that is, the crime's "essential conduct elements"—took place. *See id.* at 532 ("Only 'essential conduct elements' can provide the basis for venue; 'circumstance elements' cannot." (quoting *United States v. Bowens*, 224 F.3d 302, 310 (4th Cir. 2000))); *see also United States v. Brennan*, 452 F. Supp. 3d 225, 234 (E.D. Pa. 2020) ("Conduct elements describe actions proscribed by a criminal statute, while 'circumstance elements' are 'fact[s] that existed at the time' those actions are performed." (quoting *Auernheimer*, 748 F.3d at 532))). Thus, the essential parts of the crime actually charged in the indictment must have been committed in the district where the case is to be tried. *See Cabrales*, 524 U.S. at 7-8 (holding that a money laundering prosecution was improperly venued in Missouri because the defendant was only charged with money laundering activity that occurred in Florida, and was not charged with having participated in the unlawful conduct in Missouri which generated the laundered funds in question).

Moreover, because the "venue requirement is principally a protection for the [criminal] defendant," the prosecution bears the burden to prove that the crime was committed in the district in which the prosecution is brought. *Cabrales*, 524 U.S. at 9; *see also Perez*, 280 F.3d at 328

("The Government has the burden of proving that venue is proper."). Additionally, and significantly, "venue must be proper for each count of the indictment,' *Root*, 585 F.3d at 155, and each count must be reviewed separately, *Auernheimer*, 748 F.3d at 535 ("[V]enue must be analyzed independently for each count"). When an indictment ignores these fundamental and well-established legal principles, a court may find, as a matter of law, that venue is not established under the facts alleged. *See Perez*, 280 F.3d at 330 (holding that a court may properly determine venue as a matter of law without submitting issue to jury). In other words, a defective allegation of venue is a proper ground for dismissal of that count. *See* Fed. R. Crim. P. 12(b)(3)(A)(i); *see also Cabrales*, 524 U.S. at 4-5 (noting that separate conspiracy charge remained pending in the District Court despite dismissal of substantive money laundering count on improper venue grounds).

**B. The Conspiracy Counts, Charged in Counts 1 And 2, Should Be Dismissed Because The Alleged Agreements Were Not Formed In New Jersey And None Of The Alleged Overt Acts In Furtherance Of The Conspiracies Occurred In New Jersey.**

On a pre-trial motion to dismiss an indictment for lack of venue, the Court must determine "whether the Indictment fails to allege sufficient facts for venue in the [District of New Jersey]." *United States v. Woodard*, CR 13-25-5, 2017 WL 11463711, at *1 (E.D. Pa. Dec. 15, 2017); *see also United States v. Menendez*, 137 F. Supp. 3d 688, 694 (D.N.J. 2015), *aff'd*, 831 F.3d 155 (3d Cir. 2016) ("In an indictment, the government must allege venue 'without a facially obvious defect.'" (quoting *Perez*, 280 F.3d at 327). Consistent with the constitutional principles set forth above, "Congress has modified the venue safeguards by statute to fit the situation of conspiracy." *Perez*, 280 F.3d at 329. Thus, in 18 U.S.C. § 3237(a), Congress has provided that venue for continuing offenses—like the conspiracies alleged in Counts 1 and 2 here—is appropriate in "any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a).

Applying Section 3237(a) and its constitutional underpinnings to the continuing crime of conspiracy, courts have consistently held that venue may lie in any district where the underlying violation occurred or where an overt act in furtherance of the conspiracy was committed by any of the conspirators. *See Perez*, 280 F.3d at 329 ("In addition, venue can be established wherever a co-conspirator has committed an act in furtherance of the conspiracy."); *Auernheimer*, 748 F.3d at 533 ("Venue would be proper in any district where the [underlying] violation occurred or wherever any of the acts in furtherance of the conspiracy took place."); *Whitfield v. United States*, 543 U.S. 209, 218 (2005) ("[V]enue is proper in any district in which an overt act in furtherance of the conspiracy was committed").

Broad though these provisions are, the conspiracy counts set forth in Counts 1 and 2 do not meet these statutory, constitutionally-based requirements. The charged conspiracies did not begin, continue, or end in the District of New Jersey, nor did any acts of Mr. Johnston or his named co-conspirators occur in this state. Indeed, as is explained in further detail below, other than the threadbare and conclusory statement that the acts described "occurred in the District of New Jersey and elsewhere," ECF No. 1 ("Ind."), ¶¶ 13, 45, 49, Counts 1 and 2 do not actually allege a single fact sufficient to support venue in this district.

*First*, with respect to where the "offense was begun," 18 U.S.C. § 3237(a), the Indictment alleges that the agreements to engage in health care and wire fraud and identity theft, if any, were formed in Louisiana. During the relevant time period, Mr. Johnston and his co-conspirators resided in Louisiana, where Central Rexall is located and worked together at the pharmacy. *See* Ind., ¶ 1a (Central Rexall "was a pharmacy located in Hammond, Louisiana"); *id.* ¶¶ 1b-d (alleging that defendants Johnston, Brockmeier and Casseri all worked for Central Rexall). There is no allegation that Mr. Johnston or any named co-conspirator ever traveled to or were present in New

Jersey, and therefore no such agreement could have been formed in this District. Instead, any alleged meetings or communications between Mr. Johnston and his co-conspirators to form an alleged conspiracy as set forth in Counts 1 and 2 could only have been formed in Louisiana and, therefore, the formation of the agreement or where the "offense was begun" does not serve as a basis to bring this case in the District of New Jersey. Indeed, this fact alone undermines the Constitution's requirement that the case be prosecuted in the State or District "wherein the crime shall have been committed." U.S. Const. art. III, § 2, cl. 3; *see also* U.S. Const. amend. VI.

*Second*, as with the formation of the purported conspiratorial agreements, the Indictment lacks any allegation to support a finding that either conspiracy was carried out or concluded in this district. As detailed more fully below, the Indictment does not allege that Mr. Johnston or any co-conspirators ever even stepped foot in New Jersey during the schemes, that Central Rexall or any other pertinent corporate entity was actually located in New Jersey, or that any identified co-conspirator committed an overt act in furtherance of the conspiracies in New Jersey. To the contrary, throughout the entirety of the alleged schemes, Mr. Johnston and all of the named co-conspirators were located and operated in the Eastern District of Louisiana. *See* Ind., ¶¶ 1a, 1b, 1c, 1d, 61.

Defendant Johnston recognizes, of course, that under the jurisprudence discussed above, the analysis of venue turns on the particular statutes at issue. *See* Fed. R. Crim. P. 18 ("Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed."); *Auernheimer*, 748 F.3d at 532 ("Congress may prescribe specific venue requirements for particular crimes."). Thus, with respect to Count 1, conspiracy to commit health care fraud and wire fraud, 18 U.S.C. § 1349 assesses criminal penalties against anyone who "attempts or conspires to commit" health care or wire fraud. The statute governing

health care fraud, 18 U.S.C. § 1347 criminalizes the knowing or willful execution or attempt to execute a "scheme or artifice" to "defraud any health care benefit program" or "obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program," while the wire fraud statute provides:

> Whoever, having devised or intending to devise any scheme . . . to defraud, or for obtaining money or property by means of false or fraudulent pretenses . . . transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings . . . for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1343. Thus, neither statute contains a specific venue provision but, because a scheme to violate either the health care fraud or wire fraud statute is a continuing offense, venue is, as discussed above, proper in any district in which the offense occurred. *See United States v. Goldberg*, 830 F.2d 459, 465 (3d Cir. 1987) (explaining that because § 1343 is a continuing offense "venue is proper in any district in which the offenses were begun, continued, or completed" under 18 U.S.C. § 3237); *United States v. Rutigliano*, 790 F.3d 389, 396 (2d Cir. 2015) (same).

But even under that liberal standard, the acts that Mr. Johnston and his co-conspirators are alleged to have undertaken in executing or devising the supposed scheme to defraud, as set forth in Count 1, have no connection to the State of New Jersey. In fact, the allegations in Count 1 most often lack *any* connection to a specific geographic location. For example, the Indictment provides that the object of the conspiracy was for defendants, along with Taff, Hickman, and others, "to unlawfully enrich themselves by causing the submission of false and fraudulent insurance claims to Pharmacy Benefits Administrator for medically unnecessary Central Rexall compounded prescription medications and sharing in the profits realized by Central Rexall from payments for

those compound prescription medications." Ind., ¶ 14. The Indictment properly describes Central Rexall as a pharmacy located in Hammond, Louisiana, *see id.* ¶ 1a, but like Mr. Johnston and his co-conspirators, Pharmacy Benefits Administrator is not alleged to have any presence in New Jersey; in fact, the Indictment makes no mention at all of where Pharmacy Benefits Administrator is located. Thus, the most that can be gleaned from this allegation is that any purportedly false insurance claim was initiated in Louisiana and sent to an unknown location.

The Indictment further alleges that "[i]t was part of the conspiracy that at the direction of defendants CHRISTOPHER KYLE JOHNSTON and TRENT BROCKMEIER, Central Rexall used preprinted prescription pads with their formulas for compounded medications," Ind., ¶ 21, and "in order to determine the insurance adjudication for a potential new combination of ingredients for which they did not have an actual prescription, defendants CHRISTOPHER KYLE JOHNSTON, TRENT BROCKMEIER, and CHRISTOPHER CASSERI caused Central Rexall employees and contractors to submit to Pharmacy Benefits Administrator false test claims," *id.* ¶ 25. These allegations, however, similarly do not contain a connection to any specific location, including to the District of New Jersey.

Only three allegations in Count 1 of the Indictment make any mention of New Jersey:

- "Central Rexall received prescriptions for compounded medications via fax from medical offices in New Jersey and other states." *Id.* ¶ 10.

- "From in or about July 2013 through in or about December 2016, in the District of New Jersey, and elsewhere, defendants . . . did knowingly and intentionally conspire and agree with each other and with Hayley Taff and William Hickman and others to commit certain offenses, namely . . ." *Id.* ¶ 13.

- "It was further part of the conspiracy that because SHBP and SEHBP covered certain compounded medications until 2016, Central Rexall shipped a large percentage of its compounded medications to SHBP and SEHBP beneficiaries in New Jersey." *Id.* ¶ 31.

But none of these allegations suffice to establish venue in this district. It is well-settled that "an indictment must allege that the defendant performed acts which, if proven, constitute a violation of the law that he is charged with violating." *United States v. Hird*, 913 F.3d 332, 339 (3d Cir. 2019). In other words, an indictment cannot merely recite the essential elements of the offense charged; it must allege specific facts that fall within the scope of the relevant criminal statute. *United States v. Vitillo*, 490 F.3d 314, 321 (3d Cir. 2007). Critically, the same is true with respect to establishing venue: "Venue is . . . improper if the only acts that occurred in that district do not provide evidence of the elements of the charged crime." *United States v. Brassington*, 09-CR-45 DMC, 2010 WL 3982036, at *11 (D.N.J. Oct. 8, 2010) (quoting *United States v. Ringer*, 300 F.3d 788, 792 (7th Cir. 2002) (internal quotation marks omitted)).

Here, the very general allegations of paragraphs 10, 13, and 31 are devoid of any facts showing that Mr. Johnston or any purported co-conspirator engaged in any *specific conduct* bearing any connection to New Jersey. Because Central Rexall is not a named co-conspirator and only acts of co-conspirators can sufficiently establish venue, the fact that Central Rexall received prescriptions via fax, Ind., ¶ 10, or shipped medications to beneficiaries in New Jersey, *id.* ¶ 31, cannot be attributed to Mr. Johnston for purposes of venue. *See Perez*, 280 F.3d at 329 ("[V]enue can be established wherever a co-conspirator has committed an act in furtherance of the conspiracy."). Certainly, the mere tracking of the health care and wire fraud statutes in paragraph 13 (defendants "knowingly and intentionally" conspired and agreed with each other and with Taff, Hickman and others to "knowingly and willfully to execute a scheme and artifice to defraud a health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, or under the custody and control of, a health care benefit program in connection with the delivery of and payment for health care

benefits, items, and services, contrary to Title 18, United States Code, Section 1347" and to "devise a scheme and artifice to defraud, and to obtain money and property by means of materially false pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communications in interstate commerce, writings, signs, signals, and sounds, contrary to Title 18, United States Code, Section 1343.") does not suffice. *See United States v. Safeway Stores, Maryland*, 51 F. Supp. 448, 456 (D. Kan. 1943), *rev'd on other grounds Frankfort Distilleries v. United States*, 144 F.2d 824 (10th Cir. 1944), *rev'd on other grounds*, 324 U.S. 293 (1945) ("general and vague allegations are insufficient to satisfy the requirement that the indictment must show on its face that the crime was committed within this state and district."); *see also United States v. Birks*, 656 F. Supp. 2d 454, 461 n. 4 (D.N.J. 2009) ("Though not a substantive element, venue is nevertheless an element required by the Constitution and must be alleged in an indictment."). Nor do general allegations about unspecified fax prescriptions, Ind., ¶ 10, or shipments, *id.* ¶ 13, create venue in a way that is sufficient as a matter of constitutional and statutory right, at least not without any allegation that a specific act occurred in this district. *See, e.g., Birks,* 656 F. Supp. 2d at 461 ("specific allegations of overt acts in New Jersey, read together with the general allegation that some overt acts did take place in New Jersey, are sufficient to properly allege venue in the District of New Jersey"); *United States v. Peterson*, 357 F. Supp. 2d 748, 752 (S.D.N.Y.2005) (venue was adequately alleged where "the indictment contain[ed] more than just the conclusory allegation of the existence of venue; it also contain[ed] allegations of specific acts occurring in the Southern District of New York"). In sum, the allegations in Count 1 fail, as a matter of well-established constitutional law, to establish venue in the District of New Jersey for that Count.

With respect to Count 2, again a conspiracy count,[1] this time to commit identity theft, the statute imposes criminal liability on one who "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any [federal crime, or state or local felony]." 18 U.S.C. § 1028(a)(7). The Third Circuit has determined that "[t]he two essential conduct elements under § 1028(a)(7) are [(i)] transfer, possession, or use, and [(ii)] doing so in connection with a federal crime or state felony." *Auernheimer*, 748 F.3d at 535. With respect to the latter essential element, the Indictment alleges that Mr. Johnston knowingly conspired to commit identify theft in connection with the previously described violations of wire fraud, health care fraud, and the conspiracy to commit those offenses. Ind., ¶ 31. Nevertheless, as described above, the purported underlying violations of the health care and wire fraud statutes are not properly venued in the District of New Jersey because there are no allegations that satisfy the legal requirement that the criminal conduct at issue began or was conducted in the District of New Jersey. This alleged health care and wire fraud criminality, therefore, cannot confer venue over Count 2 before this Court.

Moreover, the Indictment fails to allege facts sufficient to establish that the first essential conduct element, *i.e.*, the transfer, possession or use of another's identification, occurred in New Jersey. The only allegations attempting to connect these acts to the State of New Jersey are that defendant Casseri sent two text messages to an individual located in New Jersey, *see* Ind., ¶¶ 49a-40b, that Central Rexall paid salespersons located in New Jersey who were trying to find patients here, *id.* ¶¶ 49d-49e, and that Central Rexall received prescriptions from two individuals from New Jersey, *id.* ¶ 49f. But none of these allegations, on their face, have anything to do with the identity

---

[1] Notably, the Indictment does not charge Mr. Johnston with substantive wire fraud and health care fraud offenses, and only asserts claims for conspiracy.

theft alleged which is at the heart of the allegation in Count 2. *See Brennan*, 452 F. Supp. 3d at 234 ("Only essential conduct elements can provide the basis for venue; circumstance elements cannot." (cleaned up)); *Cabrales*, 524 U.S. at 6-7 (the *locus delicti* of the offense charged "must be determined from the nature of the crime alleged and the location of the act or acts constituting it."); *see also Perez*, 280 F.3d at 328-29 ("Under Rule 18 of the Federal Rules of Criminal Procedure, Congress has the power to lay out the elements of a crime to permit prosecution in one or any of the districts in which the crucial elements are performed."); *Pendleton*, 658 F.3d at 303 ("Congress may fix jurisdiction in any district where a 'crucial element' of the crime is performed.").

The only allegation in the indictment that mentions allegations of identity theft in the same sentence as the State of New Jersey is that "[o]n or about February 24, 2016, defendant CHRISTOPHER CASSERI sent an email to a Central Rexall contractor asking the contractor to run a test adjudication using the identifying information of Individual 3 and another individual from New Jersey." *Id.*, ¶ 49g. But this allegation, even if it somehow states a criminal offense at all, *see infra* Section III, alleges only that information was possessed, used, and subsequently transferred by Mr. Casseri, who worked for Central Rexall in Louisiana, to a Central Rexall contractor, the location of which is not provided. The Indictment does not allege that Mr. Johnston or any implicated co-conspirator transferred the information to or from New Jersey, possessed the information in New Jersey, or used the information in New Jersey. While Mr. Johnston acknowledges that overt acts of co-conspirators may be attributable to him, there is no authority to support the proposition that acts of an unnamed, uncharged corporate entity can be attributed to Mr. Johnston for purposes of venue.

Because the Indictment fails to allege that the scheme alleged in Count 2 began, continued, or was completed in the District of New Jersey, or that any pertinent act by Mr. Johnston or any named co-defendant took place in this district, the conspiracy to commit health care fraud and wire fraud and the conspiracy to commit identify theft set forth in Counts 1 and 2 of the Indictment must be dismissed. *See Birks*, 656 F. Supp. 2d at 461 n. 4 ("[V]enue is nevertheless an element required by the Constitution and must be alleged in an indictment.").

### C. The Money Laundering Counts Should Be Dismissed Because The Financial Transaction And Underlying Unlawful Activity, If Any, Did Not Occur In New Jersey.

The remaining counts against Mr. Johnston, charging him with substantive money laundering and a money laundering conspiracy, also fail to allege facts sufficient to support venue in the District of New Jersey. The money laundering statute does have a venue provision: it provides that a prosecution may be brought in: (1) "any district in which the financial transaction or monetary transaction is conducted"; (2) "any district where a prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted"; or, with respect to conspiracy, (3) any district "where an act in furtherance of the . . . conspiracy took place." 18 U.S.C. § 1956(i)(1); *see also Whitfield*, 543 U.S. at 217-18 (discussing the venue provisions for money laundering).

Here, neither the conspiracy nor substantive money laundering counts set forth where the financial transactions at issue occurred. While the Indictment broadly alleges "that Central Rexall received payments from Pharmacy Benefits Administrator and other sources, including payments funded by the State of New Jersey for SHBP and SEHBP beneficiaries, which represented proceeds of the conspiracy to commit health care fraud and wire fraud," Ind., ¶ 57, this critical paragraph does not state where the financial transaction took place, and the remaining paragraphs

of the Indictment are similarly bereft of such information. Indeed, as it is alleged, the funds were transferred from Pharmacy Benefits Administrator, the location of which is not alleged in the Indictment, to Central Rexall, "a pharmacy located in Hammond, Louisiana," *id.* ¶ 1a, and then transferred to the bank accounts of Pharmacy Management Group, LLC ("PMG"), and Bluen Medical, LLC ("Bluen Medical"), Delaware limited liability companies of which Mr. Johnston was a member, *id.* ¶¶ 1h, 1i, as well as to Mr. Johnston's personal bank account, without any indication of where the financial institutions in which the funds were deposited are located, *see id.* ¶¶ 58-59, 61. As to Count 4, the conspiracy charge, the Indictment asserts, in a conclusory fashion, that the money laundering conspiracy occurred "in the District of New Jersey, and elsewhere," *id.* ¶ 56, but provides no foundation or factual support for this claim. And Counts 5-24, the substantive money laundering counts, are devoid of even such boilerplate, albeit legally insufficient, allegations.[2]

Nor is this argument merely academic: despite the Government's failure to expressly identify where the financial transactions were conducted, it is plain that the only place where these transactions could have occurred is in Louisiana. According to the Indictment, the funds were provided to Central Rexall and thereafter transferred from Central Rexall's account. *See* Ind., ¶¶ 1a, 58, 61. Given Central Rexall's location in Hammond, Louisiana, any transfer of funds to or from Central Rexall's account would have occurred, for purposes of money laundering, in Louisiana, where Central Rexall's accounts were located.

[2] Although Counts 5-24 "reallege[] and incorporate[]" many of the prior allegations set forth in the Indictment, they explicitly exclude the paragraphs containing the conclusory language that Mr. Johnston committed the alleged crimes "in the District of New Jersey, and elsewhere" that are included in the other counts. *See* Ind., ¶ 62 (not incorporating by reference *id.* ¶¶ 13, 45, 56).

Realizing that it cannot plausibly allege that the transactions occurred in New Jersey, the Government attempts to assert that venue is proper here based upon Mr. Johnston's purported participation in the transfer of the alleged proceeds. Specifically, the Indictment, parroting the language of the statute, provides that:

> It was further part of the conspiracy that defendants CHRISTOPHER KYLE JOHNSTON and TRENT BROCKMEIER caused the transfer of the proceeds of the conspiracy to commit health care fraud and wire fraud from the State of New Jersey to Pharmacy Benefits Administrator and from Pharmacy Benefits Administrator to Central Rexall' s bank account in Louisiana, and then caused the transfer of the proceeds from Central Rexall's bank account to the bank accounts of Bluen Medical and PMG and from the bank accounts of Bluen Medical and PMG to the personal bank accounts of defendants CHRISTOPHER KYLE JOHNSTON and TRENT BROCKMEIER.

Ind., ¶ 59. However, as discussed in Section I.B, *infra*, the underlying unlawful activity—here, conspiracy to commit health care and wire fraud—did not occur in the District of New Jersey, and thus cannot provide a basis to establish venue in this District. In addition, the Indictment does not allege other acts in furtherance of the alleged money laundering conspiracy that took place in the District of New Jersey. In short, the alleged conduct that is the subject of the money laundering charges was begun, conducted and completed in Hammond, Louisiana. As a result, venue is not appropriate in the District of New Jersey. *See Cabrales*, 524 U.S. at 7 (holding that Missouri was not the proper district for money laundering offenses which were begun, conducted and completed in Florida).

Moreover, the mere fact that proceeds of the conspiracy were transferred from the State of New Jersey to Pharmacy Benefits Administrator does not provide a basis for venue in this District. Under 18 U.S.C. § 1956(i)(1), a money laundering prosecution can be brought in any district where the financial transaction occurred. However, as set forth in Section V, *infra*, the alleged payment

from the State of New Jersey to Pharmacy Benefits Administrator does not qualify as a financial transaction under this statute. In *United States v. Fallon*, 61 F.4th 95, 118 (3d Cir. 2023), the Third Circuit recently explained that:

> money laundering, whether classic or otherwise, requires financial transactions involving "proceeds" of the fraud, and ill-gotten funds do not become "proceeds" until after a defendant receives them. After that point, transactions in those funds that are designed to conceal, such as a deliberate commingling of illicit and lawful funds, can form the basis of a money laundering charge. But any transactions that occur before a defendant obtains the fruits of its fraudulent scheme fall outside of § 1956(a)'s scope. Thus, a defendant's mere receipt of funds as a result of a fraudulent transaction cannot itself constitute money laundering, and that is true even if the funds received include illicit funds commingled with lawfully obtained funds.

Here, the alleged transfer of proceeds from the State of New Jersey occurred prior to the time Mr. Johnston is alleged to have received the funds, *see* Ind., ¶ 59 (proceeds were transferred "from the State of New Jersey to Pharmacy Benefits Administrator and from Pharmacy Benefits Administrator to Central Rexall' s bank account in Louisiana, . . . from Central Rexall's bank account to the bank accounts of Bluen Medical and PMG and from the bank accounts of Bluen Medical and PMG to the personal bank accounts of defendants"), and thus, cannot be considered a financial transaction to support a finding of venue in this District.

In sum, the District of New Jersey is not the proper venue for the charges brought against Mr. Johnston. As set forth above, the Government has failed to allege that Mr. Johnston laundered money, conspired to commit the offenses charged, or that he or any identified co-conspirator committed an overt act in furtherance of the conspiracies in the state of New Jersey. Because a trial in an improper venue, would be, not only a waste of judicial resources, but an unconstitutional intrusion on Mr. Johnston's right to be tried where the alleged crime occurred, this defect warrants

dismissal of the Indictment. Accordingly, Counts 1, 2, 4, 5, 6, 9, 10, 13, 14, 17, 19, 21, and 23 should be dismissed against Mr. Johnston.

## II. Count 1 of the Indictment Must be Dismissed Because the Statutes, As Applied, Are Void for Vagueness.

### A. Legal Standard

The Fifth Amendment to the United States Constitution prohibits depriving a person of liberty "without due process of law." U.S. Const. amend. V. That provision gives rise to the constitutional bar on vague criminal statutes, which is the "first essential of due process," and is "consonant alike with ordinary notions of fair play and the settled rules of law." *Johnson v. United States*, 576 U.S. 591, 595-96 (2015) (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)). Thus, the void-for-vagueness doctrine follows from the premise that "[a] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *United States v. Loy*, 237 F.3d 251, 262 (3d Cir. 2001) (quoting *Connally*, 269 U.S. at 392); *see also United States v. Davis*, 588 U.S. —, 139 S. Ct. 2319, 2325 (2019) ("Vague laws contravene [due process because] statutes must give people 'of common intelligence' fair notice of what the law demands of them."); *United States v. Williams*, 553 U.S. 285, 304 (2008) (a statute or regulation is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."); *accord United States v. Stevens*, 533 F.3d 218, 249 (3d Cir. 2008); *United States v. Handakas*, 286 F.3d 92, 101 (2d Cir. 2002), *overruled on other grounds* ("In short, the statute must give notice of the forbidden conduct and set boundaries to prosecutorial discretion.").

The void-for-vagueness doctrine applies with particular force in the criminal context. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982) (expressing lower tolerance for vague criminal laws because "the consequences of imprecision are qualitatively [more] severe" than those of vague civil laws). Said otherwise, when "a statute imposes criminal penalties, the standard of certainty is higher" and failure to satisfy this stringent standard necessitates that the law be held vague "even when it could conceivably have had some legitimate application." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *see also Arriaga v. Mukasey*, 521 F.3d 219, 222-23 (2d Cir. 2008) (noting that criminal laws challenged as vague receive "close scrutiny"). Simply put, "'criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed.'" *Parker v. Levy*, 417 U.S. 733, 757 (1974) (quoting *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32-33 (1963)). That, of course, is precisely the problem here, where this prosecution turns on the definition of "medical necessity," as set forth below, an inherently vague concept.

Of course, a challenge to a statute as unconstitutionally vague does not necessarily imply that the statute could never be lawfully applied, as would be the case in the context of a facial vagueness challenge. *See United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011) ("A party asserting a facial challenge must establish that no set of circumstances exists under which the Act would be valid."); *see also United States v. Salerno*, 481 U.S. 739, 745 (1987) (facial vagueness challenges are the "most difficult challenge to mount successfully"). Rather, in the context of an "as applied" challenge, a defendant must show that "as applied to the conduct at issue in [a] criminal case, a reasonable person would not have notice that the conduct was unlawful and there are no explicit standards to determine that the specific conduct was unlawful." *United States v. Sattar*, 272 F. Supp. 2d 348, 357 (S.D.N.Y. 2003) (citation omitted); *see also Heffner v. Murphy*,

745 F.3d 56, 65 (3d Cir. 2014) (explaining the distinction between facial and as-applied challenges). That is, an as-applied attack "does not contend that the law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010).

Thus, if a statute has been charged in a particular case to encompass conduct that the particular defendant did not have fair notice was criminal, those charges cannot stand. *See, e.g., United States v. Portanova,* 961 F.3d 252, 263 (3d Cir. 2020) ("Because vagueness challenges are evaluated on a case by case basis, we must examine the statute to determine if it is vague as applied to Portanova."); *Sattar*, 272 F. Supp. 2d at 361 (granting defendant's as applied vagueness challenge and dismissing counts of Indictment where government application of terms and concepts to statute in charging decisions provided "no notice to persons of ordinary intelligence and [left] the standards of enforcement to be developed by the Government"); *United States v. Morales-Lopez,* No. 2:20-cr-27-JNP, 2022 WL 2355920, at *12, n.5 (D. Utah June 30, 2022) (granting as-applied vagueness challenge where defendant had demonstrated that the statute was "vague as applied to his particular conduct and that his conduct is not clearly prohibited by a statute.").[3]

**B. The Vague Term "Medically Unnecessary" Renders the Statutes Void for Vagueness, As Applied**

Count 1 of the Indictment charges Mr. Johnston with conspiracy to commit health care fraud and wire fraud, in violation of 18 U.S.C. § 1349. In Count 1, the Government alleges that

[3] Though not in the context of a vagueness challenge, courts have dismissed indictments under analogous circumstances where the facts as alleged failed to establish any wrongful conduct by the defendant; that is, an Indictment cannot stand where the charged conduct is not recognizably criminal under the statute. *Hird*, 913 F.3d at 339 ("To be sufficient, an indictment must allege that the defendant performed acts which, if proven, constitute a violation of the law that he is charged with violating.") (quoting *United States v. Small*, 793 F.3d 350, 352 (3d Cir. 2015)).

Mr. Johnston, his co-defendants, and others "knowingly and willfully" conspired to violate the federal health care fraud and wire fraud statutes by submitting "false and fraudulent insurance claims" to Pharmacy Benefits Administrator and others for "medically unnecessary" compound medications. Ind., ¶¶ 13, 14, 37. Thus, liability on Count 1 hinges on: (1) whether these various compounded medications, prescribed by physicians were, in fact, "medically unnecessary" and, for that reason "false and fraudulent"; and, if so, (2) whether Mr. Johnston, a lay person with no medical training, knew that these various prescribed compounded medications were "medically unnecessary."

As specifically applied to these alleged facts, the wire fraud and health care fraud statutes (18 U.S.C. §§ 1343 and 1347) are unconstitutionally vague and Count 1 of the Indictment should accordingly be dismissed. Specifically, the conspiracy, wire fraud or health care fraud statutes do not—certainly not in their text—reasonably provide notice that "medically unnecessary" prescriptions are forbidden as *per se* "false and fraudulent." Nor do they even attempt to define the amorphous term "medically unnecessary" in a manner sufficient for a reasonable person to understand, so that he can steer clear of a violation of the law. Indeed, nowhere in the conspiracy to commit health care fraud statute, substantive health care fraud statute, nor in any other statute, rule or regulation related or referenced thereto, are the terms "medically unnecessary," "medically necessary," or "medical necessity" ever used or defined.

The Court in *Sattar* confronted a similar problem. There, the statute at issue, 18 U.S.C. § 2339B, prohibited providing "personnel" to a foreign terrorist organization, and the Government asserted that the term meant "employees" or "quasi-employees" who worked under the "direction and control" of the organization. 272 F. Supp. 2d at 358-59. The Court concluded that the conduct alleged, which was allegedly criminal based upon "the terms and concepts applied" by the

Government, "provide no notice to persons of ordinary intelligence and leave the standards for enforcement to be developed by the Government." *Id.* at 359. The Court thus dismissed the relevant provisions of the Indictment, rather than read into the statute a definition beyond that provided by the statute itself. *Id.* at 360; *see also Handakas*, 286 F.3d at 109-110, *overruled on other grounds* ("If the words of a criminal statute insufficiently define the offense, it is no part of deference to Congress for us to intuit or invent the crime.").[4] For a person to nonetheless face the loss of their liberty, potentially for many, many years on the basis of allegations that he was involved in submitting insurance claims deemed to be false or fraudulent because they were for "medically unnecessary" products, when that term is so undefined, is not only terribly unjust but also profoundly constitutionally problematic. *Id.*; *see, e.g., Morales-Lopez*, 2022 WL 2355920, at *12, n.5 (statute prohibiting a person "who is an unlawful user of or addicted to any controlled substance" from possessing a firearm vague as-applied to defendant charged with vagueness challenge where defendant had demonstrated that the statute was "vague as applied to his particular conduct and that his conduct is not clearly prohibited by a statute.")

The problem is particularly profound here, where there is no agreed-upon definition of "medical necessity," even among experts. Thus, guidance from the United States Department of

[4] In this respect, the language of *Sattar* echoes that of the Supreme Court in its recent line of vagueness cases, in which the Court makes clear that one of the fundamental problems with vague provisions is that they leave to the executive or judicial branches of government the role of defining crimes, a fundamentally legislative task, and thus violate separation of powers principles, which "requir[e] that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018); *see also Davis*, 139 S. Ct. at 2323-25 (vague laws improperly "hand off the legislature's responsibility" and "threaten to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide). Those principles do not allow "the legislature [to] set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, [which would] substitute the judicial for the legislative department[.]" *Kolender*, 461 U.S. at 358, n.7.

Health and Human Services states that "medical necessity" is a term used by insurance providers to determine what claims they will pay. *See Department of Health and Human Services, Medical Necessity in Private Health Plans*, https://hsrc.himmelfarb.gwu.edu/cgi/viewcontent.cgi?article=1170&context=sphhs_policy_facpubs. HHS states that "[t]here is no Federal definition" of medical necessity. *Id.* at 1. But "[r]ather than turning simply on whether a proposed treatment meets professional standards, the prevailing definition of medical necessity is broadly framed, multi-dimensional, and controlled by the insurer, not the treating professional." *Id.; see also* National Academy for State Health Policy, "State Definitions of Medical Necessity under the Medicaid EPSDT Benefit," https://www.nashp.org/medical-necessity/ (published April 23, 2021) ("The Federal statute does not define 'medical necessity' but rather describes a broad standard for coverage without providing a prescriptive formula for ascertaining necessity.").

Nor do Medicare regulations provide the necessary clarity: Medicare guidance defines "medically necessary" as "Health care services or supplies needed to diagnose or treat an illness, injury, condition, disease, or its symptoms and that meet accepted standards of medicine." *See* Medicare, *Glossary*, https://www.medicare.gov/glossary/m. General and vague though this guidance is, Medicaid guidance is even worse, employing as it does more than 50 definitions of "medically necessary" from the regulations promulgated by each State. *See* National Academy for State Health Policy, "State Definitions of Medical Necessity under the Medicaid EPSDT Benefit," https://www.nashp.org/medical-necessity/ (published April 23, 2021) (surveying the various state definitions of "medically necessary"). Simply put, "there is no universally-recognized definition of medical necessity," let alone a universally accepted understanding that lack thereof in this context constitutes criminal conduct. *See* Julie Furr Youngman, Courtney D.

Hauck, *Medical Necessity: A Higher Hurdle for Marginalized Taxpayers?*, 51 Loy. L.A.L. Rev. 1, 52–53 (2018) ("there is no universally-recognized definition of medical necessity, and even the IRS's expert acknowledged that the definition of medical necessity varies according to the defining party." (cleaned up)); *see also Grier v. Goetz*, 402 F. Supp. 2d 876, 890 (M.D. Tenn. 2005), *order clarified*, 421 F. Supp. 2d 1080 (M.D. Tenn. 2006) ("federal law does not define medical necessity"). Moreover, "[e]ven, the courts have not been consistent in interpreting medical necessity. Although some courts have held that the sole responsibility for determining medical necessity should be placed in the patient's physician's hands, other courts have held that medical necessity is strictly a contractual term in which a patient's physician must prove that a procedure is medically appropriate and efficacious." Morris A. Landau, *The Difficulties in Defining Medical Necessity*, Hous. L. Ctr. (2000)). This lack of a standard is problematic: as the Supreme Court has stated, "the failure of 'persistent efforts . . . to establish a standard' can provide evidence of vagueness." *Johnson*, 576 U.S. at 598 (quoting *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 91 (1921)).[5]

---

[5] Indeed, the prosecutorial tack of criminalizing medically unnecessary prescriptions risks preventing or deterring doctors from engaging in legitimate, non-fraudulent physician activity for fear of being criminally prosecuted for over-diagnosing or over-prescribing; thus, they may be more likely to err on the side of underprescribing, even if that is the worst thing for their patients. Criminalizing "medically unnecessary" prescriptions is therefore likely to impede doctors' clinical judgment, distort their evaluation of diagnostic procedures, and harm patients. *See* B. Sonny Bal, Lawrence H. Brenner, *The Law and Social Values: Medical Necessity and Criminal Prosecution*, 474(4) Clin. Orthop. Relat. Res. 887 (2016) ("Most physicians will agree that there is seldom a bright line in medicine that clearly differentiates medically unnecessary versus medically necessary procedures."). Indeed, "if medical necessity is interpreted broadly, many, if not most, physicians or surgeons can be prosecuted on the whim of the justice department, at least in theory." *Id.*; *see also* Julie Dickinson, The Criminalization of Human Errors in Healthcare, 18 ABA Health eSource 11 (2022) ("Criminal prosecution of clinicians also causes current and prospective healthcare providers to fear losing their livelihood, so they exit their profession (or take non-clinical positions) and choose another career path, respectively. The resultant shortage of bedside

In light of what is a vast array of definitions of medical necessity, the amorphous nature of the term itself, and the risks of chilling legitimate medical decisionmaking, the statutes proscribing conspiracy to violate the wire and health care fraud statutes set forth in Count 1 of the Indictment are, to the extent they are deployed based upon this term, void for vagueness, as applied in this case. A person of ordinary intelligence could not possibly understand whether or not he was running afoul of the criminal law by seeking insurance reimbursement for filling a prescription, if the lawfulness of those actions turn on whether the underlying prescription was "medically unnecessary" and accordingly automatically "false or fraudulent." In sum, the criminal law simply cannot turns on so vague a term, one that, as vague statutes always do, invites arbitrary and discriminatory enforcement—among the concerns that the Supreme Court's void-for-vagueness jurisprudence has articulated in case after case. *See Dimaya*, 138 S. Ct. at 1213 ("[T]he [void-for-vagueness] doctrine guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges."); *Kolender*, 461 U.S. at 357 (a penal statute cannot be drafted in a manner that "encourage[s] arbitrary and discriminatory enforcement"); *Stevens*, 533 F.3d at 249 (same). For these reasons, Count 1 should be dismissed.

### C. The Remaining Allegations In Count 1 Are Insufficient To Allege An Offense and Provide Notice to Defendants That Their Actions Were Criminal.

Much of the remainder of the Indictment rests upon theories that are similarly problematic, and thus can also not be the basis of a criminal prosecution. For example, the Government seeks to impose liability based upon the notion that the defendants submitted "test adjudications" to determine if certain formulas for compounded medications were covered by insurance. Ind., ¶¶

---

clinicians creates unsafe conditions and decreased access to healthcare – leading to more patient harm.").

25-27. However, here too, one could not possibly be on notice that such conduct could constitute criminal federal health care fraud. To the contrary, this practice is frequently utilized throughout the medical industry to verify whether a certain health care program will cover the ingredients within a formula in order to reduce a patient's cost. *See* Jim Maguire, *Specialty Pharmacy Work Flow Operations: Technical Considerations Overview*, 3 Specialty Pharmacy Times 5 (Oct. 10, 2012) ("Many pharmacy management systems allow for the submission of a 'test claim.' Test claims represent transactions used to confirm patient eligibility and the existence of any coverage restrictions and/or requirements (*i.e.*, prior authorization, step therapy, etc.). While test claims are useful, control procedures should be in place to minimize potential processing errors if not correctly reversed."). Under these circumstances it is difficult to understand how this practice could create criminal culpability, or perhaps more to the point, how a person could reasonably "understand that his contemplated conduct is proscribed." *Parker*, 417 U.S. at 757 (internal quotations omitted). But this is at the core of the Government's theory of fraud as well, yet another reason to dismiss this case on Due Process grounds.

Likewise, the Government alleges that the use of pre-printed prescription pads with formulations that contained high-paying ingredients, which doctors were given a choice to prescribe, is somehow fraudulent. Ind., ¶¶ 20-21, 29. The Indictment does not suggest that the prescription pads contained false statements or that those prescription pads somehow Mr. Johnston falsely represented whether the prescriptions were themselves medically necessary—itself, as noted, an unconstitutionally vague standard. Thus, for the Indictment to survive, the Court must conclude that an average person would reasonably be apprised that he could be held criminally liable for preparing pre-printing prescription pads, from which doctors had the option to select medications and on which these doctors were signing off, a practice that, like test adjudications,

appears to be rather common in the industry. Nor can it be the case that it is a crime to include on a pre-printed prescription pad, or even fulfill a prescription for, an unregulated product simply because the efficacy of that properly-prescribed product—at least insofar as the defendant is aware[6]—is not supported by research, as the Government alleges. Ind., ¶ 29. Under the Federal Food, Drug and Cosmetic Act, a compounding facility is not even required to obtain pre-market approval prior to selling a compounded medication. *See Zyla Life Scis., LLC v. Wells Pharma of Houston, LLC*, 4:22-cv-4400, 2023 WL 6301651, at *5 (S.D. Tex. Sept. 27, 2023) ("[T]he FDCA . . . does not require compounding facilities to acquire premarket approval."). Thus, Central Rexall was not required to conduct the "tests, studies, or research into the medical necessity or effectiveness of the particular combination of ingredients" that the Government contends it should have any more than it had to obtain approval prior to marketing and dispensing such medications.

Independently and collectively, the allegations of the Indictment seek to make criminal that which is neither clearly proscribed nor is inconsistent with the law and with industry practice. Given the centrality of the Government's concept of "medical unnecessity" and other innocuous industry practices, such as test adjudications, pre-printed prescription pads, and lack of research for compound medications, the indictment cannot stand as the charges are currently alleged.

**D. Dismissal Is The Appropriate Remedy.**

While under certain circumstances it may be appropriate to strike the offending allegations, described above, from the indictment—redacting references to medical necessity, test

[6] Notably, the Indictment goes to great pains to allege wrongful conduct occurring in New Jersey that suggests the prescriptions being fulfilled by Central Rexall were improperly obtained. *See, e.g.*, Ind., ¶ 34 (identifying patients not having been examined by doctors, prescriptions not being authorized by a doctor, doctors not having made a medical necessity determination, doctors having been paid kickbacks, and prescriptions being too voluminous or not requested by patients). However, at no point does the Indictment allege that any of the defendants knew about that alleged conduct in New Jersey, let alone directed that it be undertaken.

authorizations, preprinted prescription pads and the failure to do research[7]—such a remedy would be inappropriate here, as it would result in an unconstitutional variance. A variance occurs when the charging terms of the Indictment remain the same, but the evidence presented at trial proves facts materially different from those alleged in the Indictment. *United States v. Daraio*, 445 F.3d 253, 261 (3d Cir. 2006); *see also United States v. Castro*, 776 F.2d 1118, 1121 (3d Cir. 1985) (a variance exists "where the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment."). Thus, "a variance in the sense of a variation between pleading and proof . . . destroy[s] the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury." *Stirone v. United States*, 361 U.S. 212, 217 (1960). Thus, "[a] conviction must be vacated when (1) there is a variance between the indictment and the proof presented at trial and (2) the variance prejudices a substantial right of the defendant." *United States v. Kemp*, 500 F.3d 257, 287 (3d Cir. 2007) (quoting *United States v. Kelly*, 892 F.2d 255, 258 (3d Cir. 1989)).

Here, given the centrality of "medical necessity" to the indictment that the grand jury returned in this matter, striking the paragraphs addressing that concept, as well as the allegations related to test adjudications, pre-printed prescription pads, and lack of research for compound medications would effectively create an entirely different theory of prosecution than the one set

[7] *See United States v. Miller,* 471 U.S. 130, 133 (1985) (noting government motion to strike portion of indictment was not improper where remaining allegations still made out a violation of law); *United States v. Hedgepeth*, 434 F.3d 609, 612 (3d Cir. 2006) (recognizing that it is appropriate to strike language in an indictment under Federal Rule of Criminal Procedure 7(d) when the surplusage is "both irrelevant (or immaterial) and prejudicial."); *see also United States v. Vastola*, 670 F. Supp. 1244, 1255 (D.N.J. 1987) (finding that "irrelevant and vague language which may imply guilt by association or insinuate unalleged facts" should be stricken from the indictment). Language in an indictment is prejudicial when it could lead the jury "to believe that there exists a broader scope of illegal activity than is actually charged in the indictment." *United States v. Alsugair*, 256 F. Supp. 2d 306, 317 (D.N.J. 2003). *See also infra* at Section VII (motion to strike surplusage).

forth in the Indictment returned by the grand jury. Leaving aside that it would not leave much of the Government's case, it is not clear how such a theory could withstand a motion to dismiss the indictment for failure to state a crime, but even if that hurdle could be overcome, it would be an unconstitutional variance to allow Count 1 to proceed based on some alternative theory that cannot fairly be said to have been presented to the grand jury, in violation of the defendants' rights under the Fifth Amendment. *Stirone,* 361 U.S. at 217; *see Daraio,* 445 F.3d at 261-62 (the Due Process and Grand Jury Clauses of the Fifth Amendment give rise to the variance rule and enforce "the fairness of the trial and the protection of the defendant's right to notice of the charges against her and her opportunity to be heard" and the right not to "be[] tried on an indictment which a grand jury never returned"). The Court should therefore dismiss Count 1 against Mr. Johnston for the reasons set forth above.

## III. Count 2 of the Indictment Should be Dismissed for Failure to Charge an Offense

### A. In light of the Supreme Court's recent decision in *Dubin v. United States*, the "use" of the "means of identification of another person" must be at the crux of an identity theft offense.

As part of the alleged conspiracy to commit health care and wire fraud, set forth in Count 1, the Indictment alleges that Mr. Johnston and his co-conspirators submitted "test claims" or "test adjudications" to insurers to determine what the insurance coverage would be for a new, specified combination of ingredients. Ind., ¶ 25. According to the Indictment, these test claims contained patients' identifying information, including patient names, dates of birth, and insurance information, from prescriptions that Central Rexall had previously received for other compounded medications, but without the knowledge or consent of the individuals whose identifying information was used. *Id.* ¶¶ 11, 26. Central Rexall would, it is alleged, print the results of the test claims, inform defendants Casseri or Brockmeier of the results, promptly reverse the claim to the insurer, and shred the paper record of the test adjudication. *Id.* ¶ 27. The information from

these test claims was then allegedly used to design compounded medications based on the amount of money that insurance would pay for the compounded medications rather than on the medications' ability to help patients. *Id.* ¶¶ 25-28.

Count 2 of the Indictment then goes on to allege that the defendants' agreement to this use of "test claims" constitutes conspiracy to commit "identity theft." The referenced identity theft statute, 18 U.S.C. § 1028(a)(7), provides in relevant part as follows:

> Whoever, in a circumstance described in subsection (c) of this section . . . (7) knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law . . . shall be punished as provided in subsection (b) of this statute.

The statute defines "means of identification" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any—(A) name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, [and] employer or taxpayer identification number . . . ." *Id.* § 1028(d)(7).

In June of this year, the United States Supreme Court decided *Dubin v. United States*, 599 U.S. 110 (2023), which interpreted § 1028(a)(7)'s sister statute, 18 U.S.C. § 1028A(a)(1), prohibiting "aggravated identity theft."[8] At issue in *Dubin* was what it means to "use" a person's means of identification "during and in relation to" a felony offense. Concerned with the potentially "boundless" scope of the term "use" and the corresponding expansion of prosecutorial authority,

[8] Section 1028A(1)(1)'s text, nearly identical to § 1028(a)(7)'s, provides: "Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years." The enumerated felony offenses include theft of public money, embezzlement, mail fraud, bank fraud, and wire fraud, but not healthcare fraud. *Id.* § 1027A(c)(1)-(11).

the Supreme Court concluded that the statute could not "apply automatically any time a name or other means of identification happens to be part of the payment or billing method used in the commission of a long list of predicate offenses." *Id.* at 117, 128.

Instead, the Court interpreted the statute as applying only when a defendant's "use" of personal information is at the "crux of what makes the conduct criminal." *Id.* at 131. This requires a "genuine nexus" between the use of a means of identification and the predicate offense—"[i]n other words, the means of identification specifically [must be] a key mover in the criminality." *Id.* at 117, 122-23; *see also id.* at 123 ("[I]dentity theft is committed when a defendant uses the means of identification itself to defraud or deceive.").

Although *Dubin* interpreted § 1028A(a)(1), its reasoning obviously applies with equal force to § 1028(a)(7). There is little difference between the text of the aggravated identity theft statute, which covers a defendant who "knowingly transfers, possesses, or uses" a means of identification "during and in relation to" an enumerated felony offense, *see* § 1028A(a)(1), and the text of the identity theft statute, which applies to a defendant who "knowingly transfers, possesses, or uses" a means of identification "with the intent to commit, or to aid or abet, or in connection with" any violation of federal law or any state or local felony," *see* § 1028(a)(7). Indeed, the Third Circuit has described the elements of both offenses as "virtually identical." *Auernheimer*, 748 F.3d at 535; *see also United States v. Foster*, 740 F.2d 1202, 1206 n.3 (8th Cir. 2014) (reading the two statutes identically). This makes good sense, as no material difference can be drawn between the use of a means of identification "during and in relation to" a felony violation and the use "with the intent to commit, or to aid or abet, or in connection with" unlawful activity. Indeed, as noted by multiple Justices at oral argument in *Dubin*, courts, including the Supreme Court, have interpreted the phrases "in relation to" and "in connection with" identically. *See Shaw v. Delta*

*Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983) (construing ERISA and holding that "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan"); *United States v. Spurgeon*, 117 F.3d 641, 644 (2d Cir. 1997) ("The phrase 'in connection with' is materially indistinguishable from . . . 'in relation to.'"); *see also* Transcript of Oral Argument, *Dubin v. United States* (22-10), at 68:17-22 and 69:6-9 ("[R]eally, 'in connection with,' 'in relation to,' who draws a distinction between those words?"); 73:11-12 ("[In connection with] means 'in relation to.'").

The same factors that the Supreme Court found supported a narrow interpretation of § 1028A also counsel in favor of a narrow interpretation of § 1028(a)(7). First, both statutes contain the term "use," an "elastic" term that "poses some interpretational difficulties," and accordingly requires narrowing. *Dubin*, 599 U.S. at 118, 121. Second, just as *Dubin* held that the phrase "in relation to" must be given a narrow reading, so too must "in connection with." *See United States v. Loney*, 219 F.3d 281, 283 (3d Cir. 2000) (noting the "vagueness and pliability" of the phrase "in connection with" and describing it as a "vague, loose connective"); *accord Dubin*, 599 U.S. at 119 ("If 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes there would be no limits, as really, universally, relations stop nowhere." (cleaned up)). Third, the Court looked to § 1028A's title, "Aggravated Identity Theft," as a strong indication that Congress intended to criminalize a narrower range of conduct than the statute's text might suggest. Rather than prohibiting all "uses" of personal identification, Congress was focused on conduct that approximated "classic identity theft"—that is, "the fraudulent appropriation and use of another person's identifying data or documents." *Dubin*, 599 U.S. at 121-23. While § 1028(a)(7) does not have its own statutory title, its virtually identical language to the Aggravated Identity Theft statute

indicates that Congress intended to criminalize the same "classic identity theft." Indeed, Count 2 of the Indictment is titled "Conspiracy to Commit Identity Theft."

If anything, there are even more arguments for narrowly interpreting § 1028(a)(7) than there were for its aggravated sister statute. Section 1028A(a) only applies to a short list of federal offenses. But § 1028(a)(7)'s list of predicate offenses includes every federal offense, as well as any state or local felony. A broad interpretation of § 1028(a)(7) would therefore raise federalism concerns, extending the federal government's reach by transforming innumerable state and local offenses into federal crimes. And as the Supreme Court has made clear, interpretations of federal criminal statutes that reach into the States' prosecutorial authority are disfavored. *See, e.g.*, *Bond v. United States*, 572 U.S. 844, 863 (2014) (refusing to construe federal statute prohibiting the use of chemical weapons to reach "the simplest of assaults"); *Jones v. United States*, 529 U.S. 848, 857 (2000) (declining to adopt the Government's "expansive interpretation" of a federal arson statute, and specifically the phrase "property used in interstate or foreign commerce," because "hardly a building in the land would fall outside the federal statute's domain"); *United States v. Bass*, 404 U.S. 336, 349-50 (1971) (declining to accept the Government's broad reading of the Travel Act because it would "alter sensitive federal-state relationships," convert "traditionally local criminal conduct' into "a matter for federal enforcement," and "involve a substantial extension of federal police resources"). This reluctance to interpret criminal statutes so as to impinge on state authority is due to the "background assumption" that Congress "normally preserves 'the constitutional balance between the National Government and the States.'" *Bond*, 572 U.S. at 863 (quoting *Bond v. United States*, 564 U.S. 211, 222 (2011)); *see also Bass*, 404

U.S. at 349 ("Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States.").[9]

Finally, the rule of lenity also supports a narrow reading of § 1028(a)(7), consistent with that applied to § 1028A. It is well-settled that courts should construe criminal statutes in accordance with the principle that ambiguities be resolved in a defendant's favor. *Castillo v. United States*, 530 U.S. 120, 131 (2000); *see also Staples v. United States*, 511 U.S. 600, 619 n.17 (1994) ("[U]nder [the rule of lenity] an ambiguous criminal statute is to be construed in favor of the accused."); *United States v. Wiltberger*, 18 U.S. 76, 95 (1820) ("The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself."). The rule of lenity serves to give fair notice to citizens of what conduct is illegal, thus "ensuring that ambiguous statutes do not reach beyond their clear scope," and thereby guarantees that defendants are not sent to prison unless Congress has clearly said that they should. *United States v. Nasir*, 17 F.4th 459, 473 (3d Cir. 2021) (en banc) (Bibas, J., concurring). If, after applying the considerations discussed above, there remains any ambiguity as to whether the limiting interpretation adopted in *Dubin*—that the use of another person's means of identification in connection with a predicate offense is

---

[9] This analysis is in harmony with *Dubin*, where the Supreme Court emphasized its prior precedent that "prudently avoided reading incongruous breadth into opaque language in criminal statutes." *Dubin*, 599 U.S. at 129-30 (citing cases); *see also Ciminelli v. United States*, 598 U.S. 306, 312 (2023) ("[T]he fraud statutes do not vest a general power in 'the Federal Government . . . to enforce (its view of ) integrity in broad swaths of state and local policymaking.'" (quoting *Kelly v. United States*, 590 U.S. —, 140 S. Ct. 1565, 1574 (2020))). This concern has also been highlighted by judges on the Third Circuit. *See United States v. Porat*, 76 F.4th 213, 223-24 (3d Cir. 2023) (Krause, J., concurring) ("In the context of the myriad state-law civil claims and criminal offenses that are available to vindicate the rights of victims of deceits or mere fraudulent inducements, the Supreme Court and appellate courts have repeatedly emphasized that due process and federalism principles require the government to proceed with caution when bringing fraud prosecutions. And yet, there is a continued need for vigilance, lest prosecutors convert the fraud statutes—and the lengthy prison sentences that they can trigger—into tools to regulate good morals and business ethics.").

unlawful only if that "use is at the crux of what makes the conduct criminal." *Dubin*, 599 U.S. at 131—applies to § 1028(a)(7), then the rule of lenity applies and mandates that it does.

### B. The Indictment Fails to Satisfy the *Dubin* Test.

Given the above understanding of § 1028(a)(7), the Indictment fails to state the offense of conspiracy to commit identity theft because the alleged agreed-upon conduct in Count 2 was not at the "crux" of any of the predicate offenses referenced in the Indictment. Here, however, the "test adjudications" that constitute the basis for the identity theft claim, while representing that certain persons had received prescriptions that they had not, in fact, been prescribed, cannot and does not allege that the test adjudications themselves were fraudulent, because there is no allegation that the defendants ever received money or property from PBA for the test adjudications. To the contrary, the Indictment emphasizes that every single test adjudication was promptly cancelled before Central Rexall received reimbursement from PBA for the purported prescription. The Indictment thus alleges only that the defendants received information—nothing more—from PBA, *i.e.*, whether the ingredients contained in the test adjudications were covered, and for how much.

The alleged use of patient information in "test claims" thus cannot be the "crux" of either wire or healthcare fraud. Both variations of fraud require, as the Supreme Court has made clear, a "scheme or artifice to defraud" that is targeted at "money or property." *Ciminelli*, 598 U.S at 312 ("[W]e have consistently understood the 'money or property' requirement to limit the 'scheme or artifice to defraud' element because the common understanding of the words 'to defraud' when the [wire fraud] statute was enacted referred 'to wronging one in his property rights.'" (citations omitted)); *Porat*, 76 F.4th at 218 (property must be the "object of the fraud") (quoting *Kelly* 140 S. Ct. at 1573)). Likewise, the Third Circuit has defined "fraud" as "to cheat or wrongfully deprive another of his property by deception or artifice." *United States v. Jones*, 471 F.3d 478, 481 (3d

Cir. 2006). Because the test adjudications themselves did not result in the transfer of money or property to the Defendants, or from the victims, of the offenses, *see Porat*, 76 F.4th at 218, 220 (the federal fraud statutes require a loss to a victim that is "an incidental byproduct of the scheme"), they cannot constitute acts of wire or health care fraud, and so the use of patients' means of identification cannot be at the crux of wire or health care fraud.

The Government may argue that the test adjudications were "in connection with" acts of wire or health care fraud alleged in the Indictment because the information acquired by the test adjudications was somehow put to use in subsequent healthcare claims that were themselves fraudulent. But the Indictment simply does not allege, even taken in the light most favorable to the Government, that the misuse of another person's means of identification—here, through the test adjudications—is at the crux of what makes the underlying offense criminal, *Dubin*, 599 U.S. at 114, by alleging how it was "a key mover in the criminality" alleged, or played a "central role" in the offense, *id.* at 122-23. Instead, the essence of the fraud alleges here is the Defendants agreed to submit claims for reimbursement that were false or and fraudulent claims because they were not medically necessary—not that they obtained money or property by misusing another person's means of identification. Ind., ¶ 14. Thus, at best, that misuse is "ancillary to what made the conduct fraudulent." *Dubin*, 599 U.S. at 117. Accordingly, under the narrow test set forth in *Dubin*, the Indictment does not sufficiently allege that the defendants agreed to commit identity theft in connection with conspiracy to commit wire or healthcare fraud. For these reasons, Count 2 of the Indictment must be dismissed.

## IV. In the Alternative, the Government Must Elect a Conspiracy to Charge on Multiplicity Grounds

Counts 1 and 2 of the Indictment charge, respectively, conspiracy to commit health care and wire fraud and conspiracy to commit identity theft. As alleged, the conspiracies have the same

duration and the same conspirators, and the Government will likely use the same evidence to attempt to prove each of them. By any measure, they are the same conspiracy, charged twice, and if Counts 1 and 2 are not dismissed, the Government must elect one conspiracy to try to prove at trial and one to dismiss.

Multiplicity is the charging of a single offense in separate counts of an indictment. *United States v. Hodge*, 870 F.3d 184, 193 (3d Cir. 2017); *United States v. Kennedy*, 682 F.3d 244, 254 (3d Cir. 2012); *United States v. Pollen*, 978 F.2d 78, 83 (3d Cir. 1992). The evils inherent in a multiplicitous indictment are several: first, a multiplicitous indictment risks subjecting the defendant to multiple sentences for the same offense, a clear violation of the Double Jeopardy Clause's prohibition against cumulative punishment. *Hodge*, 870 F.3d at 193. Second, a multiplicitous indictment risks "prejudice[ing] the jury against the defendant by creating the impression of more criminal activity on his part than in fact may have been present." *United States v. Carter*, 576 F.2d 1061, 1064 (3d Cir. 1978); *United States v. Caruso*, 948 F. Supp. 382, 390 (D.N.J. 1996) (same); *see also United States v. Polizzi*, 257 F.R.D. 33, 36 (E.D.N.Y. 2009) (a multiplicitous indictment also runs the risk of creating "an exaggerated impression of a defendant's criminal activity by charging an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed"). Finally, a multiplicitous indictment poses a serious risk of jury confusion and with it, a fundamentally unfair trial. *See United States v. Hearod*, 499 F.2d 1003, 1005 (5th Cir. 1974) (noting that one of the hazards of multiplicity is "confus[ing] the jury by suggesting that not one but several crimes have been committed").

Typically, multiplicity is determined by determining whether the evidence required to sustain a conviction on one offense is sufficient to warrant a conviction on the other. *Hodge*, 870 F.3d at 194. Under the so-called *Blockburger* test, when each offense "requires proof of a fact that

the other does not," the two offenses are not the same and the prohibition against Double Jeopardy is not implicated. *Blockburger v. United States*, 284 U.S. 299 (1932); *see also Albernaz v. United States*, 450 U.S. 333, 337-38 (1981) ("As *Blockburger* and other decisions applying its principle reveal . . . the Court's application of the test focuses on the statutory elements of the offense. If each requires proof of a fact that the other does not, the *Blockburger* test is satisfied."). The Third Circuit, however, employs a different test to determine whether two *conspiracy* counts are multiplicitous. Thus, in *United States v. Liotard*, 817 F.2d 1074 (3d Cir. 1978), the Court of Appeals held that the *Blockburger* test "may not adequately protect the defendant's constitutional right against double jeopardy, unless it is tempered with the consideration that a single conspiracy may not be arbitrarily subdivided for the purposes of prosecution." *Id.* at 1078. Accordingly, the Court crafted a "totality of the circumstances" approach to determine "the ultimate inquiry" of whether "there are two agreements or only one." *United States v. Smith*, 82 F.3d 1261, 1266 (3d Cir. 1996); *United States v. Kurlander*, Crim No. 11-315 (WHW), 2012 WL 2263290, at *6-7 (D.N.J. June 14, 2012) (same); *see also United States v. Travillion*, 759 F.3d 281, 295 (3d Cir. 2014) ("The ultimate purpose of the totality of the circumstances inquiry is to determine whether two groups of conspirators alleged by the government to have entered separate agreements are actually all committed to the same set of objectives in a single conspiracy.").

Courts thus analyze four factors: (1) the place where the alleged conspiracies were committed; (2) the degree of temporal overlap between the conspiracies; (3) the overlap of personnel between the conspiracies, including unindicted co-conspirators; and (4) the similarity in the overt acts charged and the role played by the defendant in each indictment. *Smith*, 82 F.3d at

1267 (citing *Liotard*, 817 F.2d at 1078).[10] The "threshold is not high" for satisfying this test, and a defendant merely needs to make a "non-frivolous showing of a single conspiracy" to be entitled to a pretrial evidentiary hearing to determine whether the Government can bear its burden of proving by a preponderance of the evidence that the two conspiracy charges in the Indictment were really two separate crimes, as opposed to a single conspiracy that has been artificially divided. *Travillion*, 759 F.3d at 295; *Liotard*, 817 F.2d at 1077.

Two separate conspiracies are likely to exist when there is an indication that "the activities of the alleged conspiracies are not interdependent or mutually supportive and that there are major participants in each conspiracy who lack knowledge of, or any interest in, the activities of the other." *Smith*, 82 F.3d at 1269. On the other hand, "[w]hen the activities are interdependent or mutually supportive to any degree, the inference becomes compelling that the participants are involved in but one conspiracy," and "[e]ven where there are participants in one alleged conspiracy who are not involved in the activities of the other alleged conspiracy, these inferences may still have persuasive force when the common participants predominate." *Id.* In undertaking this analysis, it is irrelevant under *Liotard* and its progeny whether the two conspiracies arise under different statutes; indeed, in devising its totality of the circumstances test, the Third Circuit explicitly rejected other Circuits' consideration of the statutory offenses charged in an indictment and stated that "[f]or purposes of determining the parameters of . . . two alleged conspiracies, . . . differences in statutory violation are immaterial and fortuitous." *Liotard*, 817 F.2d at 1078 n.7 (citing *Braverman v. United States*, 317 U.S. 49, 53 (1942) ("The one agreement cannot be taken

[10] Although *Liotard* and *Smith* arose in the context of successive prosecutions, the totality of the circumstances test has been applied to multiple conspiracy counts in the same indictment as well. *See, e.g.*, *Travillion*, 759 F.3d at 295-96; *United States v. Irving*, 316 F. Supp. 3d 879, 894 (E.D. Pa. 2018); *United States v. Fumo*, Cr. No. 06-319, 2008 WL 1731911, at *3-4 (E.D. Pa. Apr. 10, 2008).

to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one.")).

Here, the Indictment satisfies neither applicable test. First, under *Blockburger*, the offense charged in Count 1 does not require proof of a fact that Count 2 does not. This is a unique case: the offense of identity theft, which is the object of the conspiracy charged in Count 2, requires that the defendant "use[], without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, *any unlawful activity that constitutes a violation of Federal law*." 18 U.S.C. § 1028(a)(7) (emphasis added). To charge Mr. Johnston with conspiracy to commit identity theft therefore requires not only an allegation that he agreed to commit the offense of identity theft, but also that he agreed to commit that offense in connection with a predicate offense. And the three predicate offenses listed in the Indictment are wire fraud, health care fraud, and conspiracy to commit wire and health care fraud. Ind., ¶ 44. But Count 1 specifically alleges that Mr. Johnston conspired to commit wire and health care fraud. Thus, not only is Count 1 itself a predicate offense of Count 2, but both offenses also have identical predicate offenses themselves, *i.e.*, wire fraud and health care fraud. In other words, the elements of Count 1 are completely subsumed in Count 2; while Count 2 contains elements that Count 1 does not,[11] all of Count 1's elements are captured by Count 2. This is classic multiplicity, alleging one conspiracy in two Counts, in violation of the Double Jeopardy Clause of the Fifth Amendment to the Constitution. *Kennedy*, 682 F.3d at 254-55 (multiplicity is "the charging of a single offense in separate counts of an indictment"); *see also United States v. Stanfa*, 685 F.2d 85, 86-87 (3d Cir. 1982) (the Double Jeopardy Clause prohibits charging the same offense in two counts).

---

[11] Mr. Johnston concedes that Count 2 contains elements that Count 1 does not: proof of an agreement to commit identity theft, and proof of an overt act.

Perhaps more straightforwardly, and beyond the obvious overlap of their allegations, Count 1 and Count 2 also violate the *Liotard* totality of the circumstances test. First, the two alleged conspiracies occurred in the same location: "in the District of New Jersey and elsewhere." Ind., ¶¶ 13, 45.[12] Second, there is complete temporal overlap: both occurred between July 2013 and December 2016, which is not surprising since really, there was a single conspiracy. *Id.* Third, the personnel involved in the conspiracies appear from both the Indictment and the discovery to be the same: the three defendants are members of both conspiracies, and while Hickman and Taff are named in the first conspiracy and not the second, *id.*, the second conspiracy states that the defendants conspired with "others," and the individuals involved in the two conspiracies appears to be very similar, if not absolutely identical, as a hearing of the sort to which the defense is entitled by this showing, *Liotard*, 817 F.2d at 1077, will demonstrate. Fourth, there is a high degree of similarity between the conduct alleged in each conspiracy and Mr. Johnston's role in each.[13] The Count 2 conspiracy alleges that Mr. Johnston and others used patient identifying information to submit false test adjudications to acquire information about the insurance coverage of particular ingredients. Ind., ¶¶ 46-48. And this exact same conduct is alleged as part of the Count 1 conspiracy. *Id.* ¶¶ 25-28. That is, Count 1 alleges, as part of the conspiracy alleged there, that the defendants "caused Central Rexall employees and contractors to submit false test claims ('test adjudications')," which "used the identifying information, including patient names, dates of birth,

[12] As discussed *supra* at Section I, the events alleged in the Indictment—significantly, with respect to both Counts 1 and 2—actually occurred in Louisiana, and are not sufficiently connected to this District to satisfy venue requirements.

[13] The *Liotard* test requires the Court to assess, at a hearing if necessary, 817 F.2d at 1077,the degree of overlap between the conduct of the defendant in each conspiracy. *Id.* at 1078. In *Liotard*, the Court looked to the overt acts charged in each conspiracy, *id.*, but that is not possible here, since the Count 1 conspiracy does not allege any overt acts and the Count 2 conspiracy does allege overt acts, but none that were undertaken by Mr. Johnston. Ind., ¶¶ 49(a)-(g).

and insurance information, from prescriptions that Central Rexall had previously received for other compounded medications, but without the knowledge or consent of the individuals whose identifying information was used," to "design compounded medications." *Id.* ¶¶ 25-28. Count 2 alleges that the defendants "caused Central Rexall employees and contractors to use the identifying information, including patient names, dates of birth, and insurance information" from "prescriptions that Central Rexall had previously received," to "submit false test adjudications for compounded medications without the knowledge or consent of the individuals whose identifying information was used," in order "to design expensive compounded medications." *Id.* ¶¶ 46-48. On the face of the indictment, therefore, the Count 2 conspiracy is nothing more than a subset of the Count 1 conspiracy. This violates *Liotard*, in violation of Defendants' rights under the Double Jeopardy Clause of the Fifth Amendment to the Constitution. *See Travillion*, 759 F.3d at 294-95; *Smith*, 82 F.3d at 1266-67. In the alternative, this analysis obviously amounts to a non-frivolous showing that requires further testing at an evidentiary hearing. *See Travillion*, 759 F.3d at 295 (holding that if a defendant makes a "non-frivolous showing" that an indictment alleges one conspiracy in two counts, "he is entitled to a pretrial evidentiary hearing").

As a practical and legal matter, then, and under either applicable test, the Indictment states one conspiracy in two offenses. If either or both of Counts 1 and 2 are not dismissed for unconstitutional vagueness or failure to charge an offense respectively, the Government should be required to elect one conspiracy that it intends to prove at trial. *See United States v. Johnson*, 130 F.3d 1420, 1426 (10th Cir.1997) (noting that the trial court has discretion to require election between multiplicitous counts); *United States v. Throneburg*, 921 F.2d 654, 657 (6th Cir.1990) (noting "that the district court has discretion in deciding whether to require the prosecution to elect between multiplicitous counts especially when the mere making of the charges would prejudice

the defendant with the jury"); *United States v. Lampley*, 573 F.2d 783, 792 (3d Cir. 1978) (Gibbons, J., concurring in part and dissenting in part) ("If the court finds that the defendant's acts constituted only one illegal course of conduct, the appropriate remedy is to compel the prosecution to elect among the multiplicitous counts."). In the alternative, Mr. Johnston requests a pretrial evidentiary hearing to assess the evidence the Government intends to introduce to prove each alleged conspiracy and adjudicate his Double Jeopardy claim. *See Travillion*, 759 F.3d at 295.

## V. Counts 4, 5, 6, 9, 10, 13, 14, 17, 19, 21, and 23 Should Be Dismissed for Failure to State an Offense

Counts 4, 5, 6, 9, 10, 13, 14, 17, 19, 21, and 23 set forth the allegations of money laundering conspiracy and substantive money laundering, respectively, against Mr. Johnston. Specifically, Count 4 charges Mr. Johnston with conspiracy to commit money laundering under 18 U.S.C. § 1956(h), which provides:

> Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

18 U.S.C. § 1956(h). "The elements of a conspiracy under 18 U.S.C. § 1956(h) are: (1) that an agreement [to violate §§ 1956 or 1957] was formed between two or more persons; and (2) that the defendant knowingly became a member of the conspiracy." *United States v. Greenidge*, 495 F.3d 85, 100 (3d Cir. 2007). The underlying substantive crime, 18 U.S.C. § 1957(a), which is charged in Counts 5, 6, 9, 10, 13, 14, 17, 19, 21, and 23, requires that the Government show that: "(1) the defendant engage[d] or attempt[ed] to engage (2) in a monetary transaction (3) in criminally derived property that is of a value greater than $10,000 (4) knowing that the property is derived from unlawful activity, and (5) the property is, in fact, derived from specified unlawful activity." *United States v. Sotelo*, 707 F. App'x 77, 87 (3d Cir. 2017) (citation omitted). "Criminally derived

property" is "any property constituting, or derived from, proceeds obtained from a criminal offense ...." 18 U.S.C. § 1957(f)(2). Section 1957 incorporates the definition of "specified unlawful activity" in 18 U.S.C. § 1956, which includes, *inter alia*, "any act or activity constituting an offense involving a Federal health care offense." *See* 18 U.S.C. § 1956(c)(7)(F); 18 U.S.C. § 1957(f)(3).

Here, both the conspiracy to commit money laundering Count and the substantive money laundering Counts must fail because the Indictment fails to permissibly charge, as a result of the vagueness challenge described in Section II above, a prosecutable offense. But that aside, and in any event, Counts 5, 6, 9, 10, 13, 14, 17, 19, 21, and 23 fail to allege that Mr. Johnston knew, when he engaged in certain monetary transactions, that the property involved in those transactions was derived from unlawful activity. One of the elements of money laundering under § 1957(a) is the defendant's knowledge that the property was derived from unlawful activity. *Sotelo*, 707 F. App'x at 87. But paragraph 63 of the Indictment—the entire factual basis for the substantive money laundering counts—only states that Mr. Johnston "knowingly engaged in the monetary transactions specified below" and that the monetary transactions were "in criminally derived property of a value greater than $10,000." Nowhere does the Indictment allege that Mr. Johnston engaged in those transactions knowing that the specific transferred funds were in property derived from unlawful activity. Because, as a result, the Indictment fails to allege an essential element of the offense, it must be dismissed. *United States v. Huet*, 665 F.3d 588, 594-95 (3d Cir. 2012) (an indictment is insufficient if it fails to allege an element of the offense).

Finally, but extremely significantly, Counts 4, 5, 6, 9, 10, 13, 14, 17, 19, 21, and 23 fail to charge money laundering because each of the financial transactions alleged charge no more than that the funds at issue went into Mr. Johnston's accounts. That is, the Indictment alleges that Defendants Johnston and Brockmeier owned PMG and Bluen Medical, two management

companies that received 90% of Central Rexall's profits. Ind., ¶¶ 1(g)-(h), 17-18. The Indictment then alleges that "as further part of the conspiracy" to commit health care and wire fraud, Johnston received millions of dollars from Central Rexall between 2014 and 2016. *Id.* ¶ 38. These payments occurred "through payments to Bluen Medical and PMG." *Id.* ¶ 58. To summarize, by way of alleging a conspiracy to commit money laundering and substantive money laundering, the Indictment alleges that Johnston caused the transfer of proceeds of the conspiracy to commit health care and wire fraud from New Jersey to Pharmacy Benefits Administrator to Central Rexall's bank account to Bluen Medical and PMG's bank accounts, and ultimately from Bluen Medical and PMG to Johnston's personal bank account. *Id.* ¶ 59; *see also id.* ¶ 63 (listing transfers from Bluen Medical and PMG to Defendants' bank accounts).

This chain of events does not state a money laundering offense because the alleged "criminally derived property" in which Mr. Johnston is alleged to have transacted was not "proceeds obtained from a criminal offense" until it entered his bank account. As the Third Circuit has recently made clear, "ill-gotten funds do not become 'proceeds' until *after* a defendant receives them," and "any transactions that occur *before* a defendant obtains the fruits of [his] fraudulent scheme fall outside of" the statute's scope. *Fallon*, 61 F.4th at 118 (emphasis in original).[14] "Thus, a defendant's mere receipt of funds as a result of a fraudulent transaction cannot itself constitute money laundering" because it is only at that moment that the criminally derived funds become "proceeds" that the defendant can launder. *Id.* Money laundering occurs, under *Fallon*, only when the funds are involved in monetary transactions thereafter.

---

[14] *Fallon* construes 18 U.S.C. § 1956(a), which contains different elements than § 1957, but both statutes require that the defendant transact in "proceeds" of unlawful activity and should be read identically. *See* 18 U.S.C. § 1957(f)(3) (providing that the term "proceeds" as used in § 1957 shall have the meaning given to it in § 1956).

Other Circuits are in accord. For example, in *United States v. Piervinanzi*, the Second Circuit held that the "ordinary meaning of the word 'obtained' implies possession of a thing," while the word "property" implies "ownership, or the 'exclusive right to possess, enjoy, and dispose of a thing.'" 23 F.3d 670, 677 (2d Cir. 1994) (quoting Webster's Third New International Dictionary 1559 and 1818 (1986)). The use of such language "demonstrates a congressional intent that the proceeds of a crime be in the defendant's possession before he can attempt to transfer those proceeds in violation of § 1957." *Id.*; *see also United States v. Lovett*, 964 F.2d 1029, 1042 (10th Cir. 1992) ("Congress intended to separately punish a defendant for monetary transactions that follow in time the underlying specified unlawful activity that generated the criminally derived property in the first place."); *United States v. Butler*, 211 F.3d 826, 830 (4th Cir.2000) (holding that to establish a money laundering offense "the laundering of funds cannot occur in the same transaction through which those funds first become tainted by crime").

Here, the Indictment does not state a money laundering offense because Mr. Johnston did not "obtain" the alleged criminally derived property until he transferred the funds from Bluen Medical and PMG—both of which Mr. Johnston was only part owner, *see* Ind., ¶¶ 1(h)-(i)—into his bank account. The funds did not, then, become his property until the final link in the chain of monetary transactions. That is, the prior transactions, in which the money flowed through Central Rexall's bank account to Bluen Medical and PMG's bank accounts, were not money laundering transactions under the statute because they occurred before the allegedly ill-gotten gains were allegedly provided to Mr. Johnston. Indeed, the Indictment specifically alleges that Mr. Johnston's receipt of funds was "further part of the conspiracy"—that is, a specific part of the alleged offense of conspiracy to commit health care and wire fraud that forms the basis of the money laundering charges' "specified unlawful activity." Ind., ¶ 38; *see also id.* ¶¶ 56, 63 (alleging that criminally

derived property was derived from conspiracy to commit health care and wire fraud). But this means, as the Third Circuit has described it, that the actions at issue can only be described as the "mere receipt of funds as a result of a fraudulent transaction[, which] cannot itself constitute money laundering." *Fallon*, 61 F.4th at 118; *see also Butler*, 211 F.3d at 830 ("Put plainly, the laundering of funds cannot occur in the same transaction through which those funds first became tainted by crime."). Again, the crime at issue was not complete, rendering the funds the proceeds of unlawful activity until they were in Mr. Johnston's account, after which financial transactions involving them would be an offense. But nothing after that receipt is alleged, and accordingly Counts 4, 5, 6, 9, 10, 13, 14, 17, 19, 21, and 23 must be dismissed for failure to charge an offense on this basis as well. [15]

## VI. If the Indictment Survives The Motion to Dismiss, The Court Should Order the Government to Provide a Bill of Particulars

If this Court disagrees, notwithstanding the fundamental pleading failures and constitutional defects identified above, that the Indictment should be dismissed, then Mr. Johnston respectfully requests that the Court, at the very least, order the Government to provide him with a bill of particulars clarifying the deficient aspects of the Indictment, identified above and below.

Federal Rule of Criminal Procedure 7(f) permits the Court to "direct the filing of a bill of particulars," which "is a 'formal detailed statement of the claims or charges brought by a plaintiff or a prosecutor.'" *United States v. Urban*, 404 F.3d 754, 771 (3d Cir. 2005) (quoting Black's Law Dictionary 177 (8th ed. 2004)). As discussed above, for an indictment to be considered sufficient

[15] Count 4 does not survive merely because it alleges conspiracy to commit money laundering. For a count to state conspiracy offense it must allege an endeavor that would satisfy all of the elements of the substantive offense. *See Salinas v. United States*, 522 U.S. 52, 65 (1997) (to be guilty of conspiracy, "[a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense"). The conduct alleged in Count 4 suffers from precisely the same defects as the monetary transactions alleged in the substantive money laundering counts and must therefore be dismissed as well.

it must "adequately inform[] the defendant of the charges against [him] such that []he may prepare a defense and invoke the double jeopardy clause when appropriate." *Id.* (quoting *United States v. Whited*, 311 F.3d 259, 262 (3d Cir. 2002)); *see also United States v. Atwell*, No. 13-cr-0560, 2015 WL 2092687, at *4 (D.N.J. May 5, 2015) ("For an indictment to be sufficient, it must contain all the elements of a crime and adequately apprise the defendant of what he must be prepared to meet."). "'[W]hen the indictment itself is too vague and indefinite for such purposes,' a bill of particulars is warranted." *United States v. Moyer*, 674 F.3d 192, 203 (3d Cir. 2012) (quoting *United States v. Addonizio*, 451 F.2d 49, 64 (3d Cir. 1971)). Thus, "the court should grant a motion seeking a bill of particulars when an indictment's failure to provide factual or legal information 'significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial.'" *United States v. DePaoli*, 41 F. App'x 543, 546 (3d Cir. 2002) (quoting *United States v. Rosa*, 891 F.2d 1063, 1066 (3d Cir. 1989)). And although a defendant is not entitled to wholesale discovery of a government's case, when he seeks legitimate information, his request for a bill of particulars may not be denied merely because providing the information would divulge details of the government's evidence. *Addonizio*, 451 F.2d at 64 n.16. Such legitimate information commonly includes, at least, the who, what, when, and where of an offense. *See, e.g.*, *United States v. Cerna*, No. CR 08-0730, 2009 WL 2998929, at *2-3 (N.D. Cal. Sept. 16, 2009) (ordering a bill of particulars to clarify "additional details including *who* was present at the meetings . . . *when* and *where* such meetings took place, *what* was said at these meetings, and *what* each defendant allegedly did to indicate their participation in the conspiracy." (emphasis in original)). In this regard, granting a bills of particulars is particularly appropriate given that Rule 7(f) was specifically amended "to encourage a more liberal attitude by the courts towards bills of particulars without taking away the discretion which courts must have in dealing with such motions on

individual cases." Fed. R. Crim. P. 7(f), Advisory Committee's Note; *see also Addonizio*, 451 F.2d at 64 ("The 1966 amendment to Rule 7(f), Fed.R.Crim.P., eliminating the requirement that cause be shown before a bill of particulars may be ordered, is 'designed to encourage a more liberal attitude by the courts towards bills of particulars without taking away the discretion which courts must have in dealing with such motions in individual cases.'" (quoting Fed. R. Crim. P. 7 (f), Advisory Committee's Note)).

The need for a bill of particulars applies with special force when the Government alleges a conspiracy offense. Courts have noted that:

> In conspiracy cases, if the government is to rely upon proof of specific acts to establish its case, there is no question that the defendants alleged to have participated in such acts should be furnished with sufficient detail to fairly apprise them of the transactions to be proved so they will have a reasonable opportunity to meet the charges of performing the specific acts.

*United States v. Agnello*, 367 F. Supp. 444, 450 (E.D.N.Y. 1973). Thus, courts routinely require that the Government provide a defendant with an appropriate bill of particulars in conspiracy cases. *See, e.g., United States v. Davidoff*, 845 F.2d 1151, 1152 (2d Cir. 1998) (holding that the District Court abused its discretion in denying a bill of particulars in a conspiracy case); *United States v. Bortnovsky*, 820 F.2d 572, 573-74 (2d Cir. 1987) (reversing the defendants' convictions for "engaging in a scheme to defraud the Federal Emergency Management Administration and the New York Property Insurance Underwriting Association through its submission of false and inflated insurance claims" because the District Court's denial of a bill of particulars hindered the defendants in preparing their defense); *see also United States v. Roque*, No. 12-cr-540, 2013 WL 2474686, at *7 (D.N.J. June 6, 2013) (ordering the Government to provide a bill of particulars in a Computer Fraud and Abuse Act case requiring that the Government list "each act of unauthorized access," state "whether the government contends that defendant(s) did it in furtherance" of the

Computer Fraud and Abuse Act, and state "whether the government contends that defendant(s) did it in furtherance of state law 'harassment'"); *United States v. Korbe*, No. 2:09-CR-0005, 2010 WL 2404384, at *5 (W.D. Pa. June 10, 2010) (granting bill of particulars as to "the general type, manner, means, and time of the alleged conspiratorial acts" the Government alleged the defendant participated in); *United States v. Cole*, 717 F. Supp. 309, 316-17 (E.D. Pa. 1989) (directing the government to particularize allegations in indictment by informing defendant of precise unlawful conduct charged against him); *United States v. Smith*, 65 F.R.D. 464, 468 (N.D. Ga. 1974) (holding that, where the indictment charged a variety of fraudulent acts and a conspiracy to commit those acts was vague, "justice require[d] a bill of particulars that more information be provided to aid in preparation of the defense").

Specifically, as set forth in greater detail below, Mr. Johnston respectfully requests that the Government be required to identify: (1) the unnamed "others" with whom Mr. Johnston allegedly acted to commit the crimes charged; (2) the locations where Mr. Johnston purportedly committed the acts constituting the alleged crimes charged in the Indictment, which instead either alleges that the defendants committed the alleged offenses "in the District of New Jersey, and elsewhere" or entirely omits any geographic limitation; and (3) what exactly Mr. Johnston, as opposed to any others, did to participate in the alleged conspiracy to commit health care and wire fraud, which consistently groups together all of the co-defendants, along with unnamed "others" with regard to the acts of the offense alleged, including a number of very specific facts that require particularization in light of the language of the Indictment drafted by the Government. These are discussed, *seriatim*, below.

### A. The Court Should Order the Government to Provide a Bill of Particulars to Remedy the Fundamental Pleading Defects Permeating Throughout The Indictment.

As discussed above, the Indictment against Mr. Johnston should be dismissed due to its numerous fundamental defects, including the vagueness of the health fraud conspiracy alleged in Count 1, based as it is on the notion of "medical necessity" which, that Count charges, caused the claims at issue to be false and fraudulent; the failure to sufficiently allege that Mr. Johnston agreed to commit identity theft in connection with conspiracy to commit wire or healthcare fraud; the failure to plead the requisite elements to support a money laundering or conspiracy to commit money laundering offense; and the failure to allege facts sufficient to support venue in this District. If the Court disagrees that the Indictment warrants dismissal, then Mr. Johnston respectfully requests that the Court order the Government to provide a bill of particulars setting forth a "formal, detailed statement of the claims or charges." *Urban*, 404 F.3d at 771 (citations omitted). Specifically, Mr. Johnston respectfully requests that the Government provide a bill of particulars identifying a limited number of very fundamental facts that necessarily underlie the allegations that Mr. Johnston laundered money and entered into conspiracies to commit health care and wire fraud, identity theft, and money laundering—facts that, as courts have consistently held, are necessary to provide the notice to which Mr. Johnston is constitutionally entitled before facing trial on the charges against him and which, in any event, should be provided by the Court in the exercise of its discretion to assure that the trial proceeds efficiently. *See Rosa*, 891 F.2d at 1066 ("[T]he case law . . . recognizes that motions for a bill of particulars should be granted whenever an indictment's failure to provide factual or legal information significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial. At the same time, these decisions recognize that trial judges must be allowed to exercise broad discretion in order to strike a prudent balance between the defendant's legitimate interest in securing information

concerning the government's case and numerous countervailing considerations" (citation omitted)).

**1. The Government Should Identify The Unnamed "Others" With Whom Mr. Johnston Is Alleged To Have Agreed And Conspired.**

In Counts 1, 2, and 4, the Government repeatedly claims that Mr. Johnston conspired and agreed with unnamed "others" to commit the charged offenses. Ind., ¶¶ 13, 45, 56. These "others" are not identified in the Indictment, and their identity cannot possibly be gleaned through the discovery in this matter, which consists of over one million documents and two million pages. Without knowing the identity of these "others" referred to in the Indictment, Mr. Johnston will not be able to fully investigate the circumstances of the Indictment, prepare potential objections under Federal Rule of Evidence 801(d)(2)(E), or protect himself against a second prosecution for the same offense, but naming different co-conspirators. In order for Mr. Johnston to adequately defend against these charges, the Government should be required to specifically identify the "others" cited in the Indictment, as courts in this and other districts routinely order. *See, e.g.*, *Vastola*, 670 F. Supp. at 1270 ("[T]he names of all co-conspirators or participants in the alleged offenses should be provided except insofar as the Government can show, *in camera*, that such disclosures might endanger the safety of prospective witnesses." (cleaned up)); *United States v. Gatto*, 746 F. Supp. 432, 477 (D.N.J. 1990) ("To the extent the indictment alleges that 'others' were involved, the government must specify who the 'others' are."), *rev'd on other grounds*, 690 F.2d 60, 66 (3d Cir. 1982); *see also United States v. Concord Mgmt. & Consulting LLC*, 385 F. Supp. 3d 69, 76 (D.D.C. 2019) (requiring disclosure of all co-conspirators identities "to the extent that the government plans to identify the individuals as co-conspirators at trial"); *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 303 (S.D.N.Y. 2018) (granting request for identities of unindicted co-conspirators known to the government); *United States v. Cree*, No. 12-26(4), 2012 WL 6194395, at *6 (D. Minn. Dec.

12, 2012) (holding that the defendant was "entitled to the names of all persons whom the United States will claim at trial were co-conspirators"); *United States v. Steele*, 83 F. Supp. 2d 340, 343 (N.D.N.Y. 2000) (requiring "that the Government must disclose the identities of any alleged co-conspirators" in a bill of particulars); *United States v. Redding*, 540 F. Supp. 2d 1184, 1188 (D. Kan. 2008) (granting a bill of particulars "detailing the alleged co-conspirators known to the government"); *United States v. Newton*, 2002 WL 122911, *2 (S.D.N.Y. Jan. 30, 2002) ("It is beyond dispute that this Court has the authority, in its discretion, to order the government to disclose the identities of known unindicted co-conspirators); *United States v. Long*, No. 1:08-CR-043, 2008 WL 11336760, at *4 (N.D. Ga. Oct. 3, 2008) (requiring the government provide a bill of particulars stating "the names of the unindicted coconspirators"); *United States v. Bin Laden*, 92 F. Supp. 2d 225, 241 (S.D.N.Y. 2000), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93 (2d Cir. 2008) ("[T]he Government must disclose to the Defendants the identities, including all aliases and code names, of all unindicted co-conspirators to whom it will refer at trial," unless such disclosure would expose the person to significant risk of bodily harm or compromise an ongoing investigation); *United States v. Nachamie*, 91 F. Supp. 2d 565, 573 (S.D.N.Y. 2000) (granting bill of particulars requiring that Government provide the identities of co-conspirators in case alleging Medicare fraud conspiracy); *United States v. Mariani*, 90 F. Supp. 2d 574, 592 (M.D. Pa. 2000) (ordering the Government to provide a bill of particulars identifying the co-conspirators and other participants in the alleged scheme to defraud, explaining that "defendants cannot know with certainty whom the government contends were involved in the fraudulent scheme"); *United States v. Nestor*, No. 3:09-CR-00397, 2010 WL 2696776, at *13 (M.D. Pa. July 6, 2010) (granting a bill of particulars detailing "the identities of the . . . co-conspirators" the government intends to testify at trial); *United States v. Trie*, 21 F. Supp. 2d 7, 22

(D.D.C. 1998) (granting bill of particulars as to the names of unindicted co-conspirators); *United States v. Ramirez*, 54 F. Supp. 2d 25, 30 (D.D.C. 1999) (granting a bill of particulars "setting forth the name of all persons the government would claim at trial were co-conspirators (whether or not they will be called as trial witnesses)); *United States v. DeGroote*, 122 F.R.D. 131, 138 (W.D.N.Y. 1988) (granting bill of particulars as to the identities of unnamed co-conspirators because "defendant is 'legitimately concerned to know' whether he need prepare a defense against allegations of his participation in acts constituting a conspiracy with others not named in the indictment."); *Agnello*, 367 F. Supp. at 450-51 (directing the Government to reveal "the names and addresses of all coconspirators" in a bill of particulars); *United States v. Iannelli*, 339 F. Supp. 171, 182 (W.D. Pa. 1972) (granting a bill of particulars listing "the names of co-conspirators not named in the indictment").

Specifically, Count 1 asserts that Mr. Johnston knowingly and intentionally conspired and agreed with the co-conspirators, Taff, Hickman, "and others" to execute and devise a scheme and artifice to defraud a health care benefit program and to obtain money and property by means of materially false pretenses. Ind., ¶ 13. Count 1 also claims that Mr. Johnston and "others" unlawfully enriched themselves, *id.* ¶ 14, "caused the submission of numerous false and fraudulent claims to Pharmacy Benefits Administrator and others for compounded medications," *id.* ¶ 37, and "caused Pharmacy Benefits Administrator to pay over $50,000,000 for false and fraudulent claims for compounded medications," *id.* ¶ 41. Counts 2 and 4 similarly contends that Mr. Johnston "and others" knowingly conspired to commit identity theft, *id.* ¶ 45, and money laundering, *id.* ¶ 56.

Thus the Indictment clearly alleges (presumably because the Government presented evidence to the grand jury and the grand jury found) that the offenses were committed by Mr.

Johnston, Mr. Brockmeier, Mr. Casseri,[16] "and others." When, as here, this is the case, a defendant in Mr. Johnston's position is—as the abundant caselaw on the subject in this and other districts makes clear—entitled to the identity of the "others" to whom the grand jury refers in the Indictment. Only with this information will Mr. Johnston be able to adequately prepare his defense to the charges actually brought, avoid surprise at trial should the evidence involve previously unidentified co-conspirators, understand the essence of the charges against him, assist the Court by airing out appropriate objections under Federal Rule of Evidence 801(d)(2)(E), and ultimately protect him against a second prosecution, in violation of the Double Jeopardy Clause of the Fifth Amendment to the Constitution, for the same conduct but with different participants. *See Moyer*, 674 F.3d at 203. Thus, under the well-established jurisprudence set forth above, the Court should grant Mr. Johnston's request and order the Government to identify the "others" referenced in the Indictment.

**2. The Government Should Identify Where, Including The "Elsewhere" Alleged In The Indictment, The Alleged Crimes Occurred.**

The Government should additionally be required to identify where the events alleged in the Indictment took place. Counts 1, 2, and 4 allege that the conspiracy offenses occurred "in the District of New Jersey, and elsewhere," but offer no indication of where that "elsewhere" may be (though, as noted above, *see* Section I, *supra*, the Defendants are aware that there are some actions at issue that occurred in Louisiana). Even worse, Counts 5-21 are devoid of any indication whatsoever as to where the alleged money laundering occurred. Again, the law is clear: a criminal defendant is entitled to know the places—here, frequently denominated as "elsewhere"—where the conduct with which he has been charged, and which he must therefore defend against, occurred.

---

[16] Mr. Casseri is not a named co-conspirator in Count 4 of the Indictment, conspiracy to commit money laundering.

*See Vastola*, 670 F. Supp. at 1270 (The Government should disclose "the precise date and place of each event alleged in the Indictment."). Indeed, case after case requires the Government to provide a bill of particulars setting forth the locations denominated by the Grand Jury's finding that offense occurred in particular locations "and elsewhere." *See Gatto*, 746 F. Supp. at 477 ("[T]o the extent that the government is able to do so, the precise date and place of each event alleged in the indictment should be provided."); *United States v. Jordan*, No. 3:06-CR-102, 2007 WL 1849985, at *21 (E.D. Tenn. June 25, 2007) (finding that "[t]he government shall provide . . . "additional particular information as to the location(s) of the alleged criminal activity, narrowing the scope of the language 'and elsewhere' used in the indictment"); *United States v. McGhee*, No. 3:06-CR-19, 2007 WL 1296009, at *3 (E.D. Tenn. May 1, 2007) (holding that "the government shall provide . . . the location(s) of the alleged criminal activity, narrowing the scope of the language 'and elsewhere' used in the indictment"); *United States v. Hickey*, 16 F. Supp. 2d 223, 245 (E.D.N.Y. 1998) (directing the government to provide a bill of particulars regarding allegation that offense took place within the district and "elsewhere"). As these cases and others demonstrate, it is well-established that Mr. Johnston is entitled to know the very basic fact of where the Government alleges the events in the Indictment took place, so that he can adequately prepare his defense, avoid surprise at trial, understand what the charges are against him, and avoid giving up his protection against double jeopardy in the event that the same charge is brought, but allegedly in a different place. *See Moyer*, 674 F.3d at 203 ("The purpose of the bill of particulars is to inform the defendant of the nature of the charges brought against him to adequately prepare his defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described offense." (quoting *Addonizio*, 451 F.2d at 63-64)). Therefore, and particularly given the serious question as to whether venue is proper in this District, the Government should, at the least, be

compelled to provide a bill of particulars identifying where the alleged acts occurred, including the locations encompassed by its use of the term "elsewhere." *See United States v. Long*, 697 F. Supp. 651, 655 (S.D.N.Y. 1988) ("[I]f the indictment is not sufficiently specific on its face, the government may remedy the inadequacy by providing a sworn bill of particulars.").

### B. The Court Should Order the Government to Provide a Bill of Particulars to Provide Necessary Details Required In Light of the Allegations Set Forth in in Count 1 of the Indictment.

In addition to the foregoing fundamental pleading defects, the Court should—if it disagrees that Count 1 warrants dismissal based upon the deficiencies set forth in Section II, *supra*, —grant a bill of particulars to clarify certain additional aspects of the conspiracy to commit health care fraud and wire fraud charged in that Count. As explained below, Count 1, in its wording, sets forth allegations that, on their face, beg for certain details, which Mr. Johnston cannot reasonably be expected to understand, though he must if he is to have a reasonable opportunity to adequately prepare for trial. Thus, in order to provide a competent defense, a bill of particulars, addressing the points set forth below is required. *See Mariani*, 90 F. Supp. 2d at 591 ("A bill of particulars should be granted where the indictment is too vague or indefinite to reasonably allow a defendant to prepare his defense.").

#### 1. The Government Does Not Specify How Mr. Johnston Participated In The Alleged Conspiracy to Commit Health Care Fraud and Wire Fraud.

It is essential that an individual alleged to have participated in a conspiracy be informed of the specific conduct in which he, as opposed to others, is alleged to have engaged. *See Vastola*, 670 F. Supp. at 1260 (holding that "the defendant is entitled to a more detailed factual description of his alleged role in the . . . conspiracies in order to avoid prejudicial surprise at trial."). The Indictment, here, however, fails to specify how Mr. Johnston participated in the purported conspiracy to commit health care fraud and wire fraud. Rather, in nearly every paragraph of Count

1,[17] the Government either attributes the alleged acts to Central Rexall as a whole, or groups Mr. Johnston together with his co-defendants, and at times Taff, Hickman and unnamed "others." But merely alleging that the co-defendants, along with Taff, Hickman and others "caused the submission of false and fraudulent claims to Pharmacy Benefits Administrator for medically unnecessary Central Rexall compounded prescription medications and . . . shar[ed] in the profits realized by Central Rexall from payments for those compounded prescription medications," Ind., ¶ 14, without providing any specifics about what Mr. Johnston actually did, impermissibly places upon Mr. Johnston the burden of preparing to defend against anything and everything that he (as well as Central Rexall and his co-defendants) did between July 2013 and December 2016, the three-and-a-half-year time period alleged. *See generally Moyer*, 674 F.3d at 203 ("[W]hen the indictment itself is too vague and indefinite [to adequately apprise the defendant of what he must be prepared to meet],' a bill of particulars is warranted). Because Mr. Johnston is entitled to know the nature of the charges brought against *him*, specifically, so that he may adequately prepare his own defense, avoid surprise during trial, and protect himself against double jeopardy, this type of "group pleading" cannot stand and can and should be addressed through a bill of particulars. *See, e.g., Concord Mgmt. & Consulting LLC,* 385 F. Supp. 3d at 80 (directing the Government to clarify which "activities" defendant is alleged to have engaged in); *Agnello*, 367 F. Supp. at 450-51 (granting bill of particulars directing the government to specify which defendant was "alleged as actually having committed the offense and specify which . . . are alleged as having aided, abetted,

[17] The only paragraphs specifically pertaining to Mr. Johnston are paragraph 1b ("Defendant CHRISTOPHER KYLE JOHNSTON was the controlling member and President of Pharmacy Management Group, LLC, and Bluen Medical, LLC and in 2014 and 2015 was General Counsel of Central Rexall"), and paragraph 38 ("It was further part of the conspiracy that defendant CHRISTOPHER KYLE JOHNSTON received over $34,000,000 from Central Rexall from 2014 through 2016"). Neither paragraph substantively speaks to Mr. Johnston's participation in the alleged scheme.

counseled, commanded, induced, procured, or caused the commission of the offense" and "specifically the means by which [the defendant] performed one of the . . . acts"); *see also Cerna*, 2009 WL 2998929, at *2-3 (ordering the government to provide a bill of particulars clarifying when each defendant was alleged to have first joined the conspiracy and "additional details including *who* was present at the meetings . . . *when* and *where* such meetings took place, *what* was said at these meetings, and *what* each defendant allegedly did to indicate their participation in the conspiracy" (emphasis in original)); *Ramirez*, 54 F. Supp. 2d at 30 (granting a bill of particulars setting forth "the approximate dates and locations of any meetings or conversations not already identified in the indictment in which each defendant allegedly participated, and the approximate date on which each defendant allegedly joined the conspiracy"); *United States v. Taylor*, 707 F. Supp. 696, 700 (S.D.N.Y. 1989) (same). Accordingly, Mr. Johnston respectfully requests that the Government specify how Mr. Johnston participated in the alleged crimes.

But beyond addressing the notice problems inherent in the kind of "group pleading" in which the Government has engaged in this Indictment, *see United States v. Kensington Hosp.*, 760 F. Supp. 1120, 1124 (E.D. Pa. 1991) ("[G]roup pleading fails to provide defendants with adequate notice, and reveals a lack of attention to detail by the government."); *Sheeran v. Blyth Shipholding S.A.*, No. 14-5482, 2015 WL 9048979, at *3 (D.N.J. Dec. 16, 2015) (explaining that group pleading fails to put defendants on notice of the claims against them), there are specific allegations in the Indictment that require clarification so that the Court and the defense can understand what is really being alleged. For the convenience of the Court and the Government, and so that this request is as specific as possible, Mr. Johnston respectfully requests a bill of particulars addressing the specific allegations below:

- The Indictment alleges that "[o]nce Central Rexall received a prescription from a medical office for a compounded medication, Central Rexall employees prepared

and submitted an electronic claim to Pharmacy Benefits Administrator using information from the prescription, including the patient's name, address and identifying information, date of birth, insurance information, the ingredients contained in the compounded medication on the prescription, and the name and identifying information of the doctor or qualified medical professional who signed the prescription." Ind., ¶ 11. Under the law, Mr. Johnston is entitled to know which electronic claim(s) the Government alleges Mr. Johnston, specifically, submitted or caused to be submitted, to Pharmacy Benefits Administrator, if any, so that he can defend against these charges. *See, e.g., United States v. Fischbach & Moore, Inc.*, 576 F. Supp. 1384, 1389 (W.D. Pa. 1983) (defendants were entitled to bill of particulars identifying which contracts were subject of the alleged conspiracy); *see generally Vastola*, 670 F. Supp. at 1270 (The government should disclose "the precise date and place of each event alleged in the Indictment."); *Gatto*, 746 F. Supp. at 477 ("[T]o the extent that the government is able to do so, the precise date and place of each event alleged in the indictment should be provided.").

- The Indictment alleges that "[i]t was the object of the conspiracy for defendants CHRISTOPHER KYLE JOHNSTON, TRENT BROCKMEIER, and CHRISTOPHER CASSERI and Hayley Taff and William Hickman and others to unlawfully enrich themselves by causing the submission of false and fraudulent insurance claims to Pharmacy Benefits Administrator for medically unnecessary Central Rexall compounded prescription medications and, by sharing in the profits realized by Central Rexall from payments for those compounded prescription medications." Ind., ¶ 14. And "[i]t was further part of the conspiracy that defendants CHRISTOPHER KYLE JOHNSTON, TRENT BROCKMEIER, and CHRISTOPHER CASSERI and others caused the submission of numerous false and fraudulent claims to Pharmacy Benefits Administrator and others for compounded medications." *Id.* ¶ 37. Mr. Johnston is entitled, under the law, to know which false and fraudulent insurance claims the Government alleges Mr. Johnston, specifically, submitted or caused to be submitted, to Pharmacy Benefits Administrator, if any, so that he can defend against these charges. *See, e.g., United States v. Jackson*, No. 3:16-CR-31, 2016 WL 6495589, at *1, 7 (N.D. W.Va. Nov. 2, 2016) ("In the case of a defendant who is charged with fraud, it is critical that the government identify in the indictment the dates of the fraudulent conduct, the specific fraudulent documents, and the fraudulent statements within the documents." (cleaned up)); "); *United States v. Vasquez-Ruiz*, 136 F. Supp. 2d 941, 943 (N.D. Ill. 2001) (holding that a bill of particulars was required to identify the "allegedly fraudulent bills submitted to insurers"); *United States v. Mango*, No. 96-CR-327, 1997 WL 222367, at *12 (N.D.N.Y. May 1, 1997) (requiring bill of particulars on conspiracy count to identify every alleged false representation, the maker of that representation, the date it was made, to whom it was made, and each co-conspirator who knew the representation was false when made); *Nachamie*, 91 F. Supp. 2d at 574 (directing the Government to provide "identify each and every one of the 'false and misleading claims' which were allegedly submitted and/or filed as part of the conspiracy" and to provide specifics regarding the claims it intended to prove were false, including: the identity of the person who prepared the

claim and who submitted it; when and where each claim was prepared and submitted; and each item or entry on the claim that is alleged to be false and the manner in which such item or entry is allegedly false).

- The Indictment alleges that "[i]t was further part of the conspiracy that defendants CHRISTOPHER KYLE JOHNSTON and TRENT BROCKMEIER brought to Central Rexall formulas for compounded medications that they knew would each adjudicate for thousands of dollars per month and would cost only a small fraction of that amount to make." Ind., ¶ 20. Mr. Johnston is entitled, under the law, to know which formulas the Government alleges Mr. Johnston, specifically, brought or directed be brought, to Central Rexall that he knew would adjudicate for thousands of dollars each month but only cost a small fraction to make, if there are any, so that he can defend against these charges. *See, e.g.*, *United States v. Barnes*, 158 F.3d 662, 665 (2d Cir. 1998) (where indictment lacked sufficient particulars of conspiracy, "the defendant was entitled to be otherwise apprised of the conduct that he was alleged to have undertaken in furtherance of this multi-faceted" conspiracy).

- The Indictment alleges that "[i]t was further part of the conspiracy that at the direction of defendants CHRISTOPHER KYLE JOHNSTON and TRENT BROCKMEIER, Central Rexall used preprinted prescription pads with their formulas for compounded medications." Ind., ¶ 21. Mr. Johnston is entitled, under the law, to know which preprinted prescription pads the Government alleges Mr. Johnston, specifically, used or directed Central Rexall to use so that he can defend against these charges. *See, e.g.*, *Fischbach & Moore, Inc.*, 576 F. Supp. at 1389 (defendants were entitled to bill of particulars identifying which contracts were subject of the alleged conspiracy); *Smith*, 65 F.R.D. at 468 (where the indictment charged a variety of fraudulent acts and a conspiracy to commit those acts was vague, "justice require[d] a bill of particulars that more information be provided to aid in preparation of the defense").

- The Indictment alleges that "[i]t was further part of the conspiracy that defendants CHRISTOPHER KYLE JOHNSTON and TRENT BROCKMEIER entered into agreements with distributors under which the distributors agreed to market Central Rexall compounded medications in exchange for percentages up to and including 50% of the insurance adjudications for the medications." Ind., ¶ 22. Mr. Johnston is entitled, under the law, to know which agreements the Government alleges Mr. Johnston, specifically, entered into with distributors, if any, so that he can defend against these charges. *See, e.g.*, *Fischbach & Moore, Inc.*, 576 F. Supp. at 1389 (defendants were entitled to bill of particulars identifying which contracts were subject of the alleged conspiracy).

- The Indictment alleges that "[i]t was further Part of the conspiracy that defendants CHRISTOPHER KYLE JOHNSTON, TRENT BROCKMEIER, and CHRISTOPHER CASSERI designed combinations of ingredients for compounded medications based on the combinations' high insurance reimbursements and manipulated the ingredients to obtain the highest possible insurance reimbursement

rather than to serve the medical needs of patients." Ind., ¶ 24. Mr. Johnston is entitled, under the law, to know which combination of ingredients the Government alleges Mr. Johnston, specifically, designed based on its reimbursements, if any, so that he can defend against these charges. *See, e.g., United States v. McCoy*, 492 F. Supp. 540, 544-45 (M.D. Fl. 1980) (granting defendant's motion for a bill of particulars "setting forth each false and fraudulent pretense and representation described generally in the indictment").

- The Indictment alleges that "[i]t was further part of the conspiracy that in order to determine the insurance adjudication for a potential new combination of ingredients for which they did not have an actual prescription, defendants CHRISTOPHER KYLE JOHNSTON, TRENT BROCKMEIER, and CHRISTOPHER 'CASSERI caused Central Rexall employees and contractors to submit to Pharmacy Benefits Administrator false test claims ("test adjudications"), which were false and fraudulent because the test adjudications necessarily represented that Central Rexall had received a valid prescription from a doctor or other qualified medical professional for the patient identified in the claim to receive a prescribed compounded medication containing the specified combination of ingredients, when in fact there was no such prescription." Ind., ¶ 25. Mr. Johnston is entitled, under the law, to know which test adjudications the Government alleges, if any, Mr. Johnston, specifically, caused Central Rexall employees and contractors to submit, and for what medications, so that he can defend against these charges. *See, e.g., United States v. Vaid*, No. 16 CR. 763 (LGS), 2017 WL 3891695, at *11 (S.D.N.Y. Sept. 5, 2017) (granting in part bill of particulars in prosecution charging conspiracy to make false statements relating to health care, mail, and wire fraud, because "[i]n cases involving fraud, courts have required the Government to specify through a bill of particulars which document or transactions it intends to prove are fraudulent if this information is not ascertainable"); *Nachamie*, 91 F. Supp. 2d at 574 (granting a bill of particulars directing the Government to "identify each and every one of the 'false and misleading' claims which were allegedly submitted and/or filed as part of the conspiracy"); *Trie*, 21 F. Supp. 2d at 21-22 (ordering the government, which had charged defendant with making false statements to a government agency, to provide "information as to exactly what the false statements are, what about them is false, who made them, and how [the defendant] caused them to be made," because a defendant "should not have to waste precious pre-trial preparation time guessing which statements he has to defend against . . . when the government knows precisely the statements on which it intends to rely and can easily provide the information").

- The Indictment alleges that "[i]t was further part of the conspiracy that defendants CHRISTOPHER KYLE JOHNSTON, TRENT BROCKMEIER, and CHRISTOPHER CASSERI used the information from these test adjudications to design compounded medications based on the amount of money that insurance would pay for the compounded medications rather than on the medications' ability to help patients." Ind., ¶ 28. Mr. Johnston is entitled to know, under the law, which compounded medications he, specifically, designed, if any, based on the amount of

money that insurance would pay, so that he can defend against these charges. *See, e.g.*, *Korbe*, 2010 WL 2404384, at *5 (W.D. Pa. June 10, 2010) (granting bill of particulars as to "the general type, manner, means, and time of the alleged conspiratorial acts" in which the government alleged the defendant participated).

- The Indictment alleges that "[i]t was further part of the conspiracy that under the direction of defendants CHRISTOPHER KYLE JOHNSTON, TRENT BROCKMEIER, and CHRISTOPHER CASSERI, Central Rexall placed compound medication combinations on its prescription pads and sent compounded medications to patients based on the amount of money that insurance would pay for a particular combination of ingredients, without doing any tests, studies, or research into the medical necessity or effectiveness of the particular combination of ingredients, without sending information to patients or their health care providers about the medical necessity or effectiveness of the particular combination of ingredients, and without disclosing to patients or their health care providers that the combination of ingredients was selected to maximize the insurance reimbursement rather than serve the medical needs of the patients." Ind., ¶ 29. And "[i]t was further part of the conspiracy that when Pharmacy Benefits Administrator stopped covering one combination of ingredients, at the direction of defendants CHRISTOPHER KYLE JOHNSTON, TRENT BROCKMEIER, and CHRISTOPHER CASSERI, Central Rexall developed a different combination of ingredients based on the amount that insurance would pay for that combination rather than the medical necessity or effectiveness of the new combination of ingredients, and Central Rexall then sent medications containing that new combination of ingredients to patients, even though the new combination of ingredients was not medically equivalent to the combination of ingredients originally prescribed for the patient, and without explaining the differences to patients or prescribing health care providers or informing them that Central Rexall chose the combination based on the insurance reimbursement." *Id.* at ¶ 30. Mr. Johnston is entitled, under the law to know the simple fact of which patients are encompassed by these allegations, and in particular, which, if any, were the subject of Mr. Johnston's own actions, in particular, so that he may adequately prepare his defense to these charges. *See, e.g.*, *United States v. Rogers*, 617 F. Supp. 1024, 1029 (D. Colo. 1985) (granting "defendants' requests for particularization of allegedly false statements," stating that "[t]he government must reveal the substance, date, time, and place of each false statement or concealment and the persons involved); *Cerna*, 2009 WL 2998929, at *2-3 (N.D. Cal. Sept. 16, 2009) (ordering a bill of particulars to clarify "additional details including *who* was present at the meetings . . . *when* and *where* such meetings took place, *what* was said at these meetings, and *what* each defendant allegedly did to indicate their participation in the conspiracy." (emphasis in original)).

- The Indictment alleges that "[i]t was further part of the conspiracy that, at the direction of defendants CHRISTOPHER KYLE JOHNSTON and TRENT BROCKMEIER, and to encourage patients to continue to receive medications they did not need, Central Rexall continued shipping compounded medications to

patients without requiring patients to pay copayments, despite the requirement in Central Rexall's agreement with Pharmacy Benefits Administrator that Central Rexall collect copayments from patients." Ind., ¶ 32. Mr. Johnston is entitled, under the law, to know to which patients the Government alleges Mr. Johnston, specifically, directed Central Rexall to continue shipping compounded medications without requiring copayments, if there are any, so that he may adequately prepare his defense to these charges. *See, e.g.*, *Rogers*, 617 F. Supp. at 1029 (D. Colo. 1985) (granting "defendants' requests for particularization of allegedly false statements," stating that "[t]he government must reveal the substance, date, time, and place of each false statement or concealment and the persons involved); *Cerna*, 2009 WL 2998929, at *2-3 (N.D. Cal. Sept. 16, 2009) (ordering a bill of particulars to clarify "additional details including *who* was present at the meetings . . . *when* and *where* such meetings took place, *what* was said at these meetings, and *what* each defendant allegedly did to indicate their participation in the conspiracy." (emphasis in original)).

- The Indictment alleges that "[i]t was further part of the conspiracy that Central Rexall distributors retained and directed by defendants CHRISTOPHER KYLE JOHNSTON, TRENT BROCKMEIER, and CHRISTOPHER CASSERI marketed medications directly to individual patients and beneficiaries of insurance plans administered by Pharmacy Benefits Administrator, even though Central Rexall's agreement with Pharmacy Benefits Administrator prohibited such marketing." Ind., ¶ 33. And "[i]t was further part of the conspiracy that Central Rexall distributors retained and directed by defendants CHRISTOPHER KYLE JOHNSTON, TRENT BROCKMEIER, and CHRISTOPHER CASSERI obtained prescriptions that were not medically necessary and Fraudulent . . ." *Id.* ¶ 34. Mr. Johnston is entitled, under the law, to know which Central Rexall distributors, if any, the Government alleges Mr. Johnston, specifically, retained and directed, to market medications directly to individual patients and to which patients, if any, so that he can adequately prepare his defense to these charges. *See, e.g.*, *Smith*, 65 F.R.D. at 468 (where the indictment charged a variety of fraudulent acts and a conspiracy to commit those acts was vague, "justice require[d] a bill of particulars that more information be provided to aid in preparation of the defense").

- The Indictment alleges that "[i]t was further part of the conspiracy that at the direction of defendants CHRISTOPHER KYLE JOHNSTON, TRENT BROCKMEIER, and CHRISTOPHER CASSERI, Central Rexall promoted Central Rexall compounded medications as prescription treatments for medical conditions and weight loss without tests or studies to support the claims that the particular combinations of ingredients in the compounded medications were effective in treating those conditions or causing weight loss." Ind., ¶ 35. Mr. Johnston is entitled, under the law, to know which medications, if any, the Government alleges Mr. Johnston, specifically, directed Central Rexall to promote without any tests or studies to support the claims so that he can adequately prepare his defense to these charges. *See, e.g.*, *United States v. Hawit*, No. 15-CR-252 (PKC), 2017 WL 663542, at *11 (E.D.N.Y. Feb. 17, 2017) (requiring the

government to file a bill of particulars specifying the transactions that it "will seek to prove were tainted by an unlawful conspiracy of which [the defendant] was a part").

- The Indictment alleges that "[i]t was further part of the conspiracy that Central Rexall marketing materials and communications with patients falsely represented that Central Rexall compounded medications were custom designed to suit the medical needs of individual patients, when in reality the formulas for Central Rexall medications were developed by defendants CHRISTOPHER KYLE JOHNSTON, TRENT BROCKMEIER, and CHRISTOPHER CASSERI and by Central Rexall distributors to maximize profits and were not tailored to individual patients." Ind., ¶ 36. Mr. Johnston is entitled, under the law, to know which formulas the Government alleges Mr. Johnston, specifically, developed, if any, which were not tailored to individual patient needs, so that he can adequately prepare his defense to these charges. *See, e.g., Bortnovsky*, 820 F.2d at 575 (trial court's failure to grant a bill of particulars was error because without it defense counsel was "left unguided as to which documents would be proven falsified"); *Cole*, 717 F. Supp. at 316-17 (E.D. Pa. 1989) (directing the government to particularize allegations in indictment by informing defendant of precise unlawful conduct charged against him).

In sum, Mr. Johnston respectfully requests this Court grant this very specific bill of particulars requiring the Government to identify what acts, specifically alleged in vague terms in the Indictment drafted by the Government, Mr. Johnston, specifically, engaged in, as opposed to his co-defendants, Taff, Hickman, or unnamed others. Only with this information will Mr. Johnston be able to fully understand what the charges against him are, adequately prepare his defense, and avoid surprise at trial.

## VII. Prejudicial Information Concerning The Amount Of Money That Mr. Johnston Purportedly Received From Central Rexall As Part Of The Alleged Conspiracy To Commit Health Care And Wire Fraud Should Be Stricken From The Indictment As Surplusage.

If the Court were to find that Count 1 of the Indictment sufficiently charges a conspiracy to commit health care and wire fraud and successfully sets forth all of the required elements, the Court should nonetheless strike from the Indictment language pertaining to the amount of money Mr. Johnston allegedly received as part of the scheme as irrelevant and highly prejudicial surplusage. Under Federal Rule of Criminal Procedure 7(d), a district court "may strike

surplusage" from an indictment upon a defendant's motion. "The purpose of Rule 7(d) is to protect a defendant against prejudicial allegations that are neither relevant nor material to the charges made in the indictment." *Alsugair*, 256 F. Supp. 2d at 317; *see also* Fed. R. Crim. P. 7(d), Advisory Committee's Note (This rule introduces a means of protecting the defendant against immaterial or irrelevant allegations in an indictment or information, which may . . . be prejudicial."). "If, for example, the government asserts irrelevant or immaterial facts, particularly those that might prejudice the jury, the defendant may compel their deletion." *United States v. Hughes*, 766 F. 2d 875, 879 (5th Cir. 1985). Surplusage may accordingly be stricken because it "serve[s] only to inflame the jury, confuse the issues, and blur the elements necessary for conviction . . . ." *United States v. Bullock*, 451 F.2d 884, 888 (5th Cir. 1971). *See generally United States v. Brooks*, 438 F.3d 1231, 1237 (10th Cir. 2006) ("Acting in its discretion, a district court may strike as surplusage allegations not relevant to the charge at issue."); *United States v. Torres*, 2:20-CR-00418 (BRM), 2023 WL 6389095, at *1 (D.N.J. Oct. 2, 2023) ("[A] motion to strike language from an indictment is committed to the sound discretion of the trial court.") (quoting *United States v. Schweitzer*, No. 03-00451-1, 2004 WL 1535793, at *3 (E.D. Pa. Feb. 26, 2004))).

In *United States v. Hedgepeth*, the Third Circuit set forth a two-part test to determine whether surplusage should be stricken from an indictment, stating that motions to strike should be granted when the challenged allegations are "both irrelevant (or immaterial) and prejudicial." 434 F.3d at 612; *see also Vastola*, 670 F. Supp. at 1255 (striking irrelevant, vague language, which may have implied guilt by association or insinuated unalleged facts). Here, the Indictment alleges that, "[i]t was further part of the conspiracy that defendant CHRISTOPHER KYLE JOHNSTON received over $34,000,000 from Central Rexall from 2014 through 2016." Ind., ¶ 38. That statement, however, has absolutely nothing to do with the elements of the charged crime, and thus,

could not be less relevant to Mr. Johnston's guilt or innocence in his case. Indeed, neither the receipt of money nor the amount of money that Mr. Johnston allegedly received from his employer, Central Rexall, are elements of a conspiracy to commit health care and wire fraud. *See United States v. Sanders*, 952 F.3d 263, 273 (5th Cir. 2020) (To prove a conspiracy to commit health care fraud, the government must show that: "(1) two or more persons made an agreement to commit health care fraud; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement with the intent to further the unlawful purpose."); *United States v. Mitan*, CRIM. A. 08-760-1, 2009 WL 1651288, at *8 (E.D. Pa. June 11, 2009) (The elements of conspiracy to commit wire fraud are: "(1) an agreement between two or more persons to commit [wire] fraud, (2) the defendant knowingly joined the conspiracy, and (3) one of the conspirators committed an overt act in furtherance of the conspiracy."); *see also United States v. Valencia*, 600 F.3d 389, 432 (5th Cir. 2010) ("We treat the allegation of additional facts beyond those which comprise the elements of the crime as 'mere surplusage.'" (quoting *United States v. Robinson*, 974 F.2d 575, 578 (5th Cir. 1992))).[18]

---

[18] While there are, of course, statutes where the Government may allege the amount of money that a defendant received in order to adequately state the offense, *see, e.g.*, 18 U.S.C. § 666 (prohibiting an agent of an organization, or of a State, local, or Indian tribal government that receives at least $10,000 in assistance through a federal program in one year, from soliciting or accepting "anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more"); 18 U.S.C. § 667 (establishing criminal penalties for "[w]hoever obtains or uses the property of another which has a value of $10,000 or more in connection with the marketing of livestock in interstate or foreign commerce with intent to deprive the other of a right to the property or a benefit of the property or to appropriate the property to his own use or the use of another); 18 U.S.C. § 2315 (creating criminal liability against "[w]hoever receives, possesses, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more, or pledges or accepts as security for a loan any goods, wares, or merchandise, or securities, of the value of $500 or more, which have crossed a State or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken"), thus presenting a different analysis

Why, then, does the Government include this information in the Indictment? The answer is obvious: it is an effort to visit undue prejudice on Mr. Johnston, portraying him as a "fat cat" who was made a lot of money as a result of the scheme alleged in the Indictment, all in an effort to prejudice and inflame the jury. In other words, the sole purpose of this pejorative allegation is to turn the jury against Mr. Johnston. This, of course, is precisely what Rule 7(d) is meant to guard against. In *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 239 (1940), the Supreme Court stated that "appeals to class prejudice are highly improper and cannot be condoned and trial courts should ever be alert to prevent them." As this Court has explained, "[a]dmission of lifestyle evidence carries a danger of appealing to class resentments," inflaming the jury, and thus "depriv[ing] th[e] defendant of a fair trial." *United States v. Lattanzio*, CR 15-446 (KM), 2018 WL 1837856, at *14 (D.N.J. Apr. 16, 2018) (quoting *United States v. Williams*, 705 F. App'x 869, 873–74 (11th Cir. 2017)). Accordingly, the Third Circuit, and various other appellate courts have recognized that prosecutorial appeals to wealth and class biases, at various stages of the trial process, can create prejudicial error, in violation of a defendant's due process rights. *See Draper v. Airco, Inc.*, 580 F.2d 91, 95 (3d Cir. 1978) (noting that inappropriate references to a defendant's wealth can be highly prejudicial); *United States v. Stahl*, 616 F.2d 30 (2d Cir. 1980) (prosecutor's references to defendant's wealth warranted reversal of his conviction); *Sizemore v. Fletcher*, 921 F.2d 667, 670 (6th Cir. 1990) (prosecutor's appeal to wealth and class created prejudicial error, violating defendant's constitutional due process rights); *United States v. Arledge*, 553 F.3d 881, 895 (5th Cir. 2008) (acknowledging that "prosecutorial appeals to class prejudice are highly improper and can be prejudicial"); *United States v. Jackson-Randolph*, 282 F.3d 369, 376 (6th Cir.

---

under Rule 7(d), such is not the case here where no such amounts are required under the applicable statutes.

2002) ("This court has already recognized that prosecutorial appeals to wealth and class biases can create prejudicial error, violating a defendant's right to due process of law under the Fifth Amendment."). Those dangers are readily apparent here, as information relating to the significant amount of money Mr. Johnston made as General Counsel for Central Rexall is either meant to show, or certainly risks being used to depict, Mr. Johnston as some kind of "money bags" whom a jury should not like and should therefore convict. *See Finch v. Hercules Inc.*, CIV. A. 92-251 MMS, 1995 WL 785100, at *10 (D. Del. Dec. 22, 1995) (excluding evidence of defendant's financial wealth as it "would serve to prejudice the jury against defendant and its senior officers by portraying them as 'avaricious fat cats who can afford to pay a sizable judgment.'"). It is for that reason that just this kind of statement has often been stricken by courts under Rule 7(d). *See, e.g., United States v. Schwenin*g, No. 8:05CR282, 2006 WL 1559668, at *5 (D. Neb. June 5, 2006) (striking indictment allegation regarding the value of the contracts won as a result of an alleged illegal gratuity); *United States v. Rush*, 807 F. Supp. 1263, 1266 (E.D. La. 1992) (striking allegation that defendant's scheme cost the state $10 million in losses because "its inclusion could prejudice the defendant"); *United States v. Lavin*, 504 F. Supp. 1356, 1362-63 (N.D. Ill. 1981) (striking $30 million figure in allegedly fraudulent property because it prejudicially, "overstate[d] both the scope and result of the alleged fraud"); *see also United States v. Bryant*, 556 F. Supp. 2d 378, 421 (D.N.J. 2008) (granting motion to strike where information was immaterial and posed a significant risk of prejudice to the jury). Given the highly prejudicial and inflammatory nature of this information, it should be stricken here as well.

## CONCLUSION

For these reasons, Defendant Christopher Kyle Johnston respectfully requests that the Court enter an Order dismissing the Indictment, in whole or in part. Alternatively, the Court should enter an Order (1) requiring the Government to elect not to prosecute either Count 1 or Count 2,

or scheduling a pretrial evidentiary hearing to consider Mr. Johnston's multiplicity challenge; (2) granting a bill of particulars; and (3) striking paragraph 38 from the Indictment. Mr. Johnston also joins in all applicable motions filed by his co-defendants, including but not limited to Defendant Christopher Casseri's motion to dismiss Count 1, filed at ECF No. 120.

Dated: November 10, 2023

Respectfully submitted,

s/ Lawrence S. Lustberg
Lawrence S. Lustberg
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07030
(973)596-4500

*Attorneys for Defendant Christopher Kyle Johnston*