# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA

v.

CHRISTOPHER KYLE JOHNSTON,
TRENT BROCKMEIER, and
CHRISTOPHER CASSERI

Crim. No. 20-800 (RBK)

*Document Electronically Filed*

---

## REPLY BRIEF OF DEFENDANT JOHNSTON
## IN FURTHER SUPPORT OF OMNIBUS PRETRIAL MOTIONS

---

**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07030
(973)596-4500

*Attorneys for Defendant*
*Christopher Kyle Johnston*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

ARGUMENT ...................................................................................................................... 2

I.      THE INDICTMENT FAILS TO ADEQUATELY ALLEGE VENUE AS TO THE
        COUNTS AGAINST MR. JOHNSTON. .......................................................... 2

II.     COUNT 1 OF THE INDICTMENT IS VAGUE AS APPLIED AND SHOULD BE
        DISMISSED. ........................................................................................................ 9

III.    The Indictment Does Not State the Offense of Identity Theft. ........................... 17

        A.      *Dubin's* Standard Applies To § 1028(a)(7). ......................................... 17

        B.      Count 2 Does Not Satisfy *Dubin's* Standard. ....................................... 22

IV.     THE INDICTMENT IS MULTIPLICITOUS. ................................................... 26

        A.      The *Blockburger* Test ........................................................................... 26

        B.      The *Liotard* Test ................................................................................... 29

        C.      A Multiplicity Challenge Can Be Considered on a Motion to Dismiss............... 32

V.      THE INDICTMENT DOES NOT STATE THE OFFENSE OF MONEY
        LAUNDERING. ................................................................................................. 34

        A.      Counts 5, 6, 9, 10, 13, 14, 17, 19, 21, and 23 Fail to Allege an Essential
                Element ................................................................................................... 34

        B.      All Money Laundering Counts Fail To Allege Any Proceeds............................. 34

VI.     THE COURT SHOULD ORDER A BILL OF PARTICULARS CLARIFYING
        THE VAGUE ALLEGATIONS IN THE INDICTMENT THAT CANNOT BE
        CURED BY THE GOVERNMENT'S EXTENSIVE DISCOVERY. ........................... 40

VII.    THE IRRELEVANT AND PREJUDICIAL LANGUAGE CONCERNING THE
        AMOUNT OF MONEY THAT MR. JOHNSTON ALLEGEDLY RECEIVED
        FROM CENTRAL REXALL SHOULD BE STRICKEN. ............................................. 45

CONCLUSION .................................................................................................................. 48

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albernaz v. United States*,
   450 U.S. 333 (1981)..................................................................................30, 32

*Blockburger v. United States,*
   284 U.S. 299 (1932).................................................................... *passim*

*Cedeno v. United States*,
   No. 09-cv-6395, 2010 WL 2682173 (D.N.J. July 2, 2010),
   *aff'd*, 455 F. App'x 241 (3d Cir. 2011)..................................................31

*Ciminelli v. United States*,
   598 U.S. 306 (2023)..................................................................................25

*Connally v. General Constr. Co.*,
   269 U.S. 385 (1926)....................................................................................9

*Dubin v. United States*,
   599 U.S. 110 (2023).................................................................... *passim*

*Flores-Figueroa v. United States*,
   556 U.S. 646 (2009)..................................................................................26

*Johnson v. United States*,
   576 U.S. 591 (2015)..................................................................................10

*Kemper v. Deutsche Bank AG*,
   911 F.3d 383 (7th Cir. 2018) ....................................................................25

*Kolender v. Lawson*,
   461 U.S. 352 (1983)...........................................................................13, 15

*Nebraska Press Ass'n v. Stuart*,
   427 U.S. 539 (1976)......................................................................................2

*Parker v. Levy*,
   417 U.S. 733 (1974)..................................................................................16

*Rutledge v. United States*,
   517 U.S. 292 (1996)..................................................................................28

*Sessions v. Dimaya*,
   584 U.S. ---, 138 S. Ct. 1204 (2018) .......................................................13

*Shaw v. Delta Air Lines, Inc.*,
    463 U.S. 85 (1983) ...........................................................................................21

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ..........................................................................................14

*United States v. Abuhouran*,
    162 F.3d 230 (3d Cir. 1998)..............................................................................36

*United States v. Addonizio*,
    451 F.2d 49 (3d Cir. 1971)................................................................................43

*United States v. Aguilar*,
    756 F.2d 1418 (9th Cir. 1985) ..........................................................................33

*United States v. Aispuro*,
    No. 08-cr-2936, 2010 WL 1404196 (D.N.M. Mar. 16, 2010) ..............................43

*United States v. Alcorta*,
    145 F. Supp. 3d 357 (M.D. Pa. 2015) .................................................................3

*United States v. Allen*,
    781 F. App'x 513 (7th Cir. 2019) ......................................................................21

*United States v. Anderson*,
    441 F. Supp. 2d 15 (D.D.C. 2006) ..............................................................44, 45

*United States v. Aprahamian*,
    No. 20-cr-64, 2022 WL 221615 (E.D. Pa. Jan. 25, 2022) .....................................4

*United States v. Arberry*,
    No. 06-cr-278, 2007 WL 9706396 (E.D. Wisc. Feb. 15, 2007) .............................43

*United States v. Auernheimer*,
    748 F.3d 525 (3d Cir. 2014)............................................................2, 7, 17, 21

*United States v. Bin Laden*,
    92 F. Supp. 2d 225 (S.D.N.Y. 2000), *aff'd*, 552 F.3d 93 (2d Cir. 2008), *cert.
    denied*, 556 U.S. 1283 (2009) ..........................................................................43

*United States v. Birks*,
    656 F. Supp. 2d 454 (D.N.J. 2009) .....................................................................5

*United States v. Bonilla*,
    579 F.3d 1233 (11th Cir. 2009) ........................................................................21

*United States v. Bortnick*,
    No. 03-cr-0414, 2004 WL 2861868 (E.D. Pa. Nov. 30, 2004).............................47

*United States v. Bortnovsky*,
    820 F.2d 572 (2d Cir. 1987)..............................................................44

*United States v. Cabrales*,
    524 U.S. 1 (1998).....................................................................................2

*United States v. Caronia*,
    703 F.3d 149 (2d Cir. 2012)..............................................................14

*United States v. Carter*,
    576 F.2d 1061 (3d Cir. 1978)............................................................33

*United States v. Caruso*,
    948 F. Supp. 382 (D.N.J. 1996).........................................................33

*United States v. Ciancaglini*,
    858 F.2d 923 (3d Cir. 1988)..............................................................30

*United States v. Conley*,
    37 F.3d 970 (3d Cir. 1994)..........................................................36, 39

*United States v. Davidoff*,
    845 F.2d 1151 (2d Cir. 1988)............................................................44

*United States v. Davis*,
    588 U.S. ---, 139 S. Ct. 2319 (2019)........................................9, 10, 13

*United States v. Dixon*,
    921 F.2d 194 (8th Cir. 1990) ............................................................33

*United States v. Eisenberg*,
    773 F. Supp. 662 (D.N.J. 1991) .......................................................47

*United States v. Fallon*,
    61 F.4th 95 (3d Cir. 2023) ....................................................... *passim*

*United States v. Ferriero*,
    866 F.3d 107 (3d Cir. 2017)..............................................................14

*United States v. Flores*,
    945 F.3d 687 (2d Cir. 2019)..............................................................25

*United States v. Foster*,
    740 F.2d 1202 (8th Cir. 2014) ..........................................................21

*United States v. Franklin-El*,
    554 F.3d 903 (10th Cir. 2009) ..........................................................13

*United States v. Galindo*,
    No. 11-10117, 2012 WL 1945142 (D. Kan. May 30 2012)....................................27

*United States v. Garcia*,
    No. 21-1415, 2022 WL 1535378 (7th Cir. May 16, 2022), *reh'g denied*, No.
    21-1415, 2022 WL 2349362 (7th Cir. June 29, 2022)............................................13

*United States v. Gladden*,
    78 F.4th 1232 (11th Cir. 2023) ......................................................................23, 24

*United States v. Golden*,
    No. 21-2618, 2023 WL 2446899 (3d Cir. Mar. 10, 2023)...............................32, 34

*United States v. Grayson*,
    795 F.2d 278 (3d Cir. 1986)...............................................................................29

*United States v. Guest*,
    383 U.S. 745 (1966) (Harlan, J., concurring) .....................................................16

*United States v. Hanna*,
    198 F. Supp. 2d 236 (E.D.N.Y. 2002) ...............................................................47

*United States v. Harris*,
    No. 90-cr-144, 1990 WL 118061 (E.D. Pa. Aug. 11, 1990)................................31

*United States v. Hearod*,
    499 F.2d 1003 (5th Cir. 1974) ..........................................................................33

*United States v. Hill*,
    2:19-cr-189, 2020 WL 491261 (D. Utah Jan. 30, 2020).....................................15

*United States v. Hoffert*,
    949 F.3d 782 (3d Cir. 2020)...............................................................................14

*United States v. Holland*,
    No. 17-cr-00234, 2018 WL 8867811 (N.D. Ga. Aug. 6, 2018), *report and
    recommendation adopted*, 396 F. Supp. 3d 1210 (N.D. Ga. 2019) ..........................3

*United States v. Huet*,
    665 F.3d 588 (3d Cir. 2012)...............................................................................35

*United States v. Irving*,
    316 F. Supp. 3d 879 (E.D. Pa. 2018) .................................................................34

*United States v. Jimenez Recio*,
    537 U.S. 270 (2003)..........................................................................................25

*United States v. Jones*,
    817 F. App'x 138 (6th Cir. 2020) ...................................................21

*United States v. Kemp*,
    359 F. App'x 356 (3d Cir. 2010) ...................................................31

*United States v. Kennedy*,
    64 F.3d 1465 (10th Cir. 1995) ...............................................36, 39

*United States v. Kennedy*,
    707 F.3d 558 (5th Cir. 2013) ......................................................39

*United States v. Koranki*,
    No. 10-cr-43, 2010 WL 2868183 (W.D. Okla. July 20, 2010)................47

*United States v. Lavin*,
    504 F. Supp. 1356 (N.D. Ill. 1981) ...............................................48

*United States v. Lievertz*,
    No. 02-cr-0005, 2002 WL 31640562 (S.D. Ind. Nov. 1, 2002)..............13

*United States v. Liotard*,
    817 F.2d 1074 (3d Cir. 1987)................................................ *passim*

*United States v. Long*,
    No. 08-cr-043, 2008 WL 11336760 (N.D. Ga. Oct. 3, 2008).................43

*United States v. Loy*,
    237 F.3d 251 (3d Cir. 2001).........................................................9

*United States v. Mark*,
    284 F. App'x 946 (3d Cir. 2008) ...................................................31

*United States v. McLean*,
    715 F.3d 129 (4th Cir. 2013) ......................................................12

*United States v. Med 1st*,
    No. 16-cr-000076, 2017 WL 4848823 (W.D. Ky. Oct. 26, 2017).........13

*United States v. Mendoza*,
    108 F.3d 1155 (9th Cir. 1997) ......................................................4

*United States v. Menendez*,
    137 F. Supp. 3d 688 (D.N.J. 2015), *aff'd,* 831 F.3d 155 (3d Cir. 2016)........................ *passim*

*United States v. Nachamie*,
    91 F. Supp. 2d 565 (S.D.N.Y. 2000).............................................44

*United States v. Nat'l Dairy Prods. Corp.*,
    372 U.S. 29 (1963) ................................................................16

*United States v. Nicolo*,
    523 F. Supp. 2d 303 (W.D.N.Y. 2007) .....................................16

*United States v. Omoruyi*,
    260 F.3d 291 (3d Cir. 2001) ...................................................39

*United States v. Perez*,
    280 F.3d 318 (3d Cir. 2002) ................................................3, 6

*United States v. Peterson*,
    357 F. Supp. 2d 748 (S.D.N.Y. 2005) .......................................5

*United States v. Phillips*,
    962 F. Supp. 200 (D.D.C. 1997) .............................................33

*United States v. Porat*,
    76 F.4th 213 (3d Cir. 2023) ...................................................25

*United States v. Quintanilla*,
    2 F.3d 1469 (7th Cir. 1993) ...................................................33

*United States v. Rigas*,
    605 F.3d 194 (3d Cir. 2010) ...................................................32

*United States v. Rush*,
    807 F. Supp. 1263 (E.D. La. 1992) ..........................................47

*United States v. Safeway Stores, Maryland*,
    51 F. Supp. 448 (D. Kan. 1943), *rev'd on other grounds, Frankfort Distilleries
    v. United States*, 144 F.2d 824 (10th Cir. 1944), *rev'd on other grounds*, 324
    U.S. 293 (1945) ......................................................................5

*United States v. Salahmand*,
    No. 08-cr-192, 2009 WL 10680619 (D.D.C. May 12, 2009) .................29

*United States v. Savage*,
    No. 07-cr-550, 2012 WL 1994736 (E.D. Pa. June 1, 2012) ............31, 32

*United States v. Schwening*,
    No. 8:05-cr-282, 2006 WL 1559668 (D. Neb. June 5, 2006) ................47

*United States v. Shea*,
    No. 20-cr-412, 2023 WL 4551635 (S.D.N.Y. July 14, 2023) ................38

*United States v. Smith*,
　82 F.3d 1261 (3d Cir. 1996).............................................................30

*United States v. Smith*,
　985 F. Supp. 2d 547 (S.D.N.Y. 2014), *aff'd sub nom. United States v.*
　*Halloran*, 664 F. App'x 23 (2d Cir. 2016)..........................................16

*United States v. Socony-Vacuum Oil Co.*,
　310 U.S. 150 (1940).......................................................................48

*United States v. Sotelo*,
　707 F. App'x 77 (3d Cir. 2017) ........................................................34

*United States v. Spurgeon*,
　117 F.3d 641 (2d Cir. 1997)............................................................21

*United States v. Travillion*,
　759 F.3d 281 (3d Cir. 2014).......................................................30, 33

*United States v. Urban*,
　404 F.3d 754 (3d Cir. 2005)............................................................41

*United States v. Whited*,
　311 F.3d 259 (3d Cir. 2002)............................................................41

*United States v. Williams*,
　553 U.S. 285 (2008).......................................................................10

*Van Buren v. United States*,
　593 U.S. --, 141 S. Ct. 1648 (2021) .................................................19

**Constitutional Provisions**

U.S. Const. amend. I ..............................................................14, 15

U.S. Const. amend. V ..........................................................9, 15, 32

**Statutes**

18 U.S.C. § 371.....................................................................30, 32

18 U.S.C. § 1028(a)(7)............................................................. *passim*

18 U.S.C. § 1028(b) .....................................................................21

18 U.S.C. § 1028A................................................................. *passim*

18 U.S.C. § 1349.................................................................30, 38

18 U.S.C. § 1956(i)(1) ................................................................................................7

18 U.S.C. § 1956(c)(7) ..............................................................................................38

18 U.S.C. § 1957 ......................................................................................................35

18 U.S.C. § 1957(a) ............................................................................................34, 37

18 U.S.C. § 1957(f)(2) ..............................................................................................35

18 U.S.C. § 1961(1) ..................................................................................................38

21 U.S.C. § 846 ...................................................................................................28, 32

21 U.S.C. § 848 ........................................................................................................28

21 U.S.C. § 963 ........................................................................................................32

## Rules

Fed. R. Crim. P. 7(d) ................................................................................................47

Fed. R. Crim. P. 12(b)(3)(B) ......................................................................................3

Fed. R. Crim. P. 12(b)(3)(B)(ii) ...............................................................................34

Fed. R. Evid. 801(d)(2)(E) ........................................................................................42

Fed. R. Crim. P. 16(b) ..............................................................................................43

## Other Authorities

Barry Tarlow, *When Too Much Discovery Is Not Enough*, 26 Mar. Champion 56
(2002) .................................................................................................................43

Centers for Medicare & Medicaid Services, CMS Repeals MCIT/R&N Rule,
*available at https://www.cms.gov/newsroom/press-releases/cms-repeals-
mcitrn-rule-will-consider-other-coverage-pathways-enhance-access-
innovative-
medical#:~:text=Today%2C%20the%20Centers%20for%20Medicare,sufficie
nt% 20to%20protect%20Medicare%20patients* ..................................................11

CMS Pub 100-18 § 10.6 Medically-accepted Indication, CMS Man. 1176879 ..........................12

H.R. REP. No. 104-736 (Aug. 21, 1996), reprinted in 1996 U.S.C.C.A.N. 1990 ........................12

## PRELIMINARY STATEMENT

The Government's opposition brief, like its Indictment, overreaches in many respects. In an attempt to obtain the conviction of the general counsel of a pharmacy who had nothing to do with the New Jersey doctors and salespersons whom it has previously prosecuted, the Government reaches into Louisiana, stretching the rules of venue well beyond what the Constitution allows, and seeking to bring prejudicial but irrelevant facts—such as the defendant's wealth—to bear in order to obtain its charge. When shown that the statutes underpinning this prosecution cannot support charging Mr. Johnston with prescribing "medically unnecessary" medications, the Government relies on out-of-circuit caselaw with dissimilar facts. When confronted with the fact that the Supreme Court has ruled against the basic theory underpinning its identity theft conspiracy count, the Government digs in its heels, insisting that its sweeping interpretation of identity theft remains valid as if last June's decision in *Dubin v. United States* had never happened. And when challenged with the fact that the Indictment charges Mr. Johnston with money laundering for the entirely non-criminal act of depositing money into his own bank account, the Government maintains that the charges are legitimate, resulting in an unbalanced Indictment containing two conspiracy offenses (albeit for the same conspiracy, in violation of the proscription against multiplicitous counts) directed to the merits of the offenses at issue, with no corresponding substantive counts, but twenty-one counts of money laundering or conspiracy to commit money laundering, none of which describe a crime, even if all of the facts alleged by the Government are accepted as true. Finally, when Mr. Johnston, confronted with an Indictment that contains little by way of specifics, requests a carefully circumscribed bill of particulars limited to specific facts that are essential to any effort to defend himself, the Government's response is simply to direct the defense to the discovery it has provided. But the defense is not required to wade through over two million pages of discovery to determine the basics of the prosecution's theory of criminality.

For the reasons in the moving brief and below, Mr. Johnston's pretrial motions should be granted.

## ARGUMENT

### I.    THE INDICTMENT FAILS TO ADEQUATELY ALLEGE VENUE AS TO THE COUNTS AGAINST MR. JOHNSTON.

As is fully set forth in Mr. Johnston's moving brief, a defendant's right to be tried "by a jury of one's peers" is "unquestionably one of the most precious and sacred safeguards enshrined in the Bill of Rights," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 572 (1976) (Brennan, J. concurring); indeed, "[i]t was of such concern that the Constitution of the United States 'twice safeguards the defendant's venue right,'" *United States v. Auernheimer*, 748 F.3d 525, 532 (3d Cir. 2014) (quoting *United States v. Cabrales*, 524 U.S. 1, 6 (1998)).  In an effort to avoid dismissal, the Government—even as it underscores the importance of this "sacred" right— improperly embellishes the allegations contained in the Indictment in order not to violate it.  But taking the Indictment as it was actually returned by the Grand Jury, it is clear that the allegations set forth therein do not to support the Government's bald assertion that venue is proper in this District.  Rather, as actually returned, the Indictment plainly fails to establish venue over Counts 1, 2, 4, 5, 6, 9, 10, 13, 14, 17, 19, 21, and 23, and accordingly must be dismissed.

The Government responds, with respect to Counts 1, 2, and 4, that its blanket assertion that the Mr. Johnston and his co-defendants conspired "in the District of New Jersey, and elsewhere" is sufficient for establishing venue for each of these counts under *United States v. Menendez*, 137 F. Supp. 3d 688, 694 (D.N.J. 2015), *aff'd*, 831 F.3d 155 (3d Cir. 2016).  ECF No. 137 ("Opp.") at 53, 56, 60.  But while the conclusory allegation that venue is appropriate "in the District of New Jersey, and elsewhere" may, at times, suffice under *Menendez*, this procedural minimum does not function as a bar to the timely consideration of a motion like that at issue here:  as the *Menendez*

court itself acknowledged, "[i]n an indictment, the government must allege venue 'without a facially obvious defect.'" *Menendez*, 137 F. Supp. 3d at 694 (quoting *United States v. Perez*, 280 F.3d 318, 327 (3d Cir. 2002)). Here, as set forth previously and in further detail below, the allegations contained in the Indictment do not even remotely support and even, at times, specifically conflict with the Government's broad allegation that the offenses charged occurred in this District. As such, the Indictment is facially defective and must be dismissed. *See United States v. Holland*, No. 17-cr-00234, 2018 WL 8867811, at *2 (N.D. Ga. Aug. 6, 2018), *report and recommendation adopted*, 396 F. Supp. 3d 1210 (N.D. Ga. 2019) (dismissal without prejudice based on a venue defect that was clear from the face of the indictment); *see generally United States v. Alcorta*, 145 F. Supp. 3d 357, 359 (M.D. Pa. 2015) ("A motion to dismiss the indictment may allege a defect in instituting the prosecution, including improper venue" (citing Fed. R. Crim. P. 12(b)(3)(B)).

Thus, although the Government contends that its unsupported conclusory allegations of venue are sufficient to withstand Mr. Johnston's motion to dismiss, it nonetheless argues that the Indictment also alleges specific facts upon which venue can be found. Opp. at 54-55, 56-57, 60-61. With respect to Count 1, the Government claims that this count "alleges an entire course of conduct by the coconspirators to market medications in New Jersey, obtain medically unnecessary prescriptions in New Jersey, cause those prescriptions to be faxed from New Jersey to Louisiana, ship medications to New Jersey, and defraud New Jersey state insurance plans," asserting that venue is proper in this District "[a]s a result of the fraudulent activities taken by Defendants' coconspirator Hickman in New Jersey." *Id.* at 55. The problem with this argument is that the Indictment says no such things, merely identifying Hickman as a "New Jersey distributor for Central Rexall," Ind. ¶ 1(g), without ever alleging that Hickman was present in New Jersey when

he allegedly marketed, obtained, or submitted the purportedly fraudulent prescriptions that form the basis for the charges against Mr. Johnston. Thus, the Government's claim—made for the first time in its opposition—that Hickman "operat[ed] in New Jersey," Opp. at 54, is misleading. In fact, the carefully worded Indictment merely alleges that "[i]t was the object of the conspiracy for defendants . . . and William Hickman and others to unlawfully enrich themselves by causing the submission of false and fraudulent insurance claims to Pharmacy Benefits Administrator," Ind. ¶ 14, that the "defendants . . . entered into agreements with distributors under which the distributors agreed to market Central Recall compounded medications," *id.* ¶ 22, that "Central Rexall distributors retained and directed by defendants . . . marketed medications directly to individual patients and beneficiaries of insurance plans administered by Pharmacy Benefits Administrator," *id.* ¶ 33, and that "Central Rexall distributors . . . obtained prescriptions that were not medically necessary and fraudulent," *id.* ¶ 34. It does not, contrary to the Government's claim improperly advanced in its opposition brief but not in the Indictment, allege that Hickman operated or took any fraudulent act "in New Jersey."

This deficiency is significant. Where, as here, the Court is tasked with assessing a defendant's pretrial challenge to venue, "only the indictment may be considered," and the "allegations must be taken as true." *Menendez*, 137 F. Supp. 3d at 694 (quoting *United States v. Mendoza*, 108 F.3d 1155, 1156 (9th Cir. 1997)). As such, the Government's belated allegations, made in a brief but not in the Indictment, cannot be used to satisfy the Government's burden of proving that venue is proper in this District, any more than such facts could support a challenge by the defense. *See United States v. Aprahamian*, No. 20-cr-64, 2022 WL 221615, at *2 (E.D. Pa. Jan. 25, 2022) ("In analyzing a motion to dismiss for improper venue, a court may only consider the indictment and must take all allegations as true.").

Nor do the remaining allegations cited by the Government sufficiently confer venue over Count 1 before this Court. As detailed in Mr. Johnston's moving brief, the Government simply cannot establish venue through the mere conclusory, general allegation that prescriptions were faxed from medical offices in New Jersey and claim that "Central Rexall, which was controlled by Johnston and Brockmeier, 'shipped a large percentage of its compounded medications to SHBP and SEHBP beneficiaries in New Jersey.'" Opp. at 55. That is because, as Mr. Johnston has previously explained, absent any allegation that a specific act occurred in this District, general allegations about faxed prescriptions and unspecified shipments cannot, as a matter of constitutional law, create venue in the District of New Jersey. *See, e.g., United States v. Safeway Stores, Maryland*, 51 F. Supp. 448, 456 (D. Kan. 1943), *rev'd on other grounds, Frankfort Distilleries v. United States*, 144 F.2d 824 (10th Cir. 1944), *rev'd on other grounds*, 324 U.S. 293 (1945) (general and vague allegations that defendant's "advertised food and food products in Kansas City, Kansas, and elsewhere in the state of Kansas," "wholly fail[ed] to meet the constitutional requirement that a defendant can only be put to trial in the state and district wherein the crime was committed"); *cf. United States v. Birks*, 656 F. Supp. 2d 454, 461 (D.N.J. 2009) ("[S]pecific allegations" that defendant called a securities broker in New Jersey regarding a specific stock and emailed a New Jersey customer about that same stock, "read together with the general allegation that some overt acts did take place in New Jersey, are sufficient to properly allege venue in the District of New Jersey."); *United States v. Peterson*, 357 F. Supp. 2d 748, 752 (S.D.N.Y. 2005) (venue was adequately alleged where "the indictment contain[ed] more than just the conclusory allegation of the existence of venue; it also contain[ed] allegations of specific acts occurring in the Southern District of New York, including for example, the use of two insurance brokerage companies located in New York . . . that were involved in the alleged scheme; the use

of policies purportedly issued by [a company], which had representatives in New York; the placement of telephone calls or transmission of facsimiles into New York in furtherance of the scheme; and an attempt to conceal evidence from a grand jury in New York"). Moreover, because Central Rexall is not a named co-conspirator and the law is clear that only acts of co-conspirators can sufficiently establish venue, its purported acts cannot be attributed to Mr. Johnston for purposes of venue. *See Perez*, 280 F.3d at 329 ("[V]enue can be established wherever a co-conspirator has committed an act in furtherance of the conspiracy."). Evidently recognizing this deficiency the Government again overstates the allegations in the Indictment, claiming, in its opposition, that Central Rexall was "controlled" by Mr. Johnston. Opp. at 55. But according to the actual allegations in the Indictment, Mr. Johnston "was the controlling member and President of Pharmacy Management Group, LLC and Bluen Medical, LLC and in 2014 and 2015 was General Counsel of Central Rexall," Ind. ¶ 1(b); there is no allegation that he "controlled" Central Rexall.

With respect to Count 2, the Government argues that "the Indictment includes allegations that the New Jersey coconspirators performed the essential conduct of obtaining patient information in New Jersey, including the patient information of Individual 3 and another New Jersey patient, which was used to run a test adjudication." Opp. at 57. As set forth previously and herein, even if true this allegation fails to state an offense upon which a conviction can rest. Notwithstanding the Government's claim to the contrary, the Indictment fails to allege sufficient facts to establish that the "essential conduct element" of identity theft—*i.e.*, the transfer, possession or use of another's identification (not, as the Government argues, the "find[ing] and obtain[ing] [of] the patient information")—occurred in New Jersey. *See Auernheimer*, 748 F.3d at 535 ("The two essential conduct elements under § 1028(a)(7) are [(i)] transfer, possession, or use, and [(ii)]

doing so in connection with a federal crime or state felony.").  While the Indictment baldly asserts that "Defendant Casseri sent text messages to co-conspirator William Hickman in New Jersey about test adjudications," it does not allege that these text messages included a patient's information; does not charge that such information was used to submit fraudulent claims, or that the test adjudications were in relation to "Individual 3," who is at the heart of Count 2; and does not include any other conduct that occurred in New Jersey that could be considered an "essential conduct element," *see* ECF No. 126 ("Johnston Br.") at 6, 14-15, or made in furtherance of the conspiracy, as would be required to sustain venue in this case.

The Government's attempt to prove venue over the money laundering counts fares no better.  In support of Count 4, the Government claims that Paragraph 49(d), which is contained in the "Overt Acts" section of Count 2 and is subsequently re-alleged in Count 4, providing that "[o]n or about October 15, 2015, William Hickman, through his company Boardwalk Medical LLC, received in New Jersey a payment from Central Rexall of $2,447,076.19 for his work and the work of people working with him to find patients in New Jersey to receive Central Rexall prescriptions," clearly alleges "an overt act in New Jersey in furtherance of the conspiracy, that is, a financial transaction of more than $10,000 in criminally derived property."  Opp. at 60.  But merely receiving a payment where, as here, the Indictment does not allege that payment to be the proceeds of a crime, does not establish venue as a matter of law.  *See* 18 U.S.C. § 1956(i)(1) (a money laundering prosecution may be brought in: (1) "any district in which the financial transaction or monetary transaction is conducted"; (2) "any district where a prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted"; or, with respect to conspiracy, (3) any district "where an act

in furtherance of the . . . conspiracy took place."); *see also United States v. Fallon*, 61 F.4th 95, 118 (3d Cir. 2023) ("[M]oney laundering, whether classic or otherwise, requires financial transactions involving 'proceeds' of the fraud."). Thus, while the Indictment generally alleges that Central Rexall received purportedly illicit payments from the Pharmacy Benefits Administrator, Ind. ¶ 57 ("It was part of the conspiracy that Central Rexall received payments from Pharmacy Benefits Administrator and other sources, including payments funded by the State of New Jersey for SHBP and SEHBP beneficiaries, which represented proceeds of the conspiracy to commit health care fraud and wire fraud."), critically absent from the Indictment is any allegation that the payment upon which the Government relies itself represented the proceeds of a crime; indeed, the Indictment does not allege *any* payments from Central Rexall to Hickman to have been a part of the alleged money laundering conspiracy, *see id.* ¶ 61 (setting forth the financial transactions alleged as part of the money laundering conspiracy, none of which include payments to Hickman).

Finally, again misquoting its own Indictment, the Government claims that Paragraph 59, which purportedly alleges that "Johnston and Brockmeier 'caused the transfer of the proceeds of the conspiracy from the State of New Jersey to Pharmacy Benefits Administrator and from Pharmacy Benefits Administrator to Central Rexall's bank account in Louisiana . . .'" sufficiently establishes venue for Counts 4, and 5 through 24.[1] Opp. at 60. Notably, the Government omits from its quote, made in support of Count 4, the fact that the proceeds allegedly laundered were "proceeds of the conspiracy to commit health care fraud and wire fraud." Thus, Paragraph 59 actually reads:

---

[1] The Government's misstatement of the allegations set forth in Paragraph 59 of the Indictment is limited to its argument made in support of Count 4. The Government appropriately included, in a block quote, the entirety of Paragraph 59 in connection with its argument in support of Counts 5 through 24.

> It was further part of the conspiracy that defendants
> CHRISTOPHER KYLE JOHNSTON and TRENT BROCKMEIER
> caused the transfer of *the proceeds of the conspiracy to commit*
> *health care fraud and wire fraud* from the State of New Jersey to
> Pharmacy Benefits Administrator and from Pharmacy Benefits
> Administrator to Central Rexall's bank account in Louisiana, and
> then caused the transfer of the proceeds from Central Rexall's bank
> account to the bank accounts of Bluen Medical and PMG and from
> the bank accounts of Bluen Medical and PMG to the personal bank
> accounts of defendants CHRISTOPHER KYLE JOHNSTON and
> TRENT BROCKMEIER.

Nevertheless, because as set forth above, the "underlying unlawful activity," here conspiracy to commit health care fraud and wire fraud, cannot be brought in this District, the Government cannot establish venue based on this "special venue provision" for the money laundering charges. *See* Section V *supra*. Thus, to avoid an unconstitutional intrusion on Mr. Johnston's right to be tried where the alleged crime occurred, the Court should dismiss Counts 1, 2, 4, 5, 6, 9, 10, 13, 14, 17, 19, 21, and 23 for lack of venue.

## II.  COUNT 1 OF THE INDICTMENT IS VAGUE AS APPLIED AND SHOULD BE DISMISSED.

A criminal defendant has the constitutional right to notice of what the law demands. U.S. Const. amend. V; *United States v. Davis*, 588 U.S. ---, 139 S. Ct. 2319, 2325 (2019); *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926); *United States v. Loy*, 237 F.3d 251, 262 (3d Cir. 2001). Mr. Johnston's moving brief detailed how that notice is woefully lacking in this case where his allegedly wrongdoing hinges on having known that the pharmacy was fulfilling prescriptions for compound medications that were "medically unnecessary," despite those prescriptions having been prescribed by independent physicians, none of whom is an alleged co-conspirator or otherwise alleged to be connected with Mr. Johnston or the pharmacy. *See* Johnston Br. at 20-31. The Government argues that the absence of a uniform statutory definition for the term "medical necessity" is not fatal to Count 1, *see* Opp. at 6-15, but this misses the point. It is not the absence

of a statutory definition that renders a statute impermissibly vague,[2] but rather the lack of "fair notice" of what the law requires.  *Davis*, 139 S. Ct. at 2325.  That fair notice is nowhere to be found in this Indictment or the statutes that underlie it, and Count 1 should accordingly be dismissed as against Mr. Johnston.

The Government suggests that a statute can only be impermissibly vague as applied "if it requires proof of an 'incriminating fact' that is so indeterminate as to invite arbitrary and 'wholly subjective' application."  Opp. at 7 (quoting *United States v. Williams,* 553 U.S. 285, 306 (2008)).  But while that standard is readily satisfied by the amorphous phrase "medically necessary," it is too narrow a description of the Supreme Court's vagueness jurisprudence.  Indeed, the case from which the Government quotes makes clear that vagueness is implicated, not based upon the difficulty of proving prohibited conduct, but instead based upon the indeterminacy of what is prohibited—including where there is no "settled legal meaning" of a term:

> What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is. Thus, we have struck down statutes that tied criminal culpability to whether the defendant's conduct was "annoying" or "indecent"—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings.

*Williams*, 553 U.S. at 306.

As the Government concedes, medical necessity has no universally accepted definition or settled legal meaning.  Opp. at 6 (acknowledging "[t]he absence in federal law of a universal definition for 'medical necessity'").  It then describes the level of detail alleged to support the purported scheme (albeit without any citation to the paragraphs of the Indictment, *id.* at 8), and

---

[2] *Johnson* voided a portion of the statute that contained a definition of the term "violent felony." *Johnson v. United States*, 576 U.S. 591, 595-96 (2015).

claims that no definition of "medical necessity" is required because the Indictment alleges health care fraud, the fundamental allegation of which is "obtaining money through fraudulent representations," *id*.[3]  But this argument ignores that the Government's allegation is that the "fraudulent representation" in the alleged health care fraud lies in the purported medically unnecessary nature of the prescriptions—a concept for which the Centers for Medicare & Medicaid Services ("CMS") could not even articulate a uniform rule.  *See* Centers for Medicare & Medicaid Services, CMS Repeals MCIT/R&N Rule, *available at https://www.cms.gov/newsroom/press-releases/cms-repeals-mcitrn-rule-will-consider-other-coverage-pathways-enhance-access-innovative-medical#:~:text=Today%2C%20the%20Centers%20for%20Medicare,sufficient%20to%20protect%20Medicare%20patients* (announcing that CMS has rescinded final rule defining "reasonable and necessary" prior to effective date).  Mr. Johnston's moving brief describes the confusion that plagues the use of this term, both within the regulations for Medicare and Medicaid and in varying decisions by courts.  *See* Johnston Br. at 24-26.  The Government does not, however, even attempt to address these concerns.

The Government relies almost entirely upon *United States v. McLean*, 715 F.3d 129 (4th Cir. 2013), but its reliance on *McLean* is misplaced.  Opp. at 8-9.  In that case, the defendant was a cardiologist who submitted claims for medically unnecessary coronary stent procedures that he

---

[3] Without citation to any specific paragraphs of the Indictment, the Government states that the Indictment alleges "that defendants had distributors obtain completed prescriptions that were fraudulent in numerous ways, such that the doctors never saw the patients or never determined the patients needed the medication, and that doctors and patients were paid for writing or receiving prescriptions."  Opp. at 8.  In fact, the Indictment does not allege that defendants "had distributors obtain completed prescriptions that were fraudulent."  *Id.*  It alleges that distributors in New Jersey undertook wrongful conduct and that those distributors were, in a general sense, "retained and directed by defendants."  Ind. ¶ 34.  It does not allege that Mr. Johnston—or any of the defendants—in working with distributors, directed them to obtain fraudulent prescriptions or engage in any other specific, improper conduct.  Nor has the Government seen fit to provide such particulars to the defense.  *See supra* at Section VI.

had personally performed on patients with no significant stenosis or blockage.[4] *McLean,* 715 F.3d at 132-33. Thus, the *McLean* court concluded that, as applied to that case, the health care fraud statute "prohibited McLean from knowingly and willfully defrauding insurers by falsely certifying that the stents he placed in arties with little to no blockage were reasonable and medically necessary in order to obtain reimbursement." *Id.* at 136. But a charge of health care fraud against an individual doctor who himself treated the patient and certified as to such obviously false medical necessity is a far cry from the circumstances of the facial challenge in this case, which involves a pharmacy in Louisiana, leased by Mr. Johnston, fulfilling prescriptions that were prescribed by physicians halfway across the country with whom Mr. Johnston is not alleged to have had any contact. The notion that Mr. Johnston would know that these prescriptions were all "medically unnecessary," particularly where the pharmacy was under no obligation to verify or certify as to the medical necessity of the prescriptions, is fanciful. *See* CMS Pub 100-18 § 10.6 Medically-accepted Indication, CMS Man. 1176879 (*Dispensing pharmacists* are not required to contact each prescriber to verify a prescription is being used for a medically-accepted indication) (emphasis in original).[5] And that is particularly so given the vagueness of the term, which vagueness leaves the

---

[4] Defendant McLean was discovered destroying patient files after receiving a government subpoena, following a hospital review that found inappropriately performed procedures in approximately half of 25 randomly selected cases. In earlier phases of the hospital's investigation, McLean also submitted a letter acknowledging that although there was some degree of subjectivity in the degree of stenosis that would justify these procedures, there is a standard practice of intervention for lesions above 70 percent, evidencing a clear standard for falsity tied to the submission of claims for unnecessary procedures. *Id.* at 134; *cf.* H.R. REP. No. 104-736, at 258 (Aug. 21, 1996), reprinted in 1996 U.S.C.C.A.N. 1990, 2071 (noting concerns re: impact on "the practice of complementary and alternative medicine and health care" and explaining that health care fraud statute "not intended to penalize a person who exercises a health care treatment choice or makes a medical or health care judgment in good faith simply because there is a difference of opinion regarding the form of diagnosis or treatment."). Again, no such standard, which would provide some degree of notice to potential violators, is alleged here.

[5] The other cases to which the Government cites in support of its argument that "medical necessity" is not vague as applied to Mr. Johnston are likewise inapposite, as-applied challenges. *See, e.g.,*

statute open to arbitrary enforcement by unelected prosecutors, in circumstances where a defendant could not possible have known what was and was not "medically necessary." *See Sessions v. Dimaya*, 584 U.S. ---, 138 S. Ct. 1204, 1213 (2018) ("[T]he [void-for-vagueness] doctrine guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges."); *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (a penal statute cannot be drafted in a manner that "encourage[s] arbitrary and discriminatory enforcement"); *see also Davis*, 139 S. Ct. at 2323 (vague laws improperly "hand off the legislature's responsibility"); *Dimaya*, 138 S. Ct. at 1212 (vagueness prohibition is also a "corollary of the separation of powers—requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not.").

Nor can the law's scienter requirement mitigate the due process concerns that Mr. Johnston has raised. Opp. at 11-13. Of course, even the cases cited by the Government recognize that "a specific intent requirement does not necessarily validate a criminal statute against all vagueness challenges." *United States v. Franklin-El*, 554 F.3d 903, 911 (10th Cir. 2009). Thus, in the criminal context, a vagueness challenge may be overcome by a scienter requirement in the "'specific case where reasonable persons would know their conduct puts them at risk of punishment under the statute.'" *United States v. Hoffert*, 949 F.3d 782, 788 (3d Cir. 2020) (quoting *United States v. Ferriero*, 866 F.3d 107, 124 (3d Cir. 2017)). This may undermine a vagueness

---

*United States v. Med 1st*, No. 16-cr-000076, 2017 WL 4848823, at *2 (W.D. Ky. Oct. 26, 2017) (finding defendant's motion in fact did not challenge vagueness but rather raised a post-trial concern: "whether the government has sufficiently proven that the procedures were medically unnecessary"); *United States v. Lievertz*, No. 02-cr-0005, 2002 WL 31640562, at *3 (S.D. Ind. Nov. 1, 2002) (examining physician liability for medical necessity as that physician having acted outside the usual course of professional practice); *United States v. Garcia*, No. 21-1415, 2022 WL 1535378, at *1 (7th Cir. May 16, 2022), *reh'g denied*, No. 21-1415, 2022 WL 2349362 (7th Cir. June 29, 2022) (rejecting vagueness argument as frivolous where appointed counsel declined to raise the argument and moved to withdraw).

challenge such as the one brought by Dr. McLean, for example, where the defendant physician responsible for assessing, ordering, and performing medically unnecessary surgical procedures could be said to have had "fair warning" that his conduct is prohibited.  *Id.* ("one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line").  But as explained above, and as detailed in Mr. Johnston's moving brief, a person of ordinary intelligence in Mr. Johnston's position could not possibly understand whether he was violating criminal law by seeking insurance reimbursement for fulfilling a prescription received by the pharmacy where the lawfulness of his conduct turns on whether the prescription was "medically unnecessary" and therefore automatically "false or fraudulent."

The remaining allegations, concerning the use of test adjudications and pre-printed prescription pads, further underscore the lack of constitutionally required notice of what conduct is prohibited in this case, and the resulting risk of arbitrary or discriminatory enforcement.  *First*, the Government concedes that the use of preprinted prescription pads is not illegal, *see* Opp. at 15 ("The Indictment does not allege that the distribution of preprinted prescription pads, standing alone, is itself illegal.").[6]  And for good reason—the idea that a prescription pad printed before a patient's own medical needs were known could constitute fraud is paradoxical.[7]  But the

---

[6] Indeed, to the extent the placement of specific medication options from which a physician may select (or not) in formulating an appropriate compound medication constitutes marketing material, it may well be protected speech under the First Amendment.  *See United States v. Caronia*, 703 F.3d 149, 152 (2d Cir. 2012) (overturning conviction for conspiracy to introduce misbranded drug into interstate commerce in violation of FDA and holding that prohibiting truthful off-label promotion of FDA-approved drugs by pharmaceutical representatives violates First Amendment); *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 557 (2011) ("[s]peech in aid of pharmaceutical marketing . . . is a form of expression protected by the . . . First Amendment. . . .  [The] creation and dissemination of information are speech within the meaning of the [Constitution].").

[7] The Government does not allege that formulas recommended on the preprinted prescription pads had no potential to benefit any possible patient.  In that instance, it might have an argument that the preprinted pads were inherently fraudulent, no matter a particular patient's individual needs.

Government's determination to nonetheless prosecute this legal conduct, but not other instances in which individuals have used similar prescription pads, raises the very concerns of arbitrary enforcement underpinning the Supreme Court's vagueness jurisprudence.  *Kolender*, 461 U.S. at 280, 357 (vagueness doctrine requires "that a legislature establish minimal guidelines to govern law enforcement.  Where the legislature fails to provide such minimal guidelines, a criminal statute may permit a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections").  Moreover, it supports Mr. Johnston's argument that, having engaged in conduct that is concededly legal, he was not on notice that the same conduct was also criminally punishable.

*Second*, the Government asserts that Mr. Johnston's arguments about the prevalence of test adjudications in the pharmaceutical industry are more properly considered at trial by a jury.[8]  But this too misses the point that Mr. Johnston is entitled to the protections of the Fifth Amendment at the motion to dismiss stage, when courts appropriately consider whether a defendant is charged with an offense of which he was on notice as to the wrongfulness of his conduct.  *See United States v. Hill*, 2:19-cr-189, 2020 WL 491261, at *1 (D. Utah Jan. 30, 2020) (noting that defendant's "void-for-vagueness challenge would have been more properly asserted in a pretrial motion to dismiss," at which point the issue of whether the statute properly gave defendant fair notice that his conduct was illegal could have been determined without a trial on the merits); *United States v. Smith*, 985 F. Supp. 2d 547, 587, 592-93 (S.D.N.Y. 2014), *aff'd sub nom. United States v. Halloran*, 664 F. App'x 23 (2d Cir. 2016) (deciding a pre-trial motion presenting as-applied vagueness challenge, as such a motion "requires that a court address only the application of the

---

[8] Moreover, the varying definitions and understandings of "medically necessary" only underscore that, beyond issues of fair notice, the parties and court will face significant difficulties at trial in formulating an appropriate instruction for the jury on the issue.

challenged statute to the person challenging the statute based on the charged conduct"); *United States v. Nicolo*, 523 F. Supp. 2d 303, 307-11 (W.D.N.Y. 2007) (considering both facial and as-applied vagueness challenges before trial); *see also United States v. Guest*, 383 U.S. 745, 748, 774 (1966) (Harlan, J., concurring) (reviewing dismissal of indictment on motion and noting "I think it wrong to sustain a criminal indictment on such an uncertain ground.  To do so subjects [the statute] to serious challenge on the score of vagueness and serves in effect to place this Court in the position of making criminal law under the name of constitutional interpretation.").  The Government claims, referencing the test adjudications, that "a reasonable person knows that submitting a claim that is not based on any actual prescription received from a doctor is fraudulent."  Opp. at 15.  Perhaps, but that is not what the Government has alleged in this Indictment, which charges that, after submission of a test adjudication by a pharmacy employee and receipt of a response as to coverage, the employee would "promptly send an electronic communication [] reversing the claim" so that it was not improperly paid.  Ind. ¶ 27.  Under these circumstances, it is difficult to see how a person of ordinary intelligence could reasonably "understand that his contemplated conduct is proscribed."  *Parker v. Levy*, 417 U.S. 733, 757 (1974) ("'[C]riminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed.'") (quoting *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32-33 (1963)).  At the end of the day, any fair reading of the Indictment in this matter makes clear that any fraud alleged is based upon the lack of "medical necessity" to support the prescriptions filled and charged for.  But "medical necessity" is, as shown, an undefined and vague concept both generally with respect to the statutes upon which this prosecution is based and as applied to the facts alleged here.  In both respects, this prosecution thus runs afoul of due process, which demands that a person of ordinary intelligence be able to reasonably understand that his

16

conduct is proscribed by the law, and so that prosecutors and judges do not take on the role reserved for the legislature.  Count 1 of the Indictment should be dismissed.

### III.    The Indictment Does Not State the Offense of Identity Theft.

Between the time that the Indictment was returned in 2020 and this motion practice, the Supreme Court decided *Dubin v. United States*, 599 U.S. 110 (2023), which effected a significant change in the standards for alleging, and ultimately proving, the offense of identity theft.  Instead of acknowledging the new standard and withdrawing Count 2 of the Indictment, the Government has doubled down, continuing to insist that its strikingly broad reading of the federal criminal code is valid.  For the reasons set forth in Mr. Johnston's moving brief, as amplified below, the Government misreads both the statutory text at issue and the Supreme Court's holding in *Dubin*. Because *Dubin*'s ruling applies to and then precludes Count 2, that allegation should be dismissed.

#### A.    *Dubin*'s Standard Applies To § 1028(a)(7).

The Government argues that *Dubin*'s ruling—that a defendant's "use" of another person's "means of identification" in relation to a predicate offense must be at the "crux of what makes the conduct criminal"—applies only to the statute at issue in *Dubin*, 18 U.S.C. § 1028A, and not at all to that provision's sister statute, 18 U.S.C. § 1028(a)(7).  Though the Government seeks to save this count by distinguishing between the two provisions, the Third Circuit has described the two as "virtually identical," *Auernheimer*, 748 F.3d at 535, leaving the Government's contention unconvincing.

*First*, the Government argues that the Supreme Court's decision in *Dubin* was "influenced by the statute's title":  "Aggravated identity theft."  Opp. at 19.  Section 1028, on the other hand, is merely titled "Fraud and related activity in connection with identification documents, authentication, and information."  This title, the Government argues, "does not suggest that identity theft is at the core of Section 1028," and Section 1028 therefore "covers all fraud involving means

of identification." *Id.* But Mr. Johnston is not charged with violating Section 1028 in its entirety; he is charged specifically with violating § 1028(a)(7), which, as a statutory subsection, would not be expected to have its own title. Moreover, as the Government acknowledges, § 1028(a)(7) was passed as part of the "Identity Theft and Assumption Deterrence Act of 1998." Opp. at 23 (citing PL 105-318, October 30, 1998, 112 Stat. 3007). It is apparent, therefore, that in enacting § 1028(a)(7), Congress was targeting identity theft—and not just "all fraud involving means of identification." In addition, the fact that § 1028A is titled "Aggravated identity theft" is evidence that some offense in the criminal code is un-aggravated identity theft; given the parallels in statutory language, that offense is obviously codified at § 1028(a)(7). Indeed, Congress's intent in criminalizing classic identity theft is so evident from the statutory scheme that Count 2 of the Indictment is titled "Conspiracy to Commit Identity Theft."

*Second*, the Government argues that Mr. Johnston's concern that a broad interpretation of § 1028(a)(7) will invade on areas of classic State prosecutorial authority, and therefore federalize what have traditionally been areas of State concern, is "misplaced" because the offenses listed in Section 1028 require a connection to interstate or foreign commerce and are thus "appropriately cabined to crimes of federal concern." Opp. at 21. Here, the Government misunderstands Mr. Johnston's challenge. Mr. Johnston is not raising an Interstate Commerce Clause challenge to Section 1028, which would require the Government to demonstrate some hook to interstate commerce. Rather, Mr. Johnston is invoking the classic background presumption, discussed at length in the moving brief, that Congress drafts criminal statutes with an intention not to reach into or usurp the States' prosecutorial authority. *See* Johnston Br. at 35-36 (citing cases). Concerned with "reading incongruous breadth into opaque statutes in criminal statutes," the Supreme Court invoked precisely this presumption in *Dubin*, noting that its recent caselaw has given a deliberately

narrow scope to federal criminal statutes.  599 U.S. at 129-30 (citing cases).  The Supreme Court's concern with the "staggering breadth" of the Government's proposed interpretation in *Dubin* is even more relevant here:  the statute interpreted in *Dubin* only applied to a short list of particularly significant federal predicate offenses (hence its status as the "aggravated" identity theft statute), while § 1028(a)(7) includes as predicate offenses every federal offense, every state felony, and every local felony.  Johnston Br. at 35.  The "far reaching consequences" of the Government's reading of § 1028(a)(7) therefore "underscores the implausibility" of its interpretation.  *Van Buren v. United States*, 593 U.S. --, 141 S. Ct. 1648, 1661 (2021).[9]

*Finally*, the Government argues that the differences between the text of § 1028(a)(7)'s and that of § 1028A mean that *Dubin*'s holding does not apply to the former statute.  The statute in *Dubin* covers "whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person," while § 1028(a)(7) covers "whoever . . . knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law."  The Government argues that applying *Dubin*'s holding to § 1028(a)(7) would render the two statutes "indistinguishable,"

---

[9] The Government's reading of the statute could plausibly encompass (and therefore render a federal crime): writing someone else's name in graffiti on an interstate overpass; applying for a bank loan with a co-signer while slightly inflating one's salary; submitting a fraudulent tax return that includes the names of one's family members; "[a] lawyer who rounds up her hours from 2.9 to 3 and bills her client electronically," *Dubin*, 599 U.S. at 114; or "a waiter who serves flank steak but charges for filet mignon using an electronic payment method," *id.*  Indeed, under the Government's reading, every instance of mail, wire, bank, securities, or other kinds of fraud would violate § 1028(a)(7), so long as it included someone else's "means of identification"—and, of course, it is difficult to send a letter or email without including someone else's means of identification.

"redundant," and "superfluous."  Opp. at 22-23.  But that is not so—Mr. Johnston acknowledges a number of key differences between the two statutes.  First, as noted, and most crucially, the aggravated identity theft covers a far narrower set of predicate offenses.[10]  Second, § 1028(a)(7)'s predicate offenses can include both attempt crimes (thus the language prohibiting the use of a means of identification "with the intent to commit . . . a violation of Federal law") and aiding and abetting (thus the language prohibiting the use of a means of identification "to aid or abet . . . a violation of Federal law").[11]

After accounting for the differences in predicate offenses and the inclusion of inchoate offenses as possible predicates, the sole remaining difference between the two statutes' text is § 1028(a)(7)'s use of "in connection with" in place of § 1028A's "during and in relation to."  But nowhere in its brief does the Government actually contend—nor, as a matter of common usage could it—that "in connection with" is meaningfully broader than "during and in relation to," or propose differing interpretations of the two phrases.  Indeed, courts have consistently construed "in relation to" and "in connection with" identically.  *See* Johnston Br. at 33-34 (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983) (construing ERISA and holding that "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan"); *United States v. Spurgeon*, 117 F.3d 641, 644 (2d Cir. 1997) ("The

_____

[10] This key distinction between the two offenses—and the basis for the "aggravated" nature of aggravated identity theft—derives from Congress's conclusion that certain predicate offenses are more significant and thus merit a separate identity-theft offense.  Indeed, the Solicitor General specifically so acknowledged at oral argument in *Dubin*.  When asked whether conduct has to be "more egregious" to qualify for aggravated identity theft, the Government responded that "[i]t is more egregious because the predicate offense has to be more egregious" and "[t]hey're a more serious set of crimes than all crimes whatsoever.  You can violate 1028A if the predicate crime is a felony.  You can violate 1028(a)(7) if the predicate offense is a misdemeanor.  So, yes, 1028A is going to be more serious than 1028."  Transcript of Oral Argument, *Dubin v. United States* (22-10), at 74:3-9, 75:5-13.

[11] The Government does not argue that either of these possibilities applies here.

phrase 'in connection with' is materially indistinguishable from . . . 'in relation to.'")).  And at least two Courts of Appeals, including the Third Circuit, have treated § 1028(a)(7) and § 1028A as "virtually identical."  *Auernheimer*, 748 F.3d at 535; *see also United States v. Foster*, 740 F.3d 1202, 1206 n.3 (8th Cir. 2014) (reading the two statutes identically).  Indeed, multiple courts have held that convictions for both identity theft under § 1028(a)(7) and aggravated identity theft under § 1028A are, given the complete overlap in the statutes' elements, multiplicitous.  *See, e.g.*, *United States v. Jones*, 817 F. App'x 138, 140 (6th Cir. 2020) ("[A]nyone who commits aggravated identity theft necessarily commits identity theft."); *United States v. Allen*, 781 F. App'x 513, 515-16 (7th Cir. 2019) ("[T]he first three elements of both statutes [that is, all except for the list of predicate offenses] are identical."); *United States v. Bonilla*, 579 F.3d 1233, 1242 (11th Cir. 2009) ("The first three elements of both offenses are identical.").  Nor, as the Government admits, was the phrase "during and in relation to" the basis for the Supreme Court's decision in *Dubin*; the Government correctly notes that "[t]he *Dubin* Court did not analyze . . ., in any detail, Section 1028A's 'during and in relation to' language."  Opp. at 22.  Thus, this change in language cannot be the fulcrum on which interpretation of the statute turns, as the Government now argues.[12]

In sum, none of the Government's proposed distinctions between §§ 1028A and 1028(a)(7) is persuasive.  Given the nearly identical elements of the two statutes, *Dubin*'s holding applies with equal force to charges brought under § 1028(a)(7), like those at issue here.

---

[12] The Government also argues that a "key reason" for *Dubin*'s holding was the Supreme Court's discomfort with mandatory two-year prison sentences for generic overbilling.  Opp. 20-21.  But the potential sentence for a violation of § 1028(a)(7) is as high is fifteen years.  *See* 18 U.S.C. § 1028(b).  If the Supreme Court was concerned with harshly penalizing garden-variety overbilling with a mandatory two-year sentence, surely a possible fifteen-year sentence would trigger the same concerns.

**B.    Count 2 Does Not Satisfy *Dubin*'s Standard.**

*Dubin*'s required nexus between the "use" of another person's means of identification and the predicate offense is demanding.  Under *Dubin*, the Government must allege that the use of another person's means of identification was "at the crux of what makes the underlying offense criminal."  599 U.S. at 114.  Thus, the use of the identity must "specifically" be "a key mover in the criminality," *id.* at 122-23, and at the "locus of the criminal undertaking," *id.* at 123 (cleaned up).  This standard requires more than that the use "facilitated or furthered the predicate offense in some way."  *Id.* at 127.  And it requires more than a "causal relationship": it is not enough for the use to be merely "a but-for cause of [the crime's] 'success.'"  *Id.* at 131.  Instead, it must be the case that the use of the means of identification is what transforms the conduct into a criminal act.  *Id.* at 117, 131.

The Government tries to salvage Count 2 by arguing that it still states an offense even if *Dubin*'s test applies, stating, without citation, that "payment directly on the false test adjudications is not required for the test adjudications to be at the crux of the underlying fraud."  Opp. at 28.  It argues that "[t]he misuse of Central Rexall's patients' identifying information was at the heart of the conspiracy to commit wire fraud and health care fraud" because the information collected through test adjudications "enabled Central Rexall to continue billing for medically unnecessary prescriptions."  *Id.* at 25-26.  It claims that the information the defendants acquired through the test adjudications "facilitate[d] the submission of other medically unnecessary claims."  *Id.* at 28.  And it somehow contends that "the entire fraud scheme would have ground to a halt when the PBA stopped covering certain compound formulations, and the defendants and their co-conspirators were able to prolong the fraud by using test adjudications to identify alternate formulations and

stay one step ahead of the PBA and insurance companies' efforts to stop the fraud." *Id.* at 28-29 (citing Ind. ¶ 30).[13]

None of these arguments can succeed in saving Count 2. The Government's claim that the use of patient identity "enabled" the fraud is precisely what the Supreme Court rejected when it wrote that the use must do more than "further" the predicate offense. *Dubin*, 599 U.S. at 127. Indeed, the Government's contention that it "facilitate[d]" the submission of medically unnecessary claims repeats verbatim the facilitation standard that the Court concluded was not enough. *Id.* And the allegation that the scheme would have "ground to a halt" and was "prolong[ed]" by test adjudications is merely a reformulation of the "causal relationship" or "but-for" standard that the Court also specifically rejected. *Id.* at 131.

The Eleventh Circuit's decision in *United States v. Gladden*, which the Government cites, Opp. 26-28, confirms that this Indictment does not state an identity-theft offense. In *Gladden*, defendant Linton (1) filed "dummy claims" to identify covered products;[14] (2) filed prescriptions falsely representing authorization from named doctors; and (3) rerouted the prescriptions of

---

[13] Of course, this is not what the Indictment alleges. Paragraph 30 states that when PBA stopped covering one combination of ingredients, the Defendants developed a different combination of ingredients based upon the amount that insurance would pay for that combination, rather than the combination's medical necessity or effectiveness. Ind. ¶ 30. It notably does not state that the alleged scheme could not have succeeded without the use of test adjudications. Indeed, the Indictment contains a number of allegations that—on their face—have nothing to do with, and would not require the use of, test adjudications, including allegations that the Defendants obtained prescriptions for patients who had not been examined by a doctor; prescriptions authorized without medical necessity determinations; prescriptions by doctors who had been paid kickbacks; prescriptions for unnecessary refills; prescriptions for medications that patients had not agreed to receive; and prescriptions for patients who agreed to receive the medications for payment. *See, e.g.*, *id.* ¶ 34.

[14] "The billing department would submit test claims for prescriptions to an insurance company to see whether the company would reimburse the product, and then claw back the claim. Linton would proceed to solicit Global employees to obtain prescriptions for the most lucrative products." *Gladden*, 78 F.4th at 1239.

dissatisfied customers to the address of her employer's owner. 78 F.4th 1232, 1238-39 (11th Cir. 2023). But only the latter two actions comprised the basis for the Eleventh Circuit's decision to uphold her conviction. *Id.* at 1245 ("Linton represented to the PBMs and insurance companies that Global was filling prescriptions for the Edenfields and Wester when, in reality, the products were being sent to Adams."); *id.* ("Linton affirmatively represented to the insurance companies and PBMs that Dr. Almirol had authorized the additional prescriptions when, in fact, he had not."). The Court noted that "Linton's fraudulent representation that individuals such as the Edenfields and Wester were the recipients of the prescriptions issued in their names directly enabled Global to continue billing for medically unnecessary prescriptions." *Id.* And it emphasized that the "insurance companies and PBMs would not have provided reimbursement had they known that Dr. Almirol had not actually authorized the prescriptions." *Id.* at 1245-46. Not only do both of these "uses" of another person's means of identification have a far tighter nexus to a fraud offense than is present here, in that each use of a person's identity was itself an act of fraud, but the fact that Linton engaged in "dummy" or "test" claims to collect coverage information went entirely unmentioned as a basis for the Eleventh Circuit's holding. Far from supporting the Government's theory of illegality, therefore, *Gladden* in fact provides further support for the idea that test adjudications cannot be the basis for an identity-theft charge.

Finally, as discussed in Mr. Johnston's moving brief, the use of patient information in test adjudications cannot be the "crux" of either wire or health care fraud because the test adjudications were not themselves fraudulent; to be fraudulent, an act must be targeted at "money or property," and the Government concedes that the test adjudications were targeted merely at information. *See Ciminelli v. United States*, 598 U.S. 306, 312 (2023) (a "scheme or artifice to defraud" must be targeted at "money or property"); *United States v. Porat*, 76 F.4th 213, 218 (3d Cir. 2023) (property

must be the "object of the fraud"); *see also* Opp. at 28 (conceding that "the false test adjudications were reversed before the PBA approved and paid money on those false claims"). The Government argues that "[t]he misuse of . . . identifying information was at the heart of the conspiracy to commit wire fraud and health care fraud" and "a critical part of the underlying . . . conspiracy." Opp. at 25. But the test claims cannot be considered the "crux" of a conspiracy offense because courts have routinely held that the "crux" or essence of the crime of conspiracy is merely the agreement to commit some act condemned by law. *See United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003) ("The Court has repeatedly said that the essence of a conspiracy is 'an agreement to commit an unlawful act.' That agreement is 'a distinct evil' that 'may exist and be punished whether or not the substantive crime ensues.") (quotations omitted)); *see also United States v. Flores*, 945 F.3d 687, 712 (2d Cir. 2019) ("The crux of a conspiracy is an agreement between two or more persons to join together to accomplish something illegal."); *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 395 (7th Cir. 2018) ("The crux of any conspiracy is an agreement between the co-conspirators."). In light of this precedent governing conspiracy crimes, the use of another person's identification can never be at the "crux" of a conspiracy offense. What makes the offense of conspiracy to commit wire or healthcare fraud criminal is the agreement to commit fraud.

In any event, whether the conspiracy to commit wire or healthcare fraud alleged in this Indictment is a criminal offense does not turn on the misuse of a means of identification. At best, that misuse is "ancillary to what made the conduct fraudulent." *Dubin*, 599 U.S. at 117. Under *Dubin,* then, Count 2 must be dismissed.[15]

---

[15] Notably absent from the Government's opposition brief is any allegation that patients, including those whose names were used, were harmed by the use of their means of identification in the submission of test adjudications. As the Supreme Court noted in *Flores-Figueroa v. United States*, the impetus behind the identity theft statutes was to "provide enhanced protection for individuals whose identifying information is used to facilitate the commission of crimes." 556 U.S. 646, 654

## IV.    THE INDICTMENT IS MULTIPLICITOUS.

In his moving brief, Mr. Johnston demonstrated that, as alleged in the Indictment, Counts 1 and 2 state the same conspiracy:  to use "test adjudications" as part of a wire fraud and health care fraud conspiracy.  The Government's opposition brief makes no attempt to rebut this overlap on the merits, instead raising three arguments:  that Counts 1 and 2 do not satisfy the *Blockburger* test; that the Third Circuit's *Liotard* test does not apply; and that multiplicity challenges should not be raised before trial.  None is persuasive.

### A.    The *Blockburger* Test

Count 1 of the Indictment (conspiracy to commit wire fraud and health care fraud) is entirely subsumed in Count 2 (conspiracy to commit identity theft).  Under 18 U.S.C. § 1028(a)(7), the commission of identity theft requires that the use of another person's means of identification be done "to aid or abet, or with the intent to commit, or in connection with" a predicate offense. The Indictment then lists three predicate offenses applicable to Count 2: wire fraud, health care fraud, and conspiracy to commit wire fraud and health care fraud.  Thus, to prove a violation of Count 2, the Government must prove that Mr. Johnston agreed to use a means of identification in connection with wire fraud, health care fraud, or conspiracy to commit wire and health care fraud, and that he shared with another conspirator a "unity of purpose and the intent to achieve" the goal of using a means of identification in connection with wire fraud, health care fraud, or conspiracy to commit wire and health care fraud.  Opp. at 33-34.

_____

(2009); *see also Dubin* OA Tr. at 79:5-15 (Government conceding that the statute does not criminalize the use of "fictitious people" because "you're not causing a harm to a real person"). Of course, the Indictment alleges no such harm; nor for that matter, was there any loss to the PBAs or insurance companies, since test adjudications did not, by definition, result in any payment, since the claims were always, as the Indictment states, withdrawn before payment.  Ind. ¶ 27.

In other words, Count 2 is straightforward in requiring proof of an agreement to commit wire or health care fraud: a defendant cannot agree to commit identity theft in connection with wire fraud or health care fraud, as is alleged, without necessarily agreeing to commit wire fraud or health care fraud. Nor can the defendant have shared a "unity of purpose" or have an "intent to achieve" the commission of identity theft in connection with wire fraud or health care fraud without having already agreed to commit wire fraud or health care fraud. This is particularly so given the statute's nexus requirement, set forth in *Dubin*, discussed above: the "use" of another's "means of identification" must be at the "crux" of what makes the conduct underlying the predicate offense criminal, requiring a tight nexus between the defendants' planned identity theft and the wire or health care fraud conspiracy that constituted the predicate offense. *See supra* at 22.[16] That is, because of how closely interwoven the use of another's identity must be with the predicate offense, a defendant cannot agree to commit identity theft without simultaneously and necessarily agreeing to commit the predicate offense.

The Government also argues that it is "clear from the face of the statute[s] [and] the legislative history" that Congress intended that the offenses charged here constitute separate crimes, and therefore Mr. Johnston's multiplicity challenge should fail. Opp. at 35-36. But this argument really amounts to no more than that the offenses charged here are codified in different statutes enacted at different times. And that, of course, does not address the Double Jeopardy

---

[16] The Government's citation to *United States v. Galindo*, No. 11-10117, 2012 WL 1945142 (D. Kan. May 30 2012), for the proposition that aggravated identity theft and a predicate offense are not multiplicitous is unavailing. The Court in *Galindo* misstates the *Blockburger* test as requiring that only "one of the two charges require[] proof of a fact the other does not." *Id.* at *7. In any event, *Galindo* addressed an argument that allegations of substantive identity theft and its predicate offense were multiplicitous; Mr. Johnston's challenge is to the multiplicity of two obviously identical conspiracy charges—one to commit identity theft and one to commit its predicate offenses. That argument involves different legal doctrine, at least in the Third Circuit. *See supra* at 30 (citing *Liotard*).

27

problem posed by punishing a person twice for precisely the same conduct. Indeed, the Supreme Court has rejected exactly this argument. Thus, in *Rutledge v. United States*, the Supreme Court rejected the argument that the relevant analysis turns on whether a defendant is alleged to have violated two different statutory provisions. 517 U.S. 292 (1996). Specifically, the *Rutledge* Court held that the district court had erred in sentencing the defendant—who was convicted of violating 21 U.S.C. § 846 (conspiracy to distribute cocaine) and 21 U.S.C. § 848 (conducting a continuing criminal enterprise)—to concurrent life sentences, where the "in concert" element of the criminal enterprise offense was based on the same agreement as the § 846 conspiracy, and § 846 did not require proof of any element not also required by § 848. *Id.* at 304. In so holding, the Court squarely addressed the government's argument that the convictions were authorized for both § 846 and § 848 because they are different sections of the United States Code, holding that "[t]his does not rise to the level of the clear statement necessary for us to conclude that despite the identity of the statutory elements, Congress intended to allow multiple punishments." *Id.* at 304 n.14. *Rutledge*'s conclusion applies here—there is no "clear statement" that Congress intended to allow multiple punishments.[17]

Indeed, avoiding a multiplicity challenge, even utilizing the *Blockburger* test, requires much more by way of a showing that Congress specifically intended to punish the same conduct twice. For example, in *United States v. Grayson*, the Third Circuit concluded that *Blockburger* does not apply to RICO prosecutions because an analysis of the statute's text and legislative history demonstrated a "congressional intent" to punish defendants twice for the same conduct. 795 F.2d

---

[17] In any event, the Government concedes that an indictment charging defendants with crimes in "statutory provisions . . . located under distinct statutory schemes enacted several years apart" must still "satisf[y]" *Blockburger*. Opp. at 36 (quoting *United States v. Salahmand*, No. 08-cr-192, 2009 WL 10680619, at *7 (D.D.C. May 12, 2009)). For the reasons set forth herein, the statutory schemes here do not.

278, 282-83 (3d Cir. 1986).  The Government here fails to make such a showing, pointing to nothing in the statutes' text or legislative history that indicates a specific congressional intent to punish the same conduct twice.

Two counts satisfy *Blockburger* only when each offense "requires proof of a fact that the other does not."  *Blockburger v. United States,* 284 U.S. 299, 304 (1932).  Because of the overlap in their essential elements, Count 1 does not require proof of a fact that Count 2 does not—that is, it is entirely subsumed into Count 1 as Count 2's predicate offense.  The Indictment therefore does not satisfy *Blockburger*, and Counts 1 and 2 are multiplicitous.

### B.    The *Liotard* Test

In *United States v. Liotard*, the Third Circuit—acknowledging that *Blockburger*'s "same elements" test "may not adequately protect the defendant's constitutional right against double jeopardy, unless it is tempered with the consideration that a single conspiracy may not be arbitrarily subdivided for the purposes of prosecution"—crafted a four-factor "totality of the circumstances test" to be used in analyzing multiplicity challenges to conspiracy counts.  817 F.2d 1074, 1078 (3d Cir. 1987).  The "ultimate purpose of the totality of the circumstances inquiry is to determine whether two groups of conspirators alleged by the government to have entered separate agreements are actually all committed to the same set of objectives in a single conspiracy."  *United States v. Travillion*, 759 F.3d 281, 295 (3d Cir. 2014).  As demonstrated in Mr. Johnston's moving brief, Counts 1 and 2 state a single conspiracy, and are therefore multiplicitous, because of the complete geographical, temporal, and personnel overlap between the supposedly distinct conspiracies, and the high degree of similarity between the conduct alleged in each.  *See* Johnston Br. at 43-44.

Instead of analyzing the four factors set forth in *Liotard* and its progeny to determine whether Counts 1 and 2 allege "two agreements or only one," *United States v. Smith*, 82 F.3d 1261, 1266 (3d Cir. 1996), the Government argues that *Liotard* does not apply at all, merely because

Counts 1 and 2 are charged under different conspiracy statutes: Count 1 under 18 U.S.C. § 1349, and Count 2 under 18 U.S.C. § 371. Relying on *Albernaz v. United States*, 450 U.S. 333 (1981), which pre-dated *Liotard*, the Government argues that *Liotard* only applies when an indictment contains multiple counts charging violations of the same conspiracy statute.

The Government's argument ignores the Third Circuit's holding in *Liotard*. It is irrelevant under *Liotard* and its progeny whether the two conspiracies arise under different statutes; indeed, in devising its totality of the circumstances test, the Third Circuit expressly rejected other Circuits' consideration of the statutory offenses charged in an indictment and stated that "[f]or purposes of determining the parameters of . . . two alleged conspiracies, . . . differences in statutory violation are immaterial and fortuitous." *Liotard*, 817 F.2d at 1078 n.7. This conclusion is echoed in the subsequent Third Circuit cases that have applied *Liotard* and its "totality of the circumstances" test. *See, e.g.*, *United States v. Ciancaglini*, 858 F.2d 923, 927 (3d Cir. 1988) ("Because the two indictments differed only in that one alleged a conspiracy involving acts of an interstate nature and the other alleged a conspiracy involving acts of an intrastate nature, we declined to consider 'the statutory offenses charged in the indictments' as one of the factors in the totality of the circumstances test."); *see generally United States v. Kemp*, 359 F. App'x 356, 358 (3d Cir. 2010) ("To ensure a defendant's constitutional right against double jeopardy is adequately protected in the context of successive conspiracy prosecutions, we apply a 'totality of the circumstances' test."); *United States v. Mark*, 284 F. App'x 946, 948-49 (3d Cir. 2008) ("Generally, the same evidence test is utilized to determine whether a second prosecution is barred. When the charge involves a conspiracy, however, this Court applies a 'totality of the circumstances' test as established in *United States v. Liotard*.") (citation omitted); *Cedeno v. United States*, No. 09-cv-6395, 2010 WL 2682173, at *4 (D.N.J. July 2, 2010) ("A determination of whether or not a

petitioner has been indicted twice for the same offense considers the 'same evidence' test. . . . In a conspiracy case, the question is slightly more complicated, and requires a four-prong test."), *aff'd*, 455 F. App'x 241 (3d Cir. 2011).  None of these cases apply, or even hint at, a rule mandating that the *Liotard* test cannot apply to conspiracies charged under different conspiracy statutes; indeed, courts have specifically applied both *Blockburger* and *Liotard* in cases where defendants raised Double Jeopardy challenges to consecutive prosecutions brought under different conspiracy statutes.  *See United States v. Harris*, No. 90-cr-144, 1990 WL 118061, at *2 (E.D. Pa. Aug. 11, 1990) (considering Double Jeopardy challenge to arms trafficking conspiracy indictment after RICO conspiracy conviction and concluding that a totality of the circumstances "gloss is applied to the *Blockburger* test where the statutes at issue charge conspiracy").[18]

The Government's citation to *Albernaz* is also unavailing.  *Albernaz* obviously does not reflect a choice by the Supreme Court to reject the *Liotard* test in favor of a *Blockburger* test. Instead, the petitioners in *Albernaz* argued that two drug conspiracy statutes with identical text, 21 U.S.C. §§ 846 and 963, were not susceptible to the application of *Blockburger*'s same-elements test; the Supreme Court concluded that they were.  450 U.S. at 335-36.  But *Albernaz* had nothing to do with the propriety of applying the totality of the circumstances test, which numerous Circuits have applied, and some have developed even after *Albernaz* was decided.  Indeed, *Albernaz* pre-

---

[18] The Government cites *United States v. Savage*, No. 07-cr-550, 2012 WL 1994736, at *8 (E.D. Pa. June 1, 2012), which does state that "[t]he totality of the circumstances test applies where the successive conspiracy charges involve the same conspiracy statute."  *Savage* cites no case in support of this statement and should not be considered persuasive.

Further, *United States v. Rigas*, 605 F.3d 194 (3d Cir. 2010), is also not to the contrary.  *Rigas* was a unit-of-prosecution case; it determined whether 18 U.S.C. § 371 created one offense (in which case *Blockburger* could not be the correct test for multiplicity, because it can only apply to indictments charging violations of multiple statutes) or two offenses (in which case *Blockburger* could be applied).  *Id.* at 203, 212.  The Court held that § 371 created only one offense, so only *Liotard* could be applied.  But, as the caselaw cited above makes clear, *Liotard* is applied to cases, like this one, involving multiple statutes as well.

dated *Liotard* by six years, and so interpreting it to bar Mr. Johnston's claim would fly directly in the face of the governing Third Circuit precedent.

The *Liotard* test applies, and when fully applied, as Mr. Johnston, but not the Government, does, leads inexorably to the conclusion that Counts 1 and 2 artificially divide one conspiracy into two, in violation of the Double Jeopardy Clause of the Fifth Amendment to the Constitution.  Mr. Johnston's motion should be granted and the Government should be required to elect as between those Counts.

### C.      A Multiplicity Challenge Can Be Considered on a Motion to Dismiss.

Finally, the Government argues that Mr. Johnston's multiplicity challenge can only be brought at sentencing, noting that multiplicity's "primary danger" is "excessive punishment." Opp. at 40 (quoting *United States v. Golden*, No. 21-2618, 2023 WL 2446899, at *3 (3d Cir. Mar. 10, 2023)).    But that is not the only evil inherent in multiplicitous counts, which risk "prejudice[ing] the jury against the defendant by creating the impression of more criminal activity on his part than in fact may have been present," *United States v. Carter*, 576 F.2d 1061, 1064 (3d Cir. 1978); *United States v. Caruso*, 948 F. Supp. 382, 390 (D.N.J. 1996) (same), and poses a serious risk of jury confusion and with it, a fundamentally unfair trial, *see United States v. Hearod*, 499 F.2d 1003, 1005 (5th Cir. 1974) (noting that one of the hazards of multiplicity is "confus[ing] the jury by suggesting that not one but several crimes have been committed").  The Government's argument that "[t]here is no reason to think that the existence of both Count 1 and Count 2 in the Indictment will prejudice the jury," Opp. at 40, then, has therefore already been addressed and rejected by the Third Circuit in *Carter*.

Accordingly, the Government's suggestion that pretrial multiplicity challenges are improper is wrong.  As Mr. Johnston showed in his moving brief, the proper remedy is the Government's election of one conspiracy that it intends to prove at trial.  *See* Johnston Br. at 44-

45 (citing cases); *see also United States v. Dixon*, 921 F.2d 194, 196 (8th Cir. 1990) (requiring the Government to elect from multiplicitous counts); *United States v. Aguilar*, 756 F.2d 1418, 1423 (9th Cir. 1985) (indicating that "[e]lection is explicitly approved as a remedy for multiplicity"); *United States v. Phillips*, 962 F. Supp. 200, 201-02 (D.D.C. 1997) (granting the defendant's motion to compel election between multiplicitous counts); *cf. United States v. Quintanilla*, 2 F.3d 1469, 1473 (7th Cir. 1993) (Government voluntarily dismissed the multiplicitous counts). Indeed, if the only remedy to a multiplicitous indictment were merger of sentences, as the Government suggests, it is not clear why, in cases like *Travillon*, the Third Circuit endorsed the possibility of a pretrial evidentiary hearing to challenge a multi-conspiracy indictment "to adjudicate [the defendant's] double jeopardy claim." 759 F.3d at 295. Indeed, the law is that a defendant must, as Mr. Johnston has done here, file the challenge he has pretrial. *See United States v. Irving*, 316 F. Supp. 3d 879, 893 (E.D. Pa. 2018) (holding at a multiplicity challenge was untimely because it "must be raised by pretrial motion" under Federal Rule of Criminal Procedure 12(b)(3)(B)(ii)).[19] In sum, there is no procedural bar to adjudicating Mr. Johnston's multiplicity challenge now, therefore protecting against the possibility of confusing or prejudicing the jury and therefore creating the risk of an unfair trial. The motion should be granted.

---

[19] *Golden* is not to the contrary. There, the Third Circuit, in a non-precedential opinion, considered a post-trial challenge to a potentially multiplicitous indictment. The defendant's challenge failed because his punishments for the allegedly multiplicitous counts had already been merged at sentencing. 2023 WL 2446899, at *3. *Golden* therefore had no occasion to discuss, and so says nothing about, pretrial multiplicity challenges.

## V.    THE INDICTMENT DOES NOT STATE THE OFFENSE OF MONEY LAUNDERING.

### A.    Counts 5, 6, 9, 10, 13, 14, 17, 19, 21, and 23 Fail to Allege an Essential Element.

The substantive money laundering counts in the Indictment fail to allege that Mr. Johnston knew, when he engaged in certain monetary transactions, that the property involved in those transactions was derived from illegal activity.  That knowledge is one of the essential elements of money laundering under § 1957(a).  *See United States v. Sotelo*, 707 F. App'x 77, 87 (3d Cir. 2017).  But Paragraph 63 of the Indictment omits this allegation, merely stating that the defendants "did knowingly engage in the monetary transactions specified below."

The Government argues that the word "knowingly" in Paragraph 63 applies to all clauses in the sentence, including the allegation that the monetary transactions were in "criminally derived property."  But the phrasing of Count 4 of the Indictment—the money laundering conspiracy count—indicates otherwise.  There, the Indictment instead alleges that the defendants, "knowing that the property involved in the financial transactions represented the proceeds of unlawful activity . . ., did knowingly conspire and agree with each other and with others to engage in monetary transactions."  Ind. ¶ 56.  This paragraph thus specifically contains what Paragraph 63 lacks:  an allegation that the defendants knew that the property represented the proceeds of unlawful activity.  Because the Indictment's substantive money laundering counts therefore fail to allege an essential element, they must be dismissed.  *See e.g., United States v. Huet*, 665 F.3d 588, 594-95 (3d Cir. 2012) (an indictment is insufficient if it fails to allege an element of the offense).

### B.    All Money Laundering Counts Fail To Allege Any Proceeds.

Instead of alleging specific acts of wire or health care fraud, Count 1 of the Indictment alleges that the Defendants engaged in a wide-ranging conspiracy.  This conspiracy began in 2013, Ind. ¶ 16, and involved Mr. Johnston's and Mr. Brockmeier's use of two management companies,

34

PMG and Bluen Medical, to acquire significant ownership stakes in Central Rexall Drugs, Inc., *id.* ¶¶ 17-18.  These management companies allegedly gave Mr. Johnston and Mr. Brockmeier the "power to manage the operations of Central Rexall."  *Id.* ¶ 19.  Mr. Johnston and Mr. Brockmeier allegedly used that power to cause Central Rexall to engage in fraudulent activity, which greatly increased Central Rexall's profits.  *Id.* ¶¶ 37, 41.  As part of the conspiracy, Mr. Johnston and Mr. Brockmeier are alleged to have received money from Central Rexall.  *Id.* ¶¶ 38-39.  The Indictment does not charge any substantive fraud counts, but it does charge Mr. Johnston with ten counts of money laundering (and Mr. Brockmeier with another ten), as well as one count of conspiracy to commit money laundering.  These counts specifically allege that wire transfers from the management companies to Mr. Johnston's bank account constituted a monetary transaction in "criminally derived property of a value greater than $10,000."  Ind. ¶ 63.

As Mr. Johnston's moving brief explained, the money laundering counts cannot stand. "Criminally derived property" under 18 U.S.C. § 1957 is defined as property constituting or derived from "proceeds obtained from a criminal offense."  18 U.S.C. § 1957(f)(2).  The Third Circuit—including in cases cited by the Government—has consistently "require[ed] that there be some distinction between the specified unlawful activity [from which the proceeds derive] and the financial transaction" penalized by the money laundering statutes.  *United States v. Conley*, 37 F.3d 970, 980 (3d Cir. 1994).  Put another way, "[m]oney laundering must be a crime distinct from the crime by which the money is obtained."  *United States v. Abuhouran*, 162 F.3d 230, 233-34 (3d Cir. 1998) (citing *Conley*, 37 F.3d at 980); *see also United States v. Kennedy*, 64 F.3d 1465, 1478 (10th Cir. 1995) ("Congress clearly intended the money laundering statutes to punish new conduct that occurs after the completion of certain criminal activity, rather than simply to create an additional punishment for that criminal activity.").  To that end, the Third Circuit has recently

and clearly held that funds obtained from a criminal offense do not become "proceeds" until "*after* a defendant receives them*," and "any transactions that occur *before* a defendant obtains the fruits of [his] fraudulent scheme fall outside of*" the statute's scope.  *Fallon*, 61 F.4th at 118 (emphasis in original); *see also* Johnston Br. at 46-49.  "Thus, a defendant's mere receipt of funds as a result of a fraudulent transaction cannot itself constitute money laundering" because it is only at that moment that the criminally derived funds become "proceeds" that the defendant can launder. *Fallon*, 61 F.4th at 118.[20]  As alleged in the Indictment, the funds did not become Mr. Johnston's property until he actually obtained them.

The Government now argues that Mr. Johnston misunderstands both money-laundering and the Third Circuit's decision in *Fallon* out of context, but it is the Government that seems to just ignore the basis for Mr. Johnston's argument.  The moving brief articulates a straightforward statutory argument: to violate § 1957(a), a defendant must transact in "criminally derived property" that is "derived from specified unlawful activity"; to be "criminally derived property," money must be "proceeds obtained from a criminal offense"; and to be "proceeds" that a defendant has "obtained," money have already been "delivered into the defendant's possession." *Fallon*, 61 F.4th at 120.  While the Government attempts to distinguish *Fallon* based on its facts, *Fallon*'s language could not be clearer: courts must employ a possession-based test to determine whether a

---

[20] *Fallon* bases its analysis on two policy justifications, both applicable in this case.  First, "in many cases, the addition of a money laundering charge can result in . . . a sentence that is much larger than the sentence for the predicate offense." 61 F.4th at 116.  That, of course, is the case here: the predicate offense of conspiracy to commit health care fraud has a maximum sentence of ten years in the absence of serious bodily injury, while the maximum sentence for each count of money laundering is also ten years.  The addition of eleven counts of wire fraud therefore multiplies Mr. Johnston's potential sentence by a factor of twelve.  Second, "a money laundering conviction can add significant financial penalties." *Id.* at 116-17.  Again, this applies here: through its forfeiture allegations, the Government appears to broadly seek forfeiture of everything the defendants receive from Central Rexall, as well as substitute assets.  Ind. at 27-28.

defendants' funds count as "proceeds obtained" under the money laundering statutes. *Id.* at 118, 120 (noting multiple times that a defendant must "receive[]" funds for them to become proceeds; a defendant must "obtain[] the fruits of its fraudulent scheme"; "a defendant's mere receipt of funds as a result of a fraudulent transaction cannot itself constitute money laundering"; and funds must be "delivered into the defendant's possession").[21] And as alleged in the Indictment, the funds at issue here simply did not come into Mr. Johnston's possession until they entered his bank account. Johnston Br. at 47-49.

Ignoring *Fallon*'s possession-based test for whether funds are "proceeds," the Government instead repeats the claim that each time Pharmacy Benefits Administrator made payments to Central Rexall's bank account, "[t]he underlying fraud—or a phase of it—was completed," and that "[o]nce the PBA paid Central Rexall, the fraud was complete." Opp. at 44; *see also id.* at 48 ("The Indictment . . . alleges that fraud was complete upon payment from the PBA to Central Rexall because those payments were based on the submission of fraudulent claims for medically unnecessary prescriptions."); *id.* at 50 (urging an understanding of money laundering "regardless of the language used in *Fallon*"). Because a "phase" of the "underlying fraud" was complete, the Government says, transactions occurring after that "phase" can constitute money laundering. But the Government's problem is that the Indictment does not actually allege an "underlying fraud."

---

[21] The Government is wrong that *Fallon* "implies that its decision would have been different had the defendants been charged with . . . transacting in criminal proceeds, which does not require evidence of an intent to conceal." Opp. at 49-50. This argument misreads *Fallon*. There, the Government pointed to multiple financial transactions, some occurring before the defendants paid partial refunds to clients and some occurring after. 61 F.4th at 120. As to the pre-refund transactions, the Third Circuit held that the funds were not "proceeds" because the defendants did not possess them. *Id.* As to the post-refund payments, the court held that there was no evidence of the defendants' intent to conceal, as required to prove concealment-based money laundering. *Id.* When the Court reads the *Fallon* opinion, it will readily conclude that the Government's brief is conflating the pre- and post-refund payments to make it seem as if the Third Circuit's reasoning on the latter applied to the former.

The "specified unlawful activity" that forms the basis of the money laundering counts is not wire fraud or health care fraud—it is "conspiracy to commit health care fraud . . . ." Ind. ¶¶ 57-60, 63.[22] This distinction is critical, and no mere formality. The Indictment alleges a lengthy and broad conspiracy with a host of "manner and means" that were "further part of the conspiracy." *Id.* ¶¶ 15-41. As alleged in the Indictment, that conspiracy was not "completed" when PBA made a payment to Central Rexall; it was "completed" when the Defendants themselves received funds from Central Rexall. *Id.* ¶ 38 (alleging that "[i]t was further part of the conspiracy that Christopher Kyle Johnston received over $34,000,000 from Central Rexall from 2014 through 2016"). Thus, the Government's own allegations make clear that Mr. Johnston's receipt of money from Central Rexall was itself part of the "specified unlawful activity" that forms the basis for the money laundering counts, again running afoul of the Third Circuit's rule that "there be some distinction between the specified unlawful activity [from which the proceeds derive] and the financial transaction" penalized by the money laundering statutes. *Conley*, 37 F.3d at 980.

The Government's conflation of conspiracy with substantive fraud infects its discussion of the caselaw. For example, it cites to *United States v. Kennedy*, 707 F.3d 558 (5th Cir. 2013), in which the "specified unlawful activity" was wire fraud. Because wire fraud "is a consummated crime when the illicitly obtained funds are transmitted," the wire fraud was "fully consummated" when funds were transferred to the defendants' business, and subsequent transactions from the business to the defendants' shell corporations constituted money laundering. *Id.* at 566. Setting

---

[22] The Indictment actually alleges that the "specified unlawful activity" is "conspiracy to commit health care fraud and wire fraud," but wire fraud conspiracy is not a specified unlawful activity under 18 U.S.C. § 1956(c)(7) or 18 U.S.C. § 1961(1) (listing "wire fraud" under § 1343 but not wire fraud conspiracy under § 1349 as "specified unlawful activity"); *see also United States v. Shea*, No. 20-cr-412, 2023 WL 4551635, at *2 (S.D.N.Y. July 14, 2023) ("specified unlawful activity" does not include wire fraud conspiracy).

aside that *Kennedy* is from a different circuit and does not apply the possession-based test set forth in *Fallon*, it is entirely different from the Indictment here because the money laundering's basis was actual fraud and not, as here, a wide-ranging conspiracy, part of which was explicitly alleged to be the transfer of funds to the conspirators. Ind. ¶ 38.

The other cases cited by the Government have the same issue. The specified unlawful activity in *Conley* was "the substantive offense of operating an illegal gambling business." 37 F.3d at 973. That offense was complete when money was placed into illegal poker machines; that money was therefore "proceeds of specified unlawful activity" and removing that money from the poker machines thus could constitute money laundering. *Id.* at 980. In *United States v. Omoruyi*, the specified unlawful activity was mail fraud. 260 F.3d 291, 296 (3d Cir. 2001). That offense was complete when the defendant's checks were placed in the mail for delivery to the banks, and thus transacting in those funds could constitute money laundering. *Id.* But here, by the very terms of the Government's own Indictment, the conspiracy included the transfer of funds to the conspirators, which could not, then, be money laundering as well under the caselaw that binds this Court.

The Government concludes by arguing that it is "routine and unremarkable that there is a connection between the underlying wire fraud and health care fraud conspiracy and the conspiracy to transact in the proceeds of that fraud conspiracy." Opp. at 51. If so, that is all the more reason to police the boundary line between the predicate conspiracy and the alleged transactions in the proceeds of that conspiracy. What is not routine, and what is remarkable, is the Indictment here, which charges Mr. Johnston with two counts of conspiracy and a striking eleven counts of money laundering—a true instance of the tail wagging the dog. The Indictment's lopsided structure is good evidence the money laundering statute has been stretched beyond its text.

39

## VI.  THE COURT SHOULD ORDER A BILL OF PARTICULARS CLARIFYING THE VAGUE ALLEGATIONS IN THE INDICTMENT THAT CANNOT BE CURED BY THE GOVERNMENT'S EXTENSIVE DISCOVERY.

If the Court determines that Counts 1, 2, 4, 5, 6, 9, 10, 13, 14, 17, 19, 21, and 23 sufficiently state an offense and that venue is proper in New Jersey, the Court should then order the Government to provide Mr. Johnston with a bill of particulars clarifying the vague allegations in the Indictment.  The Government attempts to portray its Indictment as sufficiently pled and claims that where, "as was done here, the Government supplements a detailed charging document with substantial discovery, a bill of particulars is unnecessary."  Opp. at 67.  But as set forth above and in Mr. Johnston's moving brief, however verbose the Indictment, and however extensive the discovery, the Government has not provided specific, essential facts to the defense which are necessary to enable Mr. Johnston to meaningfully prepare for trial.  *See supra* at 11, 22-23; Johnston Br. at 49-67.  Thus, a bill of particulars is necessary to (a) provide the necessary definition of certain very specific terms that the Government itself placed in the Indictment, *see* Johnston Br. at 54-57 (requesting a bill of particulars identifying the "others" with whom Mr. Johnston is alleged to have agreed and conspired with, as alleged in the Indictment), *id.* at 57-59 (requesting a bill of particulars identifying where, including the "elsewhere" alleged in the Indictment, where the alleged crimes occurred), and (b) inform Mr. Johnston what it is that *he*, in particular, is alleged to have done in participating in the alleged conspiracy to commit health care fraud and wire fraud, *id.* at 59-67.  Only with this information will Mr. Johnston, in the words of the Third Circuit, be "adequately inform[ed] . . . of the charges against [him] such that []he may prepare a defense and invoke the double jeopardy clause when appropriate."  *United States v. Urban*, 404 F.3d 754, 771 (3d Cir. 2005) (quoting *United States v. Whited*, 311 F.3d 259, 262 (3d Cir. 2002)).

Again, this is no blunderbuss, undiscriminating approach.  Rather, for example, throughout the Indictment, the Government alleges that Mr. Johnston conspired with unidentified "others" in

the state of New Jersey and "elsewhere" to commit health care fraud and wire fraud, identity theft, and money laundering. Ind. ¶¶ 11, 13, 14, 20, 21, 22, 24, 25, 28, 29, 32, 33, 35, 36, 37, 41, 45, 49, 56. The facts as alleged in the Indictment, however, fail to identify either those unnamed "others" with whom Mr. Johnston is alleged to have agreed and conspired, (2) where, including the "elsewhere" alleged in the Indictment, the alleged crimes occurred, and (3) how Mr. Johnston participated in the alleged conspiracy to commit health care fraud and wire fraud. With respect to Mr. Johnston's request for the identity of the unnamed "others," the Government argues that "[d]efendants have no shortage of information about unindicted persons who helped distribute Central Rexall compound medications in New Jersey," claiming that William Hickman and Hayley Taff "are identified in the indictment by name; those two and another 42 have pled guilty to conspiracy to commit health care fraud and related charged; and three more went to trial." Opp. at 66, 71. Of course, this response is both over- and under-inclusive: it does not claim that all of those 42 persons are co-conspirators and indeed, acknowledges that Mr. Johnston had not been provided with information in discovery on all of them, *id.* at 71 (stating that the Government had produced "interviews of *almost* all of the 44 individuals who have pled guilty") (emphasis added). Nor has the Government confirmed that its purported list sets forth all known individuals who could fall into the category of "others" as referred to in the Indictment. The law, as set forth in Mr. Johnston's moving brief, is clear: courts in this District and elsewhere have consistently ordered to the Government to specifically identify the "others" cited in the Indictment, both as a matter of fair notice to the defense and so that the trial will be more administrable by the Court, which will be required to rule on questions of evidence that turn on who is, and who is not, a purported co-conspirator, under Federal Rule of Evidence 801(d)(2)(E). *See* Johnston Br. at 54-55 (collecting cases).

Similarly, despite the Government's broad proclamation that "there is no secret about where things happened in this case:  defendants ran Central Rexall in Louisiana and used distributors around the country to market Central Rexall compound medications, including William Hickman and many others in New Jersey," Opp. at 73, the places where the alleged acts occurred, including the locations encompassed by the term "elsewhere" remain undefined.  The Government claims that Central Rexall "used distributors around the country" but offers no indication of where "around the country" may be, a particularly important fact given the venue motion that is before the Court, but an important—and unintrusive—matter of notice in any event.  As case after case requires, the Government should be ordered to provide a bill of particulars identifying the particular locations where the offenses alleged occurred.  *See* Johnston Br. at 58 (collecting cases).

As it often does, the Government argues that a bill of particulars is not necessary because it has provided Mr. Johnston with "extensive" and "substantial" discovery.  Opp. at 73.[23]  But, contrary to the Government's claim, the law is clear here too: the production of discovery does not relieve the Government of its duty to sufficiently apprise the defendant of "the nature of the charges brought against him to adequately prepare for his defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described defense."  *United States v. Addonizio*, 451 F.2d 49, 63-64 (3d Cir. 1971) (citation omitted).  Indeed, directly to the contrary, in precedent with which the Government does not deal, courts have routinely held that providing "mountains" of discovery is not a substitution for a bill of particulars; in fact, voluminous document productions in complex cases can actually *create* the need for a bill of particulars.  *See*

---

[23] Mr. Johnston does not oppose the Government's request for Rule 16(b) discovery.  *See* Opp. at 75-76.

*United States v. Bin Laden*, 92 F. Supp. 2d 225, 234 (S.D.N.Y. 2000) (holding that "it is no solution to rely solely on the quantity of information disclosed by the government; sometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars"), *aff'd,* 552 F.3d 93 (2d Cir. 2008), *cert. denied*, 556 U.S. 1283 (2009); *United States v. Arberry*, No. 06-cr-278, 2007 WL 9706396, at *2 (E.D. Wisc. Feb. 15, 2007) ("Indeed, 'the lack of specificity in the charges combined with the production of the voluminous documents will occasionally prompt judges to order a bill of particulars.'" (quoting Barry Tarlow, *When Too Much Discovery Is Not Enough*, 26 Mar. Champion 56 (2002))); *see also United States v. Aispuro*, No. 08-cr-2936, 2010 WL 1404196, at *6 (D.N.M. Mar. 16, 2010) (finding that a bill of particulars was necessary due to the complex nature of the case paired with voluminous discovery); *United States v. Long,* No. 08-cr-043, 2008 WL 11336760, at *5 (N.D. Ga. Oct. 3, 2008) (holding "that the voluminous production of discovery d[id] not render the motion for a bill of particulars redundant, unnecessary, or superfluous based on the defendants' representations, the indictment's failure to narrow the relevant contracts, the large amount of discovery, and the eight-year duration of the conspiracy"); *United States v. Anderson*, 441 F. Supp. 2d 15, 19 (D.D.C. 2006) (agreeing that "it is not a sufficient response to a motion for a bill of particulars to point to the voluminous discovery already provided to a governmental open file policy"); *United States v. Nachamie*, 91 F. Supp. 2d 565, 571-72 (S.D.N.Y. 2000) (holding that the Government was required to provide the defendant with a bill of particulars where the Government produced over 200,000 documents and "declined to identify which of the documents provided to the defense . . . it intend[ed] to use in its case-in-chief at trial"). Indeed, convictions have been reversed on precisely this basis. *See*, *e.g.*, *United States v. Davidoff*, 845 F.2d 1151, 1155 (2d Cir. 1988) (reversing and remanding for a new trial, holding that it "was error not to grant the defendant's request for a bill of particulars," and that by producing

6,000 pages of discovery, the Government did not obviate the need for a bill of particulars in a complex prosecution); *United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987) (reversing and remanding for a new trial, holding that "the district court erred by failing to grant a bill of particulars which was vital to [defendants'] understanding of the charges pending and to the preparation of a defense," reasoning that "[t]he Government did not fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided as to which documents would be proven falsified or which of some fifteen burglaries would be demonstrated to be staged").

Here, the voluminous discovery provided by the Government, consisting of over two million pages, does not provide the clarity that Mr. Johnston seeks in his request for a bill of particulars, or he would not be spending his or the Court's time moving as he has. According to the Government, it has produced "ample information about the fraud scheme [to allow Mr. Johnston] to prepare for trial," Opp. at 71, including "memoranda summarizing interviews of over 250 witnesses," *id.* at 68, "extensive data sets from Pharmacy Benefits Administrator and Central Rexall showing which claims were submitted, which were paid, and which were rejected," *id.* at 74, "pre-printed prescription pads," *id.*, "agreements with distributors," *id.*, and "Central Rexall documents and interview memorandum discussing test adjudications, *id.* at 75; it argues that Mr. Johnston can sift through this discovery to figure out what it is that the Government alleges that he did wrong. But none of these categories of discovery serve to name who the Government purports to be an unindicted co-conspirator or identify where the events that form the core of the Government's allegations against Mr. Johnston took place. Nor does the discovery shed light on the very basic question, at the heart of any indictment, of what Mr. Johnston is alleged to have done: which specific claims, if any, the Government alleges Mr. Johnston, submitted or caused to

be submitted, to Pharmacy Benefits Administrator; which formulas, if any, the Government alleges Mr. Johnston, brought or directed be brought to Central Rexall; which preprinted prescription pads, if any, the Government alleges Mr. Johnston used or directed Central Rexall to use; which agreements, if any, the Government alleges Mr. Johnston entered into with distributors; which combination of ingredients, if any, the Government alleges Mr. Johnston, designed based on reimbursements; which test adjudications, if any, the Government alleges Mr. Johnston caused Central Rexall to submit, and for what medications; which compounded medications, if any, the Government alleges Mr. Johnston designed based on the amount of money that insurance would pay; which patients, if any, the Government alleges were the subject of Mr. Johnston's own actions; which Central Rexall distributors, if any, the Government alleges Mr. Johnston retained and directed to market medications to patients; which medications, if any, the Government alleges Mr. Johnston, specifically, directed Central Rexall to promote without any tests or studies; and which formulas, if any, the Government alleges Mr. Johnston, specifically, developed that were not tailored to individual patient needs.  The Government's argument that the discovery answers Mr. Johnston's targeted requests is, this respect, simply untrue, and is inconsistent with the very discovery to which it points.  It does not, then, provide a basis for denying the very straightforward and carefully limited bill of particulars that is requested and should be granted in the interests of a fair, and efficient, trial.

## VII.   THE IRRELEVANT AND PREJUDICIAL LANGUAGE CONCERNING THE AMOUNT OF MONEY THAT MR. JOHNSTON ALLEGEDLY RECEIVED FROM CENTRAL REXALL SHOULD BE STRICKEN.

As is discussed in detail in Mr. Johnston's moving brief, the Court should strike the irrelevant and inflammatory allegation that Mr. Johnston "received over $34,000,000 from Central Rexall from 2014 through 2016."  *See* Johnston Br. at 67-71 (citing Ind. ¶ 38).  Ignoring the extremely prejudicial nature of this allegation, the Government responds that this information,

45

concerning the amount of money that Mr. Johnston purportedly received "from the fraud," is relevant "to show the scope of the fraud and [Mr. Johnston's] motive for the crimes alleged in the Indictment." Opp. at 63. In support, the Government cites to four cases allegedly holding "that allegations of the money a defendant received from a charged crime are relevant to show the defendant's motive and intent," and claims that the cases cited by Mr. Johnston "are not persuasive authority to the contrary." *Id.*

The Government is mistaken. While profits received from an allegedly fraudulent scheme may, at times, be relevant to show a defendant's motive to commit the crime charged, that is simply not what is alleged in this Indictment. Rather, by the terms of the Indictment itself, the $34,000,000 that Mr. Johnston allegedly received from Central is not alleged to have been the proceeds derived from the purportedly fraudulent scheme, but instead Mr. Johnston's overall earnings from Central of which, as the Indictment alleges, Mr. Johnston was General Counsel. *See* Ind. ¶ 1(b); *id.* ¶ 38 ("It was further part of the conspiracy that defendant [Mr. Johnston] received over $34,000,000 from Central Rexall from 2014 through 2016"). Thus, the cases cited by the Government in which courts have denied motions to strike allegations relating to profits of an alleged fraud are all readily distinguishable, *see* Opp. at 63 (citing *United States v. Eisenberg*, 773 F. Supp. 662, 701 (D.N.J. 1991) (refusing to strike paragraph "relating to the proceeds received by the Defendants from the consummation of the [alleged] Scheme . . . because it may be relevant to motive and intent"); *United States v. Bortnick*, No. 03-cr-0414, 2004 WL 2861868, at *4 (E.D. Pa. Nov. 30, 2004) (refusing to strike broad allegations relating to acts defendant purportedly took during an alleged bank fraud scheme, including the fact that Defendant allegedly diverted money to himself, as this was the exact behavior that was charged in the indictment); *United States v. Koranki*, No. 10-cr-43, 2010 WL 2868183, at *1 (W.D. Okla. July 20, 2010) (denying motion to strike proof of the

46

value of property that defendant was alleged to have obtained as part of the purported scheme); *United States v. Hanna*, 198 F. Supp. 2d 236, 245 (E.D.N.Y. 2002) (holding that "proof of profits that [defendant's companies] made from the alleged sham lock-ups is relevant and admissible on the issue of the motive for making these deals.")). Indeed, though the Government fails to recognize it, the cases cited in Mr. Johnston's moving brief show that allegations like this one are of precisely the sort that are stricken under Federal Rule of Criminal Procedure 7(d) in similar contexts, *see* Johnston Br. at 67-71 (citing *United States v. Schwening*, No. 8:05-cr-282, 2006 WL 1559668, at *5 (D. Neb. June 5, 2006) (striking an allegation regarding the total value of contracts won as a result of an alleged illegal gratuity, which was not an allegation of the defendant's proceeds from the crime); *United States v. Rush*, 807 F. Supp. 1263, 1266 (E.D. La. 1992) (striking allegation that defendant's scheme cost the state $10 million in losses because "its inclusion could prejudice the defendant"); *United States v. Lavin*, 504 F. Supp. 1356, 1362-63 (N.D. Ill. 1981) (striking $30 million figure reflecting the total amount of property reassessments because it prejudicially "overstate[d] both the scope and result of the alleged fraud")).

In sum, because the amount that Mr. Johnston received from Central Rexall is, per the actual language of the Indictment, not limited to the amount that was allegedly gained from the purportedly fraudulent scheme charged, such information is true surplusage, unrelated to the crime alleged but instead designed to prejudice the jury against Mr. Johnston by portraying him as a "fat cat" who made a lot of money as a result of the alleged scheme. *See* Johnston Br. at 70-71. But leaving aside that how much he made is completely irrelevant to guilt or innocence, this paragraph also does not even accurately or fairly depict the scope of the fraud that is alleged, which is set

forth in Paragraphs 61-63 of the Indictment.[24]  The Government glosses over the inflammatory nature of this allegation, claiming that "the Indictment includes no allegations about [Mr. Johnston's] homes, expenditures, or lifestyle," but cites to no law holding that such specific references are required for the Court to strike prosecutorial appeals to wealth and class biases. Opp. at 62.  Rather, as Mr. Johnston has previously explained "appeals to class prejudice are highly improper and cannot be condoned and trial courts should ever be alert to prevent them."  *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 239 (1940); *see also* Johnston Br. at 70 (collecting cases).  This information should therefore be stricken.

## CONCLUSION

For these reasons, Defendant Christopher Kyle Johnston respectfully requests that the Court enter an Order dismissing the Indictment, in whole or in part.  Alternatively, the Court should enter an Order (1) requiring the Government to elect not to prosecute either Count 1 or Count 2, or scheduling a pretrial evidentiary hearing to consider Mr. Johnston's multiplicity challenge; (2) granting a bill of particulars; and (3) striking Paragraph 38 from the Indictment.

Dated: February 14, 2024

Respectfully submitted,

 s/ Lawrence S. Lustberg
Lawrence S. Lustberg
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07030
(973)596-4500

*Attorneys for Defendant*
*Christopher Kyle Johnston*

---

[24] Those Paragraphs 61 and 63, which Mr. Johnston does not seek to strike as surplusage, describe the gain as $12,413,012.50, as opposed to the offending surplusage here at issue which describes it as "over $34 million" and is accordingly, much more prejudicial within the meaning of the Rule.