

LAWRENCE S. LUSTBERG
Director

Gibbons P.C.
One Gateway Center
Newark, New Jersey 07102-5310
Direct: (973) 596-4731
llustberg@gibbonslaw.com

January 10, 2025

**VIA ECF**
Honorable Edward S. Kiel
United States District Judge
Mitchell H. Cohen Building
 & U.S. Courthouse
4th and Cooper Streets, Court Room 3A
Camden, New Jersey 08101

   Re: *United States v. Johnston, et al.*, 20-cr-800 (ESK)

Dear Judge Kiel:

  Pursuant to the schedule set by the Court, *see* ECF 195, ¶ 7, Defendant Christopher Kyle Johnston respectfully submits this letter brief letter in lieu of more formal reply in response to the Government's brief in opposition (ECF 235; hereinafter "Opp.") to Mr. Johnston's motions *in limine* (ECF 222; 222-1).

**Evidence of Alleged "Kickbacks" or Improper Commission Payments is Inadmissible**

  The Government's opposition to Mr. Johnston's motions *in limine* fails for the same reasons as does as its own motion seeking to admit evidence of improper commission payments. ECF 221 (Gov't Motions *in Limine*) at 18-39; ECF 236 (Opposition to Gov't Motion *in Limine*) at 8-27. First, it describes the Indictment with undue generality, essentially rewriting it by plucking references to TRICARE and sales representative commissions out of context in an attempt to argue that conduct that is plainly uncharged has, in fact, been present in this case the whole time. Opp. at 2-3. For example, while it is true that the Indictment alleges that the defendants paid large, volume-based commissions, *see* Ind. ¶ 22, it does *not* allege that those commissions violated the law—hence the Government's need to devote 22 pages of its *in limine* motions to arguing that evidence regarding those alleged violations is admissible, *see* ECF 221 at 18-39. And while the Indictment of course alleges that the defendants defrauded TRICARE, *see* Ind. ¶¶ 6, 15, it again does not allege that improperly paid commissions on TRICARE prescriptions caused, or were even a part of, that fraud. Thus, the Government's contention that the "challenged conduct of paying commissions to obtain TRICARE compound prescriptions is the very conduct underlying the charged conspiracy," Opp. at 9, is simply false; rather, as the Indictment actually says in the charges for which the Defendants have actually prepared, the "very conduct underlying the charged conspiracy" is "the submission of false and fraudulent

GIBBONS P.C.

Honorable Edward S. Kiel, U.S.D.J.
January 10, 2025
Page 2

insurance claims to [PBA] for medically unnecessary Central Rexall compounded prescription medications," which is the object of the conspiracy charged in the Indictment. Ind. ¶ 14.[1]

Next, the Government argues, citing the same caselaw as it did in its motion *in limine*, that it must prove that the defendants "acted with a purpose to disobey or disregard the law," and so evidence that they ignored legal advice—no matter what the issue—is relevant to show willfulness. Opp. at 6-8. This truly extraordinary argument stands for the proposition that any time a defendant ignores his lawyer's advice, that is evidence of an intent to defraud. The implications of this argument are profound, and, unsurprisingly, the cases the Government cites do not support it. As noted in Mr. Johnston's Opposition to the Government's Motions in Limine, *see* ECF 236 at 12-12, *United States v. Teman*, 465 F. Supp. 3d 277 (S.D.N.Y. 2020), does not stand for the proposition that *any* disregard of *any* legal advice can prove a defendant's state of mind, but rather that a defendant's response to legal advice about the *specific criminal conduct charged in the Indictment* can be relevant. *See id.* at 308-310 (in prosecution for drawing checks from customer accounts, legal advice that defendant should not draw checks from customer accounts indicated fraudulent intent). Again, it would be one thing if the defendants ignored advice about the legality of medically unnecessary prescriptions (which would match the object of the conspiracy, like the cases cited on pages 18-19 of the Government's brief), but the legal advice here is on an entirely different issue, and would thus require a lengthy chain of inferences to be even marginally relevant.

The Government then cites a series of cases for the proposition that "evidence of paying kickbacks . . . is probative of the elements of conspiracy to commit health care fraud and wire fraud."[2] But these cases are very different from this one. For example, *United States v. Bolos*, 104 F.4th 562 (6th Cir. 2024), is distinguishable in that the coverup of kickbacks from Express Scripts was one of the bases for fraud actually alleged in the Indictment in that case, an indictment that was itself significantly broader than the indictment here. *See United States v. Assad et al.*, 2:18-cr-140 (E.D. Tn.), ECF 278 (First Superseding Indictment) ¶ 1 (broadly

---

[1] The Government's argument that it is not limited to the four corners of the Indictment, Opp. at 9-11, has been previously addressed in ECF 236 at 15-16. To very briefly reiterate, it is true that the Government is not limited to the overt acts charged in the Indictment. But the issue before the Court does not concern overt acts, but rather the object, manner, and means of the conspiracy, allegations which have appropriately focused the Court and the parties in prior pretrial motion practice and trial preparation. In any event, though, the Government's broad quotations from inapposite cases shed no light on whether evidence of uncharged acts is (1) relevant under Rule 401 or (2) unfairly prejudicial under Rule 403.

[2] The Government's apparent concession that its position is "not that paying kickbacks, by itself, proves health care fraud or wire fraud," but is instead merely "probative" of the elements of conspiracy, defeats its contention in its own motion *in limine* that evidence related to commission payments is actually intrinsic to the charged conspiracy. Opp. at 11.

GIBBONS P.C.

Honorable Edward S. Kiel, U.S.D.J.
January 10, 2025
Page 3

alleging "submitting fraudulent claims for payment for prescriptions" as the object of the charged conspiracy); ¶¶ 37-40 (alleging that the defendants engaged in "prescription brokering" and concealed that conduct from Express Scripts).³ The Government's efforts to rewrite its own Indictment to the contrary notwithstanding, the types of allegations present in *Bolos* are, as discussed above, absent here. And *United States v. Crabtree*, which is addressed in Mr. Johnston's Opposition to the Government's Motions in Limine, *see* ECF 236 at 16-17, was a case in which the Government needed to introduce evidence of the defendant's *receipt* of kickbacks to tie him to the conspiracy of which he argued he was unaware. 878 F.3d 1274, 1284, 1289 (11th Cir. 2018). Of course, that theory has nothing to do with this case.

The Government's non-healthcare fraud cases are even further afield. *United States v. Fumo*, 655 F.3d 288 (3d Cir. 2011), concerned a state senator who used public funds for private purposes, and "falsely represented that employees and contractors receiving payment by the Senate were performing proper and legitimate legislative functions." *Id.* at 295. As a result, the Pennsylvania Ethics Act, which the Government argues is somehow akin to the rules regarding commissions paid to sales representatives with regard to TRICARE reimbursement, was directly relevant to the charges of fraud and obstruction of justice in that case because there, the defendant's "theory of the case" was that nothing prohibited him from the conduct at issue. *Id.* at 302. And it was also relevant because the defendant's deception of the state Senate, by hiding his improper actions and expenditures, was the basis for the fraud charge at issue. *Id.*; *see also United States v. Fumo*, 2009 U.S. Dist. LEXIS 51581, at *126 (E.D. Pa. June 17, 2009) (noting that the Ethics Act "went to the heart of the Government's alleged scheme to defraud—Fumo improperly used Senate employees, contractors, and equipment for his personal and political gain and then misrepresented the nature of their work to the Senate itself in order to avoid a violation of state law"). Nothing of the sort is charged here. Likewise, *United States v. Agee*, 2021 WL 2894772 (S.D. Ind. July 9, 2021), did not concern violation of uncharged criminal statutes, but rather Small Business Administration ("SBA") civil regulations. *Id.* at *2-4. Moreover, the allegation in *Agee* was that the defendant defrauded the SBA's guaranty program, so context concerning that guaranty program was obviously relevant to determining the falsity of the defendant's statements. *Id.*

The Government erroneously states that the court in *United States v. Hughes*, 2007 WL 3334207 (N.D. Ill. Nov. 9, 2007), admitted evidence of two uncharged mortgage fraud schemes. It did not. It actually excluded them under Rule 403, stating (in language equally applicable

---

³ Nor was the issue here before the Court actually litigated in *Bolos*, where the appellant apparently did not argue that admission of the evidence violated Rule 403—only that his conduct was substantively protected by the AKS's safe harbor. *See* 104 F.4th at 572. Moreover, the persuasive value of *Bolos* is, at the moment, limited: a petition for certiorari is pending before the United States Supreme Court, and the Solicitor General has represented that the Sixth Circuit's decision may be affected by the outcome of *Kousisis v. United States*, No. 23-909, a pending (and already argued) Supreme Court case that will decide the permissible scope of federal fraud statutes. *See* No. 24-286, Memorandum of the United States (Oct. 15, 2024).

GIBBONS P.C.

Honorable Edward S. Kiel, U.S.D.J.
January 10, 2025
Page 4

here): "Can there be any serious question that there is a major risk (if not a near certainty) that the uncharged conduct, although marginally probative as to intent, [could] really tip[] the scales because of propensity considerations?" *Id.* Finally, in *United States v. Palazzo*, No. CR-05-0266, 2007 WL 9734138 (E.D. La. Oct. 24, 2007), the defendant physician engaged in unlawful billing practices. The Government sought to introduce evidence that he had previously engaged in unlawful billing practices to demonstrate his awareness of how to unlawfully bill and lack of accident in subsequent unlawful billing. *Id.* at *1-2. The tight connection—indeed, the identical nature—of the uncharged and charged conduct is a far cry from the distinct natures of the unlawful commissions that the Government is seeking to admit and the "medical necessity" conspiracy that is actually alleged.[4]

      The point of this discussion of the caselaw is not that the Government is selectively and incorrectly quoting precedent to support its arguments. It is that every prosecution is different. What is very relevant in one case might be only slightly relevant, or entirely irrelevant, in another. What provides necessary context in one case might be wholly unconnected in another. And what is closely connected to a defendant's state of mind and intent to defraud in one case might not be in another. It all depends upon what is actually alleged—and that is where the parties differ, for the Government's position simply does not turn on what is actually charged in the Indictment: a scheme to submit fraudulent claims for medically unnecessary prescriptions and not the alleged kickback scheme that the Government now wishes it had alleged and wants to try. Put most simply, whether a Central Rexall sales representative should or should not have been paid commissions on TRICARE prescriptions (which is not alleged) does not in any way bear on whether those prescriptions were medically necessary (which is). *See, e.g.*, *United States v. Walters*, 226 F. Supp. 3d 821, 825 (E.D. Ky. 2016) (excluding similar evidence and holding that "[i]nappropriate payment arrangements do not, by default, indicate intent to defraud," as "[i]t is certainly possible for an individual or entity to make illicit payments in order to obtain what would otherwise constitute legitimate business"). And it would shed little on the defendants' state of mind regarding that scheme, other than impermissibly, by seeking to show propensity.

---

[4] The Government also notes that evidence of kickbacks was admitted in *United States v. Merino*, 846 F. App'x 494 (9th Cir. 2021). But the Ninth Circuit found those kickbacks insufficient to support the charged healthcare fraud allegations and reversed Merino's convictions, indicating the weakness of the link between that evidence and the healthcare fraud charges at issue. *See id.* at *495 & n.1 (holding that there was "sparse evidence" of the defendant's intent to join a conspiracy to submit medically unnecessary prescriptions because "[a] defendant can be guilty of violating these anti-kickback laws if she 'knowingly and willfully' receives payment for recruiting patients, even if all the services ultimately billed to Medicare are legitimately provided and 'medically necessary'"). That same weakness is true here, which goes to admissibility as well as sufficiency in circumstance in which the kickbacks are not alleged to be the offense charged; in any event, the result of *Merino* renders the trial court's evidentiary decisions in that case not particularly useful precedent.

GIBBONS P.C.

Honorable Edward S. Kiel, U.S.D.J.
January 10, 2025
Page 5

      In this regard, the Government is simply wrong to treat the potential for unfair prejudice as cavalierly as it does. The unfair prejudice that would arise from this evidence's admission is profound and readily apparent: it would paint the defendants as routine violators of federal law and breakers of contracts. It would essentially tell the jury that: "Of course the defendants conspired to commit health care and wire fraud—look what else they were willing to do!" *See, e.g.*, *Hughes*, 2007 WL 3334207 (noting that, in a close case, evidence of prior lawbreaking could improperly tip the balance in favor of conviction). The Government's suggestion that a limiting instruction would cure this prejudice is not sufficient; as noted in Mr. Johnston's opposition brief, a limiting instruction is the fourth step in a Rule 404(b) analysis, which is only brought to bear after the evidence has satisfied the requisite Rule 403 balancing. ECF 236 at 27. Nor does the Government's citation to Third Circuit cases that reviewed trial courts' evidentiary admissions on a forgiving abuse-of-discretion standard, *see* Opp. at 15-16, demonstrate that admission of that evidence was correct in the first instance, only that it held up on appeal because it was not really, really wrong. But that is not the standard for which the Court should strive at trial.

      Perhaps most importantly of all, the Government's brief does not mention, or even touch upon—let alone rebut—Mr. Johnston's arguments regarding the potential that admission of this commission-related evidence will result in one or more mini-trials in which the Government will adduce the evidence of the legal advice provided to the defendants on trial and the defendants will have to bear the burden of showing how, in fact, they acted consistently with the legal advice that they actually received. The Government's statement that it "does not plan to prove or argue the essential elements of the AKS statute" actually makes its introduction of AKS-related evidence even *more* prejudicial and confusing to the jury. Instead of painstakingly demonstrating how the defendants violated the AKS (as it would have to do if it actually charged AKS violations in the Indictment), it will instead argue that "the defendants repeatedly disregarded advice that their conduct was unlawful, did an about-face on their own policies, and acted in a way that they knew was inconsistent with their obligations to the PBMs." Opp. at 17-18. Obviously, this will result in a trial-within-a-trial on uncharged allegations, in which the defendants will be constrained to show that their conduct was *not* unlawful, including by showing how it does not satisfy the elements of the AKS, as well as how they acted consistently with their legal advice and how they understood their obligations to the PBMs. This will result in a sideshow, and while all of this would have been appropriate if an AKS violation had actually been charged in the Indictment, it ultimately will concern evidence that has nothing to do with the actual object of the charged conspiracy: by the actual terms of the Indictment, the submission of "medically unnecessary" prescriptions.[5]

---

[5] The Government's statement that it will not elicit the word "kickback" from its witnesses (except when it already appears in documents and conversations), Opp. at 14-15, does little to mitigate the overall unfair prejudice and potential to confuse the issues. The thrust of the Government's evidence will be that the defendants were serial lawbreakers who knew better; however the Government labels their supposedly unlawful conduct, the resulting prejudice will be devastating to the fairness of this trial.

GIBBONS P.C.

Honorable Edward S. Kiel, U.S.D.J.
January 10, 2025
Page 6

**<u>Evidence Regarding Related-Party Prescriptions is Inadmissible</u>**

The Government also argues that evidence concerning payment of commissions to sales representatives for "related-party" prescriptions in violation of beneficiary inducement laws is admissible. Opp. at 20-22. That is, the Government seeks to introduce evidence that Central Rexall both approved prescriptions and paid commissions on prescriptions for patients who were related to either the sales representative who procured the prescription or the doctor who issued the prescription, in violation of either state or federal law, including the Stark Law, 42 U.S.C. § 1395nn. For similar reasons to those above, this evidence violates Rule 403. Here, too, allegations regarding related-party prescriptions are also not in the Indictment; while the Government argues otherwise, the paragraph it cites (Ind. ¶ 34) concerns "prescriptions for patients who agreed to receive the medications because they were paid or received other benefits to do so"—not commissions paid in violation of beneficiary inducement laws. The Government's argument demonstrates its casual treatment of what is actually alleged in the Indictment, as opposed to what is not.[6] And it poses the same concerns regarding unfair prejudice: painting the defendants as lawless rule-breakers engaged in "shady business practices." *Walters*, 226 F. Supp. 3d at 825.

This evidence is also of minimal relevance, despite the Government's argument that it demonstrates how Central Rexall's sales representatives were "incentivized" to obtain prescriptions that they did not need by high commissions. Opp. at 20. To the contrary, higher or more frequent commissions is merely probative of an incentive to obtain more prescriptions *period*, even when they are medically necessary. But even if Central Rexall's high commission rates in general (which are alleged in the Indictment, *see* Ind. ¶ 22) were somehow relevant to incentivizing fraud, proving that would not require evidence of how related-party commissions violated beneficiary inducement laws, with all of the unfair prejudice created by invoking legal violations not actually set forth in the Indictment. In sum, this is yet another example of the Government seeking to prove a fraud different—and much broader—than what was alleged in the Indictment that the grand jury actually returned.[7]

---

[6] The Government argues that this issue is relevant because, had Express Scripts known about the related-party commissions, it would not have approved those claims. Opp. at 22. Of course, this is untethered to the allegations in the Indictment, which (again) concern Express Scripts' reimbursements for "medically unnecessary" prescriptions (which these are not alleged to be)—not faulty, improper, or fraudulent prescriptions more broadly. Second, as explained in Mr. Johnston's Opposition, materiality cannot be demonstrated by an Express Scripts witness's testimony regarding its practices and procedures, but only through evidence of broader industry practices. ECF 236 at 27-31.

[7] This argument applies to a number of the pieces of evidence listed on pages 22-24 of the Government's brief which go to the fact and amount of commissions paid to Central Rexall sales representatives.

Gibbons P.C.

Honorable Edward S. Kiel, U.S.D.J.
January 10, 2025
Page 7

**<u>Evidence of Alleged Contractual Breaches is Partially Inadmissible</u>**

In his Motions in Limine, Mr. Johnston argued that much of the Government's evidence concerning Central Rexall's alleged breaches of contract with PBMs or insurers is of minimal relevance under Rule 401 and is unfairly prejudicial under Rule 403. *See* ECF 222-1 at 14-20. This evidence has the potential to turn the trial into a referendum on whether Central Rexall breached its contracts or not (and thus not on the central issue at hand: whether the defendants submitted fraudulent claims for medically unnecessary prescriptions). And it would necessitate the introduction of a significant amount of completely collateral evidence regarding the proper interpretation of those contracts and the defendants' receipt of legal advice regarding those agreements, resulting in a time-consuming mini-trial. Of course, as Mr. Johnston has conceded, the Government can certainly introduce evidence of the conduct in which, it alleges, Central Rexall engaged, to the extent it is relevant to the conspiracy alleged in the Indictment, and otherwise satisfies the Federal Rules of Evidence. ECF 222-1 at 18, 20. (The Government is therefore wrong to contend that Mr. Johnston "appears to seek to exclude virtually every fact and communication between Central Rexall and entities with which it had a contractual relationship." Opp. at 32.) But it cannot introduce other entities' (self-interested) conclusions that Central Rexall breached its contracts, or argue that because Central Rexall breached its contracts, the defendants were therefore guilty of fraud. ECF 222-1 at 20.

The Government seeks to go far beyond this reasonable limitation. It again describes the Indictment with undue generality as an allegation that Central Rexall "misrepresented and concealed material facts about the compound prescription medication claims" it submitted. Opp. at 26. But this is simply not what the Indictment alleges: the object of the actual charged conspiracy is, again, the submission of claims for "medically unnecessary" prescriptions. Ind. ¶ 14. Evidence going to that point is relevant and admissible. But as discussed above, the Government cannot simply place before the jury a grab bag of broader misconduct. This would result in a larger, more nebulous conspiracy than the one actually charged by the grand jury, and could very well result in a highly prejudicial variance or constructive amendment of the Indictment by broadening the potential bases of conviction or materially differing from the conspiracy set forth in the Indictment which put the defendants on notice of what they were alleged to have done. ECF 222-1 at 6 n.7, 13.[8]

---

[8] The Government again invokes *United States v. Bolos*, 104 F.4th 562 (6th Cir. 2024), in support of its arguments. But the indictment in *Bolos* actually included numerous contract-related allegations as the basis for the charged fraud. *See United States v. Assad*, 2:18-cr-140 (E.D. Tn), ECF 278 (First Superseding Indictment) ¶¶ 83-87 (alleging that the defendants devised a scheme to make it appear as though they collected copays, and made materially false representations that they were collecting copays so that PBMs would not terminate their pharmacies); ¶¶ 66-74 (alleging concealment of prescriptions without a valid practitioner-patient relationship). Whatever the validity of the theory of criminality set forth in *Bolos*—as noted above, a matter that is up in the air pending the Supreme Court's forthcoming decision in *Kousisis*—there are clear distinctions between the scheme to defraud alleged there and the one

Gibbons P.C.

Honorable Edward S. Kiel, U.S.D.J.
January 10, 2025
Page 8

      This principle should govern much of the supposedly proper purposes proffered by the Government's brief. For example, the Government argues that it must be allowed to introduce evidence of Central Rexall's material breaches of contract. Opp. at 26-27. But whether a particular contractual violation is material in the context of this prosecution only matters if that violation concerns whether a particular prescription is medically unnecessary; supposedly material violations that are untethered to that purpose go well beyond the object of the Indictment's conspiracy. Moreover, those contractual violations must satisfy the relevant elements of fraud at issue; as the Government notes, a defendant's "failure to disclose information may constitute a fraudulent representation if the defendant was under a . . . contractual duty to make such a disclosure, the defendant actually knew such disclosure ought to be made, and the defendant failed to make such disclosure with the intent to defraud." Third Circuit Model Jury Instruction 6.18.1341-1. It is not enough that the defendant's conduct violated the contract in any way; he must have specifically been under a contractual duty to disclose particular information, known of that duty, and failed to make that disclosure with the intent to defraud.[9]

      These principles govern a number of categories of evidence in this case. For example, Mr. Johnston does not contest that evidence of so-called test adjudications is admissible (assuming, of course, that such evidence otherwise satisfies the Federal Rules) to prove the conspiracies charged in Counts 1 and 2 since that allegation is, in fact, contained in the

---

alleged here. That is, whether a case is helpful or not the Court's analysis turns on the particular allegations at issue, which are often not apparent from the context provided by the Government in its brief. Opp. at 28-31.

Moreover, the admissions of evidence of compounding pharmacies' contracts with PBMs in other cases is irrelevant unless the defendants in those cases actually objected to those lines of testimony. Opp. at 28-29. For example, the Government touts the admission of evidence of third-party audits in *United States v. Chalker*, 966 F.3d 1177 (11th Cir. 2020), but *Chalker* merely references that the district court admitted evidence of audit conclusions, and is not a holding endorsing that admission. *Id.* at 1186-87. Of course, the admission of such conclusions carries a notable potential for unfair prejudice, as a jury would be exposed to the auditor's conclusion, one that may well have been economically motivated, and in any event, was not based upon the same legal principles that are applicable in this, or any other, criminal case. *See United States v. Riddle*, 103 F.3d 423, 432 (5th Cir. 1997) (reversing conviction due to admission of bank examination reports disclosing regulatory violations); *see also* ECF 222-1 at 10-11.

[9] The cases cited on pages 29-31 of the Government's brief appear to stand merely for the proposition that sometimes, a breach of contract is relevant to the allegations in an indictment. Mr. Johnston's point, however, which he will not re-argue here, is that they lack relevance to the conspiracy charged in *this* indictment, and pose a substantial risk of confusing the issues and misleading the jury. *See* ECF 222-1 at 18-19.

GIBBONS P.C.

Honorable Edward S. Kiel, U.S.D.J.
January 10, 2025
Page 9

Indictment. Ind. ¶¶ 25-28, 43-49. But evidence that those test adjudications constituted breaches of Central Rexall's contracts with PBMs or insurers is inadmissible, as it could confuse the issues by causing the jury to believe that that such a breach constitutes a criminal violation in and of itself. ECF 222-1 at 18. The same applies to whether Central Rexall's copayment collection policies, or its distributors' direct marketing, constituted breaches of Central Rexall's contracts. *Id.* The Government argues that it should be allowed to introduce evidence of a PBM representative's questions to Central Rexall regarding its use of copay discount cards, as well as its employment of independent contractors (or "1099s") to promote its medications. Opp. at 34. But the Government does not explain how this evidence would be probative of the charged conspiracy to submit false claims for medically unnecessary prescriptions. Without such a connection, these proffers appear to be attempts to paint Central Rexall as a routine violator of its contracts, and accordingly, for the reasons set forth in defendant's prior submission, ECF 222-1 at 14-20, this evidence must be excluded.

      Thank you for your kind consideration of this submission.

Respectfully submitted,

s/ Lawrence S. Lustberg
Lawrence S. Lustberg

cc:    All counsel of record (via ECF)