**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA | Crim. No. 20-800 (ESK) |
| v. | *Document Electronically Filed* |
| CHRISTOPHER KYLE JOHNSTON, TRENT BROCKMEIER | |
| Defendants | |

---

**OMNIBUS BRIEF IN SUPPORT OF DEFENDANTS'**
**POST-TRIAL MOTIONS**

---

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... iv

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ......................................................................................... 2

RULE 29 ...................................................................................................................... 6

I.    LEGAL STANDARD ...................................................................................... 6

II.   THE GOVERNMENT'S PROOFS DID NOT ESTABLISH THAT
      DEFENDANTS ENTERED INTO A CONSPIRACY TO COMMIT
      HEALTHCARE FRAUD BY SUBMITTING CLAIMS FOR PRESCRIPTIONS
      THAT WERE NOT MEDICALLY NECESSARY. ........................................ 10

      A.    Count 1's Theory of Criminal Liability Turns On Medical Necessity
            Under the Indictment. .......................................................................... 11

      B.    The Trial Of This Matter Offered No Greater Clarity On What Constitutes
            Medical Necessity. ............................................................................... 15

      C.    The Government Produced No Evidence That Defendants Knew That
            Central Rexall Was Filling And Submitting Claims For Medically
            Unnecessary Prescriptions. .................................................................. 19

      D.    The Government's Reliance On Other Facts To Establish Knowledge That
            Prescriptions Were Not Medically Necessary Is Insufficient To Meet The
            High Burden Of Proof Beyond A Reasonable Doubt. ........................... 22

            i.    Profit Margins are not a proxy for lack of medical necessity ....... 23

            ii.   "Red Flags" are not a proxy for knowledge that
                  prescriptions were not medically necessary ................................ 29

                  (1)    Copays ............................................................... 30

                  (2)    Volume of Prescriptions ................................... 33

                  (3)    Signature Stamps .............................................. 35

                  (4)    Refills Selected ................................................. 36

                  (5)    Individual, Suspicious Prescriptions ................ 38

III.  THE GOVERNMENT FAILED TO PROVE THAT DEFENDANTS
      ACTUALLY CONSPIRED TO MAKE A FALSE STATEMENT. ................. 40

Table of Contents (continued)

Page

A.    Background ....................................................................................... 40

B.    The Government Failed To Introduce Sufficient Evidence That The
      Reimbursement Claims To PBMs Were False Or Fraudulent............................. 42

C.    Evidence Of Other False Statements Is Insufficient To Prove The Scheme
      To Defraud Alleged In The Indictment Or Is, In The Alternative, A
      Prejudicial Variance From The Indictment............................................. 52

      1.    Sufficiency of the Evidence ...................................................... 52

      2.    Variance from the Indictment .................................................... 55

IV.   THE GOVERNMENT FAILED TO PROVE THAT DEFENDANTS WERE
      WILLFULLY BLIND TO THE OBJECT OF THE ALLEGED CONSPIRACY........... 66

A.    Background ....................................................................................... 67

B.    Legal Argument ................................................................................ 69

V.    THE GOVERNMENT'S EVIDENCE DID NOT ESTABLISH MATERIALITY,
      NECESSITATING A JUDGMENT OF ACQUITTAL ON COUNTS I AND II........... 81

VI.   NO RATIONAL JURY COULD FIND THAT DEFENDANTS CONSPIRED TO
      COMMIT IDENTITY THEFT THROUGH THE FRAUDULENT USE OF TEST
      ADJUDICATIONS.............................................................................. 88

A.    Legal Standard ................................................................................. 88

B.    The Government Failed To Prove That Test Adjudications Were In Fact
      The Crux Of The Underlying Fraud Offense.......................................... 90

C.    The Government Failed To Prove That There Was Any Scheme Whereby
      Property Was To Change, Or Did Change, Hands As A Result Of The
      Test Adjudications. .............................................................................. 98

D.    The Government's Evidence Failed To Prove Materiality With Respect To
      Count Two. .......................................................................................... 104

E.    The Government Failed To Prove That Defendants Knew That Improper
      Test Adjudications Were Occurring. ..................................................... 107

VII.  THE GOVERNMENT FAILED TO PROVE VENUE FOR COUNT 4. ...................... 112

A.    Factual Background ............................................................................ 112

ii

Table of Contents (continued)

Page

B.    Legal Argument .................................................................................. 115

        1.    Fedwire Transfers ................................................................... 117

        2.    Boardwalk Commission Payments ......................................... 121

RULE 33 ............................................................................................................. 124

VIII.    THE COURT SHOULD GRANT DEFENDANTS A NEW TRIAL PURSUANT
         TO FEDERAL RULE OF CRIMINAL PROCEDURE 33. ........................................ 124

    A.    Legal Standard ...................................................................................... 124

    B.    The Verdict Relied Upon Evidence That Was Both Prejudicial And
          Plainly Irrelevant To "Medical Necessity." ......................................... 126

        1.    The Government's Repeated References to W-2 versus 1099 Sales
              Representatives Were Contrary to the Court's Ruling with Regard
              to Anti-Kickback Statute Related Evidence, Prejudicial, and
              Irrelevant to "Medical Necessity." ......................................... 128

        2.    The Government's Presentation Of Evidence Regarding Central
              Rexall's Co-Pay Collection Practices Was Irrelevant To "Medical
              Necessity," And Prejudicial. .................................................. 145

        3.    The Government's Inflammatory And Irrelevant Evidence And
              Commentary Regarding The Compounding Industry Was Plainly
              Prejudicial. ............................................................................ 151

    C.    A New Trial Should Be Granted Because The Verdict Was Against the
          Weight of the Evidence ........................................................................ 163

CONCLUSION .................................................................................................... 167

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Beckles v. United States*,
580 U.S. 256 (2017)......................................................................................12

*United States ex rel. Behnke v. CVS Caremark Corp.*,
2024 U.S. Dist. LEXIS 60163 (E.D. Pa. Mar. 25, 2024)........................................83

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
140 F.3d 494 (3d Cir. 1998)............................................................................42

*Carpenter v. United States*,
484 U.S. 19 (1987).....................................................................................102

*Ciminelli v. United States*,
598 U.S. 306 (2023).......................................................................62, 99, 103

*City of Chicago v. Morales*,
527 U.S. 41 (1999).....................................................................................50

*Direct Sales Co. v. United States*,
319 U.S. 703 (1943).......................................................................................7

*Draper v. Airco, Inc.*,
580 F.2d 91 (3d Cir. 1978)..........................................................................158

*Durland v. United States*,
161 U.S. 306 (1896).....................................................................................63

*Glasser v. United States*,
315 U.S. 60 (1942).........................................................................................6

*Global-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011)........................................................................69, 76, 80

*United States ex rel. Gohil v. Sanofi U.S. Servs.*,
2020 U.S. Dist. LEXIS 131083 (E.D. Pa. July 21, 2020)......................................84

*United States ex rel. Hlywiak v. Great Lakes Educ. Loan Servs.*,
2022 U.S. Dist. LEXIS 45532 (D.N.J. March 15, 2022)...................................83, 86

*Jackson v. Virginia*,
443 U.S. 307 (1979).........................................................................................6

*Kelly v. United States*,
  590 U.S. 391 (2020)............................................................................................99

*Kluger v. United States*,
  14-6236 (KSH), 2018 U.S. Dist. LEXIS 147744 (D.N.J. Aug. 30, 2018)............................120

*Kolender v. Lawson*,
  461 U.S. 352 (1983)............................................................................................12

*Kotteakos v. United States*,
  328 U.S. 750 (1946)............................................................................................56

*Kousisis v. United States*,
  605 U.S. __ (2025)............................................................................................ *passim*

*United States ex rel. Lampkin v. Pioneer Educ.*,
  LLC, 2020 U.S. Dist. LEXIS 136022 (D.N.J. July 31, 2020) ................................................83

*Lanzetta v. New Jersey*,
  306 U.S. 451 (1939)............................................................................................51

*United States ex rel. Main v. Oakland City University*,
  2005 WL 2665600 (7th Cir. 2005) ....................................................................................137

*United States ex rel. Main v. Oakland City University*,
  426 F.3d 914 (7th Cir. 2005) ..........................................................................48, 63

*McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*,
  904 F.2d 786 (1st Cir. 1990)...........................................................................................137

*Nebraska Press Ass'n v. Stuart*,
  427 U.S. 539 (1976) (Brennan, J. concurring).................................................................115

*Neder v. United States*,
  527 U.S. 1 (1999)...................................................................................81, 82, 104, 105

*United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,
  822 F.3d 650 (2d Cir. 2016)..............................................................................................47

*Park W. Radiology v. CareCore Nat'l LLC*,
  675 F. Supp. 2d 314 (S.D.N.Y. 2009).............................................................................140

*Parker v. Levy*,
  417 U.S. 733 (1974)............................................................................................12

*United States ex rel. Petratos v. Genentech Inc.*,
  855 F.3d 481 (3d Cir. 2017)...................................................................................82, 86

*Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC)*,
    12 F.4th 171 (2d Cir. 2021) ...........................................................................80

*Randall v. United States*,
    No. 5:16-cr-00518, 2024 U.S. Dist. LEXIS 95856 (E.D. Pa. May 29, 2024) ........................95

*Screws v. United States*,
    325 U.S. 91 (1945)...........................................................................................13

*United States ex rel. Shannon v. Penn State Health St. Joseph Reg'l Health
Network*,
    No. 21-2351, 2025 U.S. Dist. LEXIS 61769 (E.D. Pa. Mar. 31, 2025)..................................83

*Sizemore v. Fletcher*,
    921 F.2d 667 (6th Cir. 1990) .................................................................................158

*Sutton v. Warden*,
    3:21-CV-897-MGG, 2022 WL 1555008 (N.D. Ind. May 17, 2022) ....................................156

*Travis v. United States*,
    364 U.S. 631 (1961)...........................................................................................119

*U.S. v. Copple*,
    24 F.3d 535 (3d Cir. 1994)..................................................................................124

*United State v. Goldberg*,
    830 F.2d 459 (3d Cir. 1987)................................................................................120

*United State v. McGill*,
    12-cr-112, 2016 U.S. Dist. LEXIS 63950 (E.D. Pa. May 13, 2016) ....................................42

*United States v. Abbas*,
    100 F.4th 267 (1st Cir. 2024)...............................................................................113

*United States v. Aguiar*,
    737 F.3d 251 (2d Cir. 2013)...............................................................125, 165, 166

*United States v. Al Hedaithy*,
    392 F.3d 580 (3d Cir. 2004)................................................................................102

*United States v. Alston-Graves*,
    435 F.3d 331 (2006)......................................................................................71, 76

*United States v. Arledge*,
    553 F.3d 881 (5th Cir. 2008) ...............................................................................159

*United States v. Arras*,
    373 F.3d 1071 (10th Cir. 2004) ..............................................................................8

*United States v. Assad*,
  2:18-cr-140 (E.D. Tn), ECF No. 278 ¶¶ 83-87 ..........................................................47

*United States v. Assad*,
  2019 U.S. Dist. LEXIS 141937 (E.D. Tenn. Aug. 21, 2019) ...................................47

*United States v. Auernheimer*,
  748 F.3d 525 (3d Cir. 2014)..................................................88, 110, 116, 119

*United States v. Balter*,
  91 F.3d 427 (3d Cir. 1996)..........................................................................56

*United States v. Berger*,
  224 F.3d 107 (2d Cir. 2000)...........................................................................7

*United States v. Blaszczak*,
  56 F.4th 230 (2d Cir. 2022) ......................................................................102

*United States v. Bolos*,
  104 F.4th 562 (6th Cir. 2024) .....................................................................47

*United States v. Boria*,
  592 F.3d 476 (3d Cir. 2010)....................................................................8, 70

*United States v. Brodie*,
  403 F.3d 123 (3d Cir. 2005)....................................................................6, 7

*United States v. Brown*,
  2022 U.S. Dist. LEXIS 204896 (D.N.J. Nov. 10, 2022)...............124, 125, 127, 163

*United States v. Bryant*,
  Crim. No. 07-267, 2009 U.S. Dist. LEXIS 44648, 2009 WL 1559796 (D.N.J.
  May 28, 2009)..........................................................................................125

*United States v. Camiel*,
  689 F.2d 31 (3d Cir. 1982)..............................................................................9

*United States v. Caraballo-Rodriguez*,
  726 F.3d 418 (3d Cir. 2013)..................................................................69, 109

*United States v. Carbo*,
  572 F.3d 112 (3d Cir. 2009)......................................................................110

*United States v. Care Alt.*,
  81 F.4th 361 (3d Cir. 2023) .........................................................................84

*United States v. Carmichael*,
  269 F. Supp. 2d 588 (D.N.J. 2003) ...........................................................150

*United States v. Carter*,
   No. 21-CR-00681-NSR-1-2, 2024 U.S. Dist. LEXIS 212857 (S.D.N.Y. Nov.
   21, 2024) ...............................................................................................................95

*United States v. Cartwright*,
   359 F.3d 281 (3d Cir. 2004) ...............................................................7, 8, 73, 109

*United States v. Cassese*,
   428 F.3d 92 (2d Cir. 2005) ....................................................................................7

*United States v. Cassiere*,
   4 F.3d 1006 (1st Cir. 1993) ..................................................................................72

*United States v. Cimera*,
   459 F.3d 452 (3d Cir. 2006) ...............................................................................126

*United States v. Coleman*,
   811 F.2d 804 (3d Cir. 1987) ..................................................................................7

*United States v. Cooper*,
   567 F.2d 252 (3d Cir. 1977) ..................................................................................9

*United States v. Cores*,
   356 U.S. 405 (1958) ...........................................................................................119

*United States v. D'Amato*,
   39 F.3d 1249 (2d Cir. 1994) .........................................................................63, 137

*United States v. Davis*,
   458 F. App'x 152 (3d Cir. 2012) ........................................................................109

*United States v. Davis*,
   488 U.S. 445 (2019) .............................................................................................50

*United States v. de Francisco-Lopez*,
   939 F.2d 1405 (10th Cir. 1991) ...........................................................................72

*United States v. Delgado*,
   357 F.3d 1061 (9th Cir. 2004) ...............................................................................6

*United States v. Devries*,
   No. 4:08-cr-00114, 2009 U.S. Dist. LEXIS 145404 (S.D. Iowa July 7, 2009) ....150

*United States v. Diarra*,
   Nos. 22-3232, 23-1405, 2025 U.S. App. LEXIS 2108 (3d Cir. Jan. 30, 2025) ......95

*United States v. Dobson*,
   419 F.3d 231 (3d Cir. 2005) .................................................................................55

*United States v. Dubin*,
   599 U.S. 110 (2023).................................................................. *passim*

*United States v. Fallon*,
   470 F.3d 542 (3d Cir. 2006)..............................................45, 81

*United States v. Fallon*,
   61 F.4th 95 (3d Cir. 2023) ......................................................113

*United States v. Ferguson*,
   246 F.3d 129 (2d Cir. 2001)..........................................125, 166

*United States v. Ferrarini*,
   219 F.3d 145 (2d Cir. 2000)......................................................70

*United States v. Flores*,
   454 F.3d 149 (3d Cir. 2006)...............................................71, 72

*United States v. Flores-De-Jesus*,
   569 F.3d 8 (1st Cir. 2009).......................................................156

*United States v. Gaudin*,
   515 U.S. 506 (1995)..................................................................81

*United States v. Georgiou*,
   777 F.3d 125 (3d Cir. 2015)...........................................124, 163

*United States v. Glenn*,
   312 F.3d 58 (2d Cir. 2002)..........................................................7

*United States v. Grow*,
   977 F.3d 1310 (11th Cir. 2020) ...............................................25

*United States v. Guertin*,
   67 F.4th 445 (D.C. Cir. 2023)...................................................82

*United States v. Hoffert*,
   949 F.3d 782 (3d Cir. 2020)......................................................13

*United States v. Husmann*,
   765 F.3d 169 (3d Cir. 2014)........................................................8

*United States v. Idowu*,
   157 F.3d 265 (3d Cir. 1998)........................................................9

*United States v. Inv. Enters., Inc.*,
   10 F.3d 263 (5th Cir. 1993) ......................................................72

*United States v. Jackson-Randolph*,
  282 F.3d 369 (6th Cir. 2002) ............................................................159

*United States v. Johnson*,
  2022 U.S. App. LEXIS 7630 (3d Cir. Mar. 23, 2022) ..........................126

*United States v. Johnson*,
  302 F.3d 139 (3d Cir. 2002) ...........................................125, 163, 164

*United States v. Johnson*,
  323 U.S. 273 (1944) ..........................................................................119

*United States v. Jones*,
  471 F.3d 478 (3d Cir. 2006) ...............................................41, 42, 50

*United States v. Jones*,
  49 F.3d 628 (10th Cir. 1995) ...........................................................7, 50

*United States v. Jones*,
  No. 07-cr-0258-05, 2009 U.S. Dist. LEXIS 54575 (E.D. Pa. June 26, 2009) ......................159

*United States v. Kenny*,
  462 F.2d 1205 (3d Cir. 1972) ...........................................................159

*United States v. Knight*,
  800 F.3d 491 (8th Cir. 2015) ...................................................125, 166

*United States v. Lallande*,
  23-0057 (ES), 2023 U.S. Dist. LEXIS 137617 (D.N.J. Aug. 8, 2023) ..................120

*United States v. Lane*,
  474 U.S. 438 (1986) ...........................................................................56

*United States v. Leon*,
  739 F.2d 885 (3d Cir. 1984) ...............................................................6

*United States v. Levy*,
  694 F. Supp. 1136 (D.N.J. 1988) .......................................................10

*United States v. Lucas*,
  No. 14-52 (FLW), 2015 U.S. Dist. LEXIS 59644 (D.N.J. May 6, 2015) ...............99

*United States v. Marchetti*,
  96 F.4th 818 (5th Cir. 2024) ..............................................................25

*United States v. Martinez*,
  921 F.3d 452 (5th Cir. 2019) .........................................................7, 70

*United States v. Mattia,*
   21-cr-576, 2024 U.S. Dist. LEXIS 98835 (D.N.J. June 3, 2024) ..........................42

*United States v. Maurizio,*
   148 F. Supp. 3d 447 (W.D. Pa. 2015) ......................................................10

*United States v. McKee,*
   506 F.3d 225 (3d Cir. 2007)..................................................................55

*United States v. Medina,*
   485 F.3d 1291 (11th Cir. 2007) ..............................................................25

*United States v. Menendez,*
   291 F. Supp. 3d 606 (D.N.J. 2018) ........................................................10

*United States v. Mercado,*
   610 F.3d 841 (3d Cir. 2010)...............................................................7, 73

*United States v. Mermelstein,*
   487 F. Supp. 2d 242 (E.D.N.Y. 2007) ..................................................100

*United States v. Milheiser,*
   98 F.4th 935 (9th Cir. 2024) ................................................................82

*United States v. Obialo,*
   23 F.3d 69 (3d Cir. 1994).......................................................................7

*United States v. Omotayo,*
   132 F.4th 181 (2d Cir. 2025) ......................................................89, 90, 95

*United States v. One 1973 Rolls Royce, V.I.N. SRH-16266 By & Through Goodman,*
   43 F.3d 794 (3d Cir. 1994)................................................................69, 70

*United States v. Onque,*
   169 F. Supp. 3d 555 (D.N.J. 2015) ................................................. *passim*

*United States v. Ouedraogo,*
   531 F. App'x 731 (6th Cir. 2013) ............................................................8

*United States v. Paulus,*
   No. 15-00015, 2017 U.S. Dist. LEXIS 32097 (E.D. Ky. May. 7, 2017), *rev'd in part and vacated in part on other grounds*, 894 F.3d 267 (6th Cir. 2018).........................42

*United States v. Pearlstein,*
   576 F.2d 531 (3d Cir. 1978)..............................................................42, 55

*United States v. Perez,*
    280 F.3d 318 (3d Cir. 2002)........................................................................115

*United States v. Pierre,*
    2023 U.S. Dist. LEXIS 119742 (S.D.N.Y. July 11, 2023) ...................................100

*United States v. Porat,*
    76 F.4th 213 (3d Cir. 2023) (Krause, J., concurring)........................................51, 63

*United States v. Prather,*
    205 F.3d 1265 (11th Cir. 2000) .....................................................................72

*United States v. Puccio,*
    No. 23-2260, 2024 U.S. App. LEXIS 22678 (3d Cir. Sep. 6, 2024) .....................69

*United States v. Quiles,*
    618 F.3d 383 (3d Cir. 2010)...........................................................124, 126, 163

*United States v. Rabbitt,*
    No. 23-320 (MAS), 2024 U.S. Dist. LEXIS 159079 (D.N.J. Sep. 4, 2024).........104

*United States v. Reeves,*
    84 F. Supp. 3d 375 (D.N.J. 2015) ...................................................................10

*United States v. Regent Office Supply Co.,*
    421 F.2d 1174 (2d Cir. 1970).........................................................................82

*United States v. Rhone,*
    864 F.2d 832 (D.C. Cir. 1989) ......................................................................110

*United States v. Root,*
    585 F.3d 145 (3d Cir. 2009)....................................................................115, 116

*United States v. Ruhe,*
    191 F.3d 376 (4th Cir. 1999) .........................................................................72

*United States v. Sacks,*
    No. 08-629 (GEB), 2009 U.S. Dist. LEXIS 109094 (D.N.J. Nov. 23, 2009).........98

*United States v. Salahuddin,*
    765 F.3d 329 (3d Cir. 2014).....................................................................125, 164

*United States v. Samuels,*
    741 F.2d 570 (3d Cir. 1984)........................................................................8, 9

*United States v. Santos,*
    2022 U.S. Dist. LEXIS 96693 (D.N.J. March 22, 2022) .....................................46

*United States v. Schneider,*
   817 F. Supp. 2d 586 (E.D. Pa. 2011) ................................................................10

*United States v. Schoenhut,*
   576 F.2d 1010 (3d Cir. 1978) ........................................................................9

*United States v. Schramm,*
   75 F.3d 156 (3d Cir. 1996) ..........................................................................70

*United States v. Schurr,*
   775 F.2d 549 (3d Cir. 1985) ........................................................................56

*United States v. Scotti,*
   47 F.3d 1237 (2d Cir. 1995) ........................................................................70

*United States v. Silveus,*
   542 F.3d 993 (3d Cir. 2008) .............................................................126, 151

*United States v. Simon,*
   12 F.4th 1 (1st Cir. 2021) ..............................................................................7

*United States v. Smith,*
   294 F.3d 473 (3d Cir. 2002) ..........................................................................6

*United States v. Sorensen,*
   2025 U.S. App. LEXIS 8777 (7th Cir. Apr. 14, 2025) ........................25

*United States v. Stadtmauer,*
   620 F.3d 238 (3d Cir. 2010) ........................................................................70

*United States v. Stahl,*
   616 F.2d 30 (2d Cir. 1980) ........................................................................158

*United States v. Stephen,*
   2025 U.S. App. LEXIS 515 (3d Cir. Jan. 10, 2025) ..........................125

*United States v. Suggs,*
   230 F. App'x 175 (3d Cir. 2007) ..............................................................124

*United States v. Syme,*
   276 F.3d 131 (3d Cir. 2002) .........................................................55, 65, 129

*United States v. Tyson,*
   653 F.3d 192 (3d Cir. 2011) ....................................................................8, 9

*United States v. Van Eyl,*
   No. 02 CR 287, 2004 U.S. Dist. LEXIS 12635 (N.D. Ill. July 8, 2004) ...............................150

*United States v. Villard,*
    885 F.2d 117 (3d Cir. 1989) .................................................................9

*United States v. Walters,*
    226 F. Supp. 3d 821 (E.D. Ky. 2016) ..............................................140

*United States v. Wert-Ruiz,*
    228 F.3d 250 (3d Cir. 2000) ..........................................................69, 71

*United States v. Wexler,*
    838 F.2d 88 (3d Cir. 1988) ...................................................................9

*United States v. Williams,*
    553 U.S. 285 (2008) .......................................................................12, 13

*United States v. Wilson,*
    879 F.3d 795 (7th Cir. 2018) ...............................................................8

*Universal Health Servs., Inc. v. United States ex rel. Escobar,*
    579 U.S. 176 (2016) ................................................................... *passim*

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982) ............................................................................50

*United States ex rel. Wilkins v. United Health Group, Inc.,*
    659 F.3d 295 (3d Cir. 2011) ..............................................................48

*Willful Ignorance and Criminal Culpability,*
    70 TEX. L. REV. 1351 (1992) .....................................................71, 112

**Statutes**

18 U.S.C.S. §§ 1341 and 1343 ...................................................................81

18 U.S.C. § 1028(a)(7) .........................................................................88, 89

18 U.S.C. § 1028(d)(7) ...............................................................................88

18 U.S.C. § 1028A ......................................................................................88

18 U.S.C. § 1347 .............................................................42, 43, 50, 100

18 U.S.C. § 1347(a) ................................................................................100

18 U.S.C. § 1349 .........................................................................................11

18 U.S.C. § 1956 ....................................................112, 116, 118, 119

18 U.S.C. § 1956(i) ...............................................................114, 116, 120

18 U.S.C. § 1956(i)(1) .................................................................................116

18 U.S.C. § 1956(i)(1)(B) .............................................................................113

18 U.S.C. § 1956(i)(2) .................................................................................116

18 U.S.C. § 1956(c)(3)...........................................................................117, 118

18 U.S.C. § 1957 ..............................................................6, 112, 114, 116

42 U.S.C. § 1320a–7b(b) ...........................................................................130

42 U.S.C. § 1320a-7b(b) ...........................................................................129

AKS.........................................................................14, 130, 131, 134

False Claims Act ...............................................48, 50, 105, 154

## Other Authorities

*Department of Health and Human Services, Medical Necessity in Private Health Plans*,
https://hsrc.himmelfarb.gwu.edu/cgi/viewcontent.cgi?article=1170&context=sphhs_policy_facpubs...........................................................................15

*Elders: A Pilot Study*, J. Altern Complement Med. 24(7):725-532 (Jul. 1, 2018) (available at https://pmc.ncbi.nlm.nih.gov/articles/PMC6065512/) .......................................25

https://www.nashp.org/medical-necessity/ (published April 23, 2021)........................................15

Ira P. Robbins, *The Ostrich Instruction: Deliberate Ignorance as a Criminal Mens Rea*, 81 J. CRIM. L. & CRIMINOLOGY 191, 220-27 (1990)............................................71

Morris A. Landau, *The Difficulties in Defining Medical Necessity*................................................15

## Rules

Fed. R. Crim. P. 7(c)(1) ...........................................................................123

Fed. R. Evid. 404(b)..................................................................130, 133

RULE 29 .................................................................................*passim*

Rule 33 .................................................................................*passim*

Rule 33(a)...............................................................................124

Rule 403 .................................................................................128

**Constitutional Provisions**

Fifth Amendment ................................................................................................................55, 159

Bill of Rights ........................................................................................................................115

## PRELIMINARY STATEMENT

Courts are understandably reluctant to overturn jury verdicts.  Indeed, that reluctance is embodied in the law, which imposes very high standards (acknowledged below) on those who would move for post-trial relief, whether in the form of a judgment of acquittal or of the grant of a new trial.  But the fact that those forms of relief are available at all, and that they are at times granted, remains significant.  It stands for the principle that our system of justice requires that we be sure that a conviction in a criminal case—with all of the loss of precious freedom, reputation and relationships that it entails, and with the destruction of the lives of defendants and their loved ones that it entails—be firmly based upon legally sufficient evidence and that it not be contrary to the interests of justice.  The cases may be rare when such relief is afforded, but those cases exist.

And this is just such a case.  For anyone who participated in or observed the trial of this matter, the result was stunning, both in terms of the substance and the alacrity of the verdict.  And when that happens, what is required, and what is here sought, is a thoughtful, careful review of the evidence, measured against both the statutory requirements for conviction and the real-life implications of the presentation that the jury heard.  These motions should not be granted, or denied, lightly.

Here, the prescribed review has demanded that the defendants provide this very lengthy presentation, in an effort to answer the question that the verdict poses: what went wrong?  And when the complete analysis is done, as the Defendants have sought to do below, that question is answered: the jury did not properly apply the law, and the Government's presentation allowed it to base its verdict on irrelevant and prejudicial proofs that denied the Defendants the just resolution of this case that they, and the public interest deserved.  For the reasons set forth at unfortunate but necessary length below, the Defendants' motions for a judgment of acquittal or, in the alternative for a new trial in the interest of justice, should be granted.

1

## STATEMENT OF FACTS

In early 2013, Kyle Johnston and Trent Brockmeier sought to develop a new business venture in the compound pharmacy industry. *See* Tr. 126:7—127:7; 364:23—365:4. At that time, there was a change in the law that modified the way that these medications were reimbursed by insurance companies. Tr. 512:5-12; 513:2-22. A compound drug is a medication that is created by a pharmacist, who combines different, FDA-approved components to create a new product that does not require separate FDA approval. Tr. 611:11-13; 364:18-22. Beginning in 2013, insurance companies began reimbursing compound prescriptions based on the price of each individual component making up the compound. Tr. 513:2-14. Defendants identified a struggling pharmacy, Central Rexall Drugs ("Central Rexall" or "CRD"), which they hoped to purchase and develop into a nation-wide operation.[1]  Tr. 124:20-23; 126:16-21; 128:21-23.  Mr. Brockmeier had significant business experience and would help grow the business and oversee operations of the pharmacy. Tr. 127:19-21. Mr. Johnston would leverage networks to identify sales representatives and serve as general counsel for the pharmacy. Tr. 128:1-2; 154:2-6. Ultimately, however, the owner of the pharmacy and pharmacist in charge, Don Fellows, did not want to sell his family business, and the parties entered into a pharmacy management services agreement as of July 15, 2013 instead. Tr. 132:14-22; 138:19-21; GX 55. Under that arrangement, Fellows's daughter, Hayley Taff, became Chief Executive Officer and oversaw the compounding pharmacy operations. Tr. 155:15-21; DX 1216; Tr. 142:18-144:7; 381:1-24.

Thereafter, Defendants started developing referral networks and building capacity at the pharmacy, including expanding into the building space next to the pharmacy and hiring additional

---

[1] Kyle Johnston's brother was a pain medicine doctor who prescribed compounds and his father was an orthopedic surgeon who was familiar with Don Fellows, the Pharmacist in Charge at Central Rexall. Tr. 126:4-6.

2

personnel, such as a VP of sales (Chris Casseri), Compliance Officer (Ryan Boyle), and accountant (Khaled Farahat).  Tr. 151:18—152:10; 157:14—158:13.  The pharmacy went from six to 85 employees, hiring a number of pharmacists, pharmacy technicians, patient care representatives, and patient advocates.  Tr. 158:20—159:2.  The pharmacy also contracted with groups of sales representatives, located in various states, who marketed the products—*i.e.*. "inform the doctor about compounds and what compounding options were available for their patients."  Tr. 161:8-19.  Those groups were independent contractors, paid based on a commission basis.  *See, e.g.*, GX 287A, 323, 325; Tr. 161:20-24; 1738:3-7; 2919:19—2920:4.  Pre-printed prescription pads were provided to sales representatives containing the formulas for common compound prescriptions, but they were editable by the prescriber to meet his or her prescribing preferences.  Tr. 433:9—434:10; GX 23A.  The formulas for these pads were either created by a compounding pharmacist, recommended by a compounding industry trade organization, or requested by sales representatives or their physician contacts.  Tr. 693:2-6; 732:13-19; 857:10-22; 1754:5—1755:7; DX 266; 760:8-13; 761:8-17.

The pharmacy expanded operations to be licensed in all 50 states and provide mail-order services, even as it continued to serve local retail customers.  Tr. 159:3-6; 665:15-18; 672:14-17; 856:1-10; 172:12-18.  The pharmacy developed and implemented routine systems and processes by which the increased volume of prescriptions was managed:  First, prescriptions would be faxed to the pharmacy and input into a database called "Quickbase," which housed patient information.  Tr. 164:17-21.  A patient care representative would then call the patient to confirm all of the information on the prescription.  Tr. 164:21-24.  Provided the patient could be reached and confirm all of the information, the prescription was next sent to a pharmacy technician, who would then submit a claim for the prescription to the pharmacy benefit manager ("PBM") to see if it was

covered; the relationship between Central Rexall and the PBMs were governed by contracts between them, as well as PBM manuals. Tr. 165:10-19; GX 37; GX 58; DX 161; DX 295; DX 336-1; DX 468. The PBM system would respond as to whether the prescription was covered, what the copay amount would be, and how much the insurance company would pay for it. Tr. 166:20-23; 3168:14-19; 3174:3-21. A patient care representative would then contact the patient again to advise whether the prescription was covered and what the copay would be, and to confirm that the patient still wanted the prescription and was willing to remit the copay. Tr. 172:5-8. If the patient did not want to pay the co-pay or no longer wanted the medication, then the claim would be reversed.[2] Tr. 684:5-10; 758:14—759:9; 3169:1-5. If the patient wanted to proceed, he or she had the option to pay the copay amount over the phone or to receive an invoice in the mail with the medication for later payment. Tr. 172:12-18; 212:8-16; DX 131A at 1; DX 131F at 4. The prescription would then be sent to a pharmacist for review and then be created in the compounding lab. Tr. 172:2-4. After another final check by the pharmacist, the prescription would be shipped to the patient. Tr. 172:15-23.

As reflected in the Quickbase entries logging communications with patients, there were times when the pharmacy learned of issues with certain prescription as a result of its outreach to patients. For example, there were times when a patient said that they did not know the doctor was sending in a prescription, Tr. 2561:10-17, or were being paid for a prescription, Tr. 2560:6-18. These issues would then be referred to Boyle as Compliance Officer and reviewed, typically with an investigation, a report to the management group, and remedial steps being taken, including

---

[2] This is one type of "test adjudication." Tr. 3174:3-10. At other times, for example when a compound component stopped being covered by insurance, the pharmacy submitted a claim to see if an alternative formulation would be covered and at what amount. Tr. 784:21—785:5. Each of these test claims was reversed, as intended at the time they were submitted, and no reimbursements were paid to Central Rexall as a result of them. Tr. 683:21-25; 846:6-13.

termination of the relationship or additional scrutiny being applied to the sales representative or doctor involved. Tr. 2560:6-18; 2561:10-17; 2530:22—2531:4; 2521:2—2522:13; 2524:11-2424:8; DX 475; GX 149; Tr. 2278:21—2279:4; 2514:13-23; 2505:16—2506:21; DX 420. The Compliance Officer testified that there was never a time when he was told not to do an investigation or not to take appropriate action by Defendants. Tr. 2561:6-9. All prescriptions were signed by a physician or prescriber, and there was no evidence that any compounded products for which reimbursements were sought were made with ingredients other than the actual products included in the claim. *See, e.g.*, GX 1, GX1 A-G; Tr. 1751:22—1752:7; 758:2-5. However, it turned out that certain sales representatives located in other states, including New Jersey, were at times bribing specific doctors or patients, or otherwise taking steps whereby the doctors or patients would write or receive prescriptions without any medical assessment. Tr. 1449:10-20; 1504:6-12; 1570:21—1571:15; 1627:16—1628:11; 1671:1-6; 1696:19—1697:17; 1699:12—1700:13; 1813:2-21; 3401:6-23. Evidence showed, however, that the facts of this fraudulent activity were hidden from or not disclosed to Central Rexall. *See, e.g.*, Tr. 3401:18—3402:16; 2004:2-12; 1504:13-25; 1737:4-8; GX 353; 352; DX 131 at row 46807 (Carolyn Bessey Oct-09-15).

In December 2016, the pharmacy ceased operations. Tr. 331:12-15. By that time, compound medications were no longer being covered by any insurance companies and the market collapsed. Tr. 2414:16-18; 331:3-11; 2414:2-18. After prosecuting sales representatives, doctors, and patients who had paid or accepted bribes in exchange for writing or receiving prescriptions without a doctor's assessment, the Government sought and obtained an indictment against Defendants, which was filed on September 16, 2020. ECF No. 1, Indictment ("Ind."). Defendants move to dismiss the Indictment. ECF Nos. 126, 118. The Court denied those motions in part, but ultimately granted the motion with respect to Counts 5-24, all of which alleged money laundering

in violation of 18 U.S.C. § 1957.  ECF Nos. 180, 184.  The trial of this matter took place from January 23 to March 10, 2025, and the jury returned a verdict of guilty on the remaining counts against all Defendants on March 10, 2025.  ECF No. 278-280.  The Court set a date for the filing of pretrial motions of May 8, 2025; this date was later extended to May 22, 2025.  ECF Nos. 310, 326.

## RULE 29

## I.    LEGAL STANDARD

Defendants, like this Court, well understand the demanding and deferential standard that applies here:  when considering a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29, a trial judge "must 'review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence.'"  *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (quoting *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002)).  Only "'where the prosecution's failure is clear,'" should the Court enter a judgment of acquittal based upon the insufficiency of the evidence. *Smith*, 294 F.3d at 477 (quoting *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984)).

But this familiar standard for Rule 29—that the evidence must be viewed in the light most favorable to the Government, *Glasser v. United States*, 315 U.S. 60, 80 (1942)—still starts with "evidence," and not with hypothesis, assumption, or speculation.  Consequently, "when there is an innocent explanation for a defendant's conduct as well as one that suggests that the defendant was engaged in wrongdoing, the Government must produce evidence that would allow a rational jury to conclude beyond a reasonable doubt that the latter explanation is the correct one." *United States v. Delgado*, 357 F.3d 1061, 1068 (9th Cir. 2004) (citation omitted).  The Supreme Court requires that a rational jury be able to find the defendant guilty beyond a reasonable doubt. *Jackson v.*

6

*Virginia*, 443 U.S. 307, 319 (1979).  And "[w]here the evidence is at least as indicative of innocence as guilt, the Court must direct a verdict of acquittal."  *United States v. Berger*, 224 F.3d 107, 116 (2d Cir. 2000).  That is, if the evidence viewed in the light most favorable to the prosecution, including all reasonable inferences drawn in favor of the verdict, gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then "a reasonable jury must necessarily entertain a reasonable doubt" and a verdict must be directed for the defendant. *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (citations omitted); *United States v. Simon*, 12 F.4th 1, 32 (1st Cir. 2021).

To survive a motion like the one here before the Court, the Government's case cannot be merely "characterized by modest evidentiary showings, equivocal or attenuated evidence of guilt or a combination of all three."  *United States v. Cassese*, 428 F.3d 92 (2d Cir. 2005).  Thus, even though the Government may rely on inferences and is not required to produce direct evidence of the defendant's participation in the charged conduct, the Court "cannot permit speculation to substitute for proof beyond a reasonable doubt."  *United States v. Jones*, 49 F.3d 628, 632 (10th Cir. 1995); *see United States v. Mercado*, 610 F.3d 841, 847 (3d Cir. 2010) (a court cannot "uphold a jury verdict based on speculation alone"); *United States v. Cartwright*, 359 F.3d 281, 291 (3d Cir. 2004) ("Our case law forbids the upholding of a conviction on the basis of . . . speculation."); *United States v. Obialo*, 23 F.3d 69, 73 (3d Cir. 1994) (holding that a conviction cannot be upheld on the basis of a "logical leap").  Nor, of course, may a conviction be obtained by "piling inference upon inference."  *United States v. Brodie*, 403 F.3d 123 (3d Cir. 2005); *see also United States v. Coleman*, 811 F.2d 804, 808 (3d Cir. 1987) ("[C]onspiracy cannot be proven . . . by piling inference upon inference"); *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943) (warning against the "piling [of] inference upon inference"); *United States v. Martinez*, 921 F.3d 452, 466 (5th Cir.

2019) ("The verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference."); *United States v. Wilson*, 879 F.3d 795, 802 (7th Cir. 2018) ("In a case that hinges on circumstantial evidence, we must not permit a verdict based 'solely on the piling of inference upon inference[.]'"); *United States v. Ouedraogo*, 531 F. App'x 731, 739-40 (6th Cir. 2013) ("Although the evidence need not eliminate all reasonable hypotheses except that of guilt, we must guard against 'piling inference upon inference.'"); *United States v. Arras*, 373 F.3d 1071, 1073 (10th Cir. 2004) ("While the jury may draw reasonable inferences from direct or circumstantial evidence, an inference must be more than speculation and conjecture to be reasonable, and caution must be taken that the conviction not be obtained by piling inference on inference[.]").

Moreover, as the Third Circuit has explained, "[w]hen a conspiracy conviction is at issue, [the Court] must closely scrutinize the sufficiency of the evidence." *United States v. Tyson*, 653 F.3d 192, 206 (3d Cir. 2011) (citation omitted). Such close scrutiny is required for two reasons: "because (1) slight evidence of [defendant's] connection to the conspiracy is not sufficient to support guilt and (2) guilt must remain individual and personal." *United States v. Boria*, 592 F.3d 476, 480 (3d Cir. 2010) (citations omitted); *see also United States v. Samuels*, 741 F.2d 570, 574–75 (3d Cir. 1984) ("Under our system of law . . . a conviction, especially on charges relating to a conspiracy, must rest on individual guilt proven beyond a reasonable doubt.").

Utilizing these standards, and even giving due deference to jury verdicts, as the law requires, in appropriate circumstances, the Third Circuit reverses judgments of conviction based upon the insufficiency of the evidence. *United States v. Husmann*, 765 F.3d 169, 177 (3d Cir. 2014) (reversing conviction for distribution of pornography and remanding for entry of judgment of acquittal due to insufficient evidence of transfer of materials); *United States v. Cartwright*, 359

8

F.3d 281, 291 (3d Cir. 2004) (reversing conviction and remanding for entry of judgment of acquittal because evidence, based upon speculation, was legally insufficient to support conviction for conspiracy or aiding and abetting cocaine distribution scheme); *United States v. Idowu*, 157 F.3d 265, 270 (3d Cir. 1998) (reversing conspiracy conviction where jury could not draw a permissible inference that defendant had knowledge of the nature of deal though he knew it was illegal and though he was trusted member of the conspiracy); *United States v. Wexler*, 838 F.2d 88, 92 (3d Cir. 1988) (reversing convictions on appeal from denial of Rule 29 motion where position of trust within conspiracy was insufficient without evidence defendant knew its specific illegal object) ;*United States v. Samuels*, 741 F.2d 570, 571 (3d Cir. 1984) (reversing convictions for drug conspiracy because "we have serious doubts that the government has proven, beyond a reasonable doubt, that [defendants] were implicated in the crimes for which they have been convicted."); *United States v. Cooper*, 567 F.2d 252, 254-55 (3d Cir. 1977) (reversing convictions due to absence of "*some* evidence" that defendant knew contents of locked compartment in car in which he was traveling with a member of a drug conspiracy).  And it affirms district courts which properly—and courageously—overturn jury verdicts.  *United States v. Tyson*, 653 F.3d 192, 211 (3d Cir. 2011) (affirming judgment of acquittal because there was insufficient evidence of tacit agreement to support conspiracy conviction); *United States v. Villard*, 885 F.2d 117, 121 (3d Cir. 1989) (affirming judgment of acquittal entered because testimony of agent provided insufficient basis for the jury to conclude beyond a reasonable doubt that sexually explicit conduct of a minor was depicted in subject materials); *United States v. Camiel*, 689 F.2d 31, 37 (3d Cir. 1982) (affirming judgment of acquittal based on insufficient evidence of charged unitary scheme); *United States v. Schoenhut*, 576 F.2d 1010, 1024 (3d Cir. 1978) (affirming judgment of acquittal on the willful misapplication of bank funds count based on government's failure to prove intent).  And

with this jurisprudence in mind, courts in this district and throughout the Third Circuit, reverse convictions and grant judgments of acquittal where that is what the law demands. *United States v. Menendez*, 291 F. Supp. 3d 606, 611, 627 (D.N.J. 2018) (granting Rule 29 motion in part because "[g]iven [the] absence of evidence [of a quid pro quo], there is nothing to view in the light most favorable to the Government"); *United States v. Reeves*, 84 F. Supp. 3d 375, 407 (D.N.J. 2015) (granting Rule 29 motion in part); *United States v. Maurizio*, 148 F. Supp. 3d 447, 460-61 (W.D. Pa. 2015) (granting Rule 29 motion in part based on insufficient evidence of wrongful conduct); *United States v. Schneider*, 817 F. Supp. 2d 586, 608 (E.D. Pa. 2011) (granting Rule 29 motion in part); *United States v. Levy*, 694 F. Supp. 1136, 1138 (D.N.J. 1988) (granting Rule 29 motion in part because the evidence was insufficient to show that the defendant "participat[ed] in the conspiracy charged in the indictment[.]").  For the reasons set forth below, however unusual it might be, that is the case here.

## II. THE GOVERNMENT'S PROOFS DID NOT ESTABLISH THAT DEFENDANTS ENTERED INTO A CONSPIRACY TO COMMIT HEALTHCARE FRAUD BY SUBMITTING CLAIMS FOR PRESCRIPTIONS THAT WERE NOT MEDICALLY NECESSARY.

Fundamental principles of due process in our criminal justice system require fair notice of what conduct is prohibited by law; likewise, those who are accused are entitled to notice of what it is that they are accused of doing wrong.  Now that the evidence is in, the Court can—as it really could not before—consider whether these critical constitutional rights have been afforded Defendants or violated by an indictment that alleged, in Count One, that they committed health care fraud "by causing the submission of false and fraudulent insurance claims to the Pharmacy Benefits Administrator for medically unnecessary Central compounded prescription medications and by sharing in the profits realized by Central Rexall from payments for those compounded prescription medications."  Ind. ¶ 14.  Pretrial, the Court denied the defense motion to dismiss this

Count based upon the unconstitutional vagueness of the term "medically necessary," pending the proofs to be adduced at trial, which the Government expressly represented would include proof of each defendant's specific intent sufficient to overcome a vagueness challenge.  ECF No. 180. Those proofs—or lack thereof—now show that the fundamental infirmity identified in the pretrial motion has resulted in a terribly unfair trial, one in which the vagueness of the term "medical necessity" played itself out in real time before the Court and jury, resulting in convictions based upon claims for medically unnecessary prescriptions even though doctors had prescribed them, thus indicating a medical judgment that they were necessary for patient care, and even in the absence of direct or, when analyzed, circumstantial evidence that Defendants were aware that claims were in fact filed for medically unnecessary prescriptions.

## A.    Count 1's Theory of Criminal Liability Turns On Medical Necessity Under the Indictment.

Count One of the Indictment charged Defendants with conspiracy to commit healthcare fraud and wire fraud in violation 18 U.S.C. § 1349, based upon a single theory:  that each knowingly agreed with others to seek reimbursement for medically unnecessary prescriptions from insurance companies.  Ind. ¶ 14 (setting forth the sole object of conspiracy, which was "to unlawfully enrich themselves by causing the submission of false and fraudulent insurance claims to the Pharmacy Benefits Administrator for medically unnecessary Central compounded prescription medications and by sharing in the profits realized by Central Rexall from payments for those compounded prescription medications.").  The Indictment alleged specific reasons why these prescriptions were medically unnecessary:  because they were " (a) prescriptions for patients who had not been examined by a doctor or other medical professional, (b) prescriptions signed or authorized by doctors and medical professionals without a determination that the medication was medically necessary, (c) prescriptions signed or authorized by doctors and medical professionals

who were paid kickbacks, (d) prescriptions for 12 months of refills that were not medically necessary and that a patient could not reasonably use in 12 months, (e) prescriptions for medications that patients had not agreed to receive, and (f) prescriptions for patients who agreed to receive the medications because they were paid or others received benefits to do so."  Ind. ¶ 34.

Before trial, Mr. Johnston moved to dismiss Count One of the Indictment as unconstitutionally vague, in particular because of the allegation that claims submitted for reimbursement were not "medically necessary."  ECF 126-1.  In brief, his motion argued that the term "medically unnecessary" in Count One was a vague and undefined phrase with varying meanings across different contexts and thus failed to provide constitutionally adequate notice of what was proscribed, or of what he was actually being charged with doing.  *Id.* at 23.  *See Parker v. Levy*, 417 U.S. 733, 757 (1974) ("[C]riminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed."); *see also Beckles v. United States*, 580 U.S. 256, 262 (2017) ("[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.") (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)); *United States v. Williams*, 553 U.S. 285, 304 (2008) (a statute or regulation is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.").  Sept. 30, 2024 Tr. 46:24– 47:4.[3]  As is well-settled, "[w]hat renders a statute vague is not the possibility that it will sometimes

---

[3] In particular, Mr. Johnston highlighted paragraph 24 of the Indictment, which focused on medical necessity, alleging that "the defendants designed a combination of ingredients for compounded medications based on their high insurance value and manipulated the ingredients to obtain the highest possible insurance reimbursement rather than to serve the medical needs of the patients."

be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what the fact is." *Williams*, 553 U.S. at 306.

In response, the Government argued that

> [T]he lack of a definition for medical necessity is not – is not fatal. That's an issue for trial. You know, we have to – we have to prove their mens rea. We have to prove they did it. If all they did was fill prescriptions, then we might have a hard time proving their mens rea. But we alleged mens rea, and we believe that we'll be able to - - able to do that."

September 30, 2024 Tr. 62:10-16; *see also* ECF No. 137 (*citing United States v. Hoffert*, 949 F.3d 782, 788 (3d Cir. 2020) ("Rather than permitting the conviction of innocent persons, § 1521 has a scienter requirement that defines the level of culpability for the offense and which has a settled legal meaning."); *Screws v. United States*, 325 U.S. 91, 101 (1945)("[T]he requirement of a specific intent to do a prohibited act may avoid those consequences to the accused which may otherwise render a vague or indefinite statute invalid."). The Court agreed, finding that the Indictment's allegations overcame a vagueness challenge at that preliminary stage, and that the issues raised with respect to medical necessity, vagueness, and intent were better resolved at or after trial, given the Government's representation that it would prove mens rea at trial. Sept. 30, 2024 Tr. 66:24—67:22 (looking only to indictment at motion to dismiss stage and concluding that it alleged mens rea sufficient to provide fair notice).

That said, the Court recognized throughout argument on the pretrial motions—as it did in both *in limine* and in mid-trial evidentiary rulings—that the Government's theory of criminal liability on Count One turned entirely on the issue of medical necessity. *See, e.g.*, Sept. 30, 2024 Tr. 37:25—38:2 ("I think that that's the charged conduct that you have to look through the lens as

---

This paragraph, too, turns on the hopelessly vague concept of medical necessity. Sept. 30, 2024 Tr. 46:24—47:4.

to what was medically unnecessary."); *id.* 65:3-8 ("But the co-pay argument seems to tie in with the medical necessity as well. . ."). As a result, it later excluded evidence that was unrelated to this question. *See* ECF No. 249 ¶ 5 ("[D]efendants' motions in limine to limit evidence the [G]overnment argues is intrinsic to the charged crimes that [D]efendants authorized payments in violation of the federal Anti-Kickback Statute . . . is GRANTED").

For example, the Court excluded evidence about alleged violations of the Anti-Kickback Statute (AKS) based upon the payment of unauthorized commissions to independent contractors (as opposed to employees) for TRICARE prescriptions, because that issue was not sufficiently relevant to the charged violation of medical necessity. ECF No. 249; Jan. 24, 2025 Tr. 52:5–18; 53:13–15 ("But the allegation of the conspiracy to commit healthcare fraud is about medical necessity . . . it's not about violating the antikickback statute."); 34:10-15 ("I did look at the indictment. And the only paragraph that talks about commission is paragraph 22. It doesn't get much into the commission. It doesn't really talk about anything about the antikickback statute. And it doesn't really even say that the payment of the commission is unlawful."); 99:22—100:1 ("The intent that the [G]overnment is trying to show as to all of those emails and the advice of counsel is the intent to violate the antikickback act. It is not relevant to the intent relating to the submission of false and fraudulent medically necessary prescriptions."). Likewise, the Court required redactions to exhibits containing AKS references where there was no connection to the issue of medical necessity. *See, e.g.*, Tr. 2442:15—2444:14; 2449:5–14 (requiring redaction of AKS references in GX 631A); 2286:13–2287; 2342:21–2343:9 (instructing jury not to speculate about extensive redactions to GX 377A, an email from Frier Levitt regarding possible AKS concerns). In this way, the Court consistently limited evidence based on the Indictment's health

care and wire fraud allegations were based entirely on the submission of medically unnecessary claims.

**B.    The Trial Of This Matter Offered No Greater Clarity On What Constitutes Medical Necessity.**

At trial, the Government did not even attempt to provide a definition of "medical necessity," perhaps because as anticipated pretrial, there is no such definition, even within the medical profession. *See* ECF No. 126-1 at 25-27;[4] ECF No. 141 at 11 (citing Centers for Medicare & Medicaid Services, CMS Repeals MCIT/R&N Rule, announcing CMS rescinded final rule defining "reasonable and necessary" prior to effective date). Indeed, the term remained vague and indistinct throughout trial, a point that is compellingly demonstrated by the Government's own treatment of the issue, including its regular substitution of phrases such as "medically beneficial" and "medically appropriate" for "medically necessary." *See* Tr. 226:12–13, 227:7–12 (questioning Hayley Taff whether Mr. Johnston expressed interest in the medical *benefits* of metabolics); *id.* 618:7–8 (questioning Candace Craven whether it was "medically appropriate" to prescribe six months of new medication without following up); *id.* 676:22–25 (questioning John Mark Rolling

---

[4] *See, e.g.*, *Department of Health and Human Services, Medical Necessity in Private Health Plans*, https://hsrc.himmelfarb.gwu.edu/cgi/viewcontent.cgi?article=1170&context=sphhs_policy_facpubs at 1 ("[t]here is no Federal definition" of medical necessity," but "[r]ather than turning simply on whether a proposed treatment meets professional standards, the prevailing definition of medical necessity is broadly framed, multi-dimensional, and controlled by the insurer, not the treating professional."); *see also* National Academy for State Health Policy, "State Definitions of Medical Necessity under the Medicaid EPSDT Benefit," https://www.nashp.org/medical-necessity/ (published April 23, 2021) ("The Federal statute does not define 'medical necessity' but rather describes a broad standard for coverage without providing a prescriptive formula for ascertaining necessity."); Morris A. Landau, *The Difficulties in Defining Medical Necessity*, Hous. L. Ctr. (2000) ("Even, the courts have not been consistent in interpreting medical necessity. Although some courts have held that the sole responsibility for determining medical necessity should be placed in the patient's physician's hands, other courts have held that medical necessity is strictly a contractual term in which a patient's physician must prove that a procedure is medically appropriate and efficacious.").

whether he or anyone at the pharmacy made any judgments that the formulas were the "most appropriate" way to treat a patient's condition); *id*. 716:15–18 (questioning Rolling whether anyone at the pharmacy advocated for higher resveratrol concentrations because it was "beneficial"); 873:19–874:7; (questioning Melissa Olsen whether a certain metabolic would be "medically appropriate" for everybody in the general population); *id*. 1453:9–12 (questioning Matthew Tedesco whether it was "medically appropriate" for doctors to sign prescriptions without first evaluating patients); *id*. 1574:5–7 (questioning Dr. Patel whether it was "appropriate" for patients to decide which prescriptions they wanted); *id*. 2776:17–18 (questioning Chris Casseri whether the pharmacy had a research department to find "medically beneficial" ingredients in formulas); *see also id*. 1680:1-6 (Gaffney: "Q: When you were talking to Mr. Lustberg, you used two terms, and I want to understand them a little bit better. You used the term 'medical necessity' or 'medically necessary,' and then 'medically appropriate.' Are those two terms the same to you? A: Yea, I would say they're similar.").

And this pattern continued right through closing arguments, where the Government continued to shift the focus, directing the jury's attention to the efforts of defendants to create product offerings that would be highly profitable as opposed to addressing their knowledge of the actual medical necessity of medications signed off on and prescribed by a physician: "I'm going to focus on [] showing how these defendants knew that the prescriptions were medically unnecessary. You know they knew that they were submitting claims for medically unnecessary prescriptions because they manipulated the ingredients in the medications to maximize the reimbursement amounts and not for any medical benefit." Tr. 3813:7–10; *see also id.* 3815:7–23 (stating there were no medical benefits for formula changes); *id.* 3825:14–18 (arguing that Central Rexall's compound wound and antifungal creams were "appropriate" only in certain instances);

16

*id.* 3826:8–11 (stating defendants made formulas for greed but not for any medical benefit); *id.* 3852:22–3 (arguing that 11 refills of antifungal cream would never be appropriate). Indeed, the Government's theory of criminal liability was that "medical necessity" was *per se* undermined by decision-making that was motivated by profit:

> They also increased the amount of certain ingredients for the sole reason of making more money. And you heard that while pharmacists reviewed formula changes and signed off on safety, it was the [D]efendants who were pushing for the more expensive formulas and who ultimately decided what got put on the pad. Witness after witness testified that the defendants had no interest in the medical benefits of Central Rexall's offerings. They cared only about what would reimburse the highest.

*id.* 3815:1–10. But, of course, this makes no sense at all: a product can be medically necessary (as well as medically beneficial or medically appropriate) even if it is expensive, or more expensive than other products—nor is it illegal, if there are multiple ways to make a product, to select the most profitable option. Indeed, there is no law to which the Government cited or which defense counsel has uncovered, which requires that profit not be considered, or which provides that consideration of profit always undermines medical necessity.

But even more to the point, the Government did not, as it promised pretrial, overcome the vagueness of the term "medical necessity" by in fact proving specific intent. Instead, the trial showed, in a way that the Court could never have known prior to trial, that the determination of medical necessity is always one that ultimately falls to the physician. Thus, every single witness who testified stated that the prescriber, *i.e.*, the doctor or nurse practitioner, determines what is or is not medically necessary, and that this is not something that can be or is questioned by a pharmacist. *See, e.g.*, Tr. 580:13—581:14 (Taff agreeing that doctors, registered nurses, and prescribers are who determine necessity, not the pharmacy); *id.* 643:16–645:2 (Craven agreeing that the assessment of patient needs is a matter between the prescriber and the patient); *id.* 741:1-

17

3 (Rolling explaining that medical necessity is "really a question for the doctor"); *id*. 938:1–939:13 (Olsen: "Q: And it's the doctor's job to decide whether that prescription is appropriate for the patient, right? A: Correct . . . As long as it's not going to harm the patient, then, yes, I have a duty to fill.")); *id*.1597:13–17 (Dr. Patel stating that he would make changes to preprinted formulas for particular patients based on medical need); *id*. 1658:14–1660:25 (Gaffney agreeing that "[d]ifferent doctors can look at a particular patient and eve – and do different types of evaluations and come to a different conclusion as to whether a particular medication, let's say, is medically necessary."). Even the Government's industry expert—an employee of one of the alleged victim PBMs, ESI—testified that, from a pharmacist's perspective, a doctor's signature is not something that could ever be second-guessed with regard to medical necessity. Tr. 3255:9—3256:5 ("Q: You've worked in pharmacies too. When a pharmacist receives a prescription that's signed by a doctor, the doctor, by signing the prescription, is essentially saying, this is medically necessary. Right? A: They should be, yes, sir . . . Q: And you know from your experience in pharmacies. It's also not something that pharmacies second-guess, that they look – let me stop there. I mean, pharmacists, you know from your experience, see a doctor's signature and they fill the prescription. Right? A: Generally, that is the case, yes, sir."). And this being so, *a fortiori*, it could not be second guessed by a non-pharmacist businessman, like Mr. Johnston or Mr. Brockmeier.

As Melissa Olsen testified, from a pharmacist's perspective, medical necessity is indicated by the required elements of a valid prescription, *i.e.*, a patient's name, address, date, medication, and, critically, the physician's signature. Tr. 938:12—940:15. And the two doctors who testified at trial confirmed this point: Dr. Gaffney testified that, as a physician, he understood that his signature constituted notice to the world that he had made a determination of medical necessity with respect to that prescription. Tr. 1666:21—1667:3. And Dr. Patel acknowledged that, when

18

he signs a prescription, he is communicating by that signature that he has used his "best medical judgment, [his] skill and experience in prescribing medication for a person" and that all of his "training and [society's] trust is manifested in this signature," which provides for his judgment as to "the appropriate course of treatment for this individual." Tr. 1608:16—1609:11.

In sum, the testimony at trial conclusively established what the pretrial motions could not: that the determination of medical necessity is not made by pharmacists, let alone pharmacy managers. Where the pharmacy receives what appears to be a valid and safe prescription, it does not have either the ability or the obligation to make its own assessment, or to otherwise second-guess the physician's determination, of medical necessity. And while these determinations by individual physicians do not define "medical necessity" so as to overcome vagueness concerns, or to address Defendants' Due Process arguments, they also make it truly impossible, even given the high standard that govern post-trial motions for judgments of acquittal, to find that the evidence in this case was sufficient as a matter of law. It was not.

### C.    The Government Produced No Evidence That Defendants Knew That Central Rexall Was Filling And Submitting Claims For Medically Unnecessary Prescriptions.

Of course, given the testimony of certain doctors and sales representatives, there really is no dispute that some of the prescriptions at issue were not written based on medical necessity. A series of prescribers and sales representatives took the stand and testified that Doctors Gaffney, Patel, and Alario wrote prescriptions for some patients whom they never actually saw or evaluated. In those cases, there could not have been a determination of medical necessity because the particular doctor at issue knew nothing about the particular patient involved. The question of fact for the Government to prove at trial was, then, whether Mr. Johnston and Mr. Brockmeier knew that this was happening, but that proof fell woefully short, even based upon a theory of willful

blindness, discussed below.   But to start, and contrary to the Government's contentions in connection with the pretrial vagueness arguments, there was clearly no evidence—none whatsoever—that Defendants were told that this was what was occurring or that either somehow knew of the fraudulent conduct of these doctors, who were, the evidence is clear, submitting false prescriptions.

For example, Dr. Patel testified that he wrote prescriptions without seeing patients in order "to financially benefit [his] cousin Paul."  Tr. 1588:22–24.  The Government offered no evidence that either Defendant had any connection to Dr. Patel or his cousin Paul.  And indeed, Dr. Patel testified that he did not know Mr. Johnston and had never even spoken with him.  Tr. 1589:7–12. Dr. Patel indicated that when he sent prescriptions for patients he had never seen, nothing on the prescriptions he signed would have indicated that he had not seen the patient.  Tr. 1594:4–9 ("Q: Okay.  Was there ever a time when on any of those forms, you indicated that even though you had signed it, it was not medically necessary?  A:  No.  Q:  That never happened, did it?  A:  No.").

Likewise, with respect to Dr. Alario (who did not testify), the sales representative Keith Ritson leveraged his personal relationship with the doctor to get him to authorize compound prescriptions for six of Ritson's friends without meeting and assessing them.  Tr. 1699:2–1708:2. However, as Ritson readily acknowledged on cross-examination, there was nothing about the prescriptions he brought to Dr. Alario to sign for his friends—as opposed to those that Dr. Alario signed after a legitimate patient meeting and assessment—that could have alerted Central Rexall to this scheme or that the prescriptions were not medically necessary.  Tr. 1751:22–1752:7; *id*. 1765-1770.  And Ritson too testified that he never met or spoke with Kyle Johnston, let alone introduced him to Dr. Alario or alerted him to Dr. Alario's failure to meet with and assess his friends before writing the prescriptions.  Tr. 1737:4–8.

Finally, Dr. Gaffney testified that he authorized compound prescriptions for approximately two hundred and twenty patients without meeting them during the time that Central Rexall was operating.  Tr. 1627:16—1629:12; *id*. 3854:22–24.  At that time, Dr. Gaffney had "a couple thousand" patients, *id*.1656:16–24, and when Matt Tedesco and Bill Hickman approached him about prescribing compounds, he advised "it would be a three-or four-month wait" before he could see their patients, *id*. 1656:6–23, so he signed prescriptions without seeing patients to help Tedesco and Hickman financially.  Tr. 1669:24–1670:11.  But Dr. Gaffney also made clear that he never met with or spoke to Mr. Johnston, *id*.1656:3–4, or with Mr. Brockmeier, *id*. 1672, and offered no reason why the pharmacy would otherwise have reason to question the validity of his prescriptions. Tr. 1666:21–1667:3 (testifying that his signature constituted a determination of medical necessity to the pharmacy, patient, and world); *id*. 1495:2-4; 1504:23-25 (Matt Tedesco acknowledged he never spoke with or met Mr. Johnston and never discussed his fraud with Chris Casseri or anyone else at the pharmacy).  Indeed, revealingly but unsurprisingly, Dr. Gaffney explained that he has never been questioned by any pharmacy—not just Central Rexall—about how he arrived at a determination of medical necessity.  Tr. 1667:13–17.

As Mr. Johnston acknowledged in closing arguments, Tr. 4008:24–4009:5, this would be a very different case if Mr. Johnston or Mr. Brockmeier had been told by doctors or anyone else that the doctors had signed prescriptions without ever seeing patients and had thereafter directed the pharmacy to nevertheless submit claims for reimbursement.  But no such evidence was introduced at trial, whether through testimony, emails or otherwise, to support the theory that

Defendants knew that certain prescriptions for these doctors were not medically necessary because no physician assessment had been conducted.[5]

### D. The Government's Reliance On Other Facts To Establish Knowledge That Prescriptions Were Not Medically Necessary Is Insufficient To Meet The High Burden Of Proof Beyond A Reasonable Doubt.

Lacking any evidence that Mr. Johnston or Mr. Brockmeier had knowledge that certain prescribers were not meeting with and assessing patients, and therefore that certain prescriptions were not medically necessary on that basis, the Government relied on two other types of evidence in an effort to establish knowledge:  (i) that Central Rexall took steps meant to increase the reimbursements it received, and therefore the profitability of its products; and (ii) that there were certain "red flags" that the Government claims should have alerted Defendants to the lack of medical necessity.  Neither of these—alone or taken together—is, however, sufficient to meet the Government's burden of proof beyond a reasonable doubt that Mr. Johnston or Mr. Brockmeier

---

[5] Even the very few witnesses who did meet or speak with Mr. Johnston—William Hickman and Antonio Serna—did not testify that they told him that doctors were writing prescriptions without seeing and evaluating patients.  Indeed, Hickman affirmatively stated that he did not tell Mr. Johnston about his fraudulent conduct and that of Boardwalk Medical.  *See* Tr. 2004:2-9 (Hickman testifying that he never told anyone at Central Rexall that he paid patients and that he gave Dr. Gaffney cases of wine and Eagles tickets).  And Serna's testimony, though so fraught with blatant lies that it should not even need to be addressed, included the admission that he too never told Mr. Johnston that doctors were not seeing patients.  To the contrary, he testified that he told defendants that doctors would be paid on an evaluation basis, Tr. 1116:8-1117:5, and in all of Serna's communications with Central Rexall staff, he denied that any  payments to patients or doctors ever occurred.  *See* Tr. 1086:7—11; 1136:1—3; 1140:2—1143:13 (Serna testifying that Sabrina Aguilar was his point of contact at the pharmacy and that he denied patients were ever paid in communications with Aguilar);  *see also* GX 353 ("Hola Sabrina, I will look into this matter [of a patient agreeing to get a prescription because he would be compensated] immediately. I completely agree with you and we would never do anything remotely close to being illegal.  Let me find out what happened."); GX 352 (Serna telling Sabrina that patient in GX 353 had PTSD and had been seen by Dr. Elder).  Moreover, Serna's testimony that he received names of corrupt doctors from Defendants is contradicted by the Quickbase evidence, which shows that Central Rexall first received prescriptions from Dr. Wagner and Elder Quintana—the doctors at issue—on December 17, 2015 and January 2, 2015, respectively, both dates after Serna's visit to the pharmacy and his email informing Central Rexall of his doctors' names.  *See* GX 286; DX 131.  *See also infra,* n.27.

agreed to engage in fraud by knowingly submitting medically unnecessary claims for reimbursement. And they accordingly also cannot serve to overcome the Government's obligation to establish the specific intent that would defeat a vagueness challenge, as it argued it would do if permitted to advance beyond pretrial motions to present its evidence to a jury.

### i.    *Profit Margins are not a proxy for lack of medical necessity*

As the Court will recall, the Government repeatedly argued that Central Rexall increased the amount of high-reimbursing ingredients in its preprinted prescription pads for the sole reason of making money, *see* Tr. 3814:21—3815:2, and elicited testimony designed to show that Central Rexall generally sought to be as profitable as possible and to market products with the highest reimbursement rates. *See, e.g.*, Tr. 227:7–13 (Taff: "[defendants Johnston and Brockmeier] expressed that their primary concern was the reimbursement rates of these medications."); *id*. 2780:23–2781:1 (Casseri: "A: [The purpose for reformulations was for] making as much money as we can . . . the best way to put it is just greed."). Indeed, the evidence presented in the Government's case-in-chief to support this theory of criminality was based primarily on "reformulations" or "formula manipulation," as the Government characterized them:

> The first formula manipulation I want to talk about is when Central Rexall tripled the resveratrol in their metabolic supplements from 100 milligrams per capsule to 300 milligrams per capsule. They also increased the number of pills from two pills per day to three pills per day. That's going from 200 milligrams of resveratrol per day to 900 milligrams. What was the effect of that? Well, there was absolutely no medical benefit as you heard. But it more than tripled Central Rexall's profits.[6]

Tr. 3815:14—3816:17.

---

[6] It is undisputed that the increased concentration of resveratrol, even above the recommended daily allowance, was certainly not harmful, even if the two pharmacists at Central Rexall were not aware of any added benefit to it. Tr. 893:8–11 (Olsen: "Q: Would taking more resveratrol than the daily limit hurt somebody? A: No.").

The evidence upon which the Government relied came from the questioning of Melissa Olsen about the "tripling of resveratrol" in one of the general wellness compound formulas which was specifically tailored to weight loss (the "GW-WT" formula). In particular, the Government asked Olsen to compare the formulas in Government Exhibit 17A, from August 29, 2014, with the formula in Government Exhibit 20A, from February 12, 2015, as a means of supporting the Government theory that the amount of resveratrol had been increased for no reason other than profit. Tr. 881:3—882:3. But it is simply not the case that these were two different formulas for the same product: GX 17A contained the original general wellness supplement formula (the "GW" formula), whereas Government Exhibit 20A contained that same formula and added a new general wellness weight loss formula (the "GW-WT" formula)—a new product offering that contained the higher concentration of resveratrol and also modified other components of the supplement formula. There is no evidence that Central Rexall ever surreptitiously modified a formula's ingredients in an effort to obtain more profit without a doctor's sign off. Nor was there any evidence that the pharmacy submitted claims for high-reimbursing products that were never prescribed or never included in the actual product shipped to the patient.

To be sure, Ms. Olsen testified that she was not aware of any added weight loss benefit to the increased amount of resveratrol. *See* Tr. 892:18–22 (agreeing with GX 319 email from Rolling to Brockmeier stating "not that I'm aware of" in response to query as to whether there is any benefit to have more resveratrol). But neither she nor Mr. Rolling testified that they ever told Mr. Johnston that, let alone that there was "absolutely no medical benefit," as the Government characterized it, Tr. 3815:14–3816:17, or possibility thereof, with this new product offering, and Rolling testified that he ultimately made the decision to approve the formula, based on consultation with

24

pharmacists and review of safety guidelines. *See* Tr. 715-717.[7]  But, as discussed above, whether

a prescribed product is "medically necessary" or "medically beneficial" is a determination made

by the individual physician or nurse practitioner who determines to write the prescription.  There

was simply no falsehood inherent in the amount of profit that results, which amount is a product

of the reimbursement rates set by insurance companies and their PBMs in any event.  Thus,

although there is no question that Central Rexall (and Defendants) would prefer that more

profitable products be prescribed—as the evidence concededly indicated—they were at the mercy

of doctors' prescriptions and there was absolutely no indication that Mr. Johnston or Mr.

Brockmeier knew that, as the Government claimed, there was no possibility that these prescribed

products were medically necessary.

No doubt, the Government found this focus on profit unsavory, as members of the jury may

have as well.  But that is not sufficient to impose criminal liability and the associated penalties;

making money is not illegal in and of itself.  *See United States v. Sorensen*, 2025 U.S. App. LEXIS

8777 at *16 (7th Cir. Apr. 14, 2025) (holding that "percentage-based compensation structures are

not per se unlawful") (quoting *United States v. Marchetti*, 96 F.4th 818 (5th Cir. 2024)); *United*

*States v. Grow*, 977 F.3d 1310 (11th Cir. 2020) (evidence of financial gain "'alone,' without some

other evidence of fraud, 'is not sufficient to establish healthcare fraud in violation of sections 1347

and 1349.'") (quoting *United States v. Medina*, 485 F.3d 1291, 1298 (11th Cir. 2007)).  That is

---

[7] Studies uncovered by the defense indicate that this was not true, and rather, that at least one study
has concluded that "resveratrol supplementation at a dose of 1000 mg/day selectively increased
psychomotor speed compared to both placebo and a resveratrol dose of 300 mg/day." *See* Anton,
Stephen D, Ebner, Natalie, Dzierzewski, Joseph M. *et al.*, *Effects of 90 Days of Resveratrol*
*Supplementation on Cognitive Function in Elders:  A Pilot Study*, J. Altern Complement Med.
24(7):725-532 (Jul. 1, 2018) (available at https://pmc.ncbi.nlm.nih.gov/articles/PMC6065512/).
As a sidebar on this issue at trial indicated, this evidence was admissible, not for the truth of the
matter asserted, but to the extent it want to the state of mind of the defendants. *See* Tr. 1019:5—
1020:6.

especially so in these circumstances where, as discussed above, the reimbursement amounts determine what is covered and for how much based upon insurance company formularies—prices which the insurance companies set—and not upon the evaluation of a pharmacy as to medical necessity. *See, e.g.*, Tr. 757:12–18 (Rolling: "Q: An adjudication is when an insurance company or a PBM makes a decision about how much reimbursement there will be for a particular prescription. Am I right? A: Yes. Q: And that amount is up to the insurance company or PBM. Correct? A: It is."); *id*. 952:5–8 (Olsen: Whether a product is reimbursed and to what extent is up to the insurance company and its PBM). Indeed, from the perspective of the pharmacy selling a product that must be prescribed by a doctor in order to be filled and distributed, the question of medical necessity is resolved when the signed prescription is returned. *See* Tr. 756:25–757:3 (Rolling: Pharmacists do not second-guess the determination of medical reasonableness that is made by the doctor); *id.* 1666:21—1667:3 (Gaffney: "Q: Right. And when you sign, you're basically telling the pharmacy that you've come to the conclusion that this prescription is appropriate and medically necessary. Correct? A: Correct."); *id*. 1608:16—1609:11 (Patel: signature communicates judgment as to "the appropriate course of treatment for this individual."). Thus, the Government's arguments are both (i) incorrect in that it is not illegal to make a profit, and (ii) unsupported by the exhibits, which do not show that existing prescriptions were unilaterally modified to triple a drug amount purely for profit and without regard to whether a doctor would deem them medically necessary or appropriate.[8]

---

[8] Beyond the Government's mischaracterization of the evidence with regard to resveratrol discussed above, *see* Tr. 3815:14–23 (Government summation), it was also inaccurate and unfair to argue, as it did, that Central Rexall manipulated the prescription pad in GX 613A purely for profit, by doubling the amount of sildenafil and increasing the application amount to account for an individual engaging in sexual activity more than three times a day for an entire month. *See* Tr. 3824:22–3825:1; *id*. 747:8–748:16; *id*. 926:25–927:14. The truth is that the instructions on GX 613A do not specify a particular duration or required usage per day or month, as they do for other

The Government's refrain that this case was about "greed over medical need," *see, e.g.*, Tr. 42:2; *id*. 3826:8–11, also relied upon argument that was both incorrect and unfair. For example, the Government poked fun at the notion of Viagra being prescribed for a woman, plainly suggesting that this would have conveyed to anyone that the prescription was a fraud. *See* Tr. 3362:6–9 (Bessey: "Q: Do you see it's a medication that includes Viagra? A: Yes. Q: And is Danielle Abel a woman? A: Yes."). But as the prescription that the Government introduced through the testimony of sales representative Robert Bessey to make this very point shows, the Central Rexall pharmacist called the prescribing physician, discussed the prescription, and made modifications to it based on that instruction:

> Q: Do you see the handwriting at the bottom of the script?
> A: At the bottom – yes. . .
> Q: So this formula was modified by the . . . Central Rexall pharmacy, after consultation with the MD, the doctor, to change it to this script which included sildenafil at 2 percent. Right?
> A: Yes.
> Q: Do you know who Jan Lantrip is?
> A: No.
> Q: Do you know any of the pharmacists at Central Rexall, any of their names?
> A: No.
> Q: Do you know whether this formula was reviewed by a pharmacist at Central Rexall?
> A: No.
> Q: Do you have – have you seen or had any information given to you that sildenafil actually does have libido-enhancing effects for women?
> A: No."[9]

---

formulas. Instead, with respect to the libido formula, the instructions direct the patient to apply the medication only as needed. The Government's argument that Defendants must have known that these prescriptions were medically unnecessary because they were indicated for an impossible amount of sexual activity is not supported by the record, other than irrelevant hypotheticals posed to Rolling and Olsen about use of the full prescription in one month, which was not even suggested by the prescription pad. *See* Tr. 747:8—748:16; *id*. 926:25–927:14.

[9] As the Government well knows from the discovery in this matter, counsel had a good faith basis to ask this question because Jan Lantrip is a Central Rexall pharmacist, who advised in response

Tr. 3399:16—3400:19.  There is simply no basis in the evidence to suggest that this prescription for a libido cream would have alerted Defendants that the prescription was fraudulent, merely because the individual was female.  Even assuming that Mr. Johnston, or even Mr. Brockmeier, was somehow aware of this individual prescription out of the many thousands that were sent specifically to the Central Rexall pharmacist fax machine—of which there is absolutely no evidence, *see id.* 154:14–16 (Taff:  explaining Mr. Johnston was "rarely" in the 211 administrative building); *id.* 164:16–165:5 (Taff:  "So the fax arrives and the person in charge of the fax machine would save it to the server . . . .  And then someone in the 211 building, a patient care representative, would call the patient, confirm all the information, the patient name, contact information, insurance information.  And then that would – once that was completed, then the pharmacy technician would put the information into the pharmacy management system . . . .")—he would have seen that the system in place was functioning properly:  a physician was behind the prescription, and pharmacists were speaking with doctors directly to ensure any questions about the prescriptions were properly addressed and appropriate modifications made.

The Government also mischaracterized the testimony of Ms. Olsen on this issue in closing arguments, disingenuously claiming that "all" of the prescriptions Central Rexall filled for women were medically unnecessary.  Tr. 3825:11–13 ("And Central Rexall filled prescriptions for the libido cream for women.  All of those prescriptions were medically unnecessary as well.").  In fact, Olsen testified that while one of the active ingredients in the Central Rexall libido compound—sildenafil—would likely not have an effect on a woman *if applied to the wrist*, the

---

to a sales rep's clinical question by way of a September 18, 2014 email that "Sildenafil Citrate 2.5mg – relaxes muscles and increases blood flow to particular areas of the body.  Sildenafil under the name Viagra is used to treat erectile dysfunction (impotence) in men, and is purported to have similar libido enhancing effects on women."

two other active ingredients definitely would be effective and beneficial for increased sexual satisfaction in women.  Tr. 927:7–12 ("A: . . . she would benefit from that part of it, but not from the sildenafil  Q:  So the sildenafil would not have any benefit for a woman?  A:  Not on the inside of the wrist").  Leaving aside the female libido-enhancing effects of sildenafil when applied to erogenous zones, there is no evidence that Ms. Olsen ever conveyed to anyone, let alone Mr. Johnston, that she believed the sildenafil was inappropriate in this prescription or that the application instructions should be modified as to the location of application.  The record, then, does not support even a reasonable inference that Defendants understood that all prescriptions to women for this product—again, signed by and at times discussed with, doctors—were "medically unnecessary" such that a crime was being committed.[10]

### ii. *"Red Flags" are not a proxy for knowledge that prescriptions were not medically necessary*

Finally, the Government argued to the jury that Defendants ignored a number of "red flags" because they cared more about profits.    Tr. 3841:1–2.  According to the Government, certain events or facts demonstrated that Mr. Johnston and Mr. Brockmeier each must have known that patients were not being seen by a doctor and therefore that their prescriptions were not medically

---

[10] The Government also repeatedly argued that the fact that Central Rexall conducted no research on the effectiveness of compound products indicated that they had no interest in the actual efficacy of the medications and only sought out profit.  But there is no basis to believe—and no evidence was introduced—that pharmacists have the obligation to perform such research, in the face of a doctor's determination of medical necessity, as indicated by his signature on a prescription. Moreover, the evidence at trial was that compound drugs are combinations of other drugs, which have each already undergone extensive research and testing in connection with obtaining FDA approval; accordingly, supplemental research on the compound is neither required nor commonly undertaken.  Tr. 611:11-13; 364:18-22; 2952:10-21; 3275:5-16.  That said, internal pharmacy correspondence shows Central Rexall staff asking pharmacists for input on formulas and the pharmacist responding with thoughtful, detailed, and medically-relevant answers.  Tr. 687:2-6; 991:14-23; DX 87; DX 1317; DX 1404.

necessary.  The events or facts that the Government characterized as "red flags" included low copay collection, the volume of prescriptions, the high number of refills selected, and other suspicious individual prescriptions.  But, as discussed in further detail below, the record does not support that any of the problems that arose at Central Rexall would give rise to knowledge that doctors were not seeing patients and that the prescriptions were accordingly not medically necessary.  And when suspicious prescriptions were received, the system put in place by defendants caught and addressed issues, negating the very notion that the prescriptions were fraudulent because they were not medically necessary or beneficial.  These issues are addressed, *seriatim*, below.[11]

### (1)    *Copays*

Throughout the trial, the Government elicited testimony about Central Rexall's low copayment collection rates, arguing that the pharmacy intentionally and deceptively failed to collect copayments at the direction of Mr. Johnston, and that the intentional failure to collect copayments was evidence that Mr. Johnston knew that medically unnecessary prescriptions were being filled.  Tr. 3859:16—3860:2.  In closing, the Government contended that patients would only be willing to pay copayments for compound medications if the medications were truly needed—i.e., because they were medically necessary.  Tr. 3860:3–9.  But low copay collection rate does not equate to lack of medical necessity for any, let alone all. prescriptions.  First, even leaving aside that individuals sometimes reject a medication or treatment which they need but cannot afford—not because it is not medically necessary or beneficial— medical necessity is a determination made by doctors and prescribers, not patients; the concept is wholly unrelated to

---

[11] In addition to the discussion below specifically with respect to medical necessity, the issue of red flags is addressed further with respect to the issue of willful blindness below.  *See, infra,* Sec. IV.

copay collection rates, and the Government presented no evidence to the contrary.  *See infra*, Sec. I(C).  Nor, of course, do patients determine medical necessity; rather, trained medical personnel in the person of licensed physicians who—as occurred here—sign prescriptions which pharmacies then go on to fill.

Moreover, the evidence at trial was directly to the contrary.  In fact, there was a systemic effort to collect copayments both before and after products were shipped.  Multiple witnesses who worked within the pharmacy stated that Central Rexall made significant and good faith collection efforts.  *See, e.g.*, Tr. 490:3–4 (Taff:  "Q: So there was an attempt in every case, an attempt to collect the co-pay. Right? A: Correct."); *id*. 933:5–8 (Olsen: "[W]e always made sure that we tried to collect copays.").   And this was corroborated by records from the pharmacy's Quickbase database, which powerfully proved that before any prescription was filled, a customer service representative systematically called the patient to confirm that they wanted the prescription and that they were willing to pay the copay.  *See, e.g.* DX 131A at 1 ("[JUL-24-14 2:00 PM (CDT) Cassidy Golmon] SPOKE TO PT'S MOM AND SHE VERIFIED THE COPAY'S F OR BOTH RX. SHE ASK THAT WE INCLUDE THE INVOICE WITH THE RX WHEN IT IS SHIPPED!]; DX 131JJ at 3 ("[JUL-14-15 2:57 PM (CDT) Erika Barrett] RX 1110246 HAS BEEN REFILLED AND IS WAITING FOR COPAY VERIFICATION").  If the patient was willing to provide information over the phone, they took payment prior to shipping.  *See* DX 131F at 4 ("[AUG-20-15 11:28 AM (CDT) Ann Guarino] COPAYS VERIFIED AND PAYMENT INFOR REC'D FOR RX 1126178 & 1126186.  UPDATED STATS TO READY TO FILL – PT NOTIFIED.").  If not, they only filled and shipped the prescription if the patient agreed to assume responsibility for the copay.  *See, e.g.*, DX 131ZZ at 4 ("[AUG-24-15 10:05 AM (CDT) Ann Guarino] REFILL COPAYS VERIFIED FOR RX 1123097 & 1123096.  PT STATED HE WILL CALL BACK AT

31

LUNCH TIME WITH PAYMENT INFORMATION FOR THESE AND PREVIOUS FILLS. UPDATED STATUS TO REFILL READY TO FILL – PT NOTIFIED.") DX 131MM at 3 ("[JUL-31-15 10:11 AM (CDT) Ann Guarino] COPAY VERIFIED ON RX 1125027. UPDATED STATUS TO READY TO FILL - PT NOTIFIED. PT AGREES TO SET UP CHARGE ACCOUNT").

And the evidence showed that the pharmacy in fact made significant efforts to collect copays even after shipping out the product with an invoice. For example, Khaled Farahat testified that the pharmacy established and filled a position for someone whose sole responsibility was to attempt to collect delinquent copays. Tr. 2743:13–15. It was evident that the pharmacy followed-up on copay obligations in that even Sara Hickman addressed her copay obligations by making payments. Tr. 2719:12–2721:1 (Khaled Farahat testifying about Paladin entry reflecting Sara Hickman paid her copay account between April and Jul 2015). Mr. Farahat also testified about Paladin, a software database that the pharmacy purchased and utilized to thoroughly log and track every patient's copayment delinquency status, allowing the pharmacy to continue to follow up with patients to ensure the copays were ultimately collected. *See* DX 888. That defense exhibit consisted of over 5,000 pages of records demonstrating the precise and evolving copayment collection efforts by the pharmacy. And the September 2014 collection rate of 31.2%, upon which the Government relied so heavily, was not even an accurate representation of the pharmacy's copay collection rate at the time it was created, let alone across the life of the pharmacy; as Mr. Farahat ultimately clarified with respect to the accounts receivable reports used to reach the 31.2% copay collection figure emphasized by the Government, those reports captured indebtedness from all

sources, not merely unpaid copays, thus clearly resulting in an inaccurately low percentage.[12]  Tr. 2734:5-17.  That rate was, in any event, legally insufficient evidence that Mr. Johnston knew that prescriptions were "medically unnecessary," as the Government contended.

### (2)    *Volume of Prescriptions*

The Government argued that a spike in the number of prescriptions from a doctor also constituted a missed red flag that would have indicated that the prescriptions were not medically necessary.  *See, e.g.*, Tr. 3822:23—3823:22 (arguing spike in prescriptions for Doctors Gaffney, Sokalsky, and Kauffman was a missed red flag).  The evidence at trial on this issue showed that there were, indeed, increased prescriptions at specific times.  Specifically, the Government's summary witness, Special Agent Brandon Galloway testified about the high volume of certain prescribers' "new" prescriptions on certain days and months, and the amount of total prescriptions filled by Central Rexall with respect to Dr. Gaffney, Tr. 3499:23—3501:4, Dr. Sokalsky, *id.* 3496:14—3497:22, and Dr. Kauffman, *id.* 3497:23—3499:6.

However, the data that the Government used to demonstrate this point failed to do so for several reasons:  first, the number of "new" prescriptions was not indicative of the total number of patients seen by those doctors, which could have been much less, given that it is not at all uncommon for a single patient to receive multiple prescriptions.  Tr. 3584:12–4 (Galloway testifying that he did not know how many of the doctor's prescriptions represented on the chart were for the same patient).  Nor were these numbers even indicative of an actual "new" prescription; instead, they included prescriptions that had been re-sent when a change in

---

[12] Moreover, as the evidence established, the pharmacy did not routinely waive copayments up front, but did so in four specific instances—out of thousands—in response to specifically articulated reasons, including hardships.  Tr. 3869:23—3870:6.  Furthermore, copayment waivers in the face of specifically articulated hardships, were completely acceptable, as Blake Stockwell himself testified.  *Id.* 3191:9–14.

ingredients was required due to (i) a loss of coverage; or (ii) the replacement ingredient not being considered a therapeutic equivalent, such that the revised formula therefore required physician sign off. Tr. 3583:24—3584:7 (Galloway: "Q: We've heard about prescriptions that come in when there's a change, and then we've heard also about something called okay to change forms, where there could just be a change of ingredients and a just a shipment. So you don't know of these 28 which of those categories this falls into? A: No I don't."); *compare* GX 1088 (showing spike in new prescriptions in approximately July 2015); *with* Tr. 3582:24–3583:4 (Galloway indicating reformulation occurred in approximately July 2015 following lapse in coverage) *and* GX 501 *and* Tr. 1728:21—1729:3 (Ritson indicating Central Rexall reformulated compound formula days after his email in June 2015).

Indeed, Agent Galloway testified that he did not actually look at the prescribing patterns of any of the prescribers about which he testified. Tr. 3581:16–20 (Galloway: "Q: With any of the prescribers that you testified about this morning, did you look at what their prescribing history was with regard to any other pharmacy? A: No"). But the record established that the volume of prescriptions was not unusual for individual doctors. For instance, it was not unusual for Dr. Gaffney to see up to thirty patients per day, *id*. 1657:5–8, and Dr. Alario had a very heavy patient load as well, *see id*. 1740:7–15; *id*. 1741:17–25. Thus, there was nothing about the number of prescriptions themselves that indicated so high a volume of patients that they could not possibly be seen and evaluated by the doctor, or otherwise negated multiple witnesses' testimony that doctors and prescribers determine medical necessity.

Moreover, the testimony established that Central Rexall routinely followed-up with each individual patient, which is how they discovered the red flag that patients were promised payment. *See infra* Sec. II(D)(ii)(5). But more to the point, the system of outreach to individual patients to

34

confirm their information and the prescription alleviated any concerns that one might have about possible fraud by the doctor indicated by a high volume of prescriptions.

(3)    <em><strong>Signature Stamps</strong></em>

Next the Government argued that the use of a signature stamp by Nurse Practitioner Craven was a red flag.  Tr. 3839:18—3840-25 (listing Craven's prescriptions as facially suspicious because of her signature stamp use).  It went on to elicit testimony that, in fact, Ms. Craven's stamp had been stolen by someone in her office and used without her authorization.  *Id*. 623:21–624:7.  But Ms. Craven also testified that signature stamps for prescribers are perfectly normal in the medical profession and their use is common, so long as it is authorized.  *Id*. 639:21–640:4; *id.* 646:18–22.  Thus, there is no basis in this record to conclude that prescriptions were not medically necessary merely because they were authorized by use of a prescriber's stamp.

With respect to the stamp having been stolen, Ms. Craven testified that she never told anyone from Central Rexall about that theft and that she never bothered to confirm that anyone in her office had done so either.  Tr. 645:3–16.  In fact, the evidence demonstrates that, had anyone notified Central Rexall of this as possible issue, it would have been addressed.  That is true because, as Ryan Boyle testified, the pharmacy did learn of concerns related to Dr. Craven—not because Dr. Craven's office had called to disclose the signature stamp issue, but because the systems in place at the pharmacy detected an issue.  *Id.* 2302:1–7 ("when we talked to the patient, they didn't know who the doctor was").  And when it learned of those concerns, it conducted an investigation and implemented remedial measures, including applying greater scrutiny to Dr. Craven's prescriptions.  Tr. 2203: 9–13.  What's more, Boyle was specifically encouraged by Mr. Johnston to "make sure all patients are contacted and verified, make sure to follow up with Melissa so she feels comfortable it's being handled."  *Id*. 2306:3–13.  Far from ignoring these red flags, Ryan Boyle then wrote to Melissa:

> Melissa, my advice is that we approach Craven's scripts with scrutiny.  I've looked into Craven's role in the Whitney situation and I don't believe she was complicit in any manner. I feel that as long as patients saw/spoke to Craven and the patient is anticipating the prescription, then everything should run smoothly.  I will work with Sabrina to make sure all of the customer care reps know what to look for and to report anything unusual, as I would expect you all to do if something unusual shows up on your end.  Barring any irregularities, I believe filling the new Rxs is fine, albeit  with a heightened scrutiny.

Tr. 2308:4–15.  Far from burying their heads in the sand and ignoring red flags, Mr. Johnston empowered his chief compliance officer and patient care representatives to confirm that patients were expecting and still wanting their prescriptions, so that when an actual red flag presented itself, the pharmacy could react accordingly, such as by not filling a prescription for a patient who was not expecting or no longer wanted it.  Based on the reaction to other concerns about Ms. Craven of which the pharmacy was made aware, there is no basis to suggest that the pharmacy, let alone Mr. Johnston or Mr. Brockmeier specifically, knew about the theft of Craven's signature stamp or had any other reason to suspect that its use was improper on certain prescriptions bearing her stamp.

### (4)    *Refills Selected*

In closing, the Government further attempted to classify the amount of refills as an inherent red flag that should have raised concerns that prescriptions were not medically necessary.  Tr. 3840:24–25 (stating "almost all of Candace Craven's prescriptions had the maximum number of refills checked"); *id*. 3852:22–3853:7 (discussing Dr. Patel prescriptions which contained "11 or 12 refills").  But the evidence at trial supported no such conclusion.  In fact, the testimony established that the number of refills selected was not a direction that the patient would actually receive those prescriptions; instead it was merely an authorization for a refill, should the patient want or need it:

36

> Q:  Just to be clear, I mentioned authorization.  When you would select the maximum number [of refills], that's an authorization to get the maximum number.  Right?
> A:  What do you mean by an "authorization"?
> Q:  I mean, it doesn't necessarily mean that the patient is going to get all of those –
> A:  Correct.
> Q:  -- refills, right?
> A:  That's correct.  It just means that, you know, of course if the insurance company would cover it for that long, then the doctor's prescription is good for that many refills.
> Q:  Right.  And if the patient wants it as well?
> A:  And if the patient wants it, correct.

Tr. 1744:25–1745:12 (Ritson); Tr. 2975:3–19 (Casseri) (same).

Nor was any evidence introduced about how many of the refills that were authorized were actually filled—a significant gap in the Government's emphasis given the prominence that this issue played in the prosecution presentation.  And of course, the authorized number of refills was not inherently suspicious because the pharmacy followed up with patients before filling and shipping out refills.  *See, e.g.*, Tr. 1540:24–1541:14   (Matt Tedesco testifying that DX 131 F reflected that patient was called about refill, did not want it, and pharmacy put it on hold);  Feb. 18, 2025 Tr. at 2061:20–2062:3 (Agent Galloway acknowledging that the pharmacy was contacting patients to see whether they wanted the refill); *see* 131II at page 2, ("[MAY-01-15 11:40 AM (CDT) Kristine Gulotta] CALL PT WHEN REFILL IS DUE RX1108793 PC DATED 03-09-15"); 131KK ("[JUL-15-15 8:37 AM (CDT) Ann Guarino] LEFT MSG TO NOTIFY PT WE CANNOT FILL RX 1107399. . . [JUL-15-15 11:14 AM (CDT) Ann Guarino] RETURNED PT'S CALL. EXPLAINED SITUATION WITH REFILL. PT WILL FOLLOW UP WITH OTHER PHARMACY. SHE STATED THEY SHOULDN'T BE FILLING ANYTHING FOR HER.").  In light of the evidence that the prescriptions were received from doctors with refills authorized and the pharmacy communicated with patients to confirm the continued desire to receive the medication, this trial record does not support even a reasonable inference that multiple

37

authorizations for refills should have indicated to the defendants that the prescriptions were not medically necessary.

### (5)    *Individual, Suspicious Prescriptions*

The Government also pointed to a handful of individual prescriptions that it deemed suspicious.  For example, it expressed incredulity that a minor child could receive a compound medication and asserted that Defendants ignored this red flag as well. Tr. 3840:19–25.  But, having not looked at Quickbase in connection with its investigation, the Government was seemingly unaware of the safeguards that Defendants put in place to identify and address such issues.  In fact, the record at trial established that the usual patient outreach occurred, and the pharmacy confirmed that the child's prescription was valid:  John Mark Rolling testified as to the Quickbase entry for the minor patient of Craven, which reflected the following:  "This patient is 5 years old.  Spoke to Dr. Craven for the okay to change formula due to patient's age.  Rxs went through patient's insurance and are ready to be filled then sending out."  *Id*. 781:2–782:6 (testifying to Defense Exhibit 131A).

The Government also pointed to a prescription that was purportedly suspicious because the patient was in India and her son was unaware of the prescription when the pharmacy made a verification call.  *See* GX 624 (Internal pharmacy email flagging concern that son was not aware of the prescription and his mother was in India).  But rather than turn a blind eye to a red flag, the Quickbase records showed that the Central Rexall put the prescription on hold.  DX 131BBB at 2 ("UPDATING STATUS TO HOLD").  The pharmacy called back several days later, at which time the patient had returned from India and authorized the prescription and the copay.  *Id.* ("CALLED PT AND PT DOES NOT SPEAK ENGLISH WELL GAVE PERMISSION TO SPEAK WITH HER SON JATIN TAILOR: JAITIN VERIFIED PT DOB: VERIFIED COPAY ON RX-1129367 AND 1129369: PT WILL MAIL IN PAYMENT ONCE SHIPMENT IS RECEIVED.").  Further

calls to the patient to confirm whether the patient wanted the next authorized refill again gave no cause for concern. *Id.* at 1 ("PT DOES NOT NEED REFILLS FOR [PRESCRIPTIONS] AT THIS TIME. ASKED THAT WE CALL AGAIN NEXT MONTH. UPDATING STATUS TO HOLD-REFILL REFUSED BY PT.").

Likewise, the Government introduced an email from Central Rexall staff identifying that a patient, Valiera Best, was not aware of her prescription. GX 347 ("I would like to discuss why patient Valiera Best was not aware of her prescription nor has never been seen by Dr. Vijil."). But once again, the record evidence is that this "red flag" was only identified due to the safeguards put in place by the pharmacy, which, in this instance, put the prescription on hold so it was neither filled nor sought for reimbursement, *see* DX 131GGG, and followed up with the head of the relevant sales representative group to discuss what the issue was, *see* GX 347.

*    *    *

Ultimately, patients were systematically called and their information, prescription, and copay commitment verified for every prescription that came through Central Rexall's fax machine. *See generally* DX 131. And the reason they were, is because that is the way Defendants set up their business: to ensure that the medical necessity determination made by the prescriber and reflected in his or her signature on the prescription, was backed up by a patient. Of course, this also goes to their knowledge and any willful blindness, as discussed below, *infra* Sec. IV, but at bottom, there was no showing at trial that Mr. Johnston or Mr. Brockmeier knew that any of the prescriptions were not medically necessary, let alone that he conspired to submit claims for medically unnecessary prescriptions. Given the vagueness of the term—beyond the trial testimony that medical necessity means a determination made by a doctor—and the lack of any evidence that he knew certain patients were not seen by a doctor, Defendants simply cannot be said to have had the requisite mens rea to have submitted claims for medically unnecessary prescriptions, such that

39

criminal liability for such an amorphous concept may be imposed.  A judgment of acquittal should be granted on Count One of the Indictment.

## III. THE GOVERNMENT FAILED TO PROVE THAT DEFENDANTS ACTUALLY CONSPIRED TO MAKE A FALSE STATEMENT.

The Court should also enter a judgment of acquittal as to Count 1,[13] charging Defendants with conspiracy to commit healthcare fraud and wire fraud, because the Government failed to present any evidence from which the jury could permissibly find or infer that Mr. Johnston or Mr. Brockmeier agreed to make a false statement.

### A. Background

Count 1 of the Indictment charged the Defendants with conspiracy to commit wire and healthcare fraud by submitting false and fraudulent reimbursement claims to PBMs for medically unnecessary prescriptions.  Ind. ¶ 14.  While the Indictment also alleges that the Defendants engaged in other conduct, all in furtherance of the alleged fraudulent reimbursement claims—*i.e.*, preprinted prescription pads, test adjudications, failure to collect copayments, failure to perform efficacy tests or studies, and improper marketing practices, among others, Ind. ¶¶ 21, 25-28, 32, 33-35—this other conduct was, as alleged, just the "manner and means" of how Defendants carried out the specific charged fraud.

To find Defendants guilty of Count 1, then, the jury had to find beyond a reasonable doubt that the Defendants conspired to commit healthcare fraud and wire fraud—that is, that they agreed

---

[13] Because Counts 2 and 4 are either legally or factually dependent on Count 1, if the Court concludes that a judgment of acquittal must be entered as to Count 1, it must also conclude that a judgment of acquittal should be entered as to Counts 2 and 4 as well.  *See* Ind. ¶ 44 (alleging that Defendants conspired to commit identity theft "with the intent to commit, and to aid or abet, and in connection with, . . . wire fraud, health care fraud, and conspiracy to commit health care fraud and wire fraud"); *id.* ¶ 56 (alleging that Defendants conspired to transact in criminal proceeds, "such property having been derived from conspiracy to commit health care fraud and wire fraud").

to engage in a "scheme or artifice to defraud" through a "misrepresentation made in connection with the delivery of, or payment for, healthcare benefits, items or services." *United States v. Jones*, 471 F.3d 478, 482 (3d Cir. 2006). During its closing, the Government argued to the jury that it had satisfied this requirement by proving a number of false statements. The Government began with the false statements alleged in the Indictment, arguing that "the defendants made false claims to Express Scripts and other PBMs each time they submitted claims for medically unnecessary prescriptions," Tr. 3889:1-3, contending that those claims were "represented to be valid claims," Tr. 3889:4-8. But during trial, and even before, the Government shifted away from this theory, moving on to discuss a wide range of *other* supposedly false statements that, it contended, could form the basis for the fraud conspiracy. These ranged from statements on PBM recredentialing forms, to a letter to the federal government stating that Central Rexall had hired a new chief compliance officer, to applications to be part of a compounding network. Tr. 3889:19-3892:22. Indeed, at trial, and especially in its summation and on rebuttal, the Government spent more time on these false statements than it did on the allegedly false reimbursement claims.[14]

---

[14] This is consistent with the Government's attempts throughout trial (discussed further below) to paint the Defendants as generally bad actors and fraudsters, without tying that conduct to the submission of reimbursement claims for medically unnecessary prescriptions that was the basis of the conspiracy charged in Count 1. For example, the Government sought to introduce evidence that Defendants violated the Anti-Kickback Statute by paying commissions on Tricare prescriptions (ECF No. 221 at 18-39); the Court denied this motion as unfairly prejudicial non-intrinsic propensity evidence. ECF No. 249 at ¶ 5. The Government also tried to introduce evidence that Defendants altered the structure of payments to their management companies so as to cut out their third business partner, Rich Hosein. Tr. 340:24-341:19. The Court excluded and struck this line of testimony as irrelevant and unfairly prejudicial. Tr. 341:20-344:6. But as discussed further below, a large amount of prejudicial evidence that the Government promised would be relevant to the allegations in the case turned out not to be and, especially taken together, rendered the trial of this matter fundamentally unfair such that a new trial should be granted. *See* Point VIII, *infra*.

These statements give rise to both kinds of relief here at issue: they establish the insufficiency of the evidence of the actual false statements alleged in the Indictment, and they cast real doubt on whether the result of the trial here was consistent with the interests of justice. For the reasons set forth below, Defendants' motion for a judgment of acquittal should be granted; as set forth later in this brief, in the alternative, a new trial should be granted.

### B.    The Government Failed To Introduce Sufficient Evidence That The Reimbursement Claims To PBMs Were False Or Fraudulent.

The core of a violation of 18 U.S.C. § 1347 is "the defendant's acts of *misrepresentation* in connection with the delivery of, or payment for, health care benefits, items, or services." *United States v. Mattia*, 21-cr-576, 2024 U.S. Dist. LEXIS 98835, at *13 (D.N.J. June 3, 2024) (emphasis in original) (quoting *United State v. McGill*, 12-cr-112, 2016 U.S. Dist. LEXIS 63950, at *11 (E.D. Pa. May 13, 2016)). A scheme to defraud "must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." *United States v. Pearlstein*, 576 F.2d 531, 535 (3d Cir. 1978); *see also Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 528 (3d Cir. 1998) (holding that a scheme to defraud "must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension."); Tr. 3783 (Jury Instructions) ("[A] scheme to defraud is any plan, device or course of action to deprive another of money or property by means of false or fraudulent pretenses, representations or promises reasonably calculated to deceive persons of average prudence.") (quoting Third Circuit Model Criminal Jury Instruction 6.18.1341-1). Accordingly, the Third Circuit has reversed health care fraud convictions when the Government "[did] not establish . . . any type of misrepresentation by [the defendant] in connection with the delivery of, or payment for, health care benefits, items, or services." *Jones*, 471 F.3d at 481-83; *see also United States v. Paulus*, No. 15-00015, 2017

42

U.S. Dist. LEXIS 32097, at *15-17 (E.D. Ky. May. 7, 2017), *rev'd in part and vacated in part on other grounds*, 894 F.3d 267 (6th Cir. 2018) (stating that to convict a defendant under 18 U.S.C. § 1347, the Government had to prove beyond a reasonable doubt that the defendant's representation "constituted a false statement"; in other words, the Government had to "identify a statement that the defendant made which asserts a proposition that is subject to proof or disproof").

Here, there was absolutely no evidence of a misrepresentation in connection with the claims-reimbursement process. Even the Government's summation did not point to one. It stated that "[c]laims are represented to be valid claims," but never pointed to a single claim, or any other representation. Tr. 3889:4-5. It stated that the Defendants knew that prescriptions were made in the absence of a genuine doctor-patient relationship, but never pointed to evidence that Central Rexall made a representation that they were. Tr. 3889:9-12. It stated that claims were submitted for medically unnecessary prescriptions and that there was "routine non-collection of copays" and a "sham AMS discount program," but never pointed to evidence that, as part of the claims-submission process, Central Rexall represented otherwise. Tr. 3889:13-18.

To satisfy its burden, the Government simply asked Blake Stockwell, a representative of ESI, whether a reimbursement claim for a medically unnecessary drug would be a "fraudulent claim." Mr. Stockwell's response was: "Yes. That would be harder for us to see, but, yes. If it was not medically necessary, it would be inappropriate and I guess potentially fraudulent." Tr. 3182:5-9.[15] This response—elicited by the Government from a Government witness—proves the insufficiency of the Government's proofs. Although the meaning of Mr. Stockwell's statement is

---

[15] This and other questions at least potentially violated the Government's pretrial representation that "[w]e are not going to ask any witness to opine on whether there was a breach of contract. And we are not going to argue that a mere breach of contract equals fraud." Tr. 95:11-13.

not obvious—it could even mean that a claim that is not based upon medical necessity may not be fraudulent at all—at the very least it shows that whether a reimbursement claim was for a medically necessary prescription was not information that ESI asked for, needed, or obligated pharmacies to provide.  There was no box to check, blank to fill, code to enter, or space to sign in which Central Rexall represented that it was submitting a reimbursement claim for a medically necessary prescription.  At the end of the day, whether or not a prescription was medically necessary was simply not information that ESI received as part of the claims-submission process.[16]

Indeed, this became particularly clear on cross examination, when Mr. Stockwell was asked if there was a part of the adjudication process where ESI asked if there was a valid patient-doctor relationship.  Stockwell confirmed that the representation that a claims submission was "true and accurate" was "built into every claim submission that [pharmacies] make."  Tr. 3253:2-9.  The billing of a claim, he stated, "*implies* that [a valid patient-doctor relationship] exists."  Tr. 3253:11-12 (emphasis added).  And "[i]f you are billing a prescription to Express Scripts, you are representing that there is a valid patient-prescriber relationship."  Tr. 3253:15-17.  But no, he agreed, it "is not a field that would be checked."  Tr. 3253:22.  And there were similarly no boxes to be checked setting forth whether the patient actually saw a doctor, or whether a doctor was

---

[16] The same issue applies to other arguments the Government may make as to why the claims were false and fraudulent.  For example, before trial, the Government argued that Defendants "fraudulently omitted from submitted claims that Central Rexall did not collect copayments."  ECF No. 173 (Opposition to Defendants' Supplemental Brief in support of their Motions to Dismiss) at 4.  Now that the evidence has unfolded, it is apparent that Defendants could not have "fraudulently omitted from submitted claims" that they did not collect copayments, because there was nowhere for them to include that information in the first place, or at least none that the Government proved up at trial.

improperly compensated for rendering the prescription—that information, Stockwell testified, does not "exist in the data." Tr. 3253:23-3254:6.[17]

Moreover, because no evidence was produced that Central Rexall was obligated to disclose such information during the claims submission process, its failure to make that disclosure cannot constitute a false statement sufficient to satisfy the healthcare and wire fraud statutes.[18] Nor, given that this information was not requested, or inquired about, could it have been "material," also a critical element of the fraud offense at issue, discussed in further detail below. Tr. 3784:14-22 (instructing the jury that "[t]he false or fraudulent representation or failure to disclose must relate to a material fact or matter," meaning a fact that "would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement in making a decision"). But one could not reasonably expect a particular fact to be of concern to a PBM or insurer if they did not inquire about or require that information to be disclosed during the claims-submission process. *See, e.g.*, *United States v. Fallon*, 470 F.3d 542, 546 (3d Cir. 2006) (holding

---

[17] In this regard, it is notable what evidence, if it existed, the Government did *not* introduce. There was no testimony from anyone at Central Rexall who actually submitted reimbursement claims to PBMs and insurers, although those who did so were on the Government's initial witness list. There was no testimony explaining how the adjudication process actually worked—that is, what information was entered when Central Rexall submitted claims. The Government did not introduce, for example, a screenshot of a pharmacy technician's computer screen to show what a claim looked like. And while the Government did admit Central Rexall's claims data, that data did not show the substance of the claims, but were only used to form the basis for the Government's summary charts. GXs 974-978. One would expect that kind of evidence in a case alleging that these claims were false.

[18] *See* Third Circuit Model Jury Instruction 6.18.1341-1 (a defendant's "failure to disclose information may constitute a fraudulent representation if the defendant was under a legal, professional or contractual duty to make such a disclosure, the defendant actually knew such disclosure ought to be made, and the defendant failed to make such a disclosure with the intent to defraud"). This instruction was included in the Government's draft jury instructions. *See* ECF 232 at 68. During the Parties' meet-and-confer before the charge conference, the Government conceded that it did not apply and withdrew that language from its proposed instructions.

that industry custom and practice is relevant to whether particular statements are material); *United States v. Santos*, 2022 U.S. Dist. LEXIS 96693, at *11 (D.N.J. March 22, 2022) (holding that "evidence tending to disprove a prevailing market practice is relevant to what a reasonable lender might find material"). Indeed, in *Santos* this Court specifically held that "evidence that a bank form requires loan applicants to disclose their income is evidence that banks find information about income material." *Id.* So too here—evidence that PBMs do not require disclosure of the existence of a doctor-patient relationship or medical necessity demonstrates that that information is not material to their reimbursement decisions.

If there was no representation accompanying the claims that they were for medically necessary prescriptions, what is the Government's theory of how they were false statements? The Government contended that ESI's provider manual and its agreement with Central Rexall specifically required only "valid claims." Tr. 3340:5-7. So, in short, the Government contended that the Defendants breached Central Rexall's contract with ESI, which amounted to fraud, because Central Rexall made the implicit representation that each of its claims were "valid." But this theory, which was of concern to Mr. Johnston from the outset, was the reason that he moved before trial to preclude the Government from attempting to argue that a mere breach of contract can constitute healthcare or wire fraud. ECF Nos. 222, 235, 241. At oral argument on that motion, defense counsel argued that while some evidence of a breach of contract is permissible, "this case can't become a case about the breaches of contract." Tr. 95:1-4. After the Court stated that "I don't think that they're going to argue before the jury that because there's a violation of the contract, that that's somehow imputed that there should be a criminal violation," Tr. 95:5-8, the Government conceded that "we are not going to argue that a mere breach of contract equals fraud"—only that breach of contract was relevant to "whether [the Defendants] intended to defraud

46

the PBM." Tr. 95:14-17; *see also* Tr. 96:4-7 (arguing that breach of contract "directly goes to whether they had an intent to submit fraudulent claims. It also goes to materiality."). This aligned with the Government's argument in its brief that breaches of contract were probative of the Defendants' "intent to defraud, state of mind, and materiality"—but not whether there was a false statement in the first place. ECF 235 at 25. The Court concluded that "[i]t sounds like everybody is on the same page." Tr. 96:15-16.[19]

Now, however, we know that that is not the case: a great deal of the Government's case turned on Central Rexall's breach of its contracts with the PBMs. But the breach-of-contract-as-fraud theory, which all parties agreed before trial was invalid, is just as invalid now, after trial, as it was before. *See, e.g.*, *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 658 (2d Cir. 2016) ("[T]he common law does not permit a fraud claim based solely on contractual breach."); *United States v. Assad*, 2019 U.S. Dist. LEXIS 141937, at *16-17 (E.D. Tenn. Aug. 21, 2019) (omissions that constitute a breach of contract "would not be sufficient to

---

[19] In its motion *in limine*, the Government cited *United States v. Bolos*, 104 F.4th 562 (6th Cir. 2024), for the proposition that a breach of contract is sufficient to prove healthcare fraud. Whatever the persuasive value of *Bolos*—and a review of the opinion shows that the Court did *not* appear to consider or apply the requirement that the Government prove a false statement, and the defendant there may not have argued for it—the indictment in *Bolos* included numerous contract-related allegations as the basis for the charged fraud. *See United States v. Assad*, 2:18-cr-140 (E.D. Tn), ECF No. 278 (First Superseding Indictment) ¶¶ 83-87 (alleging that the defendants devised a scheme to make it appear as though they collected copays, and made materially false representations that they were collecting copays so that PBMs would not terminate their pharmacies); ¶¶ 66-74 (alleging concealment of prescriptions without a valid practitioner-patient relationship). Nor did the superseding indictment in *Bolos* even reference medical necessity. The Supreme Court's opinion in *Kousisis v. United States*, 605 U.S. __ (2025), issued on the day of this submission, does nothing to alter or limit this fundamental tenet that a breach of contract alone does not amount to fraud; rather, that case, while the undersigned counsel are still analyzing it, is clear that it is addressed to fraud in the inducement of a contract, and not any later breach thereof. *Id.* (slip op. at *8, 16-20). But, of course, this case is not about fraud in the inducement: all of the breaches alleged had to do with actions that allegedly violated the already existing agreements between the PBMs and Central Rexall.

constitute a scheme to defraud and support a charge of conspiracy to commit health care fraud"). Instead, the law is clear:  a false statement—or in this case, an agreement to make a false statement—was required.  *United States ex rel. Main v. Oakland City University*, 426 F.3d 914, 917 (7th Cir. 2005) ("[F]raud requires more than breach of promise:  fraud entails making a false representation, such as a statement that the speaker will do something it plans not to do. . . . [F]ailure to honor one's promise is (just) breach of contract, but making a promise that one intends not to keep is fraud.").

None, however, was proved.  Thus, instead of arguing that Defendants conspired to submit a false statement to a PBM or insurer, and in a stark expansion of the healthcare fraud statute's traditionally accepted scope, the Government proceeded on what was essentially an "implied false certification" theory.  The Government did not, because it could not, argue that Central Rexall obtained money or property in exchange for factually false misrepresentations as to what goods or services were actually provided to patients:  there was no allegation, let alone evidence, that Central Rexall billed a PBM for, and received payment for, a prescription that a patient did not actually receive.   Instead, the thrust of the Government's case was that, in submitting reimbursement claims to PBMs, Central Rexall *impliedly certified* that it was in compliance with all of the terms of its agreements with the PBMs.[20]  This theory has, to a limited extent, been endorsed in the Third Circuit in *civil* cases arising under the False Claims Act.  *See, e.g.*, *United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 305 (3d Cir. 2011) (holding that "a claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment" and an

---

[20] While Central Rexall had contractual relationships with multiple PBMs, including UCM and CVS/Caremark, the Government only introduced evidence about Express Scripts' claims-submission process.

*impliedly* false certification occurs when "a claimant seeks and makes a claim for payment from the Government without disclosing that it violated regulations that affected its eligibility for payment").

But while such an implied false certification theory—even assuming it applies to private contracts, as opposed to Government programs, notwithstanding the legal principle that frauds and contracts are two different things—has been applied by the Third Circuit, the Supreme Court has expressed significant concerns about its scope, noting that it could lead to issues with "fair notice [to defendants] and open-ended liability." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192 (2016). To that end, the Court held that the implied false certification theory can only be applied when "a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements" such that those omissions "render the defendant's representations misleading with respect to the goods or services provided." *Id.* at 187. A claim must not "merely request payment," but must make "specific representations about the goods and services provided." *Id.* at 190. And the defendant's failure to disclose noncompliance with other requirements must render "those representations misleading half-truths." *Id.*[21] The evidence here would not even satisfy that civil standard (which, again, has not been applied, or approved, in the criminal context). In particular, there was just no evidence that Central Rexall made any representations at all, let alone any misleading representations, in the

---

[21] In *Escobar*, the defendant submitted reimbursement claims representing that specific types of professionals rendered specific services, but failed to disclose "serious violations of regulations pertaining to staff qualifications and licensing requirements for these services." *Id.* at 184-85. Because the claims represented that the services were performed by qualified, licensed, and supervised staff, but the professionals were in fact unqualified, unlicensed, and unsupervised, the claims were allegedly false. *Id.* at 185. The Supreme Court did not address whether this sufficiently stated an implied false certification claim, but remanded for the lower courts to address that issue. *Id.* at 196.

claims-submission process.  Nor was there any record evidence at all about what Central Rexall actually was required to represent during the claim submission process, beyond the identity of the patient, the doctor and the drug, and the relevant insurance information..

Moreover, the Third Circuit has already effectively held that an implied false certification theory would be invalid if exported from the civil to the criminal context.  In *Jones*, the Court of Appeals rejected the Government's argument that the "misrepresentation" required for a conviction under § 1347 could be satisfied by an employee's "implicit promise not to steal from [their] employer."  471 F.3d at 481.  The Court held that "[t]he Government has stretched the statute to cover activity beyond its plain words" because "[t]here was simply no *type of misrepresentation* made in connection with the delivery of, or payment for, health care benefits, items or services."  *Id.* at 482.  This holding makes clear that more than an *implied* representation, of the sort that is at the core of this case, is required.  But, as the Supreme Court has held, even in the civil context, the notion of implied certifications raises profound questions of "fair notice."  *Escobar*, 579 U.S. at 192; *see also id.* at 195 (noting that "the False Claims Act is not a means of imposing treble damages and other penalties for insignificant regulatory or contractual violations").  And, of course, the requirements of such notice are always much more rigorously enforced against the Government in criminal cases.  *See, e.g.*, *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982) (expressing lower tolerance for vague criminal laws because "the consequences of imprecision are qualitatively [more] severe" than is the case with respect to vague civil laws); *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999) (the "Constitution does not permit a legislature to set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large."); *United States v. Davis*, 488 U.S. 445, 451 (2019) ("Vague laws contravene [due

50

process because] statutes must give people 'of common intelligence' fair notice of what the law demands of them."); *cf. Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939) ("No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes."). Again, this is not a case where a pharmacy sought reimbursement for a prescription that a patient did not receive, or for a different dosage. Every data point that Central Rexall actually transmitted to PBMs with an expectation of payment—who received a prescription, what they were prescribed, how many refills they were prescribed—was true.

In sum, the Government has attempted to stretch the federal fraud statutes beyond what they can reasonably bear by seeking to punish Defendants not for *actual* false statements or misrepresentations—or even for misleading half-truths—but for *implied* false statements and breaches of contract. But "[i]n the context of the myriad state-law civil claims and criminal offenses that are available to vindicate the rights of victims of deceits or mere fraudulent inducements, the Supreme Court and appellate courts have repeatedly emphasized that due process and federalism principles require the government to proceed with caution when bringing fraud prosecutions. And yet, there is a continued need for vigilance, lest prosecutors convert the fraud statutes—and the lengthy prison sentences that they can trigger—into tools to regulate good morals and business ethics." *United States v. Porat*, 76 F.4th 213, 223-24 (3d Cir. 2023) (Krause, J., concurring); *see also Kousisis*, 605 U.S. at __ (slip op. at *1-2) (Gorsuch, J., concurring) ("To prove a criminal fraud, a prosecutor must show that the victim did not receive what the defendant promised . . . it is a rule that keeps judges from becoming arbiters of good morals."). That is precisely what happened here.

51

**C.**    **Evidence Of Other False Statements Is Insufficient To Prove The Scheme To Defraud Alleged In The Indictment Or Is, In The Alternative, A Prejudicial Variance From The Indictment.**

   **1.**    **Sufficiency of the Evidence**

By its plain terms, the Indictment was only concerned with allegedly "false and fraudulent claims" that Central Rexall submitted to PBMs. Not content with that allegation—and perhaps realizing that nowhere along the way did anyone at Central Rexall actually make a false statement when submitting claims for reimbursement—the Government featured in its case-in-chief and then packed its summation with a number of *other* alleged false statements that it urged the jury to use in order to find a "false, fraudulent and deceitful representation[] . . . in this case." Tr. 3888:23-25. But this strategy raises two problems for the Government. First, the Court's jury instructions required that the Government prove at least one of the misrepresentations actually alleged in the Indictment, but none of the additional false statements were alleged as a basis for the Defendants' criminality in the Indictment. And second, none of these alleged false statements had anything to do with the Government's actual theory of criminality: the submission of false reimbursement claims for medically unnecessary prescriptions.

To be specific, in its summation, the Government began its analysis of wire fraud by considering the first element: "A scheme to defraud by making materially false or fraudulent pretenses, representations and promises." Tr. 3888:20-22. To attempt to satisfy the requirement that Defendants conspired to make a false statement and therefore demonstrate "the many false, fraudulent and deceitful representations and statements in this case," Tr. 3888:24-25, the Government raised nine purportedly false statements to which Mr. Johnston or Mr. Brockmeier were supposedly connected. Tr. 3889:19-3892:22. These statements can be grouped into the following categories, which are discussed in more detail below:

- **Statements to CVS/Caremark:** The Government argued that Mr. Johnston approved false statements to the PBM CVS/Caremark that AMS had manufacturer sponsors for its copay discount coupons, and that those sponsors would pay Central Rexall the full amount of the coupons and the pharmacy would receive full payment. Tr. 3889:19-3890:3; *see* GX 575A; GX 575B.

- **Copay Discount Program Terminology:** The Government argued that Mr. Brockmeier "told Melissa Olsen to lie when he told her not to refer to the AMS copay discount program as a copay discount program." Tr. 3890:4-6.

- **The Stalling Letter:** The Government argued that "Mr. Johnston also lied to the federal government when he approved a letter stating that Central Rexall had hired a new chief compliance officer." Tr. 3890:7-15.

- **The CVS Recredentialing Questionnaire:** The Government argued that Mr. Johnston approved responses to a CVS recredentialing questionnaire "that stated we do not have any individual sales personnel who are 1099 contractors." Tr. 3890:16-21; *see also* GX 577.

- **The Good Neighbors Termination:** The Government argued that Mr. Johnston told CVS that Central Rexall had decided to terminate its relationship with the Good Neighbors PSAO[22], when in fact Good Neighbors had terminated Central Rexall. Tr. 3890:25-3891:7; *see also* Tr. 3054:6-23, GX 566.

- **The Catamaran Application:** The Government argued that Central Rexall's application to a compounding network associated with the PBM Catamaran contained three false statements: that only half of its prescriptions were sent out of state; that its sales personnel were engaged in "only direct to physician marketing"; and that all of its formulations were obtained from reputable sources. Tr. 3891:12-25-3892:1-16.

- **Test Adjudications:** The Government argued that "every time that Central Rexall submitted a test adjudication without a valid prescription, that was a fraudulent misrepresentation because Johnston and Brockmeier promised that they would only submit valid claims." Tr. 3891:8-11.

While a few of these statements are alluded to in the Indictment, none is alleged to have

been the misrepresentation that formed the basis of a scheme to defraud. For example, while test

adjudications appear in the Indictment, they are merely listed as part of the manner and means of

---

[22] As Mr. Boyle testified, a PSAO is a pharmacy service administration organization, which is a network of independent pharmacies that negotiates on pharmacies' behalf with PBMs. They typically result in obtaining better rates for pharmacies through collective bargaining. Tr. 2365:22-2366:8.

the conspiracy, and are not themselves alleged to satisfy an element of the offense set forth in Count 1. Ind. ¶ 25. After listing these statements during its summation, the Government concluded its section on the false statement requirement by stating that "[t]his case is full of lies and deceptions that caused the PBMs to pay claims and not terminate Central Rexall from the PBM networks. The fraudulent representations caused by the defendants were communicated to the PBMs and the insurance plans, and they were responsible for tens of millions of dollars of reimbursements."

Even if the evidence presented at trial was sufficient to show that they were knowingly made and as such, a part of the subject conspiracy, this grab bag of additional false statements is insufficient to sustain a conviction, because per the Court's instructions, the jury was required to unanimously find that Defendants conspired to make a misrepresentation that was actually alleged in the Indictment. Specifically, the Court instructed the jury that "[i]n this case, the indictment alleges that the scheme to defraud was carried out by making false or fraudulent statements, representations, or claims. The representations which the government charges were made as part of a scheme to defraud [are] set forth in the indictment." Tr. 3783:11-15. The Court further explained what the Government needed to prove, and what the jury needed to find, in order for the Government to satisfy is burden to demonstrate a scheme to defraud:

> In this case, the indictment alleges that the scheme to defraud was carried out by making false or fraudulent statements, representations, or claims. The representations which the government charges were made as part of a scheme to defraud [are] set forth in the indictment. The Government is not required to prove *every* misrepresentation charged in the indictment. It is sufficient that the government proves beyond a reasonable doubt that one or more of the alleged material misrepresentations were made in furtherance of the alleged scheme to defraud. However, you cannot convict Mr. Johnston and Mr. Brockmeier of conspiracy to commit wire fraud unless all of you agree as to at least one of the material misrepresentations.

Tr. 3783:11-23.  This instruction was drawn almost verbatim from the Third Circuit's Model Jury Instruction 6.18.1341-1, which defines "Scheme to Defraud or to Obtain Money or Property."

This jury instruction therefore required the jury to convict only if it agreed on a misrepresentation that was alleged in the Indictment.  But here, the only misrepresentations alleged in the Indictment as the basis of the scheme to defraud were the reimbursement claims for medically unnecessary prescriptions.  Ind. ¶ 14.  The fact that there was no actual false statement made in connection with those reimbursement claims means that there was insufficient evidence of a false statement, and the Court must therefore enter a judgment of acquittal as to Count 1.  *See, e.g.*, *United States v. Dobson*, 419 F.3d 231 (3d Cir. 2005) (reversing convictions because while the defendant made misrepresentations, the Government failed to prove that he participated in the fraudulent scheme charged in the indictment); *United State v. Pearlstein*, 576 F.2d 531 (3d Cir. 1978) (reversing convictions due to the Government's failure to connect the fraudulent misrepresentations of the particular defendants to the overall scheme alleged in the indictment).

### 2.    Variance from the Indictment

Beyond the fact that proof of false statements not alleged in the indictment cannot amount to sufficient proof of what was alleged, a conviction on the basis of purported false statements not alleged in the indictment would also constitute an impermissible and fatal variance from the Indictment, in contravention of Defendants' fundamental Fifth Amendment right to be tried only on charges presented in an indictment returned by a grand jury.  A defendant has a "substantial right to be tried only on charges presented in an indictment returned by a grand jury."  *United States v. Syme*, 276 F.3d 131, 149 (3d Cir. 2002).  A variance therefore occurs "when the evidence at trial proves facts materially different from those alleged in the indictment."  *United States v. McKee*, 506 F.3d 225, 231 n.7 (3d Cir. 2007) (citation omitted).  A variance between the allegations in an indictment and the Government's proofs at trial amounts to reversible error if it

is likely to have prejudiced the defense. *United States v. Schurr,* 775 F.2d 549, 553-54 (3d Cir. 1985). To demonstrate prejudice from a variance, a defendant "must show (1) that there was a variance between the indictment and the proof adduced at trial and (2) that the variance prejudiced some substantial right." *United States v. Balter,* 91 F.3d 427, 441 (3d Cir. 1996). When substantial rights are affected, a verdict can stand only if "the conviction is sure that the error did not influence the jury, or had but very slight effect." *Kotteakos v. United States*, 328 U.S. 750, 764 (1946); *see also United States v. Lane*, 474 U.S. 438, 455 (1986) (concluding that errors affect substantial rights if they "cast[] doubt on the outcome of the proceeding").

Here, the Government's proofs fatally varied from the allegations of the Indictment—and prejudiced the defense—when, despite charging a conspiracy that was very clearly focused entirely on allegedly false and fraudulent reimbursement claims submitted to PBMs and insurers for medically unnecessary prescriptions, it introduced extensive proof of other allegedly false statements that were never set forth in the Indictment. In fact, the Government's summation devoted substantially more time on these other false statements than it did to the false reimbursement claims that were at the heart of the Indictment. *Compare* Tr. 3889:1-18 (reimbursement claims) *with* Tr. 3889:19-25-3892:1-22 (other false statements). This bevy of additional false statements reoriented the case from being about reimbursements for medically unnecessary prescriptions to one about bad conduct generally—which, as set forth below, at the very least requires that a new trial be granted. *See infra*, Sec. VIII.

Indeed, a review of these additional false statements discussed by the Government in its summation demonstrates that each of them had nothing to do with medical necessity, and in many instances were not even false, not material to PBMs, and/or not intended to result in Central Rexall obtaining money or property. These statements are discussed, *seriatim*, below.

56

_Statements to CVS/Caremark_:  The Government argued that Mr. Johnston approved false statements to the PBM CVS/Caremark concerning Affordable Medication Solutions ("AMS"). AMS was a company that contracted with Central Rexall to provide a "copay assistance program," which meant that it would pay a portion of patient co-pays to Central Rexall.  Tr. 2547:4-15 (Ryan Boyle testimony that AMS was "supposed to pay" a "portion of a copay that the patient didn't pay").  AMS was hired by Central Rexall with the "good-faith belief . . . that they would in fact do what they were supposed to do and pay the copays."  Tr. 2547:22-2548:3.  And Central Rexall employees reached out to AMS to "try to get them to make the payments they were supposed to" make.  Tr. 2548:4-11.  But when AMS did not make those payments, Central Rexall terminated the agreement.  Tr. 2548:12-15.

The Government's narrative ignored these facts, instead arguing that AMS was a ruse used by Central Rexall simply to reduce copays across the board.  Tr. 3865:10-18.  In its argument regarding alleged false statements, the Government argued that Mr. Johnston allegedly approved a letter stating to CVS that Central Rexall had manufacturer sponsors for its co-pay discount coupons, and that those sponsors would pay Central Rexall the full amount of the coupons and the pharmacy would receive full payment.  Tr. 3889:19-3890:3; see GX 575A (8/27/15 email from Ryan Boyle to Kyle Johnston); GX 575B (5/29/15 letter from Ryan Boyle to CVS/Caremark).  But this letter—in addition to being consistent with Mr. Boyle's understanding of the AMS program— plainly had nothing to do with whether prescriptions were medically necessary.  And there is absolutely no evidence that Central Rexall's use of AMS led to the generation of medically unnecessary prescriptions.  Whether or not a patient paid the full copay for their prescription, or whether Central Rexall collected the full copay for that prescription, is entirely separate from

whether or not that prescription was medically necessary or appropriate as determined by a physician.

*Copay Discount Program Terminology*:   The Government argued that Mr. Brockmeier "told Melissa Olsen to lie when he told her not to refer to the AMS copay discount program as a copay discount program."  Tr. 3890:4-6.  This argument was premised on DX 1110, a December 5, 2014 email from Hayley Taff to Melissa Olsen and Trent Brockmeier in which Mr. Brockmeier tells Olsen to remind people that "the supplemental co-pay insurance plan is NOT a discount card." Initially, of course, Mr. Johnston is not on this email, and there was no evidence that he had any knowledge of it.  But more fundamentally, there is no evidence that anyone outside of Central Rexall was misled or lied to as a result of this email.  For example, no evidence was introduced that referring to a co-pay assistance program as a "discount" is material to a PBM.  Indeed, there was no evidence that the email was even false—Ms. Olsen responded to Mr. Brockmeier by stating that she "didn't think it was possible" to use the AMS program to discount a cash paying customer. And finally, there is significant record evidence that the AMS program *was* disclosed to PBMs. Thus, GX 574 was an August 20, 2015 email chain in which Blake Stockwell from ESI openly discussed the AMS coupons with a Central Rexall employee, and GX 582 is a September 3, 2015 response from Ryan Boyle describing the program in further detail to Stockwell.[23]  In short, the "false statement" in this email is not connected to the medical necessity that is the lynchpin of the conspiracy alleged in Count 1; it is not false, it is not material, and the AMS program at issue was actually disclosed to PBMs.  So it certainly cannot serve as the false statement needed for a conviction on Count 1.

---

[23] It is noteworthy that there is no evidence that ESI ever sought to recoup previously paid claims that used the AMS voucher, or that ESI sought to discipline or otherwise exclude Central Rexall from its network because of its contract with AMS.

_The Stalling Letter_: The Government argued that "Mr. Johnston also lied to the federal government when he approved a letter stating that Central Rexall had hired a new chief compliance officer." Tr. 3890:7-15; _see_ GX 686A (1/27/16 letter from Baker Donelson to Office of the Assistant Secretary of Defense Health Affairs). That letter, which was voluntarily submitted by Central Rexall's outside counsel (who were not called as witnesses to explain the circumstances), provided an update on additional compliance measures undertaken by the pharmacy after its meeting with Government officials, including the requirement that Ryan Boyle attain a Certification in Healthcare Compliance, which he ultimately did, and announcing the hiring of a more experienced compliance professional, Jason Stalling. As the Government partially acknowledged during its rebuttal, this statement was not a lie—Mr. Stalling accepted the job offer, Central Rexall sent a letter stating that he had been hired, and only after the letter had been sent did Mr. Stalling renege on his acceptance. Tr. 2554:8-18; _see_ DX 485 (1/25/16 email from Jason Stalling to Ryan Boyle accepting job offer from Central Rexall); DX 487 (2/2/16 Email from Ashley Rohner to Ryan Boyle containing email from Jason Stalling stating "I apologize for not letting you know this sooner, but I decided not to take the position"). On rebuttal, then, the Government adjusted its theory and argued that Central Rexall's failure had been "not correcting th[at] fact" (although the Government's statement was misleading in that it stated that "the compliance officer was never hired," which is itself untrue—Mr. Stalling accepted the job offer). Tr. 4155:13-19. But in any event, and again, this "false statement," which was actually true when it was made, had nothing to do with medically unnecessary prescriptions. And there is, once again, no evidence that Defendants were responsible for any misimpression conveyed to the government.

_The CVS Recredentialing Questionnaire_: The Government argued that Mr. Johnston approved responses to a CVS recredentialing questionnaire "that stated we do not have any

59

individual sales personnel who are 1099 contractors" when, in fact, Central Rexall contracted with distributors who were 1099 contractors.  Tr. 3890:16-21; *see also* GX 577 (8/31/15 email from Kyle Johnston to Ryan Boyle).  This statement was true:  Central Rexall did not have any *individual* sales personnel who were 1099 contractors.  The evidence was that Central Rexall engaged sales distributor *organizations* that were composed of 1099 contractors, and had not contracted with any individual sales personnel.  *See* Tr. 2353:12-13.  So once again, the statement upon which the Government relies to argue that the defendants lied was not a lie at all.  But more critically, this statement again has nothing whatsoever to do with medically unnecessary prescriptions or, for that matter, the claims-submission process at all.

The Good Neighbors Termination:  The Government argued that Mr. Johnston told CVS that Central Rexall had decided to terminate its relationship with the Good Neighbors PSAO, when in fact Good Neighbors had terminated Central Rexall. Tr. 3890:25-3891:7; *see also* Tr. 3054:6-23, GX 566 (8/14/15 email from Ryan Boyle to Kyle Johnston and Thao Pham in which Mr. Johnston states that "[w]e recently made the decision to move away from the Good Neighbors Pharmacy Provider Network.").  But this argument is truly ancillary to the allegations of this case, in that it has absolutely nothing to do with medically unnecessary prescriptions.  And, in fact, there was no evidence at all as to why Central Rexall was terminated by Good Neighbors; the termination notice itself is silent on this point, *see* GX 530, and Central Rexall's agreement with Good Neighbors had a no-fault termination clause, *see* GXs 539; 560; 564.  Moreover, while Mr. Boyle testified that it was important for Central Rexall to be in a PSAO, *see* Tr. 2366:17-19, there is no record evidence whatsoever that Good Neighbors' termination of its agreement with Central Rexall would be material to the decision of another PSAO, or a PBM, to enter into an agreement with Central Rexall—even Mr. Stockwell's lengthy recitation of what he thought PBM would

consider "important" did not include anything about a pharmacy's membership in or relationship with a PSAO.

*The Catamaran Application*:  The Government argued that Central Rexall's application to a compounding network associated with the PBM Catamaran contained three false statements: that only half of its prescriptions were sent out of state; that its sales personnel were engaged in "only direct to physician marketing"; and that all of its formulations were obtained from reputable sources.  Tr. 3891:12-25-3892:1-16.  Of course, as with the other representations discussed here, none of these representations had anything whatsoever to do with false statements of medical necessity.  Moreover, the Government did not introduce sufficient evidence that they were even false.  The Catamaran application, DX 523, was dated January 30, 2015.  And while the Government used Chris Casseri's testimony to try to prove that statements on the application were false, Tr. 3092-94, it completely failed to show that the statements were false *at the time they were made*.  For example, the application stated that Central Rexall sales representatives engaged in direct to physician marketing, but did not disclose that Boardwalk Medical and Bill Hickman were marketing to patients directly.  Tr. 3092:24-3093:12.  But there is no record evidence that Central Rexall knew of this direct marketing in January 2015—Central Rexall did not even contract with Boardwalk Medical until January 16, 2015.  *See* Tr. 1800.  Similarly, the Government argued that the statement that "[a]ll formularies are obtained from reputable sources like PCCA or Freedom Pharmaceuticals" was false because Central Rexall received formulas—specifically, the wellness formula containing hyaluronic acid—from Hickman and other sales representatives.  Tr. 3094:1-21.  But Central Rexall did not receive that formula from Hickman until June 2015—five months after the Catamaran application.  *See* GX 501.  Finally, the Government argued that the statement on the application that 50.2% of Central Rexall prescriptions were shipped out of state was false

61

because "90 to 95 percent" of "Central Rexall's business was from out-of-state customers." Tr. 3092:4-15. But there is a critical difference between the percentage of *prescriptions* that are shipped out of state and the percentage of *business* that comes from out-of-state customers; if out-of-state customers use more expensive prescriptions, the amount of business will be weighted in favor of out-of-state customers even if the number of prescriptions is evenly split between in-state and out-of-state. In any event, there is no evidence as to *when* Central Rexall received 90 to 95% of its business from out-of-state customers—the Government introduced no evidence and elicited no testimony concerning whether Central Rexall's in-state (including its many retail customers) vs. out-of-state business was that lopsided in January 2015. Indeed, the fact is that between June 20, 2014, and December 30, 2016, Central Rexall dispensed 51,154 medications based on prescriptions from 8,193 prescribers, as indicated by a PK software-generated report, *see* Tr. 298:3-9; GX 896A, and two of the top five prescribers during this time were local doctors, *see* Tr. 301:17-23.

*Test Adjudications*: The Government argued that "every time that Central Rexall submitted a test adjudication without a valid prescription, that was a fraudulent misrepresentation because Johnston and Brockmeier promised that they would only submit valid claims." Tr. 3891:8-11. This argument fails for multiple independent reasons. For the reasons explained in Mr. Johnston's Motion to Dismiss, and in further detail below, with regard to Count Two of the Indictment, the Government's argument is false: test adjudications are not "fraudulent" because they did not themselves result—and, more importantly here, were not intended to result—in the transfer of money or property to the Defendants or from the victims of the offenses. *See* ECF 126 at 37-38 (citing cases); *Ciminelli*, 598 U.S. at 312 ("[W]e have consistently understood the 'money or property' requirement to limit the 'scheme or artifice to defraud' element because the common

understanding of the words 'to defraud' when the [wire fraud] statute was enacted referred 'to wronging one in his property rights.'" (citations omitted)); *Porat*, 76 F.4th at 218, 220 (holding that property must be the "object of the fraud" and the federal fraud statutes require a loss to a victim that is more than "an incidental byproduct of the scheme"). *See also* Sec. VI , *infra*.

In addition, the Government's argument that every test adjudication was a misrepresentation "because Johnston and Brockmeier promised that they would only submit valid claims" is an argument that the Defendants breached a contract—not that they made a misrepresentation that was fraudulent at the time it was made. *See, e.g.*, *United States v. D'Amato*, 39 F.3d 1249, 1261 n.8 (2d Cir. 1994) ("To infer fraudulent intent from mere nonperformance . . . would eviscerate the distinction between a breach of contract and fraud."); *United States ex rel. Main v. Oakland City University*, 426 F.3d 914, 917 (7th Cir. 2005) ("[F]raud requires more than breach of promise: fraud entails making a false representation, such as a statement that the speaker will do something it plans not to do. . . . [F]ailure to honor one's promise is (just) breach of contract, but making a promise that one intends not to keep is fraud."); ECF No. 222.1 (Johnston Motion in Limine Brief) at 15-16 (citing cases); Tr. 2772:24-3773:9 (instructing the jury that "an ordinary breach of contract or a failure to honor one's promise" does not "give rise to criminal liability."). Indeed, centuries ago the Supreme Court established the principle that misrepresentations about future performance come within the fraud statutes only when the defendant knows he will be unable to perform but states otherwise "with an intent to cheat" the counterparty. *Durland v. United States*, 161 U.S. 306, 313 (1896).

As the above survey of the Government's various additional "false statements" shows, none of the evidence discussed in the Government's summation concerning this element (except for the reimbursement claims discussed in Section III.B. above) had anything to do with medically

unnecessary prescriptions or the claims-submission process.  And the Government's reframing of its case away from these prescriptions and that process had a substantial and prejudicial effect on Defendants' right to fair notice of the charges against them.  Their defenses—and the Court's pretrial evidentiary rulings—appropriately focused on the submission of allegedly false claims for allegedly medically unnecessary prescriptions to PBMs and insurers.  *See* ECF No. 126 at 22-23 (moving to dismiss Count 1 and stating that "liability on Count 1 hinges on: (1) whether these various compounded medications, prescribed by physicians were, in fact, 'medically unnecessary' and, for that reason 'false and fraudulent'; and, if so, (2) whether Mr. Johnston, a lay person with no medical training, knew that these various prescribed compounded medications were 'medically unnecessary'"); ECF No. 222-1 at 11 (moving to exclude evidence of uncharged acts because "even if these acts in purportedly paying improper commissions can be properly tied to the Defendants, they will not assist the jury in determining whether the Defendants conspired to commit health care fraud, as alleged in the Indictment, by agreeing to submit false and fraudulent insurance claims for medically unnecessary prescriptions"); Tr. 99:22-100:1, *id.* 101:16-24 (excluding kickback evidence because it "is not relevant to the intent relating to the submission of false and fraudulent medically [un]necessary prescriptions" and because "there's nothing about paying commissions to salespeople [in the Indictment], although paragraph 22 references . . . commissions to salespeople, that is not in any way connected in the indictment to the reasons that the prescriptions were medically unnecessary").  The fact that *other* supposedly false statements would end up being such a significant part of the Government's theory of criminality was never disclosed to defense counsel or alleged in the Indictment.[24]

---

[24] For example, some alleged false statements were disclosed in the Government's initial exhibit disclosure but were not referred to in the Indictment at all: the letter from Baker Donelson to DHA referencing Mr. Stalling's acceptance of a job offer, GX 686A; the CVS recredentialing

To be clear, Defendants are not, in this portion of the brief, arguing that evidence of other false statements was inadmissible—that issue goes to whether a new trial should be granted and is discussed below. *See* Sec. VIII, *infra*. Indeed, in those relatively few instances in which the defense was put on notice that these other false statements would be offered, the Government was clear that they were not offered as false statements that could satisfy the elements of conspiracy to commit healthcare and wire fraud, but instead of Defendants' *intent to defraud*. For example, the Government specifically stated in its response to Mr. Johnston's motions *in limine* that it would introduce evidence that the CVS recredentialing questionnaire was "highly probative" of Defendants' "intent to defraud the PBMs." ECF 235 at 34. It was on that basis that the Court admitted these statements. Tr. 96:15-16. But then, in summation, the Government pointed to those false statement as the fraud itself, and not merely as evidence of intent. *See* supra at 52-54 (citing Tr. 3888:24-25). These various late disclosures or changes in theory were understandable given that the allegations of the Indictment were, as the trial went along, unsupported. But in addition to head-faking the defense, this bait-and-switch violated the principle that a defendant has a "substantial right to be tried only on charges presented in an indictment returned by a grand jury." *Syme*, 276 F.3d at 149. And that is simply not what happened here.

---

questionnaire response regarding 1099 contractors, GX 577; and the email from Mr. Johnston referencing Central Rexall's relationship with the Good Neighbors PSAO, GX 566. But others were not disclosed until the time of the trial itself: the statements to CVS/Caremark contained in GXs 575A and 575B were provided to the defense in the Government's February 17, 2025 exhibit disclosure. Three alleged false statements—those contained in the Catamaran application, DX 523—were disclosed to the defense in the form of GX 41, but were not introduced by the Government on direct examination; they were raised by the Government on redirect examination of Chris Casseri, Tr. 3091:11, and thus were plainly not disclosed as one of the Government's bases for conviction. Finally, one alleged false statement, Mr. Brockmeier's email about how employees should refer to the AMS copay assistance program, was not disclosed to the defense at all—it was contained in another defense exhibit, DX 1110.

In short, despite the carefully chosen language in the Indictment that this case was about "medically unnecessary prescriptions," Ind. ¶ 14, the Government expanded the case to be about Defendants' bad conduct generally, which it sought to capture in other ways. This was a fatal variance that both highlights the insufficiency of the evidence of what was alleged, and, at the very least, requires the grant of a new trial because it deceived the defense into preparing for a different case—one concerned principally with reimbursement claims for medically unnecessary prescriptions—than the one that the Government actually tried.

## IV.    THE GOVERNMENT FAILED TO PROVE THAT DEFENDANTS WERE WILLFULLY BLIND TO THE OBJECT OF THE ALLEGED CONSPIRACY.

Count 1 of the Indictment charged Defendants with conspiracy to commit healthcare and wire fraud. At trial, the Government proceeded on a theory of willful blindness, attempting to prove Defendants' guilt by referring to a series of alleged "red flags" that Defendants deliberately ignored. The Government sought and received an instruction explaining to the jury that the Government could satisfy any "knowingly" element through proof that Defendants were willfully blind. For the reasons below, however, there was insufficient evidence that Defendants were "willfully blind," and the Court should therefore enter a judgment of acquittal.[25]

---

[25] The weakness of the Government's evidence of willful blindness also justifies granting Defendants' Rule 33 motion for a new trial. As noted below, in considering a Rule 33 motion, a court may weigh the evidence and set aside the verdict if it determines that the verdict constitutes a miscarriage of justice." *United States v. Onque*, 169 F. Supp. 3d 555, 566 (D.N.J. 2015). Here, the combination of the deficient evidence described herein and the Government's incorrect description of the legal standard of the Court's willful blindness instruction during summations substantially influenced the jury's decision and merits a new trial, as set forth below. *See infra*, Sec. IVB.

## A.    Background

Count 1 charged the Defendants with conspiracy to commit healthcare and wire fraud by submitting false and fraudulent reimbursement claims to PBMs for medically unnecessary prescriptions. Ind. ¶ 14. Because the Government lacked any direct evidence that Defendants were ever told that these prescriptions were medically unnecessary or the product of bribes or kickbacks,[26] it proceeded on a "willful blindness" theory. Tr. 38:16-39:9 (Gov't Opening Statement arguing that "defendants . . . did nothing to investigate or stop" alleged fraud); Tr. 3899 (Gov't Closing Statement emphasizing willful blindness instruction and stating that "[r]ather than ask questions, the defendants stuck their head in the sand"); Tr. 3661:16-19 (arguing at Rule 29 arguments that the number of red flags that Defendants were privy to showed that they "certainly knew that there was no possible way a doctor could be conducting real evaluations of these patients with that data that they reviewed and they had available to them").

To that end, the Government's proposed Requests to Charge contained a willful blindness instruction. ECF 232 at 88. That instruction stated, in relevant part:

> To find Christopher Kyle Johnston and Trent Brockmeier guilty of conspiracy to commit health care fraud and wire fraud, you must find that the Government proved beyond a reasonable doubt that Christopher Kyle Johnston and Trent Brockmeier knew the object

---

[26] *See, e.g.*, Tr.2232:25-2233:2 (Bill Hickman testimony that he never told anyone at Central Rexall about fraud he and his representatives committed); 2154:22-2156:6 (Hickman testimony that he did not tell Central Rexall that he was paying patients); Tr.3011:15-3012:7 (Casseri testimony that he was never told about fraudulent prescriptions by Hickman); Tr.2157:6-8 (Hickman testimony that he never told Central Rexall that he gave gifts to Dr. Gaffney); Tr.2232:20-2233:2 (Hickman testimony that he learned from a patient "that [a] rep was paying cash to [a] patient" and that he never informed Central Rexall of this fact); Tr.645:3-16 (Candace Craven testimony that she did not inform Central Rexall of fraud); Tr.647:1-3 (Craven testimony to never having spoken with anyone from Central Rexall); Tr.1671:1-17 (Dr. Gaffney testimony that he never told Central Rexall of his fraud); Tr.1766:1-8 (Keith Ritson testimony that he never told Central Rexall of fraud); Tr.1504:23-25 (Matthew Tedesco testimony that he never discussed fraud he committed with Chris Casseri); Tr.3402:7-23 (Robert Bessey testimony that he did not inform Central Rexall of fraud).

of the conspiracy was to commit health care fraud or wire fraud by submitting false and fraudulent insurance claims to the Pharmacy Benefits Administrator for medically unnecessary compounded prescription medications. . . . When, as in this case, knowledge of a particular fact or circumstance is an essential part of the offense charged, the Government may prove that Christopher Kyle Johnston and Trent Brockmeier knew of that fact or circumstance if the evidence proves beyond a reasonable doubt that Christopher Kyle Johnston and Trent Brockmeier deliberately closed their eyes to what would otherwise have been obvious to them.

No one can avoid responsibility for a crime by deliberately ignoring what is obvious. Thus, you may find that Christopher Kyle Johnston and Trent Brockmeier knowingly committed a charged offense based on evidence which proves that: (1) Christopher Kyle Johnston and Trent Brockmeier himself actually or subjectively believed that there was a high probability that this fact or circumstance existed, and (2) Christopher Kyle Johnston and Trent Brockmeier consciously took deliberate actions to avoid learning or made deliberate efforts to avoid knowing about the existence of this fact or circumstance.

You may not find that Christopher Kyle Johnston and Trent Brockmeier knew the fact or circumstance if you find that Christopher Kyle Johnston and Trent Brockmeier actually believed that this fact or circumstance did not exist. Also, you may not find that Christopher Kyle Johnston and Trent Brockmeier knew the fact or circumstance if you find only that Christopher Kyle Johnston and Trent Brockmeier consciously disregarded a risk that the fact or circumstance existed, or that Christopher Kyle Johnston and Trent Brockmeier should have known that the fact or circumstance existed, or that a reasonable person would have known of a high probability that the fact or circumstance existed. It is not enough that Christopher Kyle Johnston and Trent Brockmeier may have been reckless or stupid or foolish, or may have acted out of inadvertence or accident. You must find that Christopher Kyle Johnston and Trent Brockmeier themselves actually or subjectively believed there was a high probability of the existence of the fact or circumstance, consciously took deliberate actions to avoid learning it, or made deliberate efforts to avoid knowing about it, and did not actually believe that it did not exist.

*Id.* at 88-90.

Defendants objected to this instruction, arguing that it was not applicable in this case. ECF No. 234-1 at 90-91 & n.80. Specifically, Defendants argued that the instruction should not be

given because, far from being willfully blind to whether the prescriptions were medically unnecessary, "the defendants did a great many things to try to get to the truth and try to make sure that there was a valid doctor-patient relationship and make sure that doctors were seeing patients." Tr. 3690:16-21. This included the use of doctor surveys and sales representative recredentialing forms, Tr. 3690-92, as well as the repeated calls to patients documented in the Quickbase program, JDX 131. While the Court agreed with defense counsel that the instruction was "a dangerous charge," Tr. 3695:4-16 & 24-25, it concluded that the charge was required by the Third Circuit and that it would give the willful blindness instruction because "I have to follow the law," relying on *United States v. Puccio*, No. 23-2260, 2024 U.S. App. LEXIS 22678 (3d Cir. Sep. 6, 2024). Tr. 3688-89, 3695:16-17.

### B.    Legal Argument

Willful blindness is "an alternative way of proving knowledge," and evidence of "willful blindness [may be] sufficient to prove knowledge." *United States v. One 1973 Rolls Royce, V.I.N. SRH-16266 By & Through Goodman*, 43 F.3d 794, 813 (3d Cir. 1994); *see also United States v. Caraballo-Rodriguez*, 726 F.3d 418, 420 n.2 (3d Cir. 2013). A willfully blind defendant is "one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts.: *United States v. Onque*, 169 F. Supp. 3d 555, 570, 2015 (D.N.J. 2015). A willful blindness instruction is accordingly appropriate only where the evidence supports a finding that the defendant "deliberately avoided learning" about the alleged criminal scheme. *United States v. Wert-Ruiz*, 228 F.3d 250, 252, 258 (3d Cir. 2000). Thus, willful blindness has "two basic requirements: (1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011).

Critically, of course, willful blindness is only a substitute for knowledge; it does not go to the other elements of the offense at issue. *United States v. Stadtmauer*, 620 F.3d 238, 258 (3d Cir. 2010) ("[W]illful blindness applie[s] only to the element of knowledge."). But proof of conspiracy, which was the only charge here, requires that a defendant *agree* to commit an offense with others. *See, e.g.*, *United States v. Boria*, 592 F.3d 476, 481 (3d Cir. 2010) (to prove the existence of a conspiracy, "the Government must show (1) a shared unity of purpose, (2) an intent to achieve a common illegal goal, and (3) an agreement to work toward that goal"); *see also* Tr. 3776:10-16 (instructing the jury that the Government must prove "the existence of an agreement" in order to prove a conspiracy). That is, "there must be evidence tending to prove that a defendant entered into an agreement and knew that the agreement had the specific unlawful purpose charged in the indictment." *United States v. Schramm*, 75 F.3d 156, 159 (3d Cir. 1996). Accordingly, however powerful it may be with regard to the essential element of knowledge, willful blindness cannot be used as a substitute for the *agreement* element of a conspiracy. *See United States v. Ferrarini*, 219 F.3d 145, 155 (2d Cir. 2000) ("Conscious avoidance may not be used to support a finding as to the former, i.e., intent to participate in a conspiracy, but it may be used to support a finding with respect to the latter, i.e., knowledge of the conspiracy's unlawful goals."); *United States v. Scotti*, 47 F.3d 1237, 1243 (2d Cir. 1995) ("The reason that we do not permit conscious avoidance instructions on the issue of knowing participation in a conspiracy is that it is logically impossible for a defendant to intend and agree to join a conspiracy if he does not know that it exists.").

Even more importantly, a willful blindness instruction cannot be used to meet the Government's burden of proof where the evidence supports only negligence or a lack of due care. *One 1973 Rolls Royce*, 43 F.3d at 808; *see also United States v. Martinez*, 921 F.3d 452, 478 (5th

70

Cir. 2019); *see also Wert-Ruiz*, 228 F.3d at 254 (reiterating that a finding of willful blindness requires a subjective state of mind and deliberate ignorance, not mere proximity or negligence). Courts have therefore found willful blindness instructions appropriate in conspiracy cases where where the defendant directly participated in aspects of the object of the conspiracy and the only question is whether he could have mistakenly ignored the conspiracy's criminality.  *See, e.g., United States v. Flores*, 454 F.3d 149, 156 (3d Cir. 2006) (affirming willful blindness instruction in money laundering case where defendant's response to evidence of illegality was to "dissuade[] [another party] from discontinuing suspicious financial transactions" and to "open[] accounts at other banks, stating that he needed the $2,000 per week he was being paid in cash to oversee the bank accounts").

The Court was, of course, correct here that willful blindness is a "dangerous" theory that "erodes the onus upon the government."  Tr. 3695:23-3696:4.  And that is because there is a significant risk that a willful blindness instruction might lead to a defendant being convicted for reckless or even merely negligent, rather than intentionally criminal, conduct.  *See United States v. Alston-Graves*, 435 F.3d 331, 340 (2006) (highlighting the risk that a willful blindness instruction could lower the Government's burden to prove "intentional and knowing conduct"); *see also* Robin Charlow, *Willful Ignorance and Criminal Culpability*, 70 TEX. L. REV. 1351, 1382-90 (1992) (comparing willful ignorance to knowledge and recklessness and concluding that "most definitions of willful ignorance delineate a mens rea that is the equivalent neither of knowledge nor recklessness"); Ira P. Robbins, *The Ostrich Instruction: Deliberate Ignorance as a Criminal Mens Rea*, 81 J. CRIM. L. & CRIMINOLOGY 191, 220-27 (1990) (discussing the similarity of willful blindness to recklessness and arguing that the Model Penal Code "has merely renamed recklessness with respect to existing facts in order to reach the deliberately ignorant defendant").

71

For these reasons, Courts of Appeals have consistently held that "caution is necessary in giving a willful blindness instruction." *United States v. Cassiere*, 4 F.3d 1006, 1023 (1st Cir. 1993); *see also United States v. de Francisco-Lopez*, 939 F.2d 1405, 1409 (10th Cir. 1991) (the instruction is "rarely appropriate"); *United States v. Ruhe*, 191 F.3d 376, 385 (4th Cir. 1999) (the instruction is only proper in "rare circumstances"); *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000) (the instruction is only appropriate in "rare cases"); *United States v. Inv. Enters., Inc.*, 10 F.3d 263, 269 (5th Cir. 1993) (the instruction should only be given "sparingly").

Here, the Government failed to introduce sufficient evidence to prove beyond a reasonable doubt that the Defendants "deliberately avoided learning the true facts" of the ongoing conspiracy. *Flores*, 454 F.3d at 155.  First, as the trial testimony demonstrated, Mr. Johnston did not have direct involvement in Central Rexall's day-to-day operations. For example, Mr. Johnston's responsibility for review and resolution of day to day compliance issues was passed to Ryan Boyle in April 2014.  Tr.2242:23—2243:3 (Boyle testimony that he was hired as Central's Chief Compliance Officer and Assistant Counsel).  In his capacity as President, Mr. Johnston made policy decisions, Tr.154:6-7 (Taff testified to her understanding that Mr. Johnston made policy decisions), networked to engage additional sales groups, Tr.154:3-7, and generally oversaw the expansion of Central into a national compounding pharmacy, Tr.511:12-22.  But unlike other employees, Mr. Johnston did not maintain a full-time presence at Central and received business updates typically filtered through Mr. Brockmeier.  Tr. 669:3-12 (John Mark Rolling testified to seeing Mr. Johnston about once a month).  Thus, far from averting his eyes, in the way that a showing of willful blindness requires and the Government argues, Tr. 3771:4-7, 3899:9-13, Mr.

Johnston was not, based upon the Government's own proofs, in a position to see what was occurring.[27]

And while Mr. Brockmeier certainly maintained a closer presence at the pharmacy, his role consisted of macro-level operations and oversight. As multiple witnesses recounted, the responsibility for day to day receiving and processing prescriptions fell on the individual pharmacy technicians and pharmacists. Tr. 451:9-18; 452:2-17; 661:1-3; Tr. 674:5-12; 676:2-9. Managing and overseeing individual sales representatives and their groups was the responsibility of Chris Casseri. Tr.2768:5-6. Training, compliance, and investigation and resolution of "red flags" fell within the purview of Ryan Boyle. *See* Tr. 2499:17-23 (Boyle: "Q: So one of your jobs was to be available to investigate if somebody saw something that seemed to be -- to use a word that we were talking about yesterday -- a red flag. Right? A: Yes. Q: And when people brought those red flags to your attention you in fact would investigate them. Right? A: Yes."); Tr. 2503:5-13 (Boyle Q: "if this was something that came to your attention, you would recommend that action be taken to either terminate the relevant sales employee or scrutinize them more carefully or that kind of thing. Right? A: I would make a recommendation, yes. Q: But you would make a recommendation to assure that this kind of thing didn't happen? A: Correct."). As the evidence showed, far from sticking his head in the sand or turning a blind eye, Mr. Brockmeier actively engaged with the staff when they raised issues for his review and attention; rather than ignoring

---

[27] The Government may argue that Mr. Johnston acquired knowledge of particular facts through one or more conversations with Mr. Brockmeier. But there is no evidence of what the Defendants ever spoke about on the phone. Tr. 3145:1-12 (Brooks testimony that the Government has no audio recordings of the Defendants' calls and no information about the calls' content). Accordingly, any such argument would be pure speculation and therefore impermissible. *See Mercado*, 610 F.3d at 847 (a court cannot "uphold a jury verdict based on speculation alone"); *Cartwright*, 359 F.3d at 294 ("Our case law forbids the upholding of a conviction on the basis of . . . speculation.").

what the Government suggests would be evidence of fraud, Mr. Brockmeier participated in the inquiry, memorialized his efforts by email, and forwarded the issue to the appropriately responsible party, Ryan Boyle—far from what would be expected of one who is alleged to have deliberately ignored evidence of fraud.[28]  *See* Tr. 2579:16-2580:9 (Boyle: "Q. [Brockmeier] would hear something that's going on or something would come to his attention, and he would say, so bounce 'em. Right? . . . A:  Yes.  He said that about terminating rep groups, yeah. Q:  How often do you think Trent said, so bounce 'em?  A:  I don't have a number. More than once. . . . Q:  He would say it when it was just time to show some rep group the door.  Right?  A:   Correct."); Tr. 700:15-21 (Rolling:  "Q:  During your discussion with Trent Brockmeier, was there any discussion about not taking prescriptions from Candace Craven in the future?  A:  Yes.  Q:  And did Trent Brockmeier respond to that?  A:  I believe he asked Ryan to look into it, and Ryan called Dr. Craven, from my understanding."); DX 1920 (Mr. Brockmeier advising Mr. Johnston that he will "talk with Nancy" about issues to resolve); DX 1703 (Mr. Brockmeier advising Boyle they will discuss "another issue" that arose); DX 1634 (Mr. Brockmeier replying to Nancy Cook and Boyle regarding a prescription related issue).

---

[28] Indeed, Defendants made serious efforts to implement a robust compliance program and access outside resources to ensure Boyle was supported and empowered to carry out his role.  *See* Tr. 463:17-464:6  (Taff: outside consultants assisted in developing several different standard operating policies and procedures manuals); Tr. 771:18-772:4 (Rolling was comfortable bringing concerns to Boyle's attention for follow up); Tr. 2533:18-254:8 (Boyle worked with outside counsel to develop re-credentialing surveys); Tr. 2537:18-2538:17 (Boyle worked with outside counsel to develop doctor surveys); Tr.  2491:21-2492:2492:11 and 2493:19-2494:12 (Boyle worked with outside counsel to develop compliance webinars); Tr. 2499:10-23 (Boyle testimony that he investigated red flags brought to him by others); Tr. 2530:22-2531:4 (Boyle recommendations to management largely accepted); Tr.2561:6-9 (Boyle was never told to look the other way or not to investigate); Tr. 2555:9-11 (same); Tr. 2829:17-24 (Casseri testimony that he escalated issues to Boyle).

But further, the fraudulent activity that undisputedly occurred in connection with Central Rexall—bribing doctors, paying patients, falsifying prescriber signatures—was conducted by distributors, sales representatives, and healthcare providers outside of the pharmacy's organization. There was no evidence introduced whatsoever—literally none—that Mr. Johnston or Mr. Brockmeier were ever told of these activities which, also undisputedly, occurred at significant remove from Mr. Johnston and from the pharmacy in general. Instead, the person with the most direct contact with sales representatives was Chris Casseri. Tr.1819:4-12. Casseri, in turn, communicated any suspicious activity to Central's in-house compliance counsel, Boyle. Tr.2980:18-2981:7. Boyle would triage and resolve issues before reporting the results of his investigation and recommendations to the management team. Tr.2514:19-23. And when a concrete suspicious incident was brought to Mr. Johnston's attention, the evidence at trial showed that, far from "stick[ing] his head in the sand," Tr. 3899:11, he took, advocated or supported appropriate disciplinary action. For example, when a pharmacist raised concerns that a sales representative named Kevin Linn had submitted fake prescriptions to Central Rexall, Boyle investigated, discussed his findings with upper management (including Mr. Johnston), who concluded that Linn would be monitored more closely in the future and the prescribing physician's relationship with the pharmacy would be terminated. Tr.2276:14-2277:13; Tr.2276:20-2279:23; Tr.2278:21-2279:14. Likewise, when there were concerns that sales representative Jackie Green may have been impersonating a patient, *see* Tr.2280:14-2281:12; GX 242 (Email from Boyle to Mr. Johnston raising concerns about sales representative Jackie Green), Mr. Johnston emailed Mr. Boyle indicating that Green and her husband should be terminated, Tr. 2524:11-2525:8; DX 475 (Email from Mr. Johnston to Boyle instructing that both Jackie Green and Clifford Green should be terminated). And when the pharmacy learned through a news report that someone named Dr.

75

Bolger had been issuing prescriptions without seeing patients, Mr. Johnston directed that all of the claims that the pharmacy had submitted for prescriptions submitted by Dr. Bolger be reversed, which means the insurance company was refunded at Central Rexall's loss. Tr. 2389:2-13. And the Court heard many other, similar examples.

The Government argued during its summation that Defendants were willfully blind to fraud committed by sales representatives, doctors, and patients, but its evidence was insufficient as a matter of law to establish willful blindness. Tr. 3899. As an initial matter, the Government's argument during summation actually *lessened* its burden by misstating the applicable legal standard. As quoted above, the Court's willful blindness charge properly told the jury that they had to find that the Defendants "actually or subjectively believed that there was a high probability that" "the object of the conspiracy was to commit health care fraud or wire fraud by submitting false and fraudulent insurance claims to the Pharmacy Benefits Administrator for medically unnecessary compounded prescription medications." Tr. 3768:23-3769:10. A "conscious[] disregard[]" of that risk was insufficient, as was evidence that they "should have known" or "that a reasonable person would have known of a high probability." *Id.* But the Government erroneously told the jury that the defendants should have known of the fraud because "it was obvious to anybody in the defendants' position that they were involved in illegal conduct." Tr. 3899:12-13. This was an improper restatement of the negligence standard—that someone in the Defendants' position would have known of fraud. *See Global-Tech*, 563 U.S. at 770 ("[A] negligent defendant is one who should have known of a similar risk but, in fact, did not."). And it permitted the Government to impermissibly water down what was already a "dangerous" charge. *See Alston-Graves*, 435 F.3d at 340-41 (noting risks of instruction and citing cases).

76

More specifically, the Government contended that "[t]he volume of prescriptions sent in to Central Rexall by a small number of prescribers made it impossible that they could be establishing legitimate doctor-patient relationships," citing to high volumes of prescriptions from Dr. Durgin. Tr.3899:14-18. But, as the Court will recall, there was no evidence whatsoever that Dr. Durgin committed fraud—no evidence that Durgin had ever been charged with anything or that his prescriptions were actually medically unnecessary. Indeed, no one from his practice or from Supreme Medical Solutions (the sales group associated with Durgin) ever testified.

But even with regard to the doctors as to whom there was evidence of fraud, that evidence was insufficient to support a verdict based upon willful blindness. Thus, for example, the Government argued that "Dr. Gaffney's volume could not have been legitimate." Tr.3899:19. But Gaffney had "a couple thousand" patients in his practice, Tr. 1656:16-24, worked five days a week, and could therefore see 150 patients a week, Tr.1657:1-8—which means that Gaffney's volume of prescriptions, far from being unusually high, was in fact well within the range of what was possible for a doctor who had developed a preference for specific compound medications.[29]

And much of the rest of the Government's purported proof of willful blindness had, as discussed elsewhere in this brief, *see infra* at Sec.IV, nothing to do with the lack of medical necessity supporting the prescriptions at issue—which is, after all, what the Defendants are alleged to have been willfully blind to. Tr.3768:23-3769:10 (instructing the jury that the jury must find that the Defendants "actually or subjectively believed that there was a high probability that false

---

[29] On that point, the Government's rebuttal falsely stated that "Dr. Gaffney [was] writing over 200 prescriptions a month." Tr. 4141:2. As the Government's own summary chart GX 1086 shows, the most new prescriptions Gaffney wrote in a single month was 158. And those peak months in GX 1086—June, October, and December 2015—were all months in which Central Rexall engaged in reformulations of its medications, meaning that new prescriptions from prescribers would not be "red flags" or unusual activity, but would in fact be entirely expected. Tr. 3937:7-12.

and fraudulent insurance claims were submitted to the [PBA] for medically unnecessary compounded prescription medication[s]").  Thus, the Government argued that the Defendants "were advised by consultants and lawyers to stop using 1099 sales reps and to collect co-pays. They ignored that advice."  Tr. 3900:5-7.  But this has nothing to do with the question of whether the Defendants were aware of fraudulent and medically unnecessary prescriptions, as charged in the Indictment, and it is not sufficient that the Defendants were willfully blind to bad conduct generally; they must have been willfully blind to the object of the conspiracy itself: the submission of reimbursement claims for medically unnecessary prescriptions.  Allegations that they ignored *other* alleged wrongdoing—wrongdoing that was not illegal, but merely constituted potential breaches of Central Rexall's contracts—is insufficient to satisfy the Government's burden.[30]

---

[30] In making its willful blindness argument, the Government also contended in summation that a wholly inapplicable Louisiana state statute was a red flag that should have caused Mr. Johnston to know that prescriptions were authorized without a valid doctor-patient relationship and assessment, Tr.3879:18-3880:6, while simultaneously manipulating the statute to conceal from the jury the irrelevant nature of the law, pertaining only, as it did, to electronic prescription requirements, which Central Rexall did not fill.  But the fact that the statute was inapplicable to Central Rexall's business operations underscores how this cannot have suggested to Defendants that there were red flags in the pharmacy's prescriptions.  Nonetheless, on rebuttal, the Government continued to make this, at best, disingenuous argument:

> Now we have a disagreement with the defense about whether this part of Louisiana law requires pharmacists to look for red flags.  Our reading of the statute, which Mr. Boyle sent to Mr. Johnston, again, in a pharmacy that does not have electronic questionnaires, our reading of the statute is that it tells the pharmacy that the pharmacy has to look for these things to determine if a prescription as in fact an electronic prescription.
>
> The defense has a different interpretation.  That is the kind of disagreement lawyers have all the time, the lawyers should have.  And ultimately it's up to you to look at the evidence and interpret the evidence, see if you agree with our view or their view.

78

The Government also argued that the Defendants were willfully blind because they "knew there was a federal criminal investigation into Top Tier and they continued operating the same." Tr. 3900:8-10.  But after Central Rexall received the grand jury subpoena, far from "operating the same," they terminated Top Tier almost immediately.  Tr. 2523:7-9.  Rather than being evidence of willful blindness, Central Rexall's response to the Top Tier subpoena is compelling proof  of the Defendants' proactive responses to evidence of fraud.

Finally, the Government contended that Central Rexall "received a letter from the federal government telling them their prescriptions were the result of a lack of a doctor-patient relationship, and they failed to question the doctors who were responsible for most of their prescriptions at that time."  Tr. 3900:11-15.  Here, the Government's argument is simply wrong: Central Rexall actually did send a survey to the doctors who issued TRICARE prescriptions and used its sales representatives to call the prescribers themselves to review the questionnaire.  Tr. 2390:20-2391:7 (Boyle testimony).  But more important, again, the fact is that Central Rexall *did* investigate—not just in response to this letter, and not only, as discussed above, when concerns were raised, but in connection with every prescription the pharmacy received.  The pharmacy called each patient for whom it received a prescription, as documented in the Quickbase system. *See generally* JDX 131.  This is compelling evidence that Central Rexall validated the vast majority of the prescriptions it received.[31]

---

Tr. 4135:4-16.  Not only was this an inaccurate statement to the jury, but cloaked as it was in the language of the law, which is usually a matter left to the Court, it risked hopelessly confusing the jury, a risk that may well have become a reality based upon the verdict.

[31] The Government, however, criticizes Defendants because Central Rexall did not call doctors. Tr. 3900:11-15.  But leaving aside that choosing one way of investigating rather than another does not amount to willful blindness, there is no reasons to believe that the doctors at issue, who were shown to be fraudsters specifically in regard to the representations made to Central Rexall, *see* Tr. 1591:5-1594:9 (Patel testimony that he lied to the pharmacy by signing medically unnecessary

Ultimately, the Government's willful-blindness argument seems to have been an effort to require pharmacies to engage in intensive investigations whenever there is some evidence that prescribers may be engaged in fraud, or else risk being labeled a "conspirator" of those prescribers. *See.* Tr. 3877:1-6 (Gov't summation arguing that the Defendants were guilty because, after they received a letter from the Department of Defense alerting them of a potential lack of doctor-patient relationships, they "did not bother to investigate or scrutinize their current prescribers at the time after they got that letter, most of whom were from Boardwalk, and most of whom you know were sending in prescriptions just as this letter said, without establishing the necessary doctor-patient relationship"). But even leaving aside the investigation that Central Rexall did do, this argument waters down the applicable standard in a way that reveals the insufficiency of the evidence here, focusing on the Defendants' affirmative duty to investigate potential red flags, and their purported failings in that regard instead of—as the caselaw requires—on whether the Defendants took "deliberate actions to avoid learning of" a particular fact. *Global-Tech Appliances*, 563 U.S. at 769. That is, to convict under the willful blindness standard requires not that a defendant failed to take particular investigatory steps that would provide him further information about potential red flags. It instead requires that he took affirmative steps to shield himself of that information— which is why the instruction the Court gave to the jury specifically stated that "conscious[] disregard[]" of a risk was insufficient, and what was required was instead "deliberate actions to avoid learning [of the risk], or . . . deliberate efforts to avoid knowing about it." Tr. 3769:6-10. *Cf. Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC)*, 12 F.4th 171, 185 (2d Cir.

---

prescriptions); Tr. 1666:21-24, 1669:14-23 (Gaffney testimony that he lied to the pharmacy by signing medically unnecessary prescriptions); Tr. 3401:24-3402:23 (Bessey testimony that he knew Central Rexall called patients and arranged for them to lie to the pharmacy), would suddenly have told the truth  when asked whether they had issued prescriptions in the absence of a doctor-patient relationship.

2021) (explaining the difference between "inquiry notice" and "willful blindness" and stating that "[i]nquiry notice requires knowledge of suspicious facts that need not suggest a 'high probability' of wrongdoing but are nonetheless sufficient to induce a reasonable person to investigate.").

The Government therefore failed to prove what it needed to: that Central Rexall *took* deliberate actions to avoid learning for a fact that it was receiving medically unnecessary prescriptions. The best the Government could show at trial was that Central Rexall failed to take certain investigatory actions (such as calling doctors itself, or terminating Top Tier more promptly) that it would have preferred the pharmacy take. But under the charge given to the jury and the governing caselaw, this is insufficient, and truly threatened a conviction based upon mere negligence, even in the face of the Court's instruction that it could not be. The Court must therefore enter a judgment of acquittal as to Count 1.

## V.   THE GOVERNMENT'S EVIDENCE DID NOT ESTABLISH MATERIALITY, NECESSITATING A JUDGMENT OF ACQUITTAL ON COUNTS I AND II.

Materiality is an essential element of the fraud charges in the Indictment—both the health care and wire fraud charges in Count 1, and the fraudulent use of a means of identification charge in Count 2. This required the Government to prove that the misrepresentations at issue had "a natural tendency to influence, or [were] capable of influencing, the decision of the decision making body to which it was addressed." *Neder v. United States*, 527 U.S. 1, 16 (1999) (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995)). *See also Kousisis*, 605 U.S. at __ (slip op. at *16) (reiterate[ing] 'that materiality of falsehood is an element of'—and thus a limit on—the federal fraud statutes." (quoting *Neder*, 527 U.S. at 25)); *United States v. Fallon*, 470 F.3d 542, 548 (3d Cir. 2006) (applying the *Neder* materiality standard to an analysis of mail and wire fraud in violation of 18 U.S.C.S. §§ 1341 and 1343, the basis of which was a fabricated Food and Drug Administration clearance letter used to fraudulently induce the purchase of medical devices).

81

Further, as the Court explained to the jury, "[a] misrepresentation is 'material' if it goes to the very essence of the parties' bargain." Tr.3784:20-3785:3. *See United States v. Milheiser*, 98 F.4th 935, 943 (9th Cir. 2024) (overturning mail-fraud convictions on the ground that although defendants' lies induced purchasers to part with money, the misrepresentations did not alter any essential term of the contract (i.e. "nature of the bargain")); *United States v. Guertin*, 67 F.4th 445, 454–55 (D.C. Cir. 2023) (stressing that absent a showing that the deception went to the "nature of the bargain," there is no criminal fraud); *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1176 (2d Cir. 1970), (holding that to sustain a mail-fraud conviction the misrepresentation must "go to the nature of the bargain" e.g., price, quality or essential terms). *See also Kousisis*, 605 U.S. at __ (slip op. at *16) (citing the Government's endorsement of the "essence of the bargain" standard, without deciding it).

Thus, to prove materiality, the Government had to identify a relevant requirement for payment and demonstrate that the defendants "[knew] that the [reimbursing party] consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Escobar*, 579 U.S. at 195 (noting that, "[c]onversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.");[32] *see also United States ex rel. Petratos v.*

---

[32] *Escobar* relies heavily upon *Neder* for its definition of materiality. *Escobar*, 579 U.S. at 192 (Section 3729(b)(4) defines materiality using language that we have employed to define materiality in other federal fraud statutes: "[T]he term 'material' means having a natural tendency to influence, or be capable of  influencing, the payment or receipt of money or property." (quoting *Neder*, 527 U.S. at 16)).

*Genentech Inc.*, 855 F.3d 481, 489 (3d Cir. 2017) (recognizing that *Escobar* "provided guidance as to how the materiality requirement should be enforced.  It explained that a misrepresentation is not material 'merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment . . . [or because] the Government would have the option to decline to pay if it knew of the defendant's noncompliance.'") (citation omitted).

Courts within our circuit have reaffirmed *Escobar*'s understanding that, with respect to fraudulent claim submissions, materiality hinges upon the actual behavior of a reimbursing party. *United States ex rel. Shannon v. Penn State Health St. Joseph Reg'l Health Network*, No. 21-2351, 2025 U.S. Dist. LEXIS 61769, at *16 (E.D. Pa. Mar. 31, 2025) (quoting *Escobar*, 579 U.S. at 193 n.5) (noting that "under any understanding of the concept, materiality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.'"); *United States ex rel. Behnke v. CVS Caremark Corp.*, 2024 U.S. Dist. LEXIS 60163, at *120 (E.D. Pa. Mar. 25, 2024) (noting that materiality under *Escobar* "is a 'demanding' standard that requires a falsity that is more than 'minor or insubstantial,' and is not met merely because a 'condition of payment' has been violated that would give the government 'the option to decline to pay if it knew of the defendant's noncompliance.'"); *United States ex rel. Hlywiak v. Great Lakes Educ. Loan Servs.*, 2022 U.S. Dist. LEXIS 45532, *26-27 (D.N.J. March 15, 2022) (dismissing a relator's FCA claim for failure to establish materiality under the *Escobar* standard, where a defendant failed to demonstrate that the reimbursing body "would have ceased payment to Defendants under the Servicing Contracts" if had been made aware of defendant's allegedly improper business practices); *United States ex rel. Lampkin v. Pioneer Educ.*, LLC, 2020 U.S. Dist. LEXIS 136022, *11 (D.N.J. July 31, 2020)  (reaffirming that, "[a]s recognized in Escobar, the failure to plead

materiality 'was a proper basis for a motion to dismiss.'") (citation omitted); U*nited States ex rel. Gohil v. Sanofi U.S. Servs.*, 2020 U.S. Dist. LEXIS 131083, *34 (E.D. Pa. July 21, 2020) (noting that *Escobar*'s holistic approach to determining materiality in connection with a payment decision can be distilled into three factors:  1) whether compliance was a condition of payment; 2) whether the violation "goes to 'the essence of the bargain' or is 'minor or insubstantial,' and 3) whether similar claims are declined when the reimbursing party has actual knowledge that the claims are "tainted by the same kind of violation.") (citation omitted).  To establish materiality, then, the Government had to show that alleged misrepresentations actually influenced the reimbursement of Central's claims and that similar claims had been consistently rejected because of those alleged misrepresentations, which went to the essence of the parties bargain.  *Cf. United States v. Care Alt.*, 81 F.4th 361, 366-67 (3d Cir. 2023) (applying both the "actual behavior of the recipient" standard and "essence of the bargain" analysis to determine that a "reasonable jury could conclude, based on the evidence presented," that the violations resulted in decisions to reimburse fraudulent hospice claims, therefore establishing materiality).

In this case, the Government attempted to carry its burden to prove materiality through the testimony of  Blake Stockwell, a senior manager in the pharmacy special investigations unit at PBM Express Scripts.[33]  The Court permitted testimony, as to "what a reasonable pharmacy benefit manager would find material to decisions to reimburse prescription drug claims and maintain an ongoing relationship with a pharmacy network."  Tr. 3159:16-22.  At trial, however, Stockwell

---

[33] Stockwell was initially proposed as a lay witness regarding the materiality of purported false claims at trial. ECF No. 221 pp. 50-52, but the defense objected and the Court held that such testimony had to come from an expert,  ECF No. 249 ¶ 2 (denying "the aspect of the government's motion in limine to "[p]ermit the use of hypothetical questions to elicit testimony from a fraud victim about what information was material (ECF No. 221 pp. 50-52)"; Tr. 77:16-78:5 (motion hearing  after which the Government noticed Mr. Stockwell as an expert witness on the subject).

repeatedly offered statements that fell short of establishing materiality, even as a civil matter, as defined by *Escobar* and its progeny.

Initially and as part of the inquiry into his qualifications to testify as an expert, Stockwell stated that he was aware of what a PBM "would find important in deciding to maintain an ongoing relationship with a network pharmacy" or reimburse a claim because of conversations with counterparts at other PBMs. Tr.3156:16-19. And, consistent with that scope of his expertise, during his direct testimony, Stockwell repeatedly testified about what "would be important" to PBMs:

- Tr.3206:20-3207:1 ("Q. Did Central Rexall ever tell Express Scripts it was collecting only 31 percent of its co-pays? A. No, sir. Q. Was that an important fact to Express Scripts? A. Yes, Sir. Q. Would that be an important fact to any reasonable PBM? A. Yes, Sir.");
- Tr.3214:25-3215:9 ("Q. did Central Rexall ever tell Express Scripts that AMS was not a legitimate coupon program? A. No, sir. Q. And was that an important fact for Express Scripts to know? A. Yes, sir. . . .");
- Tr. 3221:18-20 ("Q. [] [W]ould you be concerned about both the extent of the unpaid co-pays and the percentage of unpaid co-pays? A. Yes, sir.");
- Tr. 3221:21-3222:5 ("Q. Did you have information at this time that Central Rexall had thousands of unpaid co-pays? A. No, sir. Q. Would that information have been important to you?");
- Tr.3226:19-3227:19 ("Q. Did Central Rexall tell you that they had used persons to market to individual members in 2015?. . . And was getting a truthful answer to this question important? A. Yes, sir");
- Tr.3234:5-8 ("Q. Would a reasonable PBM consider it important to know that prescriptions were signed without there being a valid doctor-patient relationship? A. Yes, sir.");
- Tr.3234:9-11 ("Q. Is the existence of a valid doctor patient relationship important to a reasonable PBM's decision to pay claims? A. Yes, sir.");
- Tr.3234:12-15 ("Q. Would a reasonable PBM consider it important to know that a doctor signed a prescription without examining a patient to determine if the patient needed the medication? A. Yes, sir.")
- Tr.3234:16-20 ("Q. Would a reasonable PBM consider it important to know that a doctor was paid or otherwise compensated for signing a prescription other than the normal payment for an office visit or examination? A. Yes, sir");
- Tr. 3234:21-24 ("[Q.] Would a reasonable PBM consider it important to know that a pharmacy paid a commission to a sales representative for a prescription that the sales representative received? A. Yes, sir.")
- Tr.3234:25-3235:4 ("Q. Would a reasonable PBM consider it important to know that a pharmacy paid a commission to a sales representative for a prescription that the sales representative's family member received? A. Yes, sir.");

- Tr.3235:5-9 ("[Q.]Would a reasonable PBM consider it important to know that a pharmacy paid commissions to a [] percentage of the insurance reimbursement amount to nonemployee 1099 sales representatives? A. Yes, sir.");
- Tr.3235:17-23 ("[Q.] Would a reasonable PBM consider it important to know that a pharmacy had submitted false test claims? A. Yes, sir");
- Tr.3235:24-3236:3 ("[Q.] Would a reasonable PBM consider it important to know that an ingredient in a compound medication was increased solely to increase the reimbursement and without any evidence of a medical benefit? A. Yes, sir");
- Tr.3236:7-12 ("[Q.] Would a reasonable PBM consider it important to know that a pharmacy was using a co-pay discount program but was not collecting the difference between the required co-pay and the amount charged to the patient from the discount program provider? A. Yes, sir"); and,
- Tr.3236:13-15 ("[Q.] Would a reasonable PBM consider it important to know whether a pharmacy was truthful in responding to questions? A. Yes, sir").

The phrasing of these questions and of Stockwell's answers is critical: each and every one of them turn on what would, for a PBM, be "important to know." But, "important to know" is simply not the legal standard: the legal standard turns on whether each of these facts would lead, or—and this is critical under *Escobar*—had led, a reasonable PBM to decline reimbursement of similar claims, as well as whether these facts went to the "essence of the bargain" between Central Rexall and the PBM such that they would affect whether the relationship between the pharmacy and the PBM should continue. But those questions were not what was asked of Stockwell, and were not addressed in Stockwell's answers. Nor even was Stockwell asked, and he did not opine, that it was "important to know" the things about which the Government was asking in order to determine whether to pay, or to maintain the contract between the PBM and Central Rexall. He certainly did not opine on Express Scripts' history of declining to pay claims based upon those facts—exactly the kind of evidence based upon which courts evaluate whether the essential element of materiality has been satisfied. *See, e.g.*, *Genentech Inc.*, 855 F.3d at 489 (materiality may be established where it is shown that a reimbursing party "consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement"); *Great Lakes*, 2022 U.S. Dist. LEXIS 45532, at *26-27 (dismissing a

relator's FCA claim where the proofs failed to demonstrate that the reimbursing body "would have ceased payment to Defendants under the Servicing Contracts" if it had been made aware of defendant's allegedly improper business practices).

Thus, as just one example, Stockwell testified that Central's co-pay collection rate would be important to a "reasonable PBM." Tr.3206:20-3207:1. But the Government failed to set forth at what point a PBM would, based upon that rate, either refuse to pay claims or terminate its contract with Central Rexall. And the same is true of the other business practices into which the Government inquired of Stockwell, none of which were identified by Stockwell as going to the "essence of the bargain" between Central Rexall and the PBMs. Not only did those words not appear in the questioning of Stockwell, even though they were already in the proposed jury instructions, but on their face, the practices identified did not bear upon the fundamental nature of the business relationship between pharmacy and insurer or PBM: the pharmacy provides products (which, it is undisputed, Central Rexall did) and the PBM pays for them. *See, e.g.*, Tr.758:10-759:9 (testimony of John Mark Rolling indicating that legitimate prescriptions result in products being sent to patients).

In sum, Stockwell failed to meet the standard for materiality set forth by *Escobar* and its progeny. The "materiality standard is demanding," as it must be in order to prevent "punishing garden-variety breaches of contract or regulatory violations." *Escobar*, 579 U.S. at 191. Stockwell provided general statements of importance, testifying that a reasonable PBM would find a number of Central's business practices important to reimbursement decisions. However, the relevant standard does not ask whether a PBM believes a fact to be important in some general sense. Rather, the standard asks whether the fact presented has actually—and consistently—given rise to a PBM's decision not to reimburse similar claims, or not to continue to do business with the pharmacy, and

whether that fact goes to the essence of the bargain between the pharmacy and the PBM. Stockwell's statements did not answer that inquiry and no other evidence whatsoever was introduced on this subject. Therefore, Stockwell's testimony leaves the Government's proofs fundamentally lacking. A judgment of acquittal must therefore be entered, on this basis alone, on Counts 1 and, as set forth below, 2.

## VI. NO RATIONAL JURY COULD FIND THAT DEFENDANTS CONSPIRED TO COMMIT IDENTITY THEFT THROUGH THE FRAUDULENT USE OF TEST ADJUDICATIONS.

### A. Legal Standard

Under 18 U.S.C. § 1028(a)(7), the Government was required to prove that Defendants: "[k]nowingly transfer[ed], possess[ed], or use[d], without lawful authority a means of identification of another person with the intent to commit…any unlawful activity…". The Third Circuit has held that "two essential conduct elements under § 1028(a)(7) are transfer, possession, or use, and doing so in connection with a federal crime or state felony." *United States v. Auernheimer*, 748 F.3d 525, 535 (3d Cir. 2014). "Means of identification" is defined as "any name or number that may be used . . . to identify a specific individual" and specifically includes an individual's "name, social security number, [or] date of birth." 18 U.S.C. § 1028(d)(7). However, the Supreme Court has held, in connection with 18 U.S.C. § 1028A, the Aggravated Identity Theft statute, that:

> A defendant "uses" another person's means of identification "in relation to" a predicate offense when this use is at the crux of what makes the conduct criminal. To be clear, being at the crux of the criminality requires more than a causal relationship, such as facilitation of the offense or being a but-for cause of its success. Instead, with fraud or deceit crimes like the one in this case, the means of identification specifically must be used in a manner that is fraudulent or deceptive.

*United States v. Dubin*, 599 U.S. 110, 131-32 (2023).

88

Mr. Johnston, joined by Mr. Brockmeier, has previously argued that the holding in *Dubin* applies with equal force to the statute at issue in this case in Count 2, 18 U.S.C. § 1028(a)(7).  This Court has thus far rejected that argument, holding that that "the rules of statutory interpretation do not support" extending *Dubin* to  § 1028(a)(7).  ECF No. 187 at.5.  But beyond statutory interpretation, the Court also rejected the defense argument that test claims "were not fraudulent and not at the 'crux' of the underlying criminal conduct." ECF No. 187, pp. 7-8.  Now, however, after weeks of trial and based upon the record presented, it has become abundantly clear that test adjudications were, in fact, not at the crux of the fraud, as the Government argued during pretrial motion practice.[34]  Accordingly, Defendants respectfully request that the Court reconsider its October 24, 2024 Order, despite not having charged the Jury in accordance with *Dubin*, and in order to preserve this issue for further review, if necessary.

To satisfy *Dubin*'s "but-for" or, "at the crux" test, a court must determine that: (1) the means of identification itself "must be a 'key mover' in the predicate crime[,] that is, it must play some integral role in the success of the scheme";  and (2) the government must show, where, as here, the predicate offense is fraud, that the fraudulent use is "at the locus of the criminal undertaking, rather than merely passive, passing, or ancillary employment in a crime." *United*

---

[34] *See* Government's Brief in Opposition to Defendants' Pretrial Motions, ECF No. 137 at 37-38 ("The defendants used false test adjudications to design and manipulate combinations of ingredients both to obtain the highest possible insurance reimbursement, and to identify high-reimbursing substitute formulas when insurance companies stopped covering certain formulas…This deception–centered on the identity of the individual-enabled Central Rexall to continue billing for medically unnecessary prescriptions."); Sept. 30, 2024 Tr. 86:20-23 (Mr. Friedman: "Why did the defendants submit these claims using people's identity without their permission?  Well, they did it to gather valuable information then turn that into a sizable profit."); *id*. at 87:3-8 (Mr. Friedman: "And I'm going to largely rest on our cases as far as why this is the crux.  But I think here it goes to why they were getting this information.  They were getting this information to design the medications which they then put  on prescription pads, disseminated to their sales reps and got back in and made the claims.").

*States v. Omotayo*, 132 F.4th 181, 194 (2d Cir. 2025)) (citing *Dubin*, 599 U.S. at 123.) "[H]owever … regardless of which verb is at play, a 'means of identification' must do more than facilitate[] or further' the predicate offense—it must be 'at the crux of the criminality.'" *Id*. at 195 (citation omitted).

### B. The Government Failed To Prove That Test Adjudications Were In Fact The Crux Of The Underlying Fraud Offense.

The Government alleged that, as part of Defendants' conspiracy to commit health care and wire fraud, they used test claims to determine what the insurance coverage would be, including for any new, specified combination of ingredients. Ind. ¶ 25. It was further alleged that, through the use of test adjudications, Defendants "knowingly conspired to cause and caused the transfer, possession and use of a means of identification of other persons with the intent to commit, and to aid or abet, and in connection with, any unlawful activity [namely] conspiracy to commit health care fraud and wire fraud." Ind. ¶ 44. According to testimony, the test claims contained patients' identifying information such as patient names, dates or birth, and insurance information. Tr. 680:21-22 (Rolling direct: "They would need a patient's – patient's name, date of birth, a formula and then a doctor as well."). Nonetheless, for the reasons set forth below, the Government failed to prove the elements of Count Two beyond a reasonable doubt.

First, assuming the applicability of *Dubin*, and as previously stated in Mr. Johnston's pre-trial motions, ECF No. 126-1, the agreed-upon conduct alleged in the Indictment, *i.e.*, the use of test adjudications in order to ascertain whether and to what extent a prescription would be covered, was not the crux of the fraud alleged, which was to submit medically unnecessary prescriptions. Mr. Johnston briefed this point at the outset as part of a pre-trial motion to dismiss, based upon the face of Indictment. ECF No. 126-1 at 53-54. But now, after six weeks of trial, including all of the

testimony elicited and exhibits introduced by the Government, it is clear that the defense argument was correct.

Indeed, the Court now knows, as it could not before trial, that test adjudications were not a "key mover" or "at the crux" of the scheme charged by the Government and described in its proofs. As presented at trial, the Government's theory of fraud depended upon dishonest salespeople who not only marketed and sold the compound products at issue but more significantly located and compensated corrupt doctors, who were willing to sign prescriptions, sometimes without even seeing the patients (which patients were, in some circumstances, compensated,). Tr. 36:8-18 (Government's Opening: "So they had the operation, but now they needed doctors to sign these prescriptions…Well, defendants found equally greedy sales representatives around the country."), Tr. 37:8-23 (Government's Opening: "Now, you were wondering how did these sales reps get doctors to sign the prescriptions.  You will hear about how the temptation of these big commissions led the sales reps to find doctors who would agree to sign unnecessary prescriptions…The sales reps found corrupt doctors who signed prescriptions for – that patients did not need, sometimes because the sales reps paid the doctors to sign them. The sales reps also found people with insurance that covered Central Rexall's medications, and patients would agree to get the medicine, even though they didn't want them, sometimes because the patients themselves were paid."); Tr. 3852:4-8 (Mr. Friedman's Summation:  "You heard that Hickman and Tedesco and their subreps paid people to get compound medications."). But none of these fundamental elements of the scheme, which the Government argued the defendants should have been aware as a result of the "red flags" discussed at length above, *infra*, Sec. II(D)(ii), were the least bit dependent upon the test adjudications at issue in Count 2.  Nor, even, were the test adjudications necessary to that aspect of the "scheme" which served to generate the high reimbursements from insurance

91

companies that the Government asserted was a "key mover" of the scheme.  Rather, as described below and confirmed by the Government's own witness, this scheme could have effectively relied on the Average Wholesale Price ("AWP") to determine the amount of coverage for each product, again underscoring that the submission of test adjudications was not at the crux of the fraud.  Tr. 3263: 6-18. (Stockwell:  "you could figure out if the claim is covered, what you would get paid.").

There was, of course, evidence that test adjudications were in fact conducted by Central Rexall and even that Defendants knew about that (though, as discussed above, there was no evidence as to what Mr. Johnston or Mr. Brockmeier understood them to be).  Specifically, Central Rexall employed adjudicators whose role was to take a patient's incoming information from a customer service rep and upload it into the system.  Tr. 862:3-863:4 (Olsen direct).  Adjudicators would use a computer system to type in the drug, the SIG, the patient's name, date, and the physician, before they would submit a claim to an insurance company for approval.  *Id*.  The insurance company would inform Central Rexall whether the individual drugs were covered as well as the reimbursement for the medication.  *Id*.  That process took place with regard to every prescription: indeed, the Government's expert testified that test adjudications, or "test claims," are routinely conducted to check if a patient's insurance covered the medication.  Tr. 3174:3-10 (Stockwell: "Q: In your experience, why do pharmacies submit test claims? A: I think legitimately what can happen is, you know, a patient is unsure whether or not they want to receive a prescription that they have gotten from a doctor.  It may be too expensive.  It may not be something they've decided is right for them.  In that case, a pharmacy can bill a claim just to see how much the co-pay would be or if the drug is covered.").  Central Rexall was no different.  Tr. 758:6-21 (Rolling: "Q: Okay. Now, tell me this: In your experience, and you can focus on Central Rexall, there are times, aren't there, when a legitimate prescription gets submitted to an insurance company for

adjudication….A: Yes. Q: And the adjudication comes back and indicates to the patient, for example that the product will not be covered.  That happens. Right? A: Yes.  Q: And under those circumstances, the patient may decide not to proceed with the prescription because they can't afford it.  Am I right? A: Correct, correct.").

But that said, there was also evidence that, on an unknown number of occasions, Central Rexall went through this process as a "test adjudication," *i.e.*, not because there was an actual prescription but as a "price check" of sorts.  Tr. 678:21-25 (John Mark Rolling testified that "[test adjudication is] sending a claim to an insurance to see what the insurance will pay or how much they will pay for the medication"); Tr. 679:4-6 ("Q: And how were test adjudications used at Central Rexall? A: They were used to see reimbursement, how much something would reimburse for."); Tr. 865:2-10 (Olsen direct: "Being able to identify what medications were and were not on the formulary for an insurance company, a specific insurance company, took a lot of work.  This was very quick and easy way to get a response, instead of the manpower it would have taken to try and drag it out of the insurance companies as to what they would cover…I mean, we weren't really hurting anyone.  And we definitely reversed the claims back out…").

The Government's theory, of course, was that some of the products that Central Rexall marketed were based upon formulas that were created for their insurability and the amount of their reimbursement.  But the Government did not seek to prove, and did not in fact show, how many of the products at issue were the subject of test adjudications, let alone that it was all of them; nor even, did it point to even a single claim that was based upon the results of a test adjudication.  And the evidence was clear that many of the products on Central Rexall's preprinted prescription pads were, in fact, never the subject of a test adjudication.  *See, e.g.,*  Tr. 761:8-14 (Rolling: "Q: And so the formulas that you used were formulas that were derived from the research that you could do

93

or others could do based on these resources like PCCA. That was on? A: Correct. Q: And Freedom Pharmaceuticals might be another? A: Yes.").

Nor, in any event, is it clear that in even those cases in which test adjudications did take place, it was for fraudulent purposes, instead of in order to serve patients, who could not and would not purchase these pharmaceutical products at issue unless they were covered by insurance at all, or to an extent that made the product affordable to the patient given the amount of the co-pay— the amount of which was one of the facts that would be learned from test adjudications. *See, e.g.*, Tr. 173:7-11 (Taff direct: "…So we would test whether the patient's insurance would – the PBM would cover prescription or not[.]"); Tr. 758:14-759:9 (Rolling cross: "Q: And the adjudication comes back and indicates to the patient, for example, that the product will not be covered. That happens, right? A: Yes. Q: And under those circumstances, the patient may decide not to proceed with the prescription because they can't afford it. Am I right? A: Correct, correct. Q: There are times as well when the adjudication comes back and it indicates that there's going to be a high co-pay…and under those circumstances it happens at times, doesn't it, that the patient decides not to proceed with the – with the prescription. Right? A: Correct, yes. Q: So it's sort of like – that adjudication under those circumstances is sort of like the patient checking the price. Right? A: Yes."); Tr. 684:5-10 (Rolling direct: "Q: Are there other reasons why Central Rexall might reverse an adjudication claim? A: Yes Q: Can you give a couple of examples? A: A lot of times if the co-pay came back too high[…]"); Tr. 3168:23-3169:8 (Stockwell direct: "So sometimes patients don't want a prescription or the co-pay gets disclosed to them and they decide to choose to get something else. So claims are pretty regularly reversed occasionally for those reasons….").

Under these circumstances, and for these reasons, test adjudications could not have been at the crux of the fraud, in the way that crux is defined in the cases that have applied *Dubin*. *See,*

*e.g.*, *United States v. Diarra*, Nos. 22-3232, 23-1405, 2025 U.S. App. LEXIS 2108 (3d Cir. Jan. 30, 2025) (upholding aggravated identity theft and wire fraud conspiracy convictions where defendants purchased stolen credit and debit card numbers from the dark web and attempted to withdraw funds from those accounts because "misrepresenting others' identities to creditors and banks is at the 'crux of the underlying criminality,' which is the bank and access fraud."); *United States v. Omotayo*, 132 F.4th 181 (2d Cir. 2025) (holding that the evidence at trial never showed that defendant used a fraudulent invoice with the name and identifying information, was "at the crux" of the fraud and the invoice "was not a central part of the conspirators' scheme," and that even if the fake invoice marginally advanced the conspirators' fraud *Dubin* requires "more than…facilitation of the offense[.]"); *Randall v. United States*, No. 5:16-cr-00518, 2024 U.S. Dist. LEXIS 95856, at *9-10 (E.D. Pa. May 29, 2024) ("Randall's fraud was perpetrated by not only depositing invalid checks but misrepresenting to the banks *who* was depositing and cashing the checks in order to obfuscate his identity and further his fraudulent scheme. Therefore, not only did Randall act without 'lawful authority' in using other persons' identities to defraud banks, but the use of their identities was also at the 'crux' of what made his conduct criminal, as he specifically used the identities in a way that was fraudulent and deceptive."); *United States v. Carter*, No. 21-CR-00681-NSR-1-2, 2024 U.S. Dist. LEXIS 212857, at *14-15 (S.D.N.Y. Nov. 21, 2024) ("Defendants initially used their own information and were barred from using their SSN twice, thus necessitating a continuous stream of personal information to obtain EIDL funds. Without the flow of personal information, the Defendants would have not been able to commit the wire fraud.").

Moreover, the test adjudications could not have been the crux of the matter, given that, as the evidence was developed at trial, Central Rexall did not even need to use test adjudications to

determine how a medication would be reimbursed. Instead, as the evidence showed, they could do so by analyzing publicly available Average Wholesale Price ("AWP") information. *See* Tr. 599:25-600:5 (Taff redirect: "Q: And are there a way to – are there ways to estimate the cost of NDCs that do not involve test adjudications? A: Yes. So you can – you can check the listed AWP, the average wholesale price, which are published in a – I think it's called the Blue Book, but there – and the wholesalers would also have that information available."). Government witness after Government witness testified that the AWP, which was set by the PBM or manufacturer, was a perfectly acceptable, reasonable, and obviously legal way of determining a formula's reimbursement. Thus, for example, pharmacist John Mark Rolling testified that compound formulas only have a "couple of price points:, the AWP and the pharmacy's own cost. Tr. 764:11-23. Specifically, Rolling testified, a formula's AWP, informs a pharmacy what to "expect to receive from an insurance reimbursement[.]" *Id*.; Tr. 690:3-13. Rolling even testified that when asked to run test adjudications, he started "to give cost and expected reimbursement data," demonstrating that test adjudications were not the crux of the underlying fraud offense. Tr. 740:15-18. Likewise, Pharmacist Melissa Olsen testified that the AWP, which is a set by an ingredient's producer and provides the market value of the ingredient, is not only a good way of predicting a reimbursement amount but actually was "usually used to determine how much [the formula's] reimbursement [was] going to be." Tr. 907:19-23; Tr. 941:19-942:9. Finally, the Government's own expert, Blake Stockwell, testified to the importance of the AWP in determining reimbursement rates. Stockwell explained that, if the ingredients in a compound medication were covered, a pharmacy would receive a percentage of the value of the drug. Tr. 3171:18 –3172:7. Importantly, Stockwell confirmed what Defendants have long known, that test adjudications was

not a "key mover" in the fraud as Stockwell testified that "you could figure out if the claim is covered, what you would get paid[.]" Tr. 3263: 6-18.

Government Exhibits were to the same effect, showing that Central Rexall repeatedly used the AWP to determine its potential reimbursement. Government Exhibit 331, for example, was an email in which Rolling informed Mr. Johnston that he would create a formulae and compare the AWPs. (In that same email, Rolling informed Johnston that they should not run an adjudication without a valid prescription, to which Johnston replied, "good point[.]"). Similarly, in Government Exhibit 141 Brockmeier requested that Rolling seek reimbursement data for a particular formulation, to which Rolling responded that "[i]ts basically our same migraine formula with the addition of promethazine. Reimbursements should be similar. Promethazine AWP is 0.1415/gram and Ondansetron is 0.0199/gram." Finally, Government Exhibit 144 is another email exchange between Rolling and Brockmeier in which Rolling responded to Brockmeier's question about a particular formula's reimbursement, stating "[i]t is a base similar to ActiveMax. Through Medisca. Cost is 0.088 and AWP is 3.2."

Indeed, the AWP was even used to inform Central Rexall of the reimbursement for hyaluronic acid, making the need for test adjudications unnecessary, and thus, not the crux of any fraud on this issue, which was such a central part of the Government's case—obviously something that the Court could not and did not know before trial, when it rendered its opinion on Mr. Johnston's motion to dismiss. Thus, Government witness Melissa Olsen testified that that she already knew hyaluronic acid's reimbursement through the AWP. Tr. 907:12-18 ("Q: And what did you mean when you said the AWP for hyaluronic acid is ridiculous? A: Yea. I felt like $2,500 per gram is exorbitant. I don't know that I would pay that amount for any particular medication, but based off of the other medications that we were billing for, its AWP was extremely high

compared to some of the other medications we were making."); Tr. 942:6-9 ("And from your perspective, the average wholesale price is a good way of predicting what the reimbursement is going to be. Right? A: Correct.").

For all of these reasons, it is obvious that the test adjudications were not, as the Government promised pre-trial, at the crux of the fraud theory actually advanced at trial. With this perspective, Defendants respectfully request that the Court revisit its holding as to the applicability of *Dubin,* and having done so, grant this motion for a judgment of acquittal on Count Two.

### C.    The Government Failed To Prove That There Was Any Scheme Whereby Property Was To Change, Or Did Change, Hands As A Result Of The Test Adjudications.

But even if this Court were to determine that test adjudications were somehow at the crux of the fraud alleged in this case, or that this is not a required element of the offense, Count Two still fails as a matter of law. That is because there is no evidence at all that the individuals whose identifying information was used to run a test claim, or anyone else, was deprived of property as a result of these actions, leaving a fundamental element in the Government's fraud allegations completely unproven.

To start, fraud is an element of identity theft. Indeed, as this Court's jury instructions made clear, Count Two, which specifically alleged a "conspiracy to commit identity theft by fraudulently using a means of identification," the jury must find, among other elements, two or more persons agreed to commit identity theft by fraudulently using a means of identification in connection with an offense against the United States, and that he was a party to or a member of that agreement to commit identity theft by fraudulently using a means of identification in connection with said offense. Tr. 3790:8-19 (Jury Charge); *see also United States v. Sacks*, No. 08-629 (GEB), 2009 U.S. Dist. LEXIS 109094, at *12 (D.N.J. Nov. 23, 2009) (when a defendant was charged with

98

committing mail fraud, wire fraud, and aggravated identity theft, the court held "[t]he fraud offenses require that the Government, at trial, prove beyond a reasonable doubt that Defendant had the 'intent to defraud,' which means 'to act knowingly and with the specific intent to deceive, for the purpose of causing some financial or property loss to another.'")(citation omitted); *United States v. Lucas*, No. 14-52 (FLW), 2015 U.S. Dist. LEXIS 59644, at *8 (D.N.J. May 6, 2015) ("To prove wire fraud, the Government must establish the following three elements: '(1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of . . . interstate wire communications in furtherance of the scheme.'") .

Because fraud is an essential element of the offense alleged in Count Two, under either of the predicate acts, the Government was required to show that the scheme at issue—here, the identity theft, alleged to have been perpetrated through the test adjudications—was intended to deprive the victim of the offense or result in the payment of money or property to the defendants. Specifically,  under the wire fraud statute, "[a]lthough the statute is phrased in the disjunctive, [the Supreme Court has] consistently understood the 'money or property' requirement to limit the 'scheme or artifice to defraud' element because the 'common understanding' of the words 'to defraud' when the statute was enacted referred 'to wronging one in his property rights.'" *Ciminelli v. United States*, 598 U.S. 306, 312 (2023) (citation omitted).  As the Supreme Court has just reiterated, federal fraud requires that a defendant have "had 'money or property' as an object of his fraud." *Kousisis*, 605 U.S. at ___, slip op. at *5 (citing *Ciminelli*, 598 U.S. at 312, and *Kelly v. United States*, 590 U.S. 391, 398 (2020)). And the healthcare fraud statute is the same, criminalizing "whoever knowingly and willfully executes or attempts to execute, a scheme or artifice: (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations or promises, any of the money or property owned by…any

health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services." 18 U.S.C. § 1347(a); *see United States v. Pierre*, 2023 U.S. Dist. LEXIS 119742, at *5-6 (S.D.N.Y. July 11, 2023). "Because of the similarity in the wording of the bank, [mail, wire], and health care fraud statutes, courts rely upon the more ample case law construing the former . . . statutes when interpreting 18 U.S.C. § 1347." *Id* at *6 (citing *United States v. Mermelstein*, 487 F. Supp. 2d 242, 253 n.2 (E.D.N.Y. 2007) (collecting cases)).

Here, the record is clear: test adjudications did not, and never were intended to, result in any funds flowing from any insurer, including any PBM, to Central Rexall. Indeed, the evidence was undisputed that every single submission of a test claim was, as planned, immediately reversed to assure that no money would change hands. *See, e.g.*, Tr. 683:23-25 (Rolling direct: "They would immediately reverse the claim[.]"); Tr. 846:7-13 (Rolling re-cross: "Q: When there's a test adjudication and there's no prescription after that – the adjudication is submitted to the insurance company, it's immediately reversed. Correct? A: Correct. Q: So no money flows as a result of that adjudication. Correct? A: Correct."); Tr. 865:1-10 (Olsen direct: "I mean, we weren't really hurting anyone. And we definitely reversed the claims back out . . . ."); Tr. 2936:12-15 ("Q: And the reason we're talking about collecting money is because on the test adjudications, of course, no money was collect. Right? A: Right. That's Correct."); Tr. 2936:18-21 (Casseri cross: "Q: Because as soon as the test adjudication went in, the – it was reversed so that there would be no money ever paid. Right? A: That's correct."). Obviously, as a result neither Express Scripts, nor any other insurer or PBM, were intended to or did lose money as a result of these test adjudications. In fact, the Government's own expert witness confirmed as much multiple times throughout his testimony, conceding that money never left Express Scripts and no pharmacy ever received money when a claim was reversed. Tr. 3265:6-11 (Stockwell cross: "Q: If an adjudication is sent in and

it is immediately – and the request for reimbursement is immediately withdrawn, no money will change hands, no money will flow from Express Scripts to – you know, from the plan to Express Scripts to the pharmacy as a result of that. Right? A: If the claim immediately reversed, that is true.").

Nor was Express Scripts defrauded of a "property interest" when it was, as the Government alleges, tricked by a test adjudication into providing information regarding whether and how much it would reimburse a pharmacy for a particular product. Tr. 3833:10-14 (Mr. Friedman's Closing: "And, critically, Central Rexall never told Express Scripts or any of the other PBMs that it was submitting test claims to look for high reimbursing compound medication formulas because the defendants knew it was wrong and they didn't want Express Scripts to know they were doing it."), Tr. 3913:11-17 (Mr. Friedman's Closing: "The evidence at trial tells a simple story of a gigantic fraud scheme. The defendants conspired with each other and with some of their co-workers, corrupt sales reps and corrupt doctors in New Jersey and elsewhere to trick health insurance plans, including New Jersey state and TRICARE, into paying more than $100 million for fraudulent prescriptions that were completely unnecessary.") .

This is so first, of course, because as discussed above, such information was already publicly available to pharmacies, since it was based upon the publicly available AWP. *See* Tr. 599:25-600:5 (Taff redirect: "Q: And are there a way to – are there ways to estimate the cost of NDCs that do not involve test adjudications? A: Yes. So you can – you can check the listed AWP, the average wholesale price, which are published in a – I think it's called the Blue Book, but there – and the wholesalers would also have that information available."); Tr. 764:11-23 (Rolling cross: "Q: But in fact what you do initially is you look at AWP. And can you explain the jury…what AWP is? A: Okay. It's the average wholesale price. It's what you could expect to receive from

101

an insurance reimbursement. So with compounds and chemicals, there's only a couple of price points. They have AWP and then you have your cost. There's really the only ones that we can use, so . . . Q: So – and the reason you answered that in response to the question reimbursement data is because the AWP will give Central Rexall a sense of what the reimbursement is going to be. Correct? A: Correct."); Tr. 907: 19-23 (Olsen direct: "Q: How did AWP translate into the reimbursement for the pharmacy? A: It's used in – whatever variation of the formula insurance companies pick, it's usually used to the determine how much reimbursement is going to be ."); Tr. 3171:18 –3172:7 (Stockwell: "Q: Now if the ingredients in a compound medication are covered, how would Express Scripts determine the reimbursement amount[?] A: . . .So there's a field called average wholesale price. And, essential, for every claim that's billed, a pharmacy is going to get paid a percentage of that dollar amount. So with a compound ingredient, it would go through each of those ingredients, and based on the quantity that's being billed, they would get paid a percentage of that amount[.] Q: So it's largely based on the average wholesale price? A: Yes, sir.").

Of course, this was not confidential information of the sort that the Supreme Court has held amounts to property for purposes of federal fraud statutes. *See United States v. Blaszczak*, 56 F.4th 230, 244 (2d Cir. 2022) (holding that the confidential information and the timing of the Centers for Medicare & Medicaid Services ("CMS") actions do not constitute "property" because "information reflecting such a decision and the timing of that disclosure are regulatory in character and do not constitute money or property of the victim; and they are not a 'thing of value' to CMS that is susceptible to being 'convert[ed][.]'"). *See generally Carpenter v. United States*, 484 U.S. 19, 26 (1987) ("Confidential information acquired or compiled by a corporation in the course and conduct of its business is a species of property . . . "); *United States v. Al Hedaithy*, 392 F.3d 580, 594 (3d Cir. 2004). And any theory that Express Scripts was simply controlling how and when

this information would be disclosed, as it was in every case in which a claim was actually paid, runs headlong into the Supreme Court's clear statement in *Ciminelli* that the "property" that is an essential element of any fraud statute does not encompass the right to control such information. *Ciminelli*, 598 U.S. at 314-15 (describing the right-to-control theory as holding "that, '[s]ince a defining feature of most property is the right to control the asset in question' 'the property interests protected by the wire fraud statute include the interest of a victim in controlling his or her own assets[,]'" but deciding that this "theory is …inconsistent with the structure and history of the federal fraud statutes" because it would make "a federal crime of an almost limitless variety of deceptive actions traditionally left to state contract and tort law[.]").

Finally, and even more obviously, the "scheme" here at issue was obviously not intended, and did not deprive the "victim" of the identity theft—the unknowing person whose identity was stolen—of any money, or anything else of value.  The only conceivable, and completely theoretical, harm to those individuals was contained in a hypothetical scenario supplied through Stockwell, who stated that test claims were impermissible because even if they were immediately reversed, information received from such a reversal "*could* be used in other inappropriate ways." Tr. 3175:24-3176:3 (emphasis added).  Indeed, Stockwell  testified that the use of an individual's personal information in a test run could, hypothetically, "impact" the individual because that person could be "flagged as some[one with a particular disease] in terms of their benefit."  Tr. 3176:14-24.  Stockwell continued that such test claims can "make things like life insurance and other things a little bit weirder[.]"  *Id*.  But  the Government did not present a single piece of evidence to show the "impact" about which Stockwell testified existed at all, let alone with respect to a patient in this case.  Nor was he able to provide details regarding how, for example, a life insurance company would receive this information, what it would do with this information, and

how it would ultimately affect the victims.  Tr. 3267:2-13 (Stockwell cross: "Q: So, for example, in the New Jersey plan, let's say [] if somebody makes a claim and then it gets reversed out, the New Jersey plan knows about that? A: They would have access to it. I don't know, like what reports they get, but they could access that. Q: Well that's what I'm asking. If you don't know what reports they get, how would they have access to the fact – to this confidential health information about their member? A: So I'm saying that they have access – I'm saying I don't know specifically with that plan what reporting they would get, but that is something they could get."). In fact, Stockwell was unable to provide a specific situation, in which patients were hurt as a result of Central Rexall's test adjudications, instead stating "I've seen it."  Tr.3267:14-18.  But even putting that aside, nothing in Stockwell's ill-defined hypothetical scenario in which life insurance is "a little bit weirder" actually creates a tangible harm or loss of property to the individual in question.  Certainly, such vague and elliptical descriptions cannot form the basis of a property loss sufficient to meet the Government's burden for fraud.

For this reason, the evidence of fraud on Count Two was insufficient as a matter of law, and Defendants' motion for a judgment of acquittal on that Count should accordingly be granted.

### D.    The Government's Evidence Failed To Prove Materiality With Respect To Count Two.

As is discussed above with regard to Count 1, *infra*  Sec. V, materiality is an essential element of any fraud, *see Neder*, 527 U.S. at 25 (holding that the "materiality of a falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes"); *see also United States v. Rabbitt*, No. 23-320 (MAS), 2024 U.S. Dist. LEXIS 159079, at *7 (D.N.J. Sep. 4, 2024).  As this Court instructed the jury, a "material fact" is one which would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement in making a decision (*e.g.*, the decision by a health insurance company to reimburse a claim for a

prescription medication).  "A misrepresentation is material if it goes to the very essence of the parties' bargain."  Tr. 3784:14-22 (Jury Charge).

For purposes of Count Two, the question is whether the submission of test adjudications, which were immediately reversed, amounted to material misstatements.  And that is the question regardless of whether submitting a test adjudication violated the contract between Central Rexall and the PBMs at issue, for—as discussed above—even in the civil context, "a misrepresentation cannot be deemed material merely because . . . [of] a particular statutory, regulatory, or contractual requirement." *Escobar*, 579 U.S. at 191 (2016) (holding that even in the lesser civil context of the False Claims Act, the "materiality standard is demanding" in order to prevent "punishing garden-variety breaches of contract or regulatory violations).

 In an effort to meet that standard, the Government again relied entirely on the testimony of its expert witness, Blake Stockwell.  In particular, Stockwell testified that, from a PBM's perspective, it would be "important to know that a pharmacy had submitted false test claims[.]" Tr. 3235: 17-19.  More specifically, he testified that it would, from the same perspective of a PBM, be important to know that a pharmacy submitted false test claims for the purpose of ascertaining a compound formula's profitability.  Tr. 3235:20-23 ("Q: Would a reasonable PBM consider it important to know that a pharmacy submitted false test claims for the purpose of ascertaining a compound formula's profitability? A: Absolutely, yes, sir.").  However, for the reasons discussed above, what would have been "important to know" is insufficient to the meet the standard for materiality.  Thus, the Government completely failed to elicit evidence that this fact had  "a natural tendency to influence, or was capable of influencing, the decision of the decision making body to which it was addressed,"  *Neder*, 527 U.S. at 16; in particular, it did not demonstrate, as the law requires, that had the PBM known that the pharmacy was obtaining information about the amount

105

that the product would reimburse for if covered, the PBM would not have paid a particular claim, or had ever done so in the past, let alone that it would, based upon this fact, terminate its relationship with the pharmacy because that fact went to "the essence of the bargain," between the pharmacy and the PBM. Instead, Stockwell's conclusory statement that a reasonable PBM would consider it important to know that a pharmacy had submitted test adjudications in an effort to ascertain whether a claim was reimbursable and to what extent, even if there was no actual prescription, simply fails to meet the relevant legal standard.

Indeed, it bears noting, yet again, how unlikely it is that obtaining such information could possibly be material given Stockwell's testimony that this very same evidence was already publicly available to pharmacies that could readily ascertain the Average Wholesale Price ("AWP"). *See Tr.* 3171:18 –3172:7 (Stockwell direct: "Q: Now if the ingredients in a compound medication are covered, how would Express Scripts determine the reimbursement amount[?] A: …So there's a field called average wholesale price. And, essential, for every claim that's billed, a pharmacy is going to get paid a percentage of that dollar amount. So with a compound ingredient, it would go through each of those ingredients, and based on the quantity that's being billed, they would get paid a percentage of that amount[.] Q: So it's largely based on the average wholesale price? A: Yes, sir."); Tr. 3260:6-11 (Stockwell cross: "Q: And where and how would I know, if I'm in that position, what the average wholesale price is? A: Those things are publically available, typically from a manufacturer. They also get that in the data from their suppliers of medications. So there's visibility to it, if you were looking to understand."). *See also* Tr. 599:25-600:5 (Taff redirect: "Q: And are there a way to – are there ways to estimate the cost of NDCs that do not involve test adjudications? A: Yes. So you can – you can check the listed AWP, the average wholesale price, which are published in a – I think it's called the Blue Book, but there – and the wholesalers would

also have that information available."); Tr. 764:11-23 (Rolling cross: "Q: But in fact what you do initially is you look at AWP. And can you explain the jury…what AWP is? A: Okay. It's the average wholesale price. It's what you could expect to receive from an insurance reimbursement. So with compounds and chemicals, there's only a couple of price points. They have AWP and then you have your cost. There's really the only ones that we can use, so…Q: So – and the reason you answered that in response to the question reimbursement data is because the AWP will give Central Rexall a sense of what the reimbursement is going to be. Correct? A: Correct."); Tr. 941:19-942:9 (Olsen cross: "A: I believe my understanding is that the company sets [AWP]. This is based off of, like market value…Q: And from your perspective, the average wholesale price is a good way of predicting what the reimbursement is going to be. Right? A: Correct."). In sum, test adjudications could not be material to the PBM's decision to reimburse claims, since they allowed a pharmacy to do nothing more than it otherwise could have done to ascertain the publicly available reimbursement rate for a product.

In sum, the Government failed, as a matter of law, to show the material misstatement necessary to fulfill the fraud element of Count Two. For this reason, this Court should grant Defendants' motion for a judgment of acquittal on Count Two.

### E.  The Government Failed To Prove That Defendants Knew That Improper Test Adjudications Were Occurring.

Finally, but perhaps most significantly of all, there was no evidence that Mr. Johnston or Mr. Brockmeier had the requisite intent to violate the identity theft statute based upon the test adjudications at issue here. This is so for two reasons. First and foremost, there was no evidence that Mr. Johnston, or indeed Mr. Brockmeier, even knew that test adjudications, in the form of filing claims without real prescriptions, which were then reversed, was even taking place, as opposed to situations in which a valid claim was made understanding that the patient at issue might

reject the prescription once he or she knew what it would cost. There was, of course, evidence that those kinds of *legitimate* "test adjudications," based upon valid prescriptions, occurred. *See, e.g.*, Tr. 758:14-759:9 (Rolling cross: "Q: And the adjudication comes back and indicates to the patient, for example, that the product will not be covered. That happens, right? A: Yes. Q: And under those circumstances, the patient may decide not to proceed with the prescription because they can't afford it. Am I right? A: Correct, correct. Q: There are times as well when the adjudication comes back and it indicates that there's going to be a high co-pay…and under those circumstances it happens at times, doesn't it, that the patient decides not to proceed with the – with the prescription. Right? A: Correct, yes. Q: So it's sort of like – that adjudication under those circumstances is sort of like the patient checking the price. Right? A: Yes."). Indeed, even Blake Stockwell, the Government's expert, testified that pharmacies, including Central Rexall, routinely submit test claims with valid prescriptions. In his experience, patients who are "unsure whether or not they want to receive a prescription that they have gotten from a doctor" because "[i]t may be too expensive[ or] may not be something they've decided is right for them," sometimes have a pharmacy "bill a claim just to see how much the co-pay would be or if the drug is covered" before the patient decides whether or not to receive the prescription." Tr. 3174:3-22.

But no witness—not one—testified that Mr. Johnston was aware of the practice of submitting test claims *without* valid prescription. Tr. 521:4-10 (Taff cross, discussing an email in which Kyle requesting to know "the current adjudication versus what the adjudication would be based on the new pricing schedule," DX1136: "A: And I don't have enough information based off of this email to tell you whether or not I was the one that went and worked on it or how I – How I went about working on it. And you're right, I did not respond to Kyle and tell him we can't do that. My conversations were with Trent.").

108

Indeed, as the Court will recall, Government Exhibit 331 is directly to the contrary: in that email, Rolling informed Mr. Johnston he would create a formulae and compare the AWPs, while also stating that they should not run an adjudication without a valid prescription, to which Johnston replied, "good point[.]" The Government contends that because Mr. Johnston did not "express surprise" when the issue was raised, he must have known about it. Tr. 711:24-25; *see also* Tr. 3829:2-5 ("Rolling testified about telling Johnston about the results and he told you that Johnston was never surprised to learn the pharmacy was running test adjudications. And you saw emails where he requested some himself."). But this demands a completely unreasonable inference, as does the Government's contention that the volume of phone calls between Mr. Johnston and Mr. Brockmeier proves that Mr. Johnston was aware that test adjudications without a valid prescription were occurring. Tr. 3886:8-9 ("And you have the 2,900 phone calls between the defendants, and the 726 hours they spoke on the phone."). In fact, the far more reasonable inference—and one that does not improperly drift into sheer speculation—is that Mr. Johnston understood from Rolling's email that the pharmacy was in fact not undertaking the improper type of test adjudications that is at issue here. *See United States v. Cartwright*, 359 F.3d 281, 288 (3d Cir. 2004) ("There is simply no logical and convincing connection between these facts and the inference the government seeks to draw. Rather, that inference is based solely on speculation[.]"); *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 428 (3d Cir. 2013) (reversing conviction based upon inference that he the defendant knew of the subject matter of the transaction because "where an inference as to a defendant's knowledge is based upon speculation, our case law forbids us from upholding his conviction[.]"); *United States v. Davis*, 458 F. App'x 152, 159 (3d Cir. 2012) (reversing conspiracy conviction "our conspiracy case law forbids the upholding of a conviction on the basis of . . . speculation."). In sum, there was no actual evidence, as opposed to speculation or innuendo, that

Mr. Johnston knew of the kind of test adjudications upon which the Government relies for Count Two; his conviction on that count must be reversed for that reason alone.

But even assuming that Mr. Johnston did know of those test adjudications, the Government was also required to prove that he, as well as Mr. Brockmeier, had the specific intent necessary for a criminal conviction. That is, in order to be guilty of the offense charged in Count Two, Defendants had to "(1) knowingly (2) transfer[], possesses, or uses without lawful authority (3) a means of identification of another person (4) *with the intent to commit, or in connection with, any violation of federal law or any state felony*." *United States v. Auernheimer*, 748 F.3d 525, 535 (3d Cir. 2014) (emphasis added). Thus, each Defendant had to know that he was violating the law, or, in this case, conspiring to do so. Tr. 3779:16-20 (Jury Charge: "In order to find [defendants] guilty of conspiracy, you must find that the government provide beyond a reasonable down that each joined the conspiracy knowing of its objectives and intending to help further or achieve those objectives."). In this regard, "[i]t is true that, with respect to most specific-intent crimes, [] ignorance of the law is no excuse.[,]" however, "[t]here is an exception to this rule, [] when intent to violate a legal duty is an element of a crime." *United States v. Carbo*, 572 F.3d 112, 116 (3d Cir. 2009); *see also United States v. Rhone*, 864 F.2d 832 (D.C. Cir. 1989) (overturning a mail fraud conviction and holding that defendant's conduct can constitute fraud only if she *knew* that it was illegal for her to continue to collect unemployment benefits after she had obtained a new job). And that is clearly the case with regard to this statute.

Here, the record evidence was that not a single person at Central Rexall believed test adjudications to be illegal during the pharmacy's operation. Specifically, individuals including Haley Taff, John Mark Rolling, Melissa Olsen, and Ryan Boyle all believed the practice to be, at most, a PBM contract violation. Taff testified that she did not think she was violating a criminal

law by conducting test adjudications.  Tr. 527:7-15 (Taff cross: "Q: So you thought early on, even before April the 29th, 2015, that the test adjudication could be inconsistent with the contract between the pharmacy and the PBM.  Right?  A: Yes.  Q: Okay.. You did not think – and you'll correct me if I'm wrong.  You did not think you were violating a criminal law by doing it.  Is that fair to say?  A: Yes.").  She also testified that some test adjudications were conducted with valid prescriptions.  Tr. 493:22-494:22.  Olsen testified that test claims were a "very quick and easy way to get a response," because they "weren't really hurting anyone."  Tr. 865:2-10.  John Mark Rolling also testified that he did not think there was anything wrong with test adjudications.  Tr. 794:5-8. ("Q: Okay. And so now do you recall that when you were asking that question, did you know at the time it was wrong, that you said no? A: Yes, that is correct, I said no.").  In fact, Rolling was mostly concerned with test adjudications because he believed that they would come up in the course of any PBM's audits of Central Rexall.  Tr. 794:9-17 ("Q: And I did ask you, at the time you said you weren't comfortable with it. Right? A: Yes. Q: And you were concerned in fact that it would come up in the course of audits with Express Scripts, say [sic]? A: That's correct. Q: That's one of the reasons why you were uncomfortable with it. Right?" A: Yes.").  And Taff had the same understanding.  Tr. 173-176 ("Q:  Did you explain to him why you could not do the test adjudications?, A. Yes. And that we needed a prescription., Q. And did you tell him that it was a violation of the agreement with the pharmacy benefit manager to do this?  A:  Yes., Q. Did you tell him at some point that it was illegal?, A. I don't know that we discussed whether it was illegal, but that it would trigger an audit. . .").  Likewise, Olsen was also primarily concerned about labor-intensive audits.  Tr. 947-948 ("I didn't want to trigger one of those 800-prescription audits that we were going to have to prepare for. And it was my understanding that submitting things that had high reimbursements was probably going to do that, since no one likes to lose money.").  In sum,

there was no evidence that Defendants, or anyone else at Central Rexall, possessed the requisite *criminal* intent with regard to  the  conduct of  test  adjudications.   For this reason, too, the convictions on Count Two simply cannot stand.

## VII.    THE GOVERNMENT FAILED TO PROVE VENUE FOR COUNT 4.

### A.    Factual Background

The Indictment in this prosecution contained twenty-one "money laundering" counts:  one alleging conspiracy to commit money laundering (Count 4) and twenty alleging substantive money laundering (Counts 5-24).[35]  Count 4 of the Indictment alleged that Central Rexall received payments from PBMs and other sources, "including payments funded by the State of New Jersey" for its healthcare plan beneficiaries, "which represented proceeds of the conspiracy to commit health care fraud and wire fraud" that was charged in Count 1.  Ind. ¶ 57.  According to the Indictment, the Defendants conspired to make, and Central Rexall then made, payments to two management companies, Bluen Medical and PMG, allegedly owned by Defendants Johnston and Brockmeier.  *Id.* ¶ 58.  Bluen Medical and PMG in turn made payments to those Defendants' personal bank accounts.  *Id.* ¶ 59.  To make perfectly clear which transactions were the focus of the Count 4 conspiracy, the Indictment listed 31 separate transactions to either Bluen Medical, PMG, or the Defendants' personal bank accounts.  *Id.* ¶¶ 61(a)-(cc).  Twenty payments from the management companies to the personal bank accounts were also each individually charged as instances of money laundering.  *Id.* ¶ 63.

---

[35] Mr. Johnston was specifically charged in Counts 4 5, 6, 9, 10, 13, 14, 17, 19, 21, and 23.  The Indictment styled the charges as "money laundering," but the actual statute charged, 18 U.S.C. § 1957, criminalizes engaging in monetary transactions in criminally derived property of a value greater than $10,000.  As the Parties and the Court did throughout trial, this brief refers to this conduct as "money laundering" for ease of reference, but the Indictment does not allege (and the Government of course did not prove) the classic "concealment money laundering" criminalized in 18 U.S.C. § 1956.

On November 10, 2024, Defendants moved to dismiss the Indictment.  ECF 126.  As relevant here, Mr. Johnston argued that the money laundering counts failed on both substantive and venue grounds.  *Id.* at 16-20, 45-49.  Those arguments turned on the definition of "proceeds"; citing recent Third Circuit caselaw, Mr. Johnston argued that the funds did not become the "proceeds" required by the relevant statute until they entered the Defendants' personal bank accounts, and thus any transactions preceding that point could not, as a matter of law, constitute transactions in those proceeds.  *See United States v. Fallon*, 61 F.4th 95, 118 (3d Cir. 2023) (holding that "a defendant's mere receipt of funds as a result of a fraudulent transaction cannot itself constitute money laundering" because it is only at that moment that the criminally derived funds become "proceeds" that the defendant can launder).

The Court initially denied the motion.  ECF 184.  It held that "[t]he funds that are alleged to have been laundered became 'proceeds' when they were deposited into an account for Central Rexall that was controlled by Johnston and Brockmeier."  *Id.* at 2 (citing Ind. ¶¶ 59, 61(a), 61(b)).  It therefore held that the transactions postdating the funds' entry into the Central Rexall account could constitute money laundering transactions.  *Id.*  The Court also held that the Indictment satisfied the statute's venue requirements.  *Id.*

Mr. Johnston moved for reconsideration, relying on recent First Circuit caselaw to argue that the Court's conclusion that the funds became "proceeds" upon entry into the Central Rexall account meant that the Indictment failed to adequately allege venue with respect to the money laundering counts since the relevant venue provision required that any allegedly laundered funds be "proceeds" upon leaving New Jersey.  ECF 196, 229 (citing *United States v. Abbas*, 100 F.4th 267 (1st Cir. 2024) ); *see* 18 U.S.C. § 1956(i)(1)(B) (providing that venue is proper in "any district where a prosecution for the underlying specified unlawful activity could be brought, if the

113

defendant participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted"). The Court granted the motion for reconsideration, agreeing that funds must be "proceeds" when transferred from the forum District in order to support venue under 18 U.S.C. § 1956(i), and dismissed the substantive money laundering counts. Dec. 23, 2024 Status Conference Tr. at 4; ECF 229.

At trial, therefore, the only remaining money laundering count was Count 4, which charged conspiracy to commit money laundering in violation of 18 U.S.C. § 1957. As charged, Count 4 focused entirely on payments made by Central Rexall to Bluen Medical and PMG, and subsequent payments to the personal bank accounts of Mr. Johnston and Mr. Brockmeier, with the funds Central Rexall received from PBMs. *See* Ind. ¶¶ 57-59. As noted, the Indictment contains a lengthy list of 31 transactions that provide the factual basis for the conspiracy, all of which fall into one of two categories: (1) payments from Central Rexall to Bluen or PMG, or (2) payments from Bluen or PMG to the Defendants' personal accounts.[36] *Id.* ¶ 61.

But as presented to the jury, the money laundering conspiracy was significantly expanded. Instead of focusing on the payments from Central Rexall to the management companies and then the Defendants, the Government in its summation added an entirely separate category of transactions: "the monetary transactions from Central Rexall to its sales reps as commission payments." Tr. 3907:3-4. While most of that portion of the Government's summation that focused on money laundering (Tr. 3907-11) rightly dealt with the conspiracy that was actually charged in the Indictment—a conspiracy to move proceeds from Central Rexall through management companies to personal bank accounts—the beginning of that part of the closing argument told the

---

[36] The dismissed money laundering counts all fell into the second category: electronic payments from Bluen or PMG to the Defendants' personal bank accounts. Ind. ¶ 63.

jury that "wire transfers from Central Rexall to sales reps like Boardwalk Medical" constituted money laundering as well—despite the fact that those transactions were absent from Count 4 of the Indictment.  Tr. 3908.

To prove venue, the Government's summation briefly pointed to just two facts.  First, Sean O'Malley, an employee of the Federal Reserve, testified that 17 of the wires from Central Rexall to Bluen and PMG and from Bluen to Mr. Brockmeier used the Fedwire Funds Service system and "traveled through New Jersey, which satisfies the venue requirement."  Tr. 3913:7-8.[37]  And second, "the wires from Central Rexall to Boardwalk were sent to Hickman's bank account in New Jersey."  Tr. 3913:9-10.[38]

## B.    Legal Argument

Article III, § 2 of the Constitution provides that "The trial of all crimes . . . shall be held in the state where the said crimes shall have been committed."  Proper venue in criminal trials is, therefore, "more than just a procedural requirement; it is a constitutionally guaranteed safeguard." *United States v. Root,* 585 F.3d 145, 155 (3d Cir. 2009).  As such, the Supreme Court has "repeatedly underscored the importance of safeguarding the constitutional guarantee of proper venue in criminal trials," *United States v. Perez*, 280 F.3d 318, 328 (3d Cir. 2002); indeed, it is an aspect of being tried "by a jury of one's peers" that is "unquestionably one of the most precious and sacred safeguards enshrined in the Bill of Rights," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 572 (1976) (Brennan, J. concurring).  Additionally, "venue must be proper for each count of

---

[37] These 17 financial transactions were all listed in the Indictment.  *See* Ind. ¶ 61 (listing 31 financial transactions); *see also* GX 1067 (summary chart listing 17 Fedwire transactions, all charged in ¶ 61 of the Indictment).

[38] The Government also raised these two arguments at oral argument on Defendants' motions for acquittal.  Tr. 3665-66.

the indictment," *Root,* 585 F.3d at 155, and each count must be reviewed separately for that purpose. *United States v. Auernheimer*, 748 F.3d at 535   ("[V]enue must be analyzed independently for each count").

Venue for money laundering charges is governed by 18 U.S.C. § 1956(i).  It provides that a prosecution for a violation of § 1956 (concealment money laundering) or § 1957 (transacting in proceeds greater than $10,000) may be brought in either:

> "(A) any district in which the financial or monetary transaction is conducted; or
>
> (B) any district where a prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted."

18 U.S.C. § 1956(i)(1).

In addition, 18 U.S.C. § 1956(i)(2) provides that a prosecution for conspiracy to violate § 1957 (which is charged in Count 4) could also be proper "in any . . . district where an act in furtherance of the . . . conspiracy took place." Venue in this District, therefore, could only be appropriate if either:  (1) Defendants engaged in a monetary transaction in the proceeds of the Count 1 in New Jersey; or (2) Defendants engaged in the Count 1 conspiracy in New Jersey and participated in the transfer of the proceeds of that conspiracy from New Jersey to Louisiana, where—as provided in the Indictment—all of the alleged monetary transactions took place; or (3) a coconspirator to the Count 4 conspiracy took an act in furtherance of that conspiracy in New Jersey.

Before trial, the Government contended only that subsection (B) applied, arguing that the Defendants "'caused the transfer of the proceeds [of the Count 1 conspiracy],' which satisfies the statute's requirement to 'participate in the transfer of the proceeds,' 'from the State of New Jersey,'

which tracks the statute's element of a transfer from the forum district." ECF 137 (Gov't Opposition to Defendants' Motions to Dismiss) at 61-62. The Court rejected that argument as to Counts 5-24, concluding that the funds were not "proceeds" when they left New Jersey, and only became "proceeds" (at the earliest) when they were obtained by Central Rexall. ECF 229 (Order Granting Motion for Reconsideration). That same logic applies to Count 4, and the Government made no argument at trial or in oral argument on Defendants' Rule 29 motions that it should not apply. Thus, there are only two remaining potential bases for venue for Count 4: either a "financial or monetary transaction" was "conducted" in New Jersey, or one of Defendants' coconspirators to the money laundering conspiracy engaged in an act in furtherance of the Count 4 conspiracy in New Jersey. The record provides no basis for support of either contention, as neither the Fedwire transfers nor the Boardwalk transfers satisfy either test.

### 1.    Fedwire Transfers

The Fedwire transfers satisfy neither remaining basis for venue. First, there is no evidence that a "financial or monetary transaction" was "conducted" in New Jersey. The statute, 18 U.S.C. § 1956(c)(3), defines "transaction" as including "a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition, and with respect to a financial institution includes a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument, use of a safe deposit box, or any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected." And § 1956(c)(2) defines "conducts" as including "initiating, concluding, or participating in initiating, or concluding a transaction." So the relevant inquiry is whether any of the possible "transactions" described in § 1956(c)(3) were "initiat[ed]" or "conclude[ed]" in New Jersey.

The record is clear that they were not. The Government's witness on the Fedwire system, Sean O'Malley, testified at length about how the Fedwire Funds Service system works. Tr. 3408-3424. In essence, every wire transfer[39] that engages the Fedwire system involves a wire signal between two Federal Reserve servers, one located in Texas and one in New Jersey. Tr. 3413:3-11; 3414:12-25. These signals between the servers are "necessary instructions" for every Fedwire wire transfer, as they inform the transferor and transferee banks of which accounts to credit and debit and thus "allow the transfer of money to happen." Tr. 3412:1-8; 3431:20-24.

But the most that Mr. O'Malley was able to say during his testimony was that "signals going through the wires" passed through New Jersey. Tr. 3665:12; *see also* Tr. 3424:12-15 (agreeing that "the electronic signals of all of these wires . . . travel[led] through Federal Reserve servers in both Texas and New Jersey"). His testimony made clear that the money itself does not pass through New Jersey. Tr. 3431:1-5. In fact, the money is not credited or debited—that is, transferred from one account to another—until the primary and secondary servers acknowledge receipt of each other's signals. Tr. 3413:8-13. Critically, therefore, Mr. O'Malley did not testify that any actual "transaction," as defined by § 1956, is "conducted"—that is, initiated or concluded—in New Jersey. Funds transferred via Fedwire are not delivered, deposited, withdrawn, or transferred between accounts in New Jersey. § 1956(c)(3). And notably, § 1956(c)(3) does not list "electronic signals" as one of the possible meanings of "transaction," indicating that Congress apparently did not have this sort of incidental contact in mind when it drafted § 1956's venue provision.

---

[39] A wire transfer is "an electronic transfer that moves money virtually instantaneously from one account to another account." Tr. 3411:14-15.

Interpreting § 1956 so broadly as to permit trying Defendants in New Jersey merely because of a chance and incidental routing through a New Jersey server would fly in the face of the principles underlying the Supreme Court's venue jurisprudence.  In *United States v. Johnson*, 323 U.S. 273, 275 (1944), for example, the Supreme Court recognized that a cautious interpretive approach to venue is "more consonant with the considerations of historic experience and policy which underlie [the venue] safeguards in the Constitution" because "[q]uestions of venue . . . raise deep issues of public policy in the light of which legislation must be construed."  *See also United States v. Cores*, 356 U.S. 405, 407 (1958) ("The provision for trial in the vicinity of the crime is a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place. Provided its language permits, the Act in question should be given that construction which will respect such considerations."); *Travis v. United States*, 364 U.S. 631, 634 (1961) (cautioning that "venue provisions in Acts of Congress should not be so freely construed as to give the Government the choice of 'a tribunal favorable' to it").  And the Third Circuit has stated that there must be "more than some activity in the situs district" but instead must be "substantial contacts" and "some sense of venue having been freely chosen by the defendant."  *Auernheimer*, 748 F.3d at 537.

The Government's argument in favor of venue, which ignores these principles entirely, necessarily means that every money laundering prosecution premised on a Fedwire transaction would be properly venued in New Jersey.  This is a remarkable contention.  Mr. O'Malley testified that the Fedwire Funds Service executes roughly 500,000 wires a day, totaling over $4 trillion daily.  Tr. 3411:18-19.  Assuming that it only operates on business days, that is 130 million wires a year for a total of roughly $1 quadrillion.  If the Government has its way, anyone in the world who wires $10,000 of criminal proceeds in a Fedwire transaction can be hauled into court in New

119

Jersey simply for engaging in that transaction. The staggering breadth of the Government's argument is evidence enough that it is stretching § 1956(i) well past its textual, or intended, limits.[40]

The Fedwire transfers also cannot satisfy the second possible basis for venue: an act in the District by a coconspirator in furtherance of the Count 4 conspiracy. Neither the initial decision to use Fedwire, nor the actual electronic signals themselves, constitute such an act. Mr. O'Malley's testimony made clear that the decision of whether to use the Fedwire Funds Service or an alternative means of transferring funds is at the bank's discretion. Tr. 3412:23-24; 3425:16-22. So the choice to use Fedwire—and thus the choice to send a signal through a New Jersey server— was not one that was made by Mr. Johnston, Mr. Brockmeier, or any of their alleged coconspirators. And, of course, the bank employees who actually sent the electronic signals or routed the money in accordance with the wire instructions were not coconspirators. The Fedwire transfers therefore satisfy neither basis for venue.

---

[40] The Government may cite *United States v. Lallande*, 23-0057 (ES), 2023 U.S. Dist. LEXIS 137617 (D.N.J. Aug. 8, 2023), in support of its argument. In *Lallande*, this Court held that an indictment properly alleged venue on a money laundering charge because it alleged that "wires transferred as part of the conspiracy traveled through a Federal Reserve Bank in New Jersey." *Id.* at *7. But *Lallande* is not dispositive. It did not consider the text of the money laundering statute's venue provision. And it was decided before, not after, trial, and thus was decided under the deferential motion-to-dismiss standard and was not able to consider the testimony as to what actually occurred, as defendantsdo here. *Id.* at *6 ("To start, the Indictment has facially alleged that New Jersey is the proper venue."). Moreover, *Lallande* relied substantially on *United State v. Goldberg*, 830 F.2d 459 (3d Cir. 1987), in support of its holding, but *Goldberg* was not a money laundering case, and so did not consider § 1956's venue provision (which was enacted 14 years after *Goldberg* was decided). Finally, *Lallande* cites *Kluger v. United States*, 14-6236 (KSH), 2018 U.S. Dist. LEXIS 147744 (D.N.J. Aug. 30, 2018), but *Kluger* merely found venue proper on insider trading charges and in fact assumed that venue was improper on money laundering charges. *Id.* at *16.

120

### 2.    Boardwalk Commission Payments

The Government's second proposed basis for venue—the commission payments from Central Rexall to Boardwalk Medical—likewise fails.  It is true that these payments at least concluded in New Jersey.  The problem, however, is that they have nothing to do with the particular conspiracy charged in Count 4 (as opposed to the other conspiracies, alleged in Counts 1 and 2).

As discussed above, Count 4 of the Indictment charged a conspiracy alleging that Mr. Johnston and Mr. Brockmeier transacted in criminal proceeds by transferring funds from Central Rexall to Bluen and PMG, and from those management companies to their own bank accounts. In summation, however, the Government went out of its way to support its position that venue existed in New Jersey on Count 4 by reference to commission payments to distributors and sales representatives.  Tr. 3907:3-4 (referencing "the monetary transactions from Central Rexall to its sales reps as commission payments").  But these commission payments, on their face, had nothing to do with the conspiracy charged in Count 4 of the Indictment.  As discussed above, that conspiracy clearly and specifically concerned Central Rexall's payments of the proceeds of the Count 1 conspiracy to Bluen Medical and PMG, and those companies' transfer of those proceeds to the Defendants' personal bank accounts.  Ind. ¶¶ 57-61.  In fact, the Indictment went so far as to painstakingly list the 31 specific financial transactions that the Government alleged constituted the basis for the conspiracy.  *Id.* ¶¶ 61(a)-(cc).  The Indictment could not have been clearer:  Count 4 concerned transfers from Central Rexall to Bluen and PMG, and then from the management companies to the Defendants' personal bank accounts.

The Government's attempt, during its summation, to connect the conspiracy it actually charged in Count 4 to Central Rexall's commission payments to distributors was plainly done solely to shore up its bases for venue, but those commission payments are far too distinct from the charged money laundering conspiracy to provide a basis for venue, as any reading of Count 4 of

the Indictment shows. Commission payments from Central Rexall to Boardwalk cannot be considered acts in furtherance of the money laundering conspiracy charged in Count 4: those commission payments have nothing to do with the Defendants' actions in moving its proceeds from Central Rexall to Bluen and PMG, and from those companies to the Defendants' personal bank accounts. That is, once Central Rexall had received payments from a PBM, making commission payments to distributors could not enable Defendants to make payments to their own accounts. In fact, the facts are to the contrary: those commission payments diverted, to third parties, funds that would have otherwise gone to Defendants. The commission payments and the transactions charged in Count 4 therefore actually operated at cross-purposes—the more money transferred through the management companies to the Defendants' bank accounts, the less available to be transferred to sales representatives, and vice versa. The Government's argument is akin to an argument that a defendant charged with conspiring to rob a bank in Louisiana could stand trial in New Jersey because he also robbed a bank in New Jersey; true, his conduct in New Jersey may violate the same statute he conspired to violate in Louisiana, but that does not mean that conduct was part of the same conspiracy.

It is irrelevant that Count 4 incorporated the rest of the Indictment by reference (as is often done), including the allegation that Central Rexall engaged in a wire transfer to Boardwalk as part of its list of Count 2's over acts. *See* Ind. ¶ 55 ("Paragraphs 1-12 and 14-41 of Count 1 of this Indictment and paragraphs 43-44 and 46-49 of Count 2 of this Indictment are hereby realleged and incorporated as though set forth in full herein."); *id.* ¶ 49(d) ("On or about October 15, 2015, William Hickman, through his company Boardwalk Medical LLC, received in New Jersey a payment from Central Rexall of $2,447,076.19 for his work and the work of people working with him to find patients in New Jersey to receive Central Rexall prescriptions."). While the

Government is permitted under Fed. R. Crim. P. 7(c)(1) to incorporate allegations by reference, this does not mean that those acts, let alone the entirety of the Indictment, are properly considered a part of the Count 4 conspiracy—for example, Paragraph 40 of the Indictment alleged that Chris Casseri received $100,000 bonuses, which has nothing to do with Count 4 (in which Mr. Casseri was not charged). And Paragraph 16 alleged that the Defendants approached Hayley Taff in 2013, a year before the Count 4 conspiracy began. *See* Ind. ¶ 56 (alleging a conspiracy "[f]rom in or about January 2014 through in or about January 2017 . . . ."). Clearly, then, an allegation's incorporation by reference cannot mean that it automatically becomes part of the charged conspiracy, no matter how unrelated or tangential it is to that conspiracy's allegations.[41]

In short, the Government overloaded the Indictment with unnecessary money laundering charges to inflate the appearance of Defendants' criminality. But just like the substantive money laundering counts, which the Court properly dismissed as having been brought in the wrong District, the conspiracy count should not have been prosecuted in New Jersey. A chance encounter with a New Jersey server, and commission payments that have nothing to do with the charged conspiracy, cannot save Count 4, and because of the Government's failure to prove venue, the Court should enter a judgment of acquittal on that Count.

---

[41] Indeed, if the commission payments to Boardwalk were part of the Count 4 conspiracy, the Government would not have had to call a witness (Mr. O'Malley) solely to testify about how Fedwire transfers involve a server in New Jersey.

## RULE 33

**VIII.  THE COURT SHOULD GRANT DEFENDANTS A NEW TRIAL PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 33.**

### A.  Legal Standard

Rule 33 of the Federal Rules of Criminal Procedure "permits a district court to overturn a conviction in the interest of justice." *United States v. Suggs*, 230 F. App'x 175, 183 (3d Cir. 2007). Specifically, Rule 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." *See United States v. Quiles*, 618 F.3d 383, 388 (3d Cir. 2010) ("a district court 'may vacate any judgment and grant a new trial if the interest of justice so requires.'").

There are two circumstances under which a new trial should be ordered. *See generally United States v. Onque*, 169 F. Supp. 3d 555, 566 (D.N.J. 2015) (in considering a Rule 33 motion, the Court "may weigh the evidence," and "may set aside the verdict and grant a new trial" if the Court "determines that the verdict constitutes a miscarriage of justice, or that a trial error had a substantial influence on the verdict.").  The first is "when substantial prejudice has occurred," such as when, for example, the Court determines that "improper statements or conduct make it reasonably probable that the verdict was influenced by the resulting prejudice," *United States v. Georgiou*, 777 F.3d 125, 143 (3d Cir. 2015) (internal citations omitted).  This standard allows the Court to look back at the evidence and determine whether the verdict was affected by evidence that should not have been admitted, or admitted in the way that it was.  Thus, a "Rule 33 motion may [] be based on an alleged error or combination of errors at trial," and "district courts have held that a new trial will be ordered when it is 'reasonably possible that such error, or combination of errors, substantially influenced the jury's decision.'" *United States v. Brown*, 2022 U.S. Dist. LEXIS 204896, at *4 (D.N.J. Nov. 10, 2022) (citing *U.S. v. Copple*, 24 F.3d 535, 547 n. 17 (3d

124

Cir. 1994)), *aff'd*, 451 F. App'x 196 (3d Cir. 2011); *accord United States v. Bryant*, Crim. No. 07-267, 2009 U.S. Dist. LEXIS 44648, 2009 WL 1559796 at *6 (D.N.J. May 28, 2009).

Second, a trial court, which had the distinct advantage of having observed the trial, may grant a new trial, again in the interests of justice, if, in light of its observations, it concludes that the verdict was against the weight of the evidence. In his regard, "[u]nlike an insufficiency of the evidence claim [under Rule 29], when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002) (citations omitted); *accord United States v. Stephen*, 2025 U.S. App. LEXIS 515, *10 (3d Cir. Jan. 10, 2025); *Brown*, 2022 U.S. Dist. LEXIS 204896, at *3 ("The standard under Rule 33 is more general than that under Rule 29. . . . When a defendant seeks a new trial claiming that the verdict was against the weight of the evidence, the court's review is less restricted than it is under Rule 29."). *See also United States v. Salahuddin*, 765 F.3d 329, 346 (3d Cir. 2014) (same); *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) ("In deciding a Rule 33 motion, the court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation.") (internal quotation omitted); *see also United States v. Ferguson*, 246 F.3d 129, 136 (2d Cir. 2001) (affirming district court's order of a new trial upon defendant's Rule 33 motion, finding that "[t]he district court did not abuse its discretion when it weighed the evidence of pecuniary motive and found the evidence unsatisfactory or insufficient to support the jury's finding of guilt beyond a reasonable doubt," and that "blind deference to the jury verdict [was] unwarranted"); *United States v. Knight*, 800 F.3d 491, 510-11 (8th Cir. 2015) (affirming district court's grant of a new trial under Rule 33 where, as to one charge, the district court had found the Government's evidence to be "highly circumstantial, tenuously connected, and 'largely invited only speculation and conjecture'").

Requesting a new trial on this basis is, of course, a significant ask, and one for which Defendants do not lightly move: "even if a district court believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *United States v. Silveus*, 542 F.3d 993, 1004-05 (3d Cir. 2008); *accord United States v. Johnson*, 2022 U.S. App. LEXIS 7630, *8 (3d Cir. Mar. 23, 2022). But at the end of the day, it is up to the Court. Indeed, "[a] determination of whether it should grant a new trial is left to the discretion of a district court." *Quiles*, 618 F.3d at 390 (citing *United States v. Cimera*, 459 F.3d 452, 458 (3d Cir. 2006)). Here, for the reasons set forth above and below, there truly is "a serious danger that . . . an innocent person has been convicted." *Silveus*, 542 F.3d at 1004-05. Accordingly, should it determine not to grant a judgment of acquittal, the Court should at the very least grant a new trial based on the insufficiency of the evidence, alone or in combination with the reasons set forth below; to let Defendants' convictions stand would, as set forth herein, be a manifest injustice that should not be permitted to occur.

### B.    The Verdict Relied Upon Evidence That Was Both Prejudicial And Plainly Irrelevant To "Medical Necessity."

There was, as discussed above, insufficient evidence, within the meaning of Federal Rule of Criminal Procedure 29, that physician-signed prescriptions submitted for reimbursement by Central Rexall were not in fact "medically necessary"—the only theory of fraud set forth in the Indictment. *See* Ind. ¶14 ("[i]t was the object of the conspiracy for defendants . . . to unlawfully enrich themselves by causing the submission of false and fraudulent insurance claims to [PBMs] for medically unnecessary Central Rexall compounded prescription medications. . . "). Indeed, as discussed above, the Government faced particularly daunting challenges in demonstrating that Defendants conspired to submit claims for medically unnecessary prescriptions given the

126

vagueness of that term, *see supra* at Sec. II.A., and the extent to which medical necessity is a matter entrusted to physicians, upon whom pharmacists—and pharmacies—reasonably rely. *See supra* at Sec II.B. Nor, as also discussed above, did the trial result in any direct evidence or legally sufficient circumstantial evidence that Defendants knew that claims were being made for medically unnecessary prescriptions. *See supra* at Sec. II.

Although some of the evidence adduced by the Government—however insufficient— was at least arguably relevant to an evaluation of medical necessity, much of the Government's case had nothing whatsoever to do with that sole theory of criminal liability. Thus, evidence relevant to Central Rexall's contractual obligations vis-à-vis PBMs—specifically regarding the pharmacy's work with 1099 sales representatives and commissions paid to those representatives, and with regard to co-pay collection—had no bearing upon the medical necessity of prescriptions submitted for reimbursement by Central Rexall. Nor did the plainly inflammatory evidence adduced regarding the compounding industry at large, or the amount of money made by Defendants, or how much sales representatives made in commissions. And, in an attempt to argue that any of this evidence was relevant to the charges brought with respect to the Defendants' intent or otherwise, the Government repeatedly invoked what it characterized—or mischaracterized—as false statements by the Defendants, each of which was ultimately clarified and negated by the record. Both separately, and especially taken together, the irrelevant evidence upon which the Government relied, and misleading statements which formed the basis of its summation and rebuttal, were unequivocally prejudicial, "substantially influenced the jury's decision," *Brown*, 2022 U.S. Dist. LEXIS 204896, at *4, and thus constitute the "miscarriage of justice" that demands that the Court grant Defendants a new trial under Rule 33, *Onque*, 169 F. Supp. 3d at 566.

127

1.    **The Government's Repeated References to W-2 versus 1099 Sales Representatives Were Contrary to the Court's Ruling with Regard to Anti-Kickback Statute Related Evidence, Prejudicial, and Irrelevant to "Medical Necessity."**

Throughout its case-in-chief, the Government continually elicited testimony and introduced documentary evidence regarding Defendants' business practices at Central Rexall and the pharmacy's purported breach of its contractual obligations to insurers and PBMs, none of which had any relevance whatsoever to the "medical necessity" of physician-signed prescriptions submitted for reimbursement. As one such example, the Government repeatedly emphasized that some Central Rexall sales representatives worked as independent 1099 contractors, rather than as W-2 employees of the pharmacy, and received commission payments. This evidence was used to make three points, none of which had anything whatsoever to do with medical necessity. First, it was used to show that in this regard, Central Rexall violated their agreements with the PBMs. Second, it was used to shoehorn in a great deal of evidence about how much money salespeople were making, also an irrelevant—albeit highly prejudicial—fact. And third, it was ultimately used to set up what the Government characterized as "lies" that Central Rexall made to PBMs regarding its sales work force, though—even assuming the actual statements at issue were false, which is far from clear—had nothing whatsoever to do with the Indictment's fraud allegations.

To briefly repeat, the Court will recall that this issue was the subject of substantial *in limine* motion practice. Specifically, immediately following the receipt of the Government's exhibit list, Mr. Johnston filed a motion to preclude all evidence related to commission payments for TRICARE prescriptions, and related to 1099 versus W-2 sales representatives or distributors, including several exhibits on the Government's list, under Rule 403. *See* ECF No. 221.1 at 5. In his motion, Mr. Johnston argued that evidence relating to whether or not certain Central Rexall employees paid these commissions, or, in that respect, actually engaged in "kickbacks," as defined

128

by the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("AKS"), was not at all probative of whether the Defendants engaged in the health care fraud actually charged in the Indictment, particularly insofar as kickbacks are an insufficient basis, as a matter of law, to support a healthcare fraud conviction.  *See* ECF No. 221.1 at 8-9 (citing cases).  He also argued that the introduction of such evidence would be unfairly prejudicial, particularly given the inflammatory nature of the "kickback" label.  *See id*. 6-13.  Finally, Mr. Johnston argued that permitting evidence and testimony regarding kickbacks risked constructively amending the Indictment, in violation of Mr. Johnston's "substantial right to be tried only on charges presented in an indictment returned by a grand jury" under the Fifth Amendment's Grand Jury Clause.  *Id.* at 13 (quoting *United States v. Syme*, 276 F.3d 131, 149 (3d Cir. 2002)).  In its opposition to Mr. Johnston's motion *in limine*, the Government argued that this evidence relating to kickbacks "directly proves [the Defendants'] intent to defraud, the materiality of their fraudulent misrepresentations and omissions, and their knowing and willful participation in the charged health care fraud and wire fraud conspiracy," and that "the payment of large, volume-based commissions to [1099] sales representatives is specifically alleged in the Indictment as a part of the conspiracy."  Jan. 6, 2025 ECF No. 235 at 2.  Specifically, the Government argued that the probative value of this evidence was based upon what it showed about the Defendants' intent to defraud, insofar as they "were told that what they were doing was wrong and against the law," as well as contrary to Central Rexall's agreements with the PBMs.  *Id.* 3; *see also id.* 6 ("Evidence that the defendants knew they were acting unlawfully when they paid commissions to non-employee sales representatives for TRICARE prescriptions is direct evidence of the defendants' willfulness[.]").

Separately, on the same day Mr. Johnston filed this motion *in limine*, ECF No. 222, the Government filed its own motion *in limine* seeking to admit "as intrinsic to the charged crimes

evidence that defendants authorized payments in violation of the federal Anti-Kickback Statute, or, in the alternative, permit that evidence under Fed. R. Evid. 404(b)" for non-propensity purposes.  ECF No. 221 at 1; *see id.* 18-39.  The Government acknowledged, as it had to, that "Count 1 of the Indictment alleges that the defendants conspired to defraud the PBA[42] from July 2013 through December 2016 by causing the submission of false and fraudulent insurance claims *for medically unnecessary compounded prescription medications*."  *Id.* 25 (emphasis added).  But the Government never explained how this AKS-related evidence supported the charged conspiracy, the sole object of which was the submission of medically unnecessary prescriptions. Instead, the Government argued that this evidence was "intrinsic to the charged conspiracy to commit wire fraud and health care fraud" as "Johnston's and Brockmeier's decision to knowingly violate both the AKS and Central Rexall's agreements with the PBA was . . . an act taken in furtherance of the charged conspiracy that directly proves the charged conspiracy to defraud TRICARE and the PBA."  *Id.* 25; *see also id.* 26 ("The defendants' decision to knowingly violate the AKS directly proves the material omissions and lies that the defendants caused to be made about the claims Central Rexall was submitting to the PBA.").[43]  The Government particularly

---

[42] "PBM" and "PBA" are synonymous.

[43] Indeed, the Government's motion repeatedly reiterated the ways in which the Defendants' actions ran afoul of the Anti-Kickback Statute, which, again, was not charged in this case.  *See, e.g.*, ECF No. 221 at 20, n.11; *id.* 20-21 ("paying commissions to non-employee sales representatives for referring prescriptions covered by a Federal health care program, like TRICARE, is illegal because it violates the Anti-Kickback Statute, 42 U.S.C. § 1320a–7b(b). . . . . [] in late 2014, Johnston's and Brockmeier's greed caused them to disregard the law and pay commissions to sales representatives who directed compound prescriptions for TRICARE beneficiaries to Central Rexall."); 21-22 ("In less than six months after opening the floodgates to TRICARE prescriptions, Central Rexall received nearly $40,000,000 in reimbursements for prescriptions covered by TRICARE. All of these reimbursements were obtained in contravention of the AKS because Central Rexall paid commissions to non-employee sales representatives so that the prescriptions would be sent to Central Rexall.").

emphasized that the Defendants' alleged violations of the AKS constituted a breach of Central Rexall's contractual agreements with PBMs. *Id.* 28 ("The defendants' submission of claims to the PBA for prescriptions obtained in knowing violation of the AKS constitutes a material misrepresentation or omission to the PBA. Testimony from a PBA representative at trial will establish that, had the PBA had known that Central Rexall was paying commissions to non-employee sales representatives for referring TRICARE prescriptions to Central Rexall, the PBA would not have paid those claims to Central Rexall."). But the Government did not elucidate how evidence of uncharged conduct relevant to the AKS, or of related contractual breaches, supported—much less, how it was intrinsic—to Mr. Johnston's intent to conspire to submit medically unnecessary prescriptions for reimbursements. Instead, the Government stated that "[t]estimony at trial will establish that distributors paid commissions by Central Rexall fraudulently generated TRICARE prescriptions by paying patients and prescribers to receive and prescribe the medications[,]" and "that the outside sales representatives would not have steered the lucrative TRICARE prescriptions to Central Rexall had the defendants adhered to the AKS and declined to compensate the sales representative with commissions." ECF No. 221 at 23. In opposition to the Government's motion *in limine*, Mr. Johnston argued that the allegation Central Rexall's payment structure violated either the Anti-Kickback Statute, or Central Rexall's contracts, simply does not bear on the offense charged, which again was that Mr. Johnston conspired to submit prescriptions that were false and fraudulent by virtue of being medically unnecessary. *See* ECF No. 236 at 10 (citing Ind. ¶ 14); *see id.* 10-11 ("Whether or not a particular prescription was false, fraudulent, not medically necessary, or procured through payments to a doctor or a patient has nothing to do with whether the sales representative who generated that prescription should not, as a matter of statutory or contractual law, have been paid a commission on that prescription.").

And Mr. Johnston again argued that this evidence would be far more prejudicial than probative. *Id.* 23-27.

At oral argument on these motions, the Court expressed its initial impression that evidence of commissions payments in violation of the Anti-Kickback Statute, while not "intrinsic" to the offenses charged, "may be extrinsic . . . to give a full understanding to the jury" regarding an uptick in Central Rexall's business.  Tr.32:17-25.  Nevertheless, the Court also expressed its reservation that "to say it was a violation of the antikickback statute . . . is highly prejudicial.  They're not charged with that violation or that statute.  And to say or bring in evidence that there was a violation of that statute . . . we start having a mini trial over the legality of those commissions[.]"  Tr.33:5-11.  In response, the Government again articulated its view that the probative value of the fact that Central Rexall worked with 1099 sales representatives, and representations they made to PBMs regarding 1099 contractors, spoke to "their state of mind as far as their submission of claims to the PBMs and as far as what the PBMs would find material to their decisions to pay claims."  Tr.48:22-25; *see also* Tr.36:9-13 ("But the fact that they knew what they were doing was unlawful and wrong is directly relevant to the key issue in this case, which is that they made fraudulent claims to the PBMs. They misrepresented what they were doing, they omitted what they were doing.").  The Government also stated, without further elaboration, that "paying kickbacks, paying commissions, leads to medically unnecessary prescriptions."  Tr.55:5-9.  In response, the Court correctly noted that the "state of mind and the intent that [the Government was] bringing up with this evidence is their state of mind and their intent to violate the antikickback statute," rather than "what's relevant for this case," namely "the intent and the state of mind to commit healthcare fraud[,]" and, more specifically, "the conspiracy to commit healthcare fraud is about medical necessity . . . [and] not about violating the antikickback statute."  Tr.52:7-53:15.

The Court granted Defendants' motions *in limine*, ECF Nos. 222, 223, thereby "limit[ing] evidence the government argues is intrinsic to the charged crimes that defendants authorized payments in violation of the federal Anti-Kickback Statute or, in the alternative under Federal Rule of Evidence 404(b)," ECF No. 249 ¶5.  Specifically, the Court noted that this evidence would not be probative of Defendants' intent, as "[i]t is not relevant to the intent relating to the submission of false and fraudulent medically necessary prescriptions."  Tr.99:24-100:1.  The Court further found that evidence relevant to violating the Anti-Kickback statute did not "facilitate" the charged healthcare fraud and wire fraud sufficient for admissibility as intrinsic evidence; at most, it "just ma[d]e that conspiracy conduct more lucrative."  Tr.100:2-19.  Finally, weighing whether the evidence could properly be admitted as extrinsic, the Court noted that there is "little" probative value to Anti-Kickback Statute related violations compared to the "very substantial prejudice" engendered by "talking about a violation of another statute that is uncharged in the indictment." Tr.101:3-9; *see also* Tr.101:10-15 ("If you start telling the jury that you're . . . alleging various illegal acts by the defendants, then they may have the idea that these are just bad actors in general and they're operating a shady business and that . . . they are more likely to have violated the charges against them here.").  Moreover, the Court stated that the Indictment's references to payments of commissions to sales representatives "is not in any way connected in the indictment to the reasons that the prescriptions were medically unnecessary," and that the novel notion introduced by the Government that "the payment of the commissions was a separate fraud that related to the medically unnecessary prescriptions" provided Defendants prejudicially late notice of the nature of the Government's charges.  *See* Tr.101:20-102:4.  In sum, the Court ordered that "[a]nything related to the violation of the antikickback statute will be prohibited," though added that "anything

133

related to the payment of commissions and the payment of commissions that are in violation of the agreement with the PBMs is free game[.]" Tr.102:5-10.[44]

At trial, however, the Government failed to demonstrate that the use of 1099 contractors or commissions payments had anything whatsoever to do with medical necessity. Instead, it raised this issue in three different ways. First, it contended that, in using 1099 contractors, the Defendants violated the terms of its agreements with the PBMs in order to attract potentially profitable sales representatives. Specifically, on direct examination of Mr. Boyle, the Government elicited testimony that, at some point after May 2014, Central Rexall started to pay commissions to 1099 sales reps for TRICARE prescriptions, Tr. 2339:18-2340:3, because "[Central Rexall] w[as] losing business to other pharmacies that were, so it was essentially everyone else was paying on TRICARE, so we should." Tr. 2340:8-10. Following this change in commission payment policy, to which Mr. Boyle testified, Central Rexall started receiving a large number of TRICARE prescriptions, and, in the first few months of 2015, TRICARE prescriptions were a big part of Central Rexall's compounding business. *See* Tr. 2340:22-25. The Government subsequently had Mr. Boyle read portions of GX377A, a March 4, 2015 letter from law firm Frier Levitt to

---

[44] The parameters of the Government's permitted proofs, following the Court's ruling regarding AKS evidence, was raised again when the Government asked Mr. Boyle, on direct examination, whether Central Rexall "pa[id] commissions to 1099 sales reps for prescriptions for patients who had insurance through TRICARE," Tr.2329:3-6. In response to the defense's objection, the Court clarified its ruling as permitting the Government to "bring in the change in the commission structure or the payment of commission because that was in violation of the agreements with the PBMs . . . [t]hat was the reason for bringing it in. Not for any illegality[,]" and that the Government "could show that there was a change in the commission structure because that was a violation of the agreement." Tr.2331:19-2232:3. The Court stated that the probative value of this evidence was "to tell a complete story . . . about how it became so lucrative and how it exploded[,]" namely by "paying commissions . . . in violation of the agreement" with PBMs. Tr.2332:24-2333:2. Thus, as elicited by the Government, the fact that Central Rexall paid 1099 representatives commissions was conducive to increasing the pharmacy's profits, while being potentially problematic under Central Rexall's contracts with PBMs. But respectfully, this, again, does not bear upon the medical necessity of prescriptions submitted for reimbursement.

Defendants recommending they switch Central Rexall's sales representative workers from 1099 to W-2 status due to provisions of their PBM contracts. *See* Tr. 2341:3-2344:23. Specifically Mr. Boyle read to the jury that, as stated in Frier Levitt's letter, "PBMs are asking questions during recredentialing about pharmacies' relationship with marketers, i.e., whether they are 1099 or W-2, and are specifically taking issue with marketing arrangements set up through a 1099 commission arrangement." Tr. 2343:21-25. The Government then adduced from Mr. Boyle that Frier Levitt was "recommending that the pharmacy use W-2s instead of 1099s," as the law firm expressed that "pharmacy benefit managers were taking issue with the use of 1099s[.]" Tr.2344:18-23. Specifically, the Government elicited the following testimony from Mr. Boyle regarding Frier Levitt's advice:

> Q. Now, was Frier Levitt here recommending that the pharmacy use W-2s instead of 1099s?
> A. Yes.
> Q. And did they say that pharmacy benefit managers were taking issue with the use of 1099s?
> A. Yes.
> Q. After receiving this letter from Frier Levitt, did Central Rexall change its practice of obtaining compound prescriptions by paying commissions to 1099 sales representatives?
> A. No.
> Q. Whose decision was it not to stop paying commissions to 1099 sales representatives?
> A. The management group, Trent, Kyle and Hayley.
> Q. Did Mr. Johnston discuss with you that one of the reasons was because making money depended on paying commissions to 1099 sales reps?
> A. Yes.

Tr. 2344:18-2345:10. The Government then had Mr. Boyle read out a subsequent email received by Mr. Boyle from Frier Levitt on March 23, 2015, following Central Rexall's decision to not engage the firm:

> Q. And can you read this email starting with as I understand it?
> A. As I understand it, you are utilizing 1099 marketers and compensating them on a commission basis. Recently, many PBMs

> have adopted robust recredentialing processes where they ask direct questions regarding the pharmacy's use of 1099 marketers, and we have seen PBMs decline to recredentialing pharmacies because of marketing arrangements. More directly, OptumRx has recently amended their pharmacy manual effective April 1st explicitly prohibiting the use of 1099 contract marketers. Specifically, the many updates stated that the use of Form 1099 contractors to market pharmacy or a particular compounded drug is a prohibited activity, subjecting the pharmacy to network termination. Therefore, we would still strongly recommend switching from a 1099 model to a W-2 model, because it would reduce your risk of audit and network termination vis-à-vis the PBMs.

Tr.2347:13-2348:4.  In its closing argument, the Government then repeatedly raised the point that Central Rexall declined advice regarding its work with 1099 sales representatives, though "they were told that PBMs would scrutinize their use of 1099 sales reps[.]"  Tr.3834:4-7; *see also* Tr.3834:12-17 ("Johnston also solicited advice from pharmacy law specialists about using 1099 sales reps and that law firm advised Johnston that PBMs were scrutinizing pharmacies' relationships with 1099 marketers. The lawyers told Johnston that PBMs were declining to recredential pharmacies that were using 1099 marketers."); Tr.3900:5-7 ("The defendants were advised by consultants and lawyers to stop using 1099 sales reps and to collect co-pays.  They ignored that advice.").

But the only argument that all of this evidence supported was a possible breach of Central Rexall's contractual obligations toward PBMs, potentially resulting in a "risk of audit and network termination."[45]  Tr. 2348:2-4.  Of course, as the defense argued, such a breach of contract (as

---

[45] Mr. Boyle nevertheless clarified a misleading line of the Government's questioning on direct regarding whether Central Rexall employed any W-2 sales representatives.  Specifically, the Government introduced GX289, a December 11, 2014 email from Mr. Boyle to a sales representative stating that Central Rexall "has been in the process of adapting to the ever-evolving healthcare landscape" and had "decided to move to a direct sales force and not use independent contractors."  Tr.2350:5-9.  While Central Rexall was still working with some 1099 contractors at the time Mr. Boyle sent that email, he provided the following clarification:

opposed to fraud in the inducement of a contract as in *Kousisis*) is not, as a matter of law, a fraud. *See* Tr.3773:1-4 (Jury charge: "Ordinary civil negligence does not give rise to criminal liability, nor does an ordinary breach of contract or a failure to honor one's promise give rise to criminal liability."); *United States v. D'Amato*, 39 F.3d 1249, 1261 n.8 (2d Cir. 1994) (it is well established that a mere breach of contract, or the failure to fulfill a civil obligation, is not a crime); *United States ex rel. Main v. Oakland City University*, 2005 WL 2665600 (7th Cir. 2005) ("[F]raud requires more than breach of promise: fraud entails making a false representation, such as a statement that the speaker will do something it plans not to do. . . . [F]ailure to honor one's promise is (just) breach of contract, but making a promise that one intends not to keep is fraud."); *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791 (1st Cir. 1990) (stating "[n]or does a breach of contract in itself constitute a scheme to defraud" and concluding that alleged kickback scheme could not be construed as a scheme to defraud).  But beyond this legal principle, the Government did not, because it could not, show that the use of 1099 contractors had anything whatsoever to do with medical necessity.  There was not, as just one example, any evidence that it had anything to do with any doctor's decision whether or not to prescribe a particular product.

To be sure, the Government argued that the 1099 contractors here, including contractors associated with Top Tier Medical, Supreme Medical, Military Medical Relief, and Boardwalk Medical, were paid huge commissions, both in terms of percentages of sales and in terms of the

---

Q. Why did you lie in this email?
A. *We did start to hire some W-2 sales reps*. But we also used it as an opportunity to get rid of some sales groups that were underperforming.

Tr.2350:20-23 (emphasis added).  That is, Mr. Boyle, Central Rexall's Chief Compliance Officer, denied lying in the email based on the fact that the pharmacy had started to hire W-2 sales reps, consistent with it being "in the process of adapting" to different policies.  *See* GX289.

amount of money paid. *See* Tr.1964:1-23 (Cross examination of William Hickman: "Q. . . . Initially [his commission] was 40 percent; is that right? A. Yes. Q. But then you had a conversation with -- I think it was Mr. Brockmeier? A. That's correct. . . . Q. And it went up to 45 percent. Right? A. Correct. Q. Then there was some bargaining back and forth and it went up to 50 percent. Right? A. Yes. Q. And then from there we've seen that it goes up to . . . it goes up to 54 percent and 56 percent. Right? A. Correct. Q. And you were -- you got those higher commission rates by negotiating. Right? A. Yes."); GX 1096 (summary chart demonstrating Central Rexall's monthly reimbursements by distributor from May 2014 to February 2016, specifically focusing on the sums and proportions associated to Boardwalk Medical, Military Medical Relief, Top Tier / Top Shelf, and Supreme Medical); GX-1053 (summary chart demonstrating payments made by Central Rexall to Top Tier Medical and Top Shelf from August 15, 2014 through April 15, 2015 totaling over $4 million); GX-1054 (summary chart demonstrating payments made by Central Rexall to Military Medical Relief or LS Labs from January 5, 2015 through March 2, 2016 totaling $3.6 million); GX1055 (summary chart demonstrating payments made to Supreme Medical Solutions from August 2014 to April 2016 totaling $7.7 million); GX1057 (summary chart demonstrating payments made to Boardwalk Medical from February 18, 2015 through July 15, 2016 totaling $26.2 million). But that information, again, had nothing to do with medical necessity, and much more to do with what the PBMs were willing to reimburse, as commission payments reflected a percentage of a prescription's reimbursement rate. *See* Tr:1789:20-1790:1 (William Hickman direct: "Q. What commission percentage were you getting at the start? A. 30 percent. Q. Can you explain what that's a percentage of? 30 percent of what? A. So I would get 30 percent of the amount of money that the insurance company paid for the prescription per patient per month. So if it was $100, I would get $30 of the $100."); Tr.161:22 (Taff direct: "Q. And what would the commission

be based on? A. On reimbursed prescriptions. So only if the prescription was covered by the patient's insurance. Q. And that would be a percentage of the insurance reimbursement? A. Correct. Q. And would it be a percentage of the insurance reimbursement minus the cost of what it took to make it? A. Yes.").

Of course, it cannot be denied that commissions could and do incentivize a fraudster to try to engage in fraudulent acts, but that would be true regardless of the amount of the commissions, or whether a fraudster were classified as a 1099 contractor or W-2 employee.  Tr.1966:5-20 (William Hickman cross:  "Q. And, again, there was nothing wrong with focusing on those products that would yield the highest reimbursement and so therefore the highest commission for you. Right? A. Yes. Q. And so long as the insurance companies would reimburse at those rates, your view was that your job was to take full advantage of that. Right? A. Yes. Q. Okay. Until they stopped, until they wised up and realized that you had been right in the first place, these rates were nuts and obnoxious, and the insurance companies and PBMs stopped paying it. Right? A. Yes. Q. And that's the point at which this whole compounding industry kind of fell apart. Right? A. To my understanding, yes.").  Indeed, there is no reason to believe that paying a lower commission would necessarily result in less fraud; indeed, it could result in more instances of fraudulent sales, in order to make the same amount of money as a higher commission contractor would make through fewer sales.  Nor even, is it the case that only those paid on commission are incentivized to commit fraud; thus, for example, those paid by the hour may fraudulently lie about their hours, in an effort to make money.

Prior to trial, the Court was persuaded that it should allow in evidence of the commission payments made to sales groups used by Central Rexall, based upon the Government's representation that this evidence would be probative of the Defendants' intent to defraud, as,

according to the Government, the Defendants "knew that paying those commissions on TRICARE prescriptions would not be acceptable to the PBMs that they're directly submitting claims for[.]" Tr.64:20-25.  But, although the  Government focused a great deal of attention on this evidence at trial, *see, e.g.*, Tr.36:7-20 (Gov't opening:  "defendants found equally greedy sales representatives around the country. They offered these sales representatives 40 percent, sometimes 50 percent or more commissions on these prescriptions."); Tr. 3812:11-12 (Gov't closing:  "The defendants paid large commissions to outside sales reps to get Central's compound prescriptions prescribed."); Tr. 3834:4-7 ("by paying such large commissions they were able to attract so many prescriptions."); Tr. 3880:20-22 ("After Central Rexall received the reimbursements, they paid 30 to more than 50 percent in commissions to its sales reps."), as it turned out, the entire discussion of commissions was really just a thinly veiled attempt to argue that there must have been fraud because of the amount of money that was being made.  Leaving aside that such an aphorism is not legally cognizable, let alone amount to proof beyond a reasonable doubt, it was also meant to prejudice the jury with the irrelevant fact of how much money the 1099 contractors were paid, and because the sales groups were thus incentivized to sell more product, how much the defendants made.  But in truth, the evidence regarding commissions policies at Central Rexall, or the amounts of the commissions paid, bore no relevance at all to issues of either the Defendants' knowledge and intent, or to the question of whether they agreed to submit false and fraudulent insurance claims. *See, e.g.*, *Park W. Radiology v. CareCore Nat'l LLC*, 675 F. Supp. 2d 314, 325 (S.D.N.Y. 2009) (excluding evidence of fraud by a nonparty because such evidence has only tangential bearing, if any, on disputed issues and "any probative value of this evidence is substantially outweighed by the possible confusion of the issues"); *United States v. Walters*, 226 F. Supp. 3d 821, 825 (E.D. Ky. 2016) (noting that "inappropriate payment arrangements do not, by default, indicate intent to

defraud" and excluding evidence of kickbacks in health care fraud case as unduly prejudicial because it "suggests to the jury that Defendants are generally engaged in shady business practices").

Finally, the Government sought to use the fact that Central Rexall worked with 1099 sales reps to shoehorn in evidence regarding alleged false statements that Central Rexall made to the PBMs. But, as is discussed at length above, this effort amounted to an attempt by the Government to prosecute a fraud for these false statements, as opposed to the fraud actually charged in the indictment, focusing on making claims for medically unnecessary prescriptions. As noted above, this argument actually serves to demonstrates the insufficiency of the government's proofs as a matter of law, but at the very least, establishes a fatal variance between the indictment and the proofs at trial, *see supra* at Sec III.

Specifically, on direct examination of Chief Compliance Officer and Assistant Counsel Mr. Boyle, the Government introduced GX576, a recredentialing form submitted in August 2015 by Central Rexall to CVS, a PBM, solely to emphasize that Central Rexall provided incomplete or misleading answers with regard to the irrelevant issue of 1099 versus W-2 employees, as follows:

> A. Does your pharmacy have, or contract with, a sales force to promote your compounding services directly to patients or prescribers? Provide detailed information if they are employees, W-2, or contractors, 1099.
> Q. Can you please read Central Rexall's response to that question?
> A. We currently employ 7 sales personnel, all of whom are W2 employees. We do not have any individual sales personnel who are 1099 contractors.
> Q. Was the answer we do not have any individual sales personnel who are 1099 contractors intentionally misleading?
> A. Yes.
> Q. And would a truthful and complete answer have been that Central Rexall employs a lot of 1099 sales groups?
> A. Yes.
> Q. Did you know that it was misleading to answer the question in this way?

> A. Yes.
> Q. Why did you respond in an intentionally misleading manner?
> A. In discussions with the management group, the belief was that
> we would not be able to pass recredentialing if we answered directly.

Tr.2352:25-2353:22. Then, although this evidence ultimately had nothing whatsoever to do with medical necessity, the Government nevertheless placed great emphasis on these false statements in closing and on rebuttal. *See, e.g.* Tr.3896:6-18 (closing: "Rather than stop using 1099 sales reps, the defendants just lied about using them. . . . here's a list of actions showing that the defendants' violation of the law was willful and they had the intent to defraud. . . . They lied to CVS about their use of 1099 sales reps."); Tr.3835:2-9 (closing: "when Johnston and Boyle were asked by a PBM, CVS, about Central Rexall's use of 1099 marketers, they lied. They said we do not have any individual sales personnel who are 1099 contractors. As you know from sitting through this trial, that was false and misleading. Nearly all of Central Rexall's business came through 1099 sales reps."); Tr.4155:20-4156:1 (rebuttal: "You'll recall this lie from Ryan Boyle that again was approved by Kyle Johnston, telling Amerisource Bergen in response to an inquiry, we currently employ 7 sales personnel, all of whom are W-2 employee[s]. We do not have any individual sales personnel who are 1099 contractors. You all know that's a lie. This whole case was built on 1099 contractors."); Tr.2190:23-25 (Government at sidebar: "[T]his case is all about whether PBMs were deceived in paying for these medications."). In doing so, the Government sought—and ultimately obtained—a conviction based upon evidence that, just as the Court had held in excluding evidence of violations of the Anti-Kickback Statute, was simply "not relevant to the intent relating to the submission of false and fraudulent medically necessary prescriptions." Tr.99:24-100:1 (the Court's ruling regarding Anti-Kickback Statute related evidence).

Nor was this even a fair argument. The purported misrepresentation described in this testimony was that "we do not have any individual sales personnel who are 1099 contractors." But

this was true:  Central Rexall contracted with sales *groups*, which in turn employed sales personnel.  *See* Tr.162:16-23 (Taff direct:  "Q. And did these sales reps, did they work on their own or did they have additional sales reps under them?  A. Initially they were sort of working on their own, but as it went on, there were larger and larger groups. Q. Can you give us any idea about the size of the groups they had? A. Yeah. So it would range from 2 to 20 to 40. So it sort of became more and more like a pyramid of like sales reps with what we called distributors and then master distributors, so people above them.").  It would not, then, have been "a truthful and complete answer," as the Government led Mr. Boyle to say, "that Central Rexall *employs* a lot of 1099 sales groups."  Central Rexall contracted with the sales groups at issue in this case, such as Boardwalk Medical, Top Tier Medical, Supreme Medical, and Military Medical Relief.  Indeed, those contracts were part of the evidence in the case.  But they did not make those groups, or those who worked for them, employees of Central Rexall.  *See, e.g.*, GX 414 at 4 (signed "Sales and Administrative Services Agreement" between Central Rexall and Boardwalk Medical which notes, at ¶6, "RELATIONSHIP OF PARTIES.  The Representative Parties shall act as, and be deemed to be, independent contractors for all purposes of this agreement and *shall not act, and shall not be deemed to be, an agent, employee, or servant of the Company*.") (emphasis added).  To the contrary, the nature of the 1099 independent contractor relationship is, obviously, not one of employment and thus, the "complete and truthful answer" that the Government argued should have been provided by Central Rexall was anything but.

Indeed, this came out elsewhere in Boyle's testimony.  Thus, on direct examination of Mr. Boyle, the Government introduced an email forwarded by Mr. Boyle to Mr. Johnston, GX335, which indicated that "Catamaran," one of several PBMs Central Rexall submitted claims to, had a "network . . . specifically for compounding pharmacies" which Central Rexall was interested in

143

joining, Tr.2327:10-13, and listed as a pre-requisite to doing so that "Pharmacies may hire individuals to market compounded medications on behalf of the pharmacy. These individuals must be W-2 employees only, not 1099 independent contractors." GX335; Tr.2327:22-24. The Government thereafter elicited from Mr. Boyle testimony that Central Rexall did not "disclose to Catamaran that it was paying 1099 independent contractors to market compound medications." Tr.2328:12-15. But on cross-examination, Mr. Boyle acknowledged that the 1099 versus W-2 work force figures provided by Central Rexall to Catamaran in its credentialing application were actually accurate, *see* JDX523 at 4 ("United Compounding Management Network Pharmacy Credentialing Application", indicates "number" of "sales force" as "40 – 1099" and "6 – W-2" in handwriting); Tr.2558:22-2559:12 ("The 40 was the number of groups, 1099 groups, that we had. And the 6 was the W-2 employees that he had . . . Q. And to your knowledge, was that an accurate number? A. Yes.").

But all of this said, whether Central Rexall in fact worked with 1099 sales representatives, and what the pharmacy's management decided to represent or not to PBMs regarding those contractors, bore no impact whatsoever on the "medical necessity" of a prescription. That is, whether Central Rexall's use of 1099 employees showed a violation of its agreement with the PBMs, the enormous amounts of money that were made in this enterprise, or bore upon the truthfulness of certain statements that were made to PBMs, none of these had anything to do with the conspiracies to commit health care fraud alleged in Count 1, identity theft in Count 2, or money laundering in Count 3; in other words, none of them had a thing to do with the actual charges in the Indictment, focusing on the submission of claims for medically unnecessary prescriptions. Nonetheless, the proofs on this issue made up a very substantial part of the Government's successful argument for conviction and it may well have resulted in a guilty verdict though these

proofs really had nothing to do with the actual allegations in the case, but rather went to the defendants' overall business practices, and may well have resulted in the otherwise inexplicable jury verdict that was reached because it painted the defendants as bad and dishonest people.  A new trial should be ordered to address this terrible injustice.

> ### 2. The Government's Presentation Of Evidence Regarding Central Rexall's Co-Pay Collection Practices Was Irrelevant To "Medical Necessity," And Prejudicial.

Another enormous part of the Government's case was its focus on "co-pays."  Thus, at trial, it emphasized evidence which, it claimed, showed that Central Rexall did not require that patients remit co-payments, including data showing that it collected only 31.2% of co-pays, *see* GX245A,[46] and four examples in which, it claimed, co-pays did not merely go uncollected, but were actually affirmatively waived (although none up front).[47]  The Government nevertheless

---

[46] As the cross-examination of Mr. Hickman revealed, however, there is good reason to question the accuracy of this figure.  Specifically, while Mr. Hickman initially testified that Central Rexall continued sending Mr. Hickman's wife prescribed medications, despite the Hickmans not paying the co-pay bills Central Rexall would send along with the medications, *see* Tr.2076:3-11, upon being shown his own credit card statement from the time in question, JDX325 (July 9, 2015 charges), Hickman acknowledged in fact, the co-pays from his wife were, or at least may have been, paid.  *See* Tr.2078:13-19.

Moreover, Mr. Khaled Farahat—who assembled the accounts receivable reports to reach the 31.2% copay collection figure emphasized by the Government—ultimately clarified that those same accounts receivable reports in fact captured indebtedness from *all* sources, not merely unpaid copays, thus clearly resulting in an inaccurately low percentage as concerns only unpaid copays. *See* Tr.2734:5-17 (Farahat cross:  "Q. But now even aside from the way the figures look, when you're doing this accounts receivable report, that is patient indebtedness from every source. Correct? A. Correct. Q. So if it's a cash payment and they didn't pay the cash, that would be reflected in the accounts receivable report. Correct? A. Correct. Q. So let's -- is it fair to say that most of these are likely co-payments. Correct? A. Correct. Q. But not all of them? A. Correct.").

[47] *See* GX121 (email from Mr. Brockmeier dated March 26, 2014 signing off on crediting a particular patient's co-pay of $40 after receiving a request from a Central Rexall associate as "everything that could go wrong did go wrong" with respect to filling the prescription, including the patient having to verify her doctor's contact information and contacting insurance following an initial denial); Tr.3560:19-3561:1 ("Q. You can see that -- you can see that this patient had --

misleadingly claimed in summation that "Brockmeier explicitly waived co-pays *up front*. And he was crystal clear about his reason for waiving co-pays. If the insurance reimbursement was hundreds or thousands of dollars, Brockmeier did not want to miss out on that payday just because a patient didn't pay his co-pay." Tr.3862:16-20 (emphasis added). But more to the point, as the Government ultimately acknowledged in summation, what the Government characterized as unpaid co-pays may have in fact included co-pay payments that were simply made late. *See* Tr.3863:13-15 ("Bill Hickman told you that his wife kept getting refills even though his wife never paid any co-pays until months later."). And, indeed, Central Rexall's data belied the 31.2% number upon which the Government's case relied. *See* JDX-888 (internal Accounts Receivable report dated 2017 showing that after often successful efforts to collect copays, including when patients agreed to pay before their medication was shipped, the collection rate was much higher. Thus, the Government's statement in closing that "Brockmeier stopped sending emails saying they would waive co-pays but he still failed to routinely collect them," Tr.3863:11-12, relied on co-pay collection numbers that were demonstrably inaccurate.

But even assuming that the evidence that Defendants were responsible for co-pays not being paid in sufficient number was established beyond a reasonable doubt—a dubious proposition, as set forth above—the Government's evidence did not show that the failure to collect co-pays was sufficiently related to the fraudulent submission of claims for medically unnecessary

---

was already engaged in getting a prescription from Central Rexall and asked that the co-payment -- that she not have to pay a co-payment that had already been billed. Right? A. Yes. Q. So this was not a situation where the co-payment was waived in advance in order to get her to be a patient. Right? A. It doesn't appear that way, no."); GX123 (March 28, 2014 email from Mr. Brockmeier permitting the waiver of a $10 co-pay for a patient who "really watches his pennies" and "wanted to [cancel] his [prescription] because he didn't want to pay $10 copay"); GX125 (March 31, 2014 email from Mr. Brockmeier permitting the waiver of a $10 co-pay); GX126 (March 31, 2014 email from Mr. Brockmeier permitting the waiver of a $10 co-pay).

prescriptions to outweigh the prejudice of its admission, and the possibility that, as a result of these proofs, the defendants stand unjustly convicted. That is because it is clear from the record that the Government sought to use this evidence, not to show that claims were made for medically unnecessary prescriptions, but over and over at trial, to show that Central Rexall did not abide by its contractual obligations to PBMs and insurers. *See, e.g.*, Tr.932:20-23 (Melissa Olsen direct: "Q. Do pharmacy benefit managers and insurance companies require a pharmacy to collect the co-pay associated with a prescription? A. Yes. It's -- that much I know to be in the contract."); Tr.3182:18-24 (Blake Stockwell direct: "Q. We'll talk about Section 2.4 [of GX37, a provider agreement between Express Scripts and Central Rexall] in more detail in a minute, but is that the section that requires the collection of co-pays? A. Yes, sir. Q. And so would the failure to collect co-pays under this section be a grounds for terminating the agreement? A. Yes, sir. It could be."); Tr.3190:7-12 ("Q. In a short term, since it's a long paragraph, what does Section 2.2 -- that first paragraph of Section 2.2 provide? A. Sure. You know, similarly, it is the pharmacy's responsibility to collect co-pays. They can't be altered or waived. And essentially if a patient has a question about that, they can contact us and we'll speak with them."); Tr.3191:5-14 ("Q. And, you know, we saw before that the provider agreement says the pharmacy's obligated to collect co-pays. Is there anything in this Section 2.2 that says the pharmacy does not have to collect co-pays? A. No, sir. I mean, unless required by law. So that would be the only situation where -- there are ways where a pharmacy can make a good-faith determination that a patient actually can't afford a drug. In that case, they can waive that within the law. But other than that, no, they would not be able to do it."). Indeed, the Government's conclusory statement in closing purportedly relating the medical necessity of prescriptions to co-pay collection revealed that co-pay collection evidence was, in reality, only relevant to demonstrating a breach of Central Rexall's contractual agreements with

147

PBMs. *See* 3860:16-19 ("Because collecting co-pays is so important to making sure prescription medications are medically necessary, co-pays have their own section of the contract between Express Scripts and Central Rexall.").[48]

Nor is it correct, as the Government argues, that medical necessity is established by the patient's desire for the product, which is established by his or her payment of a co-pay; that is, the Government argued that PBMs and insurers mandate co-pay collection because a customer would not agree to pay a co-pay for a prescription they did not actually need. *See* Tr. 3859:25-3860:19 (Government closing: "If you're sick or if you have a medical condition, you're probably willing, even grateful, for the opportunity to pay $10 or $20, maybe even $100 for a medication that will help you get better. . . . But would you pay $100, $20 or even $10 for a medication that you don't need?"). But this argument discussion conflates a patient's desire for medication with the question of medical necessity, a contention that is wrong both because not everything a patient wants is deemed medically necessary (as prescribed by a doctor and approved by an insurer) and because

---

[48] It bears mentioning that the Express Scripts manual, which determined Central Rexall's contractual obligations to that PBM, changed several times during the relevant timeframe. Significantly, the 2014 manual, GX59, did not mandate co-pay collection. *See* Tr.2566:11-21 (Boyle cross: "Q. . . . the pharmacy, shall do three things in this whole paragraph [of the 2014 manual]. It shall ensure that the co-payment is the correct amount. Right? A. Correct. Q. It shall not change the co-payment amount. Right? A. Yes. Q. It shall not waive the co-payment amount. Right? A. Correct. Q. It does not say in this paragraph we just looked at it, that the pharmacy shall collect every co-pay. That's not what that says. A. It does not say that in this paragraph."). Rather, that obligation was explicitly added into a subsequent version of the Express Scripts manual published in 2016, *see* GX64; Tr.2568:17-22 (Boyle cross: "Q. It says: Co-payments are a critical benefit design tool that can sensitize members to the cost of their medications and encourage members to seek out less expensive medications that are equally as effective as more expensive medications. We didn't see that in the first version. Right? A. No."); Tr.2569:19-24 ("Q. But the part that's new is that the network provider agrees that it shall collect the full co-payment from the members. Correct? A. Correct. Q. That was not in the 2014 version. Correct? A. Correct."); Tr.3309:21-3310:1 (Stockwell cross: "Q. Okay. And the additional information [added to the 2016 manual] is -- makes it very clear that the pharmacy agrees that it shall collect the full co-payment. That language was not in the earlier language. Correct? Right? A. It wasn't. . . .").

there are times that, as the evidence in this case made clear, a patient does not want to pay a co-pay even for a prescription that is signed by a doctor.  Of course, the problem that plagues the analysis, as always, is the lack of any definition of medical necessity, but the truth is that none of the definitions that have ever been offered turn on the patient's desire for the pharmaceutical product, or willingness to pay something for it.  *See supra* at Sec. II.

Nor, of course, does the record support the argument that Central Rexall did not attempt to collect co-pays.  As the defense pointed out, and as the record showed, Central Rexall's policy—and that of Mr. Johnston and Mr. Brockmeier—was to attempt to collect co-pays.  And the pharmacy's practice followed suit.  Thus, it was fundamentally undisputed that patients were informed of their co-pay amounts, and that, if the amount was approved by a patient, that the patients were billed.  *See also* JDX419 (Email from Mr. Rolling to Mr. Boyle dated September 24, 2014:  "Ryan, Can you look into why this patient was told they would not have a copay?"); Tr. 2743:7-17 (Farahat recross:  "Q. And Central Rexall had a policy of calling a patient to verify the co-pay; is that right? A. I believe so, yes. Q. And am I right that they would send a bill to the patient to collect on the co-pay? A. I don't remember that part. I can't confirm. Q. Well, do you know if Central Rexall hired someone specifically for the job of collecting co-pays? A. Yes. That's correct. Q. And organizing those bills; is that right? A. Yes."); Tr. 2543:23-2544:2 ("Q. . . . So one of the reasons a separate person had to be hired to do it was just there were so many patients and you needed a person who was going to be completely dedicated to the follow-up to collect co-pays. Right? A. Correct.").  And, Mr. Johnston was not involved in a number of the exchanges when they were not, *see* GX121, GX123, GX125, GX126.

But, in any event, the Government's focus on Central Rexall's failures to collect co-pays, despite the efforts that it made, is again beside the point:  it has nothing to do with medical necessity

and everything to do with the Government's effort to convict the defendants for what it views as

bad business practices and breaches of the pharmacy's contracts with PBMs,[49] as opposed to for

---

[49] As set forth above, this evidence was of a piece with other proofs that went much more to bad business practices or breaches of contract than to any fraud, let alone the fraud—submitting claims for medically unnecessary prescriptions—that is alleged in the Indictment. These included the allegation that Central Rexall ran test adjudications, which is fully briefed above in connection with Defendants' motion for a judgment of acquittal on Count Two, *see supra*, at Sec. VI, but should that motion be denied, warrants a new trial pursuant to Rule 33 as well. *See e.g.*, *United States v. Devries*, No. 4:08-cr-00114, 2009 U.S. Dist. LEXIS 145404, at *29-30 (S.D. Iowa July 7, 2009) (granting the defendant's Rule 33 motion for a new trial in "the interest of justice," because "the Government's evidence rest[ed] upon drawing questionable inferences, . . . even though the Court f[ound] that the Government sustained its burden on the Defendant's Motion for Judgment of Acquittal."); *United States v. Van Eyl*, No. 02 CR 287, 2004 U.S. Dist. LEXIS 12635, at *7-9 (N.D. Ill. July 8, 2004) (denying the defendant's Rule 29 motion for an acquittal, but granting the defendant's Rule 33 motion for a new trial on the grounds that the prosecutor violated a pre-trial *in limine* ruling in its summation, by introducing witnesses' opinions regarding business practices at the defendant's enterprise, beyond what was "essential to explain the actions taken by the witnesses and only for that limited purpose . . . The prosecutor should not have made this argument. It was powerful and persuasive, and it is impossible for me to conclude that it, standing alone, did not affect the verdict."). *See also United States v. Carmichael*, 269 F. Supp. 2d 588, 600 (D.N.J. 2003) (denying the defendant's motion for acquittal under Rule 29, but granting the defendant's motion for a new trial under Rule 33, on the basis of newly discovered evidence).

In a similar vein, though not briefed above, is the Government's argument that certain sales representatives who worked with Central Rexall engaged in direct marketing to patients, in contravention of Central Rexall's contract with a PBM. *See* Tr.3852:25-3852:3 (Government closing: "The defendants knew their marketers were marketing directly to patients in violation of the agreement with Express Scripts and they approved it because they were profiting."); Tr.1889:5-15 (Hickman direct: "Q. During that visit to Central Rexall, did you tell them how you brought in so much business? A. Yes. Q. And what did you tell them? A. That I had relationships with physicians that are high-volume physicians that see a lot of patients. And also direct-to-consumer marketing. Q. When you say direct-to-consumer marketing what are you talking about? A. I mean direct conversations with a patient in order to obtain a prescription."); Tr.3092:21-3093:12 (Casseri redirect: "Q. Do you see the part of the answer here [on JDX523, the "United Compounding Management Network Pharmacy Credentialing Application"] is direct-to-physician marketing of pharmacy services? A. That's correct. . . . Q. So does this answer say anything about the direct-to-consumer marketing that was going on? A. No, it does not."). Nevertheless, the Government could not argue that, apart from possibly being frowned upon by PBMs or contrary to certain contractual expectations, direct-to-patient marketing was otherwise improper, let alone that it bore upon the "medical necessity" of prescriptions signed by a physician. *See* Tr.3102:7-14 (Casseri recross: "Q. It's a red flag because it's wrong to market directly to patients? A. You should be marketing prescription or a formula to a doctor. Q. Right. So when we turn on our TV and we see ads that are directed to regular people, not just doctors, isn't that a form of direct-to-

any crime, let alone the crime with which Defendants are charged.  Certainly, there is now the very real and "serious danger that . . . an innocent person has been convicted."  *Silveus*, 542 F.3d at 1004-05.  At the very least, the Court should have sufficient concerns to grant the defense motion for a new trial under Federal Rule of Criminal Procedure 33.

> **3.     The Government's Inflammatory And Irrelevant Evidence And Commentary Regarding The Compounding Industry Was Plainly Prejudicial.**

A new trial should also be granted because the Government rendered the proceedings below fundamentally unfair with its constant effort to cast the business of compounding in an insidious light, repeatedly suggesting that compounded medications are unlikely to ever be "medically necessary," and that, as a general matter, compounding should be viewed with suspicion.  Aside from the record affirmatively negating the notion that compounded medications are any less likely to be "medically necessary" as compared to mass-produced medications, *see, e.g.*, Tr.1566:18-19 (Patel direct:  "Q. Now, can compound medications be medically necessary? A. Yes."); Tr.1589:15-21 (Patel cross:  "Q. In fact, you thought compound pharmaceuticals could be a good thing because, for example, you could use them instead of an opioid-based product. Correct? A. That's correct."); Tr.1658:23-25 (Gaffney cross:  "Q. But you would agree, right, that compounds could be, under certain circumstances, medically necessary. Right? A. Yes, sir."), the Government's deliberate infusion of exactly that suggestion throughout trial was unquestionably prejudicial, as it was intended to be.

*First*, the Government repeatedly emphasized that the compounded medications formulated at Central Rexall, such as scar cream, were not lifesaving products.  For example, in

---

patient marketing? A. That is a form of direct-to-patient marketing.").  It too was used to show bad marketing practices and breached of contract, as opposed to anything that actually went to the allegations of the Indictment.

its opening statement, the Government stated that "[t]he defendants brought formulas for compound medications to the pharmacy, formulas for scar creams, antifungal creams, pain creams, metabolic vitamins. *Nothing that exactly is curing cancer.*" Tr.36:1-4 (emphasis added). Indeed, the Government continually used the undefined scope of the term "medically necessary" to its advantage, suggesting, whenever it had the opportunity, that any product falling short of a medication that may to a layperson seem indispensable to a patient—such as a cancer drug—is not "medically necessary." *See also, e.g.,* Tr.3825:11-13 (Gov't closing: "And Central Rexall filled prescriptions for the libido cream for women. All of those prescriptions were unnecessary as well."); Tr.1863:23-1864:2 (Hickman direct: "Q. Are you aware of any doctor telling you or your representative that they needed a compound libido cream for their patients? A. Yes. I remember - - I remember a physician telling Matt Tedesco that he was looking for something like that.").

*Second*, the Government sought to admit, and did admit, a series of news articles that cast the compounding industry in the most negative possible light. Though they did not bear upon the facts of this case, or did so only minimally by implying that the defendants should have known that others involved in the marketing of compounding products were under investigation, and although the Court tried to mitigate the harm of these articles by providing corrective instructions to the jury, by admitting these exhibits the Government accomplished its purpose: casting the compounding industry in general, and Central Rexall particular, in the most negative possible light. For example, during the testimony of Hayley Taff, the Government introduced an article attached to a July 18, 2015 email from Ms. Taff to the Defendants and Mr. Boyle. Tr, 315:11; GX544. Ms. Taff testified that "[i]t was an article that described how the government was . . . increasing their investigation on compounding pharmacies regarding health fraud," Tr.315:17-20. The Court admitted the article with the following limiting instruction:

> So members of the jury, the email talks about a federal government investigation and heating things up. Again, that is not presented to you for the truth of the matter asserted. It's not presented to you to tell you that it's true that the government was doing any kind of investigation or turning up any kind of heat on any kind of industry. It's just presented for the state of mind of the defendants.

Tr.316:6-13. Notwithstanding this instruction, the Government understood the power of this kind of article in terms of poisoning the jury's view of the enterprise in which the Defendants were engaged, and accordingly re-presented this same article again, several days later, during its direct examination of Mr. Boyle, *see* Tr.2441:5-7. This time, the Government, without a limiting instruction, had Mr. Boyle read the article's headline, "Federal Government Turns Up the 'HEAT' on Healthcare Fraud and Targets Compounding Pharmacies with a Rash of New Subpoenas." Tr.2441:14-17.

And this was only one of several similar articles that the Government introduced during its direct examination of Mr. Boyle, even as the Court warned that, while the articles may have some "relevance as to the state of mind" of the Defendants, "continuing to show these articles over and over again and comparing their alleged conduct to this, it starts to compound to the point where the jury might get confused that this is what they're doing," and further noting that "the more you go into it, the more . . . prejudicial it becomes." Tr.2439:2-8. But the Government proceeded, even in the face of the Court's warnings to introduce article after article to the same effect. For example, it admitted an email from a Baker Donelson lawyer to Mr. Johnston and Mr. Boyle on November 9, 2015 titled "Probes Target Fraud In Military Health Plan," *see* GX 628; GX 628A, and had Mr. Boyle, on direct examination, read the following excerpts of that article:

> Federal prosecutors in at least four states are mounting investigations into what they describe as widespread fraud by compounding pharmacies in claims to the health-insurance program that covers 9.5 million US military members and their families.
> . . .

> Two of the compounding pharmacies, which make customized medicines by mixing pharmaceutical ingredients, employed salespeople who paid doctors to write prescriptions to.
>
> . . .
>
> In some cases, doctors would conduct telephone consultations with beneficiaries and then write them prescriptions, despite having not met with the beneficiaries in person, prosecutors said. Those prescriptions were illegitimate because they weren't based on genuine doctor-patient relationships, a violation of the federal False Claims Act, the prosecutors said. One of the pharmacies had paid commissions of up to 58 percent of the amount paid by TRICARE to marketers who promoted their drugs to physicians, prosecutors alleged in settlement agreements.

Tr.2429:13-17; 2429:22-24; Tr.2430:3-14.  Then, it introduced another article, titled "Pharmacies Push Pricier Drugs to TRICARE Users," attached to an April 14, 2015 email from Mr. Casseri to Defendants and Mr. Boyle, *see* GX436; Tr.2433:1-10, and asked Mr. Boyle to read the following excerpts:

> In what initially seemed to be a phone phishing scam to get personal information from TRICARE beneficiaries, compound pharmacy marketers have been cold-calling military families and retirees to persuade them to apply for specialty prescriptions like pain creams, wound ointments and erectile dysfunction medications.
>
> . . .
>
> The companies also are trolling for sales staff and TRICARE beneficiaries on Craigslist and setting up shop on and around military bases to sell these medications.

Tr.2433:16-21; Tr.2434:1-3.  The Government subsequently asked Mr. Boyle whether he had "receive[d] information that marketers acting on behalf of Central Rexall were setting up shop on military bases to help sell Central's compound medications," Tr.2432:4-6, to which Mr. Boyle responded that "one of the times was from a detective in Tennessee that got a complaint about military people on a base there doing this," Tr.2434:20-22, prompting the Court to sustain the defense's hearsay objection.  Tr.2434:24-25.

In sum, the Government persisted in admitting a series of inflammatory and sensationalized articles regarding *other* compounding pharmacies, and the compounding industry at large, all in an attempt to improperly cast Central Rexall as part of a larger social problem.  *See* Tr.3484:13-3485:12 (Galloway direct:  "Q. Can you identify this exhibit? A. Yes. It's an email dated April 18, 2014, from Kyle Johnston to Trent Brockmeier. The subject is: PBM Audit Lawyers: Client Alert: Health Care Fraud Prosecutions at Nationwide All-Time High. . . . Q. Can you identify this exhibit? A. It's an email dated May 8, 2015. The subject is: Feds open investigations into compounding pharmacies. It's from Kyle Johnston to Michael Tucker."); GX131 (April 18, 2014 email referenced in Galloway direct examination); GX461 (May 8, 2015 email referenced in Galloway direct examination); Tr.2388:1-2389:1 (Boyle direct: "Q. Is this an email from Chris Casseri to you, Mr. Johnston, Mr. Brockmeier and Hayley Taff? A. Yes. . . .  Q. There's a reference here to a CBS News program. What was the CBS News program? A. It was a story about -- a news story about compounding and that TRICARE beneficiaries were getting billed for these compounds for very high prices and the TRICARE program was being charged high prices for the medications. And then they interviewed a doctor who was writing these prescriptions, and he admitted in the story that he wasn't seeing the patients, he was just writing the prescriptions. Q. Okay. And here, is Mr. Casseri circulating a statement from an organization IACP about that news story? A. Yes. Q. And part of that -- is part of that statement: Pharmacists are responsible and obligated to work closely with prescribers and the patients they treat to assure that the right medication is being provided to meet that individual's healthcare needs? A. Yes."); GX365 (February 24, 2015 email referencing CBS program testified to by Mr. Boyle).  And it emphasized this evidence in its summation.  *See* Tr.3875:15-18 ("[Mr. Casseri] sent news articles and stories about fraud in the compounding industry to Johnston and Brockmeier because he noticed that Central Rexall was

155

doing the same things that the other pharmacies were described as doing."); Tr.3877:7-9 ("You also saw a number of news articles sent to the defendants describing schemes just like the one they were doing."); Tr.3877:13-21 ("The defendants saw this article about how federal prosecutors were investigating compound pharmacies and saying how prosecutors believed prescriptions were not legitimate because of the sheer volume from one prescriber and the fact that many patients were getting the same compound medications. Here are two more articles sent by Kyle Johnston, one to Trent Brockmeier, about investigations and healthcare fraud. The defendants ignored all of these flashing red lights and kept going."); Tr.3899:25-3900:2 ("The defendants received and reviewed numerous news articles and stories about fraud in the compounding industry and criminal investigations into that conduct.").

But, as the Court understood, this evidence was prejudicial as well as cumulative, Tr.2438:11-14 ("THE COURT: You have plenty of information already. It's already come in with a limiting instruction. This is building on top of it when it's a period of time that's not relevant to their conduct as to TRICARE."). And it was improper, risking exactly this motion practice, which demands a new trial because it resulted in an unfair trial, both because of its repetition, *see, e.g., Sutton v. Warden*, 3:21-CV-897-MGG, 2022 WL 1555008, at *5 (N.D. Ind. May 17, 2022) (explaining that a defendant may be prejudiced by the "'drumbeat repetition' of an out-of-court assertion" (citation omitted)); *United States v. Flores-De-Jesus*, 569 F.3d 8, 26 (1st Cir. 2009) (acknowledging that the government's presentation of repetitive testimony "is problematic in itself"), but more fundamentally because it was the defendants—and not the compounding industry—that should have been the subject of the trial. On this basis as well, a new trial should be granted, particularly in light of the Court's warnings of the consequences of the Government's strategy and tactics. Nor was the Government's efforts to try the defendants based upon criticisms

156

and investigations of the compounding industry as a whole the only way in which it sought—and ultimately obtained—a conviction based upon irrelevant and highly prejudicial evidence, which appealed to emotion, rather than the facts and the law.

Indeed, it did so in a number of other ways.  Thus, *third*,  the Government, throughout trial, and again in summations, sought to turn the jury against Defendants by  pointing to the amount of money that they gained as a result of their management agreement with Central Rexall.  *See* Tr.3880:17-3881:5 (Gov't closing:  "You heard that the money originated in the health plans that covered the compound medications . . . Johnston got the most money, about $33 million, and Brockmeier got about $5 million."); Tr.4145:19-22 (Gov't rebuttal:  "Those big fat payouts for compound medications, they were a temptation. They gave them the opportunity to make millions by fraudulent means. And the defendants jumped on it with every bit of deception they could muster."); Tr.4147:3-7 ("[Defendants] walked away with $40 million taken from the New Jersey state health plan and the health plan for the military for prescriptions that were medically unnecessary, that I don't think there's any dispute that a vast majority were medically unnecessary."); Tr.4168:25-4169:1 ("Johnston received around $34 million. Brockmeier received about $5 million.").  Though the Government thus attempted to justify the admission of this evidence as going to the Defendants' state of mind, it well knew that these amounts of money were the result of reimbursement rates set by insurance companies which approved these claims.  *See, e.g.*, Tr.764:24-765:2 (Rolling cross:  "Q. And, again, that AWP, just like the reimbursement in the first place, is set by the PBM or the insurer. Am I right? A. That's right."); Tr.1951:23-1952:3 (Hickman cross:  "Q. The reimbursement rates, just to be clear, did you have anything to do with the way the reimbursement rates were set? A. No. Q. Okay. Those were set by either insurance companies or PBMs. Right? A. To my understanding, yes.").  And the Government also knew that,

157

as Defendants had shown in successfully moving to strike these allegations from the Indictment, these proceeds, while all generated by Central Rexall, were not all the result of any alleged fraud. *See* ECF No. 126 at 69-70 (Mr. Johnston's motion to strike paragraph 38 of the Indictment, arguing that "neither the receipt of money nor the amount of money that Mr. Johnston allegedly received from his employer, Central Rexall, are elements of a conspiracy to commit health care and wire fraud," and that the only reason the Government sought to include that allegation was in an "effort to visit undue prejudice on Mr. Johnston, portraying him as a 'fat cat' who was made a lot of money as a result of the scheme alleged in the Indictment"); ECF No. 184 at ¶4 (the Court's order granting Mr. Johnston's motion to strike paragraph 38 of the Indictment, namely "the allegation that defendant Johnston 'received over $34,000,000 from Central Rexall from 2014 through 2016" as "immaterial, irrelevant, and prejudicial," finding that the dollar figure was "untethered to any alleged underlying criminal conduct.").

The admission of this evidence and the great emphasis that the Government placed upon it, though it never tied it to the offenses as it promised the Court it would do, *see* ECF No. 137 at 63 (Government argument that the "allegation that Johnston received $34,000,000 from the fraud is relevant to show the scope of the fraud and his motive of the crimes alleged"), was certainly both improper and highly prejudicial. *See, e.g., Draper v. Airco, Inc.*, 580 F.2d 91, 95 (3d Cir. 1978) (vacating the trial court's denial of a new trial due in part to the plaintiff's counsel's "repeated inappropriate references to the defendants' wealth," reasoning that "justice is not dependent upon the wealth or poverty of the parties and a jury should not be urged to predicate its verdict on a prejudice against bigness or wealth."); *United States v. Stahl*, 616 F.2d 30 (2d Cir. 1980) (prosecutor's references to defendant's wealth warranted reversal of his conviction); *Sizemore v. Fletcher*, 921 F.2d 667, 670 (6th Cir. 1990) (prosecutor's appeal to wealth and class

158

created prejudicial error, violating defendant's constitutional due process rights); *United States v. Arledge*, 553 F.3d 881, 895 (5th Cir. 2008) (acknowledging that "prosecutorial appeals to class prejudice are highly improper and can be prejudicial"); *United States v. Jackson-Randolph*, 282 F.3d 369, 376 (6th Cir. 2002) ("This court has already recognized that prosecutorial appeals to wealth and class biases can create prejudicial error, violating a defendant's right to due process of law under the Fifth Amendment."); *United States v. Jones*, No. 07-cr-0258-05, 2009 U.S. Dist. LEXIS 54575, at *13 (E.D. Pa. June 26, 2009) (articulating Third Circuit precedent requiring "sufficient nexus" supporting admissibility: such a "nexus must be present, to avoid the presentation of "evidence 'merely to give color to the present charges, and to cause the jury to believe that the accused had in his possession more money than a man in his condition could have obtained by honest methods, and therefore he must be guilty.'") (quoting *United States v. Kenny*, 462 F.2d 1205, 1219 (3d Cir. 1972)).

*Fourth*, the Government spun a clearly inflammatory, albeit inaccurate, narrative that the Defendants manipulated their way into ownership and management of Central Rexall, while elbowing Hayley Taff and her father, Don Fellows, out of their multi-generational family business. Ms. Taff provided emotional—indeed, tearful—testimony on the stand, essentially contending that the defendants had undervalued and then exploited her family business.  Tr.371:2-10 (Taff cross: "Q. . . . Why was $150,000 not enough? A. My dad was still in debt . . . it didn't seem like it would be enough to -- to be worth having somebody come in and try and -- like we -- so we would still be involved as the building owners, and the -- it still required my dad to work there in one of the offers. So that was -- that was part of it. As well as like my dad's identity."); Tr. 487:15-488:1 ("A. . . . It broke me, closing the pharmacy. [] Q. I understand. And what I was asking is -- A. I don't think you do. Q. What -- pardon me? A. I don't think you understand. Q. My question was only

whether you had used any of – or your dad had used any of the money that you earned, millions of dollars, to try to keep the pharmacy open. You're saying you couldn't -- it wouldn't have mattered? A. It wouldn't have mattered.").  Then, the Government sought to capitalize on this in summation and rebuttal.  *See* Tr. 4136:16-19 (Gov't rebuttal:  "that was the Hayley Taff you probably saw on the witness stand, trying to do the right thing until the defendants corrupted her."); Tr. 4144:15-20 ("Trent Brockmeier was the big executive desk at one end of the office. Hayley Taff was relegated to a little desk in the corner."); Tr. 4144:23-4145:1 ("[W]hen Johnston and Brockmeier and Hayley Taff were together, there was a problem. There was yelling. Hayley Taff often left in tears."); Tr.4151:4-8 ("the vast majority of the people who worked at Central Rexall were law-abiding citizens, people who were trying to comply with the law, you know. People like Hayley Taff before the defendants made her a co-conspirator. They were trying to do the right thing.").

Of course, this version of events was inconsistent with the facts.  As Ms. Taff herself testified, she was eager to turn her family's long-struggling business around and enter the compounding pharmaceutical market, and saw an excellent opportunity to do so in partnership with the Defendants.  *See* Tr.128:10-14 (Taff:  "Q. What happened at this meeting [with Mr. Brockmeier]? A. I showed Trent around the pharmacy and explained to him some of my dreams for it, of how I really hoped that – how compounding was really beneficial for patients and I hoped that we could expand our reach of the pharmacy."); Tr.363:18-25 (Taff:  "Q. And when Mr. Johnston came along, you saw that as a potential opportunity, I think you testified, to turn [the pharmacy's business] around? A. Yes. Q. And in fact, you were excited about, in particular, the opportunity to do more -- to market more compound pharmaceuticals at that point. Correct? A. Correct.").  Rather than being coerced into accepting unfavorable terms, Ms. Taff researched the

Defendants, and actively engaged in granular negotiations with the Defendants in advance of their acquisition of the pharmacy. *See* JDX 86 (May 22, 2013 email from Ms. Taff to Mr. Paul Breaux, her lawyer, regarding Mr. Johnston's business background, highlighting he was listed as a "40 Under 40" in a publication); Tr. 369:7-14 (Taff: "Q. . . . So your attorney was looking into who Mr. Johnston was or you were or both? A. He was asking questions and -- I mean, we were -- we both were. And I was relaying information that Kyle and Trent had provided to me. Q. Okay. And you were satisfied to proceed to discuss a transaction with him. Right? A. Yes."); JDX 33 (May 13, 2013 email from Ms. Taff to Mr. Brockmeier listing a series of questions and comments regarding a "management services agreement," including that "[i]n addition to the negotiated monthly payment, we will request a percentage in the profits of the business venture incentivizing mutual long-term interest"); Tr. 372:7-16 (Taff: "Q. And the negotiations over -- to get to a deal went on for a few months. Right? A. Yes. Q. In fact I think we saw a document this morning that it didn't really -- you didn't open accounts until August of 2013. So between April and August of 2013, you were negotiating. Right? A. Yes. Well, I got sick with diverticulosis, so I wasn't completely available during that time.").

Moreover, Ms. Taff—described by witness after witness as part of the management team at Central Rexall, Tr.2279:5-7 (Boyle: "Q. When you say findings were brought to the owner and upper level management, who were the findings brought to? A. That's Hayley, Trent and Kyle."); Tr.668:22-24 (Rolling: "Q. And who had the decision-making power on all major decisions? A. Hayley, Trent and Kyle.")—was proactively included and participated in both the pharmacy's hiring, as well as in its day-to-day management. *See* JDX 83 (March 20, 2014 email from Mr. Johnston to Ms. Taff noting a "prelim interview. . . with someone to head up compliance. I will ask you to meet him also . . . we will need an internal compliance person, compliance committee,

compliance plan, compliance training, anonymous compliance hotline, etc. Sounds like a lot but it's within our reach. . . ." and Ms. Taff's response, "I agree. Thanks for getting all of this together. I'm available for the interview tomorrow."); Tr.396:4-15 (Taff: "Q. You wanted Chris, meaning Chris Casseri, to be available to work by then. Right? A. Yes. Q. But in any event, you approved those two hires as well. Right? A. Yes. And they were put together and gone through by Kyle first. Q. Oh, I understand. A. Yeah. Q. He proposed them, ran it by you for approval and you approved. Correct? A. We were working to get -- yes."); Tr.859:20-25 (Olsen: "Q. Did you raise any concerns about the sales reps calling the pharmacy and asking about prescriptions? A. Yes. Q. Who did you raise those concerns to? A. The pharmacists as a whole I believe took that up with Trent and Hayley."); Tr.2728:14-18 (Farahat: "Q. . . . Do you remember that either Hayley Taff or Don Fellows had to sign off on every wire that was sent out of the pharmacy? A. Hayley."); Tr.2339:25-2340:5 (Boyle: "Q. . . . at some point after that contract in May 2014, did Central Rexall start to pay commissions for 1099 sales reps for TRICARE prescriptions? A. Yes. Q. And who at Central Rexall decided to make that change? A. The management group, Trent, Kyle, Hayley."); Tr.790:19-25 (Rolling: "Q. But there was nothing wrong, was there, with getting verbal instructions from a doctor as opposed to a written prescription initially. Correct? A. Correct. Q. In fact, *under the SOPs that Ms. Taff wrote for Central Rexall*, that was specifically allowed. Am I right? A. Yes.") (emphasis added).

But the inaccuracy of the Government's narrative aside, it stands as yet another example of how the prosecution sought to portray the defendants in the most negative possible light, using facts that had absolutely nothing to do with a conspiracy to commit health care fraud by submitting claims for prescriptions that were fraudulent because they were not necessary, with a conspiracy to commit identity theft, or with a conspiracy to commit money laundering. Instead, they were all

162

attempts to prejudicially inflame the jury's emotions in one way or another. Alone or in combination with each other, they demand that the Court grant the defendants a new trial, so that justice, not emotion, may be done.

### C.    A New Trial Should Be Granted Because The Verdict Was Against the Weight of the Evidence.

As previously stated, two circumstances warrant granting a new trial in the interests of justice: first, where the Court determines that evidentiary errors, or a combination of such errors—based on evidence that was improperly admitted, or presented in an improper way—make it reasonably probable that the verdict was influence by the resulting prejudice, *see Onque*, 169 F. Supp. 3d at 566; *Georgiou*, 777 F.3d at 143; and second, where the Court concludes that the verdict was against the weight of the evidence. *See Johnson*, 302 F.3d at 150. Importantly, under this second ground, the Court "exercises its own judgment in assessing the Government's case," and "does not view the evidence favorably to the government[.]" *Id.* Thus, "the court's review is less restricted [under Rule 33] than it is under Rule 29." *Brown*, 2022 U.S. Dist. LEXIS 204896, at *3. Given this lawful authority, even if the Court rejects Mr. Johnston's arguments for a judgment of acquittal, set forth in Sections II, III, V, and VI above, it should nonetheless, for the reasons set forth in the arguments above, grant a motion for a new trial because the verdicts are certainly against the weight of the evidence, given the "more general" and "less restrict[ive]" Rule 33 standard that really, ultimately, turn on whether the verdicts are contrary to the "interests of justice." *Quiles*, 618 F.3d at 388.

First, as discussed in detail above, *see* Section II, *supra*, the Government relied heavily, and emphasized in summation, a number of purported misrepresentations made by Central Rexall and the Defendants that, aside from being explained and negated by the record, were similarly irrelevant to the "medical necessity" of submitted prescriptions. These included    alleged

statements to CVS/Caremark regarding AMS and copay discount coupons, *see* Tr. 3889:19—3890:3; the purported misstatement regarding the hiring of a new Chief Compliance Officer in a letter to DHA, Tr. 3890:7-15; responses to a CVS recredentialing questionnaire regarding Central Rexall's 1099 sales representatives, Tr. 3890:16-21; a statement to CVS regarding the termination of Central Rexall's relationship with the Good Neighbors PSAO, Tr. 3890:25-3891:7; and statements on Central Rexall's application to a compounding network associated with the PBM Catamaran, Tr. 3891:12-25-3892:1-16. But as Defendants have shown (arguments that will not be repeated here), these misrepresentations, having nothing to do with medical necessity and introduced in a transparent effort to paint the defendants as liars and bad businessmen, more fundamentally point up the insufficiency of the evidence, *see supra* at Section II, and amount to a fatal variance from the Indictment. *See supra* at Section III.C. But they also, separately or along with the other grounds described above, reveal that the verdict rendered in this case was against the weight of the evidence under Rule 33, sufficient to warrant a new trial in the interests of justice. Specifically, as argued at length above, none of these misstatements—though they occupied far more of the Government's case-in-chief than did any allegedly false reimbursement claims—support the fraud actually alleged, as none were made in connection with the claims-reimbursement process at all; nor, as is also discussed above, was the Government able to show how any of these misstatements tended to support the Defendants' agreement to submit reimbursement claims for medically unnecessary prescriptions. In reviewing all of this evidence here, and as previously emphasized, "[u]nlike an insufficiency of the evidence claim [under Rule 29], when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *Johnson*, 302 F.3d at 150; *see also Salahuddin*, 765 F.3d at 346. Here, for the reasons discussed

at length above, "an objective evaluation" of "the entire case, tak[ing] into account all facts and circumstances," *Aguiar*, 737 F.3d at 264, reveals that the jury's determination was against the weight of the evidence.

And the same is true for the other arguments set forth above under Rule 29. Thus, as set forth in Section II above, the Government failed to prove beyond a reasonable doubt; that the Defendants had any knowledge that "medically unnecessary" prescriptions—signed as they were by licensed physicians—were being submitted for reimbursement, a fact reinforcing the vagueness of that term, *see supra* at Section II.B., and amounting to a failure of proof as a matter of law, providing an independent basis for relief. *See supra* at Section II.C. Nor, as also discussed at great length above, did the "red flags" to which the Government had to point in the absence of any direct evidence that the Defendants knew and intended that Central Rexall was making claims for medically unnecessary prescriptions, *see supra* at Section II.D., constitute legally sufficient evidence of willful blindness, as opposed to mere negligence, which cannot be the basis for a criminal conviction. *See* Section IV, *supra*.

Likewise, specifically with regard to Count Two of the Indictment, alleging identity theft, the Government not only failed to show that the "test adjudications" at the core of that allegation were at the crux of the predicate health and wire fraud charges, *see supra* at Section VI, but—even if that requirement is not applicable here—did not adduce any evidence of a scheme to deprive anyone of any money or property, as is required to prove the fraud that is an element of those charges, *see supra* at Section VI, or even that Mr. Brockmeier, and especially Mr. Johnston, knew that the kind of impermissible test adjudications that the Government alleged, were occurring. *See supra* at Section VI. And finally, for both Counts One and Two, the Government's purported proofs with regard to materiality were woefully insufficient, both as a matter of law under Rule

29, and as a part of the independent weighing of the evidence in which the Court engages under Rule 33. *See supra* at Section V, VIII.

In sum, even if the evidence can somehow withstand a principled analysis under Federal Rule of Criminal Procedure 29, the objective examination of the "entire case, tak[ing] into account all facts and circumstances," which the Court is required to do in weighing a motion under Rule 33, *Aguiar*, 737 F.3d at 264, leads inexorably to the conclusion that the verdicts reached in this case were against the weight of the evidence, and that a new trial is warranted in the interests of justice. *See Ferguson*, 246 F.3d at 136; *United States v. Knight*, 800 F.3d at 510-11. Defendants' motion for a new trial should accordingly be granted.

## CONCLUSION

For the reasons set forth above, Defendants' motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29, and/or for a new trial under Federal Rule of Criminal Procedure 33, should be granted.

Dated:  May 22, 2025                          Respectfully submitted,

                                              *s/ Lawrence S. Lustberg*
                                              Lawrence S. Lustberg
                                              Anne M. Collart
                                              Andrew J. Marino
                                              **GIBBONS P.C.**
                                              One Gateway Center
                                              Newark, New Jersey 07102
                                              (973) 596-4500
                                              llustberg@gibbonslaw.com
                                              acollart@gibbonslaw.com
                                              amarino@gibbonslaw.com

                                              *Attorneys for Defendant*
                                              *Christopher Kyle Johnston*


                                              *s/ Marc Agnifilo*
                                              Marc Agnifilo
                                              David Gelfand
                                              **AGNIFILO INTRATER LLP**
                                              445 Park Avenue, 7th Floor
                                              New York, New York 10022
                                              (646) 205-4350
                                              marc@agilawgroup.com
                                              david@agilawgroup.com

                                              *Attorneys for Defendant*
                                              *Trent Brockmeier*