**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA | Crim. No. 20-800 (ESK) |
| v. | *Document Electronically Filed* |
| CHRISTOPHER KYLE JOHNSTON, TRENT BROCKMEIER | |
| Defendants | |

---

**REPLY BRIEF IN SUPPORT OF DEFENDANTS'**
**POST-TRIAL MOTIONS**

---

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...........................................................................................iii

PRELIMINARY STATEMENT ..................................................................................... 1

ARGUMENT ................................................................................................................. 2

I.    THE GOVERNMENT DRAWS NUMEROUS UNWARRANTED
      INFERENCES AND ENGAGES IN IMPROPER SPECULATION, AND WHAT
      REMAINS CANNOT SUPPORT COUNT 1 ..................................................... 2

      A.    The Legal Standard ................................................................................ 2

      B.    The Government's Theory of the Case .................................................. 7

      C.    The Government Relies on Impermissible Inferences and Improper
            Speculation to Justify Defendants' Conviction on Count 1 ................... 7

            1.    Prescription Volume ................................................................... 8

            2.    Profits ...................................................................................... 18

            3.    Defendants' Knowledge ............................................................ 19

            4.    Unusual Prescriptions ............................................................... 24

            5.    Copays ...................................................................................... 26

      D.    The Government Packed the Trial with Evidence Designed Solely to Make
            Defendants Look Bad ........................................................................... 29

            1.    Compounding Industry .............................................................. 30

            2.    Pharmaceutical Sales Experience ............................................. 32

            3.    Direct Marketing ...................................................................... 33

            4.    Central Rexall Medications ....................................................... 34

            5.    Other "False Statements" ......................................................... 37

      E.    The Government's Willful Blindness Arguments Improperly Rest on
            Allegations of Negligence and Are Unsupported by Reasonable
            Inferences. ........................................................................................... 40

II.   THE GOVERNMENT FAILED TO PROVE THAT DEFENDANTS
      CONSPIRED TO MAKE A FALSE STATEMENT. ...................................... 50

i

Table of Contents (continued)

Page

A.      Reimbursement Claims Are Not Representations of Medical Necessity ............. 50

B.      The Other False Statements Cannot Support Count 1 in the Absence of the
        Reimbursement Claims ........................................................................................... 60

III.    THE GOVERNMENT FAILED TO PROVE THAT ANY
        MISREPRESENTATIONS WERE MATERIAL. ........................................................... 61

IV.     THE GOVERNMENT FAILED TO INTRODUCE EVIDENCE SUFFICIENT
        TO SUSTAIN DEFENDANTS' CONVICTIONS ON COUNT 2. ................................ 65

V.      THE GOVERNMENT FAILED TO PROVE VENUE FOR COUNT 4. ......................... 68

A.      Fedwire Transfers ................................................................................................... 68

B.      Boardwalk Commission Payments ...................................................................... 74

VI.     THE WEIGHT OF THE EVIDENCE AND THE CUMULATIVE IMPACT OF
        THE ADMISSION OF IRRELEVANT AND PREJUDICIAL EVIDENCE
        REQUIRE A NEW TRIAL ........................................................................................... 75

VII.    CONCLUSION ............................................................................................................... 82

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. United States*,
  417 U.S. 211 (1974)................................................................................................4, 54

*Bauer v. United States*,
  No. 14-4166 (KSH), 2018 U.S. Dist. LEXIS 147740 (D.N.J. Aug. 30, 2018)............70, 71, 72

*Bond v. United States*,
  572 U.S. 844 (2014)................................................................................................66

*Ciminelli v. United States*,
  598 U.S. 306 (2023)................................................................................................66, 67

*Direct Sales Co. v. United States*,
  319 U.S. 703 (1943)................................................................................................4

*Dubin v. United States*,
  599 U.S. 110 (2023)................................................................................................66, 67, 72

*Glossip v. Oklahoma*,
  145 S. Ct. 612 (2025)................................................................................................16

*Jersey Cent. Power & Light Co. v. Melcar Util. Co.*,
  212 N.J. 576, 59 A.3d 561 (2013)................................................................................45

*Kelly v. United States*,
  590 U.S. 391 (2020)................................................................................................66

*Kluger v. United States*,
  14-6236 (KSH), 2018 U.S. Dist. LEXIS 147744 (D.N.J. Aug. 30, 2018)..................70, 71, 72

*Kousisis v. United States*,
  145 S. Ct. 1382 (2025)................................................................................................61, 62, 64

*Krulewitch v. United States*,
  336 U.S. 440 (1949)................................................................................................22

*Marinello v. United States*,
  584 U.S. 1 (2018)................................................................................................67

*Neder v. United States*,
  527 U.S. 1 (1999)................................................................................................63

*O'Rear v. Fruehauf Corp.*,
    554 F.2d 1304 (5th Cir. 1977) ............................................................30

*Parker v. Levy*,
    417 U.S. 733 (1974).........................................................................48

*Smith v. United States*,
    599 U.S. 236 (2023).....................................................................73, 74

*Travis v. United States*,
    364 U.S. 631 (1961) .........................................................................73

*U.S. v. Copple*,
    24 F.3d 535 (3d Cir. 1994)), *aff'd*, 451 F. App'x 196 (3d Cir. 2011) ....................76

*United States v. Abbas*,
    100 F.4th 267 (1st Cir. 2024) ...............................................................71

*United States v. Aguiar*,
    737 F.3d 251 (2d Cir. 2013).................................................................17

*United States v. Anderskow*,
    88 F.3d 245 (3d Cir. 1996).................................................................24

*United States v. Anderson*,
    980 F.3d 423 (5th Cir. 2020) ...............................................................54

*United States v. Auernheimer*,
    748 F.3d 527 (3d Cir. 2014)............................................................71, 72

*United States v. Bagley*,
    473 U.S. 667 (1985)........................................................................16

*United States v. Berger*,
    224 F.3d 107 (2d Cir. 2000)................................................................3

*United States v. Bertram*,
    900 F.3d 743 (6th Cir. 2018) ...............................................................54

*United States v. Blaszczak*,
    56 F.4th 230 (2d Cir. 2022) ...............................................................67

*United States v. Brodie*,
    403 F.3d 123 (3d Cir. 2005)..........................................................2, 4, 22

*United States v. Brown*,
    2022 U.S. Dist. LEXIS 204896 (D.N.J. Nov. 10, 2022)........................................76

*United States v. Caraballo-Rodriguez,*
    726 F.3d 418 (3d Cir. 2013) (en banc) ............................................................ 2, 3, 4

*United States v. Casper,*
    956 F.2d 416 (3d Cir. 1992) ........................................................... 2, 5, 19, 26

*United States v. Coburn,*
    439 F. Supp. 3d 361 (D.N.J. 2020) ........................................................... 71

*United States v. Coleman,*
    811 F.2d 804 (3d Cir. 1987) ........................................................... 4

*United States v. Connolly,*
    24 F.4th 821 (2d Cir. 2022) ........................................................... 53

*United States v. Davis,*
    458 F. App'x 152 (3d Cir. 2012) ........................................................... 5

*United States v. Eisenberg,*
    23-cr-10 (AS), 2025 U.S. Dist. LEXIS 98813 (S.D.N.Y. May 23, 2025) ........................ 52, 53

*United States v. Elfenbein,*
    __ F.4th __, 2025 U.S. App. LEXIS 17724 (4th Cir. 2025) ........................................................... 6

*United States v. Ferriero,*
    866 F.3d 107 (3d Cir. 2017) ........................................................... 55

*United States v. Garner,*
    915 F.3d 167 (3d Cir. 2019) ........................................................... 3, 19, 26, 48

*United States v. Goldberg,*
    830 F.2d 459 (3d Cir. 1987) ........................................................... 71, 72

*United States v. Goldesberry,*
    128 F.4th 1183 (10th Cir. 2025) ........................................................... 4

*United States v. Green,*
    114 F.4th 163 (3d Cir. 2024) ........................................................... 30

*United States v. Harra,*
    985 F.3d 196 (3d Cir. 2021) ........................................................... 59

*United States v. Hinton,*
    127 F. Supp. 2d 548 (D.N.J. 2000) ........................................................... 75

*United States v. Hudson,*
    No. 20-cr-30067, 2021 U.S. Dist. LEXIS 158687 (C.D. Ill. Aug. 20, 2021) ........................ 70

*United States v. Jackson*,
  849 F.3d 540 (3d Cir. 2017)...................................................................24

*United States v. Johnson*,
  302 F.3d 139 (3d Cir. 2002)..............................................6, 75, 76, 80

*United States v. Jones*,
  471 F.3d 478 (3d Cir. 2006).................................................50, 53, 54, 55

*United States v. Jones*,
  49 F.3d 628 (10th Cir. 1995) ..............................................3, 50, 53, 55

*United States v. Jones*,
  713 F.3d 336 (7th Cir. 2013) .................................................................3

*United States v. Kitchen*,
  2000 U.S. App. LEXIS 8860 (2d Cir. May 3, 2000) .............................52

*United States v. Lallande*,
  23-0057 (ES), 2023 U.S. Dist. LEXIS 137617 (D.N.J. Aug. 8, 2023).............................70, 72

*United States v. Lavenant*,
  607 F. App'x 217 (3d Cir. 2015) ..........................................................70

*United States v. Lemoine*,
  104 F.4th 679 (8th Cir. 2024) ................................................................6

*United States v. Lindsey*,
  850 F.3d 1009 (9th Cir. 2017) .............................................................63

*United States v. Louissaint*,
  No. 12-CR-6081W, 2016 U.S. Dist. LEXIS 73210 (W.D.N.Y. June 3, 2016) .....................70

*United States v. Mercado*,
  610 F.3d 841 (3d Cir. 2010)............................................................3, 19

*United States v. Migliaccio*,
  34 F.3d 1517 (10th Cir. 1994) .............................................................59

*United States v. Monaco et al.*,
  1:19-cr-00716-ESK ...............................................................................60

*United States v. Obialo*,
  23 F.3d 69 (3d Cir. 1994).........................................................................3

*United States v. Pace*,
  314 F.3d 344 (9th Cir. 2002) ...............................................................71

*United States v. Palin*,
   874 F.3d 418 (4th Cir. 2017) ...................................................... 54

*United States v. Pauling*,
   924 F.3d 649 (2d Cir. 2019) .................................................... 3, 19

*United States v. Pearlstein*,
   576 F.2d 531 (3d Cir. 1978) ............................................ 50, 53, 54

*United States v. Perez*,
   223 F. App'x 336 (5th Cir. 2007) ................................................ 70

*United States v. Powers*,
   40 F.4th 129 (4th Cir. 2022) ..................................................... 71

*United States v. Quiles*,
   618 F.3d 383 (3d Cir. 2010) ..................................................... 16

*United States v. Riley*,
   621 F.3d 312 (2010) .............................................................. 12

*United States v. Samuels*,
   741 F.2d 570 (3d Cir. 1984) ..................................................... 22

*United States v. Sanchez*,
   No. 3:16-cr-00136-MOC-DSC, 2018 U.S. Dist. LEXIS 170147 (W.D.N.C.
   Oct. 2, 2018) ..................................................................... 70

*United States v. Silveus*,
   542 F.3d 993 (3d Cir. 2008) ..................................................... 76

*United States v. Smith*,
   294 F.3d 473 (3d Cir. 2002) ...................................................... 2

*United States v. Smith*,
   573 F.3d 639 (8th Cir. 2009) .................................................... 60

*United States v. Stadtmauer*,
   620 F.3d 238 (3d Cir. 2010) ..................................................... 24

*United States v. Tyson*,
   653 F.3d 192 (3d Cir. 2011) .................................................. 5, 32

*United States v. Villegas*,
   911 F.2d 623 (11th Cir. 1990) .................................................... 3

*United States v. Walters*,
   226 F. Supp. 3d 821 (E.D. Ky. 2016) ............................................ 38

*United States v. Whiteside*,
    285 F.3d 1345 (11th Cir. 2002) ...........................................................59

*United States v. Zhong*,
    26 F.4th 536 (2d Cir. 2022) ...............................................................32

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
    579 U.S. 176 (2016)..............................................................54, 61, 62, 63

*Van Buren v. United States*,
    593 U.S. 374 (2021)...........................................................................66

*Williams v. United States*,
    458 U.S. 279 (1982)...........................................................................50

*Yates v. United States*,
    574 U.S. 528 (2015)...........................................................................66

**Statutes**

18 U.S.C. § 1028................................................................................67

18 U.S.C. § 1028(a)(7)..........................................................65, 66, 67, 68

18 U.S.C. § 1028A...............................................................................67

18 U.S.C. § 1956(i) ...................................................................69, 70, 72

18 U.S.C. § 1956(c)(2)..........................................................................69

18 U.S.C. § 1956(c)(3)..........................................................................69

18 U.S.C. § 3237.................................................................................70

**Rules**

Fed. R. Crim. P. 29 ........................................................................1, 5, 6, 7

Fed. R. Crim. P. 33 .......................................................................*passim*

Fed. R. Evid. 401 ...............................................................................77

Fed. R. Evid. 403 ...............................................................................77

**Treatises**

Restatement (2d) of Torts § 538 ...............................................................61

**Constitutional Provisions**

U.S. Const., amdt. VI ........................................................................................................73

U.S. Const., Article III, § 2 ..............................................................................................73

## PRELIMINARY STATEMENT

The Government's response to Defendants' post-trial motions is a helpful document, serving as it does to focus the Court and counsel on the ways in which the proofs at trial cannot, as a matter of both law (for purposes of the motion for a judgment of acquittal) and the interests of justice (for purposes of a new trial), support the unjust verdict reached here.[1]  That is, the Government's submission does an excellent job of cataloguing the unreasonable inferences upon which its case rested and the extent to which it relied upon efforts to make the defendants look bad, though the evidence at issue had nothing to do with the Government's theory at trial.  The opposition brief shows just how much the Government used its theory of willful blindness to argue that, really, the Defendants were criminally negligent.  And the brief shows how the Government elided the legal requirements of the offenses alleged, aggressively seeking to extend criminal fraud statutes to purportedly false implied certification; distorting the standards for materiality that have been dictated by the Supreme Court; failing to prove the elements of fraud with regard to the fraud statute that addresses identity theft; and finding venue proper for money laundering even without the required connection of the Indictment's allegations to New Jersey.

This reply brief, therefore, does more than simply respond to the Government's opposition; it shows how that opposition proves the defense case, and supports the request for post-trial relief which the law both supports and allows.  Accordingly, for the reasons set forth below, and those included in Defendants' earlier submission (none of which are waived if not included here), Defendants' motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29 or a new trial under Federal Rule of Criminal Procedure 33 should be granted.

---

[1]The Government's Opposition Brief (hereinafter "Opp.") is ECF 342.  Defendants' Moving Brief (hereinafter "Mov. Br.") is ECF 327.1.  Unless otherwise noted, all citations herein omit internal citations and quotations.

## ARGUMENT

I.    **THE GOVERNMENT DRAWS NUMEROUS UNWARRANTED INFERENCES AND ENGAGES IN IMPROPER SPECULATION, AND WHAT REMAINS CANNOT SUPPORT COUNT 1.**

A.    **The Legal Standard**

Although the Government accuses the Defendants of merely paying "lip service" to the standard of review applicable to the pending motions, Opp. at 1, it is the Government that distorts the standard, cherry-picking quotes from the case law in a transparent effort to make it seem, as a practical matter, impossible for Defendants to prevail.  *See, e.g.*, Opp. at 2 (describing the burden on a defendant as "extremely high" and the challenge in bringing such motions as "an uphill battle").  But, of course, Defendants recognized in their motion papers, citing the same cases as does the Government, that the court "must review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence."  Mov. Br. at 6 (citing *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (internal quotation omitted)).  And the defense also recognized, expressly, that all reasonable inferences must be drawn in favor of the verdict.  Mov. Br. at 2 (citing *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002) ("The court is required to draw all reasonable inferences in favor of the jury's verdict.").

Of course, that does not mean that post-trial motions for judgment of acquittal and a new trial are never granted—indeed they are, *see* Mov. Br. at 8-10, and should be here.  The question for the Court on this motion is what is and what is not a "reasonable inference."  Although the Government measures the reasonableness of an inference using a standard of "bare rationality," Opp. at 3 (citing *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 431 (3d  Cir. 2013) (en banc)), it remains the law in this Circuit, as in all others, that whether an inference is permissible turns on whether it has "a logical and convincing connection to the facts established."  *United*

*States v. Casper*, 956 F.2d 416, 422 (3d Cir. 1992); *see also United States v. Garner*, 915 F.3d 167, 170 (3d Cir. 2019) (same, post-*Caraballo-Rodriguez*).  "An inference is not a suspicion or a guess.  It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist."  *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019).  And even "reasonable speculation"—the conclusion that a disputed fact is "within the realm of possibility"—is insufficient when that conclusion is "not logically based on another fact known to exist."  *Id.*; *United States v. Mercado*, 610 F.3d 841, 847 (3d Cir. 2010) (a court cannot "uphold a jury verdict based on speculation alone"); *United States v. Obialo*, 23 F.3d 69, 73 (3d Cir. 1994) (holding that a conviction cannot be upheld on the basis of a "logical leap").  That is, the Court "cannot permit speculation to substitute for proof beyond a reasonable doubt."  *United States v. Jones*, 49 F.3d 628, 632 (10th Cir. 1995).  "Guesswork or conjecture" is insufficient.  *United States v. Villegas*, 911 F.2d 623, 628 (11th Cir. 1990).  And if the Government's case is based on a chain of inferences, as it often is in the Government's brief, "each link in the chain of inferences must be sufficiently strong to avoid a lapse into speculation."  *United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013).

In their Moving Brief, Defendants argued that "[w]here the evidence is at least as indicative of innocence as guilt, the Court must direct a verdict of acquittal."  Mov. Br. at 7 (quoting *United States v. Berger*, 224 F.3d 107, 116 (2d Cir. 2000)).  In response, the Government argues that the Third Circuit has rejected this reasoning, relying on *United States v. Caraballo-Rodriguez*.  But that is an incorrect reading of the law.  *Caraballo-Rodriguez*, a case highly focused on sufficiency review of narcotics convictions in particular, 726 F.3d at 430 (recognizing a need to reassess the Circuit's jurisprudence "in this particular area—drug conspiracy cases"), held that where there was a permissible inference of criminality, a district court was not free to ignore that inference and

instead infer innocence, *id.* at 432 ("Reversing the jury's conclusion simply because another inference is possible—or even equally plausible—is inconsistent with the proper inquiry for review of sufficiency of the evidence challenges."). But Defendants' argument is that, *after* viewing the evidence and inferences in the government's favor, if the evidence remains equivocal—that is, if, as the Third Circuit said in *Caraballo-Rodriguez*, there is not enough evidence to "make a strong enough case to let a jury find him guilty beyond a reasonable doubt,"— then the Court must enter a judgment of acquittal. *Id.* at 432. In so holding, *Caraballo-Rodriquez* described its holding as "aligning [the Third Circuit] with the majority of our sister circuits." *Id.* at 432. And a majority of those circuits apply precisely this principle to sufficiency review.[2]

As Defendants argued in their moving brief, and as they discuss further below, that analysis is and must be the guiding light here: the question before the Court is whether the inferences that the Government seeks to draw in this case are *reasonable* ones, sufficient to support a verdict of guilt beyond a reasonable doubt. Those inferences are simply not reasonable, for three reasons. *First*, as is set forth in section I.C below, the "logical and convincing connection to the facts

---

[2] *See United States v. Goldesberry*, 128 F.4th 1183, 1193 (10th Cir. 2025) (holding that "after [the trial record] is properly construed for the prosecution" and "*after* viewing the evidence and inferences from it in the government's favor," when the evidence gives merely circumstantial support to a theory of guilt, a court must enter a judgment of acquittal); *id.* at 1193 n.6 (explaining that the First, Second, Sixth, Seventh, Eighth, Tenth, and Eleventh Circuits apply similar principles, while the Fifth and Ninth Circuits do not, and the Fourth and D.C. Circuits have not directly addressed the issue).

The Government also argues that Defendants misconstrue *Brodie*, which, the Government says, prohibits "piling inference upon inference" only "where those inferences do not logically support the ultimate finding of guilt." Opp. at 4 (quoting *Brodie*, 403 F.3d at 134). But Defendants' quotation was proper; cases well in advance of *Brodie* from the Supreme Court have prohibited making out a charge of conspiracy "by piling inference upon inference, thus fashioning . . . a dragnet to draw in all substantive crimes," and without the qualifying language found in *Brodie*. *Anderson v. United States*, 417 U.S. 211, 224 (1974) (quoting *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943)); *see also United States v. Coleman*, 811 F.2d 804, 808 (3d Cir. 1987) (same).

established," *Casper*, 956 F.2d 416 at 422, is lacking. *Second*, as described in section I.D, below, the Government relied, to a great extent, not on permissible inference at all, but on impermissible ones—that is, on evidence that was designed only to make the Defendants look bad, rather than shedding light on their actual criminal responsibility; such arguments certainly do not fall within the realm of the kinds of reasonable inferences that Courts, looking to the sufficiency of the evidence, can or do consider. *See, e.g.*, *United States v. Davis*, 458 F. App'x 152, 159-60 (3d Cir. 2012) (non-precedential) (reversing denial of Rule 29 motion and concluding that defendants' "unusual behavior" did not support an inference that they were coconspirators, and rejecting argument that "a showing that a person is driving someone who the driver knows is carrying a gun in itself establishes that there was a conspiracy between the driver and the passenger to possess the gun"); *United States v. Tyson*, 653 F.3d 192, 208-10 (3d Cir. 2011) (finding insufficient evidence from which to infer a conspiracy to traffic firearms where the only evidence presented by the government indicated "a pattern of unusual and suspicious activity," as this was "too slim a reed upon which to hang a criminal conspiracy conviction"). And finally, as explained in sections I.E through IV of this brief, the legal requirements governing the offenses at issue—with respect to issues of willful blindness, falsity, materiality and identity theft—are not met as a matter of law, even accepting the "inferences" that the Government asks the Court to draw. For these reasons, Defendants' motion for a judgment of acquittal should be granted.

Moreover, the inappropriate inferences, improper argument, and legal deficiencies that plague the Government's case are relevant not only to Defendants' Rule 29 motion for a judgment of acquittal, but also to their Rule 33 motion for a new trial. The standard governing that motion receives very little attention from the Government, which mentions it only twice in passing (on pages 5 and 102). It is understandable why the Government spends so much more time on the

more favorable Rule 29 standards, which require the Court to make inferences in the Government's favor and treat even the most compromised witnesses as credible. Rule 33, however, does not contain these requirements. It allows the Court—having presided over the trial, observed witness testimony, and heard all of the evidence—to set aside a verdict that was against the weight of the evidence, while exercising its own independent judgment about the Government's case and its witnesses' credibility. Mov. Br. at 124-26; *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002) (for purposes of evaluating a Rule 33 motion, the Court "does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case"). And it also asks the Court to expressly consider if that verdict was affected by the cumulative impact of improperly prejudicial evidence, as was certainly the case here. *See* infra at § VI. It is not surprising then, that even where Courts of Appeals have reversed a district judge for granting a motion for a judgment of acquittal, they have affirmed the judge's decision to exercise his or her discretion to grant a new trial when based on the same concerns that motivated the decision ultimately reversed. *United States v. Lemoine*, 104 F.4th 679, 686 (8th Cir. 2024) ("[T]he district court granted Lemoine's motion for new trial based on the same evidence sufficiency concerns that supported its grant of acquittal. . . . In the reweighing process, the district court found that the facts showing Lemoine's knowledge and involvement in the drug distribution were such that a miscarriage of justice may have occurred."); *United States v. Elfenbein*, __ F.4th __, 2025 U.S. App. LEXIS 17724, at *33 (4th Cir. 2025) (reversing order for judgment of acquittal but affirming order granting new trial on same basis due to the "weaknesses in the government's case-in-chief").

It is with these principles in mind that the Court should review the Government's defenses of the verdict.

### B.    The Government's Theory of the Case

In order to correctly assess whether the inferences the Government seeks to draw are permissible, the Court should begin by identifying the Government's theory of the case, which thus relies upon the inferences at issue.  Fortunately, in its Opposition brief, the Government sets forth that theory, repeatedly.  Thus, for example, the Government describes its theory, at the beginning of its brief, as follows:

> The trial evidence established that Johnston and Brockmeier started and controlled a vast conspiracy to submit fraudulent insurance claims for compound medications.  Johnston and Brockmeier hand-picked and managed the co-conspirator sales representatives who got prescriptions signed; directed the rapid expansion of Central Rexall to fill all of the new prescriptions; dictated the medically unnecessary medications that were placed on the prescription pads, which yielded higher and higher profits; directed Central Rexall to submit fraudulent test adjudications, which helped them identify even more lucrative formulas; directed employees to ship our medicines even when individuals did not pay their copays, a clear sign that the medications were unnecessary; turned a blind eye to numerous practices that everyone else could see were evidence of fraud; wrote or approved false and misleading communications to cover up the conspiracy; and reaped the substantial profits of the fraud.

Opp. at 7-8.  *See also, e.g., id.* at 68-69 (repeating theory in argument regarding materiality).  When one carefully considers the evidence underlying this theory, it becomes apparent how flawed and unreasonable—and in many cases impermissible—are the inferences upon which it depends.

### C.    The Government Relies on Impermissible Inferences and Improper Speculation to Justify Defendants' Conviction on Count 1.

As discussed above, there are limits on the Government's ability to rely on inferential reasoning when defending a guilty verdict in response to a Rule 29 motion.  The Government here contravenes those limits.  Its Opposition brief routinely draws strained or unwarranted inferences, or speculates that Defendants should have suspected fraudulent conduct when there is little basis even to think that Defendants were aware of the underlying facts.  But a review of the evidence

and the Government's arguments demonstrates that there is no basis for attributing knowledge of fraud to Defendants.

### 1.    Prescription Volume

The Government, over and over and over, intones that Central Rexall should have been aware of fraudulent, illegitimate, or medically unnecessary prescriptions because of the sheer volume of prescriptions it was receiving from specific doctors.[3]Indeed, this argument appears in the Government's brief in regard to each and every sales group to which the Government points as the centerpiece of its argument seeking to uphold the verdict. *See* Opp. at 12, 14 (Top Tier); 18 (Supreme Medical); 22 (Military Medical Relief 21); 28-30 (Boardwalk Medical).

Taken together, the Government's argument amounts to an attempt to justify the reasonableness of the inference that a large number of prescriptions, and, relatedly, significant revenue, is a basis to infer illegality.  Even formulating the proposition reveals its lack of merit.  And a more detailed discussion of what the Government says, and what the evidence actually showed, further supports the argument that this inference, upon which the Government so heavily relies, is inappropriate.  For example, the Government argues that Defendants should have known that Top Tier prescriptions were medically unnecessary because of the "sheer number of prescriptions." Opp. at 12.  According to the Government, a prescriber could not possibly issue 170 prescriptions for "specialty medications" in a particular month.  *See also id.* at 18 (stating, with respect to the number of prescriptions written by Dr. Durgin that "[t]hese prescriptions are

---

[3]The Government argues that this and many elements of the "scheme" were present in other healthcare fraud cases.  Opp. at 57-58.  This is as relevant as justifying a death by auto conviction by pointing out that defendants in similar cases have also driven cars.  Defendants' point is that the evidence *in this case* is not sufficient to justify their convictions; guilt is, of course, personal, and just because, for example, other defendants have actually committed these crimes elsewhere and filled a high number of prescriptions does not mean that these Defendants did merely because Central Rexall too operated at a high volume.

obviously fraudulent, as no doctor could examine near that number of patients and make a decision that it was medically necessary for each of those patients to receive a compound medication tailored to their individual needs[4]"); *id.* at 28 (arguing, with respect to Dr. Gaffney, that "it is inconceivable that one doctor could legitimately determine in a year that 220 patients all needed the exact same compound medication"). But the Government's argument—that one can infer fraud from a high number of prescriptions—is simply not a reasonable inference because it is not supported by the evidence. Thus, there was no expert or competent lay testimony[5] regarding the number of prescriptions (whether for generic or compound medications) that a doctor or nurse practitioner could prescribe in a given month, except perhaps for unrebutted testimony of Dr. Gaffney that he could see roughly 150 patients a week, Tr. 1656-57 (Gaffney)). And, perhaps more importantly, there was no testimony that the Defendants were themselves aware of any such limits. There was therefore nothing upon which the jury could have based a conclusion that 170 prescriptions in a given month was "not legitimate[]," Opp. at 12, let alone that 220 patients in a year could not conceivably be prescribed the same medications.

Indeed, the Government's argument is particularly without basis given that 170 or 220 prescriptions does not mean 170 or 220 *patients*—if Craven, or Gaffney, for example, thought that patients merited multiple prescriptions, it could mean significantly fewer patients, and the Government did not adduce any testimony to satisfy its burden to prove how many actual patients were seen. Indeed, given that Central Rexall's most-prescribed product was a wellness metabolic

---

[4]The fallacy in arguing that compound pharmaceuticals are always "tailored to [the individual needs" of each patient is discussed below, *infra* at 30-31.

[5]Casseri's testimony that "there's no way a doctor could see that many patients in that little amount of time to get that amount of prescriptions into the pharmacy," Tr. 3011 (Casseri), is flatly wrong. Gaffney himself testified that he could see 150 patients a week. And contrary to the Government's brief, Boyle did *not* testify that he raised "concerns" about Dr. Gaffney being a large prescriber, as a truthful review of the transcripts shows. Opp. at 29 (citing Tr. 2409).

supplement—deliberately designed to be widely prescribable and appropriate for anyone (like the compound equivalent of a one-a-day multivitamin)—it is simply not reasonable to infer from these numbers that Defendants must have known (beyond a reasonable doubt) that fraud was taking place because of a high prescription volume, even assuming the volumes described were actually high. Tr. 1725:1-6 (Ritson: "The metabolic supplement was extremely easy to get prescribed, because essentially because—by its nature, it's a general wellness pill that's typically—essentially doesn't even require even a diagnosis. It's just a general wellness pill that anybody could take is the way that we were marketing it.").

As noted, the Government raises similar issues with respect to Supreme Medical, whose head, Tom Isley, did not testify at trial and has never been prosecuted. Lacking any testimony from Isley admitting that he engaged in fraud, the Government relies even more on speculation, guesswork, and innuendo to reach the conclusion even that Supreme Medical was engaged in fraud, let alone that Defendants knew of it. The "biggest red flag," according to the Government, "was the conduct of Dr. Jeff Durgin," who was also never prosecuted and also did not testify. Durgin sent an opaque email stating that he "signed a contract" that would lead to "many prescriptions," and subsequently sent Central Rexall a lot of prescriptions. Opp. at 17-18. But there was zero evidence that Defendants were ever told about this email, and it is pure speculation to think that they were. Tr. 2407-08 (Boyle); GX 411. Indeed, perhaps tellingly, the Government did not ask Boyle on direct examination whether Defendants were aware of this email, Tr. 2407-08, choosing to argue the "inference"—really the guess—that they were notified, rather than eliciting evidence, even when it could have done so, had Boyle actually notified Defendants of the email. As noted, the Government again speculatively relies on prescription volume, describing Durgin's prescriptions as "eye-popping" and "obviously fraudulent," Opp. at 18, but again, there

is no basis for the Government's conclusion, absent any testimony—fact or expert—about what an appropriate prescription volume would be and absent any proofs about whether the number of prescriptions also reflected the number of patients, as would be necessary to make the Government's statement that "no doctor could examine anywhere near that number of patients," Opp. at 18, supportable.  Moreover, these "eye-popping numbers" occurred in March and April 2015, after which Central Rexall stopped processing Durgin prescriptions.  GX 1080; GX 1081. It is not clear what more the Government expects Defendants to have done.  As discussed below, this hardly bespeaks willful blindness, but reveals the speciousness of the inference that the Government urges:  that the numbers demonstrate the requisite illegality and criminal intent.

The Government's description of Military Medical Relief ("MMR21") is of a piece.  Once again, the Government cites to the "extraordinary" volume of prescriptions written by Nurse Practitioner Wagner and Dr. Elder-Quintana.  Opp. at 22.  Of course, with regard to MMR21, the Government relies to an alarming extent on the testimony of Antonio Serna to the effect that he had an agreement with the Defendants to pay both patients (through participation in "studies") and doctors to prescribe medications that would be filled by Central Rexall.  *Id.* at 20.  Indeed, the Government relies upon this testimony—which was of a kind that was not provided by any other witness in the case—to argue that the Defendants' association with Serna was alone enough to establish the conspiracy charged.  *Id.* at 21 ("By themselves, the terms of the deal Serna struck with Johnston and Brockmeier establish a conspiracy to commit fraud through medically unnecessary prescriptions."); *id.* at 59 ("[J]ust conspiring with Serna to get unnecessary prescriptions by paying doctors and patients" would suffice to support Defendants' convictions.).

This contention, which really is "extraordinary," to use the Government's terminology, obligates the Defendants to respond.  While the Government, perhaps sensing that citing Serna's

testimony would subject it to ridicule in the jury's eyes, severely limited its reliance on Serna in summation, Tr. 3846-49, it now offers a full-throated argument that Serna's contacts with Central Rexall alone can support the Defendants' convictions.  It is alarming that the Government would so rely upon the narrative of a convicted fraudster who not only, as the Government admits, repeatedly lied about whether he had prepared with the Government to testify on re-direct examination, Tr. 1408,[6] but who also was shown to have submitted forged documents to the grand jury—documents which replaced his name with the name of his deceased sister, Lucy Serna, in order to attempt to shift culpability off of him and onto her.  Tr. 1302-10, Tr. 1312-26.  The documents are plainly forged:  they misstate Defendants' email addresses and contain oddly sized letters.  *Id.*; *compare* DX 173 *with* DX 176, DX 177 *with* DX 175, and DX 179 *with* 172.  And according to Serna's own narrative, they were collected in response to a grand jury subpoena issued *after* Lucy passed away, meaning that she could not have been the one to tamper with the production (in what would have been an attempt to exculpate her brother and inculpate herself).  Tr. 1309-10, 1316-17; *see also* ECF 268 (Motion to Strike Serna Testimony).

What is so offensive about the Government's position on these post-trial motions (which seeks to hide behind the idea that, regardless of what the Court saw with its own eyes and heard with its own ears during trial, it "must treat all of the incriminating evidence as true and credible," Opp. at 23 (citing *United States v. Riley*, 621 F.3d 312, 329 (2010))) is that the Government knows, from its own discovery and public documents in another criminal prosecution brought by the same

---

[6]The Government acknowledged Serna's perjury at his sentencing, although it contended that "his testimony was otherwise truthful."  4.22.2025 Transcript of Sentencing Proceeding in *United States v. Serna*, 3:20-CR-170-M(1), N.D. Tx., at 6.  Of course, this was not the case.  Serna lied about whether he had ever represented himself as a gunnery sergeant.  Tr. 1403-07.  He lied about whether he hoped that his cooperation would result in a reduced sentence.  Tr. 1269.  And, as discussed below, he lied about whether Central Rexall "set him up" with corrupt doctors.

United States—as well as from the evidence in this case—what the true narrative was here. Thus, as the Government is well aware, in February 2016, a number of sales representatives and doctors, including Walter Simmons and William Elder-Quintana, were indicted in the Northern District of Texas concerning a scheme that bears a striking resemblance to the scheme Serna engaged in with his group MMR21, for which he was also prosecuted in the Northern District of Texas. *See* Case No. 3:16-CR-060-M, ECF No. 75. The indictment alleged that John Paul Cooper, the president of a pharmaceutical marketing group called CMGRX, defrauded Tricare by paying illegal kickbacks to more than 2,300 patients in Texas. *Id.* ¶ 8. The patients were paid $250 per prescription. *Id.* ¶ 25. The illegal kickbacks were disguised as payments for participation in a bogus medical study and funneled through a sham charity, the "Freedom from Pain Foundation." *Id.* ¶ 26. CMGRX paid two doctors—not any two doctors, but Simmons and Elder-Quintana—who had no prior relationship with the patients to write the prescriptions after brief telephone calls. *Id.* ¶ 32. One of the defendants, Richard Robert Cesario,[7] came up with the idea of the pain study, and Dr. Simmons came up with the idea of calling it the "Patient Safety Initiative." ECF 397 ¶¶ 15-17. This scheme occurred from September 2014 through May 2015. One of the pharmacies associated with the scheme was Trilogy Pharmacy, which paid CMGRX employees kickbacks. ECF 75 ¶¶ 15-19.

And one of the indicted individuals was Joe Straw, who owned and operated a marketing company that focused on members of the military. *Id.* ¶ 10. The evidence at trial showed that Serna knew Joe Straw. He created a "company" with him called "Life Style 700." DX 236; Tr. 1223-26 ("Mr. Straw is a gentleman that my sister Lucy introduced me to."). Straw's name was

---

[7]Notably, the names of the two individuals who Serna says introduced him to Central Rexall were "Richard" and "Robert." Tr. at 1073:10-19; 1248:22-1252:17.

also on one of the documents that Serna doctored when he submitted it in response to the grand jury subpoena, though Serna removed Straw's affiliation with "CMG" and "PSI4U" [the "Patient Safety Initiative" discussed above, as named by Dr. Simmons] from the version he produced.  DX 180; GX 287; Tr. 1315:20.  And Serna had a CMGRX email account—and was aware that Straw was involved with CMGRX.  Exhibit A (DX 223A (not admitted)); Tr. 1232:11-12 (Serna).  DX 223A states that Serna's affiliated "store" is Trilogy Pharmacy, the pharmacy discussed above that engaged in fraud with CMGRX, Elder-Quintana, and Simmons.[8]  Richard Robert Cesario's, John Cooper's, and Joe Straw's names and CMGRX emails also appear in this document.

Serna was, thus, heavily connected with a fraudulent scheme that originated with the company CMGRX and the corrupt doctors Elder-Quintana and Simmons.  That scheme began no later than September 2014, according to the Government—well before Serna ever became associated with Central Rexall.  The scheme involved two doctors who were paid to issue prescriptions in connection with a fraudulent study—the same two doctors who Serna became involved with months later.  Serna was associated with the relevant sales company (CMGRX), a related pharmacy (Trilogy), the two relevant doctors (Elder-Quintana and Wagner), and their co-defendant (Joe Straw).  Of course, he lied about all of this, instead blaming his deceased sister.  Tr. Tr. 1225 (stating that Joe Straw was "a gentleman that my sister Lucy introduced me to"); 1230-32 (denying involvement with CMGRX and stating that his sister Lucy was involved with them instead); Tr. 1273 (stating that he was told that Elder-Quintana and Wagner were involved with

---

[8]Trilogy Pharmacy was sued in an FCA qui tam suit on May 19, 2015.  Attached to the complaint was a copy of CMGRX's Compound Medication Self Assessment Study Agreement (that is, the fake pain study) dated August 16, 2014.  4:15-cv-01349 (S.D. Tx.), ECF 57-2, at 44-49.  Mr. Serna produced to the grand jury a copy of his own fake study's "Compound Medication Self Assessment Study Agreement."  Exhibit B (MMR21000837).  The two agreements use the exact same language.

Central Rexall by his sister); Tr. 1273-74 (stating that he could not recall if he knew that Elder-Quintana and Wagner were affiliated with CMGRX).

The point is that Serna plainly got the ideas to which he alone testified in this case, including the fake pain study, from his associates at CMGRX—essentially, he copied it from Cooper, Cesario, and Straw. That scheme also involved the exact same doctors with whom Serna worked here. This is significant because it reveals that Serna did not, as the Government contends, get his ideas or the names of these doctors from anyone at Central Rexall. Opp. at 20 ("Johnston suggested telling members that they were participating in a study and would be paid for their feedback."); *id.* ("Serna said that he had no doctors, and Johnston responded that they could help get doctors."). This was *his* scheme, and they were *his* doctors. The alternative hypothesis—that Mr. Johnston happened to come up with a scheme that, coincidentally, paralleled exactly the scheme that had been concocted by Serna's associates months earlier—does not withstand scrutiny, once the Court is apprised of that which the Government has failed to candidly disclose to it.

The Government argues that Defendants ask the Court to dismiss Serna's testimony because he "falsely denied at trial that he met with prosecutors to prepare for his redirect testimony." Opp. at 23. This is a disingenuous understatement of the issue: Serna also committed obstruction of justice by submitting numerous doctored emails to *these prosecutors* in response to a grand jury subpoena, seeking to fob off the blame for his crimes onto his deceased sister for his own benefit. *See* ECF 268 (explaining the doctored emails). Of course, the Government has never once responded to this issue, or in any way taken it into account. *See* ECF 271 (ignoring the doctored emails). Serna again lied in an effort to secure leniency when he stated that Central Rexall provided him with Elder-Quintana and Simmons; those doctors had never before prescribed

Central Rexall medications, and the Government's argument that an "inference" can be drawn that Central Rexall provided him with doctors with whom the pharmacy had up to that point been unaffiliated, *see* Opp. at 21 n.3, is not an inference at all, but a complete lie, as was Serna's statement that "Richard" and "Robert" introduced him to Central Rexall; the Government misstates the issue as Serna being unable to remember the last name of the person who introduced him, when he in fact fabricated the identities of two people entirely, using a name familiar to him. Opp. at 19 n.2.

The Government's reliance on Serna's testimony in its Opposition Brief, used to support the same kinds of inferences that it seeks to draw with respect to the other sales groups, cannot be ignored. To be sure, it justifies the Court permissibly reweighing the evidence on a motion for a new trial. But it is worse than that. Though Defendants do not now argue that the Government was aware that Serna would perjure himself when he testified at trial, or even that the Government improperly relied on his testimony at summation, it is of grave concern that, at this stage of the case, the Government, given all that it knows—whether in the record or otherwise—relies on Serna's testimony to save its conviction of the Defendants. It is a "well-established rule that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair." *United States v. Bagley*, 473 U.S. 667, 678 (1985). Indeed, just this last term, the Supreme Court reiterated the government's obligation to correct false testimony of one of its witnesses. *Glossip v. Oklahoma*, 145 S. Ct. 612 (2025). That, rather than relying on Serna's testimony, is what the Government should be doing. Certainly, under these circumstances, the kind of deference to Serna's testimony which the Government here seeks, *see* Opp. at 21 n.3, 23, is neither called for nor remotely appropriate, at least not with respect to the motion for a new trial. *See United States v. Quiles*, 618 F.3d 383, 395-96 (3d Cir. 2010) (a court may reweigh the evidence and assess

witness credibility in reviewing a Rule 33 motion for a new trial); *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (in deciding a Rule 33 motion, the court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation").

In any event, with regard to MMR21, as with the other sales groups, the Government relied largely upon the inappropriate inferences to be drawn from the volume of prescriptions; the discussion above serves only to point out that, contrary to the Government's position, there was not, in fact, other credible evidence. But with regard to volume, as noted above, the same issue arises with the Boardwalk-related prescriptions upon which the Government relies. Opp. at 28-29. Dr. Gaffney—who admitted that he was paid to sign prescriptions and did not see his patients but truthfully admitted that he never told Central Rexall of his misconduct, Tr. 3011 (Casseri); Tr. 1669 (Gaffney); Tr. 1504 (Tedesco)—provides a particularly poor example of "high prescription volume." After all, the evidence was that Dr. Gaffney only saw 220 patients, which is simply not a high number of patients, and the Government introduced no expert testimony that 220 patients being prescribed compound medications by the same doctor would or should set off alarm bells at a reasonable pharmacy. The Government's reliance on specific days with supposedly high numbers of prescriptions—"single days with 63, 38, and 31 prescriptions"—is unpersuasive because, as Boyle testified, some doctors wait to submit prescriptions to pharmacies in batches. Tr. 2385 (Boyle); *see also* Tr. 1751 (Ritson).

The Government also cites the volume of prescriptions from Drs. Sokalsky and Kauffman, but these numbers are not high at all: 169 prescriptions (and even fewer patients) from Sokalsky and 187 prescriptions from Kauffman. Opp. at 28-29. And the Government ignores an unrebutted reason for high prescription volume: that doctors reasonably issued new prescriptions when formulations changed. As Defendants' Moving Brief showed, spikes in prescriptions in, for

example, July 2015 corresponded with a reformulation in July 2015. Mov. Br. at 34 (citing Tr. 3583:24—3584:7 (Galloway); GX 1088 (showing spike in new prescriptions in approximately July 2015); Tr. 3582:24–3583:4 (Galloway indicating reformulation occurred in approximately July 2015 following lapse in coverage); GX 501; Tr. 1728:21—1729:3 (Ritson indicating Central Rexall reformulated compound formula days after his email in June 2015)). Indeed, this is the clear explanation for Dr. Sokalsky's and Dr. Kauffman's prescription spikes, highlighted by the Government, Opp. at 29, which occurred in July 2015 and December 2015, when Central Rexall reformulated frequently prescribed medications, necessitating new prescriptions—as the Government acknowledged in its summation. Tr. 3823 (Gov't Closing). The inference that these volumes demonstrated criminality, and Defendants' knowledge thereof, is unfounded.

### 2.    Profits

In its Opposition to Defendants' Post-Trial Motions, the Government focuses on the amounts of money earned both by the Defendants, Opp. at 57 ("Johnston and Brockmeier reaped "the lion's share of the proceeds"; "Brockmeier received over $5 million and Johnston received just over $34 million."), and by the sales groups at issue. *See, e.g.*, Opp. at 14 (Craven wrote "over $1,000,000 worth of prescriptions per month"); 18 ("Supreme's prescriptions brought Central Rexall $9.8 million in April 2015… which put over $4 million into Johnston and Brockmeier's pockets"); 22 ("Tricare paid $6,573,362.98 for Dr. Wagner's prescriptions" while Dr. Elder Quintana's "prescriptions cost Tricare $4,500,068.60."); 29 (Dr. Kauffman wrote $5,094,611.34 in  prescriptions in one year); 31 ("Central Rexall received $417,000 for the Chacker family's medications"). But this is a perfect example of the Government relying on an unwarranted and inappropriate inference, as there is absolutely nothing about the amount of money that was earned that demonstrates that a crime was committed, though these large numbers may very well have prejudiced the jury against the Defendants, as was undoubtedly the Government's hope. Indeed,

as the Court acknowledged before trial, the amounts of money earned by the Defendants was "untethered to any alleged underlying criminal conduct." ECF 184. And as was repeatedly confirmed during trial, the amount of money that was paid to Central Rexall for any compound prescription was set by insurers, suggesting that, far from being criminal, the amount of money that each compound component was worth was assessed as reasonable by the PBMs that set those prices. And the same is true of the commissions earned by the sales teams, which the Government repeatedly cites, *see* Opp. at 14 (40% commission for Top Tier); 20 (40% commission for MMR21); 32 (up to 56% commission for Boardwalk), but which not only do not demonstrate criminality or knowledge thereof, but in fact served to *reduce* Defendants' profits—again undermining the reasonableness of any inference of wrongdoing based on the amount of money earned.

### 3.    Defendants' Knowledge

One of the most obvious deficiencies in the Government's case was its failure to tie the evidence of illegality that it adduced to the Defendants. Over and over throughout its brief, the Government points to facts that it simply cannot show were known to either or both of the Defendants. Accordingly, it is now left to argue that such knowledge could reasonably have been inferred by the jury. This is not unusual: a defendant's state of mind is often a matter of inference. Tr. 3763 (Jury Charge) ("Often this state of mind, such as intent, knowledge or willfulness with which a person acts at any given time cannot be proved directly, . . . because one cannot read another person's mind and tell what he or she is thinking."). But the state of mind must still be proven beyond a reasonable doubt, Tr. 3774:11-17 (intent must be proven beyond a reasonable doubt), and so those inferences must still be reasonable ones, must still be supported by the evidence and must still be "logical and convincing," *Garner*, 915 F.3d at 170; *Casper*, 956 F.2d at 422, and not mere guesses or speculation, *Mercado*, 610 F.3d at 847; *Pauling*, 924 F.3d at 656-67.

19

Here, the Government's narrative points to piece of evidence after piece of evidence that were never shown to be known by the Defendants. Nevertheless, the Government cites numerous facts that it does not even attempt to show were known by Mr. Johnston or Mr. Brockmeier. Some examples include (but are certainly not limited to):

- the location of Craven's patients and the medicines she prescribed (Opp. at 12), as well as that particular individuals, who said that they did not know Craven, had their prescriptions filled (*id.* at 14);

- the suspicious email from Durgin (Opp. at 17);

- whether Hickman's sales representatives had experience in pharmaceutical sales (Opp. at 25);[9]

- Boardwalk doctors' and patients' receipt of payments in exchange for prescriptions, including, for example, the "quid pro quo arrangement" between Dr. Sokalsky and Tedesco (Opp. at 26-27) —though, as discussed above, the record is clear that Defendants were never informed of this conduct (Tr. 3011 (Casseri); Tr. 1669 (Gaffney); Tr. 1504 (Tedesco));

- that family members all received "the same medications with the maximum number of refills" (Opp. at 27-28);

- anything to do with Dr. Sokalsky's prescriptions (including whether the libido creams he prescribed worked on women) (Opp. at 29); and

---

[9]As noted below, this fact, even if true, has no relevance to the offenses at issue and was introduced only to "dirty up" the defendants. But with regard to this particular instance, the cited transcript section, Tr. 1803, does not state that Hickman told Defendants about his representatives' experience.

- "questionable prescriptions" as to which, the Government argued, it can be
  *inferred* Boyle discussed with Defendants because "he discussed issues like this
  with the defendants." (Opp. at 30-31).

These are just examples: the Government's brief is riddled with facts that, even if proven, are not

tied to the Defendants, other than by guessing: the "inferences" which the Government continually

asks the Court to draw are not inferences at all, but guesses—all because there was a lack of proof

that the Defendants knew these things, even when witnesses who could have been asked about

them (*e.g.*, Taff, Casseri, and Boyle) were not—while, as noted, still other facts were, the record

shows, specifically not told to the Defendants.

The guesswork that underlies the Government's case is even more profound and

problematic for Mr. Johnston in particular.[10] Thus, numerous facts are argued to have been

communicated to Mr. Brockmeier, with no evidence tying them to Mr. Johnston, except the fact

that Mr. Brockmeier and Mr. Johnston spoke often and at length—about what, no one knows, since

there was no evidence about the content of even a single one of these conversations.  Tr. 3145

(Brooks).  Thus, the Government is simply speculating when it concludes that Mr. Brockmeier

---

[10]As is discussed above and in Defendants' moving papers, there was no evidence adduced at trial
which showed either defendant was aware of the fraudulent conduct committed by individual
prescribing doctors or sales representatives which made prescriptions filled by the pharmacy
medically unnecessary.  *See* Mov. Br. at 19-21.  And this is true for Mr. Brockmeier, as well as
Mr. Johnston; though Mr. Brockmeier maintained a more frequent presence at the pharmacy and
was therefore often the first to interface with certain staff on a select number of prescription-related
concerns, this fact alone (or in conjunction with others proffered by the Government) does not
demonstrate knowledge of a wide-ranging fraud scheme, as the Government suggests, or willful
blindness with respect to such a scheme.

The Government misstates the record by arguing that "Taff told Brockmeier in early 2015 that
Serna's patients were getting paid."  Opp. at 22.  This is not what Taff testified—she instead stated
that he heard "complaints" about patients getting paid and that "we needed to look into what was
happening."  Tr. at 270-71.  She did not, however, testify in the manner indicated by the
Government put it, and in particular, did not testify that Central Rexall declined to investigate these
"complaints."

necessarily informed Mr. Johnston of, for example, Taff's concerns with Top Tier and Craven (Opp. at 11-12); the Mapelli prescriptions from Supreme Medical and payment for a related party prescription from Supreme (Opp. at 16-17); commission numbers in Quickbase, to which the Government concedes Mr. Johnston did not have access (Opp. at 18); Olsen's concerns as to whether a year's supply of certain medications would be unnecessary (Opp. at 27); Taff's supposed concerns about family members receiving the same prescriptions (Opp. at 28); Taff's concerns with Dr. Kauffman's prescription volume (Opp. at 29-30); any of Mr. Brockmeier's conduct involving copays, including forgiveness of individual copays (Opp. at 42-43); any of a number of isolated purported "red flags" listed at pp. 51-52; and Taff's vague conclusion that Central Rexall was submitting medically unnecessary prescriptions (Opp. at 56).  The Government's recitation of the evidence, and its arguments regarding permissible inferences, plays into the "tendency in conspiracy cases for finders-of-fact to believe that a defendant must have been involved in the conspiracy, once evidence has been presented of some questionable acts the prosecution contends are but an extension of the larger conspiracy," but ignores the crucial requirement that "guilt must remain personal and individual."  *United States v. Samuels*, 741 F.2d 570, 575 (3d Cir. 1984).[11]

---

[11]*See also Krulewitch v. United States*, 336 U.S. 440, 449 (1949) (noting that "the looseness and pliability of [conspiracy] doctrine present inherent dangers which should be in the background of judicial thought"); *see also* Mov. Br. at 8 (citing cases).

The Government cites *United States v. Brodie*, 403 F.3d 123 (3d Cir. 2005), which imputed knowledge possessed by the defendant's brother (the company vice-president) to the defendant himself (the company president).  But in *Brodie*, the facts that the Government imputed to the defendant via his brother were large, significant facts—for example, whether the defendant's company was making sales involving Cuba.  403 F.3d at 150.  By contrast, the facts that the Government here attempts to impute to Mr. Johnston through Mr. Brockmeier are of notably smaller import, which one cannot reasonably infer Mr. Brockmeier would have discussed with Mr. Johnston in the absence of actual evidence that he did, or that he spoke to him about similar facts.  But there was no evidence of that introduced in this case, so the Court is left to guess at what the two spoke about, though those conversations are a dominant aspect of the Government's theory.  *See* Opp. at 10.

Lacking any real evidence of the Defendants' knowledge, the Government argues that such knowledge can be inferred from the fact that other witnesses supposedly knew that Central Rexall was submitting claims for medically unnecessary prescriptions, contending that Defendants must have possessed the same knowledge. Opp. at 49-50. But the Government's arguments are either hollow, or fail the test of logic. They are hollow because, for some of the witnesses, knowledge was obvious: of course Hickman and Ritson thought fraud was occurring—they were the fraudsters generating the medically unnecessary prescriptions. For others, their opinions—for example, Rolling's view that Central Rexall was not "legitimate"—was ultimately inadmissible. See Tr. 741-43 (Court precluding the Government from asking Rolling whether he believed Central Rexall was filling medically unnecessary prescriptions). And for still others (really, all of the witnesses cited by the Government on pages 49 and 50 of their brief)—especially Taff and Casseri, who conclusorily agreed with the Government that Central Rexall submitted medically unnecessary prescriptions but failed to specifically explain what made those prescriptions medically unnecessary—the Government cannot and does not attempt to tie that knowledge to Mr. Johnston and Mr. Brockmeier. Opp. at 49-50.[12] For example, Taff did not testify that she shared any of her concerns with Mr. Johnston, Tr. 317, and again, it is not a reasonable inference to assume that any and all concerns shared with Mr. Brockmeier were automatically conveyed to Mr. Johnston. Nor did Casseri testify that he conveyed his beliefs to either defendant. Tr. 2881-82.

More fundamentally, however, an alleged coconspirator's "subjective belief" as to what a defendant "must have known" is not a basis for assessing a defendant's own mental state and thus

---

[12]The Government's section header, which states that "[w]itnesses with less knowledge than Johnston and Brockmeier knew that Central Rexall was committing fraud," is plainly inapplicable to Casseri, who was far more involved with sales groups like Boardwalk than either Defendant. Tr. 1819 (Hickman) (describing Casseri as his "point person").

cannot properly be considered as evidence of guilt. *See United States v. Anderskow*, 88 F.3d 245, 251 (3d Cir. 1996) (co-conspirator's belief as to what defendant must have known is not sufficient evidence of defendant's criminal knowledge to support conviction of charge requiring criminal knowledge); *United States v. Stadtmauer*, 620 F.3d 238, 265 (3d Cir. 2010) ("[T]he witness's testimony was not helpful—and thus inadmissible under Rule 701—because the jury was in just as good a position as the witness to infer what [defendant] 'must have known.'") (citing *Anderskow*); *United States v. Jackson*, 849 F.3d 540, 554 (3d Cir. 2017) (lay opinion testimony "may not 'simply dress[ ] up argument as evidence'"). This fundamental proposition, flowing as it does from the notion that guilt must be considered on an individual basis, precludes the outrageous inference that the Government seeks to draw: that because others pleaded guilty, the Defendants must be guilty too (especially given that they made the most money from the pharmacy), an argument that flies in the face of the law and in the face of the instructions that the Court actually provided. Tr. 3754 (Jury Charge) (Witnesses' "decision[s] to plead guilty [were] personal decision[s] about their own guilt. Such evidence is offered only to allow you to assess the credibility of the witness . . . and to explain how the witness came to possess detailed firsthand knowledge of the events."); Tr. 3757-58 ("[I]n our system of justice, guilt or innocence is personal and individual."). For this reason too, the conviction in this case is not supported by appropriate or sufficient evidence. A judgment of acquittal should be entered or a new trial granted.

### 4.    Unusual Prescriptions

The Government argues that Defendants should have been aware of fraud due to "[t]he unusual nature of the medicines prescribed," Opp. at 12, or later "questionable prescriptions." Opp. at 30-31. These include prescriptions by Candace Craven for an 11-year old with age spots, eczema cream for a three-year old, scar cream for both a three- and 77-year old, and the same supplement for a 16- and 77-year old, Opp. at 12, as well as "overlapping prescriptions for two

families" (i.e., the same prescriptions written by different doctors) and "prescriptions for a family member." Opp. at 30-31. But, as discussed above, there was literally no evidence—none whatsoever—that Defendants were aware of the specific prescriptions being prescribed by specific practitioners. Moreover, there was no expert testimony that these prescriptions were in any way inappropriate, and the Government's own skepticism about whether they were suitable is irrelevant. It is unclear why, for example, a three-year old could not have eczema, or why a young person and an old person could not be prescribed the same supplement, let alone what is wrong with two different doctors issuing similar prescriptions or doctors prescribing for their own families. Without actual evidence that the few prescriptions at issue were both medically improper and (more importantly) brought to Defendants' attention, this argument cannot support Defendants' convictions.

The Government also cites Craven's prescriptions for patients with home addresses in different states than Craven's practices, including where she was not licensed. Opp. at 12. But making the leap from these prescriptions to the conclusion that they were therefore not medically necessary is simply not a reasonable inference, for several obvious reasons. First, and again, there was no evidence or testimony adduced that Defendants (or, for that matter, anyone at Central Rexall) knew where, aside from Tennessee, Craven was licensed. And second, there is no logical connection that a patient's state of residence has anything whatsoever to do with medical necessity—the lack of which is the entire basis of the fraud in this case. Finally, it is not even clear in an age of legal telemedicine that there is anything wrong with a prescriber and a patient residing in different states, such that it should have raised suspicion, let alone an inference of criminality beyond a reasonable doubt. Tr. 2534-36 (Boyle) (explaining telemedicine and Central Rexall's survey of state telemedicine regulation); Tr. 2819 (Casseri) (stating that Central Rexall

received prescriptions from doctors who had phone or video calls with patients). This is not a matter of the Defendants urging a different inference than the one the Government advocates; there is simply no evidence of criminality in the first place, let alone evidence that would support an inference that Defendants knew of any ongoing fraud.

### 5.    Copays

As the Court certainly recalls, a great deal of the Government's case was based upon Central Rexall's copay collection policies and practices. The Government's argument is that the refusal to make a copayment demonstrates the lack of medical necessity of a prescription. But that inference is simply not reasonable. There are many reasons why a patient may not make a copayment for a prescription that was written and signed by a physician:  the co-pay could have been too high; the patient may have decided that—like a patient who declines to undergo recommended surgery or, these days, one who decides not to have his or her children vaccinated—medical necessity aside, he or she does not want the medication; another doctor may have rendered a second opinion. The Government dismisses all of these possibilities, in favor of a single theory: that the patient decided the prescription was not medically necessary even though a physician determined that it was, and so therefore there was a fraud. At the end of the day, this inference is not, however, sufficiently "logical and convincing" to support the verdict. *Garner*, 915 F.3d at 170; *Casper*, 956 F.2d at 422.

To be sure, copay collection was a contractual matter, as between PBMs and pharmacies, like Central Rexall. In this regard, whether Central Rexall did or did not satisfy its contractual obligations was a matter of dispute at trial, given the shifting sands of the contracts (embodied in the ESI Manual) and, in particular, whether contract compliance turned on the efforts that Central Rexall made, or the effectiveness of those efforts—in fact, even accepting the notion that the violation of  a contractual requirement to collect copays could ever amount to a crime, at no time

during Central Rexall's operation did the PBM contracts require collection of copayments prior to

shipping medication, and Defendants' accurate belief was that the pharmacy was making extensive

and ongoing efforts to live up to that obligation over time.[13]  But either way, as the Court charged

the jury, a breach of contract by Central Rexall did not amount to a crime, Tr. 3773 (Jury Charge)

("Ordinary civil negligence does not give rise to criminal liability, nor does an ordinary breach of

contract or a failure to honor one's promise give rise to criminal liability."), let alone this crime,

which was the fraudulent submission of claims for medically unnecessary prescriptions.

Nor even is the breach as profound as the Government portrays it.  The truth, as the Court

heard at trial, was that Central Rexall made significant efforts to collect copays, including calling

---

[13]*Compare* DX 336-1 § 2.3 (Dec. 2013 ESI Provider Manual) (requiring pharmacy not to waive copay or modify its amount) *and* GX 61 § 2.9 (Jan. 2015 ESI Provider Manual) (adding language that pharmacy "must disclose the full and correct copayment amount to the member," but not requiring collection at any particular time) *with* DX 1912 § 2.2 (July 2016 ESI Provider Manual, by which time Central Rexall had effectively ceased operations) (providing, for the first time, language about when a copay should be collected:  "Network Provider shall inform Members of the Copayment prior to dispensing each medication.  In addition, Network Provider must collect the Member Copayment.  In general, the collection of the Copayment must occur prior to dispensing each medication.").

*See also* Tr.2566:11-21 (Boyle) ("Q. . . . the pharmacy, shall do three things in this whole paragraph [of the 2014 manual].  It shall ensure that the co-payment is the correct amount.  Right?  A. Correct.  Q. It shall not change the co-payment amount. Right?  A. Yes.  Q. It shall not waive the co-payment amount. Right?  A. Correct.  Q. It does not say in this paragraph we just looked at it, that the pharmacy shall collect every co-pay.  That's not what that says.  A. It does not say that in this paragraph."); GX 64 § 2.2; Tr. 2568:17-22 (Boyle cross: "Q. It says: Co-payments are a critical benefit design tool that can sensitize members to the cost of their medications and encourage members to seek out less expensive medications that are equally as effective as more expensive medications.  We didn't see that in the first version.  Right?  A. No."); Tr. 2569:19-24 ("Q. But the part that's new is that the network provider agrees that it shall collect the full co-payment from the members. Correct?  A. Correct.  Q. That was not in the 2014 version. Correct?  A. Correct."); Tr. 3309:21-3310:1 (Stockwell cross: "Q. Okay. And the additional information [added to the 2016 manual] is—makes it very clear that the pharmacy agrees that it shall collect the full co-payment.  That language was not in the earlier language.  Correct?  Right?  A. It wasn't.").

every, or nearly every, patient and confirming that the patient was willing to undertake the obligation to pay the copay prior to shipping the medication. Central Rexall then followed up with invoices for payment included with the medication when shipped. The pharmacy even hired someone whose sole responsibility was following up on delinquent copays, Tr. 2743 (Farahat) (Central Rexall "hired someone specifically for the job of collecting copays" and "organizing those bills"), and created an ESI-approved charge account program for patients unable to pay, Tr. 3221, 3224 (Stockwell). That Mr. Brockmeier "sometimes" waived co-pays does not undermine this point and certainly does demonstrate a company-wide failure-to-collect policy. And, at the end of the day, the Government's contention that Central Rexall "failed to collect 69% of copays," Opp. at 80, severely misstates the evidence. To the contrary, as of September 2014, 69% of the charge account balances for which Central Rexall had billed were outstanding, GX 245A, but this snapshot fails to account for the falling number of outstanding copays, which actually *decreased* between September 2014 and September 2015. Opp. at 43. For example, the Government highlighted a patient named Nancy Althouse, who had an unpaid copay balance as of September 2014. But Ms. Althouse ended up paying her copay balance on or before February 8, 2016. Tr. 2719:1-3; DX 837. Likewise, as the evidence at trial showed, Sara Hickman, whom the Government highlighted as delinquent on her copays, also paid them. Tr. 2719-21 (Farahat).

In an effort to create a fraud where there was none—at most, there was only a contract breach—the Government argues that the evidence showed that Central Rexall "never told" ESI about its collection rates, or "concealed" its collection practices from PBMs. Opp. at 43, 80. In this regard, the Government emphasizes, over and over, its contention that Central Rexall entered into a "sham contract with Affordable Medical Solutions." Opp. at 43. But, even assuming this

was true,[14] it was not, as discussed below, the fraud alleged here, to submit claims for medically unnecessary prescriptions, and only served to prejudice the jury against the Defendants. Nor was it shown to be a representation that was material to any PBMs. Central Rexall's use of the AMS program was disclosed to ESI, Mov. Br. at 58 (citing GX 574 and 582), but there was no evidence that ESI ever sought to recoup claims it had paid that used the AMS voucher or ever tried to verify that the AMS payments had been made, or that ESI ever sought to discipline or exclude Central Rexall from its network because of the AMS program. If that had happened, Blake Stockwell surely would have testified about it.

### D. The Government Packed the Trial with Evidence Designed Solely to Make Defendants Look Bad

The above discussion demonstrates the extent to which the Government relies not upon reasonable inferences, but on speculation, guess, and unwarranted supposition in seeking to save its conviction. But beyond those inappropriate inferences, insufficient as they are to support a conviction under the applicable legal standards, the guts of the Government's case was its effort to obtain a conviction by simply making the Defendants look like criminals, based upon facts that were in no way part of a chain of logical inferences, and were even in many cases legally irrelevant to the charges here. That effort, motivated by the weakness of the case without it, pervaded the prosecution presentation here, and serves now to undermine the sufficiency of the evidence under Federal Rule of Criminal Procedure 29, and to demonstrate the injustice of the verdict, warranting a new trial under Federal Rule of Criminal Procedure 33.

---

[14]In fact, the facts at trial showed that AMS was "supposed to pay" a portion of patients' copays and was hired by Central Rexall with the "good-faith belief . . . that they would in fact do what they were supposed to do and pay the copays." Tr. 2547 (Boyle). When AMS did not make those payments, Central Rexall terminated the agreement. Tr. 2548. The Government's argument contemplates none of this.

### 1.    Compounding Industry

At the heart of much of the Government's case is an attack upon the compounding industry in general.  Thus, the Government introduced a significant amount of evidence (to which, contrary to the Government's contentions, Defendants objected before trial, *see* ECF 222.1 (Motion in Limine) at 10 n.10) of fraudulent conduct in the compounding industry.  For example, the Government introduced a news article titled "Probes Target Fraud in Military Health Plan," GX 628A, which Boyle read excerpts of, and another titled "Pharmacies Push Pricier Drugs to TRICARE Users," GX 436.  Ostensibly, this evidence was introduced to show that Defendants were "put on notice that Central Rexall's practices were criminal."  Opp. at 100.  But this argument was a transparent effort to convict Defendants based on misconduct—or actually, *allegations* of misconduct—on the part of others, and, really, to argue that they should not have been involved in the compounding business in the first place, or should have gotten out of it, as opposed to trying to do it the right way.  As Defendants predicted, the high volume of evidence on this point unfairly prejudiced Defendants by painting them as just another set of criminals in the compounding pharmacy industry.  *See* ECF 222.1 at 10 n.10 ("[T]here is a strong likelihood that their cumulative effect will be to make the completely improper point that the mere participation in the compounding industry means that the Defendants are guilty of something.").[15]

Beyond arguing that their mere participation in the sales of compound pharmaceuticals is, in and of itself, indicia of wrongdoing—this, though there was plenty of evidence at trial that

---

[15]The Government relies largely on the limiting instructions that the Court provided with regard to this evidence, Opp. at 99-100, but such instructions are, as the caselaw recognizes, often ineffective in the face of repeated, highly prejudicial evidence.  *See United States v. Green*, 114 F.4th 163, 180 (3d Cir. 2024) (limiting instructions are "not a panacea"); *O'Rear v. Fruehauf Corp.*, 554 F.2d 1304, 1309 (5th Cir. 1977) (holding that "[t]here must be a line drawn in any trial where, after repeated exposure of a jury to prejudicial information, a judge realizes that cautionary instructions will have little, if any, effect in eliminating the prejudicial harm").

compound pharmaceuticals are completely legitimate, Tr. 1566 (Patel); Tr. 1589 (Patel); Tr. 1658 (Gaffney); Tr. 3274 (Stockwell) ("Compound pharmaceuticals are legal.")—, the Government also mischaracterizes the purpose of compound products to make it appear as if the Defendants were engaged in wrongdoing.  Specifically, the Government contends that compound medications are "supposed to be medications specifically tailored by prescribing doctors to meet the unique medical needs of particular patients."  Opp. at 7; *see also* Opp. at 28 (arguing that "it is inconceivable that one doctor could legitimately determine in a year that 220 patients all needed the exact same compound medications—medications that are supposed to be individually tailored to the needs of particular patients").  While the Government cites snippets of testimony from Taff and Rolling, it cites no federal or state law or regulation imposing such a requirement.  This is for good reason:  There is no such requirement and the contention is simply false, as the Government well knows.[16]  This is, of course, why Central Rexall was permitted by law to prepare and utilize preprinted prescription pads, which was (as the Government conceded pretrial) a permissible means of marketing specific compound formulas to physicians.  *See* ECF 137 at 15 (conceding that "[t]he Indictment does not allege that the distribution of preprinted prescription pads, standing alone, is itself illegal").  It is what the compounding industry did then and does now, and is not, in any way, illegal.  But this "specific tailoring" theory underpins much of the Government's later arguments concerning, for example, willful blindness.  Opp. at 28.  It is, however, wrong, should

---

[16] From 2013 to 2016, neither § 503A of the FD&C Act (21 U.S.C. § 353a(a)), which governed compounding, nor FDA policy required that each compound be chemically unique or "special" for each individual.  FDA Compliance Policy Guide § 460.200 (Pharmacy Compounding) (2002, in effect until 2017).

not have been the basis of the convictions here at issue, and is not a ground to uphold the verdict in this case.[17]

### 2.    Pharmaceutical Sales Experience

The Government introduced evidence that Central Rexall's sales representatives lacked prior pharmaceutical sales experience and emphasizes this fact throughout its Opposition Brief. Opp. at 11, 25 ("Many of these sales representatives had no experience in pharmaceutical sales and no knowledge of the drugs they were selling; the Boardwalk representatives included firemen, police officers, teachers, a maintenance worker, and a gym floor installer.").  But whether or not the pharmacy's distributors had experience in pharmaceutical sales is irrelevant; there was no record evidence that this was in any way unusual in the compounded medication market (as opposed to with regard to FDA-approved products like those sold by a company like Merck, with which the Government unfairly contrasted Central Rexall).  There was, of course, no evidence that there was a legal or regulatory requirement that sales representatives possess prior sales experience, or any proof tying that fact to whether the prescriptions at issue were supported by medical necessity.[18]  Instead, this evidence was introduced solely to prejudice Defendants by

---

[17]Of a piece with the Government's arguments is its attempt to paint Central Rexall as a criminal organization by giving John Mark Rolling a non-prosecution agreement almost five years after the expiration of the statute of limitations and without him having asked for one or even having been worried about prosecution.  Tr. 818-19 (Rolling).  The obvious implication of this unnecessary action—that Mr. Rolling was a coconspirator and criminal—was plainly improper and merely represented another attempt to convict the Defendants based upon an improper inference—here of guilt by association.  *United States v. Tyson*, 653 F.3d 192, 210-11 (3d Cir. 2011) (Third Circuit "conspiracy jurisprudence does not sanction guilt by association"); *United States v. Zhong*, 26 F.4th 536, 557-58 (2d Cir. 2022) ("The government also may not invite the jury to find guilt based on a defendant's associations.").

[18]And, lest it be unclear, "medical necessity" does not require that a given medication be lifesaving—Gaffney testified that a scar cream could be "medically necessary" despite a scar not being life-threatening.  Tr. 1680-81.  All that was needed was that a medication "improve[d] quality of life for a patient."  Tr. 1681.  For example, vitamins can be "medically appropriate" without being strictly necessary.  Tr. 1681.

making it seem as though they were willing to cut corners and skirt the rules.[19]  The Government now also contends that Central Rexall representatives "did not receive meaningful educational information about the compound medications that they could have used to convince doctors about the benefits and side effects of Central Rexall's medications."  Opp. at 25.  But again, this does not go to any element of the offenses, and is argued in an effort to make the Defendants look bad. In this case, it is also false and unfair, contradicted as it is by a wealth of record evidence; it cannot serve to defeat Defendants' post-trial motions.  GX 229A (Central Rexall powerpoint explaining medications and products); Tr. 441-42 (Taff) (testimony walking through presentation for sales representatives); DX 775 (email referencing sales representative training); Tr. 2894-99 (Casseri) (explaining sales representative training); DX 30 (email from Casseri to Johnston re: weekly sales training calls); Tr. 2908-09 (Casseri) (explaining sales representative training calls); Tr. 3355 (Bessey) (referencing Central Rexall brochure); Tr. 1501-02 (Tedesco) (introducing DX 244 (email attaching 57-page pdf explaining medications) and DX 245 (email attaching pdf explaining metabolic supplement)).

### 3.    Direct Marketing

The Government argued at trial, and makes a point of repeatedly pointing out in its Opposition, that certain distributors marketed Central Rexall medications directly to patients, despite this conduct ostensibly violating Central Rexall's agreement with ESI.  Opp. at 20 (Serna); Opp. at 25 (Hickman); Opp. at 46-47.  This evidence, of course, has absolutely no relationship to the question of whether Central Rexall submitted claims for medically unnecessary prescriptions,

---

[19]This extends to evidence like Hickman's attempt to hide his relationship with Central Rexall from his employer Merck by using his wife's name.  Opp. at 24.  Such evidence goes to no element of any charged offense and served only to make Defendants look bad because they associated them with such a deceitful and unsavory character and did not cease to do so when they learned this fact.

but—because the Government emphasizes that direct marketing was in violation of Central Rexall's contract with Express Scripts, *see* Opp. at 25 (citing Tr. 3198-3201 (Stockwell))—it was plainly introduced to cast Defendants as contract breakers and, therefore, people who cannot be trusted. Accordingly, it cannot and should not play any role in determining the sufficiency of the evidence post-trial, and the Government's reliance upon it requires that Defendants' post-trial motions (and especially their motion for a new trial) should be granted.

### 4.     Central Rexall Medications

The Government also draws implausible or speculative inferences from certain Central Rexall practices that, it says, were "part of the fraud." Opp. at 32. For example, it argues that the jury could infer that Defendants were aware of medically unnecessary prescriptions because Central Rexall tripled the amount of resveratrol in its metabolic vitamin. Opp. at 32-35. The increased resveratrol "did not have any medical benefit"—apparently, the Government contends, "for any patient." Opp. at 35.[20]

Leaving aside the accuracy of this conclusion, *see* Mov. Br. at 25 and n.7, this argument is flawed for three fundamental reasons. First, prescriptions that included the higher dose of

---

[20]The Government argues that "[p]rescribers also believed that a medicine was placed on a preprinted pad because of a determination that it was medically appropriate, Tr. 1596-97 (Patel), and thus were misled by the omitted information, i.e., that the triple resveratrol formula was designed only to make money and was not medically necessary for any patient." This argument (in addition to misstating the cited testimony—Patel made no such statement) is absurd. Medications are not "medically appropriate" in the abstract—they are medically appropriate only for particular patients. And, as was absolutely clear at trial, prescribers always had the option to change (or simply not prescribe) any medication listed on a preprinted pad, as Patel himself made clear. Tr. 1597 (Patel). The Government's theory depends upon the physicians not doing their job and being swayed by the marketing efforts inherent in the notion of preprinted prescription pads. But regardless of the extent of any marketing effort—whether in the incessant television advertising that we all see or preprinted prescription pads—we count on doctors to do their jobs and prescribe in accordance with professional standards.

resveratrol were signed and submitted by prescribing medical professionals. Tr. 1608-09 (Patel) (a signature communicates a physician's judgment as to "the appropriate course of treatment for this individual"); Tr. 1666-67 (Gaffney) (a signature represents a physician's determination of medical necessity). Second, these prescriptions were, as Defendants required, signed off on by the pharmacists prior to being included on preprinted prescription pads, even if they now—or at least one of them, Rolling—has second thoughts about having done so. Tr. 427 (Taff) (prescriptions could only be placed on pads if approved by pharmacists); Tr. 715 (Rolling) (only Rolling and Olsen had final approval over formulas); Tr. 868-69 (Olsen) (the primary considerations for formula approval were the pharmacy's ability to make the product and patient safety). And third, perhaps most significantly of all, if the formula at issue could never have had a medical benefit, it should not have been reimbursed by insurance companies. Tr. 3258 (Stockwell) (insurance plans decide what pharmaceuticals to cover). But it was, and the very fact that insurers reviewed the vitamin's formula and approved payment demonstrates that, at least some of the time, the formula was appropriate. The Government's recitation does not mention (nor could it dispute) this critical evidence of potential medical propriety.[21] Nor is it the case, as the Government contends post-trial—though this was clearly not the import of the evidence at trial—that the pertinent prescriptions including higher doses of resveratrol were fraudulent because "there were no studies or tests showing that the formula actually helped with weight loss." Opp. at 34. As the evidence showed at trial, there is no requirement that compound pharmaceuticals be the subject of clinical testing, let alone that such testing be performed by pharmacies. *See, e.g.,* Tr. 2952 (Casseri) (the

---

[21]Indeed, if the Government were to argue—as it wisely does not—that PBMs do not care about medical necessity, then that would undermine the notion that any claim necessarily includes an implied certification of medical necessity, or the materiality of any misrepresentation as to medical necessity, if there was one. *See infra* at §§ II, III.

FDA does not require research or clinical studies for compound medications); see also Tr. 940-41 (Olsen) (neither walk-in nor mail-order pharmacies conduct studies of particular ingredients).

Of course, the same analysis applies to the Government's argument regarding the substitution of hyaluronic acid for resveratrol. Opp. at 35-37. Whether or not hyaluronic acid is medically appropriate for any given patient, and even assuming again that there were "no studies" to support its use, the fact remains that it was prescribed by licensed physicians, filled by licensed pharmacists and adjudicated and reimbursed by PBMs and insurers. That chain of determinations alone is sufficient to rebut the Government's contention that oral hyaluronic acid was, *in all cases*, "very medically unnecessary," let alone understood by the Defendants to be so. Opp. at 36.[22]

Given these facts, why did the Government place so much emphasis on the lack of medical necessity when it came to the greater dose of resveratrol or the substitution of hyaluronic acid for resveratrol? It was to make the Defendants look bad, and greedy. But that is precisely what evidence should not be admitted to show: the question was not and could not be whether they were good or bad, greedy or altruistic people. It was about whether they knew they were submitting prescriptions that they knew were fraudulent because they were medically unnecessary. The prescriptions signed by doctors (which Defendants were not), the filling of the prescriptions by pharmacists (which Defendants also were not) and the payment for them by insurers (which Defendants definitely were not) undermines any argument that the evidence was sufficient on this point. Defendants' posttrial motions should be granted.

---

[22]The Government's statement that patients were never called about the switch from resveratrol to hyaluronic acid (Opp. at 36-37) is false. Any testimony to that effect by Hickman or Casseri is flatly contradicted by reams of Central Rexall records, all of which show that when the switch occurred in early July 2015, every patient to receive a new prescription was contacted. *See, e.g.*, DX 131, Column AE, Rows 22976 (M.S.), 22982 (J.E.), 23307 (E.M.), 28874 (S.F.); DX 131ZZ. Relying on Casseri's misstatement is not reasonable given the overwhelming contemporaneous documentary evidence to the contrary.

### 5.    Other "False Statements"

Most emblematic, perhaps, of the Government's effort to "dirty up" the Defendants because it could not adduce sufficient evidence to obtain a conviction without doing so is the Government's argument that Defendants made a series of "false statements" to "keep the fraud going, keep the money fraudulently obtained from the PBMs, and avoid detection by PBMs." Opp. at 45. But the statements upon which the Government puts overwhelming reliance in its opposition to the post-trial motions are, at best, only tangentially connected to the charged fraud, and as such cannot support Defendants' conviction on Count 1, on this or any other basis. For example, the Government points to alleged "lies" to CVS and Express Scrips about the AMS copay program (Opp. at 45, 48), but makes no effort to show that any medically unnecessary prescriptions resulted from this lie, or that CVS would have terminated its relationship with Central Rexall had it not been made, a conclusion that follows from the discussion above about the lack of connection between medical necessity and copays in the first place. The Government likewise cites a statement to CVS that Central Rexall had "made the decision to move away from the Good Neighbors Pharmacy Provider Network," when in fact Central Rexall had been terminated by the Network without cause. Opp. at 46; Tr. 2369-70 (Boyle). Again, there is no evidence that this statement was material to CVS, and no evidence that it led to the generation or payment of any medically unnecessary prescriptions. Indeed, as is clear from the email at issue, its purpose was merely to locate Central Rexall's preexisting contract with CVS. GX 566 (email from Mr. Johnston stating: "I'm trying to locate our direct contracts . . . . GNPPN said that we have a direct contract with CVS Caremark. . . . Can you help me locate this contract?").

The same applies to the other "false statements" that the Government discusses. It argues that Central Rexall misleadingly represented to CVS that it did not have any individual 1099 contractors. Opp. at 46-47. But this has nothing to do with medically unnecessary prescriptions,

and this representation was not material to PBMs anyway: on Central Rexall's application to Catamaran, DX 523, Central Rexall *disclosed* that it employed 1099 contractors, and Catamaran approved the pharmacy anyway—clear evidence that PBMs were not concerned about the usage of 1099s. Likewise, with respect to the truly irrelevant fact as to the percentage of Central Rexall's shipments that went out-of-state. Opp. at 47. Leaving aside that the Government did not, for the reasons set forth in Defendants' Moving Brief, demonstrate the falsity of this statement, *see* Mov. Br. at 61-62 (showing that the Government's arguments rely on a timing mismatch, as the evidence showing that the statements in the letter were "false" post-dated the letter by months), that false statement had nothing to do with the alleged fraud, involving submitting fraudulent—because medically unnecessary—claims to insurance companies, or to "keeping the fraud going."[23]

As it did before trial, when it tried to use evidence that Central Rexall violated the Anti-Kickback Statute as evidence of an entirely different fraud, the Government's intent was clear: they sought to introduce evidence of representations that they claimed were false though they had nothing to do with medical necessity, yet the Government argues that they go to the Defendants' "knowledge that they were committing fraud, their fraudulent intent, and their knowing participation in a fraud conspiracy." Opp. at 48 (citing cases). But misrepresentation as to a fact, even if it amounts to a separate crime, does not automatically translate to knowledge of, agreement to, or concealing another, as Defendants argued in their motions *in limine*. *See* ECF 236 at 12

---

[23]The Government does not even try to rebut Defendants' argument that the prosecution's reliance on Central Rexall's letter to the Defense Health Agency regarding its hiring of compliance officer Jason Stalling was wrong and unfair. As Defendants demonstrated, the letter was true when written—Stalling had in fact been hired as a compliance officer at the time that the letter was written. Mov. Br. at 59. The Government attempts to elide this fact by describing it as an "uncorrected false statement." Opp. at 71. The Government never explains how a letter that was true when it was written could be "part of the conspiracy's efforts to obtain payment." *Id.* Nor was any evidence introduced to demonstrate that the failure to correct this letter was some kind of purposeful act of deception.

(arguing "Defendants are not on trial for having an intent to engage in generally fraudulent conduct; they are on trial for having the intent to defraud PBA by and through fraudulent insurance claims via medically unnecessary prescriptions."); *United States v. Walters*, 226 F. Supp. 3d 821, 825 (E.D. Ky. 2016) (noting that "inappropriate payment arrangements do not, by default, indicate intent to defraud"). That is, lying as to one thing does not show guilt of another, a fundamental principle of our legal system which the Government here eschews.

Ultimately, these statements were introduced[24] not to demonstrate fraudulent intent or knowledge of medically unnecessary prescriptions, but simply to make the Defendants look bad. By loading the case with other, unrelated instances of alleged misconduct, the Government was able to frame Defendants as routine contract breakers and liars, despite the high potential for unfair prejudice resulting from this strategy. Given the tenuousness—indeed, the inappropriateness—of the inferences upon which the Government otherwise relies, this prejudice may very well be the source of the convictions here. Though they lay bare the insufficiency of the prosecution proofs, at the very least, they require that the motion for a new trial should be granted so that the Defendants may be tried based on evidence actually related to the offense charged.[25]

---

[24]Over Defendants' objections: Defendants objected in their motions in limine to evidence regarding 1099 contractors, as well as evidence that their conduct breached Central Rexall's contracts with PBMs but that did not go to whether prescriptions were medically unnecessary. ECF 241 at 8 ("But whether a particular contractual violation is material in the context of this prosecution only matters if that violation concerns whether a particular prescription is medically unnecessary; supposedly material violations that are untethered to that purpose go well beyond the object of the Indictment's conspiracy."); *id.* at 9 (objecting to evidence regarding copay discount cards and 1099 contractors because "these proffers appear to be attempts to paint Central Rexall as a routine violator of its contracts").

[25]Defendants maintain their argument that reliance on these statements, which did not appear in the Indictment and were not, apparently, considered by the grand jury, constituted a variance, and one that was prejudicial because of how the Government used them, particularly on rebuttal and therefore at a time when the Defendants did not have the opportunity to respond. *See* Mov. Br. at 55-66; Tr. 4154-55.

**E.    The Government's Willful Blindness Arguments Improperly Rest on Allegations of Negligence and Are Unsupported by Reasonable Inferences.**

As Defendants argued in their moving brief, the real problem with a willful blindness instruction is the risk that it will allow a criminal defendant to be convicted because he was negligent and not because, as the law required here, he knowingly and willfully violated the criminal laws of the United States.  Tr. 3764-66 (Jury Charge) (explaining Count 1's knowledge and willfulness requirements).  The Court recognized this risk, agreeing with the Government that willful blindness should be charged, but acknowledging that it was "a dangerous charge" that "erodes the onus upon the Government."  Tr. 3695:4-16 & 24-25; Tr. 3696 (Charge Conference).  *See* Mov. Br. at 71-72 (citing cases and other authorities).

In response to the Defendants' post-trial motions, the Government—seeking both to justify the willful blindness charge, but more significantly, to support the verdict which almost certainly was based upon that charge and theory—demonstrates just how dangerous it was.  Thus, in support of the verdict, the Government points to these facts (none of which the Defendants dispute for purposes of this motion), which, it argues, defeats any claim of the insufficiency of the evidence:[26]

- The Defendants were made aware of a number of circumstances in which doctors or patients did not confirm that they had written or received a prescription, Opp. at 51-52, or did not actually have doctor-patient relationship, *id.* at 54;

- The Defendants were made aware of a number of federal investigations into compound pharmacies, or and the practices in which those pharmacies engaged, *id.* at 53-54;

- Defendant Johnston reviewed the prescriptions written by Dr. Paul Bolger, whose office was located in Iowa, which included prescriptions written for patients from other

---

[26]The Government never responds to the Defendants' motion for a new trial based upon a reweighing of the facts in support of a verdict based upon willful blindness.  *See* Opp. at 102-03.

states and for a compound-medication mouthwash, though Bolger was not a non-dentist, *id*. at 55;

- The large number of prescriptions from Central Rexall's four largest sales groups, *id*. at 56; and

- Hayley Taff's warning that medically unnecessary prescriptions were the subject of Central Rexall claims. *Id*.[27]

For the reasons discussed herein, and in the Defendants' prior submission, these facts—and the Government's critique of Central Rexall's responses to learning them—do not, as a matter of law, suffice to demonstrate willful blindness, but at most only negligence, which cannot establish criminal liability.

First, the Government's argument that willful blindness can be inferred by a few specific instances (the Government identifies nine, Opp. at 51-52) not only fails to describe a systemic problem—nine out of a total of roughly 37,000 patients, DX 131, and more than 51,000 prescriptions authorized by more than 8,000 prescribers during the timeframe of the alleged

---

[27]These same points are repeated in the Government's argument in support of the Court's decision to provide a willful blindness charge to the jury. Opp. at 76-77. There, in addition, the Government argues, as it did in rebuttal, that Central Rexall "sent out survey forms only to TRICARE doctors." *See also* Tr. 4143 (Rebuttal) ("[W]e saw doctor surveys, but we did not see doctor surveys of any of the important doctors" because Central Rexall "failed to contact doctors with impossibly high volumes."). This was false, as the Government knew from the both the trial record (because Boyle testified that Central Rexall sent surveys to TRICARE doctors, and Elder-Quintana and Wagner were TRICARE doctors, as the Government's brief acknowledges, Opp. at 22), and from discovery which did not make its way into trial (in part, because the Government's argument that specific doctors did not receive surveys was not raised until its rebuttal). *See* Ex. C ((BD001624) (Durgin survey); (CRDrugs1716832) (Wagner survey); (NJ_2016R00427-01424557) (Elder-Quintana survey); NJ_2016R00427-01421060 (Sokalsky survey)). And, as Exhibit C shows, Boyle actually spoke with Durgin personally. As well, the Government's narrative ignores that Central Rexall spoke with Gaffney personally, when he called in to confirm medication changes for dozens of patients. Tr. 814 (Rolling)

conspiracy, GX 896A[28] —but also does not bespeak widespread fraud. Perhaps even more to the point, the fact of those nine instances demonstrates that Central Rexall had a system that worked, in that it identified these problems when they arose, so that Central Rexall could take appropriate action.[29] That is, in servicing the almost 40,000 patients it did, Central Rexall set up a professional operation that included (i) patient care representatives who called the patients to confirm each prescription as well as the copayment amount; (ii) pharmacists licensed in all 50 states who oversaw the pharmacy technicians, responded to individual queries about the medication formulas, and approved each formula that was included on a prescription pad for marketing; (iii) an in-house attorney who served as chief compliance officer to whom employees were encouraged to raise issues that were uncovered and who was empowered to conduct investigations and take appropriate action as a result of his findings; and (iv) a system that took decisive action—up to and including termination and the reversal of claims—in response to egregious issues that were identified, investigated, and corroborated. This is the operation that the record evidence establishes Defendants created at Central Rexall, and it is one that makes unreasonable any inference that Mr. Johnston or Mr. Brockmeier possessed the requisite criminal intent and knowledge of fraudulent conduct.

The Government, though, seeks to justify any inference of willful blindness not by virtue of the fact that Central Rexall did not respond, but by virtue of its view of the quality of that response. Thus, it argues that "Defendants tried at trial to rebut this evidence by pointing to evidence that some incidents were investigated and addressed, but *defendants did not show that*

---

[28]*See also* Tr. 3563 (Galloway) (agreeing that Central Rexall shipped out "tens of thousands of prescriptions").

[29]Indeed, it is entirely unreasonable to infer from these isolated instances that every Supreme Medical prescription is fraudulent, particularly when at least two ended up having a benign explanation. Tr. 3569 (Mapelli); Tr. 3563-67 (Best).

*that happened with all of these red flags.*"  Opp. at 52.  Leaving aside the Government's blatant attempt, implicit in this sentence, to shift the burden of proof to the defense, the Government's position ignores that, as was undisputed and indisputable, Central Rexall—understanding that this kind of thing can happen when so many patients are being served—had a process whereby it called the vast majority of patients for whom it received prescriptions.  Tr. 2980 (Casseri) (agreeing that in an organization of Central Rexall's size, "errors are going to happen" and Central Rexall's system 'was set up to try to detect those errors and deal with them").  DX 131 amply demonstrates this:  the Court need only scroll through column AE to see not just evidence that Central Rexall called almost every patient, but also made and kept copious records of those conversations.  By doing so, Central Rexall purposefully uncovered the misconduct upon which the Government so heavily relies.  And even the patients in GX 183 and 183A, which the Government argued showed that a number of Candace Craven's patients were *not* contacted, showed just the opposite: contemporaneous Quickbase records show that those patients were in fact contacted.  *See* DX 131, Column AE, Rows 10469 (H.A.), 10471 (J.B.), 10474 (L.C.), 10476 (S.T.H.), 10382 (C.H.), 10400 (B.H.), 36887 (P.K.), 10481 (A.K.), 10421 (E.M.), 10486 (V.S.), 10404 (W.T.), 10487 (R.T.), 10386 (K.S.U.), 10391 (J.W.), 10394 (M.W.) (documenting calls from Central Rexall regarding prescriptions).  If patients were missed, in this context, that was a mistake and at worst negligence, but it was not willful blindness—a conclusion that is not a matter of inference at all, let alone an inappropriate one, as the Government contends.[30]

_____

[30]The Government's argument that Mr. Brockmeier directed Central Rexall "not to call patients when the Top Tier group arrived" blatantly misreads the evidence.  Opp. at 76.  Mr. Brockmeier's email stated: "Very important to run these scripts *where we are awaiting pt verification*."  GX 183. Far from not verifying the prescriptions, the email makes plain that Central Rexall was in the process of verifying the prescriptions using the patient verification process repeatedly documented in DX 131, and wanted to begin the adjudication process.  Nowhere in his email does Brockmeier direct the pharmacy not to call patients, and any such reading of the email requires strained and

Likewise, the Government's brief repeatedly argues that willful blindness can be shown by the fact that while Central Rexall in fact undertook investigations, it failed to do so the way the Government thinks it should have: by contacting the doctors involved. Opp. at 52; *see also* Opp. at 15 (failure to contact Craven), 29 (Gaffney), 55 (non-TRICARE prescribers), 76 (failure to contact "doctors with impossibly high prescription volumes"). Here, the Government points to the investigation conducted of Candace Craven which ultimately resulted in the termination of Top Tier as a sales organization for Central Rexall as "the clearest example" of willful blindness. But in fact, it is a particularly clear example of *the Government* employing a negligence standard as opposed to one of willful blindness, second-guessing what Central Rexall did because it cannot claim it did nothing. *See* Tr. 3769 (Jury Charge) (willful blindness requires "deliberate actions to avoid learning or made deliberate efforts to avoid knowing"). Certainly, Central Rexall's in-house counsel (and the Government's witness) felt that he had undertaken an "appropriate" investigation at the time,[31] including that he made the determination that Central Rexall would only fill new prescriptions after verifying that the patient at issue saw Craven; he then made this recommendation, which was approved by Mr. Johnston. Tr. 2517-19, 91-92 (Boyle); DX 418; DX 471.[32] Nor is willful blindness a fair and reasonable inference from the fact that even though

_____

implausible inferences, particularly in light of other record evidence. GX 139 (email from Brockmeier instructing that every patient be called)

[31] *See also* Tr. 2499, 2505-06, 2513, 2530-31, 2555 (Boyle had freedom to investigate how he saw fit, and there was never an investigation where he was told not to speak to a particular doctor, take a particular investigative action, or conduct a particular survey); 2591-92 (Boyle felt he had engaged in "appropriate investigation" of suspicious circumstances).

[32] The Government also misstates the record by stating that Taff told Brockmeier "that Top Tier did not contact patients." Opp. at 11. This was not her testimony; Taff stated that *Willow Pharmacy* did not contact patients—hence why Taff stated immediately thereafter that Willow was at risk of losing its PBM contracts. Tr. 236:19-237:2. It is not clear why a sales group focused on promoting to doctors would ever contact patients.

Central Rexall terminated Top Tier, Mr. Johnston "delayed the decision" to do so, omitting both that Mr. Johnston was the person who in fact made the decision to terminate, and that he delayed that decision for all of one weekend.[33]  GX 304.  Yes, this is a clear example—not of willful blindness, but of the Government second-guessing what Central Rexall did, improperly employing a negligence standard[34]—which is arguably not even met here—in a criminal case.  Tr. 3770-71 (Jury Charge) ("[Y]ou may not find that Mr. Johnston and Mr. Brockmeier knew that false and fraudulent insurance claims were submitted to the pharmacy benefits administrator for medically unnecessary compounded prescription medications if you find only that . . . Mr. Johnston and Mr. Brockmeier consciously disregarded a risk that the fact existed, or that Mr. Johnston and Mr. Brockmeier should have known that the fact existed, or that a reasonable person would have known of a high probability that that fact existed. It is not enough that Mr. Johnston and Mr. Brockmeier may have been reckless or stupid or foolish and may have acted out of inadvertence or accident.").

Finally, in this regard, in assessing the Government's repeated mantra that it deserves all reasonable inferences, with regard to willful blindness and otherwise, Opp. at 3, 10, 13, 18, 19, 21,

---

[33]In fact, as the Government knows from the emails it obtained from Central Rexall's server, but which were ultimately not admitted at trial (but are before the Court in the parties' submission in response to the draft Presentence Report as Exhibit LL, appended hereto as Exhibit D), after that weekend, Mr. Johnston determined not to take on new prescriptions despite assurances from Top Tier:  "I'd rather us not be associated with Wayne at this point.  He says he's terminated the "rogue" rep (or reps) and it's against his internal policies, but I'm still concerned… At the least, I think we should no longer accept new scripts generated through him until the investor tells us he's not in any kind of trouble.  If we do continue sending out medications to existing patients, then let's make sure every single one is contacted prior to doing so. . . Either way, we've done nothing wrong, but my vote is we no longer affiliate with them."  Mr. Brockmeier agreed with this sentiment in the same email thread:  "I agree with your thoughts.  Also, we always and have always contacted every patient before we send out their prescription.  Once we contact patients, it is of course up to their discretion to get the prescription or not.  In so far as Wayne – let's not accept new scripts from them."

[34]For the negligence standard, *see, e.g.*, *Jersey Cent. Power & Light Co. v. Melcar Util. Co.*, 212 N.J. 576, 594, 59 A.3d 561, 571 (2013) (negligence standard requires evaluating a defendant's conduct on the basis of what a "prudent man" would have done in defendant's circumstances).

32, 57, 85, 96, Defendants urge the Court to truly evaluate the reasonableness of the inferences that the Government urges. Here, for example, at least one inference that the Government seeks the Court to approve as the basis for the Defendants' conviction is that willful blindness can be inferred from the fact that Central Rexall did not call doctors as part of their investigations when a problem arose. But this is an odd contention in a case where the Government's theory was that these doctors, who have entered guilty pleas, GXs 1020, 1022, 1026 (Gaffney, Patel, and Craven plea agreements), were corrupt—that they were writing prescriptions without even seeing the patients at issue. Had they been called as part of an investigation (and to be clear, they were contacted via prescriber surveys, *see* Exhibits C-F), would they have admitted that misconduct?[35] Or was it a better idea to call patients, as Central Rexall routinely did (thereby uncovering the very problems that the Government highlighted)? These rhetorical questions answer themselves; the inferences upon which the Government relied in the willful blindness context were also flawed and unreasonable.

The other arguments that the Government musters with regard to willful blindness are largely addressed above. Thus, the articles describing criminal investigations into other compound pharmacies are, as discussed above, much more prejudicial than probative, designed as they were to vilify the entire compounding industry. *See supra* at 30-31. But beyond that truth, the Government fails to mention the fact that Central Rexall actually responded responsibly to these press reports, paying close attention to them and reacting by, for example, terminating both Top

---

[35]That Craven, for example, would likely would not have admitted her fraud, is particularly clear, since after she stopped prescribing Central Rexall medications she began committing fraud with a group in California, from January through July 2015. GX 1026 (Craven Plea Agreement) at 4; https://www.justice.gov/usao-sdca/pr/tennessee-nurse-practitioner-pleads-guilty-role-65-million-tricare-fraud-0#:~:text=As%20part%20of%20her%20guilty%20plea%2C%20Craven%20admitted,that%20she%20never%20saw%20or%20examined%20in%20person.

Tier and Bolger, including the latter in the wake of the article to which the Government points about how Bolger was not meeting with patients.  Tr. 2389 (Boyle) (Mr. Johnston directed that all Bolger claims be reversed, meaning insurers were refunded at Central Rexall's loss); Tr. 2523 (Boyle) (Central Rexall terminated Top Tier after receiving subpoena); Tr. 2489 (Boyle) (In March 2015, Central Rexall worked with outside counsel to develop a recredentialing questionnaire for its sales groups); and Tr. 2492-94 (Boyle) (Central Rexall worked with outside counsel to create a webinar "[t]o make sales reps aware of different cases involving healthcare fraud, violations of antikickback law, fraud, waste and abuse cases where there was improper behavior taking place").  As for the other "red flags" raised in the Government's criticisms of Central Rexall's reaction to the review of Bolger's prescriptions, as discussed above, the mere fact of out-of-state prescriptions does not give rise to a reasonable inference that those prescriptions were fraudulent.[36]  *See supra* at 25-26.  Nor can the Government seriously contend that it has proven willful blindness because Central Rexall did not react strongly enough to Dr. Bolger's prescribing "magic mouthwash," *see* Opp. at 55, an obvious attempt to distort the meaning of medical necessity, since such compound mouthwashes may, though not life-saving, satisfy that standard (nor, in any event, was there any evidence that such mouthwashes must be prescribed by dentists).  *See, e.g.*, Tr. 1658, 1680-81 (Gaffney) ("medical necessity" means that a given medication will improve a patient's quality of life or is "medically appropriate," not that it is "life and death medically necessary").  And it bears mentioning again that Central Rexall did terminate its relationship with Dr. Bolger who, perhaps

---

[36]The Government points to prescriptions Bolger wrote for patients outside Iowa and Illinois, but presented no evidence suggesting that Mr. Johnston or Boyle knew where Bolger was licensed. Tr. 2393-94 (Boyle) (acknowledging that he also reviewed the Bolger prescriptions and independently confirmed that he saw no red flags).  The same applies to Craven—there is no evidence that either Defendant knew where Craven was licensed.  But, as Boyle testified,  after the Bolger news articles, Central Rexall purchased additional software to verify prescribers' licensure status.  Tr. 2448 (Boyle).  This is the antithesis of willful blindness.

significantly, did not testify at the trial of this matter at all, let alone testify to the existence of a conspiracy that was supposedly formed with the Defendants.

Finally, the Government again relies upon the "impossibly large number of prescriptions" to argue willful blindness. *See* Opp. at 56. Defendants showed above how this contention depends upon an inference that is not a reasonable—*i.e.*, a "logical and convincing"—one. *See supra* at 2-3; *Garner*, 915 F.3d at 170 (inferences must be "logical and convincing"). And even if Boyle thought that large numbers of prescriptions constituted a red flag, as the Government argues, *see* Opp. at 56 and n.8 (citing Tr. 2385 and GX 617), Boyle had the unfettered ability to investigate, as he did without interference from the Defendants, *see supra* at 44 n.30, and to make recommendations, which were largely accepted, Tr. 2531 (Boyle agreeing that most times, his recommendations were accepted). The Government's analysis—like Hayley Taff's conclusory statement that she believed that medically unnecessary prescriptions were being filled and billed for, Tr. 315-16 ("Q: [W]as Central Rexall filling compound medication prescriptions that were not legitimate and not medically necessary? A: Yes.")[37]—ignores the systems that were put into place at Central Rexall to effect compliance with the law, described in detail in Defendants' moving papers. *See, e.g.,* Mov. Br at 4-5, 75-76. These systems engender the very opposite of willful blindness, of deliberately closing one's eyes to the problem. Tr. 3770-71 (Jury Charge) (requiring

---

[37]In so testifying, it is not at all clear what definition, among the many available, Ms. Taff was using in concluding that these prescriptions were not medically necessary. As Defendants have shown, the term "medical necessity" is and remains unconstitutionally vague and ought not have been the basis for a prosecution like this one. Mov. Br. at 15-19 (noting the shifting use throughout trial of phrases like "medically beneficial" and "medically appropriate"); *Parker v. Levy*, 417 U.S. 733, 757 (1974) ("[C]riminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed."). Taff's conclusory statement, and the Government's citation to it now, only demonstrates how that vagueness resulted in real prejudice at trial. In any event, Defendants maintain their vagueness argument, now both facially and as applied in this trial.

that Defendants "actually or subjectively believed there was a high probability that false and fraudulent insurance claims were submitted to the pharmacy benefits administrator for medically unnecessary compounded prescription medication, consciously took deliberate actions to avoid learning it, or made deliberate efforts to avoid knowing about it and did not actually believe that it did not exist").[38]   Indeed, as set forth above, it is simply not reasonable to infer that the Defendants deliberately avoided learning of a widespread fraud when, in fact, the undisputed evidence supports the opposite conclusion, making overwhelmingly clear that the Defendants employed deliberate efforts to participate in the very inquiries that uncovered instances of misconduct, which were then elevated, investigated, and addressed.   When that is the case, it is not reasonable to infer that, where a defendant actively participates in investigations into fraud and adopts remedial measures to address them, that defendant is simultaneously taking active measures to avoid learning of the very problems he is addressing.   Accordingly, even considering the evidence in the light most favorable to the Government, the trial record cannot justify this verdict or at the very least requires the kind of careful reweighing that should result in a new trial in this truly extraordinary case.

---

[38]The Government does not really dispute that it misstated the standard by telling the jury that "it was obvious to anybody in the defendants' position that they were involved in illegal conduct." Opp. at 77 (quoting Tr. 3899).  This language is similar to the part of the jury charge stating what is *not* sufficient to demonstrate willful blindness: that Defendants "should have known that the fact existed, or that a reasonable person would have known of a high probability that the fact existed." Tr. 3770.  The Government seeks to excuse this statement by arguing that it did not make a difference because an excerpt of the correct jury charge was up on the screen at the same, but the record does not show which part of the charge the Government excerpted, or whether the Government elided any relevant language.  The Government also argues that its phrasing was similar to the part of the jury charge that states that "[n]o one can avoid responsibility for a crime by deliberately ignoring what is obvious."  But by dropping the word "deliberately" and focusing instead on "anybody in the defendants' position," the Government transformed the standard into a "reasonable person" or negligence standard, thus weakening its burden.  This error—which is plain and concerned the primary basis for liability pressed by the Government in this case—alone requires that this verdict be overturned, one way or the other.

## II.    THE GOVERNMENT FAILED TO PROVE THAT DEFENDANTS CONSPIRED TO MAKE A FALSE STATEMENT.

### A.    Reimbursement Claims Are Not Representations of Medical Necessity

The Government derides as "bold," "novel," and an "absurdity," Opp. at 65 & n.10, the Defendants' straightforward, well-founded, and, as many cases acknowledge, legally significant argument that health care fraud and wire fraud require an actual false statement, and not merely an implied one. Mov. Br. at 42-43 (citing cases including *United States v. Jones*, 471 F.3d 478, 481 (3d Cir. 2006)). Really, despite briefly noting that Defendants were not charged with the crime of making false statements relating to health care matters, the Government does not argue otherwise—and even acknowledged this requirement in its summation. Tr. 3888-89 (acknowledging the requirement to prove "materially false or fraudulent pretenses, representations and promises"). But the Government did not introduce evidence sufficient to satisfy this essential element: it did not show that Defendants conspired to make an actual false statement in connection with the conspiracy charged in Count 1. That is enough to require an acquittal on that Count.

The Government's brief obscures Defendants' argument, so it is worth setting out again. A "scheme or artifice to defraud" requires a "misrepresentation"—that is, a "false or fraudulent pretense[], representation[] or claim[]." *Jones*, 471 F.3d at 481; *United States v. Pearlstein*, 576 F.2d 531, 535 (3d Cir. 1978); Tr. 3783:11-13 (jury charge); *cf. Williams v. United States*, 458 U.S. 279, 284 (1982) (holding that the mere depositing of a check "is not a factual assertion" and thus "cannot be characterized as 'true' or 'false'").[39] This could mean a statement that is entirely false, or one that is—as the Government argues and Defendants have always agreed—a "deceitful statement[] of half truth[]," that is, a statement that conceals "material facts." Tr. 3784:5-6. In

---

[39]The Government's brief completely ignores *Jones*, which reversed a conviction due to a lack of any misrepresentation. 471 F.3d at 481.

this regard, the "defendant's "failure to disclose information may constitute a fraudulent representation if the defendant was under a legal, professional or contractual duty to make such a disclosure, the defendant actually knew such disclosure ought to be made, and the defendant failed to make such a disclosure with the intent to defraud." Third Circuit Model Jury Instruction 6.18.1341-1. Here, however, the jury was never instructed that it could consider a "failure to disclose" theory of falsity; as noted in Defendants' moving brief, the Government expressly conceded that the Third Circuit Model Instruction containing this language was not applicable to this case, and so Defendants' convictions could not be premised on a mere failure to disclose. Mov. Br. at 45 n. 18.

Defendants' argument is that—even assuming the counterfactual that they bore personal responsibility for all of Central Rexall's actions—Central Rexall never expressly misrepresented anything when it submitted claims. Every piece of information submitted by Central Rexall (to the extent the Government even showed what those were, *but see* Mov. Br. at 45 n.17) was literally true—there were actual prescriptions signed by actual doctors for actual products to be provided to actual patients. The Government, however, repeatedly argues that the claims forms contained "deceitful statements of half truths or concealment of materials facts," Opp. at 67, in that they failed to disclose all of the features of the Government's prosecution theory: "that prescriptions were signed without a valid doctor-patient relationship, doctors were paid for signing prescriptions, patients were paid to get prescriptions, sales representatives were paid commissions on prescriptions for themselves and. their family members, ingredients were increased solely to increase reimbursement without any medical benefits, prescriptions were obtained by a phony copay discount program and without collecting copays, and prescriptions were not medically necessary." Opp. at 69. That is, the Government's theory is that the claims submitted by Central

Rexall were false because they did not inform the PBMs of each of these facts, though it conceded, in the course of discussing the jury charge, that Defendants were under no obligation to provide any of that information.

At the end of the day, the Government's theory of guilt in this regard amounts to an attempt to force the round peg of "material omission" into the square hole of Third Circuit caselaw that does not, in fact, permit of fraud convictions based upon an "implicit misrepresentation" theory but instead clearly holds that an actual misrepresentation is required. That the Government's "implicit representation theory" is invalid as a matter of law is demonstrated by a case decided the day after Defendants filed their motion. In *United States v. Eisenberg*, 23-cr-10 (AS), 2025 U.S. Dist. LEXIS 98813 (S.D.N.Y. May 23, 2025), Judge Subramanian of the Southern District of New York vacated a wire fraud conviction on similar grounds. The court applied Second Circuit caselaw applying the same standard as the Third Circuit cases cited by Defendants here, holding that "[e]stablishing a scheme to defraud requires proof of a material misrepresentation." *Id.* at *66 (quoting *United States v. Kitchen*, 2000 U.S. App. LEXIS 8860 (2d Cir. May 3, 2000)). In *Eisenberg*, the defendant inflated, via manipulation, the value of his cryptocurrency assets, before clicking a "borrow" button on his trading platform to use the artificially inflated assets as collateral for a loan. *Id.* at *68-70. The Government's theory of fraud was that Eisenberg took these actions knowing that his account value was artificially inflated, thus "creat[ing] the false impression that his [cryptocurrency asset] was an extraordinarily valuable asset[] against which he could borrow huge sums of cryptocurrency." *Id.* at *70. This, the Government argued, meant that Eisenberg "*implicitly represented* . . . that the collateral in his account had not been manipulated, and that it was in fact valuable, both of which were false." *Id.* at *75 (emphasis added). But the court held that there was no actual false statement made, concluding that an "implied certification" that

Eisenberg possessed a valuable asset was insufficient to satisfy the caselaw's requirement that a defendant make an actual material misrepresentation. *Id.* at *76.

*Eisenberg* relied on *United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022), which also has persuasive force here. In *Connolly*, the defendants were convicted of enacting a scheme to defraud in connection with LIBOR instructions. *Id.* at 834.[40] Defendants were asked questions about hypothetical interest rates, and provided answers that were influenced by Deutsche Bank's actual investment positions. Three cooperating witnesses who also engaged in this "scheme" testified that their conduct was "wrong" and "intuitively wrong." *Id.* at 835. But the Second Circuit held that the traders' answers were literally true; Deutsche Bank, in fact, was capable of borrowing funds at the rates stated in the defendants' LIBOR submissions. *Id.* at 835-36. Crucially, the Second Circuit rejected the Government's argument that a trader-influenced LIBOR submission constituted a "half-truth" "on the theory that it carried an 'implied certification' that there had in fact been no trader influence on the submission." *Id.* at 842.

To be sure, these authorities—like many upon which the Government relies—come from outside of the Third Circuit. But unlike those cases cited by the Government, which endorse an "implicit misrepresentation" theory, cases like *Eisenberg* and *Connolly* apply the same principles of Third Circuit cases like *Pearlstein* and *Jones* that expressly require an identifiable false statement to support a fraud claim. *Jones*, 471 F.3d at 481-83 (requiring a "misrepresentation by

---

[40]LIBOR was an interest rate published by the British Bankers' Association ("BBA"), and was meant to reflect, on any given day, the rate at which one bank could borrow money from other banks. *Id.* at 824. It was calculated by surveying various banks; bankers were asked the rate at which their bank could borrow funds in a reasonable market. *Id.* at 825. Bankers at Deutsche Bank were charged with providing responses to LIBOR surveys that were inaccurate and that would be helpful to the bank's positions. *Id.* at 828-29. For example, if a higher LIBOR would mean that Deutsche Bank would profit more on one of the bank's trades, bankers were encouraged to give the BBA answers that would lead to a higher LIBOR.

[the defendant] in connection with the delivery of, or payment for, health care benefits, items, or services"); *Pearlstein*, 576 F.2d at 535 (a scheme to defraud "must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension"). For example, the Government's citation to *United States v. Anderson*, 980 F.3d 423 (5th Cir. 2020), appears to conflict with the Third Circuit's (and the Second Circuit's) holdings; *Anderson* explicitly holds (with almost no analysis) that "[w]e conclude that an implicit misrepresentation theory of health care fraud is valid").

The out-of-Circuit cases cited by the Government reveal its real legal position, one that attempts to elide the prohibition against basing a criminal conviction on an implied certification theory by relabeling implied certification as the omission or concealment of a material fact. This is the import of the Government's citation to *United States v. Bertram*, 900 F.3d 743, 749 (6th Cir. 2018), and *United States v. Palin*, 874 F.3d 418, 424 (4th Cir. 2017). *See* Opp. at 68. But these cases conflict with the Third Circuit's more rigorous standard. The "concealment of material fact" standard merely means expressing a "half truth" that leaves out a material fact that would render a response honest and complete. *See* Tr. 3784:5-8 (jury charge); *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192 (2016) (half truths that omit "critical qualifying information" can be an "actionable misrepresentation"). It does not and cannot mean failing to provide information when that information is not asked for, or when the defendant is not under any obligation to provide that information; that would amount to criminalizing an implied certification. And as Defendants argued in their Moving Brief, the Third Circuit has essentially declined to hold that an implied false certification can support a criminal healthcare fraud conviction. Mov. Br. at 50 (explaining that in *United State v. Jones*, 471 F.3d at 481-82, the Third Circuit rejected the argument that when an employee embezzled corporate money into a private

account, her "implicit promise not to steal from [their] employer" could satisfy the false statement requirement).  Thus, the Court has held that "[t]he Government has stretched the statute to cover activity beyond its plain words" because "[t]here was simply no type of misrepresentation made in connection with the delivery of, or payment for, health care benefits, items, or services."  471 F.3d at 482.  The Third Circuit has also rejected the Government's argument that the defendant's deposit slip to her personal bank was a misrepresentation, holding instead that "there is no indication that the deposit slip did not represent accurately the amount deposited. The deposit slip argument is essentially the same argument as the employee's implicit promise argument, which we reject."  *Id.* at 481 n.6.  The Government, which has not in any way responded to Defendant's reliance on *Jones*, apparently agrees—a defendant's ostensible implied representation that he will comply with applicable rules and regulations is not a "misrepresentation" under the federal fraud statutes.

The Government's conflation of implied certification on the one hand with a "half truth" theory of misrepresentation on the other is clear from its extremely heavy reliance on *United States v. Ferriero*, 866 F.3d 107 (3d Cir. 2017), to which it devotes almost three pages.  *Ferriero*, of course, is a genuine half-truth case, in which a statement was literally true, but omitted critical information about who owned a particular corporation.  But *Ferriero* is a far cry from Central Rexall's prescriptions here:  there, the  co-conspirator was asked a specific question about the ownership of a particular corporation and failed to make a completely truthful answer on a material matter.  Materiality aside, nothing of the sort occurred here.  No specific question—on any of the matters that the Government say should have been disclosed—was asked here, either initially or

by way of follow-up.[41]  That leaves the Government's theory of implied misstatements, which is impermissible under Third Circuit precedent.

Even if such a theory were valid, and Defendants could be convicted for implying, with every claim submission, that each prescription was medically necessary and the product of a genuine doctor-patient relationship, the Government's theory would still fail.  The Government, of course, cannot argue that Central Rexall ever *explicitly* represented that the prescriptions for which it submitted reimbursement claims were medically necessary.  So it argues, as it must, that when it submitted a claim, Central Rexall "impliedly was representing that it had a valid prescription for that medication," a proposition for which it relies on the testimony of a number of witnesses.  Opp. at 65 (citing testimony).  But that is simply not what the testimony cited by the Government actually states.  Ms. Olsen did not testify that the pharmacy represented that the prescriptions for which it submitted claims were valid—in fact, she testified that "validity" requires specific paper size, patient identifying information, medication, quantity, and SIG, and said nothing about medical necessity.  Tr. 938:22-939:8.  Mr. Rolling also did not testify about validity, and actually stated that all the pharmacy is representing during an adjudication is that "we have a prescription for a patient and . . . this is the prescription and we're going to fill the prescription for them."  Tr. 675:14-16.  Nothing in that definition relates to medical necessity.  And Ms. Taff, too, did not testify that Central Rexall made a representation about validity, but

---

[41]Of course, the PBMs did have an opportunity to request further information from *the doctor*.  *See* Tr. 165-66 (Taff) (noting that the adjudication request required disclosing "the patient name, date of birth, contact information, insurance, prescription billing information, the list of the drugs, as well as the pricing of the medication, and the quantities, the directions for the prescription and the doctor's information"); Tr. 167:10-13 (noting that a PBM could communicate if it needed "a prior authorization or more information from the doctor").  That the PBMs apparently did not avail themselves of this opportunity is a particularly ironic fact given the Government's heavy reliance, discussed above, on Central Rexall's failure to follow up with doctors.

only communicated to the PBM that "the pharmacy has a prescription. Here's what we would like to be paid for it." Tr. 166:20-23.[42]

Without any actual testimony from a Central Rexall employee showing that anyone at the pharmacy—let alone the Defendants—thought that they were making a representation regarding the prescriptions' medical necessity, the Government is consigned to rely entirely upon the testimony of Blake Stockwell regarding what the PBMs thought Central Rexall was representing. But Mr. Stockwell could not testify as to what Defendants thought they were representing—that was beyond his knowledge as either a fact or an expert witness. And the core idea expressed by Mr. Stockwell—that every prescription represented an implicit claim that the medication was medically necessary—simply does not hold up under scrutiny. As the Government conceded in connection with the jury charges, the relevant contracts did not require that every claim submitted by the pharmacy contain an implied representation of medical necessity—in fact, they said nothing about medical necessity at all. GX 37 (Central Rexall-ESI contract); GX 59 (2014 ESI Manual). Certainly these contracts did not—and could not have—placed the burden of investigating medically unnecessary prescriptions on pharmacies.

This does not mean that a pharmacy is insulated from a fraud prosecution. Obviously, as discussed above, the pharmacy could not simply make up claims out of whole cloth—those would obviously be false statements. Nor could a pharmacy submit claims for compounded products

---

[42]Later in its brief, the Government contends that "pharmacists look at prescriptions to determine that they are medically appropriate and will call doctors if they spot an issue with the medical reasonableness of a prescription." Opp. at 62 (citing Tr. 678, 841-42 (Rolling)). This misstates Rolling's testimony; pharmacists evaluate whether a given prescription will interact with anything else a patient is taking or is "medically reasonable," but are obviously not in a position to fully reevaluate whether a given prescription is necessary for a given patient. Tr. 756-57 (Rolling) (clarifying that pharmacists don't second-guess whether a prescription is medically appropriate); Tr. 940 (Olsen) (pharmacists have a "duty to fill" prescriptions "[a]s long as it's not going to harm the patient").

composed of different amounts or different components than were actually filled and shipped to patients. But neither of those things was alleged here. In fact, Defendants' relationship with the PBMs did not mandate that the pharmacy satisfy itself of a prescription's medical necessity before submitting a claim. This makes good sense: How could any pharmacy possibly be aware that every single prescription it submitted a reimbursement claim for was medically necessary? And that every prescription was based on a genuine doctor-patient relationship? Did the PBMs have a real belief that every pharmacy called every doctor, sales rep, and patient to question them about whether each patient really needed each prescription? Were the PBMs sincerely under the impression that every pharmacy with which they contracted knew, sufficient to make a genuine representation, whether prescriptions were based on actual doctor-patient relationships? Of course they were not, and there was no testimony to that effect.

The Government's reliance on the notion that the ESI contract and ever-changing Provider Manuals mandated that whenever a pharmacy submitted a prescription it was certifying that the prescription was medically necessary is flawed for a related reason. Even if the Court concludes that the Central Rexall-ESI agreements and various Provider Manuals[43] could permissibly be read as requiring Central Rexall to certify, with each adjudication claim, that a given prescription was medically necessary and the product of a genuine doctor-patient relationship, such an interpretation would be only one reading of the contracts. An alternative reading—that ESI's requirement that a pharmacy submit only "valid prescriptions" refers to the administrative elements of validity set forth in, for example, Melissa Olsen's testimony (*i.e.*, that a valid prescription is one that has

---

[43]Of course this conclusion, were it appropriate, would only address claims submitted to ESI, as the Government never bothered to introduce the contracts with, and provider manuals for, other PBMs. Thus, the record is devoid of any evidence that could give rise to an obligation to certify certain information in connection with claim submissions for non-ESI claims.

specific paper size, patient identifying information, medication, quantity, and SIG)—would be that Central Rexall had no obligation to verify that its prescriptions were medically necessary. But for the Government to prove that a statement is false when that statement is given in response to an ambiguous legal requirement, it must prove that the statement is false "under each objectively reasonable interpretation of the relevant requirement[]." *United States v. Harra*, 985 F.3d 196, 213 (3d Cir. 2021); *see also United States v. Whiteside*, 285 F.3d 1345, 1351 (11th Cir. 2002) ("In a case where the truth or falsity of a statement centers on an interpretive question of law, the government bears the burden of proving beyond a reasonable doubt that the defendant's statement is not true under a reasonable interpretation of the law."); *United States v. Migliaccio*, 34 F.3d 1517, 1525 (10th Cir. 1994) ("[T]he government bears the burden to negate any reasonable interpretations that would make a defendant's statement factually correct where reporting requirements are ambiguous."). This is, therefore, not a situation where the jury could draw a permissible inference that the Government's interpretation of the ESI Manual was correct; instead, the Government was obligated to show falsity under all reasonable interpretations of the contracts, including Defendants'.

In any event, the Government's argument is that Central Rexall impliedly represented that its prescriptions were medically necessary, and that all of the features of the fraud alleged— assuming they were proven—were not present. This is the very essence of an implied certification theory, but in the Third Circuit, at least, such a theory does not suffice to establish criminal liability. Accordingly, a scheme to defraud was not alleged or proven in Count 1, and a judgment of acquittal

on that count must be entered, or at the very least a new trial ordered based on an appropriate reweighing of the evidence on this point.[44]

**B.    The Other False Statements Cannot Support Count 1 in the Absence of the Reimbursement Claims**

In their moving brief, Defendants also argued that the Government's grab bag of other "false statements" was insufficient to prove Count 1, or was in the alternative a prejudicial variance.  Leaving aside the flaws in the arguments regarding those false statements, discussed above, *see supra* at § I.D.v, Defendants' point was that, should the Court conclude that the reimbursement claims did not constitute false statements, then the rest of the "false statements" could not support Defendants' convictions.  Revealingly, the Government does not now appear to argue otherwise, contending that those statements were admissible not because they constituted the fraud itself but because "they kept the fraud scheme going" and "evidence the defendants'

---

[44]The Government argues that the logical implication of Defendants' argument is that prescribers like Dr. Gaffney, who signed prescriptions without examining patients, did not commit healthcare fraud "because there was no box to check stating that he had examined the patients or that the prescribed medication was medically necessary."  Opp. at 65 n.10.  But that, of course, is not what the Defendants argue at all.  Leaving aside that Dr. Gaffney's conduct likely violated the Anti-Kickback Statute in any event, Dr. Gaffney made *explicit* false statements to Central Rexall when he represented that he met with his patients and that his prescriptions were medically necessary. *See, e.g.*, GX 5 at 105 (stating that "I have reviewed my patient's medical record(s) and determine the items I have ordered are medically necessary.  I verify I had a face to face examination with the above patient."); *see also United States v. Smith*, 573 F.3d 639, 651 (8th Cir. 2009) (a prescription "means only a bona fide order—*i.e.*, directions for the preparation and administration of a medicine, remedy, or drug for a real patient who actually needs it after some sort of examination by a licensed doctor").  It was these kinds of express, as opposed to implied, statements that give rise to criminal liability on his part, but not Defendants'.

It bears noting, in this regard, that in fact, the Government has charged Defendants' supposed coconspirators on this theory, contending that doctors like Michael Goldis signed printed prescription forms that falsely represented a doctor/patient relationship and medical necessity. *See United States v. Monaco et al.*, 1:19-cr-00716-ESK, ECF 28 (Superseding Information), ¶¶ 4-5.  The Information described these as "materially false statements."  ¶ 5.  Because prescriptions were not themselves sent to PBMs or insurers, the statements could only have been "materially false" as to Central Rexall.

criminal intent." Opp. at 70. And it agrees—in a fairly obvious effort to downplay the prejudice caused by the evidence and argument that really was beside the point—that those statements amounted to "a very small part of a very long trial about medically unnecessary compound medications." Opp. at 71. Defendants therefore maintain their argument that, if the Court agrees that the reimbursement claims did not constitute misrepresentations as required by the healthcare fraud and wire fraud statutes, the remainder of the alleged "false statements" cannot save the convictions on Count 1.

## III. THE GOVERNMENT FAILED TO PROVE THAT ANY MISREPRESENTATIONS WERE MATERIAL.

For the reasons set forth in Defendants' post-trial brief, the Government failed to introduce sufficient evidence that, even assuming the existence of a false statement made by Defendants, such statement was material, as that term is defined in the law. *See* Mov. Br. at 81-88. By way of summary, the parties agree that the touchstone for whether a misrepresentation is material is its capacity to influence the listener's behavior. Mov. Br. at 81; Opp. at 77. Thus, a misrepresentation is material "only if it would 'likely . . . induce a reasonable person to manifest his assent.'" *Universal Health Servs. v. United States ex rel Escobar*, 579 U.S. 176, 193 (2016) (quoting Restatement (2d) of Torts § 538, at 80). As the Supreme Court has recently reminded us, materiality "[r]esembl[es] a but-for standard," and is notably "demanding." *Kousisis v. United States*, 145 S. Ct. 1382, 1396, 1398 (2025). Indeed, "a demanding approach to materiality is all that prevents an 'extraordinarily expansive view of liability' from rendering the federal wire-fraud statute nearly limitless in scope." *Id.* at 1404-05 (Thomas, J., concurring) (quoting *Escobar*, 579 U.S. at 196). Moreover, "[a] party's actions may reveal that a contract term is not material even if the contract's language would suggest otherwise"; "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has

61

signaled no change in its position, that is strong evidence that the requirements are not material." *Id.* at 1401 (Thomas, J., concurring) (quoting *Escobar*, 579 U.S. at 195). For example, a contractual provision that, if breached, "may result in termination," but that did not require the wronged party to "take any action, let alone to withhold or deduct payment," is relevant evidence that the provision is not material. *Id.* at 1402 (Thomas, J., concurring). And "the Government's decision to fulfill its end of a bargain 'despite actual knowledge that certain requirements were violated' is very 'strong evidence that those requirements are not material.'" *Id.* at 1402-03 (Thomas, J., concurring) (quoting *Escobar*, 579 U.S. at 195). Thus, "regulatory requirements in a contract are not automatically material." *Id.* at 1401 (Thomas, J., concurring).

In their moving brief, Defendants argued that the lengthy recitation of what a PBM would consider "important" to know did not satisfy the demanding materiality standard. The Government does not argue otherwise, but instead contends that four lines of Blake Stockwell's testimony that were not included in Defendants' brief demonstrate materiality. Opp. at 78-79. Reading these lines carefully however, makes clear why they were not highlighted in Defendants' brief and, more importantly, why they do not show materiality: responding to leading questions, Stockwell testified that reasonable PBMs "would" not pay claims for prescriptions if they knew that "the prescribing doctor did not have a valid doctor-patient relationship," that "the doctor never examined or spoke with the person the doctor wrote the prescription for," that "the prescribing doctor was paid or otherwise compensated for signing a prescription," or that "the prescription was for a pharmacy sales representative who would receive a commission for that prescription." *Id.* But he did not testify, and the Government never produced testimony, that any of these facts were ever elicited by the PBMs, which instead paid all claims through standard adjudication systems without knowing or requesting the information in question. Indeed, to the contrary (and

62

contradicting Hayley Taff's testimony, upon which the Government also relies, *see id.* at 79) (citing Tr. 169), Stockwell acknowledged that PBMs do not assess medical necessity at all. Tr. 3254:24-3255:2.

This testimony, accordingly, engenders a complete failure of proof as to whether even claims characterized by the features about which the Government asked Stockwell are ordinarily paid. *Escobar*, 579 U.S. at 194-95 (proof of materiality includes "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement"); *see also United States v. Lindsey*, 850 F.3d 1009, 1017 (9th Cir. 2017) ("The way the entire market has historically treated a statement or requirement says a lot about that statement or requirement's natural capacity to influence a decision by market participants."). Every one of the Government's questions to Stockwell, to which he dutifully responded as the prosecution wished, talked about what a reasonable PBM *would* think or do. None discussed what they actually *did* do. Accordingly, despite it being an element of the offenses charged, the government failed to show that any omission was material to the actual decision to pay a claim—the standard required under *Escobar* and *Neder v. United States*, 527 U.S. 1, 25 (1999) ("[M]ateriality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes.").

Thus, the specific misconduct referenced in the Government's questions—doctors not speaking with patients, doctors receiving compensation for signing a prescription, etc.—were not shown to be material to a PBM's reimbursement decisions in the way the caselaw requires. As for the alleged failure to collect co-pays, the Government does not even argue that they would have been the basis for non-payment, only that they would be the basis for the termination of a contract between a PBM and a provider, like Central Rexall. *See* Opp. at 80 (citing GX 61 at 18; Tr. 3190-

91 (Stockwell). But as set forth above, the fact that a contractual provision "may result in termination" is simply not enough to establish materiality. *Kousisis*, 145 S. Ct. at 1402 (Thomas, J., concurring). Indeed, Stockwell did *not* testify that even a medically unnecessary prescription would automatically result in termination, only that a medically unnecessary prescription (which, he said, "would be harder for us to see") would be "potentially fraudulent." Tr. 3182:7-9. In any event, that the PBM would have viewed the pharmacy's decision as a breach of contract and a basis for termination was not the criminal fraud theory on which this prosecution was premised. *That* theory was the submission of specific false and fraudulent claims that contained certain misrepresentations. And with regard to those, for the reasons set forth herein, and in the Defendants' prior briefing, the Government failed to bear its burden of proof with regard to the essential element of materiality.[45]

---

[45]Although the Government contends that materiality is not an essential element of the fraud that is the predicate for the allegations of Count 2, *see infra* at § IV, it argues that the element is satisfied without, again, even attempting to argue, or adduce any proof, that the fact that there had been a test adjudication would have mattered to whether a claim was paid. *See* Opp. at 84. Instead, the Government seeks to beat back the Defendants' common-sense argument that a test adjudication would not have been material to any decision because the information obtained as a result of a test adjudication was also available through review of the publicly available information regarding the average wholesale price. Tr. 599 (Taff); Tr. 907 (Olsen); Tr. 3263 (Stockwell). But whatever the merits of the Government's response to the defense argument in this regard (which argument included the powerful fact that test adjudications were permissible and not contractually prohibited by ESI until January 2023, *see* DX 161, and thus their use could not have been material to a typical PBM), they do not include any discussion, because none was possible on this record, of whether any claim had ever been rejected based upon the fact that a test adjudication had occurred.

The Government also fails to even try to address the requirement that any false representations "go[] to the very essence of the parties' bargain." Tr. 3784-85 (Jury Charge); Mov. Br. at 82. Nor did Stockwell's provide any evidence as to whether any particular facts went to the essence of the agreement between Central Rexall and ESI.

Finally, the Government failed to adduce any evidence as to what an *insurer*—as opposed to a PBM—would find material. It is the health plans, and not the PBMs, that actually make coverage decisions, and thus materiality should have been assessed from their perspective. Tr. 3171 (Stockwell). The Government did not even attempt to undertake this analysis.

Defendants' motion for a judgment of acquittal, or alternatively a new trial based upon an analysis of the weight of the evidence, should be granted.

## IV.    THE GOVERNMENT FAILED TO INTRODUCE EVIDENCE SUFFICIENT TO SUSTAIN DEFENDANTS' CONVICTIONS ON COUNT 2.

In its Opposition to the Defendants' motion for a judgment of acquittal or a new trial with regard to Count 2 of the Indictment, charging that Defendants "use[d] the means of identification of another person with the intent to commit, or to aid or abet, or in connection with . . . wire fraud, health care fraud, and conspiracy to commit health care fraud and wire fraud," Ind. ¶ 44, the Government seeks to rewrite the Indictment and the statute upon which it is based, to read the fraud aspect out of them.  Specifically, although the statute is located in a section of Title 18 labeled "Fraud and related activity in connection with identification documents, authentication features, and information," the Government argues that 18 U.S.C. § 1028(a)(7) is not a fraud statute at all and thus does not require either an intent to target the victim's money or property, Opp. at 82-83, or, even more fundamentally, a material misrepresentation, Opp. at 84.  But this argument is inconsistent with the Government's position before trial, when the Government sought to recast Count 2—initially charged as "conspiracy to commit identity theft," Ind. at 13, as "conspiracy to *fraudulently* use a means of identification."  ECF 232 (Gov't Requests to Charge) at 22-23 (emphasis added).  And, although the Government now retreats from its framing of the charged offense, it is also inconsistent with its position at trial, when—according to its own characterization—it contends that "[t]he jury heard extensive evidence that the defendants committed identity theft 'with intent to commit' and 'to aid and abet' and 'in connection with' defendants' scheme to obtain money from PBMs and insurance companies."  Opp. at 83.

Leaving aside that, as Defendants have argued, the Government never actually grapples with the statutory text, in that it never explains what it means to "use" a means of identification

"in connection with" the overall alleged fraud scheme.  Thus, the Government argued pretrial that *Dubin v. United States*, 599 U.S. 110 (2023), did not apply to § 1028(a)(7), a contention with which the Court agreed.[46]  But neither then, nor now, does the Government proffer any alternative interpretation of the statute, one that would explain these elements of the statute, as opposed to leaving them completely undefined and the statute accordingly truly boundless.

The Government's "reading" of the statute—which premises criminality on whether a means of identification was involved in a scheme in even the most incidental way—cannot be right.  The Supreme Court has mandated that courts must avoid "reading incongruous breadth" into the "opaque language" of any criminal statute, including § 1028(a)(7).  *Dubin*, 599 U.S. at 130; *see also Ciminelli v. United States*, 598 U.S. 306, 312 (2023) ("[T]he fraud statutes do not vest a general power in 'the Federal Government . . . to enforce (its view of) integrity in broad swaths of state and local policymaking.'" (quoting *Kelly v. United States*, 590 U.S. 391, 404 (2020))); *Van Buren v. United States*, 593 U.S. 374, 393-94 (2021) (holding that the "far-reaching consequences" of the Government's interpretation "underscore[d] the implausibility" of that reading); *Yates v. United States*, 574 U.S. 528, 540 (2015) (an "unrestrained" reading of the obstruction statute would turn a provision focused on "documents" into "an all-encompassing ban on the spoliation of evidence" that would "sweep within its reach physical objects of every kind," which the Court could not do in the absence of "a clearer indication of [Congressional] intent"); *Bond v. United States*, 572 U.S. 844, 863 (2014) (refusing to construe federal statute prohibiting

---

[46]Defendants continue to maintain and preserve their position that *Dubin*'s "crux" standard applies, and that the Government failed to demonstrate that Defendants' use of means of identification was at the crux of the charged healthcare fraud conspiracy.  Mov. Br. at 90-98.  Indeed, there was no evidence that any specific, medically unnecessary prescription was facilitated or aided by a test adjudication, and Government cites no testimony that that practice was connected to any particular fraudulent prescription—let alone that Defendants were aware of such a test adjudication.

the use of chemical weapons to reach "the simplest of assaults"); *see generally Marinello v. United States*, 584 U.S. 1, 11 (2018) (noting that the Supreme Court has "traditionally exercised restraint in assessing the reach of a federal criminal statute").  Defendants, by contrast, propose a solution to the problem—even if the "use" of another person's means of identity does not need to be at the "crux" of the predicate offense (as *Dubin* required for § 1028A)—that use must, consistent with the title of the statute, still be done in a fraudulent manner.  *See* 18 U.S.C. § 1028 (titled "Fraud and related activity in connection with identification documents, authentication features, and information").  And, as such, it must, as with all federal frauds, be targeted at money or property, Mov. Br. at 99-104 (citing, *e.g.*, *Ciminelli v. United States*, 598 U.S. 306, 312 (2023)), and must involve material misrepresentations.

But here, as Defendants have argued and as the Government essentially concedes—contending instead that neither of these fundamental elements of fraud is required under § 1028(a)(7), Opp. at 82-83—those elements were not satisfied.  With regard to the money or property requirement, the Government does not dispute (and indeed, the Indictment itself alleged, Ind. ¶ 27) what Defendants demonstrated in their Moving Brief:  that the use of others' means of identification were not intended to and did not result in the transfer of money or property because test adjudications were promptly reversed before money ever changed hands.  Opp. at 100-01.  Instead, the Government argues that the purpose of the test adjudications was to obtain *information*, but that does not, again as a matter of law, amount to money or property.  Mov. Br. at 102-03 (citing, *e.g.*, *United States v. Blaszczak*, 56 F.4th 230, 244 (2d Cir. 2022)).

Likewise, the Government contends that § 1028(a)(7) does not require that the underlying fraud include a material false statement.  Opp. at 84.  But, as defendants have shown, such a material misstatement is an essential element of fraud, Mov. Br. at 104-05, and fraud is an essential

67

element of § 1028(a)(7).  Nor, as Defendants explained in their moving brief, Mov. Br. at 105-07, and above, *see supra* at § III,  did the Government satisfy this essential element.[47]

For these reasons, the Court should enter a judgment of acquittal as to Count 2 or in the alternative order a new trial because, among other reasons, the weight of the evidence does not support findings beyond a reasonable doubt as to the essential elements of fraud: an intent to target money or property or a material misrepresentation.

## V.    THE GOVERNMENT FAILED TO PROVE VENUE FOR COUNT 4.

Count 4 charged the Defendants with conspiring to commit money laundering in New Jersey by transferring funds from Louisiana to Louisiana.  Ind. ¶¶ 55-61.  The Government raises two proposed bases for venue in New Jersey:  Fedwire transfers and wire transfers to Boardwalk Medical.  Opp. at 87-92.  As discussed in Defendants' moving brief, neither suffices.  Mov. Br. at 112-23.  The Government's Opposition fails to rebut Defendants' arguments, and the Court should vacate Defendants' conviction on Count 4.

### A.    Fedwire Transfers

To establish venue, the Government first relies on wire transfers that "were effectuated by wire signals sent through servers maintained in New Jersey."  Opp. at 88.  But the money-

---

[47]Defendants also showed that the Government failed to prove that they were aware that illegitimate test adjudications—as opposed to the reversal of legitimate claims for prescriptions—were occurring.  Mov. Br. at 107-12.  For example, the Government cites GX 331 as evidence that Mr. Johnston was aware that test adjudications were run without a valid prescription, when it is plainly evidence of the opposite: that he was told that test adjudications could *not* be run without a prescription.  The Government's interpretation of the email is not a reasonable reading of the exchange.  Mov. Br. at 108-10.  And even if Defendants were aware that test adjudications did not require valid prescriptions, there is no evidence that Defendants then had the specific intent to commit health care fraud and wire fraud via those adjudications.  Mov. Br. at 110-12. The Government misconstrues this as an argument that the statute contains a willfulness requirement, Opp. at 86-87, but this was not Defendants' contention.  Defendant did not contend that they did not understand that test adjudications were unlawful.

laundering statute does not speak in terms of "effectuating" wire transfers; instead it speaks in terms of whether a "transaction" was "conducted" in a District. 18 U.S.C. § 1956(i). As Defendants previously noted, each of these is a defined term, with § 1956(c)(3) providing a list of possible "transactions" and § 1956(c)(2) defining "conducts" as including "initiating, concluding, or participating in initiating, or concluding a transaction."[48] But quite simply, the transfers of funds were not initiated and did not conclude in New Jersey.

The Government does not even try to grapple with that statutory text. It describes the wire transfers at the highest possible level of generality, stating in a heading that "[t]he wire transfers . . . went through New Jersey servers." Opp. at 88. But this description is simply not born out by the testimony of Government witness Sean O'Malley, which made clear that no funds transferred via Fedwire are, in fact, delivered, deposited, withdrawn, or transferred between accounts in New Jersey. Mov. Br. at 118 (quoting testimony). At most, the wire signal through New Jersey served as a trigger for the actual transfer of funds. But that does not mean that the trigger was *part* of that transfer any more than some other direction to transfer the funds would be. The Government's *ipse dixit* conclusion that "a portion of each transaction took place in New Jersey" utterly fails to identify which of the statute's possible definitions of "transaction" applies to the wire signals in New Jersey; it is apparent that nothing is, for example, pledged, transferred, delivered, deposited, exchanged, loaned, or sold in New Jersey. 18 U.S.C. § 1956(c)(3).

---

[48]Mov. Br. at 117. Specifically, 18 U.S.C. § 1956(c)(3) defines "transaction" as including "a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition, and with respect to a financial institution includes a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument, use of a safe deposit box, or any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected."

To avoid this conclusion, the Government, as expected, Mov. Br. at 120 n.40, relies on three cases that do not consider the propriety of venue over money laundering charges specifically,[49] as well as *United States v. Lallande*, 23-0057 (ES), 2023 U.S. Dist. LEXIS 137617 (D.N.J. Aug. 8, 2023), a case that was decided before trial pursuant to the lenient standard—not applicable here—for a motion to dismiss. Two of those cases, *Kluger v. United States*, 14-6236 (KSH), 2018 U.S. Dist. LEXIS 147744, at *13-14 (D.N.J. Aug. 30, 2018), and *Bauer v. United States*, No. 14-4166 (KSH), 2018 U.S. Dist. LEXIS 147740, at *8-9 (D.N.J. Aug. 30, 2018), which arise out of the same prosecution and are nearly identical opinions, do not (as noted in Defendants'

---

[49]The Government cites unpublished and out-of-circuit caselaw to argue that 18 U.S.C. § 3237, the "general venue provision," also applies to money-laundering charges, despite the presence of a specific money-laundering venue provision, § 1956(i). This is error. Section 3237 provides that "*[e]xcept as otherwise expressly provided by enactment of Congress*, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." (emphasis added). Section 1956(i) is just such an enactment; it thus supplants § 3237 by making clear just what Congress thought were the appropriate grounds for venue in a money laundering case. Indeed, § 1956(i) itself makes this clear: section(i)(1) specifically states that there are two bases for venue "[e]xcept as provided in paragraph (2)," which provides an additional basis for attempt and conspiracy offenses. Had Congress intended for § 3237 to still apply, it would have written "[e]xcept as provided in paragraph (2) *or 18 U.S.C. § 3237.*" *See United States v. Sanchez*, No. 3:16-cr-00136-MOC-DSC, 2018 U.S. Dist. LEXIS 170147, at *6 (W.D.N.C. Oct. 2, 2018) (explaining that for money laundering charges, "venue is not governed by the general provisions of § 3237(a), but by a specific venue statute, 18 U.S.C. § 1956(i)"); *United States v. Hudson*, No. 20-cr-30067, 2021 U.S. Dist. LEXIS 158687, at *8 (C.D. Ill. Aug. 20, 2021) (deliberately considering venue under § 1956(i) and not § 3237); *United States v. Louissaint*, No. 12-CR-6081W, 2016 U.S. Dist. LEXIS 73210, at *37 (W.D.N.Y. June 3, 2016) (same). The Government's cases to the contrary—which, it rightly notes, lack any precedential value—engage in little analysis, and should not be relied upon. *See United States v. Lavenant*, 607 F. App'x 217, 221 (3d Cir. 2015) (failing to discuss whether § 3237 ought to apply). And *United States v. Perez*, 223 F. App'x 336 (5th Cir. 2007), in fact holds that § 3237 and § 1956(i) apply the same standard. *Id.* at 341.

Ultimately, however, it is irrelevant whether or not § 3237 also applies: § 3237's text, which provides for venue "in any district in which [a continuing] offense was begun, continued, or completed," is functionally identical to § 1956(i)(3), which provides that a funds transfer is a "continuing transaction" that "may be charged in any district *in which the transaction takes place.*" (emphasis added). In either case, it is the Government that struggles to explain how a transfer of funds from Louisiana to Louisiana "takes place" in New Jersey.

moving brief) even consider venue challenges to money-laundering charges: *Kluger* concerned insider-trading charges and *Bauer* concerned securities-fraud charges. Moreover, in those cases the transactions "did not simply 'pass through' this district, but were actually completed here." 2018 U.S. Dist. LEXIS 147744, at *14. By contrast, the transactions here were not completed in New Jersey, and were only tangentially connected to the District. This is insufficient, as a matter of law. *See United States v. Auernheimer*, 748 F.3d 527, 535 (3d Cir. 2014) (venue needs "more than some activity in the situs district" and instead requires "substantial contacts" with the forum).

*United States v. Goldberg* was also not a money-laundering case, and the defendant there conceded in his briefing that a wire transfer passed through the Philadelphia Federal Reserve bank. 830 F.2d 459, 465 (3d Cir. 1987). Defendants here obviously do not make that concession: the wire transfer here did not travel *through* New Jersey. But more significantly, there are critical differences between wire fraud and money laundering. In a wire fraud prosecution, the use of the wires is an essential element of the offense. *See, e.g., United States v. Coburn*, 439 F. Supp. 3d 361, 377 (D.N.J. 2020); *see United States v. Pace*, 314 F.3d 344, 349 (9th Cir. 2002) ("[I]t is using wires and causing wires to be used in furtherance of the fraudulent scheme that constitutes the prohibited conduct."). Accordingly, the law is clear that venue for a wire fraud charge is proper "wherever the wire transmission at issue originated, passed through, or was received, or from which it was orchestrated." *United States v. Abbas*, 100 F.4th 267, 282 (1st Cir. 2024); *see also Pace*, 314 F.3d at 350 (same); *United States v. Powers*, 40 F.4th 129, 136 (4th Cir. 2022) (wire fraud "can be prosecuted in any district the wire communication . . . passed through in furtherance of the fraudulent scheme"). But this broad standard for venue does not apply to money laundering

charges, although Congress could easily have used that language in drafting § 1956(i).  Given the differences between wire fraud and money laundering, therefore, *Goldberg* is of little help here.[50]

Finally, the Government argues in a footnote that the Court need not concern itself with the necessary consequences of its almost boundless venue argument—that venue would be authorized in New Jersey whenever a Fedwire transfer was involved, no matter how attenuated the rest of the prosecution's connection to New Jersey was—because "[g]iven the extensive New Jersey conduct in this case, that concern is not present here."  Opp. at 90 n.16.[51]  This contention is strikingly brazen.  Venue must be assessed "independently for each count," *Auernheimer*, 748 F.3d at 535, so for the Government to argue that the case as a whole implicates "extensive New Jersey conduct" is plainly insufficient—the fact that some of the case actually did take place in New Jersey does not guarantee that the Louisiana-to-Louisiana transfers that form the basis of Count 4 do too.   And the Government completely ignores the actual thrust of Defendants' argument:  Any theory of venue that permits such far-reaching prosecutions simply cannot be what Congress intended when drafting the statute—and that would be true even if the Government were to disclaim any intent of actually bringing prosecutions having nothing to do with the venue of trial (which disclaimer has not been forthcoming, in any event).  *Cf. Dubin v. United States*, 599 U.S. 110, 128-31 (2023) (rejecting the "staggering breadth" of the Government's "boundless

---

[50]Contrary to the Government's brief, Defendants do not claim that "reasonable foreseeability" of venue is required, and Defendants' brief did not use that language.  Opp. at 89-90.  But the Government entirely fails to respond to the Third Circuit's emphasis on the requirement that, even without foreseeability, there must be "some sense of venue having been freely chosen by the defendant."  *Auernheimer*, 748 F.3d at 535.

[51]The Government also argues that Defendants' concern was rejected by the cases relied on by the Government, i.e., *Goldberg*, *Lallande*, *Bauer*, and *Kluger*.  Opp. at 90 n.16.  This is wrong.  First, those cases could not have rejected Defendants' argument because, as even a quick reading of them will show, that argument was not raised by the defendants in those cases.  Second, and again, three of those cases were wire fraud cases, not money laundering cases.

reading" of the statute as an implausible reading of Congressional intent and noting that a court "cannot construe a criminal statute on the assumption that the Government will use it responsibly" (cleaned up)); *Travis v. United States*, 364 U.S. 631, 634 (1961) (cautioning that "venue provisions in Acts of Congress should not be so freely construed as to give the Government the choice of 'a tribunal favorable' to it").

Nor, most fundamentally, is such a sweeping interpretation in any way consonant with the fundamental constitutional provisions that are implicated by questions of venue. Specifically, the Constitution guarantees that "the trial of all crimes … shall be held in the state where the said crimes shall have been committed," U.S. Const., Article III, § 2, and that a defendant has "the right to . . . an impartial jury of the State and district wherein the crime shall have been committed," U.S. Const., amdt. VI. These provisions, in turn, derive from the English common law, which "presumptively entitled defendants to a jury of the 'neighborhood' where the crime was allegedly committed." *Smith v. United States*, 599 U.S. 236, 246 (2023) (quoting 4 W. Blackstone, Commentaries on the Laws of England 344 (1769)). This right was "enthusiastically embraced" by the Framers, in reaction to the English Parliament's circumvention of local trials before colonial juries, "most notably by authorizing trials in England for both British soldiers charged with murdering colonists and colonists accused of treason." *Id.* at 246-47. This practice of plucking colonists from hundreds of miles away to try them before a favorable jury was decried as an "affront to the existing common law" at the First Continental Congress, *id.* at 247, and was denounced in the Declaration of Independence, *id.* ("[C]olonists were 'transport[ed] . . . beyond Seas to be tried for pretended offences.") (quoting Declaration of Independence ¶¶ 17, 21).

The Government's argument effectively demeans and ignores these fundamental Constitutional principles. Under the Government's view, even the most incidental contact with

the District is sufficient to satisfy these "highly prized" dual Constitutional requirements. *Id.* at 248. This simply cannot be the case—the Government's theory goes too far.

**B.    Boardwalk Commission Payments**

The Government also argues that commission payments from Central Rexall to Boardwalk Medical satisfy venue requirements. Opp. at 90-91. But these payments were simply not part of the charged conspiracy. The Government's perfunctory arguments to the contrary are wrong.

First, the Government argues that Count 4 broadly charged that Defendants "engaged in transactions in amounts exceeding $10,000 with the proceeds of the conspiracy to commit health care fraud and wire fraud," Ind. ¶ 60, and thus encompassed any and all payments that Defendants ever made with those proceeds, including commission payments to Boardwalk. But a holistic reading of the Indictment's plain text shows otherwise. Count 4 is obviously and entirely concerned with payments from Central Rexall to Bluen and PMG, and from those companies to the Defendants' personal bank accounts. *None* of the 31 transactions listed in ¶ 61 (which the Government presumably meticulously selected when drafting the Indictment) were commission payments, and no paragraph in Count 4 even uses the word "commission."

And for good reason: as argued in the Moving Brief, these commission payments had nothing to do with the movement of proceeds from Central Rexall to Bluen and PMG and ultimately to personal bank accounts, and the Government does not really argue otherwise. Mov. Br. at 121-22. Indeed, if Count 4 were to be construed so broadly as encompassing both a conspiracy to transfer funds from Central Rexall to the management companies and then the Defendants, as well as a conspiracy to make commission payments to sales representatives and distributors, it would, by charging two clearly distinct conspiracies, be impermissibly

duplicitous.[52]   Again, the two types of conduct have nothing to do with each other, and have completely different aims; in fact, every commission payment siphoned funds *away* from the management companies and, ultimately, from Defendants' bank accounts.  It thus strains credulity to argue that the commission payments were a part of the charged conspiracy.

Finally, the Government's argument that it is not limited to the overt acts in the Indictment is a red herring.  Opp. at 91.  The issue before the Court does not concern the overt acts taken in support of the conspiracy charged in Count 4, but rather concerns the scope of the conspiracy itself, as the grand jury charged it.  Of course, the Government could prove the actual charged conspiracy through over acts not listed in the Indictment.  But what it did not have license to do is expand the scope of that conspiracy in a way that changed what was actually charged, and what the defendants were on notice they had to defend against.  And here, the payment of commissions to Boardwalk was simply not an overt act or acts in support of the conspiracy that was actually charged: the transfer of fraud proceeds from Central Rexall to management companies and personal bank accounts.

For these reasons, the Court should vacate Defendants' conviction as to Count 4.

## VI.    THE WEIGHT OF THE EVIDENCE AND THE CUMULATIVE IMPACT OF THE ADMISSION OF IRRELEVANT AND PREJUDICIAL EVIDENCE REQUIRE A NEW TRIAL

Defendants recognize that a new trial under Rule 33 is only appropriate, to use the standard expressed by the Government, "in an 'exceptional' case in which a 'miscarriage of justice has occurred—that is, that an innocent person has been convicted.'"  Opp. at 92 (citing *Johnson*, 302 F.3d at 150.  *See also* Mov. Br. at 124-26.  That said—but notably excluded from the Government's

---

[52]"Duplicity is the joining of two or more distinct offenses in a single count, so that a general verdict does not reveal exactly which crimes the jury found the defendant had committed."  *United States v. Hinton*, 127 F. Supp. 2d 548, 553 (D.N.J. 2000).

brief—the cases specifically leave the decision whether to grant such a new trial to the discretion of the trial court, which must assess risk:  the Court must determine  "if it believes that there is *a serious danger* that a miscarriage of justice has occurred—that is, that an innocent person has been convicted," *United States v. Silveus*, 542 F.3d 993, 1004 (3d Cir. 2008) (emphasis added); *see also United States v. Johnson*, 2022 U.S. App. LEXIS 7630, *8 (3d Cir. Mar. 23, 2022), and whether the Court believes that it is "*reasonably possible*" that a combination of errors "substantially influenced the jury's decision," *United States v. Brown*, 2022 U.S. Dist. LEXIS 204896, at *4 (D.N.J. Nov. 10, 2022) (emphasis added) (citing *U.S. v. Copple*, 24 F.3d 535, 547 n. 17 (3d Cir. 1994)), *aff'd*, 451 F. App'x 196 (3d Cir. 2011).  In making this determination, the parties agree, the Court need not view the evidence in the light most favorable to the prosecution, but instead "exercises its own judgment in assessing the Government's case." *Johnson*, 302 F.3d at 150.

The shocking—and alarmingly quick—verdict in this case warrants a new trial for both reasons: it is contrary to the weight of the evidence and is the result of the extraordinary volume of evidence that, while promised to be relevant, turned out to be nothing but a strong—and effective—effort by the Government to make the Defendants look bad, and convict them as a result.  A new trial is, accordingly, not only appropriate, but the right result, and genuinely in the interests of justice.

The reasons why this is so are all set forth above, and in the interest of not repeating an already lengthy presentation, are only briefly summarized here.  *First*, the Government's case is based on inferences, all or many of which are completely inappropriate, either because they fail the test of being "logical and convincing," *supra* at 2-3, or because, more specifically, they require not the exercise of logic at all but of speculation and guesswork.  In the former category fall the arguments that, for example, the volume of prescriptions, as well as the profits and commissions

they yielded, give rise to an inference of unlawfulness, *see supra* at § I.C.i, or that the failure to collect copays demonstrates a lack of medical necessity, even assuming that such failure occurred as often, or was as purposeful, as the Government argues, *see supra* at § I.C.v.  For the reasons set forth above, the inferences upon which the Government relies simply do not make logical, let alone convincing, sense.  As just one example, the Government relies in this response on facts regarding Dr. Jeff Durgin, who never testified and was never prosecuted, and whose ostensibly "suspicious" email was never shown to Defendants and thus cannot give rise to any inference.  Tr. 2407-08 (Boyle); GX 411.  In the latter category falls the Government's speculation that either or both of the Defendants were aware of or involved in certain actions as to which there is no evidence it was the case.  *See supra* at § I.C.iii.  With regard to either, the evidence that the Defendants were willfully blind, as opposed to—at worst—negligent, is belied by the evidence of Defendants' actual actions, and not subject to any reasonable inference otherwise.  The impermissibility of these inferences really leaves the verdict without legal basis, warranting a judgment of acquittal. But their weakness demands at least a new trial, upon reweighing them and all of the other evidence in the case.

*Second*, especially given the weakness of a case that was built not only upon unreasonable and impermissible inference piled upon unreasonable and impermissible inference, the volume of irrelevant and unfairly prejudicial evidence—under Federal Rule of Evidence 401, 403, or both— makes the verdict in this case particularly unjust.  It should be clear: the Government did everything it could at the trial of this matter to damn the Defendants with the sins of the entire compounding industry, which it sought to demonstrate through charges against and investigations of others pharmacies (not actual convictions), *see supra* at § I.D.i; it sought to blame the Defendants just because they (and others, through high commissions) made money by working

77

for, managing, and investing in Central Rexall, *see supra* at § I.C.ii; it tried to make criminal both the violations of contractual terms between the pharmacy and the PBMs (such as the prohibition on direct marketing to patients, *see supra* at § I.D.iii), though criminalizing the breach of contract is not allowed, and even certain conduct that was not part of the contracts and not otherwise illegal, such as the amount of training that contract sales representatives were required to have, *see supra* at § I.D.ii, and the fact that the pharmacy did not do its own studies as to the efficacy of its products, which it was clearly not required to do, *see supra* at § I.D.iv; it located, in the thousands of documents it obtained through subpoena and otherwise, several purportedly false statements (for some were not false at all) that it put before the jury on the theory that they somehow concealed an ongoing conspiracy, or somehow kept it going, when none of these purported false statements— not one—had anything whatsoever to do with a lack of medical necessity. *See supra* at I.D.v.

The Government even argued that some prescriptions for products, as to which the Government doubted their medical necessity, should not have been the subjects of insurance claims filed by Central Rexall, even when the prescriptions were signed by physicians, filled by licensed pharmacists, and approved by the insurance company for payments. And throughout, it argued that the Defendants were willfully blind to unlawfulness even though they called every, or almost every, patient; launched investigations when questions arose; terminated some doctors or sales groups and reversed claims attributable to others; and documented everything they did, creating a comprehensive database rather than, for example, destroying records. *See supra* at § I.E. The Government tried to make the Defendants look like bad people, because this was the way it could get a conviction in the absence of real evidence. Sadly, it succeeded, but fortunately, the Federal Rules of Criminal Procedure, and the United States Constitution, allow Judges to have the final word. This Court should not allow that final word to be "guilty," not in this extraordinary

78

case and not based upon the Government's weak inferences and unfairly prejudicial evidence. At the very least, a new trial should be granted.

This is also true because, *third*, the Government's proofs on certain elemental facts were lacking, as a matter of law. Admittedly unable to prove that the Defendants, or their pharmacy, actually lied when submitting any claim, the Government argues that they impliedly certified that each and every claim was for a medically necessary product. But both the legal and the factual underpinnings of such a claim are deeply flawed and a new trial should be ordered—one which cannot be tried on that basis. *See supra* at § II. Similarly, the Government failed to prove materiality, as that term has been defined even in civil cases, by the United States Supreme Court: it did not prove that PBMs had ever, let alone consistently, denied claims on the bases asserted by the Government, for example, that there did not exist a legitimate doctor-patient relationship, that copays were not collected, or that medical necessity was not shown. On this basis too, a new trial should, at the very least, be ordered. *See supra* at § III. Nor did the Government prove the elements of fraud as part of its case on Count 2, which alleged not just identity theft, but that the Defendants "use[d] the means of identification of another person with the intent to commit, or to aid or abet, or in connection with . . . wire fraud, health care fraud, and conspiracy to commit health care fraud and wire fraud." For all of the reasons set forth in Point IV, above, a new trial should be ordered on that issue as well. And a new trial is even appropriate with regard to whether venue was properly found in New Jersey on Count 4, the money laundering count, which was charged in the Indictment (though the Government tries to broaden the charged conspiracy post-trial to save the conviction) to involve funds transferred from one place in Louisiana to another in the same state. *See supra* at § V.

*Fourth* and finally, but perhaps what makes this conviction so exceptional as to demand a new trial, *see Johnson*, 302 F.3d at 150, there can be little question but that this conviction may very well rest on the false testimony of Tony Serna, who so obviously lied in front of this court on a number of issues, including issues beyond the only one that the Government acknowledges or addresses, when he falsely stated that the Government had not prepared him for re-direct examination. These included his obstruction of justice by submitting altered documents to the Government, and by attempting to show that his deceased sister was the culpable party, among other things. And they include weaving a narrative that we now know, from public documents filed in other cases, was concocted to convict the Defendants, and to minimize Serna's responsibility for, by way of example, finding the necessary doctors and inventing the idea of a bogus study to pay patients. *See supra* at 11-15. Here, he testified, uniquely, that he spoke to the Defendants about these things, something not one other doctor or sales representative said—to the contrary, they all admitted that they hid their unlawful conduct from the Defendants and Central Rexall. Tr. 3011 (Casseri); Tr. 1669 (Gaffney); Tr. 1504 (Tedesco).

A new trial should be ordered because of the utter incredibility of Tony Serna alone. But of course, there is so much more, and that so much more is best described in terms of what a new trial should actually look like. It would be concerned with the offense actually charged in the Indictment: Whether Defendants conspired to submit medically unnecessary prescriptions. It would focus not on how much the Defendants were paid, or how many prescriptions Central Rexall filled or commissions it paid, or whether it used 1099 or W-2 employees, but upon whether the Defendants knew they were engaged in wrongdoing, established by facts and reasonable inferences and not by guesses about whether they knew certain facts or discussed certain things. It would be about whether Hayley Taff actually conspired with Defendants to commit healthcare fraud, and

not about whether Defendants tried to cut out their prior business partner, Tr. 341-42 (Taff), or whether Mr. Brockmeier was "sitting at the big corporate desk" while Taff was "sitting at a little desk in the corner," Tr. 153.  It would not seek to disparage Defendants with facts that the Government promised would be relevant, but ended up not being probative, even while they were terribly prejudicial.  It would uphold principles of individual responsibility—regardless of others' pleas of guilty—of the difference between breach of contract and crime, and of rigorously holding the Government to its burden of proving the essential elements of the offense.

The verdict in this case was truly shocking and a horrific miscarriage of justice.  Mr. Johnston and Mr. Brockmeier are innocent.  If the Court does not grant Defendants' motion for judgment of acquittal, it should exercise its broad discretion and order a new trial.

## VII.    CONCLUSION

For the reasons set forth above, Defendants' motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29, and/or for a new trial under Federal Rule of Criminal Procedure 33, should be granted.

Dated:  August 18, 2025                     Respectfully submitted,


                                            *s/ Lawrence S. Lustberg*
                                            Lawrence S. Lustberg
                                            Anne M. Collart
                                            Andrew J. Marino
                                            **GIBBONS P.C.**
                                            One Gateway Center
                                            Newark, New Jersey 07102
                                            (973) 596-4500
                                            llustberg@gibbonslaw.com
                                            acollart@gibbonslaw.com
                                            amarino@gibbonslaw.com

                                            *Attorneys for Defendant*
                                            *Christopher Kyle Johnston*


                                            *s/ Marc Agnifilo*
                                            Marc Agnifilo
                                            David Gelfand
                                            **AGNIFILO INTRATER LLP**
                                            445 Park Avenue, 7th Floor
                                            New York, New York 10022
                                            (646) 205-4350
                                            marc@agilawgroup.com
                                            david@agilawgroup.com

                                            *Attorneys for Defendant*
                                            *Trent Brockmeier*

# EXHIBIT A

| | FirstName | LastName | Username | HireDate | StoreName | NCPDP |
|---|---|---|---|---|---|---|
| 21293 | KIRK | PIERZINA | kirk@cmgrx.com | 12/8/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21294 | LOUISE | HICKS | louise@cmgrx.com | 12/8/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21295 | CHRISTOPHER | FIELDS | c.fields2040@gmail.com | 7/31/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21296 | TONY | SERNA | tony@cmgrx.com | 8/1/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21297 | CANDICE | COLE | candice@cmgrx.com | 12/8/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21298 | JEREME | LEBOURGEOIS | jereme@trilogyrx.com | 12/22/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21299 | DERRICK | PERRY | derrick@cmgrx.com | 12/8/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21300 | JACQUELINE | EWINGS | jacqueline@cmgrx.com | 12/8/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21301 | MIKE | KISELAK | mike@cmgrx.com | 12/8/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21302 | MARK | WATKINS | kimark@me.com | 7/31/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21303 | LUIS | RIOS | luis@cmgrx.com | 12/8/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21304 | MARK | MOHAIR | mark@cmgrx.com | 12/8/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21305 | DETRIC | WINFREY | detric@cmgrx.com | 8/1/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21306 | ELIZABETH | ARLOTTA | liz@cmgrx.com | 12/8/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21307 | LINDA | CANALES | linda@cmgrx.com | 8/1/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21308 | ROBERT | CESARIO | robert@cmgrx.com | 12/4/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21309 | CHARLES | PARKS | cdparks.rph@gmail.com | 7/31/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21310 | JOHN | COELHO | jcoelho@cmgrx.com | 12/8/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21311 | EDWARD | DETTMER | ed@cmgrx.com | 12/30/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21312 | ANTWAN | STANLEY | antwan@cmgrx.com | 12/8/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21313 | DONALD | WILLIAMS | donald@cmgrx.com | 12/8/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21314 | JOYCE | KORNEGAY | joyce@cmgrx.com | 12/8/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21315 | JACOB | SAAVEDRA | jacob@cmgrx.com | 12/8/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21316 | DIANNA | DAVIED | dianna@cmgrx.com | 12/8/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21317 | KATHERINE | PFAFF | kat@cmgrx.com | 12/8/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21318 | HIERELA | CARTER | hierela@cmgrx.com | 12/8/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21319 | KIMBERLY | WATKINS | kmwholdings@icloud.com | 7/31/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21320 | DAVE | MCCOWAN | dave@cmgrx.com | 12/8/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21321 | TRESA | RICE | tresa@cmgrx.com | 12/8/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21322 | JACQUELINE | SWANSON | jswanson@cmgrx.com | 12/8/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21323 | JOE | STRAW | joe@cmgrx.com | 12/8/2014 | Trilogy Pharmacy Inc | 5900661 |
| 21324 | SHERRI | WILLIAMS | sherri@cmgrx.com | 12/8/2014 | Trilogy Pharmacy Inc | 5900661 |

2. Employees No 2015 Refresh



JOHNSTON

**DX223A**

# EXHIBIT B

**American Christian Warrior 13**

1603 Capitol Ave. Suite 414635
Cheyenne, WY 82001
E-Mail: Study@acw13.com

# COMPOUND MEDICATION SELF ASSESSMENT STUDY AGREEMENT

This Compound Medication Self Assessment Study Agreement (the "**Agreement**") is made and entered into as of _02/21/2015_ (the "**Effective Date**") by and between **American Christian Warrior 13** (herein after referred to as "ACW13"), **A Wyoming Non Profit Corporation** and _Joe Gomez_ (herein after referred to as "Participant") an individual whose mailing address is _1309 A West Jasper Drive Killeen Tx 76549_.

## R E C I T A L S:

**WHEREAS**, ACW13 desires to retain the services of Participant, as an independent contractor, to serve as one of ACW13's study group participants (collectively, "**Services**"), and Participant wishes to furnish such Services, on the terms and conditions set forth in this Agreement.

**NOW THEREFORE,** in consideration of the foregoing recitals, which are hereby incorporated as an integral part of this agreement, are mutually agreed as follows:

## 1. ENGAGEMENT OF PARTICIPANT; COMPLIANCE WITH POLICIES

(a) Participant agrees to represent ACW13 and the entity or entities (individually a "**Client**" and collectively the "**Clients**") with which ACW13 has contracted to provide the Services, which Services are more particularly described on Schedule 1(a) attached hereto and hereby incorporated by reference.

(b) In providing the Services, Participant agrees to comply with the applicable provisions of federal and state health care laws, including but not limited to the False Claims Act (31 U.S.C. Section 3729), the Fraud and Abuse provisions of Section 1128B of the Social Security Act, the Medicare and Medicaid Patient and Program Protection Act of 1987 (42 U.S.C. Section 1320a 7b), Section 1877 of the Medicare Act (42 U.S.C. Section 1395nn) (the Stark anti-referral amendments), as amended, the Texas Patient Brokering Act (Section 817.505, Fla. Stat.), or any directives, rules or regulations there under promulgated by the U.S. Department of Health and Human Services, or any comparable laws, regulations or rules promulgated by any other federal or State agency.

(c) As part of the consideration for this Agreement, Participant agrees to comply and abide by all compliance plans, policies, and directives that may be established from time to time by ACW13 and/or any Client. Participant recognizes the right of ACW13 or any Client, in its sole discretion, to change, modify, and or adopt new compliance plans, policies, and directives affecting the relationship hereunder, which may be made effective retroactively if deemed reasonably appropriate by ACW13 or the Client.

## 2. COMPENSATION

As consideration for the Services to be rendered by Participant under this Agreement, ACW13 shall compensate Participant the sums more particularly described on Schedule 2 attached hereto and hereby incorporated by reference. Such rate of compensation may be changed by sole discretion of ACW13 at any time.

**American Christian Warrior 13**

1603 Capitol Ave, Suite 314635
Cheyenne, WY 82001
E-Mail: Study@acw13.com

## 3. TERM

Subject to Section 5, this Agreement shall become effective as of the Effective Date, or such later date as the parties may agree and hereby specify which date shall be substituted as the "Effective Date" and the term shall exist for 24 months, unless terminated earlier pursuant to Section 5 or as hereinafter provided.

## 5. TERMINATION

(a) Termination for Breach. ACW13 may terminate this Agreement upon breach by Participant of any material provision of this Agreement.

(b) Immediate Termination. This Agreement may be terminated by ACW13 immediately upon the occurrence of any of the following events:

• Without notice, upon the death or permanent disability of Participant;

• By written notice to Participant, if the conduct of Participant, in the sole reasonable discretion of ACW13, is deemed to no longer be in the best interest and welfare of ACW13;

• By written notice to Participant, if Participant is no longer receiving and/or using the medication for the specific assessment study.

• By written notice to Participant, upon a breach of the confidentiality provisions in this Agreement;

• By written notice to Participant, upon Participants conviction or plea of guilty or nolo contender to a felony or to an offense related to healthcare, or a listing by a federal agency of Participant as being debarred, excluded, or otherwise ineligible for federal program participation;

• By written notice to Participant, upon Participant becoming insolvent, making assignment for the benefit of creditors, being declared in bankruptcy or having Participant's assets administered in any type of creditor's proceeding;

• Without notice, upon the date that ACW13's contract with any Client terminates or lapses by its terms.

(c) Change in Law. If there is a change in a federal or applicable State statute or regulation, or an interpretation of the law by a court of competent jurisdiction that would render the arrangement specified in this Agreement illegal, then and in that event, either party may request in writing that the Agreement be amended to comply with the change in the law, if possible, and the parties agree to negotiate in good faith the necessary changes, attempting to maintain the contemplated financial relationship described herein to the extent possible.

(d) Termination Without Cause. Either party, without cause and upon fifteen (15) days' prior written notice, may terminate this Agreement; provided, however, that if Participant presents such a notice of termination, then ACW13 may immediately suspend Participant's compensation. Notwithstanding the foregoing, if either party without cause terminates this Agreement at any time, then the parties will not enter into another contract during the remainder of agreement Term.

## American Christian Warrior 13

1603 Capitol Ave. Suite 314635
Cheyenne, WY 82001
E-Mail: Study@acw13.com

**CONFIDENTIALITY**

(a) Information of ACW13 or its Clients. Participant recognizes and acknowledges that, by virtue of entering into this Agreement and providing pain and scar assessment services to ACW13 hereunder, Participant will have access to certain information of ACW13 and/or its Clients that is confidential and constitutes valuable, special and unique property of ACW13 or the applicable Client. Accordingly, Participants will not at any time, either during or subsequent to the termination of this Agreement, disclose to others, or use, copy or permit to be copied without ACW13's express prior written consent, except pursuant to Participant's duties hereunder, any confidential or proprietary information of ACW13, its Clients or their affiliates, including, but not limited to intellectual property of any kind (whether or not registered federally or in any State), information that concerns ACW13 or its clients, providers, suppliers, costs, prices, contractual terms and methods at any time used, developed, or made by or for ACW13, it's Client or their affiliates. For this purpose, the term "affiliate" shall mean any entity controlled by, controlling or under common control with ACW13 or its Client.

(b) Participant's Information. ACW13 recognizes and acknowledges that, by virtue of entering into this Agreement, ACW13 may have access to certain private information of Participant. ACW13 will not at any time, either during or subsequent to the termination of this Agreement, disclose to others, or use, copy or permit to be copied without Participant's express prior written consent, any confidential or proprietary information. However, Participant does allow health related information to be used anonymously.

(c) Terms of this Agreement. Except for disclosure to ACW13's legal counsel, accountant, or other advisors, or ACW13' or its Client's affiliates, neither party will disclose the terms of this Agreement to any third party, unless disclosure thereof is required by law or otherwise authorized by this Agreement or consented to by the Participant. Unauthorized disclosure of the terms of this Agreement will be a material breach of this Agreement and will provide the non-disclosing party with the option of pursuing remedies for breach or immediate termination of this Agreement in accordance with the terms of this Agreement.

(d) HIPAA and State Confidentiality Compliance. Each party will comply with the applicable provisions of the Administrative Simplification section of the Health Insurance Portability and Accountability Act of 1996, as codified at 42 U.S.C. § 1320d through d-8 ("**HIPAA**"), as the same may be amended from time to time, and the requirements of any regulations promulgated there under including, without limitation, the federal privacy regulations as contained in 45 CPR Part 164 (the "**Federal Privacy Regulations**") and the federal security standards as contained in 45 CPR Part 142 (the "**Federal Security Regulations**"). Neither party will use or further disclose any protected health information or individually identifiable health information, as defined in HIPAA and the Federal privacy Regulations (collectively, the "**Protected Health Information**"), concerning a patient of any person affiliated with a party, other than as permitted by the requirements of HIPAA or the Federal Privacy Regulations and the Federal Security Regulations. ACW13 will implement appropriate safeguards to prevent the use or disclosure of Participant's Protected Health Information. ACW13 will promptly report to Participant any use or disclosure of Participant's Protected Health Information of which it becomes aware that is in violation of HIPAA, the Federal Privacy Regulations, the Federal Security Regulations, and State confidentiality laws. ACW13 will make its internal practices, books, and records relating to the use and disclosure of  Participant's Protected Health Information available to the Secretary of Health and

**American Christian Warrior 13**

1603 Capitol Ave. Suite 314635
Cheyenne, WY 82001
E-Mail: Study@acw13.com

Human Services to the extent required for determining compliance with the Federal Privacy Regulations and the Federal Security Regulations. In addition, with respect to any Participant receiving treatment for alcohol or drug abuse, each party shall be fully bound by the provisions of the federal regulations governing Confidentiality of Alcohol and Drug Abuse Patient Records (42 C.F.R. Part 2, as amended from time to time).

## 7. REQUIRED DISCLOSURES

(a) Participant will notify ACW13 in writing within three (3) days after any of the following events occur:

- Any license or certification held by Participant lapses or is denied, suspended, revoked, terminated, relinquished, or made subject to terms of probation or other restriction;

- Participant becomes the subject of an investigatory, disciplinary, or other proceeding or action before any governmental, professional, licensing board or peer review body;

- Participant is convicted of a felony or an offense related to health care or Participant is listed by a federal or State agency as being debarred, excluded, or otherwise ineligible for federal or State program participation.

(b) Participant will keep and maintain (or cause to be kept and maintained) in a timely fashion accurate and appropriate records relating to all services rendered by Participant under this Agreement, and Participant will timely prepare and attend to, in connection with such services, all reports and correspondence necessary and appropriate under this Agreement.

## 8. RELATIONSHIP OF THE PARTIES

It is understood that Participant is acting as an independent assessment study group contractor of ACW13. It is agreed and acknowledged by the parties that, as an independent contractor, Participant shall be responsible for all of Participant's own expenses, including federal and state income and employment taxes and related costs. In addition, Participant retains the right to engage in other businesses but not to render similar services to others. In no event will this Agreement be construed as establishing a partnership or joint venture or similar relationship between the parties, and nothing herein contained will be construed to authorize either party to act on behalf of each other.

## 9. REFERRALS

The parties acknowledge that none of the benefits granted to Participant hereunder are determined based upon the volume or value of any referrals made or influenced by Participant to, or otherwise based upon the generation of business for ACW13 or its Clients.

## 10. HOLD HARMLESS

Participant hereby agrees to hold ACW13, its Clients and their affiliates harmless for any loss, cost or expense, including reasonable attorney and paralegal fees and costs (at the pre-suit, pre-trial, trial and appellate levels), which ACW13 or any Client might become obligated to pay because of the negligence

MMR21000840

**American Christian Warrior 13**

1603 Capitol Ave. Suite 314635
Cheyenne, WY 82001
E-Mail: Study@acw13.com

or intentional acts of Participant.

## 11. **NOTICES**

All notices hereunder will be in writing, delivered personally, or delivered by certified or registered mail return receipt requested, or by overnight courier, and will be deemed to have been duly given when delivered (or upon refusal of delivery), addressed as follows:

**ACW13:**

ACW13 C/O CM-Self Assessment Study
1603 Capitol Ave. Suite 314635
Cheyenne, WY 82001

Joe B Gomez

**Participant:**

12. **ASSIGNMENT** This Agreement is not assignable by Participant. ACW13 may assign this Agreement, as it deems appropriate, including upon the sale of its business or any portion of it; provided, that the assignee agrees to be bound by the terms of this Agreement.

13. **SEVERABILITY** Any paragraph, phrase or other provision of this Agreement that is determined by a court of competent jurisdiction to be unenforceable or in conflict with any applicable statute or rule, shall be deemed, if possible, to be modified or altered so that it is not unenforceable or in conflict with or, if that is not possible, then it shall be deemed omitted from this Agreement. The invalidity of any portion of this Agreement shall not affect the validity of the remaining portions.

14. **GOVERNING LAW; VENUE** This Agreement will be construed in accordance with the laws of the State of Wyoming. Venue shall be in Laramie County, Wyoming.

15. **THIRD PARTY BENEFICIARIES** ACW13 and the affiliates of ACW13 shall be deemed to be third party beneficiaries of this Agreement for all purposes. Except as provided in the previous sentence, no other person shall be deemed to be a third party beneficiary of this Agreement.

16. **ENTIRE AGREEMENT; MODIFICATION** This Agreement contains the entire understanding of the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, and all other communications between the Parties relating to such subject matter. This Agreement may not be amended or modified except by mutual written agreement.

MMR21000841

## American Christian Warrior 13

1603 Capitol Ave. Suite 314635
Cheyenne, WY 82001
E-Mail: Study@acw13.com

**17. COUNTERPARTS; FAX SIGNATURES**This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute one and same instrument. Faxed or other electronic signatures shall be deemed to be originals and effective to bind the party by authorized representative signing below.

**This agreement** is hereby binding on the date mentioned below.

**ACW13 Legal Representative:**

Authorized Representative

Date: _02/09/2015_

**Participant Signature:**

Printed Name: Joe

Date: _02/21/2015_

MMR21000842

## American Christian Warrior 13

1603 Capitol Ave. Suite 314635
Cheyenne, WY 82001
E-Mail: Study@acw13.com

# Schedule 1(A)

**Services to be performed by Participant**

Independent Participant's responsibility:

1. Participant must follow the all instructions on the usage of the compound medication.

2. Answer honestly to all questions on the Compound Medication Self Assessment Study (CM-SAS).

3. Submit a fully completed CM-SAS within 10 business days of receiving the CM-SAS.

4. Submit any additional requested information and or pictures within 10 business days of such request.

5. Participant shall keep all information regarding assessment private and highly confidential. Participant shall not share information with anyone unless authorized by ACW13.

6. Participant will participate in any testimonies requested by ACW13.

**Participant's compensation for time and feedback:**

The Participant shall be compensated $250.00 for each monthly assessment. There are currently two (2) monthly assessments; Pain and Scar. If Participant is eligible, Participant may participate in both assessments and will be compensated accordingly for Participant's time and feedback.

Compensation shall be paid to Participant within 10 business days of submitting all required information.

ACW13 will issue a 1099 to Participant at the end of each participating fiscal year.

Participant agrees and understands that ACW13 reserves the right to cancel compensation at anytime.

MMR21000843

**American Christian Warrior 13**

1603 Capitol Ave, Suite 314635
Cheyenne, WY 82001
E-Mail: Study@acw13.com

**Participant's Information**

Name on Account:_ N/A

Name of Bank:_ N/a

Routing# 00000000000          Account # 0000000000000

```
ATTACH VOIDED CHECK
```

✓ Check here, if you prefer to get paid by paper check.

**Checklist:**

1. Sign Compound Medication Self Assessment Study Agreement (This Document)
2. Complete and submit a Medical Release Form (Emailed to you)
3. Complete your CM-SAS Initial Questionnaire (Emailed to you)
4. Fax or Upload a copy of current Driver's License or any other Government issued ID

## American Christian Warrior 13

1603 Capitol Ave. Suite 314635
Cheyenne, WY 82001
E-Mail: Study@acw13.com

## Release of Medical Information

### Permission to get records

I ___Joe Brian Gomez_____ **born on**___11/16/1986_____ **give my permission for**

    (Patient name)                                       (Patient's DOB)

___CPT Lopez_____**to give my medical records to**
(Doctor's name that has records)

### American Christian Warrior 13 Inc. to better understand my condition.

**By initialing each item below, I understand that I give permission for records to be sent that may contain information about:**

___JG_____ **My mental health,**
___JG_____ **Transmittable disease I may have like HIV/AIDS,**
___JG_____ **Genetic records, and/or**
___JG_____ **Drug and Alcohol records**

### I understand that:

- **I do not have to give my permission to share these records.**

- **If I want to take away the permission for ACW13 to get these records, I need to talk to My doctor or a staff person and sign a paper.**

- **This form is only good for 24 months from the date I sign it.**

Patient's Signature_____ Date _02/21/2015_____

Authorized Representative's Signature_____ Date_____

Relationship of Authorized Representative_____

MMR21000845

# EXHIBIT C

## Inquiry Into Global Marketing's Physicians regarding Valid Physician/Patient Relationship

On May 18, 2015 I, Ryan Boyle acting as Chief Compliance Officer for Central Rexall Drugs, Inc. ("Central") began an investigation into whether physicians associated with the marketing group "Global Marketing Strategies" ("GMS") created a valid physician/patient relationship with their patients. This inquiry was prompted by a CBS news report indicating that a physician (Paul Bolger) may not have been establishing a valid relationship with his patients before writing prescriptions for them. Because Dr. Bolger was associated with GMS, Central decided it would be prudent to verify with any other associated physicians that the requisite relationships are being established before submitting prescriptions to our pharmacy. The following information was gathered:

At 1: 33 pm on 5/18/2015 @ 903-229-7384, I spoke with Dr. Phillip Jones and asked:

- Before submitting a prescription to Central, do you speak with the patient?
- Dr.'s response: **Yes**
- When speaking with the patient, is it done via telephone, in person or via video conference?
- Dr.'s response:  **Over the phone**
- Finally, before prescribing medicine do you establish a valid physician/patient relationship according to applicable state and federal law?
- Dr.'s response: **Yes**

At 9:13 pm 5/19/2015 @ 843-364-2308, I spoke with Dr. Frederick Warner and asked:

- Before submitting a prescription to Central, do you speak with the patient?
- Dr.'s response: NO there were instances where a prescription was submitted without any consultation with the patient. Dr. believed a consult was only needed when the patient requested one.
- When speaking with the patient, is it done via telephone, in person or via video conference?
- Dr.'s response: When doctor did speak with patients it was via telephone.
- Finally, before prescribing medicine do you establish a valid physician/patient relationship according to applicable state and federal law?
- Dr.'s response:

At 10:06 am 5/19/2015 @ 432-312-9955, I spoke with Dr. Jeff Durgin and asked:

- Before submitting a prescription to Central, do you speak with the patient?
- Dr.'s response: **Yes**

- When speaking with the patient, is it done via telephone, in person or via video conference?
- Dr.'s response: **Via telephone**
- Finally, before prescribing medicine do you establish a valid physician/patient relationship according to applicable state and federal law?
- Dr.'s response: **Yes**

At _____3:05_____, I spoke with Dr. Juan Carlos Fuentes and asked:

- Before submitting a prescription to Central, do you speak with the patient?
- Dr.'s response:
- When speaking with the patient, is it done via telephone, in person or via video conference?
- Dr.'s response:
- Finally, before prescribing medicine do you establish a valid physician/patient relationship according to applicable state and federal law?
- Dr.'s response:

At _____, I spoke with Dr. David McCarther and asked:

- Before submitting a prescription to Central, do you speak with the patient?
- Dr.'s response:
- When speaking with the patient, is it done via telephone, in person or via video conference?
- Dr.'s response:
- Finally, before prescribing medicine do you establish a valid physician/patient relationship according to applicable state and federal law?
- Dr.'s response:

At 2:30 pm on 5/18/2015 @ 561-737-4500, I spoke with Dr. Sara Garcia and asked:

- Before submitting a prescription to Central, do you speak with the patient?
- Dr.'s response: **Yes**
- When speaking with the patient, is it done via telephone, in person or via video conference?
- Dr.'s response: **Telephone consult**
- Finally, before prescribing medicine do you establish a valid physician/patient relationship according to applicable state and federal law?
- Dr.'s response: **Yes**

*Dr. David Wagner*
*6/23 left msg*

Hello,

My name is *Sabrina Kline* with Central Rexall Drugs. Our records indicate that you have used our pharmacy to fill compounded medications for your patients. As part of our compliance program, we like to touch base with our prescribers from time to time and survey their prescribing practices. The purpose of this is to show that we are a leader in the industry and only work with prescribers that believe in compounding and take compliance seriously. The survey is 3 quick questions and if you don't have time right now to answer, I'd be happy to email them to you or someone on your staff to answer and send back later.

At *2:23* (p.m.)/a.m. on *June* , *23* 2015, I spoke with Dr/NP/PA *Erik Wagner* and asked:

- Before submitting a prescription to Central, do you speak with the patient?

- Dr.'s response: *Yes*

- When speaking with the patient, is it done via telephone, in person or via video conference?

- Dr.'s response: *telephone*

- Finally, before prescribing medicine do you establish a valid physician/patient relationship according to applicable state and federal law?

- Dr.'s response: *Yes*

Thank you for taking the time to answer these questions and we appreciate you using our pharmacy for your patient's compounded medication needs. If you ever have any questions or need something from Central, please feel free to contact me at _____.

# Hunt Telecom  Fax Service

## FAX **DELIVERY** NOTIFICATION

Account: 9852697440
7/16/2015 3:04:38 PM

The following fax was **successfully** sent to the specified recipient.

**Fax Number:**    **9155333453**
Remote CSID:    (station ID of receiving fax device)
Pages:    1
Status:    No errors

## FAX TRANSMISSION DETAILS

Sent On:    7/16/2015 3:04:38 PM
Duration:    39 seconds
Speed:    14400 bps
Retries:    0
Event ID:    20150716150538634

---

07/16/2015 THU 15:04    FAX    ☒0017/001

Hello Dr. William F. Elder Quintana,

My name is Sabrina Kline with Central Rexall Drugs. Our records indicate that you have used our pharmacy to fill compounded medications for your patients. As part of our compliance program, we like to touch base with our prescribers from time to time and survey their prescribing practices. The purpose of this is to show that we are a leader in the industry and only work with prescribers that believe in compounding and take compliance seriously. Please take a moment to answer the below questions and verify the address and contact number we have on file for you are correct. If there are corrections that need to be made please note those changes and I will update your profile in our system. Please fax completed form to 985-269-7440 or email to Sabrina@centraldrugs.net.

- Before submitting a prescription to Central, do you speak with the patient?

- Dr.'s response:_____

- When speaking with the patient, is it done via telephone, in person or via video conference?

- Dr.'s response:_____

- Finally, before prescribing medicine do you establish a valid physician/patient relationship according to applicable state and federal law?

- Dr.'s response:_____

- Address(es) on file: 10391 Gateway West Blvd. El Paso, TX 79925

- Phone number(s) on file: 915-545-3134/915-400-8992

- Fax number(s) on file: 915-533-3453

Prescriber Signature: X_____  Date:_____

Thank you for taking the time to answer these questions and we appreciate you using our pharmacy for your patient's compounded medication needs. If you ever have any questions or need something from Central, please feel free to contact me at 985-269-7454 or 985-285-9441.

Central Rexall Drugs    Phone: 877-258-3477    Fax: 888-653-7297
125 E. Thomas St.
Hammond, La 70401



```
        *********************
        *** FAX TX REPORT ***
        *********************


             TRANSMISSION OK

    JOB NO.                  1653
    DESTINATION ADDRESS      9155333453
    SUBADDRESS
    DESTINATION ID
    ST. TIME                 07/16 15:06
    TX/RX TIME               00' 37
    PGS.                     1
    RESULT                   OK
```

Hello Dr. William F. Elder Quintana,

My name is Sabrina Kline with Central Rexall Drugs. Our records indicate that you have used our pharmacy to fill compounded medications for your patients. As part of our compliance program, we like to touch base with our prescribers from time to time and survey their prescribing practices. The purpose of this is to show that we are a leader in the industry and only work with prescribers that believe in compounding and take compliance seriously. Please take a moment to answer the below questions and verify the address and contact number we have on file for you are correct. If there are corrections that need to be made please note those changes and I will update your profile in our system. Please fax completed form to 985-269-7440 or email to Sabrina@centraldrugs.net.

- Before submitting a prescription to Central, do you speak with the patient?

- Dr.'s response:_____

- When speaking with the patient, is it done via telephone, in person or via video conference?

- Dr.'s response:_____

- Finally, before prescribing medicine do you establish a valid physician/patient relationship according to applicable state and federal law?

- Dr.'s response:_____

- Address(es) on file: 10391 Gateway West Blvd. El Paso, TX 79925

- Phone number(s) on file: 915-545-3134/915-400-8992

- Fax number(s) on file: 915-533-3453

Prescriber Signature: X_____ Date:_____

Thank you for taking the time to answer these questions and we appreciate you using our pharmacy for your patient's compounded medication needs. If you ever have any questions or need something from Central, please feel free to contact me at 985-269-7454 or 985-285-9441.

Hello Dr. William F. Elder Quintana,

My name is Sabrina Kline with Central Rexall Drugs. Our records indicate that you have used our pharmacy to fill compounded medications for your patients. As part of our compliance program, we like to touch base with our prescribers from time to time and survey their prescribing practices. The purpose of this is to show that we are a leader in the industry and only work with prescribers that believe in compounding and take compliance seriously. Please take a moment to answer the below questions and verify the address and contact number we have on file for you are correct. If there are corrections that need to be made please note those changes and I will update your profile in our system. Please fax completed form to 985-269-7440 or email to Sabrina@centraldrugs.net.

- Before submitting a prescription to Central, do you speak with the patient?

- Dr.'s response:_____

- When speaking with the patient, is it done via telephone, in person or via video conference?

- Dr.'s response:_____

- Finally, before prescribing medicine do you establish a valid physician/patient relationship according to applicable state and federal law?

- Dr.'s response:_____

- Address(es) on file: 10391 Gateway West Blvd. El Paso, TX 79925

- Phone number(s) on file: 915-545-3134/915-400-8992

- Fax number(s) on file: 915-533-3453

Prescriber Signature: X_____ Date:_____

Thank you for taking the time to answer these questions and we appreciate you using our pharmacy for your patient's compounded medication needs. If you ever have any questions or need something from Central, please feel free to contact me at 985-269-7454 or 985-285-9441.

**Central Rexall Drugs**          Phone: 877-258-3477          Fax: 888-653-7297
125 E. Thomas St.
Hammond, La 70401



Hello, Dr. Brian Sokalsky DO,

My name is Danielle Marks with Central Rexall Drugs. Our records indicate that you have used our pharmacy to fill compounded medications for your patients. As part of our compliance program, we like to touch base with our prescribers from time to time and survey their prescribing practices. The purpose of this is to show that we are a leader in the industry and only work with prescribers that believe in compounding and take compliance seriously. Please take a moment to answer the below questions and verify the address and contact number we have on file for you are correct. If there are corrections that need to be made please note those changes and I will update your profile in our system. Please fax completed form to 888-653-7297 or email to Danielle@centraldrugs.net.

- Before submitting a prescription to Central, do you speak with the patient?

- Dr.'s response: ___Yes___

- When speaking with the patient, is it done via telephone, in person or via video conference?

- Dr.'s response: ___In person___

- Finally, before prescribing medicine do you establish a valid physician/patient relationship according to applicable state and federal law?

- Dr.'s response: ___Yes___

- Address(es) on file: 801 Central Ave.

    Ocean City, NJ. 08226

- Phone number(s) on file: 609-545-8553

- Fax number(s) on file: 609-545-8706

Prescriber Signature: X_____ Date: 9/24/15

Thank you for taking the time to answer these questions and we appreciate you using our pharmacy for your patient's compounded medication needs. If you ever have any questions or need something from Central, please feel free to contact me at 985-269-7437 or 985-415-7785.

# EXHIBIT D

| | |
|---|---|
| **From:** | Kyle Johnston[kyle@centraldrugs.net] |
| **Sent:** | Mon 1/19/2015 6:07:45 PM (UTC) |
| **To:** | Trent Brockmeier[trent@centraldrugs.net] |
| **Subject:** | RE: Top Tier / Wayne Wilkerson |

Ok no problem.
Sounds good.
Not much, kids were sick. I just worked on house a bit. Let me know when yall can come by.
**From:** trent@centraldrugs.net [mailto:trent@centraldrugs.net]
**Sent:** Monday, January 19, 2015 11:56 AM
**To:** Kyle Johnston
**Subject:** Re: Top Tier / Wayne Wilkerson
Hey man - sorry, when you called me yesterday I had fallen asleep watching the game.
Say, I agree with your thoughts. Also we always and have always contacted every patient before we send out their prescriptions. Once we contact patients, it is of course up to their discretion to get the prescription or not.
In so far as Wayne - let's not accept new scripts from them.
What did y'all do this weekend?
Trent

On â€Ž1â€Ž/â€Ž19â€Ž/â€Ž2015 at 10:40 AM, "Kyle Johnston" <kyle@centraldrugs.net> wrote:

Hey, just thinking about it some more, Iâ€™d rather us not be associated with Wayne at this point. He says heâ€™s terminated the â€œrogueâ€ rep (or reps) and itâ €™s against his internal policies but Iâ€™m still concerned. I know the memorial deal was weird b/c it was a â€œtransferâ€ and a continuation of treatment, but aside from those couple of scripts (which we refunded right away), we have call logs of where weâ€™ve spoken with the prescribers and all of the patients â€" not to mention all of the acknowledgement postcards weâ€™ve received back signed by those patients. My guess is the fraud really was limited to the memorial deal, but weâ€™ve got too many good things going on to be associated with Wayne if thereâ€™s a chance heâ€™s in trouble. At the least, I think we should no longer accept new scripts generated through him until the investor tells us heâ€™s not in any kind of trouble. If we do continue sending out medications to existing patients, then letâ€™s make sure every single one is contacted prior to doing so â€" which is our current practice anyway, right? Either way, weâ€™ve done nothing wrong but my vote is we no longer affiliate with him. What about you? Also, they told us we donâ€™t have to appear in Nashville on the 27th but we still need to be there that night to meet with Jeff. I tried you on your cell but no answer. Call me when you free up today. Kyle