**GIBBONS**

LAWRENCE S. LUSTBERG
Director

Gibbons P.C.
One Gateway Center
Newark, New Jersey 07102-5310
Direct: 973-596-4731
llustberg@gibbonslaw.com

November 10, 2025

**VIA ECF**

Honorable Edward S. Kiel
United States District Judge
Mitchell H. Cohen Building
  & U.S. Courthouse
4th and Cooper Streets, Court Room 3A
Camden, New Jersey 08101

    Re:    <u>*United States v. Johnston, et al.*, 20-cr-800 (ESK)</u>

Dear Judge Kiel:

    During oral argument on the Defendants' posttrial motions for a judgment of acquittal or a new trial, this Court graciously invited counsel to provide supplemental briefing with regard to issues raised during oral argument. In this submission, the Defendants respectfully provide such briefing, primarily with regard to three (3) subjects.[1]

---

[1] As discussed briefly at oral argument, Defendants also here memorialize their position with regard to the Third Circuit's recent decision in *United States v. Mattia*, __ F.4th __, 2025 U.S. App. LEXIS 27332 (3d Cir. 2025). *See* 10/27/25 Tr. at 4. Defendants concede that *Mattia* holds that an implied misrepresentation may be cognizable under the healthcare fraud statute, but do not concede that it supports the conviction theory in this case. As the Court pointed out at oral argument, *Mattia* was decided at the pleading stage, and the Third Circuit held that the indictment there sufficiently alleged a basis for concluding that medical necessity was implied in the prescriptions at issue—and that misrepresentations were made by the *doctor* in issuing those prescriptions. By contrast, the evidence here—after trial—failed to establish that medical necessity was implied as the basis for claims to the PBMs. Specifically, as set forth at pages 56-60 of Defendants' reply brief, the facts of *this* case show that Defendants never made any representation—explicit or implicit—as to medical necessity. Central Rexall's contracts with ESI (GX 37), as well as the ESI manual (GX 59), said nothing about medical necessity, only "validity," and the Central Rexall witnesses themselves testified that the validity of a prescription turned on factors other than medical necessity: as Melissa Olsen explained, "validity" meant specific paper size, patient-identifying information, medication, quantity, and SIG. Tr. 938-39. And this made good sense—how could a pharmacy know that a prescription was medically necessity, and how could a pharmacy ever reasonably be expected to make a representation as to each and every claim it submits to a PBM? In short, *Mattia* was premised on a particular set of factual allegations that cannot simply be imported whole-cloth into this case's trial record.

Nor, as the Court pointed out, does the *Mattia* court's treatment of whether the term "medically unnecessary" is unconstitutionally vague decide that issue here. Indeed, the Court of Appeals in *Mattia* left that issue for determination by the District Court in that case. 2025 U.S. App. LEXIS

GIBBONS P.C.

November 10, 2025
Page 2

**Assessment of Credibility in Evaluating Rule 29 or Rule 33 Motions**

First, during oral argument, the Court invited supplemental briefing with respect to the permissibility of its considering the credibility of witnesses in deciding posttrial motions. 10/27/25 Tr. at 91-92, 130-33. In particular, the Defendants argued that the Court could consider the obvious incredibility of the testimony of Government witness Tony Serna in deciding not only whether to grant a new trial, but for purposes of deciding the pending motion for a judgment of acquittal as well.

Of course, Defendants acknowledge (as they did in their prior briefing, *see* ECF 327.1 at 2, 6; ECF 350 at 2) the demanding standard that applies to motions for a judgment of acquittal under Rule 29. A court reviews "the evidence in the light most favorable to the jury verdict and presumes that the jury properly evaluated credibility of the witnesses, found the facts, and drew *rational* inferences." *United States v. Iafelice*, 978 F.2d 92, 94 (3d Cir. 1992) (emphasis added). And the court must determine whether, "viewing the evidence in the light most favorable to the prosecution, any *rational* trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 424-25 (3d Cir. 2013) (emphasis added). In that regard, while courts *presume* the credibility of the Government's witnesses, this presumption is just that – a presumption, which is rebuttable under certain circumstances. Thus, the law provides that a court will generally accept a jury's credibility findings unless the testimony was "incredible on its face" or "def[ied] physical realities." *United States v. Mickens*, 2021 U.S. App. LEXIS 22139, at *7-8 (2d Cir. July 26, 2021) (quoting *United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012)); *United States v. Tharrington*, No. 24-310, 2025 U.S. Dist. LEXIS 163147, at *12 (E.D. Pa. Aug. 22, 2025) (applying this standard); *United States v. Caraway*, 411 F.3d 679, 682 (6th Cir. 2005) ("[W]here testimony is patently incredible or defies physical realities, it may be rejected by the court, despite the jury's evaluation.").

The caselaw's references to a "rational juror" and testimony that is "incredible on its face" themselves make clear that this Court can and should consider whether Tony Serna's patently and facially incredible testimony casts doubt upon whether a rational trier of fact could have found the essential elements of the crimes here at issue beyond a reasonable doubt. Serna's outrageous and obviously false testimony was detailed in Defendants' prior briefing: Serna admitted to lying on the record about whether or not he had prepared his redirect testimony with the Government, Tr. 1408—the only falsehood that the Government owns up to. Beyond that, he was shown to have submitted forged documents to the grand jury by replacing his name with the name of his deceased sister in order to paint her as the real culprit. *See* ECF 350 at 11-17; *see also* ECF 268 (Ltr Br. re: doctored emails). He lied about whether he had ever misrepresented his military rank, Tr. 1403-07, whether he hoped that his cooperation would result in a reduced sentence, Tr. 1269, whether

---

27332, at *13 n.4. Here, the vagueness of the term was amply demonstrated at trial, as the Court's colloquy with counsel on these post-trial motions compellingly showed. *See* 10/27/25 Tr. at 59-63 (discussing the confusion generated by the terms "medically necessary" and "medically reasonable").

GIBBONS P.C.

November 10, 2025
Page 3

he was introduced to Central Rexall by two employees named "Richard" and "Robert," Tr. 1073, 1248-52, and even with regard to such matters as whether doctors engaged in telephone evaluations of patients that lasted four-seconds long, Tr. 1127-31, 1136-37.[2]

Of course, even his lies about his preparation would be sufficient to render Serna's entire testimony not credible; having witnessed Serna's perjury, no rational juror could credit anything else he said. But his complete lack of credibility pervaded his testimony: believing that Serna knew nothing about the alterations to the documents would require believing that Lucy Serna (or perhaps some shadowy third figure) created and altered hard copies of particularly inculpatory emails before she passed away and before Serna's group MMR21 had ever received a grand jury subpoena, all on the off-chance that someday, someone would come looking for hard copies of MMR21's records; it would also require believing that Serna, after having produced what he represented was a complete production of documents in response to the grand jury subpoena, then met with the prosecutors, realized that his production was in fact incomplete, and drove several hours to Lucy's house so as to make a complete production, where he found a stack of files in her garage, thus inadvertently giving the Government altered documents. The story is preposterous.[3]

Because of these myriad fabrications and patently incredible claims, this Court can and should conclude that Serna's testimony simply could not be credited by a rational jury. And this requires relief, as that testimony was uniquely important to this case, as was demonstrated by the

---

[2] As noted, other than with regard to his initial failure to acknowledge that the Government prepared him for his re-direct, the Government has yet to acknowledge any of his other falsehoods, including that Serna provided them with false records in response to the grand jury subpoena or that he lied about this, and other things, during his testimony. Indeed, as noted previously, the Government has doubled down on Serna's testimony during this post-trial motion practice, *see* ECF 350 at 11-12, in essence turning a blind eye to, for example, perjury committed by its witness during the grand jury process, while at the same time asking the Court to rely on Serna's testimony to sustain these convictions. But witness perjury of this kind is a serious matter and should not be ignored in the interest of just moving on to sentencing.

[3] As noted in Defendants' Reply Brief, ECF 350 at 12-15, Serna was associated with multiple individuals charged by the United States in the Northern District of Texas in a healthcare fraud scheme involving the same Doctors Elder-Quintana and Simmons as were involved in this matter, as well as a pharmaceutical marketing group called CMGRX. Significantly, the scheme pre-dated and was identical to the scheme that Serna undertook with MMR21: paying patients kickbacks disguised as a fraudulent medical study. Even Serna's own "agreement" that patients associated with the fake study had to execute was copied verbatim from the "agreement" created by CMGRX. The only reasonable reading of these facts is that Serna copied his scheme directly from his friends at CMGRX, and therefore it was not (as Serna testified) something that was, as he testified conceived of by Johnston. And the fact that it involved, earlier in time, the same doctors as he testified were provided to him by unknown persons at Central Rexall undermines that testimony. These facts, again, demonstrate Serna's complete lack of credibility or, at the very least demonstrate that a new trial should be ordered at which these facts may be fully aired.

GIBBONS P.C.

November 10, 2025
Page 4

number of pages devoted to Serna in the Government's Opposition Brief, and the Government's contention during oral argument that Serna's purported agreement with Mr. Johnston, standing alone, is sufficient to justify Defendants' convictions. ECF 342 at 19-24. More substantively, Serna was the *only* witness who testified that Central Rexall provided the names of corrupt doctors to a sales organization, as opposed to the patter with respect to all of the other sales organizations in the case, each of which had or independently pursued its own contacts with doctors in its geographic territory. That is, Tony Serna claimed that Central Rexall had a rolodex of doctors which it provided to its sales representatives. He was also the only witness who claimed that Central Rexall affirmatively suggested bogus studies for compound medications which would see patients getting paid for their participation. That testimony was incredibly important for the government—indeed, it was completely unique—and particularly damaging for the Defendants.[4]

In any event, even if the Court were to agree that a rational jury could not only believe but rely upon, the testimony of Tony Serna, and that the Court should therefore deny the defense motion for a judgment of acquittal under Rule 29, there is no doubt that the Court can itself assess that testimony in determining whether to grant the defendants' motion for a new trial. The law is clear: the Court has the obligation to independently assess the record—including witness credibility—when considering whether to exercise its discretion to grant a new trial under Rule 33. The caselaw in the Third Circuit is strikingly clear in this regard: a district court can independently weigh the evidence, including make its own independent determinations regarding a witness's credibility, when ruling on a motion for a new trial. *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (in deciding a Rule 33 motion, the court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation"); *United States v. Quiles*, 618 F.3d 383, 395-96 (3d Cir. 2010) (a court may reweigh the evidence and assess witness credibility in reviewing a Rule 33 motion for a new trial); *United States v. David*, 222 F. App'x 210, 215 (3d Cir. 2007) (a court "may examine the credibility of the evidence in considering" a Rule 33 motion); *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002) (for purposes of evaluating a Rule 33 motion, the Court "does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case"); *United States v. Friedland*, 660 F.2d 919, 931 (3d Cir. 1981) (expressly recognizing the trial court's ability to make independent credibility determinations when considering a Rule 33 motion); *accord United States v. Stephen*, 2025 U.S. App. LEXIS 515, *10 (3d Cir. Jan. 10, 2025); *United States v. Brown*, 2022 U.S. Dist. LEXIS 204896, at *3 (D.N.J. Nov. 10, 2022) ("The standard under Rule 33 is more general than that under Rule 29. . . . When a defendant seeks a new trial claiming that the verdict was against the weight of the evidence, the court's review is less restricted than it is under Rule 29."). Other Circuits are in accord. *See, e.g., United States v. Leach*, 427 F.2d 1107,

---

[4] The Government's argument that Serna's testimony is "corroborated" by his email to Central Rexall requesting a list of doctors (ECF 342 at 21 n.3) is just wrong. There was no response to that email from anyone at Central Rexall; Central Rexall had never had a relationship with Dr. Elder-Quintana or Dr. Simmons until Serna showed up; and, as Defendants showed in their Reply Brief, it was in fact Serna, *not* Defendants, who had a pre-existing relationship with those doctors. ECF 350 at 13-15. Serna is patently a liar, and the idea that his false testimony can be corroborated by own emails is nonsensical.

G<small>IBBONS</small> P.C.

November 10, 2025
Page 5

1111 (1st Cir. 1970) ("Motions for new trial are directed to the trial court's discretion. Under its broad power, the court may weigh the evidence and consider the credibility of the witnesses."); *United States v. Olazabal*, 610 F. App'x 34, 38 (2d Cir. 2015) ("Though the government complains that the District Court 'improperly supplant[ed] the jury's view of the evidence and the credibility of witnesses with its own,' the District Court was fully entitled to independently assess both the credibility of witnesses and other evidence in deciding the Rule 33 motion."); *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981) (when considering a Rule 33 motion, a court "need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses"); *United States v. Moore*, 76 F.4th 1355, 1363 (11th Cir. 2023) ("A Rule 33(a) motion for a new trial is different because "the district court may weigh the evidence and consider the credibility of the witnesses.").

At oral argument, however, the Government argued that *United States v. Salahuddin*, 765 F.3d 329, 346 (3d Cir. 2014), stands for the proposition that "even on a Rule 33 motion, the Court should give deference to the jury's evaluation of credibility." 10.27.25 Tr. at 112. But when reviewed alongside the rest of the Third Circuit's Rule 33 jurisprudence, *Salahuddin* is a stark outlier. No other published decision from the Court of Appeals (including, tellingly, no case citing *Salahuddin*) holds that a court can or should defer to a jury's credibility determinations when considering whether the weight of the evidence supports a guilty verdict. Such a standard would reduce a Rule 33 motion to little more than a copy of a Rule 29 motion—and, indeed, the only case *Salahuddin* cites for such a remarkable proposition is *United States v. Boone*, 279 F.3d 163, 189 (3d Cir. 2002), which in the quoted passage was considering a Rule 29 motion, and not a Rule 33 motion. *See id.* ("[W]e review the sufficiency of the evidence in the light most favorable to the verdict winner, and we credit all reasonable inferences that support the verdict.").

The Government's use of *Salahuddin* is also contrary to the ultimate purpose of Rule 33 motions: to give a district court the opportunity to engage in a holistic review of the trial record, independently weigh the evidence, and assess whether a miscarriage of justice may have occurred. *Johnson*, 302 F.3d at 150. And Rule 33 motions are, of course, subject to abuse-of-discretion review on appeal. *Id.* As one court aptly put it, "[w]hen making a new trial determination, the district court has much broader discretion and may weigh the evidence, choose to believe or disbelieve witnesses, and may grant a new trial even where there is substantial evidence to sustain the verdict." *United States v. Lemoine*, 104 F.4th 679, 685-86 (8th Cir. 2024) (quotations omitted). So, for example, a court's determination that there may have been a miscarriage of justice when the "core of the government's case was the testimony of [a supposed co-conspirator], an artful and commercially successful liar" whose testimony "was riddled with inconsistency" was affirmed on appeal as within the court's discretion. *United States v. Autuori*, 212 F.3d 105, 120-21 (2d Cir. 2000). The Court should exercise its ample discretion here to do the same thing here: vacate a judgment obtained through perjured and patently unreliable testimony and therefore rectify what really is a terrible miscarriage of justice.

GIBBONS P.C.

November 10, 2025
Page 6

**Willful Blindness and Conspiracy**

Second, at oral argument, the Court also invited supplemental briefing with regard to willful blindness, and particularly the question of whether willful blindness, which is, by its terms, a means of satisfying the "knowingly" requirement of the offense alleged, *United States v. Stadtmauer*, 620 F.3d 238, 258 (3d Cir. 2010), with the question of whether it can also be used to fulfill other essential elements of those offenses. In some cases, the answer seems obvious as a matter of common sense: how can one willfully blindly enter into an agreement? It is impossible, as a number of courts have noted. For example, the Second Circuit has written that there are "two aspects of knowledge involved in a conspiracy: (1) knowing participation or membership in the scheme charged and (2) some knowledge of the unlawful aims and objectives of the scheme." *United States v. Lanza*, 790 F.2d 1015, 1022 (2d Cir. 1986). Conscious avoidance may not be used to support a finding as to the former, i.e., intent to participate in a conspiracy, but it may be used to support a finding with respect to the latter, i.e., knowledge of the conspiracy's unlawful goals. *See United States v. Eltayib*, 88 F.3d 157, 170 (2d Cir. 1996); *United States v. Scotti*, 47 F.3d 1237, 1243 (2d Cir. 1995) ("The reason that we do not permit conscious avoidance instructions on the issue of knowing participation in a conspiracy is that it is logically impossible for a defendant to intend and agree to join a conspiracy if he does not know that it exists.").

The willful blindness instruction that the Court gave the jury (to which Defendants objected in its entirety, *see* ECF 234.1 at 90) did not draw this distinction; for example, it did not instruct the jury not to apply willful blindness principles to the agreement element of the conspiracy charges.[5] Indeed, the instruction did not address the applicability of willful blindness to the elements of the offenses at issue. As charged, it stated only that "you may find that Mr. Johnston and Mr. Brockmeier knowingly conspired to commit healthcare fraud and wire fraud based upon evidence which proves that: One, Mr. Johnston and Mr. Brockmeier himself actually or subjectively believed that there was a high probability that false and fraudulent insurance claims were submitted to the pharmacy benefits for medically unnecessary compounded prescription medication; and, second, Mr. Johnston and Mr. Brockmeier consciously took deliberate actions to avoid learning or made deliberate efforts to avoid knowing about the existence of the submission of false and fraudulent claims to the pharmacy benefits administrator for medically unnecessary compounded prescription medications." Tr. 3768-69. Thus, the charge said nothing about not applying the willful blindness instruction to the agreement element of a conspiracy. In fact, as written, it permitted the jury to convict Defendants of Count 1 without any consideration of that most essential element of conspiracy, an offense which really is all about agreement. *See, e.g., United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003) ("The Court has repeatedly said that the essence of a conspiracy is 'an agreement to commit an unlawful act.' That agreement is 'a distinct evil' that 'may exist and be punished whether or not the substantive crime ensues.'") (quotations omitted)); *United States v. Kapp*, 781 F.2d 1008, 1010 (3d Cir. 1986) ("[T]he essence of criminal conspiracy . . . is an agreement . . . to commit an unlawful act."); *see also United States v. Flores*, 945 F.3d 687, 712 (2d Cir. 2019) ("The crux of a conspiracy is an agreement between two or more persons to join together to accomplish something illegal."); *Kemper v. Deutsche Bank AG*, 911

---

[5] The relevant portion of the instruction is at Tr. 3768-73.

GIBBONS P.C.

November 10, 2025
Page 7

F.3d 383, 395 (7th Cir. 2018) ("The crux of any conspiracy is an agreement between the co-conspirators."). At the very least, there is little doubt that the instruction may well have confused the jury insofar as it was given before the Court instructed the jury on the elements of the conspiracy charge.[6]

This defect necessitates a new trial. Certainly, willful blindness played an enormous role in the Government's case. Indeed, it was a centerpiece of its summation and rebuttal, as it was of its post-trial presentation. Tr. 38-39 (Gov't Opening Statement arguing that "defendants . . . did nothing to investigate or stop" fraud); Tr. 3899 (Gov't Closing Statement emphasizing willful blindness instruction and stating that "[r]ather than ask questions, the defendants stuck their head in the sand"); Tr. 3661:16-19 (arguing at Rule 29 arguments that the number of red flags that Defendants were privy to showed that they "certainly knew that there was no possible way a doctor could be conducting real evaluations of these patients with that data that they reviewed and they had available to them"). But as discussed at oral argument and in their moving briefs, ECF 327.1 at 66-81; ECF 350 at 40-50, the Defendants were correct that the willful blindness instruction should not have been given at all. The instruction turned on whether the Defendants "took deliberate actions to avoid learning or made deliberate efforts to avoid knowing about the existence of the submission of false and fraudulent claims to the pharmacy benefits administrator for medically unnecessary compounded prescription medications." But the evidence at trial was directly to the contrary: Defendants hired and did nothing to limit the power or authority of their compliance officer Ryan Boyle (whose recommendations they largely accepted), terminated sales representatives when there was evidence of fraud, and (critically), implemented procedures whereby every patient was called to verify their prescription details and these contacts were documented. Of course, the Government argues that they did not do enough, arguing that Defendants became aware of nine instances (of tens of thousands of prescriptions) where there was a potential lack of a doctor-patient relationship, knew of certain federal investigations, and received large number of prescriptions from certain doctors; the Government contends that the Defendants failed to conduct a thorough enough investigation into these facts to determine if there was underlying fraud. ECF 342 at 51-56. But these contentions really amount to a contention not

---

[6] While the willful blindness instruction may have been based on the Third Circuit's model charge, that is not enough to insulate it from criticism. The Third Circuit's model charge discusses willful blindness in the abstract; it does not address the particular issues that arise when the Government argues that Defendants both participated in a conspiracy and were willfully blind to that conspiracy's object. And to make matters worse, the Government undermined the instruction that was provided, lessening its burden when during summation it argued that "it was obvious to anybody in the defendants' position that they were involved in illegal conduct." Tr. 3899. This formulation removes a critical word from the actual jury instruction, which states that "[n]o one can avoid responsibility for a crime by *deliberately* ignoring what is obvious," thus eliminating the requirement that a defendant take active measures to ignore obvious fraud; indeed, it makes patent the very danger that the Court saw in the willful blindness standard—that it could be used to convict based upon mere negligence. 10/27/25 Tr. at 30-31 (noting concerns with willful blindness instruction allowing a jury to convict "based upon negligence or recklessness and not based upon intentionality"); ECF 327.1 at 76.

GIBBONS P.C.

November 10, 2025
Page 8

that Defendants deliberately avoided learning the facts, but that they did not do enough to address them – precisely the kind of negligence standard that Courts and commentators warn cannot be the basis of a criminal conviction but is threatened by a willful blindness instruction. *United States v. One 1973 Rolls Royce, V.I.N. SRH-16266 By & Through Goodman*, 43 F.3d 794, 813 (3d Cir. 1994) (a willful blindness instruction cannot be used to meet the Government's burden of proof when the evidence supports only negligence or lack of due care). The willful blindness instruction, which thus lessened the Government's burden and muddled the elements of conspiracy such that the jury could convict Defendants under what was essentially a negligence standard, should not have been given because the necessary factual predicate—active conduct by Defendants to avoid acquiring knowledge of illegality—was absent.

**Money Laundering Conspiracy Venue**

Third and finally, at oral argument, the Court invited the Parties to address whether the Government could satisfy the venue requirement of Count 4 – given the striking weakness of its argument that a chance routing through a New Jersey server gave rise to venue over transactions that occurred entirely in Louisiana – by incorporating by reference in Count 4 allegations contained in an overt act charged in Count 2 to the effect that Central Rexall engaged in a wire transfer to Boardwalk. *See* Ind. ¶ 55 ("Paragraphs 1-12 and 14-41 of Count 1 of this Indictment and paragraphs 43-44 and 46-49 of Count 2 of this Indictment are hereby realleged and incorporated as though set forth in full herein."); *id.* ¶ 49(d) ("On or about October 15, 2015, William Hickman, through his company Boardwalk Medical LLC, received in New Jersey a payment from Central Rexall of $2,447,076.19 for his work and the work of people working with him to find patients in New Jersey to receive Central Rexall prescriptions.").

To be clear, the Government's argument to the contrary notwithstanding, ECF 342 at 91, Defendants have never argued that the Government is not permitted to incorporate allegations by reference. Indeed, Federal Rule of Criminal Procedure 7(c)(1) specifically permits it to do so. That is, Rule 7(c) allows the Government to avoid unnecessary prolixity or duplication when preparing an indictment; instead of repeating the same information over and over again, an indictment can merely refer the reader to previous paragraphs. So, for example, while an indictment must allege every element of a given offense, it may do so by alleging those elements in an earlier section and incorporating that section into particular counts. *See, e.g.*, *United States v. Harra*, 985 F.3d 196, 222 (3d Cir. 2021) (holding that a particular theory of liability was incorporated by reference into certain counts because the indictment "[made] it sufficiently clear that the counts alleged the . . . theory").

Here, however, the Indictment does *not* make it "sufficiently clear" that Count 4 incorporated a theory of liability derived from the transfer of commission payments to sales representatives like Boardwalk. In *Harra*, the indictment contained lengthy descriptions of a particular kind of criminal conduct; it had a separate heading in the indictment and was specifically cited in one of the counts. *Id.* at 221-22. The Third Circuit therefore concluded that the indictment could be construed as alleging that theory. But here, Count 4 is perfectly clear as to what it concerns: financial transactions from Central Rexall to Bluen and PMG, and from Bluen and PMG

to the Defendants' personal bank accounts. Paragraph 61, which lists these transactions, does not state that they are "examples" or only "certain" of the illegal transfers; it states instead that Defendants "caused financial transactions affecting interstate and foreign commerce to occur, *as set forth below*"—that is, the 31 transactions listed in Paragraph 61 are *all* of the transactions that form the basis for Count 4. So construing Count 4 as encompassing not only those transactions but also commission payments to distributor groups like Boardwalk is not only a gross expansion of what is a fairly narrow charge but really is a transparent effort to avoid a problematic theory whereby venue would be appropriate in New Jersey in thousands and thousands of cases which have absolutely nothing to do with this case, just because part of the signal to transfer the funds happens to be routed through a server in New Jersey.

Read in a common-sense manner, therefore, Count 4 simply cannot be construed as alleging both a conspiracy to transfer funds from Central Rexall to Defendants and, additionally, a conspiracy to transfer commission payments to sales representatives. As Defendants argued in their briefs, such a fusion of conspiracies would make no sense, as the two flows of money operated at cross-purposes: every wire sent to sales representatives was less money for Defendants themselves. But even setting that illogic aside, the Indictment itself makes plain that Count 4 does not encompass payments to distributors. This is obvious from the Indictment as a whole, as is apparent from a comparison of Count 4 with Count 1, which alleges that Defendants conspired with Chris Casseri, Hayley Taff, William Hickman, and others, ECF 1 ¶ 13, listing Taff and Hickman in the object paragraph of the charge. *Id.* ¶ 14. Count 4, meanwhile, only alleges that Defendants, along with unspecified others, conspired to transact in criminal proceeds. *Id.* ¶ 56. Hickman is not mentioned, making it clear that the grand jury did not consider Hickman a coconspirator in Count 4, a conclusion that was bolstered by the fact that none of the substantive money laundering counts charged Defendants with illegally wiring funds to Hickman or Boardwalk. *Id.* ¶¶ 62-63.[7]

In short, the Government has never alleged – and thus did not put the defense on notice – that commission payments were separate crimes that constituted individual acts of money laundering. Until challenged on venue, it thought that they were, as the Indictment itself alleges, merely "part of the conspiracy" charged in Count 1. ECF 1 ¶ 22. The Court should reject the Government's post hoc attempt to expand Count 4's scope.

For the reasons set forth above, as well as in the Defendants' Moving Brief and Reply Brief and at oral argument on these motions, Mr. Johnston and Mr. Brockmeier respectfully submit that this is the rare case where post-trial relief is appropriate and necessary. Their motions should accordingly be granted.

---

[7] Though not dispositive, it is worth noting that when the Government indicted Hickman, it did not seem to think that the commission payments from Central Rexall to Boardwalk constituted transactions in criminal proceeds. If it had, Hickman could have been charged with receipt of criminal proceeds in violation of 18 U.S.C. § 1957. Instead, the Government charged Hickman with transacting in the funds he received from Central Rexall. *United States v. Hickman*, 19-cr-191-ESK (D.N.J.), D.E. 1 ¶¶ 34, 36.

G<small>IBBONS</small> P.C.

November 10, 2025
Page 10

        We again thank the Court for its careful consideration of this matter.

        Respectfully submitted,

        *s/ Lawrence S. Lustberg*
        Lawrence S. Lustberg

cc:    All counsel of record (via ECF)