

LAWRENCE S. LUSTBERG
Director

Gibbons P.C.
One Gateway Center
Newark, New Jersey 07102-5310
Direct: 973-596-4731
llustberg@gibbonslaw.com

December 8, 2025

**VIA ECF**

Honorable Edward S. Kiel
United States District Judge
Mitchell H. Cohen Building
  & U.S. Courthouse
4th and Cooper Streets, Court Room 3A
Camden, New Jersey 08101

    **Re:**    ***United States v. Johnston, et al., 20-cr-800 (ESK)***

Dear Judge Kiel:

    As Your Honor is aware, this Firm represents Defendant Christopher Kyle Johnston in the above-referenced matter. In that capacity, we write to advise the Court of very recent supplemental authority from the Courts of Appeals for the First and Fourth Circuits that squarely address issues relevant to the post-trial motions currently pending before this Court. Specifically, in *United States ex rel. Omni Healthcare Inc. v. Md. Spine Sols. LLC*, the First Circuit held that a medical laboratory was permitted to rely upon the doctors having prescribed certain tests and was not required to independently assess medical necessity in order to avoid civil liability under the federal False Claims Act ("FCA"). No. 25-1110, 2025 U.S. App. LEXIS 31085 (1st Cir. Dec. 1, 2025). And in *Al-Sabah v. World Business Lenders, LLC*, the Fourth Circuit performed a careful analysis of whether and when fraud can be established by willful blindness. Nos. 24-1345, 24-1382, 2025 U.S. App. LEXIS 30939 (4th Cir. Nov. 26, 2025). A copy of each opinion is attached hereto for the Court's convenience.

***United States ex rel. Omni Healthcare Inc. v. Md. Spine Sols. LLC*, 2025 U.S. App. LEXIS 31085 (1st Cir. Dec. 1, 2025).**

    In this civil FCA case, decided just last week, Omni Healthcare alleged that MD Labs submitted false and fraudulent claims when it (conducted and) billed for an alternative tests to detect urinary tract infections in patients—specifically "PCR" tests, rather than "BUC" tests. *Id.* at \*12. Because PCR tests offered no greater benefit and were significantly more expensive than BUC tests, Omni Healthcare alleged, they were not medically necessary, and thus failed Medicare's "reasonable and necessary" requirement. *Id.*; 42 U.S.C. § 1395y(a)(1)(A). On this basis, Omni Healthcare alleged that MD Labs thus "'knowingly present[ed] or cause[d] to be presented, a false or fraudulent claim for payment.'" *Omni Healthcare*, 2025 U.S. App. LEXIS 31085 at \*16 (quoting 31 U.S.C. § 3729(a)(1)(A)). On appeal, the First Circuit acknowledged that "a clinical laboratory has a legal duty to ensure it is not submitting false or incorrect claims," but concluded that there is no requirement "to independently determine the medical necessity of the tests billed." *Omni Healthcare*, 2025 U.S. App. LEXIS 31085 at \*18-19.

GIBBONS P.C.

December 8, 2025
Page 2

The Court's analysis has obvious applicability here, where Defendants and the pharmacy also relied upon doctors' prescriptions and did not independently evaluate medical necessity with regard to each patient:

> OMNI is a doctor's office that works on the frontlines with patients. And remember MD Labs is a clinical laboratory staffed with technicians who (as we understand it) lack both the expertise and the discretion to diagnose patients directly; their role is instead to process tests that doctors (who presumably do interact with patients)order. . . Finally, recall that OMNI (the doctor's office) specifically ordered MD Labs (the laboratory) to conduct the very same UTI tests that OMNI's now saying are not medically necessary (insofar as BUC tests are cheaper),even though OMNI ordered PCR tests (and did so to gin up this very case). So, truth be told, we struggle to make sense of OMNI's litigation position about medical necessity. We strain to see how MD Labs could know, be deliberately indifferent to, or reckless about a test being medically unnecessary when it has, in-hand, a requisition form from OMNI.

*Id.* at \*20. The Court further cautioned that a contrary position could cause laboratories—or in this case pharmacies—to second guess orders from a physician or provide less expensive care than what was prescribed, all in an effort to avoid FCA (or even criminal) liability. *Id.* at \*21. Absent "some other chicanery at play,"[1] the First Circuit held, as a matter of first impression, that in FCA cases alleging Medicare fraud, "a laboratory can rely on a doctor's order to show that the test is reasonable and necessary." *Id.* at \*22 (citing *United States v. Bertram*, 900 F.3d 743, 760 (6th Cir. 2018) (explaining that in criminal health care fraud case, laboratory may generally rely on doctor's order as establishing medical necessity)). Generally, a doctor's order for medical testing will

---

[1] To the extent the Government asserts that the evidence here reflected additional facts, including fraudulent conduct by actors outside the pharmacy or even the pharmacy's failure to collect copays prior to shipping prescriptions in violation of the ESI manual, the First Circuit emphasized that False Claims Act liability turns on the defendant's scienter at the time an alleged false claim was submitted. *Id.* at \*30-31 ("So even if some later information surfaced that could grind against a determination of medical necessity, that shouldn't factor into scienter of the falsity of medical necessity at the time the tests were submitted."). As applied to this case, even to the extent that concerns about specific doctors or sales representatives were raised (and then investigated), that may have occurred after a claim was submitted. *See, e.g.*, Tr. at 2389:2-1 (when the pharmacy learned through a news report that Dr. Bolger had been issuing prescriptions without seeing patients, Mr. Johnston directed that all of the claims from this doctor be reversed and the insurance company be refunded at the pharmacy's loss). And of course, the obligation to generally collect copays prior to shipping did not become a requirement, at least insofar as ESI was concerned, until after the pharmacy ceased operations. *Compare* GX 62, § 2.2, *with* DX 295, § 2.3.

G IBBONS P.C.

December 8, 2025
Page 3

provide "a safe harbor of medical necessity" the applicability of which a FCA relator must rebut in order to survive summary judgment.  *Id.*

In an effort to avoid the effect of that safe harbor, Omni Healthcare pointed to internal MD Labs communications discussing billing practices, medical literature about UTI testing, and evidence that MD Labs was bundling tests by way of a pre-printed prescription form in order to drive up costs.  *Id.* at *25, 31.  Even crediting that evidence, the First Circuit concluded that there Omni Healthcare had failed to demonstrate why MD Labs should have second-guessed doctors' determinations of patient medical needs.  *Id.* at *25.

As the Court well knows, this prosecution was based entirely on whether the Defendants conspired to submit claims for prescriptions that were not medically necessary.  *See* Ind. ¶ 14 (setting forth the sole object of conspiracy, which was "to unlawfully enrich themselves by causing the submission of false and fraudulent insurance claims to the Pharmacy Benefits Administrator for medically unnecessary Central compounded prescription medications and by sharing in the profits realized by Central Rexall from payments for those compounded prescription medications.").  But just as was the case in *Omni Healthcare*, every claim in this case was supported by a prescription that was signed by a doctor or nurse practitioner authorized to prescribe.  For the reasons set forth extensively in Defendants' moving brief, the Government produced no evidence that Defendants knew that those prescriptions were medically unnecessary, *see* ECF No. 327-1 at 36-39, but even beyond that fact, the First Circuit's decision supports Defendants' argument that Central Rexall pharmacists were not required to second guess signed doctor orders.  *See id.* at 35 (citing Government's expert witness testimony that, from a pharmacist's perspective, a doctor's signature is not something that could ever be second-guessed with regard to medical necessity).  The applicability of this principle to this case is obvious, though the reasoning is even more compelling in a criminal case, where freedom rather than just money is on the line, and where the standard of proof is higher than in civil cases—even FCA cases, upon which both parties have relied.  *See id.* at 67-68 (noting profound questions of "fair notice" raised by *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 195 (2016), and citing cases pursuant to which such notice requirements are more rigorously enforced against the Government in criminal cases); ECF No. 342 at 77.

### *Al-Sabah v. World Bus. Lenders, LLC*, 2025 U.S. App. LEXIS 30939 (4th Cir. Nov. 26, 2025)

The fraud at issue in *Al-Sabah*, as in this case, was undisputed.  An individual not a party to the case (Agbodjogbe) defrauded Plaintiff Al-Sabah out of nearly $7.8 million, which Agbodijogbe used to enrich himself, including by purchasing a personal residence.  *Id.* at *6-7.  Agbodgjogbe then applied for loans from the defendant World Business Lenders, LLC ("WBL"), which he ultimately received and secured with the residence purchased using funds fraudulently obtained from the plaintiff.  *Id.* at *9-10.  Plaintiff sued WBL, alleging that the lender facilitated and participated in the fraud—that is, that WBL aided and abetted the fraud by encumbering the collateral real estate with liens, which effectively transformed the misappropriated funds from real property to liquid proceeds and obstructed Plaintiff's ability to recover the secured real estate.  *Id.*

GIBBONS P.C.

December 8, 2025
Page 4

at *17. In order to prevail, plaintiff was required to show that the defendant knew of or was willfully blind to the tortious act.[2]

To support her claim, plaintiff adduced evidence that, across four loan applications, WBL saw a number of red flags that should have made clear that fraud was afoot; nevertheless, WBL funded three of the loans. Specifically, "WBL identified numerous character concerns associated with the loan and flagged the file as a high fraud risk," requesting more information about the source of certain wires and documentation supporting the explanation that the funds were gifts from a business partner (which WBL received) and that they were partially used to purchase a condo in New York. *Id.* at *10, *12. Nevertheless, some at WBL suspected "money laundering because the transfer amounts did not square with [the purported business's] revenues," and escalated those concerns internally. *Id.* WBL, however, relied upon the fact that a third party— the bank with which Agbodjogbe had an account—had its own regulatory obligations to investigate and clear large deposits; WBL therefore assumed that some level of due diligence had been undertaken by other professionals involved with Agbodjogbe. *Id.* at *11. WBL also spoke with and relied on representations from Agbodjogbe's CPA, who confirmed Agbodijogbe's explanation for the wires, and obtained proof of purchase of the NY property. *Id.* at *11-12.

With respect to a third and final loan, Agbodjogbe pledged his residential property, which had already been liened by plaintiff—a further red flag that WBL was involved in fraudulent activity by working with Agbodjogbe. WBL obtained a title report specifically identifying the Notice of Lis Pendens from plaintiff's separate suit against Agbodjogbe and identified the underlying litigation, alleging fraud, via a PACER search. *Id.* at *14-15. By way of investigation, WBL asked the title company to review the report again and received an updated title report, as well as a professional attorney opinion letter, but did not investigate or inquire further regarding the specifics of the litigation. *Id.* at *16. Since Agbodjoge was a repeat customer and had repaid larger loans, WBL funded the loan, secured by the residence. *Id.* at *17.

Following a bench trial, the trial court concluded that WBL was willfully blind to Agbodjogbe's fraud when it funded the third loan, but not any of the prior loans. *Id.* at *17-18. The Fourth Circuit agreed that WBL was not willfully blind to Agbodjogbe's fraud when it funded the first two loans, but reversed the trial court decision finding willful blindness even with respect to the third loan. In so concluding, the Circuit looked to "what WBL did 'to avoid confirming a high probability of wrongdoing,"[3] *id.* at *20, and rejected plaintiff's contentions—consistent with

---

[2] The tort of aiding and abetting under Maryland law at issue in this case requires that a person have "by any means . . . encouraged, incited, aided or abetted the act of the direct perpetrator of the tort." *Id.* at *18. "To prevail, the plaintiff must prove: (a) a primary actor committed a tort; (b) the defendant knew of, or was willfully blind to, that tortious act; and (c) the defendant substantially assisted the actor in bringing about its occurrence." *Id.* at *18-19.

[3] In this case, the jury was required to undertake a similar inquiry: As charged, the jury could "find that Mr. Johnston and Mr. Brockmeier knowingly conspired to commit healthcare fraud and wire fraud based upon evidence which proves that: . . . Mr. Johnston and Mr. Brockmeier consciously took deliberate actions to avoid learning or made deliberate efforts to avoid knowing about the

GIBBONS P.C.

December 8, 2025
Page 5

the Government's arguments at trial against Mr. Johnston—that WBL "did not do enough" and that its "failure to investigate these matters further demonstrates its willful blindness": "At its core, this argument is no more than a post hoc critique of the way WBL runs it business and confuses possible negligence with the entirely separate concept of aiding and abetting fraud." *Id.* at *20, 22. "Just because WBL *might* have discovered Agbodjogbe's fraud *if* it had investigated any of these matters further does not mean that WBL was willfully blind for not doing so." *Id.* at *23 (emphasis in original).

Specifically with respect to the third loan, the Fourth Circuit focused on the information that WBL had before it at the time the loan was funded and concluded that it was reasonable to rely on the independent title insurance company, which had issued an updated title report and agreed to insure the property, and the opinion of Agbodjogbe's counsel, which represented that, after due diligence, there was no litigation that could adversely impact the ability to repay the loan. *Id.* at *27-33 ("Hindsight-focused erroneous conclusions led the district court to find willful blindness based on evidence that, at best, shows negligence."). The fact that the defendant could have investigated further and identified fraud does not mean that there was a deliberate effort to turn a blind eye to fraud: "Perhaps WBL *could have* sought more. Maybe another lender would have done more, maybe not. But WBL's decision not to is not evidence of a deliberate effort to avoid uncovering Agbodjogbe's fraud." *Id.* at *32-33. At best, the Court concluded, WBL's actions were negligent or reckless, but they did not constitute willful blindness of civil fraud. *Id.* at *33.

Again, the applicability of this holding to this case is clear: as in that civil case, the thrust of the case against the defendants was, as the Defendants here have shown, willful blindness. *See* Tr. 38-39 (Gov't Opening Statement arguing that "defendants . . . did nothing to investigate or stop" fraud); Tr. 3899 (Gov't Closing Statement emphasizing willful blindness instruction and stating that "[r]ather than ask questions, the defendants stuck their head in the sand"); Tr. 3661:16-19 (Rule 29 arguments that red flags showed Defendants "certainly knew that there was no possible way a doctor could be conducting real evaluations of these patients with that data that they reviewed and they had available to them").[4] For the reasons already argued, the evidence at trial

existence of the submission of false and fraudulent claims to the pharmacy benefits administrator for medically unnecessary compounded prescription medications." Tr. 3768-69.

[4] Indeed, the Government lacked any direct evidence that Defendants were ever told that these prescriptions were medically unnecessary or the product of bribes or kickbacks. *See, e.g.*, Tr.2232:25-2233:2 (Bill Hickman testimony that he never told anyone at Central Rexall about fraud he and his representatives committed); 2154:22-2156:6 (Hickman testimony that he did not tell Central Rexall that he was paying patients); Tr.3011:15-3012:7 (Casseri testimony that he was never told about fraudulent prescriptions by Hickman); Tr.2157:6-8 (Hickman testimony that he never told Central Rexall that he gave gifts to Dr. Gaffney); Tr.2232:20-2233:2 (Hickman testimony that he learned from a patient "that [a] rep was paying cash to [a] patient" and that he never informed Central Rexall of this fact); Tr.645:3-16 (Candace Craven testimony that she did not inform Central Rexall of fraud); Tr.647:1-3 (Craven testimony to never having spoken with anyone from Central Rexall); Tr.1671:1-17 (Dr. Gaffney testimony that he never told Central

GIBBONS P.C.

December 8, 2025
Page 6

was not, as in *Al-Sabah*, that nothing was done or that Defendants relied exclusively on representations of third parties; indeed, the evidence was, among many other things, that Defendants hired and then did nothing to limit the power or authority of their compliance officer Ryan Boyle (whose recommendations they largely accepted), more closely monitored or terminated sales representatives when there was evidence of fraud, contacted doctors to confirm compliance with TRICARE doctor-patient relationship requirements, and (critically), implemented procedures whereby every patient was called to verify their prescription details, which contacts were openly documented. *See also* ECF No. 327-1 at 89-98 (detailing extensive record evidence refuting willful blindness). Thus viewed, *Al-Sabah* was—like this case—one that risked the imposition of liability based upon mere negligence based upon willful blindness, though negligence was not a sufficient basis to find either civil fraud (in *Al-Sabah*) much less criminal guilt (here), the very danger about which this Court has repeatedly expressed concern. *See* Oct. 27, 2025 Tr. at 30-31 (noting concerns with willful blindness instruction allowing a jury to convict "based upon negligence or recklessness and not based upon intentionality"); ECF 327.1 at 93.

We again thank the Court for its continued careful consideration of this matter.

Respectfully submitted,

*s/ Lawrence S. Lustberg*
Lawrence S. Lustberg

cc:    All counsel of record (via ECF)

---

Rexall of his fraud); Tr.1766:1-8 (Keith Ritson testimony that he never told Central Rexall of fraud); Tr.1504:23-25 (Matthew Tedesco testimony that he never discussed fraud he committed with Chris Casseri); Tr.3402:7-23 (Robert Bessey testimony that he did not inform Central Rexall of fraud). Accordingly, the Government relied heavily on willful blindness in obtaining and then supporting the conviction in this matter. *See* ECF No. 342 at 61-67.

**Attachment 1**

# *United States ex rel. Omni Healthcare Inc. v. Md. Spine Sols. LLC*

United States Court of Appeals for the First Circuit

December 1, 2025, Decided

No. 25-1110

**Reporter**

2025 U.S. App. LEXIS 31085 *; 2025 LX 571491; __ F.4th __; 2025 WL 3442574

UNITED STATES, ex rel. OMNI HEALTHCARE INC., Plaintiff, Appellant, STATE OF ALASKA, ex rel. Omni Healthcare, Inc.; STATE OF CALIFORNIA, ex rel. Omni Healthcare, Inc.; STATE OF COLORADO, ex rel. Omni Healthcare, Inc.; STATE OF CONNECTICUT, ex rel. Omni Healthcare, Inc.; STATE OF DELAWARE, ex rel. Omni Healthcare, Inc.; DISTRICT OF COLUMBIA, ex rel. Omni Healthcare, Inc.; STATE OF FLORIDA, ex rel. Omni Healthcare, Inc.; STATE OF GEORGIA, ex rel. Omni Healthcare, Inc.; STATE OF HAWAII, ex rel. Omni Healthcare, Inc.; STATE OF ILLINOIS, ex rel. Omni Healthcare, Inc.; STATE OF INDIANA, ex rel. Omni Healthcare, Inc.; STATE OF IOWA, ex rel. Omni Healthcare, Inc.; STATE OF LOUISIANA, ex rel. Omni Healthcare, Inc.; STATE OF MARYLAND, ex rel. Omni Healthcare, Inc.; STATE OF MASSACHUSETTS, ex rel. Omni Healthcare, Inc.; STATE OF MICHIGAN, ex rel. Omni Healthcare, Inc.; STATE OF MINNESOTA, ex rel. Omni Healthcare, Inc.; STATE OF MONTANA, ex rel. Omni Healthcare, Inc.; STATE OF NEVADA, ex rel. Omni Healthcare, Inc.; STATE OF NEW JERSEY, ex rel. Omni Healthcare, Inc.; STATE OF NEW MEXICO, ex rel. Omni Healthcare, Inc.; STATE OF NEW YORK, ex rel. Omni Healthcare, Inc.; STATE OF NORTH CAROLINA, ex rel. Omni Healthcare, Inc.; STATE OF OKLAHOMA, ex rel. Omni Healthcare, Inc.; STATE OF RHODE ISLAND, ex rel. Omni Healthcare, Inc.; STATE OF TENNESSEE, ex rel. Omni Healthcare, Inc.; STATE OF TEXAS, ex rel. Omni Healthcare, Inc.; STATE OF VERMONT, ex rel. Omni Healthcare, Inc.; STATE OF VIRGINIA, ex rel. Omni Healthcare, Inc.; STATE OF WASHINGTON, ex rel. Omni Healthcare, Inc., Plaintiffs, v. MD SPINE SOLUTIONS LLC, d/b/a MD LABS INC.; DENIS GRIZELJ; MATTHEW RUTLEDGE; DOE HEALTHCARE PROVIDERS 1-100, Defendants, Appellees.

**Prior History: [*1]** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS. Hon. Patti B. Saris, U.S. District Judge.

*Omni Healthcare, Inc. v. MD Spine Sols. LLC, 761 F. Supp. 3d 356, 2025 U.S. Dist. LEXIS 1680, 2025 WL 32676 (Jan. 6, 2025)*

**Counsel:** Evan Bianchi, with whom Thomas M. Kenney and Spiro Harrison & Nelson LLC were on brief, for appellant.

Seth B. Orkand, with whom Julianna M. Charpentier, Danielle H. Tangorre, Edward J. Heath, Scott T. Garosshen, and Robinson & Cole LLP were on brief, for appellees.

**Judges:** Before Montecalvo, Lynch, and Thompson, Circuit Judges.

**Opinion by:** THOMPSON

# Opinion

**THOMPSON**, **Circuit Judge**. Today, we're reckoning with a qui tam Medicare fraud case arising under the *False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq.* On its face, this appeal has a bit of everything: a labyrinthine regulatory structure, a fraud-hunting doctor, an alleged "smoking gun" email exchange, and a lot of information -- perhaps more than most readers would care to know -- about urinary tract infection ("UTI") tests.

But behind all that fanfare, the question we face is straightforward: did OMNI Healthcare (our relator/appellant) produce enough evidence that MD Labs (our main defendant/appellee) "knowingly" submitted false Medicare claims to avoid the summary judgment scythe?[1] See *31 U.S.C. § 3729(a)(1)(A)*. The

---

[1] We'll take a second to get the parties straight. Because this is a qui tam case, OMNI isn't serving as a plaintiff in its own right. See *United States ex rel. Schutte v. SuperValu Inc., 598 U.S. 739, 743, 143 S. Ct. 1391, 216 L. Ed. 2d 1 (2023)*. Instead, it's a relator (a private party litigating on the government's behalf) suing while standing in the shoes of the United States, 29

district court said "No." We agree. Read on to see why.

**HOW WE GOT HERE**

**A.**

As our opening line intimated, **[*2]** this case sits at the intersection of the Medicare Act and the FCA. For now, we'll provide the reader with some context about the *Medicare Act, 42 U.S.C. § 1395 et seq.*, and our breakdown of the FCA will come later.

Signed into law during the administration of President Lyndon B. Johnson, the Medicare Act established "a national health insurance program for the elderly and the disabled." *Warder v. Shalala, 149 F.3d 73, 75 (1st Cir. 1998)*. It's a sprawling and serpentine statute that we've reckoned with on many different occasions and in many different circumstances.[2]

Yet our focus today is on a narrow -- but important -- part of it. Generally, Medicare can reimburse medical providers for expenses incurred while providing services to patients. See *42 U.S.C. § 1395x(s)(2)(C)* (defining diagnostic services covered by Medicare Part B); see also *42 C.F.R. § 410.28* ("Medicare Part B pays for hospital or [other] diagnostic services furnished to outpatients, including drugs and biologicals required in the performance of the services[.]"). But there's some qualifications to that rule. The one our parties key in on is that "no payment may be made" for "any expenses incurred for items or services" that "are not reasonable and necessary for the diagnosis or treatment of illness

or injury or to improve the functioning of a malformed **[*3]** body member." *42 U.S.C. § 1395y(a)(1)(A)*. Or, paraphrasing, to secure a Medicare reimbursement, the expense must be "reasonable and necessary."

Of course, that prompts an important question: what expenses are "reasonable and necessary"? The Act doesn't tell us, but it does vest the Secretary of Health and Human Services with the power to decide. See *42 U.S.C. § 1395ff*; see also *Heckler v. Ringer, 466 U.S. 602, 617, 104 S. Ct. 2013, 80 L. Ed. 2d 622 (1984)*. Still, the Secretary isn't making those decisions all alone; the Centers for Medicare and Medicaid Services (or "CMS") helps, too. See *Health Care Financing Administration; Statement of Organization, Functions, and Delegations of Authority, 46 Fed. Reg. 56911, 56911-34 (Nov. 19, 1981)* (establishing the Health Care Financing Administration, which was later renamed CMS); see also *Kort v. Burwell, 209 F. Supp. 3d 98, 102 (D.D.C. 2016)* (describing this history). And CMS also "contracts with private entities to which healthcare providers and suppliers submit their claims for reimbursement." *Kort, 209 F. Supp. 3d at 102*. These contractors (somewhat confusingly tied to our regional circuit courts) are each "responsible for a particular region of the country." *Odell v. U.S. Dep't of Health & Hum. Servs., 995 F.3d 718, 720 (9th Cir. 2021)*. (Keep those contractors in mind, because we'll run into one later.)

Zooming back out, the Secretary can determine whether an expense is reasonable and necessary either "by promulgating a generally applicable rule or by allowing individual adjudication." *Heckler, 466 U.S. at 617*. As for the "generally applicable" rules, there are two kinds. Id.; see *Odell, 995 F.3d at 720* (describing this **[*4]** framework).

The first are "National Coverage Determinations," or "NCDs." Those are decisions "with respect to whether or not a particular item or service is covered nationally." *Kort, 209 F. Supp. 3d at 102* (quoting *42 U.S.C. § 1395ff(f)(1)(B)*). The Secretary, through CMS, issues NCDs. Id. And these are binding on Medicare contractors nationwide. *Odell, 995 F.3d at 720*.

Along with NCDs are "Local Coverage Determinations," or "LCDs." And that's where our private contractors come in. If there isn't a clear national coverage decision, Medicare coverage decisions are left to local contractors. See *42 U.S.C. § 1395ff(f)(2)(B)*; *Willowood of Great Barrington, Inc. v. Sebelius, 638 F. Supp. 2d*

---

[2] See, e.g., *Hosp. Amerimed Cancun S A DE C V v. Martin's Point Health Care, Inc., 149 F.4th 82, 85 (1st Cir. 2025)* (considering a Medicare administrative exhaustion requirement); *Medicaid & Medicare Advantage Prods. Ass'n of P.R., Inc. v. Emanuelli Hernández, 58 F.4th 5, 7-10 (1st Cir. 2023)* (considering the relationship between Puerto Rico's Act 90 and a federal Medicare plan); *Warder, 149 F.3d at 75* (considering an administrative ruling interpreting Medicare Part B).

states and commonwealths, and the District of Columbia. And we'll note here that MD Labs (formally known as MD Spine Solutions LLC) isn't the only defendant/appellee; so, too, are its co-founders Denis Grizelj and Matthew Rutledge, as well as 100 unnamed healthcare providers. But unless more specificity is necessary, we'll use MD Labs for all of the appellees to save keystrokes.

*98, 106 (D. Mass. 2009)*. And a local contractor can issue general determinations in the form of LCDs about whether services are "reasonable and necessary" within its jurisdiction. See *42 U.S.C. § 1395ff(f)(2)(B)*.

But if there isn't an on-point LCD or NCD, that isn't the end of it. Contractors can also make case-by-case determinations. See *Odell, 995 F.3d at 720* ("Absent a regulation, a national coverage determination, or an LCD, the Medicare contractor proceeds on a case-by-case basis to determine whether a service is reasonable and necessary."). That's important to our case today, as the reader will see, because no NCDs or LCDs governed the issue that our parties faced. Instead, the case concerns how a group of providers and a lab grappled **[*5]** with medical necessity absent those more generalized guiding determinations.

**B**.

That's an adequate introduction to Medicare, but we need a bit more table-setting. As the reader will soon learn, much of this case is about different methods for UTI testing -- and whether some are medically "necessary" under the Medicare reimbursement provision that we just discussed. So now's as good a time as any to tee up the debate.[3]

We'll start with some basics: the human urinary tract (the "UT" in "UTI") includes the bladder, the urethra, and the kidneys. See U.S. Ctrs. for Disease Control and Prevention, *Urinary Tract Infection Basics* (Jan. 22, 2024), https://www.cdc.gov/uti/about/index.html [https://perma.cc/Q8TB-NKHZ]. And a UTI is a "common" infection, normally happening when "bacteria, often from the skin or rectum, enter the urethra and infect the urinary tract." Id. It's so common, in fact, that one study estimates that UTIs affect more than 10 million patients in the United States each year.

Doctors test for UTIs in two ways relevant to our case.[4] For decades, the "gold standard" test for UTIs has been the bacterial urine culture ("BUC") test. That test requires placing a urine sample on a growth **[*6]** medium (think: petri dish) and waiting between twenty-four and seventy-two hours to see if certain bacteria

grow. The growth of that select bacteria leads to the diagnosis.

But medical advancements have expanded options for UTI testing. Now there's the PCR test, and that one uses polymerase chain reaction (thus, "PCR") technology to amplify copies of a DNA segment in the urine sample.[5] Our understanding is that PCR tests somehow lock into a segment of DNA in a urine sample, allowing the scientist to identify the genetic material present belonging to a particular biological origin -- like a pathogen. These tests can apparently pinpoint what's wrong 24 hours faster than BUC tests, given the time those BUC tests need for the bacteria culture to grow. That faster diagnostic turnaround naturally lends itself to faster appropriate treatment of infections, too. So PCR testing is by some considered more efficient and accurate but (and here's the kicker) also much more costly than BUC testing.

**C**.

All the prelims explained, we can get into the facts of today's case. We'll start with our alleged fraudsters: MD Labs, an independent clinical laboratory in Reno, Nevada, founded in 2011 by Matthew Rutledge **[*7]** and Denis Grizelj.

MD Labs got its start by processing urine drug tests. But in 2017, it began offering PCR UTI testing. It decided to get into UTI testing because, in processing drug tests, a lot of patient specimens came in "resembling having the characteristics of an infection" (co-founder Rutledge's words). Yet because many specimens that MD Labs received were from patients on certain pharmaceuticals, the patients' UTI symptoms were concealed. The concern? In Rutledge's phrasing, there "might be a lot of undiagnosed urinary tract infections coming through the lab" that better testing could fix. So MD Labs entered the UTI testing business to help solve that patient-care gap.

One email exchange at MD Labs early into their PCR testing days is (at least in OMNI's view) critical, so that's where we'll turn next.[6] In January 2018, as MD Labs

---

[3] Disclaimer: this opinion is not intended to provide medical advice.

[4] There may be more ways to test for UTIs that we don't know about, but they aren't relevant for our discussion.

[5] The reader might remember PCR testing becoming prominent during the COVID-19 pandemic.

[6] Like most readers, we typically loathe long block-quotes. But because OMNI puts a lot on this email exchange, and MD Labs argues that OMNI's taking it out of context, we figured it

began rolling out PCR UTI testing, Rutledge drafted an email to Noridian, the private Medicare contractor overseeing MD Labs' region, and shared his draft email with his co-founder Grizelj for review. Rutledge wrote to Grizelj, in an email titled "Noridian Email on UTI billing & coding," as follows:

Hey Dude,

What do you think about this letter to Dr **[*8]** Lurvey at Noridian to give them a heads-up on our new molecular diagnostic testing? I think it would be a prudent move to at least document that we told CMS of this new technology and advised them to modify their billing and coding. I think it's our duty, in a way.

Lemme know what you think of this first draft...

Below that last line, Rutledge included a draft email to Dr. Lurvey. Here it is:

Hi Dr Lurvey,

Happy New Year. I hope this email finds you well.

I'm writing to let you and Noridian know of some new clinical laboratory testing we are now offering which is becoming very popular in the area of urinary tract infections (UTI's).

Genetic analytical technology is now allowing us to pinpoint DNA signatures from various infectious pathogens in order to positively identify them with almost 99% certainty very quickly and relatively affordably. We couple this with antibiotic susceptibility testing here at the lab and the result is a report provided to physicians that positively identifies the infecting agent and what antimicrobials will be most effective at killing it and treating the infection.

We are finding physicians are excited about this test and starting to order it in greater numbers. **[*9]** Thus, you will be seeing an increasing number of claims submitted by our laboratory and labs around the country for this testing in 2018 and beyond.

But... the current CPT coding system doesn't adequately describe this testing very well and the fee schedule payment is quite robust for the work being performed. New technology is able to do this work much more affordably than it could in the past. I'd recommend we have a discussion on how to best change the current payment system to best accommodate this new testing technology so that CMS can develop a fair compensation system and simplified coding system that makes billing easy

and avoids future overpayments to labs.

I'd strongly advise having this discussion sooner, rather than later. Let me know when you are available.

- Matthew Rutledge
President
MD Labs[7]

Later that day, Grizelj wrote back to Rutledge. Here's that email, too:

I think we should wait on this and instead of asking them to modify their rates, we should ask them to give us guidance on medical necessity instead. I don't think we are going to a significant amount of testing that would reach Millennium-like levels so we may still end up being a blip. I am not sure how many Pathnostics **[*10]** is currently doing but I am hoping that they are at least aware of this testing currently.[8]

The other reasons I want to wait are 1) I want some time to leverage this on some of the commercials carriers we are not in network in yet to hopefully backdoor a tox contract and 2) I would like for them to re-visit looking at Rxight and adopting a similar model that Pathway Genomics (or whoever it was) has in their Medicare jurisdiction.

I get what you are trying to do but I would like to wait at least 6 months if that's cool with you. We haven't even made a dent yet.

Denis Grizelj

And that's the entire email exchange relevant here. It's uncontested that Rutledge and Grizelj did not follow up with Noridian about the things they discussed in their exchange. Instead, MD Labs continued to roll out PCR UTI testing. And that's how it encountered OMNI, our fraud-hunting relator.

Owned by Dr. Craig Deligdish, OMNI is a broad-spanning medical practice, boasting seven offices with more than twenty medical professionals across Brevard County, Florida.[9] As a medical practice goes, OMNI

---

[7] We've omitted only Rutledge's proposed post-script about Dr. Lurvey being the Contractor Medical Director for Noridian.

[8] We've inserted an extra line between paragraphs here for readability, but otherwise (aside from the omission noted in the last footnote) left the text of the emails entirely unaltered.

[9] The careful reader will note that we've said OMNI's in Florida and MD Labs is based out of Nevada. It isn't exactly clear to us how the two, in practice, worked together -- for instance, was OMNI shipping every urine sample practically cross-

best to include the whole thing in our discussion.

professionals see patients and diagnose them. And when an OMNI provider determines that a patient needs a particular test, **[\*11]** the provider selects the test in the patient's electronic medical record, and a medical assistant completes the form for a lab (like MD Labs) to do the requested test. Afterward, the lab can submit a claim to Medicare (via the local contractor) to reimburse or subsidize the test. As long as the service is covered, the claim is paid. See *42 U.S.C. § 1395l(a)*; *Odell, 995 F.3d at 720*.

Between 2017 and 2019, that process played out repeatedly between our parties here: OMNI sent MD Labs nearly 600 requisition forms and samples for UTI testing, MD Labs ran those tests and reported back the results, and Medicare reimbursed MD Labs for at least some of those tests.[10]

Here's the twist. The whole time, Dr. Deligdish instructed his OMNI medical assistants to order only PCR UTI testing from MD Labs, even if the provider had requested the older BUC test. The reason is that, as Dr. Deligdish later admitted, he wanted to beef up a Medicare fraud case against MD Labs.[11] It's undisputed that all the PCR UTI tests that MD Labs delivered for OMNI patients resulted from this instruction. But nothing in the record suggests that MD Labs knew the inner workings of OMNI's qui tam side-tactics -- all it knew was that a doctor's office had ordered UTI tests **[\*12]** for its patients.

**D**.

OMNI then sued MD Labs on behalf of the governmental coalition we described in Footnote 1 for a host of claims, including Medicare fraud under the FCA. The relevant Medicare fraud theory? PCR tests are far more expensive yet confer no greater benefit than BUC tests, and thus (in OMNI's view), are medically unnecessary. So MD Labs, in recouping payment for PCR tests, submitted claims that didn't comply with

Medicare's "reasonable and necessary" standard; by doing so, it "knowingly" submitted false claims. (More on what "knowingly" means shortly.)

Some other claims in the case (claims whose details are immaterial here) must have had teeth, because MD Labs entered a settlement agreement with OMNI and the federal government to resolve them. As part of the settlement, OMNI retained the right to pursue this claim against MD Labs about unnecessary test submissions.

So that aspect of the case carried on. Complaints were amended, motions to dismiss were filed but largely denied (and not on appeal), and discovery ensued all in the usual course. Following the close of discovery, each party moved for summary judgment, although in different ways. MD Labs wanted summary judgment **[\*13]** on all of OMNI's remaining claims. OMNI sought partial summary judgment on three questions of law relating to the FCA standard.

The district court granted summary judgment to MD Labs in full (and thus denied it to OMNI). OMNI only appeals the district court's decision as to one issue -- the "medically unnecessary" theory of FCA liability that we've described above -- so we skip detailing the district court's reasoning as to the others.

In its summary judgment filing below, MD Labs sought judgment for the "medically unnecessary" theory of FCA liability on three grounds: (1) because the claims for reimbursement were not false because the tests were not medically unnecessary; (2) because Dr. Deligdish broke the causal chain by ordering the PCR tests himself; and (3) because MD Labs and its employees did not know that MD Labs was performing medically unnecessary tests.

The district court determined summary judgment should be granted on the third argument (what it christened the "scienter" argument) alone, so it didn't address the other two arguments we just mentioned. As for scienter, the district court reasoned that MD Labs offered evidence showing how it believed PCR testing was "superior" **[\*14]** to BUC testing for diagnosing UTIs. And the district court explained that none of OMNI's evidence to the contrary raised a triable issue of fact about MD Labs' purported knowledge that the tests were unnecessary. (OMNI now puts all that evidence in front of us and asks us to draw the opposite conclusion, so we'll save any further explanation for later.) Largely relying on its holding that OMNI's federal FCA claims failed, the district court also granted summary judgment

---

country just to have MD Labs test it? -- but the parties don't give us any insight into those logistics that, by our lights, are immaterial to today's case anyway.

[10] The parties don't provide us a precise figure of how many tests were submitted for Medicare reimbursement.

[11] This is perhaps unsurprising when considered alongside the fact that OMNI, by its own account, is a frequent flyer in the qui tam world, having recovered tens of millions of dollars on behalf of the government in other similar cases.

on OMNI's analogue state-law claims.

OMNI timely appealed the above-described part of the district court's summary judgment order. And that led to the appellate task now before us.

## OUR TEST

"We review an order granting summary judgment de novo." *Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 377 (1st Cir. 2018)*. The standard is a familiar one: a court can grant summary judgment "only if the record, construed in the light most amiable to the nonmovant, presents no genuine issue as to any material fact and reflects the movant's entitlement to judgment as a matter of law." Id. (cleaned up); see *Fed. R. Civ. P. 56(a)*.

A word also on the mechanics of summary judgment, as they drive our decision. The party "seeking summary judgment must, at the outset, inform the court of the basis for its motion and identify the **[\*15]** portions of the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, that demonstrate the absence of any genuine issue of material fact." *Irobe, 890 F.3d at 377* (cleaned up). As long as the movant "crosses this modest threshold," it becomes the nonmoving party's duty to, "with respect to each issue on which it would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in its favor." Id. (cleaned up). To avoid the axe, the nonmovant must identify "significantly probative evidence favoring" its position. Id. (cleaned up).

## OUR DIAGNOSIS

Like we said at the start, the question on appeal is rather narrow: did OMNI produce enough evidence that MD Labs "knowingly" submitted a false claim to survive summary judgment? See *31 U.S.C. § 3729(a)(1)(A)*. Like the district court, we think not. We'll start with a primer on FCA scienter and then explain why OMNI's case can't go on.

### A.

The FCA "permits private parties to bring lawsuits in the name of the United States . . . against those who they believe have defrauded the Federal Government."

*United States ex rel. Schutte v. SuperValu Inc., 598 U.S. 739, 743, 143 S. Ct. 1391, 216 L. Ed. 2d 1 (2023)*.

Relevant here, the FCA imposes liability on anyone who "knowingly presents, or causes to be presented, a false or fraudulent **[\*16]** claim for payment or approval" to the federal government. *31 U.S.C. § 3729(a)(1)(A)*. So for a successful FCA claim under this part of the statute, the relator needs to show: (1) that there's a "false or fraudulent claim" made to the government, (2) that the defendant "presents, or causes to be presented," that claim, and (3) that the defendant did so "knowingly." See id. Our appeal today centers on that third element, "knowingly," so we'll next turn to what that means.

Thankfully, the FCA defines it for us, and the term encompasses "three mental states." *SuperValu, 598 U.S. at 749*. It reaches: (1) a person who "has actual knowledge of the information," (2) one who "acts in deliberate ignorance of the truth or falsity of the information," and (3) one who "acts in reckless disregard of the truth or falsity of the information." *31 U.S.C. § 3729(b)(1)(A)(i)-(iii)*.[12] But what do those three states of mind mean? We can tell you. Actual knowledge "refers to whether a person is aware of information" about the claim's falsity. *SuperValu, 598 U.S. at 751* (cleaned up). Deliberate ignorance instead "encompasses defendants who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statement's truth or falsity." Id. And reckless disregard "similarly **[\*17]** captures defendants who are conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims anyway." Id.

A couple more points. The scienter standard turns on the defendant's "knowledge and subjective beliefs -- not [on] what an objectively reasonable person may have known or believed." *Id. at 749*. And the relevant inquiry focuses us on "what the defendant thought when submitting the false claim -- not what the defendant may have thought after submitting it." *Id. at 752*.

So "in short, either actual knowledge, deliberate ignorance, or recklessness" regarding the claim's falsity "will suffice" to show scienter. *Id. at 750*.

---

[12] We'll note here, as the Supreme Court did, that "proof of specific intent to defraud" is not necessary. *SuperValu, 598 U.S. at 750 n.3* (quoting *31 U.S.C. § 3729(b)(1)(B)*).

**B.**

Scienter summarized, we'll now examine the merits.[13] OMNI makes two main arguments for reversal. First, in its view, the record shows how MD Labs and its founders recognized and ignored the risk of PCR UTI testing being medically unnecessary. Second, it submits that the district court relied on what OMNI dubs "irrelevant and inapposite evidence" in drawing the very conclusion that OMNI sought to avoid.

But we think the natural place to start is not OMNI's briefing, but MD Labs'. And MD Labs opens by contending that it had no reason to **[*18]** override OMNI's orders for PCR tests or OMNI's certifications that those tests were medically necessary. To support that point, MD Labs directs us to *United States ex rel. Groat v. Boston Heart Diagnostics Corp., 296 F. Supp. 3d 155 (D.D.C. 2017)*. That court held that "a laboratory cannot and is not required to determine medical necessity, but rather is permitted to rely on the ordering physician's determination that the laboratory tests billed to Medicare are medically necessary." *Id. at 158*. We agree.

_____

[13] One more minor point as we begin to forge through the merits. Despite OMNI's suggestion that summary judgment was inappropriate because it was a scienter-heavy analysis, it's long been good law in our circuit that scienter can be decided on summary judgment. See, e.g., *Stepanischen v. Merchs. Despatch Transp. Corp., 722 F.2d 922, 928-29 (1st Cir. 1983)*. It's true that because "the state of mind of one of the parties is crucial to the outcome of the case, resort to summary judgment is vested with more than usual difficulty" in these types of cases. *Id. at 928*. "But the presence of issues involving state of mind, intent, or motivation does not automatically preclude summary judgment." *Id. at 929*. Of course a party "against whom summary judgment is sought is not entitled to a trial simply because [it] has asserted a cause of action to which state of mind is a material element." Id. (cleaned up). A party with a state-of-mind-based claim still must "produce the requisite quantum of evidence to enable [it] to reach the jury with [its] claim." Id. (cleaned up). And particularly here, where OMNI's theory is paper-based, a summary judgment determination on scienter was fair game. See, e.g., *United States ex rel. Phalp v. Lincare Holdings, Inc., 857 F.3d 1148, 1152 (11th Cir. 2017)* (affirming a district court's summary judgment order in a false claims case where the relators'"best evidence of scienter" only "consisted of two emails," which when read together "did not allow a reasonable jury to conclude that [the defendants] knowingly submitted false claims" (cleaned up)).

In making that holding, the *Boston Heart* court drew largely from the *Office of the Inspector General ("OIG") for the Department of Health and Human Services' ("HHS") Publication of OIG Compliance Program Guidance for Clinical Laboratories, 63 Fed. Reg. 45076, 45079 (Aug. 24, 1998)*. See *Bos. Heart, 296 F. Supp. 3d at 158-63*. (We'll call it the "OIG Guidance" or just "the Guidance.") And we find the *Boston Heart* court to be particularly persuasive in making sense of the Guidance, the role of laboratories in the patient-care process, and most importantly for our purposes, how that all relates to FCA cases. We'll recount what we see as necessary.

In 1998, HHS issued the Guidance "to refine and build on the original model guidance plan for clinical laboratories," published in 1997 to "engage the private health care community in combating fraud and abuse[.]" *OIG Guidance, 63 Fed. Reg. at 45076*; see *Bos. Heart, 296 F. Supp. 3d at 158* (quoting *OIG Guidance, 63 Fed. Reg. at 45077*). More specifically, the Guidance aimed "to assist clinical laboratories in developing effective internal controls that promote adherence" to the law and to "advance the prevention of fraud, **[*19]** abuse, and waste in the clinical laboratory[.]" *OIG Guidance, 63 Fed. Reg. at 45077*; see *Bos. Heart, 296 F. Supp. 3d at 158*.

And there's a whole section of the Guidance dedicated to "medical necessity." *OIG Guidance, 63 Fed. Reg. at 45079*; see *Bos. Heart, 296 F. Supp. 3d at 158-59*. Central to our case, HHS recognized that "laboratories do not and cannot treat patients or make medical necessity determinations." *OIG Guidance, 63 Fed. Reg. at 45079*. But it laid out "steps that such facilities can take to assure compliance with the applicable statutes, regulations, and the requirements" of Medicare and other health plans. Id. Those enumerated steps (along with other federal regulations) relate largely to requisition forms, billing practices, and recordkeeping. *Id. at 45079-80*; see *Bos. Heart, 296 F. Supp. 3d at 158-63* (discussing the OIG Guidance as well as another regulation on clinical laboratory recordkeeping). We'll spare the reader the finer details to avoid straying too far from the task at hand.

The lesson we learn from *Boston Heart* and the OIG Guidance is this: while it's of course true that a clinical laboratory has a "legal duty to ensure that it is not submitting false or incorrect claims to [g]overnment and private payors," neither "the Medicare statute nor [current regulations] regarding laboratories require

laboratories to independently determine the medical necessity of the tests billed." *OIG Guidance, 63 Fed. Reg. at 45077* (first quote); *Bos. Heart, 296 F. Supp. 3d at 162* (second **[*20]** quote).

And that lesson is edifying as we figure out this case. Recall that OMNI is a doctor's office that works on the frontlines with patients. And remember MD Labs is a clinical laboratory staffed with technicians who (as we understand it) lack both the expertise and the discretion to diagnose patients directly; their role is instead to process tests that doctors (who presumably do interact with patients) order. *See OIG Guidance, 63 Fed. Reg. at 45079* ("We recognize that laboratories do not and cannot treat patients or make medical necessity determinations.") Finally, recall that OMNI (the doctor's office) specifically ordered MD Labs (the laboratory) to conduct the very same UTI tests that OMNI's now saying are not medically necessary (insofar as BUC tests are cheaper), even though OMNI ordered PCR tests (and did so to gin up this very case).

So, truth be told, we struggle to make sense of OMNI's litigation position about medical necessity. We strain to see how MD Labs could know, be deliberately indifferent to, or reckless about a test being medically unnecessary when it has, in-hand, a requisition form from OMNI. *See 31 U.S.C. § 3729(b)(1)(A)(i)-(iii)*. At times there might be other problems undergirding "medical necessity" -- *Boston Heart* recognized one such **[*21]** instance in the very same decision that we endorse -- but, as we'll discuss below, this isn't one of them. *See Bos. Heart, 296 F. Supp. 3d at 165*.

Accepting OMNI's position to the contrary could also lead to dangerous consequences. Should laboratories start second-guessing a doctor's orders, delaying care to double-check the doctor's work (however that might get accomplished), or even providing different, less-expensive care than the doctor ordered just to avoid FCA liability? And it seems to us that OMNI's "categorical" arguments might compel medical professionals not to order treatments as needed on an individualized basis. We don't think the FCA can be reasonably viewed as intending to expand labs' liability or to affect physicians' practices so significantly. Instead, like the Supreme Court, we read the statute to give "effect to Congress' efforts to protect the [g]overnment from loss due to fraud but also [to ensure] that a defendant is not answerable for anything beyond the natural, ordinary and reasonable consequences of [its] conduct." *Allison Engine Co. v. United States ex rel.*

*Sanders, 553 U.S. 662, 672, 128 S. Ct. 2123, 170 L. Ed. 2d 1030 (2008)* (cleaned up) (considering *31 U.S.C. § 3729(a)(2)*). And we don't see how it is "natural, ordinary and reasonable" to put labs on the hook for doctors' professional decisions, barring some other chicanery **[*22]** at play. *Id.; see also Biden v. Nebraska, 600 U.S. 477, 512, 143 S. Ct. 2355, 216 L. Ed. 2d 1063 (2023)* (Barrett, J., concurring) (noting how "common sense" plays a role in statutory interpretation).

So we hold (as a matter of first impression in the First Circuit) that in FCA cases alleging Medicare fraud based on laboratory testing, generally a laboratory can rely on a doctor's order to show that the test is "reasonable and necessary" under *42 U.S.C. § 1395y(a)(1)(A)*. The burden then shifts to the FCA claimant to rebut this showing. *See Bos. Heart, 296 F. Supp. 3d at 158-66* (working through that rule at the motion to dismiss stage); *United States v. Bertram, 900 F.3d 743, 750 (6th Cir. 2018)* (explaining that, in a criminal health care fraud case, "a laboratory generally may rely on that doctor's order in submitting a claim for reimbursement as medically necessary"); *OIG Guidance, 63 Fed. Reg. at 45079*; see also *United States ex rel. Allen v. Alere Home Monitoring, Inc., 334 F. Supp. 3d 349, 365 (D. Mass. 2018)* (explaining that, absent a "specific basis to second-guess" a doctor's certification, a lab "is generally entitled to rely on the independent judgment of a medical provider"). To be clear: laboratories still have "a legal duty to ensure that they do not submit claims for medically unnecessary tests," *Bos. Heart, 296 F. Supp. 3d at 166*, and they can still be held liable under the FCA.[14] But -- and this is the

_____

[14] We provide more of the Sixth Circuit's reasoning to spell out at least one limit of this holding. As it explained:

Laboratories, it is true, may not be well equipped to determine whether a doctor orders necessary services. But that practical reality means nothing when the laboratory acts in a way that makes the services **[*24]** unnecessary. When laboratories know that their own actions have made a medical service unnecessary, they should not be shielded by the independent determination of a physician, who never took -- who was never asked to take -- the laboratory's subsequent conduct into account.

*Bertram, 900 F.3d at 750*. And we further highlight the contours of the lab's independent duty identified by the OIG and discussed in *Boston Heart*. Labs should construct requisition forms carefully in compliance with federal law and regulation, ensure that doctors are not ordering unnecessary tests when reasonable suspicion

critical point -- the doctor's order for medical testing will generally offer a safe harbor of medical necessity that, once raised, a **[\*23]** relator must rebut, discredit, or undermine to raise a genuine dispute of material fact as to the lab's scienter.[15] See *Bos. Heart, 296 F. Supp. 3d at 162, 164-65*; *United States ex rel. Senters v. Quest Diagnostics Inc., No. 24-12998, 2025 U.S. App. LEXIS 17583, 2025 WL 1951196, at \*3 (11th Cir. July 16, 2025)* (affirming dismissal of a case against a laboratory when "[r]elator provided no factual allegations to indicate that doctors later discovered, or even now believe, that they were tricked or confused [by the laboratory] into ordering medically unnecessary tests or tests that they did not intend to order"). Put differently, the doctor's determination of medical necessity (inherent, if not explicitly stated, in the order for the test) demonstrates "the absence of any genuine issue of material fact" about a lab's scienter of a false claim, such that it becomes the relator's problem to "demonstrate that a trier of fact could reasonably resolve" the claim (and, in particular, the necessary scienter element) in its favor despite the doctor's order. *Irobe, 890 F.3d at 377* (cleaned up); cf. *Bos. Heart, 296*

---

arises about the propriety of the testing requested, not "alter the physician's order in any way either increasing or decreasing the number of services performed without the express consent of the ordering physician," and require "that individuals with technical expertise in laboratory testing review the appropriateness of the codes [for services] before the claims are submitted" to avoid "upcoding," what the OIG describes as "the selection of a code to maximize reimbursement when such code is not the most appropriate descriptor of the service." See *Bos. Heart, 296 F. Supp. 3d at 159* (quoting *OIG Guidance, 63 Fed. Reg. at 45080*).

[15] We'll flag a couple of times that it's been overcome (although at earlier stages of the litigation) in the caselaw. See *Bos. Heart, 296 F. Supp. 3d at 165* (holding that an FCA claim survived a motion to dismiss, even when a lab relied on a doctor's determination of medical necessity, when the lab allegedly "engaged in a scheme to encourage non-cardiology physicians to order medically unnecessary tests through a false marketing campaign and pre-printed test requisition forms"); *United States ex rel. Allstate Ins. v. Phx. Toxicology & Lab Servs., LLC, No. 22-6303 (RMB/AMD), 2024 U.S. Dist. LEXIS 95976, 2024 WL 2785396, at \*9 (D.N.J. May 30, 2024)* (holding that an FCA claim survived a motion to dismiss, even when a lab relied on a doctor's determination of medical necessity, when the lab allegedly "engaged in a scheme to conduct duplicative presumptive testing without regard to medical necessity and to encourage physicians to order additional screening tests as a matter of course").

*F. Supp. 3d at 162, 164-65* (applying a similar rule at the motion to dismiss stage). (How this plays out will soon become clear.)

## C.

That guiding principle now established, we can turn to the record. **[\*25]** OMNI says that, in response to MD Labs' motion for summary judgment (which laid out the "medical providers' determination of medical necessity" argument, among others), it produced plenty of evidence showing how MD Labs and its founders deliberately ignored the risk of PCR testing being medically unnecessary. In particular, OMNI points to four buckets of evidence:

- the email exchange between MD Labs' co-founders discussing billing practices;
- medical literature about UTI testing;
- a lack of guidance from Medicare and its contractors on the question of medical necessity; and
- forms showing how MD Labs was "bundling" up tests to drive up costs.

In its view, that combination of evidence shows how a jury could reason that MD Labs "knowingly" submitted false claims, based on either deliberate indifference or recklessness theories.

Yet none of that evidence explains why MD Labs couldn't rely on OMNI's orders for its patients' PCR testing to show that such tests were medically necessary for FCA purposes. We see nothing here demonstrating why MD Labs should have had any reason to "second-guess" OMNI's determinations of its patients' medical needs. *Allen, 334 F. Supp. 3d at 365*. Nor do we see any basis for a jury to determine **[\*26]** that, because of MD Labs' actions, "doctors later discovered, or even now believe, that they were tricked or confused into ordering medically unnecessary tests or tests that they did not intend to order." *Quest Diagnostics Inc., 2025 U.S. App. LEXIS 17583, 2025 WL 1951196, at \*3*.

We can be more specific, so we'll walk through the proffered evidence and why we don't think it undermines MD Labs' rightful reliance on OMNI's orders as evidence of medical necessity. First, the email exchange that OMNI ballyhoos. In OMNI's view, the emails between Grizelj and Rutledge showed three things: MD Labs' recognition that PCR testing was a novel technology; MD Labs' recognition that it had a duty to inform its

Medicare contractor; and MD Labs' recognition that it had a duty to seek more guidance before billing -- a duty that it never followed through on.

Yet we think OMNI's arguments about the email exchange are "all foam and no beer." *United States v. Correia, 55 F.4th 12, 27 (1st Cir. 2022)* (using the colorful phrase in a different context). For starters, Rutledge wanted to give Noridian a "heads-up on our new molecular diagnostic testing" because it "will be seeing an increasing number of claims" for it. He wanted "a discussion on how to best change the current payment system to best accommodate this new testing technology." **[*27]** But neither Rutledge's thoughts on the nitty-gritty of billing practices nor his acknowledgment that PCR tests are relatively new do anything to suggest that he thought they were medically unnecessary. See *Patco Constr. Co. v. People's United Bank, 684 F.3d 197, 207 (1st Cir. 2012)* ("A fact is material" only "if it has the potential of determining the outcome of the litigation." (cleaned up)). In fact, if he thought those tests weren't actually necessary, why would he be eager to raise the issue to the contractor and delve into those nitty-gritty billing details? We are baffled. See *Lawton v. State Mut. Life Assurance Co. of Am., 101 F.3d 218, 222-23 (1st Cir. 1996)* ("Though the district court must interpret the record in the light most hospitable to the nonmoving party, reconciling all competing inferences in that party's favor, the nonmovant has a corresponding obligation to offer the court more than steamy rhetoric and bare conclusions." (cleaned up)).

As for Grizelj, all that OMNI seems to hang its hat on is one line: "instead of asking them to modify their rates, we should ask them to give us guidance on medical necessity instead." But we don't see how that statement reflects awareness of "a substantial and unjustifiable risk that their claims are false." *SuperValu, 598 U.S. at 751* (emphases added); see, e.g., *id. at 746-47* (noting, among other evidence, a direction to employees **[*28]** not to "put any of this in writing to stores");[16] see also *United States v. Teva Pharms. USA, Inc., 682 F. Supp. 3d 142, 147 (D. Mass. 2023)* (denying a company's

motion for summary judgment in a similar FCA case because the company had, in its possession, legal analysis stating that its actions "would almost certainly violate" federal law). That's especially true given that MD Labs consulted its infectious disease doctor about the PCR tests, and he informed it of the tests' importance in patient care.

One last point on the email exchange: any inference that could be drawn from the co-founders' brief back-and-forth about general policy carries little weight against a <u>specific</u> order that MD Labs received from a <u>specific</u> doctor for a <u>specific</u> patient. Cf. *Allen, 334 F. Supp. 3d at 365* (explaining that, absent a "specific basis to second-guess" a doctor's certification, a lab "is generally entitled to rely on the independent judgment of a medical provider"). Or, put differently, a past generalized remark about medical necessity should not fairly be considered an appropriate basis for liability in light of a specific present order from a doctor (that, in our view, shows that MD Labs believed the test was medically necessary), at least without evidence of more unscrupulous acts by the lab **[*29]** (which OMNI doesn't provide). See *Bos. Heart, 296 F. Supp. 3d at 158*.

Similarly, contrary to OMNI's assertions, medical literature doesn't cast doubt on MD Labs' decision to rely on OMNI's requests. OMNI argues that guidance published by the American Urological Association ("AUA") in 2019 shows how PCR testing wasn't considered standard fare at the time. Though the district court didn't give this literature much weight because it post-dated most of the PCR tests at issue, OMNI says that it is probative for precisely that reason: even after MD Labs submitted false claims, a leading medical organization confirmed that the tests weren't all they were cracked up to be.

That line of argument flops for a couple of reasons. First, that generalized AUA guidance (presumably available to urology specialists) again gives us no reason to think that MD Labs should have doubted the doctors' orders. See *Allen, 334 F. Supp. 3d at 365*. And we think the district court was wise to key in on the timing issue: scienter focuses on what "the defendant thought when submitting the false claim -- not what the defendant may have thought <u>after</u> submitting it." *SuperValu, 598 U.S. at 752*. So even if some later information surfaced and could grind against a determination of medical necessity, that shouldn't **[*30]** factor into scienter of the falsity of medical necessity at the time the tests were submitted. See id.

---

[16] The Court in <u>SuperValu</u> did not address "whether petitioners have made a sufficient showing under the correct legal standard to preclude summary judgment." *598 U.S. at 757*. But we're just using the facts the Supreme Court identified as salient as a reference point for the appellees' far less suspicious actions.

Next, OMNI observes that CMS (to remind, the federal agency determining what services are "reasonable and necessary") has never issued an NCD (to remind, "National Coverage Determination") about PCR UTI testing. Combined with the fact that there was no LCD (to remind, "Local Coverage Determination") on the issue at the time of the tests' submissions, that (in OMNI's view) shows that MD Labs should have known something was up.

But we need not tarry on this one: as the district court observed, OMNI specifically conceded that neither an NCD nor an LCD was required for a service to be deemed medically necessary. Individual adjudication, after all, can fill that stop-gap. See *United States ex rel. Polukoff v. St. Mark's Hosp., 895 F.3d 730, 735 (10th Cir. 2018)* (noting that determinations are made either "by promulgating a generally applicable rule or by allowing individual adjudication" (quoting *Heckler, 466 U.S. at 617*)). So the lack of an LCD or NCD doesn't help OMNI prove scienter.

Finally, the "bundling" of tests. This one is a bit more complex but is still offered by OMNI as more evidence of MD Labs' scienter. One of the nuanced parts of PCR UTI testing is that it can test for many pathogens **[*31]** all at once, though each search for a specific pathogen, as we understand, is technically a separate test to run. OMNI argues that because MD Labs sometimes bundled up to nineteen pathogen tests into a single PCR test order -- via requisitions forms that in OMNI's view "forced" physicians to get either seventeen-or nineteen-pathogen panels with no other options -- it ran medically unnecessary tests. The allegedly unnecessary bundling is the purported hook for scienter here, says OMNI.

It's true that some courts have held that "bundled tests, ordered via a pre-printed form, can create FCA liability, provided the certifying entity is aware that one or more of the tests is medically unnecessary, or recklessly disregards such a risk." *Allen, 334 F. Supp. 3d at 357* (collecting cases). Assuming that's right, we still don't think OMNI has presented evidence that MD Labs "knowingly" erred in its specific approach.[17]

Below, MD Labs offered an expert infectious disease

doctor who stated in a report that the pathogens that MD Labs tested for "are reasonable" and "within the range endorsed" by a peer-reviewed article. The district court noted that OMNI "does not respond with any record evidence indicating that the make-up of **[*32]** the panels was unnecessarily broad."

On appeal, that hasn't changed. Instead, OMNI takes aim directly at the expert's opinions in its brief without any evidence to back up its attacks. For instance, OMNI fusses that the expert's opinion was based only on "a single study" issued in 2023 (thus post-dating the period in question) and that anyway, the expert didn't accurately interpret the study, so their conclusion's bunk. But we think OMNI's arm-chair scientist approach isn't consistent with its evidentiary obligations at the summary judgment stage to put up or shut up. See *Corrada Betances v. Sea-Land Serv., Inc., 248 F.3d 40, 43 (1st Cir. 2001)* ("We have held before, and today reaffirm, that statements contained in a memorandum or lawyer's brief are insufficient, for summary judgment purposes, to establish material facts.") Once MD Labs provided an expert backing its bundling position, it fell to OMNI as the non-movant to "point to materials of evidentiary quality" that could raise a genuine dispute for trial. *Irobe, 890 F.3d at 377.* It didn't then and still doesn't now.[18] See *Corrada Betances, 248 F.3d at 43.* OMNI "cannot defeat summary judgment by relying on speculation about the facts" laid out in MD Labs' expert's testimony. *Lang v. Wal-Mart Stores E., L.P., 813 F.3d 447, 460 (1st Cir. 2016)* (cleaned up). So the bundling issue is rather easily unbundled after all.

Those four **[*33]** buckets of evidence emptied, we see eye-to-eye with the district court in concluding that OMNI has failed to present any evidence through which a reasonable jury could find for it on the scienter issue. Because scienter is an essential element of the claim, that's dispositive. See *31 U.S.C. § 3729(a)(1)(A).* We need go no further.[19]

_____

[17] We say "assuming" because we don't have to grapple with that legal question today. That proposition's validity is pretty ancillary to our appellate work here, given that our decision turns on OMNI's evidentiary shortcomings.

_____

[18] We don't see the 2019 AUA literature as relevant to this consideration because, by our understanding (and more importantly, OMNI's presentation of it), it doesn't address or concern bundling.

[19] Just a bit of housekeeping as we wrap up. Because we hold that OMNI hasn't presented enough evidence to survive summary judgment for the federal claims, we don't need to reach its alternative argument that the district court relied on what it calls "irrelevant and inapposite" evidence. That one, in our view, was settled by our holding that MD Labs could offer

**(JURIS) DOCTOR'S ORDERS**

Our diagnosis is simple: we affirm. The parties shall bear their own costs.

---

**End of Document**

---

up OMNI's orders as evidence of medical necessity. Nor do we need to consider whether OMNI's state-law claims should be revived. The district court dismissed the state-law claims because it believed that they failed for the same reasons as the federal claims. On appeal, OMNI doesn't argue that they should be treated any differently, and because we think the only federal claim on appeal still fails, that settles the state-law claims too. And having found in MD Labs' favor on its main argument, we don't need to reach its alternative argument for affirmance about the causal chain, which the district court declined to address.

**Attachment 2**

# *Al-Sabah v. World Bus. Lenders, LLC*

United States Court of Appeals for the Fourth Circuit

October 22, 2025, Argued; November 26, 2025, Decided

No. 24-1345, No. 24-1382

**Reporter**

2025 U.S. App. LEXIS 30939 *; 2025 LX 597735; __ F.4th __; 2025 WL 3290262

ALIA SALEM AL-SABAH, Plaintiff - Appellee, v. WORLD BUSINESS LENDERS, LLC, Defendant - Appellant, and ROBERT WILLIAMS; UPTOWN COMMERICAL CAPITAL; KENNETH WILLIAMS; SHARESTATES INVESTMENTS, LLC; IRM PLAZA, LLC, Defendants. ALIA SALEM AL-SABAH, Plaintiff - Appellant, v. WORLD BUSINESS LENDERS, LLC, Defendant - Appellee, and ROBERT WILLIAMS; UPTOWN COMMERICAL CAPITAL; KENNETH WILLIAMS; SHARESTATES INVESTMENTS, LLC; IRM PLAZA, LLC, Defendants.

**Prior History:** [*1] Appeal from the United States District Court for the District of Maryland, at Baltimore. Stephanie A. Gallagher, District Judge. (1:18-cv-02958-SAG).

**Counsel:** ARGUED: Stephen J. Rosenfeld, MCDONALD HOPKINS LLC, Chicago, Illinois, for Appellant/Cross-Appellee.

Michael Broughton MacWilliams, VENABLE LLP, Baltimore, Maryland, for Appellee/Cross-Appellant.

ON BRIEF: Patrick O'Meara, MCDONALD HOPKINS LLC, Chicago, Illinois, for Appellant/Cross-Appellee.

Elizabeth C. Rinehart, Catherine G. Ottenritter, VENABLE LLP, Baltimore, Maryland, for Appellee/Cross-Appellant.

**Judges:** Before AGEE, THACKER, and RICHARDSON, Circuit Judges.

**Opinion by:** AGEE

# Opinion

AGEE, Circuit Judge:

Between 2014 and 2016, Jean Agbodjogbe—a Baltimore restaurateur—defrauded Alia Al-Sabah—a member of the Kuwaiti royal family—out of nearly $7.8 million. While Al-Sabah thought Agbodjogbe was using the six-figure wire transfers that she regularly sent him to purchase and renovate real estate investments on her behalf, he instead funneled most of her money almost exclusively to entities he controlled. Through those entities, he purchased several commercial properties in Baltimore, a condo in New York City as a residence for Al-Sabah's daughter ("NYC condo"), and—unbeknownst [*2] to Al-Sabah—a home for him and his family in Pikesville, Maryland ("Pikesville home").

After Al-Sabah eventually recognized that all was not as promised and Agbodjogbe evaded her attempts to communicate, she sued him for fraud in the United States District Court for the District of Maryland. In addition to seeking damages, Al-Sabah requested that the court impose a constructive trust over the properties Agbodjogbe purchased with the fraudulently obtained funds. Days after she sued Agbodjogbe, Al-Sabah filed a Notice of Lis Pendens ("Notice of Lis Pendens" or "Notice"). As we discuss below, the Notice, if properly filed, would have imputed constructive notice of the litigation to a future purchaser who would then take the title to the property subject to its outcome. The Notice, however, was improperly filed and thus ineffective.

During discovery in that case, Al-Sabah learned that World Business Lenders, LLC ("WBL") funded three loans for Agbodjogbe, each secured by real property Agbodjogbe acquired using funds he obtained from Al-Sabah: (1) a $600,000 loan secured by the NYC condo in May 2016 ("Loan One"); (2) a $1.2 million loan to refinance Loan One, also secured by the NYC condo [*3] in August 2016 ("Loan Two"); and (3) a $360,000 loan secured by the Pikesville home in March 2017 ("Loan Three"). WBL progressively learned more about Agbodjogbe's questionable actions during the underwriting process for each loan.

Foreseeing the difficulty of executing on a potential judgment against Agbodjogbe, Al-Sabah also sued WBL in the District of Maryland, contending it aided and abetted his fraud. In essence, her theory was that WBL

acted as Agbodjogbe's "getaway driver" by burdening the ill-gotten real estate with liens to secure Agbodjogbe's loans. In this way, Al-Sabah argues WBL aided Agbodjogbe by converting the misappropriated money from real estate equity to liquid cash, thereby preventing her recovery on her potential judgment against Agbodjogbe.

Following a bench trial, the district court found partially in favor of Al-Sabah, awarding her $469,990 in compensatory damages and $235,000 in punitive damages as to Loan Three. Specifically, the district court found that WBL was willfully blind to, and substantially assisted, Agbodjogbe's fraudulent scheme as it related to the Pikesville home when it funded Loan Three. As to the other two loans, the district court found for **[*4]** WBL, concluding that it was not willfully blind as to them.

WBL appeals the district court's judgment as it relates to Loan Three, and Al-Sabah cross-appeals with respect to Loans One and Two.

On review, we conclude there is no reversible error as to the judgments in favor of WBL. As to the judgment for Al-Sabah on Loan Three, however, we conclude that the district court's decision has material factual and legal errors that essentially converted conduct that, at most, amounted to simple negligence into aiding and abetting fraud. Therefore, we will affirm the judgment of the district court on Loans One and Two, reverse as to Loan Three, and remand for entry of final judgment for WBL in all respects.

I.

To properly focus Al-Sabah's aiding and abetting claim, we briefly recount the facts of the underlying fraud Agbodjogbe perpetrated against Al-Sabah, and her suit against him, even though neither is directly before us in this appeal. Then we turn to Agbodjogbe's relations with WBL, which form the basis for Al-Sabah's claims against it.

A.

While visiting the United States in 2014, Al-Sabah met Agbodjogbe at a small restaurant named Nailah's Kitchen that he owned and operated in Baltimore, Maryland. **[*5]** [1] Shortly after Al-Sabah returned to

Kuwait, Agbodjogbe told her that he wanted to expand his restaurant, and proposed converting his existing business into a new one named N&A Kitchen, LLC ("N&A Kitchen"), which Al-Sabah believed stood for "Nailah's and Alia's Kitchen." Although Al-Sabah had never participated in a business venture, she agreed to invest $150,000 in N&A Kitchen for fifty percent ownership. Agbodjogbe emailed Al-Sabah background information about him, such as his driver's license and a federal income tax return for Nailah's Kitchen, and relayed his willingness to "go through a background check if necessary." _Al-Sabah II, 2024 WL 263579, at *2_. Al-Sabah declined, perceiving Agbodjogbe to be honest and transparent. Agbodjogbe then sent Al-Sabah articles of organization, an operating agreement, and a contribution agreement for N&A Kitchen, which had been prepared by her attorney. Thinking all was in order, Al-Sabah wired her $150,000 investment to N&A Kitchen's newly formed bank account.

Events escalated quickly from there for an unsuspecting Al-Sabah. Along with the new restaurant venture, Agbodjogbe persuaded Al-Sabah to invest in purchasing commercial real estate in Baltimore. Al-Sabah agreed **[*6]** so long as the properties were titled in a to-be-formed entity that she alone would own named 9 Jewels, LLC ("9 Jewels"). Agbodjogbe formed 9 Jewels, but unknown to Al-Sabah, he—not Al-Sabah—owned and controlled it.

Almost monthly, Agbodjogbe requested six-figure wire transfers from Al-Sabah. Sometimes, he claimed he needed money to renovate N&A Kitchen. Other times, he presented her with a new property investment opportunity. He also facilitated the purchase of a condo for her daughter in New York City. And he offered to buy a building for an aftercare program for Muslim students and property to build a cemetery for local Muslims who could not afford burial costs—all with Al-Sabah's money.

With little to no inquiry or hesitation, Al-Sabah agreed at each turn, trusting that Agbodjogbe was using the money as intended. He somewhat did. For example, he did purchase the NYC condo in 9 Jewels' name, and her daughter did live there for a period, but 9 Jewels was owned by Agbodjogbe alone. Perhaps unsurprisingly by this point, Agbodjogbe redirected most of Al-Sabah's money to his own purposes. Relevant to this appeal, Agbodjogbe used Al-Sabah's money to purchase the

---

[1] We largely recite the facts from the district court's findings of fact following the bench trial in this case. _Al-Sabah v. World_ _Bus. Lenders, LLC, No. 18-cv-2958-SAG, 2024 WL 263579 (D. Md. Jan. 24, 2024)_ ("_Al-Sabah II_").

Pikesville home as his personal **[*7]** residence for $469,990 in January 2015.

When all was said and done in July 2016, Al-Sabah had transferred nearly $7.8 million over 22 months to either N&A Kitchen or 9 Jewels. She believed nearly all of it would be used to benefit 9 Jewels; in reality, Agbodjogbe alone owned and controlled it all. And the money was gone by the time Al-Sabah finally realized Agbodjogbe's scheme.

Agbodjogbe evaded Al-Sabah's attempts to communicate with him, and on March 17, 2017, Al-Sabah sued him for fraud in the United States District Court for the District of Maryland. *Al-Sabah v. Agbodjogbe*, No. 1:17-cv-730-SAG (D. Md.) ("*Al-Sabah I*"). She sought monetary damages and, among other things, for the district court to impose a constructive trust over the NYC condo and Pikesville home because Agbodjogbe purchased them with money he fraudulently obtained from her. Amended Complaint at 21, *Al-Sabah I*, ECF No. 76. Three days later, Al-Sabah filed the Notice of Lis Pendens in the Circuit Court for Baltimore County.[2] J.A. 719-47. The Notice, which included the district court complaint as an exhibit, explained the nature of her suit against Agbodjogbe and, among other things, that he used the money fraudulently **[*8]** obtained from her to purchase the Pikesville home. Only later did Al-Sabah realize that the Notice was incorrectly recorded against the wrong property (not the Pikesville home) and thus did not provide constructive notice to potential future purchasers. *See* J.A. 747; *see also* Md. R. 12-102(b).

In January 2020, a jury found for Al-Sabah, and the district court entered judgment in her favor for $7,895,277.50. *Al-Sabah I*, ECF No. 288 (No. 1:17cv730). The court, however, declined to impose a constructive trust over either property. *Id.*, ECF No. 279.

B.

WBL is an alternative business lender that provides small businesses that have difficulty procuring loans

from traditional lending sources with "short-term, high-cost loans secured by real estate." *Al-Sabah II, 2024 WL 263579, at \*7*. Recognizing that "the needs of small businesses tend to be more urgent[,]" WBL makes funds "available to the borrower . . . often within 7-14 days from application." J.A. 486. To assess credit risk, WBL considers internal guidelines that "focus[] on metrics designed to predict performance over a short time period." *Id.* It sometimes deviates from these guidelines as it "takes a discretionary approach to underwriting **[*9]** each prospective loan[.]" *Al-Sabah II, 2024 WL 263579, at \*7*; *see also* J.A. 487 ("[A]s each credit presents its own unique set of facts and circumstances, exceptions to guidelines can be expected on a case-by-case basis[.]").

As the district court explained:

> The process of issuing and funding a loan at WBL involves (1) review and evaluation of the business applying for the loan; (2) valuation of the real estate pledged as collateral supporting the loan; (3) acquisition of title insurance for the collateral; (4) presentation to, and approval by, at least one person of a three-person investment committee; (5) credit approval issued by the credit department; (6) generation and signature of a funding package handled by the closing department; and ([7]) funding of the loan.

*Al-Sabah II, 2024 WL 263579, at \*7*.

Between December 2015 and March 2017, Agbodjogbe, on behalf of N&A Kitchen or 9 Jewels, applied for four loans from WBL, three of which were funded. The circumstances surrounding the underwriting and approval of these loans form the basis of Al-Sabah's theory of WBL's aiding and abetting liability here. We address each below.

1.

WBL first entered the picture in December 2015 when Agbodjogbe applied for a $350,000 loan to be secured by a property he purchased **[*10]** with money he obtained from Al-Sabah ("Loan Zero").[3] While reviewing the application, a junior credit analyst at WBL flagged several large incoming wire transfers in N&A Kitchen's bank records. WBL identified "numerous character concerns" associated with the loan and flagged the file

---

[2] Lis pendens means "pending lawsuit" and refers "to the jurisdiction, power, or control which a court acquires over property involved in a lawsuit pending its continuance and final judgment." *DeShields v. Broadwater, 659 A.2d 300, 305 (Md. 1995)*. Under the doctrine of lis pendens, "an interest in property acquired while litigation *affecting title to that property is pending* is taken subject to the results of that pending litigation." *Id.* (emphasis added) (citations omitted).

---

[3] For ease of reference, we adopt the naming convention for the loans used by the parties and the district court.

as a "high fraud risk." *Al-Sabah II, 2024 WL 263579, at *8* (citation omitted). The analyst requested more information about the source of the wires from Agbodjogbe's loan broker, Kenneth Williams, who told the analyst that the funds were from his business partner. Later, the analyst learned during a call with Agbodjogbe that the wire transfers were purportedly "gifts" from Agbodjogbe's business partner, who "belong[ed] to a wealthy family in Kuwait." *Id.* The analyst requested and received an IRS Form 3520 gift tax return prepared and signed by David Leichter—Agbodjogbe's certified public accountant ("CPA")—that reflected Agbodjogbe reported more than $1 million in gifts from Al-Sabah to the IRS. *See* J.A. 513.

Even so, the credit analyst and Yasemin Fakioglu, then a WBL vice president, suspected that Agbodjogbe might have been engaged in money laundering because the transfer amounts did not square with N&A Kitchen's revenues. When they relayed **[*11]** this concern to Robert Pardes, WBL's Chief Operating Officer ("COO") at the time, he told them that financial regulations require Agbodjogbe's depository bank to investigate and clear the large deposits, and WBL "can only assume that the depository bank has exercised the requisite due diligence." *Al-Sabah II, 2024 WL 263579, at *9* (citation omitted). The IRS gift tax returns eliminated any remaining concern that Pardes had of money laundering, "because money laundering is a discrete activity, and here the deposits are being reported to the IRS and the federal government directly." *Id.*

Still, Pardes urged his subordinates to speak with Agbodjogbe's CPA. In doing so, Leichter told them that the wire transfers were "legitimate" and "legal" gifts and confirmed that Agbodjogbe's "entire story with respect to the wires all checks out." *Id.* (cleaned up). The investment committee then approved the loan, finding that the identified "character concerns" were "all mitigated" because WBL "confirmed that the funds are gift funds through a professional who filed the tax returns." *Id.* (cleaned up). Agbodjogbe, however, withdrew the application before Loan Zero was funded.

2.

In May 2016, Agbodjogbe applied for Loan One—a $600,000 loan, **[*12]** which he intended to use to remodel the upper level of N&A Kitchen and purchase a building for a new location, secured by the NYC Condo. During another conversation with the WBL credit analyst who handled Loan Zero four months earlier, Agbodjogbe provided the same explanation for the large

wire transfers—one of which was identified as coming from "ALSHAIKHA ALIA SALEM AL-S"—that he had given for Loan Zero: he "receives the money as gifts from a longtime friend and . . . has reported the money to the IRS as gifts." *Al-Sabah II, 2024 WL 263579, at *10*. WBL was not concerned about the source of the transfers because the gift tax filings and Leichter's representations from Loan Zero were sufficient to show that these transfers were legitimate gifts. Agbodjogbe had also disclosed that he used some of the transferred money to buy the NYC condo, and the analyst requested and received proof of purchase of that property.

WBL deviated a bit from its internal guidelines in approving Loan One. For example, one underwriting metric that measures the borrower's ability to repay a loan exceeded the ordinary limit. But the projected revenues that Agbodjogbe provided for his restaurants satisfied WBL that he would be able to perform on **[*13]** the loan as required. It also received a short form accountant representation letter from Leichter, as opposed to a long-form attorney opinion letter that it ordinarily required for loans of this type that exceed $200,000. *Id.* at *11.

As discussed below, the long-form attorney letter would have provided WBL an array of assurances, such as the validity of N&A Kitchen's organization, Agbodjogbe's authority to act on its behalf, and the absence of pending litigation that could negatively affect his performance of the loan. *See, e.g.,* J.A. 643-45. But WBL found Leichter's letter "served its purpose" for Loan One by representing that: (a) Agbodjogbe had consulted an outside professional before taking a high-interest loan; and (b) Agbodjogbe owned 9 Jewels (the owner of the NYC condo) and N&A Kitchen (the borrower). J.A. 214-15. Importantly, "there were no other facts inconsistent with [the CPA's] representation either in title and all the due diligence that was done[.]" J.A. 215.

On May 27, 2016, WBL funded Loan One, secured by the NYC condo.

3.

Agbodjogbe applied for Loan Two in July 2016, seeking to refinance Loan One with a new $1.2 million loan from WBL, still secured by the NYC condo. **[*14]** WBL performed another round of due diligence—collecting updated revenue projections, bank statements, and this time, an attorney opinion letter—and, in a third

interview, the same credit analyst again asked Agbodjogbe about the wire transfers. Although WBL noted some inconsistencies in Agbodjogbe's representations for Loans One and Two, and his revenue projections did not pan out as he had previously represented, WBL determined that these occurrences were "commonplace and typical among WBL's borrowers[.]" *Al-Sabah II, 2024 WL 263579, at *12*. Accordingly, WBL funded Loan Two, secured by the NYC condo on August 26, 2016. Four months later, Agbodjogbe refinanced the loan with a third-party lender and, as a result, fully paid off Loan Two.

4.

Agbodjogbe returned to WBL for a third and final loan in March 2017, this time pledging the Pikesville home as collateral. Loan Three was $360,000 ostensibly so that Agbodjogbe could renovate a new N&A Kitchen location. WBL received a title report for the Pikesville home that reflected that the title was vested solely in Agbodjogbe. The title report also identified the Notice of Lis Pendens from Al-Sabah's suit against Agbodjogbe, filed days earlier, as one of seven judgments or liens [*15] associated with the property.[4] WBL sought to resolve the Notice because it ordinarily would not close on a loan secured by property with a lis pendens. *Al-Sabah II, 2024 WL 263579, at *14*.

Fakioglu asked Agbodjogbe about the lis pendens and learned that he and his attorneys were working on resolving it, along with the other judgments identified in the title report. Fakioglu relayed that information to at least three other WBL employees, including the title department manager. Along the way, someone in the closing department conducted a PACER search to try to identify the litigation underlying the lis pendens and identified Al-Sabah's suit against Agbodjogbe. *Id.*

Meanwhile, the investment committee approved Loan Three, subject to certain conditions including, obtaining title insurance, removal of all "prior owner judgments," a

primary residence additional diligence ("PRAD") call (so Agbodjogbe knew pledging his home as collateral had risks), and receiving a long-form attorney opinion letter. J.A. 792. WBL again deviated somewhat from its guidelines but was comfortable doing so given "the free and clear nature of the collateral" and Agbodjogbe's positive payment history.

One of WBL's managing [*16] directors, also its "head of credit," testified at trial that, after reviewing the initial title report, WBL "asked the title company to take another look and omit [the title issues] that had belonged to the prior owner or omit [the title issues] that don't belong." *Al-Sabah II*, ECF No. 214, at 112. By that point, the lis pendens notation had been relayed to Pardes, who typically would have investigated further only if it remained unresolved after the title insurance process cleared up any "blemishes to title[.]" J.A. 217. But "shortly after" Pardes learned about it, WBL received an updated title report that omitted the Notice as it "was found not to apply to the subject property." *Id.* In other words, the title company would insure title to the Pikesville home, resolving all known blemishes, including the lis pendens notation, so Pardes did not inquire further.

WBL also received a long-form attorney opinion letter on Agbodjogbe's behalf that represented, among other things, that "*after due inquiry*," *no* "*threatened or pending litigation*" *posed a risk to the borrower's (N&A Kitchen) or guarantor's (Agbodjogbe) ability to perform their obligations as to Loan Three.* J.A. 796 (emphasis added). [*17] In WBL's view, the title policy and unconditional opinion letter—both conditions of loan approval—resolved any concerns that litigation might affect the Pikesville home. With all its other closing conditions met, WBL waived the PRAD call because Agbodjogbe was "a repeat customer" and "paid WBL multiple times on bigger loans." *Al-Sabah II, 2024 WL 263579, at *15*. WBL funded Loan Three on March 30, 2017, secured by the Pikesville home.

C.

While her suit against Agbodjogbe was still pending, Al-Sabah separately sued WBL, raising various causes of action related to its lending relationship with Agbodjogbe.[5] Relevant to this appeal, Al-Sabah alleged that WBL aided and abetted Agbodjogbe's fraudulent

---

[4] The Notice itself was not attached to the title report. The only attached document was a printout of the Maryland docket webpage, which reflects a case captioned "*Al Sabah v. Agbodjogbe, et al*" was filed in the Circuit Court for Baltimore County on March 20, 2017. J.A. 759. It also identifies "Alia Salem Al Sabah," of Kuwait as the plaintiff and Agbodjogbe as one of several defendants. Lastly, it shows that a document titled "Notice of lis pendens from Baltimore County" had been filed on March 20, 2017. J.A. 760.

[5] The district court had jurisdiction under *28 U.S.C. § 1332(a)(2)*.

scheme by funding Loans One, Two, and Three in exchange for a priority lien on the pledged collateral.[6] As noted earlier, her theory was that WBL "monetized" Agbodjogbe's fraud by encumbering the collateral real estate with liens to secure its loans, which effectively transformed Al-Sabah's misappropriated funds from real property equity to liquid proceeds and ultimately obstructed her ability to recover the secured real estate.

After a four-day bench trial, the district court found partially in favor of Al-Sabah. It concluded that **[*18]** WBL was willfully blind to Agbodjogbe's fraud—an essential element of aiding and abetting—when it funded Loan Three but not Loans One and Two. Then the district court turned to the second element and concluded that WBL substantially assisted Agbodjogbe in carrying out the fraud when it funded Loan Three. Finding WBL thus liable for aiding and abetting fraud as to Loan Three, the district court awarded Al-Sabah $469,990 in compensatory damages, which was her out-of-pocket loss for the Pikesville home,[7] and $235,000 in punitive damages. *Al-Sabah II, 2024 WL 263579, at \*27*; J.A. 375.

II.

WBL timely appealed as to Loan Three, Al-Sabah timely cross-appealed as to Loans One and Two, and we have jurisdiction under *28 U.S.C. § 1291*. We review a district court's judgment rendered following a bench trial "under a mixed standard of review— factual findings may be reversed only if clearly erroneous, while conclusions of law are examined de novo." *Chavez-Deremer v. Med.*

*Staffing of Am., LLC, 147 F.4th 371, 398 (4th Cir. 2025)* (cleaned up).

III.

Maryland recognizes aiding and abetting as an independent tort claim. *Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc., 665 A.2d 1038, 1049 (Md. 1995)*. Liability for aiding and abetting flows if a person "by any means . . . encouraged, incited, aided or abetted the act of the direct perpetrator of the tort." *Duke v. Feldman, 226 A.2d 345, 347 (Md. 1967)*. To prevail, the plaintiff must prove: (a) a primary actor **[*19]** committed a tort; (b) the defendant knew of, or was willfully blind to, that tortious act; and (c) the defendant substantially assisted the actor in bringing about its occurrence.[8] *Sutton v. FedFirst Fin. Corp., 126 A.3d 765, 792 (Md. Ct. Spec. App. 2015)*; *see also Alleco, 665 A.2d at 1050*.

For the second element—and the only one we need to address to dispose of this appeal—Al-Sabah had to prove that WBL knew about, or was willfully blind to, Agbodjogbe's fraudulent activity.[9] *See Hoffman v. Stamper, 867 A.2d 276, 302 (Md. 2005)*. Al-Sabah proceeded on a theory of willful blindness, which "occurs when a person has his suspicion aroused but then deliberately omits to make further enquiries,

_____

[6] Al-Sabah also asserted other state-law claims, including unjust enrichment, for which the district court found in favor of WBL. Those claims are not at issue on appeal.

[7] WBL does not separately appeal the discrepancy between the district court's compensatory damages award of $469,990 and the loan of only $360,000. Nonetheless, it is hard to comprehend how Al-Sabah's damages, premised on WBL's lien on the Pikesville home, could exceed $360,000—the amount of the secured loan. In other words, WBL would be entitled only to $360,000 if Agbodjogbe had defaulted on the loan and it foreclosed on the home, assuming Al-Sabah's equitable lien under the lis pendens was invalid. Al-Sabah could have enforced her separate judgment lien on any proceeds from the foreclosure over $360,000. But if the lis pendens was valid and attached to the property without defect, then Al-Sabah would have had an equitable lien on the Pikesville home and WBL would have taken subject to that lien.

_____

[8] As for the first element, Al-Sabah had to prove that Agbodjogbe—the primary actor—committed fraud, the underlying tort. To do so, she was required to prove by clear and convincing evidence that Agbodjogbe knowingly made a false representation with the purpose to defraud her, she justifiably relied on that misrepresentation, and she suffered injury from that misrepresentation. *Md. Env't Tr. v. Gaynor, 803 A.2d 512, 516 (Md. 2002)*. At trial, WBL stipulated to all but one of these elements of fraud, only arguing that Al-Sabah was not justified in relying on Agbodjogbe's misrepresentations. The district court mostly disagreed with WBL, concluding that Al-Sabah's reliance was justified in nearly all respects. For some reason, Al-Sabah argues on cross-appeal that the district court erred in finding that her reliance was not always justified. *See* Al-Sabah Opening Br. 49-52. We see no merit in that argument and are otherwise satisfied that Al-Sabah proved Agbodjogbe's fraud as the predicate tort.

[9] WBL also argues that the district court erred by concluding that it substantially assisted Agbodjogbe's fraud by funding Loan Three. Because we hold that WBL neither knew of nor was willfully blind to that fraud—an essential element of aiding and abetting—we need not reach the substantial assistance element.

because he wishes to remain in ignorance." *Id.* (citation omitted). Said differently, "a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and *who can almost be said to have actually known the critical facts*." *Glob.-Tech Appliances, Inc. v. SEB S.A., 563 U.S. 754, 769 (2011)* (emphasis added).

The district court found that WBL was not willfully blind to Agbodjogbe's fraud when it funded Loans One and Two but was willfully blind when it funded Loan Three. Al-Sabah challenges the former conclusion, and WBL challenges the latter. As we explain, the evidence does not show that WBL was willfully blind when it funded any of the loans as a matter of **[*20]** law. Accordingly, we affirm the district court as to Loans One and Two and reverse as to Loan Three.

A.

We first consider and reject Al-Sabah's argument that the district court erred by concluding that WBL was not willfully blind to Agbodjogbe's fraud when it funded Loans One and Two. "[L]ower-level employees" at WBL "first discovered" several large incoming wire transfers to N&A Kitchen while underwriting Loan Zero in December 2015.[10] *Al-Sabah II, 2024 WL 263579, at *20*. And, as Al-Sabah points out, WBL flagged the transfers as "very large unusual deposits," and designated Agbodjogbe as a "high fraud risk" with "numerous character concerns." Al-Sabah Opening Br. 43 (quoting *Al-Sabah II, 2024 WL 263579, at *22*). In short, its suspicions of dubious actions were aroused.

The willful blindness inquiry requires that we look to what WBL did "to avoid confirming a high probability of wrongdoing." *Glob.-Tech Appliances, Inc., 563 U.S. at 769*. Like the district court, we conclude that "there is no evidence that WBL deliberately omitted making further enquiries about these concerns." *Al-Sabah II, 2024 WL 263579, at *20*. Starting with Loan Zero, rather than brushing that information aside, WBL sought answers. It asked Agbodjogbe and his loan broker about the source of the transfers and learned that they were gifts from Agbodjogbe's **[*21]** wealthy Kuwaiti business partner.

But WBL did not simply accept these representations at face value. It requested and received CPA-prepared gift tax returns that confirmed Agbodjogbe reported the transfers as gifts to the IRS under penalty of perjury. Even after those documents assuaged Pardes' concerns, he still required his subordinates to speak with Leichter, who in turn confirmed Agbodjogbe's representations. Based on this investigation, WBL was no longer concerned that Agbodjogbe was engaged in illegal activity.

WBL "replicated in some fashion" these actions when underwriting Loans One and Two. *Id.* It sought and received proof that Agbodjogbe purchased the NYC condo and a professional opinion in the form of Leichter's CPA letter, which confirmed Agbodjogbe owned 9 Jewels and N&A Kitchen. The evidence reflects, and the district court correctly found, that "[a]t no point during the underwriting for Loans One and Two did WBL uncover any other suspicious bank activity that created any new questions about the source of the large wires into Agbodjogbe's bank accounts." *Id. at *20 n.29*. Simply put, there is no evidence WBL avoided learning about Agbodjogbe's possible fraud, much less that it had reason **[*22]** to believe he purchased the NYC condo with misappropriated money.

Yet Al-Sabah contends that WBL did not do enough and that it should have been suspicious (or at least more suspicious) that Agbodjogbe was engaged in fraud based on the large wire transfers, Agbodjogbe's contradictory statements to WBL about his businesses and their revenue, his ability (or lack thereof) to make some loan payments, and his character for truthfulness. According to Al-Sabah, WBL's failure to investigate these matters further demonstrates its willful blindness. At its core, this argument is no more than a post hoc critique of the way WBL runs its business and confuses possible negligence with the entirely separate concept of aiding and abetting fraud.

Perhaps a more traditional lender might have scrutinized these issues more than WBL did here; perhaps not. But WBL "takes an unconventional approach to lending[.]" *Id. at *20*. It provides short-term secured loans to "businesses that cannot or do not qualify for loans from banks and other traditional lending sources." *Id. at *7*. Inconsistencies in loan applications are "commonplace and typical among WBL's borrowers," and WBL's decision to lend to high-risk borrowers "with 'very **[*23]** difficult complex credits' reflects only WBL's own high-risk tolerance." *Id. at *12,*

---

[10] Like the district court, we conclude that "[a]lthough Loan Zero did not ultimately fund, WBL's *activities* during its underwriting of Loan Zero are highly relevant to the issue of knowledge and willful blindness of Agbodjogbe's fraud on Al-Sabah." *Al-Sabah II, 2024 WL 263579, at *20 n.28* (emphasis added).

*20 (citation omitted); *see also* J.A. 101-02 (explaining that WBL deviates from its internal guidelines and its reliance on projected revenues is "a common element of [its] underwriting" because "depending on what the business is going to do with the funds, that's a part of the growth in revenue").

Just because WBL *might* have discovered Agbodjogbe's fraud *if* it had investigated any of these matters further does not mean that WBL was willfully blind for not doing so. In arguing that WBL should have done a more thorough investigation than it did, Al-Sabah argues that "[t]o require any more direct awareness of the fraudulent particulars would collapse the willful blindness standard into one of actual knowledge." Al-Sabah Reply Br. 9. In reality, accepting this argument would transform willful blindness into a mere negligence standard. After all, willful blindness "is a *form* of knowledge, not a *substitute* for knowledge." *State v. McCallum, 583 A.2d 250, 255 (Md. 1991)* (Chasanow, J., concurring). Creative arguments about what more could have been done do not demonstrate that WBL ever knew, or should have known, something nefarious was taking place.

We thus discern no **[*24]** error in the district court's conclusion that WBL was not willfully blind to Agbodjogbe's fraud when it funded Loans One and Two and affirm the district court's judgment as to those claims.

B.

We now turn to WBL's contention that it was not willfully blind to Agbodjogbe's fraud when it funded Loan Three. For WBL to have been willfully blind it must have suspected Agbodjogbe's fraud—that he purchased the Pikesville home, the collateral for Loan Three, using money he fraudulently obtained from Al-Sabah—but "deliberately omit[ted] to make further enquiries, because [it] wishe[d] to remain in ignorance." *Hoffman, 867 A.2d at 302*.

As we discuss below, the district court concluded WBL was willfully blind as to Loan Three, but that conclusion was both legally and factually erroneous.

1.

Briefly recounting the district court's discussion on this point, it found WBL's discovery of the Notice of Lis Pendens on the Pikesville home's title report as particularly significant—"WBL's personnel had knowledge of Agbodjogbe's alleged wrongdoing and

could make the requisite connections to Al-Sabah and the Pikesville [home], but WBL chose not to investigate so that it could quickly close and fund Loan Three." *Al-Sabah II, 2024 WL 263579, at *23.* And "at least eight **[*25]** days before WBL funded Loan Three on March 30, 2017, [WBL] knew that Agbodjogbe had just been sued for fraud by the very person who sent him the large wires and that person, Al-Sabah, contested title to the very property Agbodjogbe pledged as collateral for Loan Three." *Id. at *21.* So, the district court concluded that "the evidence in the record clearly and convincingly shows that WBL was willfully blind to Agbodjogbe's fraud when it elected to fund Loan Three." *Id.*

Underpinning that conclusion was the district court's determination that WBL's reliance on the title insurance policy was unjustified because WBL initiated the reissuance of the policy, while it "was aware that the lis pendens applied to the Pikesville [home]." *Al-Sabah, 2024 WL 263579, at *22.* The court also rejected Pardes' explanation that he "declined to investigate the specifics of the lis pendens any further based on a questionable and improbable belief that the lis pendens applied to a different property." *Id. at *23.* It emphasized what it perceived to be the "glaring problem" with this explanation:

> [O]nly the last page of the Notice of Lis Pendens contains a recording document for an unrelated address[,] and [t]he first twenty-eight pages . . . clearly identify Al-Sabah **[*26]** as the plaintiff against Agbodjogbe in the lis pendens, describe her fraud allegations, and establish that she was contesting title to the Pikesville [home].

*Id. at *22.* This, according to the district court, "refutes Pardes's testimony that the title company omitted the lis pendens from the final title policy because it found the lis pendens 'not to apply' to the Pikesville" home. *Id.*

Likewise, the district court "decline[d] to ascribe any meaningful weight to the form attorney opinion letter WBL obtained the same day it funded Loan Three." *Id.* The district court emphasized that there was "no evidence" whether the attorney who signed the letter knew about the lis pendens or Al-Sabah's fraud suit, and it was "unclear" which title commitments the attorney reviewed. *Id.* So, "given WBL's knowledge of [Al-Sabah's] pending fraud suit," it "makes no sense" for WBL to rely on the attorney to "sufficient[ly] vet[] any potential litigation against Agbodjogbe to the extent it

would impact his loan obligations and accept[] the representations[.]" *Id.*

In the end, the district court concluded that, based on "the totality of all evidence elicited at trial and at depositions[,] . . . WBL was willfully blind to [*27] Agbodjogbe's underlying fraud during its processing of Loan Three." *Id. at *23*. We disagree.

2.

We now look at the information WBL had before it at the time it funded Loan Three, the actions it undertook, and how the district court went awry in reaching its conclusions.

On top of what WBL knew from underwriting the previous loans, it received a title report for the Pikesville home, which confirmed that Agbodjogbe was the owner of the home, but included a notation of an associated lis pendens. WBL sought to resolve the lis pendens so that it could proceed with closing. Fakioglu, WBL's vice president, asked Agbodjogbe about it and learned that he and his attorneys were working on a resolution. The lis pendens notation was relayed to at least three other WBL employees, including the title department manager, and ultimately to Pardes, WBL's COO at the time. But "shortly after" Pardes learned of the lis pendens, WBL received an updated title commitment that omitted it as it "was found not to apply to the subject property." J.A. 217. At that point, all "blemishes to title" were resolved and Pardes did not investigate the lis pendens any further.

WBL acted reasonably when it relied on the independent title [*28] insurance company's issuance of a title policy that omitted the lis pendens and did not include any other exclusions. That is *precisely* the purpose of title insurance—"[a]s an indemnity agreement, the insurer agrees to reimburse the insured for loss or damage sustained as a result of title problems, as long as coverage for the damages incurred is not excluded from the policy." *Stewart Title Guar. Co. v. West, 676 A.2d 953, 360 (Md. Ct. Spec. App. 1996)* (emphasis omitted). In other words, if the title company got it wrong and the lis pendens applied to the Pikesville home, *it* would be on the hook to WBL for damages.[11] But WBL did more even though the title

company's willingness to take on that risk was likely reason enough for it not to investigate further. WBL required another professional opinion, bolstering its decision to proceed with Loan Three: a long-form attorney opinion letter in which, based on his review of several relevant documents, Agbodjogbe's attorney represented that, "[t]o [his] knowledge, after due inquiry, there is no: (a) outstanding judgment . . . against or affecting" N&A Kitchen or Agbodjogbe or any of their properties; "(b) action by any government entity . . . pending or explicitly threatened against or affecting" N&A Kitchen or Agbodjogbe [*29] or any of their properties; or (c) "threatened or pending litigation against [N&A Kitchen or Agbodjogbe] that could adversely impact [their] ability . . . to perform the obligations under the terms of the" loan.[12] J.A. 796.

Like most lenders, WBL routinely obtains long-form attorney opinion letters to vet key issues, relying on counsel to adhere to the appropriate standard of care—"due inquiry." J.A. 219. A lender does so for good reason: it can safely rely on the attorney's representations knowing that the attorney is on the hook if any representations fall through. *See Bennett v. Gentile, 321 A.3d 34, 49-50 (Md. 2024)* (holding a non-client can recover damages from an attorney for negligence if "the intent of the client to benefit the non-client was a direct purpose of the transaction" (quoting *Flaherty v. Weinberg, 492 A.2d 618, 625 (Md. 1985)*)).

So, in broad strokes, WBL knew Al-Sabah sent Agbodjogbe "large sums of money[,]" he had "used at least some of that money to purchase the property he pledged as collateral for Loans One and Two," and the Notice existed. *Al-Sabah, 2024 WL 263579, at *21*. But WBL's affirmative due diligence—which resulted in not one, but two, independent professional opinions, which were further supported by the earlier professional opinion from the CPA, Leichter—led it to reasonably conclude [*30] that no further investigation into the lis pendens notation was necessary. Given the information

---

30, at 3. The "Covered Risks" of that policy "include title in someone else's name, defects in title, encumbrances on title, unmarketable title, and no right of access." W. Scott Tinney, Real Estate Practice in Maryland, in Practice Manual for the Maryland Lawyer (2023).

[12] The attorney also represented that (a) N&A Kitchen "has been duly organized and validly exists as an [LLC] in good standing" in Maryland; and (b) Agbodjogbe has "the power and authority to enter into and perform the obligations under the" loan. J.A. 795.

---

[11] The title policy provides that the insurance company "insures [WBL] in accordance with and subject to the terms . . . set forth in the American Land Title Association Loan Policy (6-17-06), all of which are incorporated herein." ECF No. 137-

it knew at the time, WBL's actions did not amount to willful blindness as a matter of law.

Al-Sabah, like the district court, disagrees. She argues WBL should have done more to run down the source of the lis pendens notation and, if it did, it might have discovered Agbodjogbe's fraudulent scheme. She and the district court are simply wrong, ignoring the totality of what WBL knew and did before proceeding with Loan Three.

We first observe that the district court attributed WBL with more knowledge of Agbodjogbe's fraud than it had by assuming that WBL had seen or reviewed the contents of the Notice and Al-Sabah's complaint. *See, e.g., Al-Sabah II, 2024 WL 263579, at *21* ("[A]t least eight days before WBL funded Loan Three on March 30, 2017, it knew that Agbodjogbe had just been sued for fraud by the very person who sent him the large wires and that person, Al-Sabah, contested title to the very property Agbodjogbe pledged as collateral for Loan Three."); *id. at *22* (rejecting Pardes' explanation that the lis pendens was removed before he reviewed it as it was found to apply to a different property because "only the last page of the Notice **[*31]** of Lis Pendens contains a recording document for an unrelated address"); *id. at *23* (concluding that WBL's "knowledge of, and attention to, Al-Sabah's lis pendens and fraud suit created the conditions for WBL to pursue further investigation"). But as Al-Sabah conceded at oral argument, no evidence shows that anyone at WBL was ever aware of the actual contents of the Notice of Lis Pendens or the *Al-Sabah I* complaint. Oral Argument at 22:41-24:30. Rather, it shows only that WBL knew a lis pendens—associated with fraud litigation between Al-Sabah and Agbodjogbe—existed. The title report did not recount the details of Al-Sabah's claims; it simply noted that a notice of lis pendens was filed without any description of its basis.

The district court's erroneous assumption about WBL's "knowledge" only compounded its primary error: ignoring the input of the independent professional opinions. Start with the title insurance policy. True, WBL "asked the title company to take another look and omit [the title issues] that had belonged to the prior owner or omit [the title issues] that don't belong." *Al-Sabah II,* ECF No. 214, at 112. But such requests are routine in lending transactions. WBL asking the title **[*32]** company "to take another look," rather than the insurer doing so on its own, does not affect the result: the title to the Pikesville home was still insured and the insurer, not

WBL, bore the risk of any title-related issue that might arise. *Al-Sabah II, 2024 WL 263579, at *15* (citation omitted). WBL was fully entitled to rely on the title policy.

The district court also faulted WBL for relying on the "form" attorney opinion letter "given [its] knowledge of [Al-Sabah's] pending fraud suit" because there was no evidence Agbodjogbe's attorney knew of *Al-Sabah I,* and it was "unclear" what title documents the attorney reviewed. *Id. at *22.* Even if the letter was a "form" letter, that is beside the point. Regardless of who wrote the letter, a duly licensed and independent attorney—whom no one argues failed to adhere to the standard of care—signed it and is accountable for its representations. *See Bennett, 321 A.3d at 49-50.* Thus, WBL's reliance on the letter was reasonable and negates any claim of willful blindness.

Hindsight-focused erroneous conclusions led the district court to find willful blindness based on evidence that, at best, shows negligence. Perhaps WBL *could have* sought more. Maybe another lender would have done more, maybe not. But WBL's decision **[*33]** not to is not evidence of a deliberate effort to avoid uncovering Agbodjogbe's fraud. WBL's reliance on multiple independent professional opinions—a gold standard in lending practice—was not "the essence of willful blindness" as the district court found. *Al-Sabah II, 2024 WL 263579, at *23.* It was the mirror opposite. Like the district court found for Loans One and Two, WBL's actions concerning Loan Three are at best "couched in terms of negligence or recklessness and fall short of what the willful blindness standard requires." *Id. at *21.*

* * * *

For these reasons, we hold as a matter of law that WBL was not willfully blind to Agbodjogbe's fraud in funding Loan Three.[13]

_____

[13] Although not dispositive, one more point warrants discussion. As should be clear by now, Al-Sabah's theory of, and the district court's basis of imposing, liability against WBL in this case, centers on the Maryland lis pendens. Assuming Al-Sabah had a valid lis pendens on the Pikesville home (which was at issue with Loan Three), it terminated as a matter of law when the district court in *Al-Sabah I*—Al-Sabah's suit against Agbodjogbe— incorporated its denial of the imposition of the constructive trust over the home into the final judgment, which Al-Sabah did not appeal. *See* Md. R. 12-102(c)(2)(B) (providing that a lis pendens terminates as a matter of law "by entry of a judgment in favor of the defendant,

IV.

To recap, the district court correctly found that WBL was not willfully blind when it funded Loans One and Two but erred in finding that WBL was as to Loan Three. Put directly, WBL was not willfully blind as a matter of law regarding any of the loans at issue here. We therefore affirm the district court's judgment on Loans One and Two, but reverse it on Loan Three and remand this case with instructions to enter final judgment for WBL in all

respects.[14]

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED [\*34] WITH INSTRUCTIONS*

---

**End of Document**

---

if a timely appeal is not taken or the judgment is affirmed on appeal").

The lis pendens here arose from *Al-Sabah I*. Because a lis pendens cannot be based on an action for damages but applies only in "proceedings directly relating to the title to the property[,]" *DeShields, 659 A.2d at 306*, the only basis for the lis pendens was Al-Sabah's request for a constructive trust over the Pikesville home. Most of Al-Sabah's claims went before a jury, but the district court "determined that any request for declaratory and/or equitable relief [including the imposition of a constructive trust] would be decided by the Court in post-trial briefing." *Al-Sabah I*, ECF No. 279, at 4 (No. 1:17cv730). Al-Sabah assigned no error to that decision.

Following the jury trial, the district court entered judgment for Al-Sabah and against Agbodjogbe, consistent with the jury's verdict. *Id.*, ECF No. 259. Shortly after, Al-Sabah moved for the court to impose a constructive trust, arguing that the final judgment previously entered dealt only with "the claims adjudicated by the jury" but did not "end the action[.]" *Id.*, ECF No. 262, at 1 n.1. The district court denied that motion—i.e., it declined to impose a constructive trust—on March 4, 2020, *id.*, ECF No. 279, and entered an "amended order of judgment" on April 20, 2020, *id.*, ECF No. 288. In addition to entering judgment for Al-Sabah for monetary damages, the amended judgment incorporated "[a]ny and all prior rulings made by the Court disposing of any claims against any parties" and "deemed [them] to be a final judgment within the meaning of *Fed. R. Civ. P. 58*." *Id.*

In other words, the amended judgment in *Al-Sabah I* operated as an "entry of a judgment in favor of the defendant [Agbodjogbe]" on this claim. *See* Md. R. 12-102(c)(2)(B). Therefore, any lis pendens related to the Pikesville home terminated as a matter of law when the district court entered the amended judgment on April 20, 2020, nearly 4 years before the district court's decision here. *See id.* It was the district court, not WBL, that caused the lis pendens to expire, and with the expiration of the lis pendens, any equitable lien by Al-Sabah also expired.

Lastly, we simply observe that nothing in the record suggests that there was a corresponding filing of a lis pendens in New York relating to the NYC condo.

---

[14] Because we reverse the district court's judgment awarding compensatory damages for Al-Sabah and remand for entry of final judgment for WBL in all respects, we need not reach Al-Sabah's argument on cross-appeal that the district court's punitive damages award was an abuse of discretion. Al-Sabah Opening Br. 52-57. Lastly, we do not disturb the district court's award of judgment for WBL on Al-Sabah's unjust enrichment claim as it is not before us.